ORIGINAL

# In the United States District Court for the Middle District of Pennsylvania

GREENE/GUILFORD ENVIRONMENTAL
ASSOCIATION, a non-profit corporation incorporated
under the laws of the Commonwealth of Pennsylvania,
CITIZENS FOR PLANNED COMMUNITY GROWTH,   : Civ. No. 1:CV-01-0910
an unincorporated association organized under the laws of
the Commonwealth of Pennsylvania, PAUL B. AMBROSE, :    (Judge Rambo)
JOHN G. ENDERS, CHARLES F. RAHAUSER,
BETSY RAHAUSER, DOUGLAS A. WARNOCK, U.X
VAGNERINI, THOMAS W. BUNDY, STEPHEN P.
BUCHER, ROGER J. ROBERTSON, JAMES A.
STRITE, JR., DAVID A. GUTHRIE

v.

KEN WYKLE, Administrator, Federal Highway
Administration, ROBERT GATZ, Federal
Highway Administration.

FILED
HARRISBURG
AUG 3 1 2001
MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

### MEMORANDUM OF LAW IN SUPPORT OF

### PLAINTIFFS' MOTION FOR LIMITED DISCOVERY IN ADDITION TO THE ADMINISTRATIVE RECORD

### I. PROCEDURAL HISTORY

This lawsuit was filed on May 24, 2001. Accompanying the filing of the Complaint in this action was the filing of the Plaintiffs' Motion for Production of the Administrative Record. An Amended Complaint was filed on June 6, 2001. Plaintiffs' Motion for Production of the Administrative Record was denied without prejudice, subject to the parties' agreement concerning preparation of the Administrative Record.

-1-

A Conference Call between counsel and the Hon. Judge Rambo was held on July 20, 2001. As a result of that Conference, the Administrative Record was required to be produced no later than October 15, 2001 and the Parties were directed to Brief the issue of whether the Plaintiffs were entitled to obtain evidence outside of the Administrative Record to support one of their causes of action. The deadline for the submission of this Motion and supporting Brief was September 15, 2001.

On August 15, 2001, the Defendant filed its Answer to the Complaint, and the Pennsylvania Department of Transportation filed a Motion to Intervene in the case.

## II. STATEMENT OF THE FACTS

On April 2, 1987, the United States Congress adopted the Surface Transportation and Uniform Relocation Assistance Act (STURAA). As part of this legislation, Congress appropriated $5.2 million for a "demonstration project", which would "demonstrate[] how construction of an interchange on a north-south interstate route [would] provide access to Chambersburg, Pennsylvania, and relieve traffic congestion on an existing interchange on such interstate route." Pub. L. No. 100-17, §149(a)(74), 101 Stat. 132, 192 (April 2, 1987). Funding for such a "demonstration project" was secured through the efforts of Representative Bud Shuster for his home Congressional District.

On September 21, 1990 - four years prior to the completion and release of any initial environmental studies that examined preliminary construction alternatives for the location of the proposed Exit 7 interchange, the President and Chairman of the Chambersburg Area Chamber of Commerce sent a letter to Robert Mueser, P.E., District Engineer for the Pennsylvania Department of Transportation ("PennDOT"), recounting a meeting between Mueser, the Chamber, and Ann Eppard - Bud Shuster's Chief of Staff. That letter states:

> We appreciated you taking time to meet with our Chamber Representatives in late July. . . At Ann Eppard's and your suggestion, we developed and instituted a strategy to consolidate support for the exit at a particular location. We put

-2-

considerable effort into the endeavor of choosing the Walker Road location. . .
(*See* Attachment Two to Motion).

On July 6, 1992 - two years prior to the completion of the initial environmental documents which examined preliminary construction alternatives for the location of the proposed Exit 7 interchange - then-Pennsylvania Secretary of Transportation Howard Yerusalim wrote to U.S. Representative Bud Shuster, stating that

> PennDOT is committed to pursuing construction of Exit 7 **at or near Walker Road to service and promote economic development** in the area. It is our intention to satisfy the environmental requirements and to work with you and local interests to complete this project promptly. I will personally guarantee the Governor's and my full attention to the completion of this project.
> We plan to expedite this project.

(*See* Attachment One-A to Motion) (emphasis added).

The July 6th letter from Yerusalim to Shuster was circulated to eight high-level planning, design, and engineering managers at PennDOT. The letter was circulated to the Deputy Secretary for Highway Administration, the Director of the Bureau of Environmental Quality, the District Engineer for the PennDOT Region in which the interchange was proposed, the Director of Communications, the Director of Legislative Affairs, the Director of the Center for Program Development and Management, the Director of the Bureau of Transportation Systems Performance, and the Special Assistant to the Deputy Secretary for Planning. The individuals who received the letter were directly responsible for overseeing the development of the environmental studies and preliminary planning and design for the exit interchange project.

On July 14, 1992, then-Pennsylvania Secretary of Transportation Howard Yerusalim wrote another letter to U.S. Representative Bud Shuster, stating that

> [w]e are now restructuring the project scope by **focusing on the objective to provide access to developing land adjacent to Walker Road.** We will make sure our consultant fully understands the development potential. . . **PennDOT is committed to pursuing construction of Exit 7 at or near Walker Road to service and promote economic development in the area.**

(*See* Attachment One-B to Motion) (emphasis added).

A draft of that letter obtained by the Plaintiffs reveals that highway agency staff

were intimately involved in the decision to predetermine the location of the interchange. In that draft of June 5, 1992, the Secretary of Transportation writes that

> "[a]fter our follow-up meeting of May 13, 1992 in your Washington office, we had further internal discussions between District and Central Office staff. We have formulated the following approach:
> *We will restructure the project scope by adding the objective to provide access to developing land adjacent to Walker Road."

(*See* Attachment One-C to Motion).

In addition to that statement, the Secretary of Transportation then declared that

> "[i]n order to support the need for this project, we will need the cooperation of all interested parties. I suggest a meeting be scheduled with Chambersburg Borough, Greene Township, development interests, county officials, the Department, and your office attending. A show of support will greatly assist the Department in expediting the project schedule. . . "

(*See* Attachment One-C to Motion).

The July 14th letter was circulated to seven high-level design, planning, and engineering managers at PennDOT. The letter was circulated to the Deputy Secretary for Highway Administration, the Director of the Bureau of Environmental Quality, the District Engineer for the PennDOT Region in which the exit was proposed, the Director of Communications, the Director of Legislative Affairs, the Director of the Center for Program Development and Management, the Director of the Bureau of Transportation Systems Performance, and the Deputy Secretary for Planning.

In May of 1994, a Draft Environmental Impact Statement (DEIS) was approved by the Defendants. Through that document, PennDOT selected the Walker Road location for the exit interchange as the "Preferred Alternative." In May of 1995, a Final Environmental Impact Statement (FEIS) was approved by the Defendants. That document selected an Interchange at Walker Road as the "Selected Alternative." On March 24th and 25th, 1999, the Record of Decision ("ROD") for the Interstate 81 Interchange Project was signed by David Lawton of the Eastern Resource Center of FHWA and Ronald W. Carmichael, Division Administrator, FHWA, Pennsylvania Division.

## III. STATEMENT OF QUESTIONS INVOLVED

A. Does it frustrate this Court's "hard look" judicial review to deny the Plaintiffs' request to supplement their claim that the location for the proposed exit was predetermined in violation of federal environmental and historic preservation law?
*Proposed Answer:* Yes.

B. Have the Plaintiffs made a strong showing that the agency acted in bad faith and used extra-record considerations in determining the location of the proposed interchange?
*Proposed Answer:* Yes.

## IV. ARGUMENT

### A. It is Well-Settled Law that Discovery Outside of the Administrative Record is Allowable When the Agency has Acted in Bad Faith or Relied Upon Extra-Record Considerations in Reaching Its Desired Result, and Barring the Plaintiffs from Discovering that Evidence Would Frustrate Judicial Review

Although judicial review of administrative action is generally confined to the administrative record, the U.S. Supreme Court and almost all federal Circuit Courts have held that extra-record evidence is admissible under certain situations. *See, e.g., Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971); *County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368 (2d Cir. 1977); *Sterling Drug v. Federal Trade Comm'n*, 450 F.2d 698 (D.C. Cir. 1971); *Madison County Bldg. & Loan Ass'n v. Federal Home Loan Bank Board*, 622 F.2d 393 (8th Cir. 1980); *Animal Defense Council v. Hodel*, 867 F.2d 1244 (9th Cir. 1989).

The United States Supreme Court, in *Camp v. Pitts*, 411 U.S. 138 (1973), explained that the overriding standard for the admission of extra-record evidence was whether the agency's explanation of certain decisions is so inadequate that review

solely upon the record frustrates "effective judicial review."

While the Third Circuit Court of Appeals and this Court have decided several National Environmental Policy Act (NEPA) cases involving a review based on an administrative record, they have never addressed the precise question presented by this Motion: whether the Plaintiffs may introduce extra-record evidence when they have made a strong showing that the defendant agency acted in bad faith and relied upon extra-record considerations when determining the location for the proposed interchange.

Although the Third Circuit Court of Appeals and this Court have not previously addressed the central issue raised by the Plaintiffs, the Courts have enunciated a core concern which may serve to defeat the Plaintiffs' request to introduce extra-record evidence. Namely, if the Plaintiffs have failed to "forcefully" raise their concerns to the agency during the agency's decisionmaking process, the petitioners may then be barred from seeking extra-record evidence which could have feasibly been introduced during the agency process. A brief review of that caselaw and of the Plaintiffs' participation in the administrative review process reveals that the Third Circuit's concern has been satisfied by the Plaintiffs in this case.

In *The Township of Lower Alloways Creek v. Public Service Electric & Gas Company*, 687 F.2d 687, the Third Circuit - in ruling on a challenge by a local government to the Nuclear Regulatory Commission's failure to prepare an environmental impact statement before approving an expansion of a nuclear reactor spent fuel pool - addressed the appropriate general standard of review and the burden to be met by those parties challenging an agency's decision not to prepare an Environmental Impact Statement under NEPA.

First, that Court determined that the "reasonableness" standard of review - rather than the more lenient "arbitrary and capricious" standard should be applied, and identified three relevant inquiries that a review should undertake. Those inquiries

included whether the agency took a "hard look" at the environmental consequences of the action, whether the agency identified the relevant areas of environmental concern, and whether the agency made a "convincing" case that the impacts were insignificant. *Id.* at 742. Thus, this "higher scrutiny on review" has been adopted by the Third Circuit as the reviewing standard for general challenges to an agency's compliance with NEPA mandates.

Second, and of greater relevancy to the Motion before this Court, was the Third Circuit's discussion of the duty of the Plaintiffs to meaningfully participate in the study process conducted by the agency in making NEPA determinations. At issue was the petitioners' general claims that the decision by the agency not to prepare an EIS constituted a violation of NEPA, and the petitioners' subsequent failure to raise specific arguments to the agency during the course of the agency's decisionmaking process. The Court held that raising general concerns was inadequate to advance specific claims, and that comments by the petitioners must "show why the mistake was of possible significance in the results." *Id.* at 743.

Although it has been explicitly recognized by this Court that the *Lower Alloways Creek* decision did "not precisely address whether plaintiffs challenging the sufficiency of an FEIS in a district court may introduce evidence outside of the administrative record", this Court has ruled that petitioners should only be allowed to raise claims which have been "fully and forcefully" presented to the agency during the study process. *See Don't Ruin Our Park v. Stone*, 749 F. Supp. 1388 (M.D. PA 1990); *Pennsylvania Protect Our Water v. Appalachian Reg. Com'n*, 574 F. Supp. 1203 (M.D. PA 1982). The focus on the petitioners' participation in the agency process is derived from the necessity that administrative proceedings not be merely a forum for the Plaintiffs to raise "cryptic and obscure" references to matters that "ought to be" considered by the agency. *Lower Alloways Creek* at 743.

In *Pennsylvania Protect Our Water v. Appalachian Reg. Com'n*, this Court held

that the *Lower Alloways Creek* ruling gave a "strong signal" that extra-record evidence - not presented to the agency by the petitioners during the administrative process - is inadmissible. 574 F. Supp. at 1214. In that case, several environmental groups had brought an action to enjoin the continued development of a recreational area, a civic arena, a motor inn complex, and access road. While most of the development was supported by state monies, federal funds were used to construct the access road. Due to the use of federal funds, the Federal Highway Administration prepared an Environmental Impact Statement. The plaintiffs' action included challenges to the adequacy of that Statement.

In deciding that plaintiffs (and defendants) were barred from introducing extra-record testimony, this Court reasoned that the parties should be limited to arguing the evidence "placed before the agency during development of the administrative record" instead of being allowed to develop completely new arguments in the reviewing Court. *Id.* at 1215. The Court's concern was that the plaintiffs had not brought "their concerns to the agency's attention in a forceful manner" or pointed out that "their concerns were brought to the agency's attention by others." *Id.*

In *Don't Ruin Our Park v. Stone*, this Court dealt with a similar situation - in which the Plaintiffs brought suit challenging the use of an airport in a state forest in the absence of environmental reviews. 749 F. Supp. 1388 (1990). A hearing was scheduled to receive testimony on the merits of the case, and the Defendant filed a motion to limit this Court's consideration to the administrative record prepared in support of the National Guard Aviation Unit's decision not to prepare an environmental review.

In deciding to grant the Defendant's motion, this Court quoted with approval the *Pennsylvania Protect our Water* ruling, and stated that the challenge to the Guard's decision had to be made on the basis of the administrative record. In making that determination, this Court underscored the importance of requiring the Plaintiffs to present their arguments to the agency via the administrative record. *Id.* at 1391.

In considering the Motion currently before this Court, however, it is clear that neither the *Lower Alloways Creek* ruling nor this Court's previous rulings apply to the specific issue of whether the Plaintiffs in this case should be allowed to pursue extra-record evidence when they have made a substantial showing that the agency acted in bad faith and relied upon political considerations in place of the objective study process mandated by NEPA.

As reviewed in the second part of this Brief, the Plaintiffs have clearly satisfied the central concern enunciated by *Lower Alloways Creek* by fully participating in the administrative review process and raising predetermination concerns through various submissions to the Defendant beginning as early as four years prior to the issuance of the Record of Decision (ROD) for the interchange.

Whereas courts within the Third Circuit have not addressed the precise issue raised by the Plaintiffs, the United States Supreme Court and a majority of Circuit Courts have ruled that the admission of extra-record evidence may be necessary when an agency has acted in "bad faith" or has relied on extra-record considerations. The U.S. Supreme Court, in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971), has explicitly held that an extra-record inquiry may be necessary when there is a "strong showing of bad faith or improper behavior" and when "effective judicial review" may be achieved only by "examining the decisionmakers themselves." *Id.* at 419-420.

Almost all of the Circuit Courts which have addressed the issue of extra-record review in NEPA cases have adopted the standard enunciated by the Ninth Circuit Court of Appeals in *Animal Defense Council v. Hodel*, 867 F.2d 1244 (9th Cir. 1988). That standard - derived from the *Overton Park* decision - enables the Plaintiffs to introduce extra-record testimony when the Plaintiffs have shown "bad faith" on the part of the agency or if the agency used extra-record considerations in arriving at its determinations. *See, e.g. Preserve Endangered Areas of Cobb's History v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242 (11th Cir. 1996); *USA Group Loan Servs. v. Riley*, 82 F.3d

708 (7th Cir. 1996); *Franklin Sav. Ass'n Director, Office of Thrift Supervision*, 934 F.2d 1127 (10th Cir. 1991); *Mt. Clemens v. United States EPA*, 917 F.2d 908 (6th Cir. 1991).

In *Animal Defense Council v. Hodel*, the Ninth Circuit Court of Appeals dealt with a challenge to the adequacy of an Environmental Impact Statement prepared by the Bureau of Reclamation of the U.S. Department of the Interior for an Aqueduct project in Arizona. In the EIS, the agency discussed two primary sets of alternatives - one set which would construct the route on the west side of the Tucson Mountains and one set which would construct the route on the east side of the Mountains. *Id.* at 1434. In ruling on a motion submitted by the Bureau, the Court limited the scope of its review to the administrative record, allowing the Plaintiffs to supplement the record only if they provided the Court with "adequate justification." *Id.* at 1435.

In affirming the determination of the District Court that extra-record evidence could be introduced if there was "adequate justification" for doing so, the Court of Appeals reaffirmed that extra-record evidence would be admissible under several scenarios, including whether the EIS "neglected to mention a serious environmental consequence," "failed adequately to discuss some reasonable alternative," or otherwise "swept stubborn problems or serious criticism. . . under the rug." *Id.* at 1437 (*quoting Suffolk v. Secretary of the Interior*, 562 F. 2d 1368 (2nd Cir. 1977), *cert denied*, 434 U.S. 1064 (1978). The Court of Appeals also declared that a showing of "agency bad faith" would constitute grounds for the granting of discovery. *Id.*

Although the Court affirmed the lower court's decision that the Plaintiffs had failed to make such a showing, the Court examined the Plaintiffs' contention that the Bureau "knew before issuing the EIS" that a $40 million canal, included in the Bureau's estimated cost of the Plaintiffs' favored plan, would not be constructed. *Id.* at 1437. In finding that the Plaintiffs had failed to sufficiently support their claim of bad faith, the Court held that Record suggested that the "Bureau had a good faith belief that the canal" would have to be built and that the Plaintiffs had not rebutted that presumption

-10-

by making a showing that the agency acted due to other motives. *Id.*

Under the standard enunciated in *Animal Defense Council*, it is clear that the Plaintiffs have advanced "adequate justification" (*Animal Defense Council* at 1435) to obtain discovery of extra-record evidence to supplement their claim that the agencies determined the location of the exit interchange prior to complying with the legal mandates of the applicable federal laws.

B. The Plaintiffs' Full and Forceful Participation in the Administrative Review Process, the Plaintiffs' Showing of Agency Bad Faith and Reliance Upon Extra-Record Considerations, and the Resulting Frustration of Effective Judicial Review in the Absence of Additional Discovery Necessitates the Granting of Limited Discovery.

As the administrative record will indicate, the Plaintiffs have fully and forcefully participated in the administrative review process for the proposed interchange. That participation began - with many of the Plaintiffs - with the submission of comments and oral testimony to the highway agencies prior to the release of the Draft Environmental Impact Statement. As admitted by the Defendant, one of the Plaintiff organizations was even granted official status as a "consulting party" on the section 106 historic review process for the interchange. *See* Answer of FHWA at 4.

Upon discovery of the illuminating Shuster/Yerusalim letters by the Plaintiffs in 1995 - four years prior to the issuance of the Record of Decision for the project - the Plaintiffs raised the predetermination issue in each and every administrative forum available to them.

Beginning in July 31, 1995 and extending to the date of the issuance of the Record of Decision, the precise issue of predetermination - and the Shuster/Yerusalim exchange of letters - was raised in a myriad of documents submitted to the highway agencies by the Plaintiffs and other parties. Those include:

- A July 31, 1995 submission to PennDOT by a law firm on behalf of the Greene Township, Franklin County Board of Supervisors;

- The Greene Township Board of Supervisors' *Comments on the Cultural Resources Section of the Interstate 81 Interchange Final Environmental Impact Statement* dated July 31, 1995;

- A December 8, 1995 submission to the National Park Service which was delivered to the FHWA and PennDOT;

- A January 11, 1996 submission by the Greene Township Board of Supervisors to Governor Ridge which was circulated to one of the highway agencies;

- A January 26, 1996 submission to the U.S. Department of Transportation's Office of Inspector General raising the issue of the predetermination of the exit location;

- A March 4, 1996 letter to the FHWA's Office of Inspector General requesting an investigation concerning the apparent predetermination of the location of the exit interchange;

- A March 18, 1998 presentation by Plaintiff Paul Ambrose to the State Transportation Commission, asking that the Commission remove the Ext 7 Project from the Commonwealth's Twelve Year Transportation Program, due to the predetermination of the project location;

- A July 2, 1998 submission by the Greene Township Board of Supervisors on historic preservation issues, which was circulated to the highway agencies;

- An October 8, 1998 submission by Plaintiff Citizens for Planned Community Growth to the Inspector General of Pennsylvania which was circulated to the highway agencies;

- An October 16, 1998 submission to the Office of Inspector General of the U.S. Department of Transportation, and circulated to the highway agencies by Plaintiff Citizens for Planned Community Growth raising concerns about the predetermination of the project location;

- An October 23, 1998 submission by the Greene Township Board of Supervisors to the Advisory Council on Historic Preservation, which was circulated to the highway agencies;

- A January 13, 1999 submission to the FHWA by Plaintiff Greene-Guilford Environmental Association;

- A January, 1999 "Evaluation of Traffic Impacts" of the proposed Exit, submitted by the Greene Township Supervisors;

- A February 24, 1999 letter to the Advisory Council on Historic Preservation from the Greene Township Supervisors, which was circulated to the highway agencies; and

- A March 2, 1999 letter from Plaintiff Greene-Guilford Environmental Association to the Advisory Council on Historic Preservation which was circulated to the highway agencies.

In recognition of the concerns expressed by the Plaintiffs to the FHWA's Office of Inspector General in March of 1996, the Inspector General requested a response to the Plaintiffs' Complaint from the FHWA's Office of Planning and Program Development in Baltimore. In its reply of July 3, 1996, that Regional office downplayed the Complaint and dismissed the predetermination claim (and the Shuster/Yerusalim letters) with the statement that it was "human nature to find flaws with any process that does not yield a

-13-

personal preference." (*See* Attachment Three to Motion). The Office then confirmed that "the FHWA was made aware of these letters in July 1995 when they were included as part of the comments a local government submitted on the FEIS." Finally, in an illuminating statement, the Office explained that "we consider Mr. Yerusalim's letters regrettable. . . "*Id.*

Although the FHWA was "made aware of these letters in July 1995", no efforts by the highway agency were made in the Record of Decision to address the predetermination concerns. In the ROD, while the agency acknowledged the comment that "the decision-making process has been flawed; the project need and alternatives development process had a predetermined outcome", the agency utterly failed to address the concern - and simply reaffirmed its opinion that the project had complied with state and federal mandates. *See* Attachment Four to Motion.

Clearly, even a brief review of the Plaintiffs' submissions and comments show that they have fully and forcefully participated in the administrative review process. They have thus satisfied the central concern expressed by the *Lower Alloways Creek* court in determining whether the Plaintiffs should be entitled to seek extra-record evidence.

The Plaintiffs have also satisfied the *Animal Defense Council* standard of review by making a substantial showing that the agency acted in bad faith by predetermining the location of the interchange, and that the agency relied on extra-record considerations in determining the location of the interchange. At this point, to ensure effective judicial review and to determine the extent of the predetermination, the Plaintiffs must be allowed to conduct limited discovery to supplement their claim that the location for the exit interchange was predetermined.

Although currently not privy to the entire administrative record, the predetermination of the location of the exit interchange was of such a blatant character that the Plaintiffs have been able to obtain evidence of predetermination from the files of the highway agencies as early as mid-1995. That evidence, as recounted at length in

both the Complaint and this Memorandum of Law, consists of explicit promises and statements of fact made by the highest-ranking member of the highway agency responsible for preparing the documents to comply with the mandates of the National Environmental Policy Act and other federal laws. Those explicit promises include not only statements that the location for the road had already been predetermined as of early 1992, but also that the road was being constructed to "service and promote economic development in the area" - a goal not stated in the legislation which established the funding and purpose of this "demonstration project."

Clearly, the Plaintiffs have made a substantial showing of agency bad faith and reliance upon extra-record considerations, such that the lack of additional evidence on these issues may frustrate this Court's "hard look" judicial review at the agencies' compliance with the mandates of the National Environmental Policy Act and other applicable federal laws. As such, the Plaintiffs have satisfied the standards and concerns voiced both by the Third Circuit, by this Court, and by the Circuit Courts across the country which have addressed the precise issue raised by the Plaintiffs in this Motion.

## V. CONCLUSION

For the above reasons, this Court should GRANT the Motion for Limited Discovery submitted by the Plaintiffs in this case, subject to the limitations expressed in the proposed Order which accompanies the Motion.

Respectfully Submitted this 30th Day of August, 2001,

Thomas Alan Linzey, Esq.
Community Environmental Legal Defense Fund (CELDF)
2859 Scotland Road
Chambersburg, Pennsylvania 17201