# ORIGINAL

## UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREENE/GUILFORD ENVIRONMENTAL : 
ASSOCIATION, a non-profit corporation : 
incorporated under the laws of the : 
Commonwealth of Pennsylvania, CITIZENS : 
FOR PLANNED COMMUNITY GROWTH, : 
an unincorporated association organized :    CIVIL ACTION NO.
under the laws of the Commonwealth of :    1:CV-01-0910
Pennsylvania, PAUL B. AMBROSE, JOHN G. : 
ENDERS, CHARLES F. RAHAUSER, BETSY :    (Judge Rambo)
RAHAUSER, DOUGLAS A. WARNOCK, U.X. : 
VAGNERINI, THOMAS W. BUNDY, : 
STEPHEN P. BUCHER, ROGER J. : 
ROBERTSON, JAMES A. STRITE, JR., DAVID : 
A. GUTHRIE, : 
           Plaintiffs : 
   : 
      v. : 
   : 
KEN WYKLE, Administrator, Federal : 
Highway Administration, ROBERT GATZ, : 
Federal Highway Administration, : 
         Defendants : 
   : 
      and : 
   : 
BRADLEY L. MALLORY, Secretary for : 
The Department of Transportation, : 
Commonwealth of Pennsylvania, : 
         Intervenor. : 



**EXHIBITS TO DEFENDANTS' AND INTERVENOR'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION FOR LIMITED DISCOVERY
IN ADDITION TO THE ADMINISTRATIVE RECORD**



MANKO
GOLD &
KATCHER

SUITE 500
401 CITY AVENUE
BALA CYNWYD PA 19004

(610) 660-5700
(610) 660-5711 FAX

JOSEPH M. MANKO
MARC E. GOLD
BRUCE S. KATCHER
ELIZABETH J. HOENIG
KENNETH J. WARREN
NEIL S. WITKES
MICHAEL M. MEIZLISH
ROBERT D. FOX
STEPHEN T. MANNO
JILL H. HYMAN
DAVID H. MOSKOWITZ
PAMELA M. WEILERSTEIN
JONATHAN H. SPERGEL
RANDY I. GELBLICK
JOHN F. GULLACE
BART E. CASSIDY
MATTHEW H. CARDEN
BRENDA HUSTIS GOTANDA
JONATHAN H. SPERGEL

*ALSO ADMITTED IN NJ

NEW JERSEY OFFICE:
SUITE 180
1 EVES DRIVE
MARLTON NJ 08053
(609) 596-4062
(609) 596-7299 FAX

AN
ENVIRONMENTAL
LAW PRACTICE

July 31, 1995

**VIA OVERNIGHT DELIVERY**
Lester L. Nace, P.E.
Project Manager
Pennsylvania Department of Transportation
Engineering District 8-0
2140 Herr Street
Harrisburg, PA 17103-1699

Re:  Interstate 81 Interchange
     Franklin County, Pennsylvania
     S.R. 8016
     **Final Environmental Impact Statement**

Dear Mr. Nace:

On June 14, 1995, the Pennsylvania Department of Transportation ("PennDOT") transmitted to the Greene Township Board of Supervisors a Final Environmental Impact Statement ("FEIS") prepared by PennDOT in cooperation with the Federal Highway Administration ("FHWA") in response to requirements emanating under the National Environmental Policy Act ("NEPA"). The FEIS describes studies performed by PennDOT and FHWA in connection with a proposal to construct an additional interchange along Interstate Route 81 ("I-81") near Chambersburg, Franklin County, Pennsylvania.

In the FEIS, PennDOT discussed five alternative locations for the proposed interchange as well as the option of not constructing the proposed interchange. PennDOT rejected three of the proposed alternatives (Alternatives B, C and D) because they would have an adverse impact on historic resources protected pursuant to 49 U.S.C. § 303 (commonly referred to as Section 4(f)). From the two remaining alternatives (Alternatives B-1 and D-C), PennDOT recommended that Alternative D-C be chosen as the "selected alternative." The selected alternative involves constructing an interchange in an undeveloped, agricultural portion of Greene Township, Franklin County

1

43554

---

**RESPONSE TO MANKO, GOLD, AND KATCHER (JULY 31, 1995)**

**Response No. 1:**  The FEIS states that Alternatives B, C, and D will require property from a historic resource or from a contributing element within a historic district.  Alternative D-C does not require the use of historic resources identified as of the May 1995 circulation of the FEIS.  Alternative B-1, the other alternative which avoids the use of any property protected by 49 U.S.C. §303, has been determined not to meet the project need.  Following the determination of eligibility of the Christian Fry, Jr. House/Fry Property by the Keeper in her letter of June 27, 1997, Alternative D-C would require the use of an historic resource.  To avoid the use of an historic resource, Alternative D was modified.  Alternative D Modified does not require the use of any resource protected by 49 U.S.C. §303.  Alternative D Modified does meet the needs of the project which are to provide access to Chambersburg and relieve congestion on an existing interchange (Public Law 100-17), accommodate existing and future traffic volumes, and provide for existing and proposed development.  Construction of Alternative D Modified would provide access to Chambersburg via a network of local roads, including Walker Road, Kohler Road, Grand Point Road, and Norland Avenue if the extension of Norland Avenue from Fifth Avenue to Walker Road is open to traffic.  Alternative D Modified would improve the Level of Service (LOS) and reduce the volume to capacity ratio of the critical U.S. Route 30/Walker Road Interaction.  Alternative D Modified would remove a minimum of 6,000 vehicles from the I-81/U.S. Route 30 Interchange.  When combined with other expected network improvements, congestion at the U.S. Route 30/Walker Road/I-81 interchange area would be reduced by as much as 60% over the No-Build Alternative, providing for acceptable or near acceptable levels of service.

Pursuant to the Administrative Code of 1929, Pennsylvania Act 1979-100, as amended, ALCAB is an independent board that has jurisdiction over condemnations for highway purposes, "but not including activities relating to existing highways such as, but not limited to, widening roadways, the elimination of curves or reconstruction." – 71 P.S. §106(d)(1).  The Agricultural Area Security Law, Pennsylvania Act 1891-43, as amended, contains a similar jurisdictional statement with regard to lands included in an Agricultural Security Area (ASA) – 3 P.S. §913(d)(2)(i).  Pennsylvania courts have construed language such as "but not limited to" as a term of enlargement, not limitation.  Accordingly, the General Assembly intended to exclude other types of projects that relate to existing highways from ALCAB jurisdiction and not just the examples described in the law.  The current project at issue – whereby an interstate highway is to be constructed at the intersection of two existing highways (a four-lane, limited access interstate highway and a Township Road) with the accompanying geometrical improvements and widening of the existing highways, constitutes an activity relating to existing highways and is therefore exempt from ALCAB jurisdiction as a matter of law.

Greene Township's 1985 Comprehensive Plan identified an I-81 interchange within its boundaries.  However, in 1994, after the project was initiated, Greene Township revised its Comprehensive Plan to oppose an interchange.  The area where Walker Road crosses I-81 is zoned residential by Greene Township.

Lester L. Nace, P.E.
July 31, 1995
Page 2

near Walker Road. PennDOT identified Alternative D-C as the selected alternative despite the fact that this alternative will require the use of resources protected under the National Historic Preservation Act of 1966 ("NHPA") and Section 4(f), will result in the taking of agricultural lands protected under Pennsylvania law, is inconsistent with Greene Township's planning goals, and will not address the purported need for the project.

The Greene Township Board of Supervisors (the "Board of Supervisors") individually and on behalf of the residents of Greene Township has reviewed the FEIS as well as other documentation relating to PennDOT's evaluation of alternatives for the proposed interchange. As PennDOT and FHWA are aware, the Board of Supervisors has taken an active role in reviewing studies conducted by PennDOT and FHWA concerning the project and providing comments to PennDOT and FHWA regarding such studies. For example, the Board of Supervisors submitted to PennDOT on July 25, 1994, extensive comments regarding the Draft Environmental Impact Statement ("DEIS") for the project. Representatives of the Board of Supervisors have also participated in municipal coordination meetings conducted by PennDOT and FHWA, and have submitted extensive correspondence and documentation concerning historic resources in the area surrounding the proposed location for Alternative D-C.    **1**

The Board of Supervisors continues to believe that there are numerous and significant procedural and substantive flaws associated with the studies performed by PennDOT and FHWA which are summarized in the FEIS. Accordingly, as provided in PennDOT's letter accompanying the FEIS and pursuant to 23 C.F.R. § 771.123(g), we are hereby submitting comments on behalf of the Board of Supervisors to PennDOT discussing certain of the defects that our review of the FEIS has revealed.[1] We are also incorporating by reference the comments, information, and correspondence previously submitted to PennDOT and FHWA in connection with this project which should be treated as if fully set forth herein. A nonexhaustive list of key submissions is attached hereto as Exhibit "B." We strongly believe that in the face of the information presently before PennDOT and as set forth in these comments, construction of PennDOT's selected alternative, Alternative D-C, would be arbitrary, capricious, an abuse of discretion, and not in accordance with applicable law.    **2**

---

[1] In its letter accompanying the FEIS of June 14, 1995, PennDOT requested that comments concerning the FEIS be submitted by July 17, 1995. By letters dated July 13, 1995, and July 25, 1995, FHWA agreed to extend this deadline for submission of comments by the Board of Supervisors to August 1, 1995. Copies of FHWA's letters confirming this short extension of time for submission of comments are attached hereto as Exhibit "A."

Response No. 2: Comment noted. FHWA does not find facts to substantiate the accusations.

4353A

- 74 -

Lester L. Nace, P.E.
July 31, 1995
Page 3

Because of the numerous legal and technical issues raised by the contents of the FEIS, we have divided our comments into sections to address various aspects of the project. For ease of reference, certain of these topics including cultural resources and farmlands are discussed in individual reports which are included herewith and incorporated fully herein. We have also included certain exhibits with these comments which are incorporated fully herein. In addition, as part of our comments, Nassaux-Hemsley, Inc. is submitting concurrently on behalf of the Board of Supervisors further information and reports concerning issues raised by the FEIS.

Along with the reports and appendices that are included with this letter, we are setting forth below additional concerns relating to the FEIS which, in and of themselves, justify selection of another alternative for the proposed interchange. For ease of review, these concerns are organized under specific topic headings.

Finally, we note that after the FEIS was provided to the Board of Supervisors, PennDOT agreed to make its files regarding this project available for review. These files contain numerous documents and reports relating to this project. We assume that these files form a part of the administrative record developed in connection with this project and it is therefore unnecessary to supply PennDOT and FHWA with copies of documents made available for our review and which are already in PennDOT's files. Please advise us immediately if the foregoing is not the case.

**1.    Project Need**

    **a.    Background**

The genesis for this project arises out of legislation adopted by Congress in 1987. As part of the legislative process, Representative Bud Shuster inserted into this legislation the authorization for a "demonstration" interchange project near Chambersburg located within his home congressional district.

Specifically, Section 149(a) of the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA") provides for demonstration and priority surface transportation projects including the following:

    The Secretary shall carry out a highway project which
    demonstrates how construction of an interchange on a north-
    south interstate route will provide access to Chambersburg,

3

43534

Lester L. Nace, P.E.
July 31, 1995
Page 4

Pennsylvania, and relieve traffic congestion on an existing interchange on such interstate route.

Pub. L. No. 100-17, § 149(a)(74), 101 Stat. 132, 192 (April 2, 1987).

This statutory provision defines the purpose for the project assessed in the FEIS. Specifically, by going forward with the proposed interchange along I-81, PennDOT and FHWA must be able to demonstrate that the interchange (1) will provide access to Chambersburg and (2) will relieve traffic congestion "on" one of the existing interchanges along I-81 near Chambersburg.

In a letter to Howard Yerusalim, Secretary of PennDOT, dated April 14, 1992, Representative Shuster described the inclusion of funding in STURAA for an additional interchange along I-81 near Chambersburg as "a major accomplishment for me." Moreover, notwithstanding the rationale for the project described in STURAA, Representative Shuster stated in this letter that "[t]his project was included in the legislation to benefit an area congested by daily traffic and open up new areas of Chambersburg for development". A copy of this letter is attached hereto as Exhibit "C."

Representative Shuster's letter underscores the wholly ephemeral character of the purported need for the project. The provisions of STURAA are relatively specific in the goals which the project is supposed to achieve -- providing access to Chambersburg and relieving congestion on one of the existing interchanges in the Chambersburg area along I-81. However, as part of an initial effort to demonstrate that the project could be justified, and later as part of a scheme by PennDOT and FHWA to exclude alternatives other than Alternative D-C from satisfying the "need" for the project, the need for the project has been described elsewhere in a variety of more contrived and expansive terms.

b.    Efforts to Identify a Need for the Project

The FEIS describes the "needs" for the project as follows:

The needs for the proposed I-81 interchange demonstration project are:

● complying with a Congressionally-legislated demonstration project to provide access to Chambersburg and to relieve congestion on an existing interchange (Public Law 100-17);

Response No. 4: The need of the project, defined in the EIS, is to comply with Public Law 100-17 -- to relieve congestion on an existing interchange and provide access to Chambersburg (FEIS, Section I). Both the Kriner Road Interchange and the Walker Road Interchange alternatives were addressed in the DEIS. The U.S. Route 30 Interchange carries the largest volume of traffic in the Chambersburg area. If construction of an interchange on I-81 is to relieve traffic congestion on an existing interchange, it is then prudent and reasonable to relieve congestion on the interchange which is currently, and in the future will be, experiencing the worst congestion.   The Kriner Road interchange relieves congestion at S.R. 0316.  However, S.R. 0316 with the construction of planned improvements and without the interchange will accommodate the existing and future traffic.  There is no need to build an interchange at Kriner Road.

4

43354

- 76 -

Lester L. Nace, P.E.
July 31, 1995
Page 5

- accommodating existing and future traffic volumes;

- adhering to comprehensive plans of area municipalities; and

- providing for existing and proposed development in the study area.

FEIS at p. 1-1.

While the first of the four "needs" listed above corresponds to the statutory mandate set forth in STURAA to construct a demonstration project, the remaining three identified "needs" are nowhere mentioned in the statute. Instead, it appears that PennDOT and FHWA have crafted these "needs" out of whole cloth to provide a context in which to justify their decisions regarding the project. (The fundamental flaws that have infected the study process relating to this project are discussed in more detail in later sections of this submission.)

PennDOT's struggles to legitimize this project are highlighted in documents recently found during an inspection of PennDOT's files concerning the project. Internal memoranda reflect the fact that during 1991 and 1992, more than four years after the project had been identified in STURAA for funding, PennDOT continued to have great difficulty in establishing a need for the project. According to internal PennDOT meeting minutes prepared by Jim DiLouie concerning a meeting held on September 26, 1991, "[t]he development of project need is top priority." These minutes also state that "[j]ust because project need can't be successfully defended before the Transportation Project Development Interagency Coordination Committee doesn't mean that the project has to be stopped. (Note: Presentations before this committee on June 28, 1989, and June 27, 1990, have been extremely unsuccessful, most of which is because this is a Federal Demonstration Project.)" In addition, these minutes reflect the fact that at that point in time, PennDOT was using two separate consultants in an effort to identify a need for the project.

Internal PennDOT minutes prepared by Jim DiLouie of subsequent meetings document continuing difficulties on this front. For example, these minutes indicate that a meeting was held on October 28, 1991, for purposes of further discussing project need. The minutes identify a multitude of theories which were offered to help justify the project, many of which appear to have been almost immediately rejected. In addition, a meeting was held on April 16, 1992, to discuss the project. The minutes of this meeting concede that "[t]here may be no solid project need at this time, but a decision still needs to be made as to what to do with the project. The problems with the build alternatives include the inability to divert sufficient traffic from a major east-west route (such as U.S. Route 30) and the placing of any

5

**Response No. 5:** In its Transportation Project Development Process Environmental Impact Statement Handbook (Publication 278) and (Project) Needs Study Handbook (Publication 319), PennDOT has established procedures and guidelines for determining need for all projects. Within those guidelines are listed eight principal factors to judge the need for a project. These eight factors are: Master Planning Consistency; Transportation Demand; Governmental Authority; Social Service Demand; Economic Development; Structural Conditions; Social, Economic, and Environmental Effects of Taking No Action; and Right-of-Way Preservation Plan. In 1994, before publication of the DEIS, PennDOT personnel reviewed the criteria set forth in determining need and confirmed the need of the I-81 Interchange project. The legislative (Governmental Authority) need has been evident since 1987.

Public Law 100-17 states that an interchange is to be constructed that provides access to Chambersburg and relieves traffic congestion on an existing interchange. Traffic congestion relief must accommodate existing and future traffic. Without an additional interchange, traffic will be forced to use an existing interchange; therefore accommodating existing and future traffic volumes meets the intention of Public Law 100-17. Alternative D Modified would serve traffic volumes ranging from approximately 8,000 vehicles per day to approximately 10,900 vehicles per day, depending on the combination of other roadway improvements (U.S. Route 30 Improvements and Norland Avenue Extension).

Municipality comprehensive plans are the key source for assessing planned future growth. Traffic predictions are based on the best available information and comprehensive plans define the wishes of the municipalities. The traffic modeling used the comprehensive plans and interviews with local municipal officials to determine growth rates and planned growth areas of the local municipalities. The land use plans determine future traffic levels and patterns, and these levels and patterns help in identifying the best location for an interchange that will relieve traffic congestion on an existing interchange thereby conforming to Public Law 100-17.

A press release (1993) that was reviewed by the participating parties, including representatives of Greene Township, in the Winsor roundtable discussions states "Other points on which the groups reached concurrence were: ... Irrespective of whether an exit is built at Walker Road, development will occur in the northeast quadrant of the Greene and the adjacent area of Greene Township . . ." An Environmental Impact Statement for a transportation project identifies where growth is proposed and accommodates the corresponding transportation need.

**Response No. 6:** As described in the 1995 and 1998 traffic studies, an interchange at Walker Road would serve approximately 9,000-10,000 vehicles per day, depending on the combination of other roadway improvements (U.S. Route 30 Improvements and Norland Avenue Extension). Traffic will increase on local roadways with or without an interchange at Walker Road due to existing and planned development.

6

43534

Lester L. Nace, P.E.
July 31, 1995
Page 6

diverted traffic on a rural road network incapable of handling more traffic in its present condition."

These findings are also reflected in a briefing paper concerning the project prepared by Barry Hoffman of PennDOT dated April 27, 1992. This document confirms that "[a]fter thoroughly reviewing the data collected thus far, McCormick Taylor [one of PennDOT's consultants] has been unable to develop a project need which will satisfy TPDICM [Transportation Project Development Interagency Coordination Meeting). The District is reluctant to meet with agencies without having established a reasonable project need." (Emphasis added.) The briefing paper also indicates that PennDOT was at that time considering whether to suspend the project, place the project on hold pending future land use changes "that could justify project need," or expand the studies performed to date with the hope of identifying a project need.[3]

The absurdity of the process described in PennDOT's internal records is self-evident. After four years of studies relating to the project and the efforts of two separate consulting firms to identify a need for the project, PennDOT in the spring of 1992 was still not in a position to explain the need for the project beyond the statutory mandate creating this "demonstration" project. This reflects a planning process turned on its head. Instead of evaluating alternatives to address a compelling public need justifying governmental action (as is normally the case with legitimate projects conceived to address pressing transportation problems), PennDOT and its consultants engaged in elaborate efforts to concoct, after the fact, a need for a project which Congress had funded five years earlier. By PennDOT's own admission, these efforts met with little or no success.

**c.     Intervention by Representative Shuster**

At approximately the same time that PennDOT was evaluating whether to place the project on hold, suspend the project indefinitely or continue its fruitless efforts to find a need for the project, Bud Shuster reentered the picture. By letter dated April 14, 1992, Representative Shuster wrote to Howard Yerusalim, Secretary of PennDOT, urging swift action to move the project forward. In his letter, Representative Shuster stated the following:

The inclusion of federal funding in the Surface Transportation and Uniform Relocation Assistance Act of 1987 for the

---

[3]   Copies of the foregoing meeting minutes and briefing paper are attached hereto as Exhibit "D."

Response No. 7:  See Response No. 5.

7

43534

Lester L. Nace, P.E.
July 31, 1995
Page 7

construction of an additional exit on Interstate 81 near Chambersburg, was a major accomplishment for me. Unfortunately, five years later, the state has yet to break ground on the project.

This project was included in the legislation to benefit an area congested by daily traffic and open up new areas of Chambersburg for development. It is the reason I am writing today.

Howard, the five year hold up on this project has stifled development in the area and if this problem persists, it could cost the area 4,000 jobs.

An integral part of the local community proposal designed to attract the Department of Defense Finance Accounting Service is the increased access to the borough that this exit will provide.

In designing the exit, the interested local parties are in unanimous agreement that the project should be alternative D at Walker Road with a modification. This modification would be the removal of the direct connection of the exit with Kohler Road. The direct connection to Kohler road would cause the dislocation of residents and the destruction of valuable farmland. It will also take traffic into Greene Township, where it is unwanted and unneeded and will only create public opposition to the project.

An exit at Walker Road with direct connections to Walker Road will provide increased access to the areas north of Route 30, relieve congestion at the other exits and attract development to an area desperately in need of it. Your decision to build this exit at Walker road will provide the necessary link to connect the planned development site and the Interstate. This will allow the local community to include this planned addition to the local infrastructure in their proposal to the Department of Defense due to be submitted at the end of May.

43536

Lester L. Naac, P.E.
July 31, 1995
Page 8

Howard, the importance of this project can not be understimated and a definitive decision from you can make the difference between economic growth and stagnation for an area hard hit by the recession.

Even when stripped of hyperbole, this letter conveys unmistakable directions to PennDOT from the individual who is now serving as Chairman of the Transportation and Infrastructure Committee of the U.S. House of Representatives — build the proposed interchange at Walker Road in Greene Township, and build it now.[3] (A copy of this letter can be found as Exhibit "C".)

On July 6, 1992, Howard Yerusalim responded to Bud Shuster's inquiries stating that "PennDOT is committed to pursuing construction of Exit 7 at or near Walker Road to service and promote economic development in the area." Secretary Yerusalim also added that "I will personally guarantee the Governor's and my full attention to the completion of this project." A copy of this letter is attached hereto as Exhibit "E."

On July 13, 1992, Bud Shuster directed a second letter to Howard Yerusalim reiterating his concern "about the progress towards construction of this very important transportation project" and making further inquiry regarding the status of studies relating to the "Walker Road alternative." The next day, Secretary Yerusalim responded to this letter, reiterating PennDOT's commitment to pursue "construction of Exit 7 at or near Walker Road to service and promote economic development in the area." He also described PennDOT's plans in this regard as follows:

> We are now restructuring the project scope by focusing on the objective to provide access to developing land adjacent to Walker Road. We will make sure our consultant fully understands the development potential at this location. We will also pursue the elimination of the direct connection of Walker Road relocated to Kohler Road and are investigating the need to upgrade and expand local roads in conjunction with the

---

[3]  The letter inaccurately characterizes the purported "unanimous" agreement of interested local parties that the proposed exit should be located at Walker Road. The Board of Supervisors and many other local entities and organizations have steadfastly opposed locating the proposed interchange at Walker Road.

---

8

---

Response No. 8:  The Draft EIS evaluated six alternatives in detail: the No-Build Alternative and five build alternatives. The Draft EIS also identified a Preferred Alternative located at Walker Road. However, a decision on a selected alternative is made with the issuance of a Record of Decision. Further, the selection of an alternative is made by the lead agency, FHWA in this case. Although FHWA considers the position and interest of the project owner (PennDOT in this case), numerous other relevant factors are also considered.

The desires and interests of congressional and State transportation officials are considered in decisions for this and other projects. However, administrative actions under these Federally required evaluation and decision processes (i.e., NEPA, NHPA §106, §4f) consider a range of factors; the decisions are ultimately those of an agency official. In this case, the decision will rest with a FHWA official.

Letter L. Nace, P.E.
July 31, 1995
Page 9

interchange, including a proposed connection between Walker Road and Fifth Avenue.[4]

Copies of these two letters are attached hereto as Exhibits "F" and "G," respectively.

This incredible exchange of correspondence and the commitments outlined by Secretary Yerusalim left PennDOT with no choice but to build an interchange at Walker Road, despite the fact that the environmental studies associated with the project had barely begun. Two years before the DEIS was prepared for the project and three years before the FEIS was issued for the project, and at a time when PennDOT was considering suspending the project for lack of any legitimate need, PennDOT committed itself to the selection of one alternative located in Greene Township near Walker Road.[5] It is not surprising that this "rush to judgment" has wholly undermined the validity of the studies associated with the DEIS and the FEIS conducted thereafter and indeed has impaired the entire evaluation process relating to this project.[6] PennDOT and FHWA have not engaged in reasoned decision-making but instead have attempted through post hoc rationalization to defend a

8

9

Response No. 9:  See Response Nos. 1 and 8.

---

[4]   The reference in this letter to land adjacent to Walker Road, the development of which PennDOT agreed to help facilitate through construction of the proposed interchange, appears to be directed to the Gabler Tract.

[5]   Secretary Yerusalim's "marching orders" in this regard were conveyed throughout the power structure of PennDOT. Copies of Secretary Yerusalim's letters to Representative Shuster were directed to no less than nine high-ranking PennDOT officials holding a variety of positions within PennDOT.

[6]   PennDOT's inappropriate and imprudent "rush to judgment" concerning the location of the proposed interchange has fatally infected the work which has proceeded over the past three years. For example, as discussed in more detail in other sections of the comments submitted on behalf of the Board of Supervisors, PennDOT's commitments to Bud Shuster in 1992 have manifested themselves in myriad ways including, but not limited to efforts to limit the scope of historic resources found near Alternative D-C, efforts to distort underlying data and information concerning development and traffic impacts in favor of Alternative D-C, and efforts to turn a blind eye toward requirements under Pennsylvania law designed to protect agricultural resources. These actions fundamentally violate the requirement found in the regulations implementing NEPA that agencies preparing environmental impact statements "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a).

43534

Lester L. Nace, P.E.
July 31, 1995
Page 10

decision spurred by the intervention of an elected official motivated by undefined interests in the project.[7]

d.    The Goals of "Demonstration" Highway Projects

"Demonstration" highway projects traditionally have almost always been synonymous with pork-barrel projects. They commit federal funds to be spent in particular legislative districts, often with little real benefit except to direct the largess of the federal government to benefit a narrowly defined constituency. Concerns over the "unjustifiable funding for narrow, individual special interest highway and transit construction projects" led President Ronald Reagan to veto STURAA. See Text of President Reagan's Veto Message (March 27, 1987). Indeed, President Reagan specifically identified funding for 152 highway special interest projects (one of which is this project) as part of the unaffordable aspects of STURAA.

More recently, in a report entitled "Creating Government that Works Better & Costs Less" (September 10, 1993), Vice-President Al Gore recommended that all unobligated contract authority and appropriations for existing highway demonstration projects be rescinded. Vice-President Gore discussed the fact that many highway demonstration projects "are little more than federal pork" and often do not respond to the most critical needs for federal highway funds.

[7]    Documents from PennDOT's files indicate ongoing "interest" in the project by Representative Shuster. Draft correspondence from Howard Yerusalim to Bud Shuster prepared by PennDOT during May and June of 1992 reveals that a meeting was held concerning the project in Representative Shuster's office in Washington, D.C. on May 13, 1992. In addition, meetings were held with Representative Shuster and/or his staff on January 8, 1993, and April 12, 1993. On September 28, 1994, Mortimer Downey, Deputy Secretary of the U.S. Department of Transportation, wrote to Representative Shuster regarding Representative Shuster's "continuing concerns about the pace of the project's environmental review." The letter also references a meeting between these individuals which took place in April of 1994. Moreover, on February 10, 1995, Representative Shuster wrote to Bradley Mallory, the current Secretary of PennDOT, stating that a group of constituents had requested his "assistance" in connection with the project. (The individuals in question had written to Representative Shuster to express their support for Alternative B-1 rather than Alternative D-C.) In his letter, Representative Shuster asked Secretary Mallory to "provide me with any information and comments that would be helpful when responding to this inquiry.")

43534

Lester L. Nace, P.E.
July 31, 1995
Page 11

These concerns are certainly evident with respect to the proposed interchange. According to an article entitled "Proposed Exit 7 Off I-81 Draws Fire" which appeared in the Harrisburg Patriot News on March 5, 1995, Greg Penny, a spokesman for PennDOT, acknowledged that the proposed interchange would not be very high on PennDOT's priority list if the proposed interchange were not being paid for solely with federal funds. (He also indicated in the same article that proponents of the project were over-emphasizing any potential relief which the proposed interchange would give to traffic along Route 30.) A copy of this article is attached hereto as Exhibit "H."

**e.    PennDOT's Efforts to Identify a Project Need Which Can Only be Satisfied by Alternative D-C**

Having experienced sustained difficulties in attempting to define a need for the project and facing the possibility that state and federal laws protecting agricultural lands and historic resources might require the selection of an alternative other than Alternative D-C, PennDOT and FHWA embarked on a mission to define the need for the project so specifically that it could by met only by Alternative D-C. First, the statutory purpose of the project (i.e., to provide additional access to Chambersburg and to relieve congestion on an existing interchange along I-81 near Chambersburg) were redefined as "goals." As the FEIS readily concedes, any of the proposed interchange alternatives will meet the first of these goals. However, according to the FEIS, only Alternative D-C of the two avoidance alternatives evaluated will serve to relieve "congestion" on an existing interchange. This conclusion is patently false.

Table I-2 contained in the FEIS summarizes peak hour levels of service at certain intersections under current conditions and as projected in 2016 assuming a "no build" scenario. Under current conditions, the on/off ramps of the I-81 interchange with Route 30 all function with level of service "B," both during the morning and afternoon peak traffic periods. Under conditions projected in 2016 assuming a "no build" alternative, the south bound ramps at this interchange continue to function at level of service "B" during both the morning and afternoon peak traffic periods. The north bound ramps at this interchange also continue to function at level of service "B" during the morning peak traffic period but drop to level of service "C" during the afternoon peak traffic period.

By contrast, the I-81 interchange with Wayne Avenue suffers from unacceptable levels of service under both current conditions and as projected in 2016. Specifically, the south bound ramps on this interchange currently function at level of service "F" during both the morning and afternoon peak traffic periods. This is also the case as projected to exist in 2016 under the "no build" scenario. The north bound ramps currently function at level of

10

---

**Response No. 10:** Public Law 100-17, enacted in 1987, dedicated funds for a demonstration project in the Chambersburg area. PennDOT, through its planning and programming of improvements, has identified other needed improvements in Franklin County. However, the Federal funds were specifically designated for an interchange to provide access to Chambersburg and relieve congestion on an existing interchange.

The referenced newspaper article only partially described Mr. Penny's statements. In fact, it was Mr. Penny's opinion that both the potential positive and negative effects of the project were over-emphasized.

**Response No. 11:** The 1995 traffic study shows that the congestion at the I-81/U.S. Route 30 interchange. The primary cause of congestion at this interchange is the volume of traffic traveling through the interchange and the weaving of traffic between the Walker Road/U.S. Route 30 intersection. Considered as isolated intersections, or intersections which are not influenced by the operation or congestion of other surrounding intersections, the levels of service which are obtained for the two interchange ramps appear to be acceptable. However, these intersections cannot be considered isolated intersections because of the close spacing with the congested Walker Road and Falling Spring Road intersections. In addition, analysis and field observations show that the poor operation of the Walker Road/U.S. Route 30 intersection severely impacts the operation of the interchange ramps through the Highway Capacity Manual analysis provides no means to model this situation. Based on the analysis conducted for the traffic studies, it was determined that congestion at the I-81/U.S. Route 30 interchange ramps could be reduced by improving the level of operation of the Walker Road intersection. Improvements ranging from 4% to 14% in the volume/capacity ratio at the I-81/U.S. Route 30 interchange intersections are obtained with improvements to U.S. Route 30 and the addition of the Walker Road interchange, with greater improvements made in congestion at the Walker Road/U.S. Route 30 interchange. Because the operation of this intersection affects the I-81/U.S. Route 30 interchange, additional improvements at the Walker Road intersection will be realized at the interchange intersections. The 1988 traffic study for Alternative D Modified demonstrated that the above conclusions are valid.

Improvements to Wayne Avenue are presently under construction. These include signalization of the I-81 ramp intersections and widening to a five-lane cross section between Orchard Road and Gerber Road. With these improvements, in the design year 2016, the intersections of both northbound and southbound I-81 ramps with Wayne Avenue will operate at Level of Service B or C without a Kriner Road Interchange. Construction of a Kriner Road Interchange in addition to the Wayne Avenue improvements would result in additional improvement of the southbound ramps Level of Service from C to B in both the morning and afternoon peak hours.

Assuming 330,000 square feet more development of the Chambers 5 Industrial Park than anticipated in the FEIS, levels of service are similar. Only with 500,000 square feet of additional development will Level of Service D result at the northbound I-81 ramps and Wayne Avenue (during both morning and afternoon peak hours). This level of service represents acceptable performance for an urban area. Furthermore, our analysis indicates that this Level of Service D would not be mitigated with construction of a Kriner Road Interchange. This is based upon diversion of traffic which can reasonably be expected based on the new access to I-81. As shown on page 142 in Appendix B of the FEIS, 10,200 vehicles per day can be expected to use a Kriner Road Interchange. As a result, there is a 12 to 17 percent reduction in the average daily traffic in the vicinity of the Wayne Avenue interchange when compared to the No-Build Alternative or to a Walker Road build alternative.

Construction of an interchange north of U.S. Route 30 results in no traffic relief south of U.S. Route 30 (i.e., at Wayne Avenue). Similarly, an interchange south of Wayne Avenue does not relieve congestion to the north (i.e., at U.S. Route 30). This is because the traffic shed of any new interchange necessarily does not extend beyond the resultant traffic shed of any other interchange. For example, some traffic which presently uses either S.R. 0997 or U.S. Route 30 but that would be better served by an intermediate interchange would divert to Walker Road. However, no traffic with destinations south of U.S. Route 30 would divert to Walker Road. Therefore, a Walker Road

11

4354

Lester L. Nace, P.E.
July 31, 1995
Page 12

service "D" and "E" during the morning and afternoon peak traffic periods, respectively. These levels of service deteriorate to "F" under projections for 2016.

This information is critical for the following reasons. First, it shows that "congestion" is far worse on the Wayne Avenue interchange than the Route 30 interchange, both under current conditions and as projected under the "no build" alternative. Second, it shows that the Route 30 interchange is currently functioning well above acceptable levels of service and will continue to do so in 2016 even if no interchange is built.

Rather than focusing on the existing and projected problems that the FEIS itself documents on the Wayne Avenue interchange, PennDOT and FHWA have attempted to sidestep this issue by indicating that improvements to Wayne Avenue between Orchard Drive and Kriner Road are likely to take place which will include constructing traffic signals at the Wayne Avenue interchange. According to the FEIS, "[a]s a result, and after completion of the scheduled project, the ramp intersections will operate at Level of Service C conditions, an acceptable traffic condition." FEIS at I-10.[4] The FEIS also states that "[b]y any measure, Level of Service C represents acceptable traffic operations." FEIS at I-18. On this basis, PennDOT and FHWA have broadly concluded that Alternative B-1 does not satisfy the legislative requirements set forth in STURAA because this alternative would only serve to further improve acceptable conditions at the Wayne Avenue interchange expected after improvements to Wayne Avenue are completed. FEIS at I-19. The crux of this analysis is that because the ramps to the Wayne Avenue interchange are expected to function at level of service "C" after the improvements to Wayne Avenue are completed, the Wayne Avenue interchange will no longer be "congested." FEIS at ES-28.

If PennDOT and FHWA are correct that "congestion" on the Wayne Avenue interchange will not exist after improvements to Wayne Avenue are completed because the interchange ramps will function at level of service "C," then it necessarily follows that "congestion" does not exist on the Route 30 interchange either. As noted above, the I-81 ramps at the Route 30 interchange are currently functioning at level of service "B" during both morning and afternoon peak traffic periods. This is one level of service better than the anticipated level of service expected at the Wayne Avenue interchange after improvements to

interchange would have no impact on the Wayne Avenue interchange. Similarly, a Kriner Road interchange offers no congestion relief to the U.S. Route 30 interchange.

As demonstrated in the FEIS, however, congestion does exist at the I-81/U.S. Route 30 interchange due to traffic volumes and weaving between the interchange and the Walker Road/U.S. Route 30 intersection. The poor performance and congestion remain in the design year 2016 even if U.S. Route 30 is improved (to a five-lane cross section from just west of Walker Road to Fayetteville) and the improvements to Wayne Avenue are completed.

11

---

[4] As set forth in a report entitled "Interstate 81 Interchange, S.R. 8016, Franklin County, Pennsylvania, Final Report, Supplemental Traffic Studies" (May 1995) (hereinafter the "Supplemental Traffic Report") prepared on behalf of PennDOT by Orth-Rodgers and Associates, Inc., PennDOT "designs improvements to a level of Service "C" standard (except in urban areas where level of service "D" conditions represent the design level of service)." Supplemental Traffic Report at p. vi.

Lester L. Nace, P.E.
July 31, 1995
Page 13

Wayne Avenue are completed. Under PennDOT's and FHWA's definition of "congestion," traffic congestion on the Route 30 interchange does not currently exist."

The projected traffic flows for 2016 under the "no build" scenario at the I-81 - Route 30 interchange underscore this analysis. As discussed above, the south bound ramps at the Route 30 interchange will continue to function at level of service "B" during both the morning and afternoon peak traffic periods. The north bound ramps at this interchange will also continue to function at level of service "B" during the morning peak traffic period and will drop only to level of service "C" during the afternoon peak traffic period. As with current conditions, traffic congestion on the Route 30 interchange is not projected to exist in 2016 using PennDOT's and FHWA's definition of "congestion."

Given the foregoing, either both Alternative B-1 and Alternative D-C meet the threshold requirements of STURAA or neither meet the threshold requirements of STURAA. Moreover, even with anticipated improvement to Wayne Avenue, the Wayne Avenue interchange will function at a level of service one step below that projected for the Route 30 interchange (with the exception of the north bound ramps during the afternoon peak traffic period in 2016, which will function at the same level of service expected for the Wayne Avenue interchange.) This strongly suggests that if the goal as set forth in STURAA is to relieve congestion on an existing interchange, efforts should focus on finding ways to further improve traffic service at the Wayne Avenue interchange even after improvements to Wayne Avenue are completed in order to bring the Wayne Avenue interchange up to the level of service projected for the Route 30 interchange.

Finally, we note that in drafting Section 149(a) of STURAA, Congress was precise in the language which it used. It specifically provided that one of the two goals to be satisfied by the project was to relieve traffic congestion "on" an existing interchange. It did not say "around" or "near" or "adjacent" to an existing interchange as it could have. Indeed, in describing other demonstration projects in Section 149 of STURAA, Congress used such

---

**11**

**12**

---

* In the FEIS, PennDOT and FHWA advance as one of the purported disadvantages of Alternative B-1 the fact that Alternative B-1 does not relieve traffic congestion at the I-81 interchange with Route 30, which, on the basis of their own traffic studies, PennDOT and FHWA improperly characterize as "the most congested interchange in Chambersburg." FEIS at p. ES-30. This characterization is plainly false as the data described in the FEIS indicate. In attempting to justify Alternative D-C, PennDOT and FHWA have blatantly mischaracterized even their own studies which show that congestion exists along a segment of Route 30 west of I-81 but not on the I-81 interchange at Route 30 itself.

---

**Response No. 12:** Interchanges are separate level junctions of two or more highways and do not operate in isolation of the highways they serve. It is inappropriate to evaluate the Level of Service on an interchange without considering the adjacent highways which it was built to service.

43534

Lester L. Nace, P.E.
July 31, 1995
Page 14

alternative language clearly showing that if it had intended to describe the congestion to be relieved more broadly, it could easily have done so. See, e.g., Section 149(a)(47) of STURAA (describing the purpose of another demonstration project as reducing traffic congestion and improving traffic flow "in the immediate vicinity of a highway on the Interstate System").

f.    Accommodating Existing and Future Traffic Volumes.

As noted earlier, PennDOT has engaged in extensive efforts to identify a need which might justify and lend legitimacy to this "demonstration" project. This search has been fraught with difficulties and underscores the fundamental problems that have infected the planning process from the beginning.

Following Secretary Yerusalim's commitments to Representative Shuster in 1992 that the proposed interchange would be located at Walker Road, PennDOT renewed its efforts to find a "need" to justify not only the project in general but an interchange located at Walker Road in particular.

In the FEIS, PennDOT and FHWA appear to have advanced the proposition that a separate "need" for the project should be to accommodate existing and future traffic volumes. To the extent that this is an implicit part of evaluating reductions in congestion (if any) on existing interchanges resulting from construction of a new interchange along I-81, it is swept within the legislative goals for the project set forth in STURAA. PennDOT and FHWA have not, however, focused their analysis of this new project "need" in such a way. Instead, the FEIS and the Supplemental Traffic Study include evaluations of traffic patterns and areas of congestion throughout the Chambersburg area.[10]

The central thrust of the FEIS is to focus on existing traffic problems along U.S. Route 30 and to bootstrap the proposed interchange into serving as a solution (or purported solution) for these problems. In this way, PennDOT and FHWA are able to reach their desired result that only Alternative D-C satisfies the "project need" which PennDOT and FHWA have identified. For example, the FEIS discusses at length the congestion found

Response No. 13: Evaluation of traffic patterns and congestion are analyzed from a regional (Chambersburg area) and local (I-81 and the roadway system surrounding Walker and Kilner Roads) perspective. Local patterns and congestion are the result of regional patterns and congestion.

Response No. 14: Designs for Federally funded highway projects are required to meet existing and probable future traffic needs.

13

14

[10] Section 149(a)(74) of STURAA discusses the proposed demonstration project in terms of relieving traffic congestion on an existing interchange. By its own terms, the legislative authorization for this project speaks in terms of relieving existing congestion, not future congestion. Accordingly, it is unclear whether the "accommodation of future traffic volumes" is a factor which is consistent with this legislation.

4334

along Route 30, particularly at the intersection of Route 30, Walker Road and Stouffer Avenue which the FEIS characterizes as a "bottleneck" along Route 30. The FEIS also discusses traffic patterns that are anticipated along secondary roads in the vicinity of Chambersburg as well as major thoroughfares such as Wayne Avenue. PennDOT and FHWA have then used the traffic data as a means to rationalize the pre-ordained selection of Alternative D-C.

If the need for the project encompasses improving traffic flow patterns along Route 30, Wayne Avenue, and associated secondary roads, then the FEIS falls far short of evaluating the range of options which are available to accomplish this goal. At an elemental level, the feasibility of solving east-west traffic congestion through improvements to a north-south limited access highway is not evident. Instead, other options which directly address this problem are available. For example, widening Route 30 and improving the traffic signalization along Route 30 is expected to dramatically improve traffic conditions along Route 30 whether or not any new interchange is built. With respect to the "bottleneck" at the intersection of Walker Road, Route 30 and Stouffer Avenue, improvements in traffic patterns can be accomplished by adjusting the timing of the traffic signals and by adding additional turn lanes on both Walker Road and Stouffer Avenue. These issues are addressed in more detail in a separate report prepared by Lichty Engineering on behalf of the Board of Supervisors which is being submitted as part of these comments.

Obviously, the FEIS does not begin to identify, let alone address, a full array of options associated with improving traffic flow patterns in the Chambersburg area or even along Route 30 in particular. This omission illustrates in stark relief the fact that accommodating existing and future traffic volumes is not a "need" for the project. Instead, accommodating traffic volumes is at most merely a factor to be considered in evaluating the relative merits of various alternatives just as impacts to agricultural resources and historic properties are factors to be considered.

Finally, we note that traffic problems which currently exist and are expected in the future along the Route 30 corridor are primarily a function of east-west traffic flows which are independent of traffic movement onto and off of I-81. Moreover, if Alternative D-C is implemented, traffic existing I-81 at this new interchange will flow onto Walker Road and Franklin Farm Lane, both of which drain into Route 30 in close proximity to the existing I-81 interchange with Route 30. Indeed, because of the 16-ton weight limits which are in effect for the secondary roads in Greene Township near Alternative D-C, truck traffic will necessarily be required to drain onto Route 30 only yards from the existing I-81 interchange. Under such circumstances, the purported benefits of relieving traffic congestion along Route 30 vanish.

**15**

**Response No. 15.** PennDOT does not contend that the I-81 interchange is an overall solution to the U.S. Route 30 problems. Traffic studies for the interchange were analyzed with and without improvements to U.S. Route 30.

The Final Supplemental Traffic Report (1995) identified the overall volume of traffic and weaving of traffic between the I-81/U.S. Route 30 interchange and the U.S. Route 30/Walker Road intersection as the primary cause of congestion. Computed levels of service show that the poor mid-block levels of service at the Walker Road intersection create congestion which extends through the I-81 interchange. Several improvements to the Walker Road/U.S. Route 30 intersection were evaluated for all of the alternatives studied. The improvements consisted of adding an additional travel lane on both the Walker Road and Stouffer Road approaches, creating shared lanes and split phasing, and evaluating "best case phasing". The analyses showed that even with these improvements and the future improvements to U.S. Route 30, the overall level of service of this intersection would continue to be "F" (with just the U.S. Route 30 improvements). In fact, the analysis showed that the Walker Road interchange in combination with the U.S. Route 30 improvements achieves the greatest improvement in projected levels of service.

**16**

**Response No. 16:** See Response No. 14 above. As described in Section 1 of the FEIS, existing traffic conditions on I-81, U.S. Route 30, S.R. 0316, and other roadways in the study area indicate existing transportation deficiencies in the study area. The traffic analysis conducted in 1995 concluded that by 2016, the project's design year, traffic volumes will increase between 33% and 50% on U.S. Route 30. Traffic volumes will also increase on secondary roads as motorists use the secondary roads to avoid congestion on U.S. Route 30 and as the area's growth continues to increase. The 1998 traffic study reiterated the conclusions of the 1995 study. The existing transportation deficiencies will be worsened by the anticipated increased traffic. Therefore, it is appropriate that accommodating existing and future traffic volumes is an I-81 interchange project need.

**17**

**Response No. 17:** See Response No. 15 above. Under the No-Build scenario, traffic on Walker Road north of the U.S. Route 30 intersection is projected at 13,950 vehicles per day (average). With an interchange at Walker Road, traffic on Walker Road north of the U.S. Route 30 intersection will be reduced by between 4,400 (Norland Avenue Extension and U.S. Route 30 Improvements) and 7,450 (Norland Avenue Extension) vehicles per day. Traffic on Franklin Farm Lane is projected to be the same under the No-Build scenario (2,300 vehicles per day) as with any of the combinations of improvements described in the FEIS (Walker Road interchange, Norland Avenue Extension, and U.S. Route 30 Improvements).

4353a

Lester L. Nace, P.E.
July 31, 1995
Page 16

**8.    Adherence to Municipal Comprehensive Plans**

According to the FEIS, a third "need" of the project, identified by PennDOT and FHWA and outside the statutory mandate for the project, is to adhere to comprehensive plans adopted by municipalities in the project study area. Setting aside the issue of whether this is a proper "need" for the project, we note that Alternative D-C specifically does not adhere to the comprehensive planning documents that have been adopted by Greene Township including a report entitled "Greene Township Comprehensive Plan Update, May 4, 1994" which the Board of Supervisors adopted on July 12, 1994. (A copy of this report was previously submitted to PennDOT with comments concerning the DEIS.) As the municipality in which the "selected alternative" is proposed to be located, Greene Township has an overriding interest in ensuring that actions which are taken within its physical boundaries are consistent with the comprehensive planning documents which Greene Township has adopted. Alternative D-C is wholly inconsistent with these comprehensive planning documents.

The importance of the fact that Alternative D-C is wholly inconsistent with Greene Township's comprehensive planning documents cannot be underestimated. Under regulations implementing the requirements of NEPA, the environmental consequences of the alternatives under evaluation must be assessed, including addressing "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, and local . . . land use plans, policies and controls for the area concerned." 40 C.F.R. § 1502.16(c). Moreover, these regulations provide as follows:

> To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan or laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

40 C.F.R. § 1506.2(d).[11]

---

[11]    As described in a document issued by PennDOT in August 1993 entitled "The Transportation Project Development Process -- Environmental Impact Statement Handbook," a principal factor to be evaluated as part of analyzing transportation projects is "master planning consistency." As such, PennDOT has incorporated into its own guidelines the same concepts contained in the regulations implementing

4335a

---

**18**

**Response No. 18:** PennDOT and FHWA did acknowledge that Alternatives C, D, and D-C are not in keeping with Greene Township's latest Comprehensive Plan (1994). See FEIS, pages I-11 and I-12. Alternative D Modified is similarly not in keeping with Greene Township's Comprehensive Plan (1994). Since the FEIS was circulated (1995), Guilford Township adopted a zoning ordinance (1997). In the vicinity of the Kriner Road alternative, the area to the west of I-81 is zoned industrial and the area east of I-81 is zoned agricultural. According to NEPA 40 CFR 1502.16(c), the EIS must acknowledge and describe the potential conflicts between the project and local land use plans, policies, or controls. Then all the other environmental and non-environmental factors must be considered in reaching a decision. Unless precluded by other law from causing or contributing to any inconsistency with the land use plans, policies, or controls, FHWA retains the authority to go forward with the proposal, despite the potential conflict. In the Record of Decision, FHWA explains the decision and mitigation measures.

- 88 -

5

5

5

5

5

5

5

5

5

5

5

5

5

5

Lester L. Nace, P.E.
July 31, 1995
Page 18

b.    Provision for Existing and Proposed Development

The final component of the purported "need" for the project is to provide for existing and proposed development. The FEIS is singularly unclear as how PennDOT and FHWA have incorporated this "need" into their evaluation of alternatives. At best, this component of need would appear to be a factor to be considered in weighing the relative merits of various alternatives and not a threshold screening device for deciding which alternatives should receive further consideration.

As part of assessing the rationale for Alternative D-C described in the FEIS, it is evident that PennDOT and FHWA apparently continue to cling to the instructions of Representative Shuster to facilitate future development of the area adjacent to the location of Alternative D-C, much of which is located within an historic district determined to be eligible for the National Register of Historic Places. Moreover, the portions of Greene Township in this area are slated to remain in agricultural use or to be used for low density, single-family residential dwellings. In fact, much of the area adjacent to Alternative D-C consists of lands in Agricultural Security Areas. Further, it is unclear whether undeveloped property known as the Gabler Tract in the northeastern portions of the Borough of Chambersburg, near Alternative D-C will, in fact, be developed as PennDOT and FHWA have presumed. Rather than assessing future predicted growth patterns in an even-handed fashion, PennDOT and FHWA have improperly become advocates for stimulating growth in certain areas near Alternative D-C. This "expected" growth is then used as a reason to justify the construction of Alternative D-C.

The correspondence between Secretary Yerusalim and Representative Shuster underscores the improper role which PennDOT has decided to play in attempting to funnel development into the area adjacent to Alternative D-C. The linkage between Alternative D-C and the potential development of the Gabler Tract is well established, as is more fully described in the accompanying comments concerning historic resources. Using public funds to facilitate private development of this sort is contrary to principles of sound government. Moreover, Congress could have but did not describe the demonstration project at issue here in terms of enhancing the development potential of specific areas near Alternative D-C.[13]

_____

[13]  Section 149(a) of STURAA includes numerous examples of demonstration projects which have, as part of their stated purpose, the goal of facilitating development. See, e.g., STURAA, Sections 149(a)(3), (4), (15) (17), (25), (26), (27), (29), (33), (34), (37), (39), (48), (62), (66), (68), and (73).

Response No. 22: In its Transportation Project Development Process Environmental Impact Statement Handbook (Publication 278) and (Project) Needs Study Handbook (Publication 319), PennDOT has established procedures and guidelines for determining need for all projects. Within those guidelines are listed eight principal factors to judge the need for a project. These eight factors are: Master Planning Consistency; Transportation Demand; Governmental Authority; Social Service Demand; Economic Development; Structural Conditions; Social, Economic, and Environmental Effects of Taking No Action; and Right-of-Way Preservation Plan. In 1994, before publication of the DEIS, PennDOT personnel reviewed the criteria set forth in determining need and confirmed the need of the I-81 interchange project. The legislative (Governmental Authority) need has been evident since 1987.

Public Law 100-17 states that an interchange is to be constructed that provides access to Chambersburg and relieves traffic congestion on an existing interchange. Traffic congestion relief must accommodate existing and future traffic. Without an additional interchange, traffic will be forced to use an existing interchange, therefore accommodating existing and future traffic volumes meets the intention of Public Law 100-17. Alternative D Modified would serve traffic volumes ranging from approximately 9,000 vehicles per day to approximately 10,900 vehicles per day, depending on the combination of other roadway improvements (U.S. Route 30 improvements and Norland Avenue Extension).

Municipality comprehensive plans are the key source for assessing planned future growth. Traffic predictions are based on the best available information and comprehensive plans define the wishes of the municipalities. The traffic modeling used the comprehensive plans and interviews with local municipal officials to determine growth rates and planned growth areas of the local municipalities. The land use plans determine future traffic levels and patterns, and these levels and patterns help in identifying the best location for an interchange that will relieve traffic congestion on an existing interchange thereby conforming to Public Law 100-17.

A press release (1993) that was reviewed by the participating parties, including representatives of Greene Township, in the Winsor roundtable discussions states "Other points on which the groups reached concurrence were: ... Irrespective of whether an exit is built at Walker Road, development will occur in the northeastern quadrant of the Borough and the adjacent area of Greene Township. . ." An Environmental Impact Statement for a transportation project identifies where growth is proposed and accommodates the corresponding transportation need.

Response No. 23: The local municipalities were contacted concerning planned development. Areas of planned development as shown in municipal plans were programmed into the model to predict future traffic volumes and patterns. Future development in an area must be a consideration for any highway project. A highway improvement should accommodate planned growth of local municipalities. Planned growth is used as a "screening device" and in "weighing relative merits of various alternatives". According to conversations with the owners of the property, the Gabler Tract will be developed with or without construction of the interchange. The type of development will be affected by construction of the interchange. The type of development is discussed in Section V of the FEIS, Secondary and Cumulative Impact Analysis (Pages V-15 and V-21, FEIS).

22

23

43534

- 90 -

Lester L. Nace, P.E.
July 31, 1995
Page 19

In summary, the flaws in PennDOT's and FHWA's analysis of the need for the project infect much of the content of the FEIS. Not only do PennDOT and FHWA identify factors to be served by the project that are not part of the statutory mandate for the project, but they inaccurately assess the relationship between Alternative D-C and those factors. At bottom, the linchpin to the identification of Alternative D-C as the "selected alternative" appears to rest not on the results of the planning and environmental studies conducted over the past three years, but instead on the premature and inappropriate commitments made by Secretary Yerusalim to Representative Shuster in 1992 concerning the project.

2. Assumed Improvements to the Local Road Network

As PennDOT and FHWA have acknowledged, the road network which will service Alternative D-C if the proposed interchange is constructed consists of a series of unimproved secondary roads located in Greene Township which are owned and maintained by the Township. As described in Chapter III of the FEIS, these roads are weight restricted with 16-ton limit, generally have narrow lane widths, have narrow or no shoulders, and are characterized by poor vertical and horizontal alignment.

In recognition of the tight nexus between construction of Alternative D-C and improvements to this network of local roads, PennDOT and FHWA have conceded that as part of the project, improvements to Walker Road in the vicinity of the proposed interchange will be necessary. As described in Chapter II of the FEIS, it appears that PennDOT and FHWA contemplate rebuilding Walker Road from east of I-81 near where the proposed northbound ramps associated with Alternative D-C are to be located west to the point where Walker Road intersects with Route 30. However, PennDOT and FHWA do not identify in the FEIS other improvements to the local road network which will be required if Alternative D-C is constructed. This omission is critical in that PennDOT and FHWA have failed to evaluate the full scope of the project.

FHWA's policies and procedures for implementing NEPA include the following requirements:

In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each EIS ... shall ... [h]ave independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional

24

Response No. 24: A Walker Road Alternative (Alternative D-C in the FEIS; Alternative D Modified was developed to avoid the Christian Fry, Jr. House/Fry Property designated by the Keeper to be eligible for the National Register in her letter dated June 27, 1997) meets the project needs of providing access to Chambersburg and relieving congestion on an existing interchange, accommodating existing and future traffic problems, and providing for existing and proposed development in the study area.

Response No. 25: Traffic will increase on the local roadway system with or without construction of the interchange. PennDOT and FHWA are relocating and improving Walker Road within PennDOT's area of responsibility as part of Alternative D Modified.

Traffic will increase in northern Chambersburg and western Greene Township with or without construction of the Walker Road interchange. In fact, traffic along Walker Road is expected to increase by as much as four-fold, and traffic along Norland Avenue is expected to double between 1995 and 2016 (No-Build conditions). This is primarily due to future planned development which has been identified in these areas. With the Walker Road interchange, increases in traffic can be expected, however, when compared to the percent increases expected due to the identified developments, the increases due to the proposed interchange are not as significant (only about 16% on Walker Road east of Franklin Farm Lane and 17% on Norland Avenue east of Scotland Road, considering the Norland Avenue extension and Walker Road Interchange construction).

Extensive improvements will be required to the local road system with or without the proposed interchange. With the No-Build Alternative, traffic volumes will significantly increase on the local roads as motorists try to avoid congestion on U.S. Route 30 and due to planned development. Construction of an interchange at Walker Road adds very little traffic to the local road system when compared to the No-Build Alternative.

With Alternative D Modified, roadways within PennDOT's area of responsibility (i.e., relocated Walker and Kohler Roads) will be improved. Improvement to other local roadways are not a component of the I-81 interchange project.

25

4534

Lester L. Nace, P.E.
July 31, 1995
Page 20

transportation improvements in the area are made.

23 C.F.R. § 771.111(f)(2) (emphasis added).

Here, the viability of the proposed interchange is undercut if improvements to the local road system are not undertaken. Other than improvements to Walker Road, the FEIS makes no mention of the fact that additional improvements will be necessary to the secondary road network. However, PennDOT has long recognized this reality. For example, in an "Early Coordination Form" (undated) regarding the project prepared for PennDOT by Robert Mueser, PennDOT acknowledged that an interchange at Walker Road would require reconstruction of Mower Road to Route 30, the realignment of Kohler Road, and the reconstruction of portions of Kohler Road and Grand Point Road.

In a narrative which accompanied a transmittal to Daryl Kerns dated April 20, 1989, Brad Brosius of Johnston, Mirmiran and Thompson, P.C. described necessary actions in connection with a proposed interchange at Walker Road as follows:

Mower Road will be reconstructed to near Walker Road down to Route 30. Mower Road has the same existing section as Walker Road and will be upgraded to 36'.

On the west side of the overpass, Kohler Road will be realigned as shown. Some reconstruction will be required when the new alignment meets existing Kohler Road near Grand Point Road. Existing Kohler Road has a total of 18' of paving and will be widened to 36'.

Grand Point Road will be realigned and reconstructed, as shown, to the railroad which is the limit of our study. We will mention in our alternative report that if this alignment is chosen, Grand Point Road will have to be reconstructed through to Route 11. Existing Grand Point Road has a total of 18' of paving and will be widened to 36'.

Thereafter, during the spring of 1992, Barry Hoffman of PennDOT made a presentation regarding the project. A document summarizing this presentation dated April 27, 1992, notes that "[e]very alternative uses the township road [sic] extensively. All of these roads are narrow and would require substantial funds to bring them up to acceptable standards." This document also states that "[t]he Kohler Road underpass has a restricted

25

Here, the viability of the proposed interchange is undercut if improvements to the

26

**Response No. 26:** Traffic will increase on local roadways with or without an interchange. With construction of the Walker Road interchange and the development which has been identified in northern Chambersburg and western Greene Township, traffic will increase on the area roadways surrounding the Walker Road interchange. However, the studies show that one of the largest components of future traffic which will use the Walker Road interchange comes from "new" developments which have been identified in this area. Without this development, there will be increased traffic on the area roadways surrounding the interchange, but not to the extent that significant improvements to the local roadways will be required immediately. Rather, as this future development proceeds over the course of time, the burden of any necessary improvements should be shared with the developers of properties who will benefit from the improved roads. Act 209 and Act 47 provide measures by which the municipalities can and should make this effort regardless of whether an interchange is or is not constructed at Walker Road.

It is doubtful that any improvements would be needed for Mower Road under any scenario, except at intersections created by developers as the projected increase in daily traffic (which is mostly attributable to these developments) between existing conditions and horizon year 2016 is only about 550 vehicles per day. Walker Road, however, needs geometric improvements today. Even if there is no traffic growth, safety improvements along this roadway should be considered by Greene Township.

The intersections on Ragged Edge Road should also be reviewed for improvements. It should be pointed out that the intersection of U.S. Route 30 and Ragged Edge Road will be reviewed for improvements as part of the U.S. Route 30 improvements. Kohler Road will be affected by development activity that is ongoing in Chambersburg. The extension of Norland Avenue will improve conditions on Kohler Road by reducing traffic by as much as 36% or 5,000 vehicles per day when compared to the 2016 No-Build Alternative. Greene Township and Chambersburg would both be best served by cooperating and coordinating as future development proceeds, regardless if an interchange is constructed.

43534

Lester L. Nace, P.E.
July 31, 1995
Page 21

underclearance which would have to be increased in order to serve as a collector should alternative C or D [Walker Road] be chosen."

Even FHWA has recognized the difficulties associated with the Walker Road alternative with respect to triggering the need to upgrade the local road system. In a letter to Michael Ryan of PennDOT dated August 2, 1993, Manual Marks, Division Administrator of FHWA, stated as follows:

> It appears from the data presented in the DEIS as well as field views conducted by FHWA Staff, that the roadway network from the interchange locations to Chambersburg will require upgrading and/or construction of new roadways in order to adequately address the demonstration of provided [sic] access to Chambersburg and to meet the Federal Point of Access requirements. Because these improvements are a direct requirement of this project, the commitment to construct these improvements must be obtained and the impacts of such improvements addressed in the DEIS.

These concerns were underscored in more detail in a letter from Manual Marks to Larry King, Deputy Secretary for Planning for PennDOT, dated September 29, 1994. In this letter, FHWA made the following points:

> The direct and indirect social, environmental and economic impacts of the local road improvements necessary to accommodate the changes in traffic patterns resulting from the proposed interchange on I-81 must be assessed and documented. It is clear that these issues are very much a priority for the local officials and the review agencies. Decisions and commitments must be made regarding which roads will be improved and the financial responsibility for the work. We cannot complete the proposed interchange only to create an intolerable condition on the local connecting roads. The additional environmental impacts, if significant, will require the preparation of a Supplemental Draft Environmental Impact Statement, and/or Draft Section 4(f) Statement.

> The proposed Walker Road interchange causes changes in traffic patterns that require local roadway improvements if the network

26

**Response No. 27:** With construction of the Walker Road interchange and the development which has been identified in northern Chambersburg and western Greene Township, traffic will increase on the area roadways surrounding the Walker Road interchange. However, the studies show that one of the largest components of future traffic which will use the Walker Road interchange comes from "new" development which has been identified in this area. Without this development, there will be increased traffic on the area roadways surrounding the interchange, but not to the extent that significant improvements to the local roadways will be required immediately. Rather, as this future development proceeds over the course of time, the burden of any necessary improvements should be shared with the developers of properties who will benefit from the improved roads.

It is doubtful that any improvements would be needed for Mower Road under any scenario, except at intersections created by developers as the projected increases in daily traffic (which is mostly attributable to these developments) between existing conditions and horizon year 2016 is only about 550 vehicles per day. However, Walker Road needs geometric improvements today. Even if there is no traffic growth, safety improvements should be considered by Greene Township.

The intersections on Ragged Edge Road should also be reviewed for improvements. It should be pointed out that the intersection of U.S. Route 30 and Ragged Edge Road will be reviewed for improvements as part of the U.S. Route 30 improvements. Kohler Road will be affected by development activity that is on-going in Chambersburg. The extension of Norland Avenue would improve conditions on Kohler Road by reducing traffic by as much as 36% or 5,000 vehicles per day when compared to the 2016 No-Build alternative. Greene Township and Chambersburg would both be best served by cooperating and coordinating as future development proceeds, regardless if an interchange is constructed.

27

Lester L. Nace, P.E.
July 31, 1995
Page 22

is to function safely and efficiently. The capacity of the local network must be improved either through the construction of the Norland Avenue extension or significant improvements to existing roads such as Kohler Road, Mower Road, and Ragged Edge Road. Walker Road east and west of I-81 warrants study regardless of the Norland Avenue Extension issue . . . . .

The DEIS for this project was advanced without inclusion of a draft Section 4(f) Evaluation because of the lack of direct takes from the involved historic properties by the preferred alternative. However, the necessary local road improvements, particularly the Norland Avenue Extension, may produce both Section 106 and Section 4(f) impacts. Therefore, it is prudent to delay further determination of effect actions until the necessary local road impact study has progressed sufficiently to give definition to these impacts.

A copy of this letter is attached hereto as Exhibit "L."[14]

The foregoing demonstrates that the FEIS must be supplemented to take into account necessary components of the project which have not been discussed or evaluated in any meaningful fashion other than to recognize that improvements to the local road system surrounding Alternative D-C will be required if Alternative D-C is constructed. By ignoring this issue, PennDOT and FHWA have prepared an FEIS which is not complete and which does not satisfy the regulations which have been developed to implement the requirements of NEPA.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

We trust that PennDOT and FHWA will carefully consider the issues and concerns raised in this letter and the accompanying reports, appendices, and exhibits. The information provided herein leads inextricably to the conclusion that Alternative D-C should be rejected

[14]  Confirmation of the necessity for improvements in the local road network if Alternative D-C is constructed is also contained in a "Telephone Advisory Report" prepared by Marcia Shiffman of Orth-Rodgers & Associates, Inc. dated January 18, 1995, and a report prepared by Orth-Rodgers & Associates, Inc. entitled "Interstate 81 Interchange, S.R. 8016, Franklin County, Pennsylvania, Final Report, Supplemental Traffic Studies" issued in May, 1995.

**28**

**Response No. 28:** PennDOT is responsible for upgrading State and Federal roadways within Pennsylvania. The updated traffic studies showed increased traffic on all local roadways within or without construction of an interchange. The local municipalities will need to upgrade their roadways to accommodate the increase in traffic due to the current and planned development in the area, not directly related to construction of the interchange. See Response No. 26.

43534

Lester L. Nace, P.E.
July 31, 1995
Page 23

as the "selected alternative" for construction of a new interchange along I-81 in the Chambersburg area. By contrast, Alternative B-1 remains a viable option and consistent with the overall goals of the project. We therefore request that PennDOT and FHWA eliminate Alternative D-C from further consideration.

In addition, we reserve our rights to supplement these comments on behalf of the Board of Supervisors should additional information germane to the project be received or obtained. Further, we hereby request that these comments, including all reports, associated appendices and exhibits thereto, be included in the administrative record developed for the project.

Very truly yours,

Michael M. Meloy
For MANKO, GOLD & KATCHER

MMM/vc
Enclosures
cc: Mr. Manuel Marks (via overnight delivery)(w/enclosures)
   Greene Township Board of Supervisors (w/enclosures)

43534

# Memorandum

**U.S. Department
of Transportation**

**Federal Highway
Administration**

*HDA-PA*

| Subject: | *ACTION*: Office of Inspector General Hotline Complaint 61H-215-I-000 | Date: | July 3, 1996 |
| --- | --- | --- | --- |
| From: | Director, Office of Planning & Program Development Baltimore, Maryland | Reply to Attn of: | HPP-03 |
| To: | Mr. John H. Schnackenberg Chief, Organization & Management Programs Division (HMS-11) Washington, D.C. | | |

This is a response to your memorandum of May 28, 1996, which forwards a March 4, 1996 complaint letter from the Community Environmental Legal Defense fund (CELDF) and a May 7, 1996 complaint letter from the Greene/Guilford Environmental Association, Inc. In substance, we interpret the complaint to be that the National Environmental Policy Act (NEPA) process was contravened by the Pennsylvania Department of Transportation (PennDOT) and that FHWA did not prevent or redress the alleged improper conduct.

Two sets of documents are submitted by the complainants. The first is an exchange of letters between Congressman Bud Shuster and Howard Yerusalim, the latter of whom was Pennsylvania's Secretary of Transportation at the time. The second set of documents is correspondence pertaining to an engineering/design contract. Our specific responses will address each of the two sets of documents, but before doing so, a few general points should be made. First -- and perhaps foremost -- the alternative selection for this project has not yet been made. We don't anticipate having the necessary information to render a Record of Decision (ROD) until September 1996 at the earliest. At this point, it is procedurally possible for FHWA to select any one of six alternatives that were evaluated in the Final Environmental Impact Statement (FEIS), including the no-build. Therefore, there is an opportunity to review this matter prior to a decision and the commitment of resources to a specific alternative. Next, you should know that this project is very controversial. There are parties that strongly oppose, and others that strongly support, various conclusions. It is perhaps human nature to find flaws with any process that does not yield a personal preference. Although a final decision has not yet been rendered, the FHWA has identified a "preferred alternative" that various stakeholders find objectionable. Therefore, the complaint may be more in response to a possible undesirable result, rather than the process. The NEPA process is not guaranteed to produce a result that everyone is pleased with.

**ATTACHMENT THREE**

Our responses to the submitted information are as follows:

*Shuster-Yerusalim Correspondence*

The FHWA was made aware of these letters in July 1995 when they were included as part of the comments a local government submitted on the FEIS. In our view, a distinction must be made between the actions and writings of a congressman and those of a state transportation agency official. Congressman Shuster sponsored legislation to secure "earmarked" funds for the design and construction of an additional I-81 interchange in Franklin County. Based on the correspondence, he also appears to favor a Walker Road location. However, as is pointed out by the CELDF letter, under NEPA, the decision is made by the lead (administering) Federal agency. Therefore, as long as it is not coercive, we are not concerned by any stakeholders advocating a specific course of action.

On the other hand, as a statewide public agency and project applicant, PennDOT is preparing the EIS for the project. We understand the concerns that Mr. Yerusalim's letter could raise. On the other hand, if no real harm was done to the evaluation and decision processes, it doesn't make sense to discard the substantial public investment in this project. We believe the central question is: Did these letters or possible interpretations of the views expressed in them, have any influence on the scope or conclusions of activities administered by PennDOT? At the time the letters were written, studies were being conducted in preparation of the Draft EIS (DEIS). The DEIS and other environmental documents were made available for review and comment to the public and agencies. Based on these comments and additional analysis, the FEIS was prepared. The FEIS is the technical evaluation of the alternatives and provides key information relevant to a decision.

Maintaining the integrity of the NEPA process is of paramount importance to the FHWA. Because of the concern surrounding these letters, which were brought to our attention almost a year ago, the FHWA reviewed key technical analyses related to this project. We concluded that an objective and balanced evaluation of all reasonable alternatives was conducted. We also found the project's purpose and need is likely to be best satisfied by a Walker Road alternative. The Office of Inspector General is welcome to review all the project studies and records, which are located at our Division Office in Harrisburg, Pennsylvania.

*Open-End Engineering/Design Contract*

We believe this to be a straightforward matter and hopefully the ensuing explanation will clarify a possible misunderstanding by the complainants. We need to begin with an overview of the Open-End contract procedure. PennDOT must frequently carry out unanticipated

3

design related work. Open-End contracts are used to meet these time-sensitive needs. An Open-End contract is one that PennDOT executes with a consultant for work assignments that are not specifically identified at the time of contract solicitation or execution. By their nature, Open-End contracts do not relate to specific PennDOT projects at the time they are executed. Terms such as "stand by," "as needed," and "if and when directed" might also be used to characterize Open-End contracts.

Another important point is that the Open-End contract itself does not approve or authorize any work. When a task is identified, and no other means are appropriate, PennDOT will execute a "work order" under one of its Open-End contracts for that specific assignment. These work orders are the specific approvals for compensable work by the consultant.

When the Open-End contract was executed in April 1994, it was not specifically for the I-81 interchange project. In fact, as of this writing, work orders for 18 different projects have been executed under the Sheladia Associates Open-End contract of concern.

In the case at hand, the Open-End contract was for final and prefinal design activities. However, the referenced work order (No. 4) is for prefinal design activities only. The complainant is correct in stating that final design before a ROD is prohibited. Due to the concerns expressed in the complaint, we will take steps to assure that final design is not conducted by PennDOT or its consultants until the ROD is issued.

As we stated earlier, this is a controversial project. The FHWA has been criticized by some for being too deliberative and by others for being too expedient. In summary response to the complaint, the FHWA has found no improper conduct which led to irreparable harm. We consider Mr. Yerusalim's letters regrettable, but not harmful to the NEPA process. We believe this process will provide an objective and bias-free evaluation of all reasonable alternatives.

Hopefully, we have been responsive to your inquiry and the concerns of the complainants.

David C. Lawton

Date _____

# HOTLINE RESPONSE REVIEW / DISPOSITION INSTRUCTION

Hotline No. _____

    1.   Close Complaint _____

    2.   Return to action office _____

➡   Request following additional action/information:

    3.   Other instructions/comments:

JI-2 Hotline _____    _____
                                                    Date

JI-2 _____    _____
                                                    Date

# RECORD OF DECISION
## FEDERAL HIGHWAY ADMINISTRATION
## INTERSTATE 81 INTERCHANGE PROJECT
## S.R. 8016
## FRANKLIN COUNTY, PENNSYLVANIA

## I.    DECISION

The selected alternative for the Interstate Route 81 (I-81) Interchange project to provide access to Chambersburg, Pennsylvania is Alternative D Modified, a diamond interchange with a new bridge over I-81 approximately 412 meters (1,350 feet) south of the existing Walker Road (T-517) overpass. The southbound ramps to and from I-81 will be located on the east side of the existing Walker Road, and will tie in to existing Walker Road near the Greene Township-Chambersburg Borough line. The northbound ramps to and from I-81 will be located on the west side of Franklin Farm Lane. The existing Walker Road overpass will be removed. As Walker Road will be relocated during the construction of this project, existing Walker Road will terminate on both sides of I-81. Alternative D Modified includes ramps with a 4.6 m (15 ft) lane width, a 1.2 m (4 ft) left shoulder, and a 3.0 m (10 ft) right shoulder. The bridge carrying the relocated portion of Walker Road over existing I-81 will have 3.7 m (12 ft) lanes, one lane in each direction and a left-turn lane, and 3.0 m (10 ft) outside shoulders. The selected alternative is a modification of Alternative D and was developed in response to comments received on the final Environmental Impact Statement (final EIS) and to avoid, minimize and mitigate project impacts. Alternative D Modified was evaluated in a written reevaluation of the final EIS dated January 1999. Attachment A graphically depicts Alternative D Modified.

Alternative D Modified best meets the needs for the project identified in *Section I* of the final EIS. The reevaluation confirms that Alternative D Modified would not result in any significant environmental impacts that were not evaluated in the final EIS. Alternative D Modified is the environmentally preferred alternative for reasons discussed in the following sections.

This project was developed in accordance with the National Environmental Policy Act (NEPA) of 1969, CEQ Regulations for Implementing the Procedural Provisions of the NEPA (40 CFR 1500-1508), the FHWA Environmental Impact and Related Procedures (23 CFR Part 771), the Historic Preservation Act of 1966 (16 U.S.C. 470 f, Section 106, 110(d) and 110(f)), and other related Federal and state requirements.

The Surface Transportation and Uniform Relocation Assistance Act of 1987 (STURAA) provided funding for a new interchange that would provide access to Chambersburg, Pennsylvania and reduce traffic congestion on an existing interstate interchange. Environmental studies for the project commenced in 1988. A series of public meetings were held as the project developed. A draft EIS was circulated and on June 29, 1994, a public hearing was held for the project. Five alternatives were presented in the draft EIS. Alternative D-C (referred to as the

Walker Road location) was identified as the preferred alternative in the draft EIS. The final EIS was approved for circulation in mid 1995. Controversy with respect to the identification of historic properties was apparent from the comments. Several years of additional studies, coordination and consultation ultimately resulted in the identification of several additional historic properties on the east side of I-81 in 1997. An alternative has been identified that avoids the use of Section 4(f) properties, identified as of the date of this Record of Decision. Local officials of Franklin County, Greene Township, Guilford Township and Chambersburg Borough have been kept abreast of the progress through a series of Municipal Coordination Committee meetings. Alternative D Modified was presented to the public on June 4, 1998. A written reevaluation of the final EIS for the Interstate 81 Interchange project was prepared in accordance with FHWA regulations. All public and agency comments received during the review period for the final EIS and comments received through the Section 106 consultation process were considered in the decision to select Alternative D Modified.

## II.    ALTERNATIVES CONSIDERED

During the project development process, a range of alternatives including the No-Build, were evaluated. The comparative advantages of each alternative were considered with respect to the alternatives ability to meet project needs, the estimated costs, and the resulting environmental impacts. As described in *Section I* of the final EIS (*Project Location, Need and Background*), the project needs are:

- comply with a Congressionally-legislated demonstration project to provide access to Chambersburg and to relieve congestion on an existing interchange (Public Law 100-17);
- accommodate existing and future traffic volumes;
- adhere to comprehensive plans of area municipalities; and
- provide for existing and proposed development in the study area.

A complete description of the TSM alternative and the build alternatives considered as part of this study is included in *Section II. Alternatives* of the final EIS. Also included is a description of each alternative, indicating which were carried forward or dismissed. Alternatives which were determined not to substantially meet the project needs or that resulted in unacceptable adverse impacts were dismissed and not studied in detail. Those alternatives and their deficiencies are discussed in *Section II.A.* of the final EIS.

Historical resources were identified within the vicinity (area of potential effect) of the proposed interchange locations during project development. These resources were determined to be affected by construction of three of the build alternatives identified in the Preliminary Alternatives Analysis Report. Therefore, in early 1994, two additional build alternatives were

2

developed to avoid the use of historic resources. Section 4(f) Avoidance Alternatives were designated as D-C at Walker Road and B-1 at Kriner Road. The No-Build Alternative was carried through the EIS process as a baseline for the assessment analysis and does not satisfy the project need.

A summary description of the build alternatives that were studied in detail and the No-Build Alternative is provided below.

NO-BUILD: This alternative consists of no construction of an additional interchange on Interstate 81. This alternative does not meet the needs of the project. It was evaluated in the EIS because it provided a valuable basis of reference when evaluating impacts of other alternatives and it could have been selected.

ALTERNATIVE B - INTERCHANGE AT KRINER ROAD: This alternative would involve constructing four new ramps to form a diamond interchange on I-81 at the existing Kriner Road (T-489) overpass. The interchange location would have been approximately 1,200 meters (4,000 feet) south of the existing S.R. 0316 interchange on I-81. All ramps providing access northbound and southbound to I-81 would have been tied into Kriner Road. Kriner Road, Bowman Road (T-491), and the Kriner Road bridge over I-81 would have been brought up to current standards.

ALTERNATIVE C - INTERCHANGE AT FRANKLIN FARM LANE/WALKER ROAD: This alternative would involve constructing four new ramps approximately 1,200 meters (4,000 feet) north of the existing U.S. Route 30 interchange on I-81. The northbound ramps of I-81 would have tied into Franklin Farm Lane (T-560) east of I-81. The southbound ramps of I-81 would have tied into Walker Road (T-517) west of I-81. Access from one side of this interchange to the other would have been via the existing Walker Road overpass over I-81.

ALTERNATIVE D - INTERCHANGE AT WALKER ROAD: This alternative would involve constructing four new ramps to form a diamond interchange on I-81 at the existing Walker Road (T-517) overpass. The interchange location would be approximately 1,800 meters (6,000 feet) north of the existing U.S. Route 30 interchange on I-81. Approximately 810 meters (2,700 feet) of Walker Road would have been reconstructed to provide better horizontal alignment and to meet the current standards. The reconstructed section of Walker Road would have had one, 3.6 meter (12 foot) wide lane in each direction and 2.4 meter (8 foot) wide shoulders on the outside. A 90 meter (300 foot) section of Kohler Road would have been relocated to provide a 90 degree

intersection with Relocated Walker Road.

**ALTERNATIVE B-1 HISTORIC PROPERTY AVOIDANCE ALTERNATIVE FOR INTERCHANGE AT KRINER ROAD:** This alternative would involve constructing a new two quadrant cloverleaf interchange at existing Kriner Road (T-489) approximately 1,200 meters (4,00 feet) south of the existing S.R. 0316 interchange on I-81. The southbound I-81 on and off-ramps would have been constructed in the southwest quadrant of the interchange and would have intersected Kriner Road approximately 300 meters (1,000 feet) west of the existing Kriner Road over the I-81 bridge. The northbound I-81 on and off-ramps would have been constructed in the northeast quadrant of the interchange and would have intersected with relocated Kriner Road. Approximately 625 meters (2,050 feet) of Kriner Road, east of I-81 would have been relocated approximately 120 meters (400 feet) east of its present location and would have been constructed with one, 3.6 meter (12 foot) wide lane in each direction and 2.4 meter (8 foot) wide outside shoulder.

**ALTERNATIVE D-C (*EIS PREFERRED*) - HISTORIC PROPERTY AVOIDANCE ALTERNATIVE FOR INTERCHANGE AT WALKER ROAD:** This alternative would involve constructing a combination diamond/cloverleaf interchange in the vicinity of Walker Road (T-517). The northbound I-81 on and off-ramps would have been in a diamond configuration and would have been located at the existing Walker Road overpass approximately 2,195 meters (7,200 feet) north of the exiting I-81/ U.S. Route 30 interchange. The southbound I-81 on and off-ramps would have been in a modified cloverleaf configuration and would have intersected Relocated Walker Road west of I-81.

These alternatives are depicted on Figures ES-4 through ES-9, and described in detail in *Section II.B* of the final EIS. The alternatives have been evaluated and are presented in *Section IV. Environmental Consequences* of the final EIS.

The final EIS was circulated in May, 1995. Of the comments received during the EIS review period, Greene Township, the municipality within which the Preferred Alternative lies, and its representatives, expressed the most adamant concern and opposition to the project. During this review period, the Pennsylvania Department of Transportation (PennDOT) received a letter on June 12, 1995, from the State Historic Preservation Officer (SHPO) stating that the final EIS adequately addressed the identification and evaluation of historic and archaeological resources in relation to the project. The final EIS identified the Preferred Alternative as Alternative D-C which substantially met the project needs and avoided direct impacts to Section 4(f) resources. Recognizing, through past opinions tendered by Section 106 consulting parties as well as the SHPO, that the lack of trust among parties would restrict the ability to reach consensus on any

4

build alternative or any mitigation strategies, in 1995 the FHWA developed an MOA. Regardless of the ultimate project effect determination, the FHWA reasoned that an MOA would delineate project activities perceived to relate to Section 106 consultation, as well as measures that would avoid, minimize or mitigate potential impacts to cultural resources. On June 19, 1995, PennDOT received a letter from the Greene Township Board of Supervisors, declining to sign the Memorandum of Agreement (MOA) which had been prepared for the project in conjunction with the Section 106 process, stating that neither the Section 106 process nor the MOA had addressed the adverse effect the Preferred Alternative would have on the Greene Township-Conococheague Rural Historic District. The letter was based on a May 24, 1995, designation by SHPO that the Greene Township-Conococheague Rural Historic District is a National Register-eligible resource. The designation of the Greene Township-Conococheague Rural Historic District was sought independent of the project's NEPA and Section 106 processes, and neither FHWA nor PennDOT had been apprised of the submission or of the determination by the SHPO until receiving the comment to the MOA submitted by the Greene Township Supervisors.

On October 25, 1995, PennDOT and FHWA submitted a request for reevaluation to the Keeper of the National Register (Keeper). On January 15, 1997, the Keeper rescinded the determination of eligibility for the Green Township-Conococheague Rural Historic District. However, in that same letter, the Keeper determined that 14 properties were individually eligible for the National Register, including the Christian Fry, Jr. House, and that two rural historic districts were also eligible: an unnamed district to the east of I-81; and, the McKee Historic District.

As a consequence of these events, and the lapse of time involved in the process, a written reevaluation of the final EIS Preferred Alternative was prepared. Alternative D-C requires the use of land within the boundaries of and contributing to the National Register significance of the Christian Fry Jr., House/Fry Family Property. To avoid the use of property which contributes to a National Register-eligible resource, Alternative D was modified. Alternative D Modified, as described below, is the selected alternative.

**ALTERNATIVE D MODIFIED (*SELECTED*)** - Alternative D Modified consists of the construction of a diamond interchange with a new bridge over I-81 approximately 412 meters (1,350 feet) south of the existing Walker Road (T-517) overpass. The southbound ramps to and from I-81 will be located on the east side of the existing Walker Road, and will tie in to existing Walker Road near the Greene Township-Chambersburg Borough line. The northbound ramps to and from I-81 will be located on the west side of Franklin Farm Lane. The existing Walker Road overpass will be removed and a new bridge over I-81 will be constructed 412 meters (1,350 feet) south of the existing overpass. As Walker Road will be relocated during the construction of this project, existing Walker Road will terminate on both sides of I-81. Alternative D Modified includes ramps with a

4.6-m (15-foot) lane width, a 1.2-m (4-foot) left shoulder, and a 3.0-m (10-foot) right shoulder. The bridge carrying the relocated portion of Walker Road over existing I-81 will have 3.7-m (12-foot) lanes, one lane in each direction and a left-turn lane, and a 3.0-m (10-foot) outside shoulders.

Each alternative was evaluated in terms of its ability to solve the identified project needs. In addition, the environmental impacts associated with each alternative were considered in detail. The intent was to identify a safe, efficient transportation facility that best satisfies the project needs while avoiding, minimizing, and balancing impacts to social, natural and cultural resources.

## NEEDS

At the Kriner Road location, Alternative B would provide access to Chambersburg, reduce traffic volumes on the S.R. 0316/I-81 interchange, accommodate existing and future traffic volumes, and provide for existing and proposed development in the study area. Because the S.R. 0316/I-81 interchange is not congested, this alternative would not meet the need of the project to relieve congestion on an existing interchange. Alternatives B and B-1 would reduce traffic in the year 2016, by 6,300 and 6,450 vehicles per day at the S.R. 0316/I-81 interchange (1994 and 1995 traffic studies respectively). Alternative B-1 would provide access to Chambersburg, reduce traffic volumes on the S.R. 0316/I-81 interchange, provide for existing and proposed development, and accommodate existing and future traffic volumes. Because the S.R. 316/I-81 interchange is not congested, this alternative would not meet the need of the project to relieve congestion on an existing interchange.

In the vicinity of Walker Road, Alternative C would provide access to Chambersburg, accommodate existing and future traffic volumes, provide for existing and proposed development in the study area, and reduce traffic volumes and congestion on the U.S. Route 30/I-81 interchange. Alternative D would provide access to Chambersburg, accommodate existing and future traffic volumes, provide for existing and proposed development in the study area, and reduce traffic volumes and congestion on the U.S. Route 30/I-81 interchange. Alternatives C and D would both reduce traffic by 7,680 vehicles per day at the U.S. Route 30/I-81 interchange (1994 draft EIS traffic study). Alternative D-C would accommodate existing and future traffic volumes, provide for existing and proposed development, reduce traffic volumes and congestion at the U.S. Route 30/I-81 interchange, and provide access to Chambersburg. Alternative D-Modified would provide access to Chambersburg, accommodate existing and future traffic volumes, provide for existing and proposed development in the study area, and reduce traffic volumes and congestion on the U.S. Route 30/I-81 interchange. Alternatives D-C and D-Modified would reduce traffic by 5,800 vehicles per day at the U.S. Route 30/I-81 interchange (1995 and 1998 traffic studies).

None of the alternatives would meet the project need to adhere to the comprehensive plans of all area municipalities as project area municipalities have conflicting plans and zoning ordinances. Alternatives D-C and D-Modified best meet the project needs.


## ENVIRONMENTAL IMPACTS

The project study area is characterized by several resources, including agricultural land and National Register-eligible resources. While magnitude of the proposed project was minor, project impacts to the resources by alternative varied. Alternative impacts were balanced to arrive at an environmentally preferred alternative. The impacts to resources for each of the alternatives carried into the detailed alternatives evaluation can be found in the final EIS. Attachment B depicts the comparison of environmental impacts by alternative. The FHWA was notified of the identification of additional National Register eligible resources in the area of potential effect after the final EIS was circulated. The Chronology of Section 106 activities is included to this ROD as Attachment C. Subsequently, Alternative D (presented on page II-10 in the final EIS) was modified to avoid the Section 4(f) use of historic properties. Alternative D Modified best satisfies the needs of the project as stated in *Section I* of the final EIS and in the reevaluation, while avoiding the use of all Section 4(f) properties.

The impacts of Alternative B include adverse effects on historical resources, the use of three Section 4(f) historic resources, and probable secondary and cumulative development impacts to historic resources in the surrounding areas due to existing development allowances (i.e. the availability of water and sewer facilities). The impacts of Alternative C includes an adverse effect on historical resources, the use of contributing elements from one historic district resulting in a Section 4(f) use, and the limited potential for secondary and cumulative impacts to historic resources in the study area due to the existing development restrictions (i.e. lack of water or sewer facilities, presence of Agricultural Security Areas (ASA's), County ownership of land, and geologic constraints for on-lot sewers). The impacts of Alternative D include adverse effects on historical resources, also requiring the use of contributing elements from one Section 4(f) historic district, and the limited potential for secondary and cumulative impacts to historic resources in the surrounding areas due to existing development restrictions (i.e. lack of water or sewer facilities, presence of ASA's and geologic constraints for on-lot sewers). The impacts of Alternative B-1 include an effect on historical resources, perceived by the SHPO as an adverse effect and having probable secondary development impacts to historic resources in the study area due to existing development allowances (i.e. the availability of water and sewer facilities). The FHWA has determined that Alternative B-1 would have probably secondary and cumulative development impacts. The impacts of Alternative D-C include a no adverse effect determination by the FHWA on historical resources; SHPO perceived that the Alternative D-C would have an adverse effect due to potential secondary development impacts to historic resources. Other

7

impacts of Alternative D-C as determined by the FHWA include the use of a Section 4(f) property and the limited potential for secondary and cumulative development impacts to historic resources in the study area due to existing development restrictions (i.e. lack of water or sewer facilities, limits of ASA's and geologic constraints for on-lot sewers). The impacts of Alternative D Modified include a determination of adverse effect from the Advisory Council on Historic Preservation due to its perception that there is the potential for secondary and cumulative development impacts to historic resources in the surrounding areas. Consistent with the other alternatives in the vicinity of Walker Road, the FHWA has found that this alternative would not be the catalyst for secondary or cumulative development impacts to historic resources in the study area as existing development restrictions limit that potential (i.e. lack of water or sewer facilities, limits of ASA's and geologic constraints for on-lot sewers). Although Alternative D Modified would temporarily occupy a Section 4(f) property, its impact does not constitute a use, as defined within the conditions of 23 CFR 771.135(o)(7). The alternative would remove a non-contributing element, the existing Walker Road overpass. After construction, the ground would be restored to meet the above referenced conditions. Alternative D Modified would not directly or constructively use Section 4(f) protected historic property.

During the project development, farmland preservation was raised as an important issue; however, designated farmland within Greene and Guilford Townships in the vicinity of Alternatives C, D, D-C and the Selected Alternative is primarily zoned R-1, residential. The designated farmland in the vicinity of Alternative B and B-1 is zoned primarily for commercial development in Chambersburg Borough and for agriculture/residential, commercial and industrial uses in Guilford Township. As documented in the EIS and in the reevaluation report, proposed and ongoing development in the project area as well as the growth forecasts of the county and the municipalities give evidence that area development in the Kriner and Walker Road locations is not occurring in response to this project, but rather, that this project is proposed in response to ongoing, approved and projected development.

Alternative B will impact one Agricultural Security Area (ASA) for a total of 1.6 ha (4.0 a). No ASA's will be impacted by Alternative B-1. Alternatives C, D and D-C will each impact two ASA's for a respective total of 3.2 ha(8.0a), 3.6 ha(8.9a) and 1.2 ha(2.9a), and Alternative D-Modified will impact one ASA for 1.9 ha(4.7a). Alternative B impacts five farm operations, segments one parcel and will require the direct take of 5.7 ha(14.2 ac) and an indirect take of 1.2 ha(2.9a) of productive farmland. Alternative B-1 impacts two farming operations, segments two parcels and will require the direct taking of 5.1 ha(12.7ac) and an indirect take of 3.4 ha(8.5 a) of productive farmland. Alternative C impacts four farm operations, segments five farm parcels and requires the direct taking of 7.5 ha(18.6 ac) and an indirect taking of 4.3 ha(10.6 a) of productive farmland. Alternatives D and D-C each impact three farm operations, each segment one parcel, and require 3.8 ha(9.3 ac) and 3.2 ha(8.0ac) of productive farmland respectively. Alternative D has no indirect take and Alternative D-C will indirectly take 3.2 ha(7.9 a) of productive farmland.

The Selected Alternative impacts three farm operations, segments three parcels and requires the direct taking of 4.9 ha(12.1 ac) and the indirect taking of 0.7 ha(1.8 a) of productive farmland.

Alternatives B, B-1 and C would require no displacements. Alternatives D, D-C and D Modified would each require one residential displacement. Alternatives D, D-C and D Modified would displace one water well associated with this residential displacement. Alternatives B, B-1 and C would not directly impact Groundwater and Water Supplies. While not anticipated, due to the local geology all alternatives have the potential for indirect impacts to Groundwater and Water Supplies. None of the evaluated alternatives would have a direct impact or measurable indirect impact to Surface Water and Aquatic Biota.

Based on the above assessment, Alternative D Modified is now identified as the environmentally preferable alternative and the Selected Alternative. *Section VI* of the final EIS and *Section V* of the reevaluation report (Attachment D) describe the balancing process used to identify the Preferred and ultimately the Selected Alternative. Of all the alternatives considered, the Alternative D Modified avoids the use of Section 4(f) resources and minimizes impacts to Agricultural Security Areas.

Even with the designation of additional historic resources since the final EIS, there have been no significant additional impacts to environmental or historical resources as a result of the development of Alternative D Modified. Alternative D Modified lies within the area evaluated in the draft and final EIS's and it was developed as part of the continuing effort to avoid and minimize impacts. A summary of the environmental impacts of Alternative D Modified is found at *Table 3* of the reevaluation report. Based on the above reasons, Alternative D Modified has been identified as the Selected Alternative.

## III.     SECTION 4(f) RESOURCES

Although there are several Section 4(f) protected resources in the vicinity of the project area, no Section 4(f) resources are directly or constructively used by Alternative D Modified and therefore a Section 4(f) analysis was not required. Although Alternative D Modified would temporarily occupy Section 4(f) property, its impact would be so minimal such that it does not constitute a use as the conditions defined in 23 CFR 771.135 (p) (7) (I-v) are met. An analysis of the historic resource impacts and the applicability of Section 4(f) is contained in pages IV-6 through IV-23 of the final EIS and in the February 10, 1999, FHWA letter to PennDOT (Attachment E).

## IV.   MEASURES TO MINIMIZE HARM

Throughout the project development process, alternatives have been designed and modified to minimize, to the extent practical, impacts to identified resources.  In response to coordination with the federal and state resource agencies and the public, alternatives were refined to reduce impacts.  All practicable measures to minimize negative impacts on environmental resources have been incorporated into the project design.  Documentation of the coordination among individuals, municipalities, agencies, PennDOT and the FHWA is contained in a separately bound volume of the final EIS and in the project files.

A Memorandum of Agreement was prepared and executed to address concerns raised by certain consulting parties to the Section 106 process and, ultimately, to mitigate adverse effects as determined by the Advisory Council on Historic Preservation.   Although the FHWA effect determination did not agree with that of the ACHP, the FHWA accepted the determination in order to proceed with the project development.  The FHWA will ensure that the stipulations identified therein will be undertaken in a timely manner.

Mitigation measures have been proposed to offset the minimal, yet unavoidable, impacts to the resources in the project area and to ensure that project commitment associated with the Section 106 consultation.  These measures include, among other activities, the posting of historical/ educational signs and the development of other informational materials regarding the historic districts and farmlands; and compensation, and consideration of special design criteria, the minimization of right of way impacts on productive agricultural lands.  These mitigation measures, as well as others, are discussed in *Section IV* of the final EIS, and to the extent relevant, *Section V* of the reevaluation report.  Specific mitigation commitments are made in pages IV-90 through IV-94 of the final EIS; mitigation to productive agricultural lands is contained on pages IV-65 through IV-67 of the final EIS, and Section 106 mitigation is contained in the attached MOA (Attachment F).  Attachment G is a matrix describing the mitigation measures for Alternative D Modified.  During final design, attempts will be made to refine the engineering design to further avoid and minimize impacts to resources in the project area.

## V.   MONITORING OR ENFORCEMENT PROGRAM

Normal coordination during final design, right-of-way acquisition and construction will ensure that the environmental commitments will be followed.  PennDOT will use a Mitigation Memorandum as a tool to ensure that the mitigation commitments are implemented during final design and construction.  These mitigation measures are discussed in *Section IV* of the final EIS.  All mitigation commitments associated with the Selected Alternative will be consolidated into a single final Mitigation Memorandum.  The Mitigation Memorandum will be provided to design

and construction personnel for their use and reference to ensure that all mitigation commitments are incorporated into final design plans, and implemented during construction. These mitigation commitments are hereby incorporated into this Record of Decision by reference.

An Erosion and Sedimentation Control Plan will be prepared in the final design stage of the project to conform to the Pennsylvania Department of Environmental Resources Erosion and Sedimentation Control Program Manual.

## VI.    COMMENTS ON THE FINAL EIS

The Notice of Availability of the final EIS was published in the Federal Register on June 16, 1995. Legal notices were printed in *The Public Opinion* on June 16, 1995 and on June 23, 1995, and notice was printed in a newsletter which was distributed to over 500 people. The notices announced the availability of the final EIS and requested that comments be provided to PennDOT by July 17, 1995, fulfilling the 30 day comment period required for a final EIS. Due to the extent of comments received during the draft EIS, copies of the final EIS were made available for review at a number of locations identified in the *Preface* to the final EIS, including five locations in Chambersburg, Pennsylvania, and at two locations in the Harrisburg, Pennsylvania, area. A list of specific agencies, governments, groups and individuals to whom copies of the final EIS were sent is contained in *Section IV* of the final EIS.

Letters from 13 agencies or individuals for a total of 18 comment letters were received during the initial Final EIS comment period and included time extensions requested by Greene Township and the Pennsylvania Game Commission. Of these, five were received from state and Federal agencies (three state and two Federal), letters from two municipalities and one from an area development corporation; letters from two area historic organizations and letters from three individuals from the general public.

The following is a summary of the general issues raised regarding the final EIS and the responses:

ISSUE:    The Advisory Council on Historic Preservation's (ACHP) regulations implementing Section 106 of the National Historic Preservation Act (as amended) have not been followed.

RESPONSE:    As noted in the reevaluation report, there was extensive consultation during project development with the PA SHPO, ACHP, and the Section 106 consulting parties to identify historic resources within the area of potential effect; assess reasonably foreseeable effects as a result of the undertaking; and to seek ways to avoid, minimize, or mitigate these effects.

11

Beginning in 1993 with the submission of the Determination of Eligibility report to the PA SHPO, the Section 106 consulting process was continued through the establishment in early 1995 of a Municipal Coordination Committee (MCC) which met to discuss Section 106 issues. In addition, information about the process and the project was continuously communicated amongst all the consulting parties throughout project development. A Memorandum of Agreement has been prepared and executed. The intent of Section 106 regarding consideration and consultation has been met.

ISSUE:    The decision-making process has been flawed; the project need and alternatives development process had a predetermined outcome.

RESPONSE:  Alternatives for the I-81 Interchange Project were developed in accordance with applicable federal and state legislation and regulations, and were based on project need, the location of an interchange to comply with Public Law 100-17, and environmental features. The project needs are defined on page 2 of this Record of Decision and form the basis for the identification of alternatives. The implementing regulations for the National Environmental Policy Act require that all reasonable alternatives be explored and evaluated. A Design Location Study initiated in late 1988 examined alternatives at four different locations near Chambersburg. Two locations, Guilford Road and Woodstock Road, were dismissed as they did not meet project needs. A Preliminary Alternatives Analysis, completed in May 1990, recommended that alternatives at the Kriner Road and Walker Road locations be studied in detail. Alternatives at Kriner Road and at Walker Road, in addition to the No-Build Alternative, were studied in detail in the draft and final EIS. As confirmed in the written reevaluation of the final EIS, Alternative D Modified best meets the needs of the project and is the environmentally preferred alternative.

ISSUE:    The project will cause traffic on local roads to increase, necessitating improvements to the local road network.

RESPONSE:  The traffic studies show that traffic will increase on area roadways with or without an interchange at Walker Road. In fact, under the No-Build condition and with improvements to U.S. Route 30 and the completion of the Norland Avenue Extension (a local project), traffic on segments of Walker Road will likely increase by as much as 205% to 238%. One of the largest components of future traffic on area roadways is the planned and on-going development which has been identified in the area. Without this development, there would be increased traffic

on the area roadways surrounding the interchange area due to the background population growth, which is likely to occur with or without the construction of the interchange. While it is likely that roadway improvements will eventually be necessary, the improvements will not be as a result of this project.

**ISSUE:** The project will result in secondary and cumulative impacts which have not been evaluated.

**RESPONSE:** Conditions within the secondary and cumulative impact analysis area are described in the final EIS and are updated in the written re-evaluation. Development is planned and on-going in the Walker Road area. However, unplanned development in the immediate vicinity of Selected Alternative D Modified is unlikely due to the development controls in place, i.e. zoning, limited sewer and water service areas, Agricultural Security Areas, and weight restriction on the portions of Walker and Kohler Roads maintained by Greene Township. In addition, limited access easements have been incorporated into the design of the Selected Alternative. No secondary impacts are anticipated as a result of an interchange at Walker Road (Selected Alternative D Modified). There will a cumulative impact at the Walker Road location, because the intensity of proposed development on a tract in Chambersburg Borough is dependent on provision of sewer and water, extension of Norland Avenue, and construction of the interchange at Walker Road.

**ISSUE:** Impacts to farmland and farming operations will result from an interchange at Walker Road.

**RESPONSE:** Direct impacts to farmlands have been minimized to the greatest extent practicable, as described in the final EIS and the re-evaluation, and have been balanced by the requirement to avoid the use of Section 4(f)-protected resources. Access easements to a segmented parcel on the east side of I-81 will be provided. The increased width of the new Walker Road overpass provided by the Selected Alternative will improve safety for farm equipment operators, and the location will not add significantly to the farmers' travel distance.

During the circulation of the final EIS, several letters were received concerning compliance with Section 106 of the National Historic Preservation Act of 1966 and questioning the identification of, and potential impacts to, historical and cultural resources. These letters prompted the FHWA to review the final EIS Preferred Alternative, which ultimately resulted in the development and selection of a new alternative described in the reevaluation report and this Record of Decision as

Alternative D Modified.  The reevaluation report fully reviews the potential for environmental, cultural and other resource impacts for Alternative D Modified.  The reevaluation report concludes that the impacts associated with Alternative D Modified are substantially the same as the originally Preferred Alternative, Alternative D-C.  According to the analysis of the reevaluation report and application of 40 CFR 1508.27 which defines "significant," Alternative D Modified does not result in significant new impacts from that which were discussed in the final EIS.  In fact, the modification made to Alternative D lessens environmental impacts by avoiding historic resources and reducing visual effects to historic resources, without causing significant environmental impacts.  Alternative D Modified does not amount to a substantial change to the proposed action which results in "significant environmental impacts" that were not evaluated in the EIS.  Accordingly, a supplemental EIS is not required, and further distribution and comment on the Selected Alternative not required.

## VII.    CONCLUSION

Based on the analysis and evaluation presented in the Final Environmental Impact Statement: consideration of the social, economic and environmental factors; and input from the public involvement and Section 106 processes, Alternative D Modified is adopted as the Selected Alternative.

Date    3-25-99

David C. Lawton, P.E.
Eastern Resource Center
FHWA

3/24/99

Ronald W. Carmichael
Division Administrator
FHWA, Pennsylvania Division

ATTACHMENTS
RECORD OF DECISION
FRANKLIN COUNTY, PENNSYLVANIA
INTERSTATE 81, S.R.8016, SECTION 001


A.    GRAPHIC OF ALTERNATIVE D MODIFIED

B.    MATRIX OF ENVIRONMENTAL IMPACTS

C.    SECTION 106 CHRONOLOGY

D.    REEVALUATION REPORT

E.    FEBRUARY 10, 1999 FHWA LETTER TO PENNDOT REGARDING SECTION 4(F)

F.    MEMORANDUM OF AGREEMENT

G.    MATRIX OF MITIGATION MEASURES

# MEMO TO ADMINISTRATIVE RECORD

## Responses to Manko, Gold and Katcher letter
## dated December 8, 1995

1. Page 2, paragraph 1 - "To our knowledge, FHWA has never sought to overturn a final decision reached by the Keeper concerning the eligibility of an historic resources for inclusion in the National Register."

*Seeking a reevaluation of an historic resource determination from the Keeper of the National Register is not a frequent occurrence. However, when an entity, including FHWA, feels that the Keeper has erred in a determination of eligibility, it is the entity's responsibility to provide the Keeper with additional information that clearly portrays the nature and significance of the property (36 CFR 63.2)*

2. Page 2, paragraph 2 - "Second, FHWA has no legal right to request that the Keeper perform a "reevaluation" of the final determination which the Keeper reached. Moreover, the regulations governing this matter do not authorize the Keeper to perform such a reevaluation."

*The statements made by Greene Township's attorney regarding the lack of legal authority to conduct reevaluations of the eligibility of a property for inclusion in the National Register are incorrect. Section 800.4(c) of the regulations which govern the identification of historic properties under the Section 106 process clearly provides for the reevaluation of properties eligible for inclusion in the National Register:*

> *The passage of time or changing perceptions of significance may justify reevaluation of properties that were previously determined to be eligible or ineligible.*

*(36 C.F.R. §800.4(c).) According to Section 800.4(c), a reevaluation is permitted under the following two circumstances: (1) if there is a passage of time; or (2) if there is a change in the perceptions of significance. The regulations apply no time limitations to the "changing perceptions of significance". Therefore, Green Township's argument that a significant passage of time must occur is incorrect.*

*With regard to the alleged historic district referred to as the Conococheague Rural Historic District in Franklin County, Pennsylvania, FHWA and PennDOT conducted additional studies of this district after the determination of eligibility was made. The data resulting from these additional detailed studies support a stronger argument against the significance of the Greene Township-Conococheague Rural Historic District. Specifically, the data resulting from these additional studies support a finding that the Greene Township-Conococheague Rural Historic District is not eligible for inclusion in*

1

the National Register and agrees with the Keeper's March 3, 1995 letter which states the area to the east of I-81 does not retain the required integrity to qualify as a rural historic district. Therefore, because the regulations provide that a reevaluation of the determination of eligibility for a particular property may occur if there are changing perceptions of significance, FHWA is legally entitled to conduct a reevaluation of the determination of eligibility for the Greene Township-Conococheague Rural Historic District. Under the regulations the procedure for conducting a reevaluation are the same, and therefore, include the right to request a determination of eligibility from the Secretary of the Interior (the Keeper).

Greene Township's attorney claims that because 36 C.F.R Part 63 does not provide for a reevaluation, a request for reevaluation is impermissible. However, the Section 106 process is governed by 36 C.F.R. Part 800, not 36 C.F.R. Part 63. As stated above, Part 800 provides legal authority for a reevaluation. Part 63 governs the process used by the Keeper in making determinations of eligibility whether the request for determination is the initial request or is based on a reevaluation. In fact, Section 63.2(a)(3) provides that the determination of eligibility process applies to "[p]roperties determined eligible by the Secretary of Interior [the Keeper] for listing in the National Register", which is consistent with Section 800.4(c) that authorized reevaluations.

Moreover, requests for reevaluations of eligibility have been made in the past by other projects. For example, in California, a request for reevaluation process was made in the determination of eligibility for Mount Shasta. In this case, the state preservation office defined the boundaries of the potentially eligible historic site as consisting of 19,000 acres on Mount Shasta. The Keeper determined that 50,000 acres of Mount Shasta were eligible for listing with the National Register under Section 106 on March 11, 1994. After a public hearing and 60 day comment period, the Keeper issued his reevaluation in November, 1994 that adopted the boundaries set by the state preservation office based on integrity issues which were not clearly documented by the state preservation office in the original request for determination of eligibility.

3. Page 3, fourth paragraph - "This nebulous description serves to thinly disguise what apparently is the underlying rationale for the Project - to facilitate the development of lands located in the eastern end of Chambersburg and in south central portion of Greene Township. These lands are used for agriculture and are historically significant."

Congressman Shuster states in his letter of April 14, 1992 to Secretary Yerusalim that "this project ....benefit(s) an area congested by daily traffic and open(s) up new areas of Chambersburg for development".

One of the needs for the project as stated in the FEIS is providing for existing and proposed development in the study area. Land in the eastern end of Chambersburg and in south central Greene Township are currently zoned Low Density Residential,

2

Commercial Highway, Commercial Neighborhood, Medium Density Residential, Professional Office, and Heavy Manufacturing. Furthermore, the Agriculture Security Area (ASA) designation to several parcels adjacent to Walker Road within Greene Township does not protect agriculture land from development. The parcels that are considered ASAs are zoned Low Density Residential which permits development, not preservation of the land in agriculture use. It appears from the zoning designations that both Chambersburg Borough and Greene Township are preparing for development rather than discouraging it.

4. Page 4, third paragraph - "The "new areas of Chambersburg" which will be "open[ed] up" "for development" if the Project is constructed regrettably include areas in Greene Township near the proposed interchange and found within the Historic District."

Based on communication with local municipal officials, Chambersburg Borough and the surrounding area are anticipated to experience increased commercial, residential and industrial development. With or without the construction of the interchange, development will take place in the northern end of Chambersburg near the proposed interchange location at Walker Road. In December 1994, the area near Walker Road in Chambersburg was rezoned to industrial uses by the Chambersburg Borough Council to prepare for the anticipated growth.

Greene Township states that it does not want development around the Walker Road area; however, the area around Walker Road in Greene Township is zoned residential. Greene Township has the ability to limit development by zoning the area agricultural; but it has chosen not to do so. Paul Ambrose, Greene Township Supervisor is quoted in the October 30, 1995 Public Opinion as stating, "I have no intentions with trying to do anything to restrict development."

Knowing Greene Township's stated objections to development, FHWA anticipates purchasing limited access right-of-way along Walker Road within the Eastern Green Township Rural Historic District to assist Greene Township in its stated effort to maintain the historic and agricultural environment.

5. Page 5, second paragraph - "This incredible exchange of correspondence between Representative Shuster and Secretary Yerusalim and the commitments outlined therein took place at a time when the environmental studies associated with the Project had barely begun."

The project was initiated in 1988. In 1990, a Preliminary Alternatives Report was prepared and distributed. The Report identified Walker Road and Kriner Road as the two locations for a potential interchange. The selection of these two locations was based on engineering and environmental studies. The reference to correspondence took place in 1992 when the project was in the intermediate steps of the transportation development process and environmental studies had taken place.

3

6. Page 5, footnote 3 - "PennDOT's commitments to Bud Shuster in 1992 have manifested themselves in a myriad of ways not limited to efforts to limit the scope of historic resources found near the Walker Road alternative. For example, we have submitted formal comments in the past noting that there have been efforts to distort underlying data and information concerning development and traffic impacts on historic resources to favor the Walker Road alternative, and also efforts to turn a blind eye toward requirements under the Pennsylvania law designed to protect agricultural resources. These actions fundamentally violate the requirement found in the regulations implementing NEPA that agencies preparing environmental impact statements "[r]igorously explore and objectively evaluate all reasonable alternative." 40 C.F.R. 1502.14(a)."

*PennDOT and FHWA have addressed each comment from Greene Township, its consultants and its attorneys. Greene Township's allegations of distortion of information and data and its assertions that PennDOT and FHWA have turned a "blind eye" toward requirements under Pennsylvania law to protect agricultural resources have been proven erroneous. I-81 FEIS, Section VII, Volume 1, Pages 15-65; I-81 FEIS, Section VII, Volume 2, "Comments Addressed Before Publication of FEIS" letter (dated February 2, 1995) to Greene Township from FHWA addressing cultural resource issues; Responses to FEIS Comments, Pages 7-20, 63-87, 107-184, 230-246.*

7. Page 6, first paragraph - "...the decision by FHWA to take the unprecedented step of seeking to overturn the final decision by the Keeper that the Historic District is eligible for inclusion in the National Register is yet further evidence of this phenomena".

*Request for reevaluations have been made in the past. For example, in California, the request for reevaluation process was used in the determination of eligibility for Mount Shasta. In this case, the state preservation office defined the boundaries of the potentially eligible historic site as consisting of 19,000 acres on Mount Shasta. The Keeper determined that 50,000 acres of Mount Shasta were eligible for listing with the National Register under Section 106 on March 11, 1994. After a public hearing and 60 day comment period, the Keeper issued his reevaluation in November, 1994 that adopted the boundaries set by the state preservation office based on integrity issues which were not clearly documented by the state preservation office in the original request for determination of eligibility. Therefore, a precedent has been set for permitting a request for reevaluation.*

8. Page 6, second paragraph - "...the Keeper has previously considered and explicitly rejected the same arguments FHWA now makes in the Reevaluation Report.

*The Keeper rejected FHWA and PennDOT's opinion that the Greene Township-Conococheague Rural Historic District was not eligible for the National Register when FHWA and PennDOT used the larger boundaries which they were lead to believe was the*

4

*Greene Township-Conococheague Rural Historic District boundary to be submitted to the Keeper. Paula Reed submitted a smaller boundary. (See response #12)*

9. Page 6, second paragraph - "...FHWA incorrectly attempts to portray the Reevaluation Report as its only opportunity to supply information to the Keeper".

*The October 25, 1995 letter from FHWA transmitting the reevaluation report states it is additional information to "illustrate the extent and nature of the nonhistoric intrusions in the area".*

10. Page 6, second paragraph - "Accordingly, FHWA's request for a reevaluation is improper and without legal basis".

*See the response to Item No. 1.*

11. Page 6, Footnote 4 - "Documents from PennDOT's files indicate ongoing "interest" in the Project by Representative Shuster..."

*Elected officials often express interest in highway projects within their congressional district. State and federal legislative staff are frequently briefed by FHWA and PennDOT on the status of highway development projects. Local officials have also expressed an interest in the project. For example, elected officials from Greene Township, Chambersburg Borough, and Guilford Township have attended numerous meetings on this project. As indicated by letters in the Administrative Record, Representative Shuster has periodically been briefed by FHWA regarding the status of the project. Neither Representative Shuster nor his staff has attended the internal Management Team meetings which FHWA and PennDOT conduct regularly. A representative of Congressman Shuster's staff did attend the public officials meeting held April 3, 1995 along with other local and regional officials.*

12. Page 7, third paragraph - "The Boundary drawn to delineate the district in this report goes extensively beyond that boundary defined in the township's request and includes a large number of noncontributing residential areas that are not located within the boundary of the now determined eligible district.

*FHWA and PennDOT were not made aware of the eligibility of the Greene Township-Conococheague Rural Historic District until receiving Greene Township's letter (June 19, 1995) commenting on the MOA for the Eastern Greene Township Rural Historic District. At that time, PennDOT and FHWA contacted PHMC and reviewed the submission and*

5

files at PHMC. When FHWA sent _Rural Historic Landscape Assessment, Interstate 81 Interchange: Area East of Interstate 81_, July 1995, to the Keeper, the boundary used for Greene Township-Conococheague Rural Historic District was the boundary suggested by PHMC (the SHPO) in Dan Deibler's letter of May 24, 1995. The memo concerning the boundaries attached to the May 24, 1995 letter is attached here as Exhibit A. It is worthy to note that Paragraph #2 of the Memo states, "After careful review, the group decided to use property lines and roads for new boundaries and to make the following boundary changes:" The group consisted of Harry Stokes, Ted Hanson, Doug Reynolds, Susan Zacher, Paula Reed and "a representative of Greene Township." The boundary as reflected in the Memo was agreed upon by all members of the group, and it is this boundary upon which FHWA and PennDOT based their submission to the Keeper.

The boundary outlined by Paula Reed in her submission of eligibility of the Greene Township Conococheague Rural Historic District was not the boundary that the "group" had determined as the boundary according to the SHPO's May 24, 1995 letter. FHWA and PennDOT were not made aware of the revised boundary until FHWA received a letter from the Keeper (August 3, 1995) which stated, "The boundary of the eligible district is that originally proposed by the township in documentation forwarded to the Pennsylvania Historical and Museum Commission (received by the State on April 24, 1994 (sic)) and marked by a solid line on the enclosed map labeled Figure 1 - Revised."

FHWA's October, 1995, submission for a Reevaluation concerned the "revised" (smaller) District as identified on Paula Reed's submission to the Keeper and therefore is not identical to the original report. The boundaries of the District, as documented in PHMC files, had been changed without notification to FHWA or PennDOT. In addition to consideration of a smaller District, the reevaluation included a pictorial inventory and maps not included in the original submission.

13. Page 7, Footnote 5 - Pursuant to the regulations developed under the authority of Section 106 of the National Historic Preservation Act, FHWA must make a "reasonable and good faith effort to identify historic properties" that may be affected by a project and gather sufficient information to evaluate the eligibility of these properties for the National Register. 36 C.F.R. 800.4(b)."

FHWA followed every regulation and guideline applicable to this project. Historic properties were identified early in the project process. The alternatives' impacts on historic resources were identified in the Determination of Effect Report (April 1994, revised July, 1995) and Addendum to Determination of Effect Report (October, 1995).

14. Page 7, footnote 7 - "...a representative of the Keeper's office...conducted a field view".

No records of a field view by a representative of the Keeper is contained in FHWA's administrative record.

6

15. Page 8, second paragraph - "The arguments advanced by FHWA in the Reevaluation Report are identical to the arguments found in the Addendum, which are previously considered and specifically rejected...No changes to the area within the Historic District have occurred between FHWA's submission of the Addendum and its submission of the Reevaluation Report less than four months later..."

> *See comment #12*

15a. Page 8, Footnote 8 - "FHWA should not now be entitled to dispute the conclusions reached by the Keeper simple because FHWA mistakenly assumed that the Keeper would never disagree..."

> *See comment #12*

16. Page 9, first paragraph - "FHWA did, in fact, review the information submitted by the Township, and by letter dated July 11, 1995, sought from the Keeper a determination of eligibility for the Historic District in conformance with governing regulations and on the basis of both the Township's and FHWA's submittal, the Keeper determined that the Historic District was eligible...".

> *As requested by the Keeper in a letter dated June 30, 1995, FHWA submitted a determination of eligibility for the Conococheague Rural Historic District including a description, statement of significance, photographs and a map pursuant to 36 CFR 63.2 (d). FHWA determined the area east of I-81 does not have the characteristics of a rural historic district according to Bulletin 30 and is not eligible for listing in the National Register.*

17. Page 10, first paragraph - "It has not been nominated for inclusion in, nor has it been formally added to, the National Register. Because the Historic District is not listed in the National Register, it is inappropriate to utilize the procedures established for removing a property from the National Register, particularly where the applicable regulations specifically address such circumstances."

> *Paula Reed stated in the July 13, 1995 letter to Carol Shull that "It was our understanding that the increased scrutiny and attention which PHMC gave to its consideration of the District was because PHMC decided to treat our request for a DOE in the same fashion as a formal nomination." It appears from this statement that Greene Township understands the request to be treated as a formal nomination.*

> *36 CFR 60.15 (a)(2) are procedures for removing properties from the National Register based on additional information that shows that the property does not meet the National Register criteria for evaluation. Since no procedures have been established for petitioning the Keeper for removal of an eligible property, the procedures set forth for the removal of a nominated property have been referenced as guidance.*

7

18.    Page 10, second paragraph - "[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parities have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose. U.S. v. Utah Construction & Mining Co., 86 S. Ct. 1545, 1560 (1966)."

> *The doctrine of res judicata is a judicial principal.  A judicial function before an agency requires a hearing before an administrative law judge.  The determination that the Greene Township-Conococheague Rural Historic District is eligible for inclusion on the National Register did not involve a hearing.  Rather, the determination of eligibility was issued by the Keeper in his/her capacity to enforce the regulations, not in his/her judicial capacity to interpret the regulations.*

> *A determination of eligibility can be equated with a decision to issue a permit, which is not a judicial function.  In fact, if a permit application is filed on a certain subject and is denied by an agency, another permit application regarding the same subject matter could be filed with additional factual information by the same entity; thus, requiring another action by the agency to either grant or deny the permit.*

> *Therefore, Green Township's attorney blatantly misapplied the Supreme Court's holding in U.S. v. Utah Construction & Mining Co to the current situation.  Without dispute, the doctrine of res judicata is inapplicable in the current situation because the Keeper is not acting in a judicial capacity in determining whether a property is eligible for inclusion on the National Register.*

19.    Page 10, paragraph 3 (continued onto page 11) - "FHWA had a full opportunity to present its views and information to the Keeper prior to the time that the Keeper determined the Historic District to be eligible for the National Register".

> *Between the week of July 3rd and July 10th, the time between the Keeper's request to FHWA to make a determination of eligibility and the first attempt to provide support of FHWA's decision that the Greene Township-Conococheague Rural Historic District was not eligible, PHMC determined that the Greene Township-Conococheague Rural Historic District was not eligible in a letter dated July 5, 1995.  FHWA supported this decision in its July 11, 1995 submission to the Keeper.  It was believed at this time that all submissions plus the determination from the SHPO exhibited adequate evidence that the Greene Township-Conococheague Rural Historic District did not exist to the east of I-81 as stated by the Keeper in their March 3, 1995 letter to John Szajna of Nassaux-Hemsley. Admittedly, the broad-base approach of evaluating the eligibility in the July 11, 1995 submission to the Keeper was not all inclusive.  FHWA's submission to the Keeper was based on the original larger boundary determined by Harry Strokes, Ted Hanson, Doug Reynolds, Susan Zacher, Paula Reed and "a representative of Greene Township".  The submission also took into account the SHPO's determination that the area to the east of I-81 was not eligible in addition to the Keeper's original statement that the area east of*

8

*I-81 "does not retain the integrity to qualify as a rural historic district".*

*The submission of detailed information was provided to the Keeper after the determinations of both the FHWA and the SHPO were not accepted and the Keeper overruled her original determination on March 3, 1995 that the area to the east of I-81 "does not retain the required integrity to qualify as a rural historic district". Below is a chronology of events leading to FHWA's request for a reevaluation of eligibility for the Greene Township-Conococheague Rural Historic District.*

| | |
|---|---|
| 3/03/95 | *Keeper determined a large area, including the area east of I-81 not eligible for the National Register* |
| 4/24/95 | *PHMC received Greene Township-Conococheague Rural Historic District Determination of Eligibility from Greene Township (not known to FHWA or PennDOT)* |
| 5/29/95 | *PHMC determines Greene Township-Conococheague Rural Historic District eligible for National Register* |
| 6/12/95 | *PHMC sends PennDOT a letter saying all cultural resources issues for the I-81 interchange project have been addressed* |
| 6/19/95 | *Comments on MOA from Greene Township. First knowledge by PennDOT and FHWA of eligibility of Greene Township-Conococheague Rural Historic District.* |
| 6/30/ 95 | *Keeper requested FHWA make a determination of eligibility and transmitted P.Reed material to FHWA* |
| 6/30/95 | *P.Reed submitted additional information to Keeper (Patrick Andrus)* |
| 6/30/95 | *FHWA asks for clarification of eligibility of Greene Township-Conococheague Rural Historic District from PHMC because of the 6/12/95 cultural resource clearance letter* |
| 7/05/95 | *PHMC rescinds determination of eligibility for Greene Township-Conococheague Rural Historic District* |
| 7/11/95 | *FHWA submits Rural Historic Landscape Assessment I-81 Interchange: Area East of I-81. Determines Greene Township-Conococheague Rural Historic District not eligible* |
| 8/03/95 | *Keeper determined Greene Township-Conococheague Rural Historic District eligible for National Register* |

9

20.  Page 10, Footnote 9 - "...as found at 36 CFR §63.6. indicates that the National Park Service did not intend for administrative appeals or requests for reevaluation to be made from a determination of eligibility made pursuant to 36 CFR Part 63."

> *Section 63.6 does not mention administrative appeals or requests for reevaluations. Rather, Section 63.6 provides for the annual review of the condition of properties determined eligible for the National Register by the Keeper and the nomination of eligible properties for the National Register by the Keeper. Greene Township's allegation that Section 63.6 indicates that the National Park Service did not intend for administrative appeals or request for reevaluation is not supported by the actual language of Section 63.6 and is a leap of faith at best.*

21.  Page 11, second paragraph - "If FHWA believed that the Keeper had improperly determined that the Historic District was eligible for the National Register, FHWA's remedy, if so chose, was to appeal the Keeper's final determination directly to federal court for review".

> *A determination of eligibility can be equated with a decision to issue a permit, which is not a judicial function. In fact, if a permit application is filed on a certain subject and is denied by an agency, another permit application regarding the same subject matter could be filed with additional factual information by the same entity; thus, requiring another action by the agency to either grant or deny the permit.*

22.  Page 11, footnote 11 - "If FHWA is successful in obtaining a reevaluation of the Keeper's final determination regarding the Historic District, a dangerous precedent will be established."

> *See response to Item No. 3.*

23.  Page 12, second paragraph - "...the Reevaluation Report identifies a number of modern buildings which FHWA and PennDOT improperly assert are found within the Historic District. In fact, these buildings are located outside of the Historic District."

> *FHWA and PennDOT relied on the original mapping provided to the Keeper by Paula Reed to assess structures within the historic District. The original mapping provided to FHWA did not include additional information provided to the Keeper on June 30, 1995 by Paula Reed.*

24.  Page 12, third paragraph - "The improper inclusion of buildings found outside the Historic District which was apparently done on order to have these noncontributing elements lessen the integrity of the Historic District, is an analytical ploy previously used by FHWA and PennDOT..."

2106

*FHWA utilized the boundary suggested by PHMC. Upon reviewing Paula Reed's submission, PHMC added additional lands (working farms) to the areas of Paula Reed's submission. Both boundaries were submitted to the Keeper. The Keeper did not inform FHWA which boundary would be used when they requested FHWA to make a determination of eligibility (letter dated June 30, 1995). The boundaries used in the reevaluation report represented the most accurate boundary information available to FHWA.*

25. Page 12, fourth paragraph - "...the Keeper visited the Historic District in early 1995 prior to making its determination..."

*No records of a field view by a representative of the Keeper's is contained in FHWA's administrative record.*

26. Page 13, first paragraph - "...we maintain our position that a complete building inventory is not required and the information previously submitted on behalf of the Township to the Keeper regarding the Historic District to fairly and accurately represent the area in and around the Historic District".

*A complete inventory is not necessary. FHWA supplied a complete inventory so the Keeper could assess the full extent of the intrusions within the historic district.*

*With the limited information and mapping supplied to FHWA, it evaluated structures that appeared to be included within the District. The boundary in the attached map (Exhibit A), which was included in Paula Reed's submission to the Keeper, appears to include structure Nos. 58, 60 through 63, and 77 through 83.*

27. Page 13, second paragraph - "FHWA and PennDOT treat the historical context of the Historic District in snapshot form, ignoring the important concept of history as process and evolution."

*The Reevaluation included a description of the historical background and development pattern of the area. Deed research and historical photographs were used to support the conclusion that ownership, function of the land and configuration of farm parcels changed throughout the Nineteenth and Twentieth centuries. Unlike Paula Reed's submission, the Reevaluation noted and documented the extensive suburban development that has occurred within the area, most within the last 50 years.*

11

28.  Page 13. third paragraph - "...the Historic District has only about 8% of the overall acreage associated with modern development and still maintains its historic, agricultural characteristics."

*Based on field views, aerial photography and as documented in the photographic inventory in the Reevaluation, PennDOT and FHWA determined that the area contains 64 percent intrusions.  The intrusions consist of single family residential development.*

12

# EXHIBIT A



Greene Township – Conococheague Rural Historic District
Franklin County, Pa.
Scotland Quadrangle

attachment to PHMC's
May 24, 1995 submission

Principal Contributing Resources
◯

– – – changes as per 5/24/95
c. t. vict



Greene Township - Conococheague Rural Historic District

attachment to Paula Reed's
June 30, 1995 submission

# - ATTACHMENT -

*Opinions on Comments to the Request for Re-evaluation of the Greene Township - Conococheague Rural Historic District* by Paula Reed, dated December, 1995

**Comments, page 4 and 5, under *Design*:** The Supervisors consistently omit any reference to the modern properties that exist in the area. The modern properties comprise 64 percent (using their revised boundaries, as yet only proposed) of the total. The modern properties exhibit materials, layout, and planning of modern suburban development. The area of the Supervisors' submission does not retain integrity of design. The suburban development is not hidden behind "undulating terrain" as the Supervisors assert.

In the area of the interchange, Walker Road was relocated in 1963 when I-81 was built, and Franklin Farm Lane was relocated in the late 1960's when the Franklin County Prison was constructed. The existing Franklin Farm Lane does not date from the early 20th Century.

The District's period of significance involves agriculture. The evolution of the area has progressed from agriculture to suburbs. The proposed District does not retain physical integrity of design.

**Comments, page 5, under *Setting*:** The setting of the area of the Supervisors' submission has considerable suburban development. The extensive area of woodland along Conococheague Creek was not always present, according to informants. Although the upper portion of the Creek had historically been wooded, the portions from Woodstock Road to the northwest was not. Two informants stated that they had participated in truck farming of the area. The Creek had been used for irrigation, with extensive gardening occurring there. Hurricane Agnes (1972) destroyed the garden beds and associated buildings with such force that truck gardening ceased. One farmer stated that all the trees in that section dated from after Hurricane Agnes because no trees had been permitted to grow and shade the beds.

The portion of woodland along Conococheague Creek from Woodstock Road to the northwest should not be included as a "largely unchanged" setting. Historically, it would have been the site of extensive truck gardening. When that area is subtracted from the "largely unchanged" agricultural land, only 62 percent remains in agricultural use. Between the suburban development and large areas reverted to forest, the integrity of setting has been compromised.

**Comments, page 5, under *Materials*:** Like *Designs* above, the large proportion of modern properties (64 percent) has also compromised the integrity of setting.

**Comments, page 6, under *Workmanship*:** The two examples noted by the Supervisors do not translate into integrity of workmanship for the entire District. Certainly some features remain and the two farmsteads that contain these features could be considered for individual eligibility.

13

**Comments, page 6, under *Feeling*:** The suburban development and the areas of thick forest detract significantly from the integrity of feeling. The roadway network has been altered.

**Comments, page 6, under *Association*:** Farm borders can be seen, but so can the borders of suburban development. (The Brindle Farm has *not* been held by that family since 1818. Only small portions have existed in the family; the present estate has been assembled from many land transactions by the current resident.) The suburban development has replaced much of the agrarian association. Thus integrity of association has been severely compromised.

**Comments, page 7, under *Assessing Integrity*:** The Supervisors consistently ignore the extensive suburban development that has occurred in the area. Sixty-four percent of the properties are modern. Thus the area of the Supervisors' submission is not intact. It does not retain identity or character; it retains only a skeleton of the "essential physical features." The high rate of suburban development detracts from the "overall sense of time and place."

Finally, while all properties change over time, the change that would be expected of an agrarian area would be structures of field patterns indicative of changing technology. These types of changes are present on the farmsteads of the area of the Supervisors' submission. However, extensive suburban development is not a reaction to changing agricultural technology, but an intrusion of a different kind of land use. This different land use has resulted in significant changes in the area.

**Comments, page 8, third complete paragraph:** Conococheague Creek did not "evolve from a natural area to an industrial area, to a recreational area and back to a natural area." The mill sites along the Creek became objects of speculation prior to the nearby farmlands. Grain milling thus occurred concurrent with settlement. In addition, grain milling in an agricultural area hardly qualifies as industrial use. The mills continued until after World War II. The Creek was likely the site of recreational activity throughout the period 1790-1940. The Creek continues to be the site of recreational activity today.

The Supervisors' assertion that "FHWA and PennDOT's view of the past is narrow in scope and inappropriately limited" is misleading. The context of the *Reevaluation* included considerable information on process. However, the Supervisors' have omitted discussion of the extensive suburban development. The suburban development detracts from the integrity of the areas of the Supervisors' submission. The development is an intrusive and significantly different type of land use.

If the Supervisors' were interested in "vibrant and dynamic" landscapes, they would look to the north of their area. The northern portion of Southampton and all of North Newton and Penn Townships are excellent examples of potentially-eligible rural historic landscapes. Suburban development has not encroached there, as it has in the area of the Supervisors' submission.

14

**Comments, page 9, number 1:** The Greene Township Supervisors have retained both legal counsel and an architectural historian to act in their behalf. The Supervisors have thus produced the products that have resulted in the present controversy. Because the area of the Supervisors' submission should not be considered to be an eligible Nation Register of Historic Places historic district, it was not referred to as such.

**Number 2:** The Supervisors' submission does not state that any architectural qualities exist separate from agricultural uses.

**Number 3:** *First Paragraph* - The rule of thumb of 15 percent non-historic properties has been offered and used by Dr. Bernard Herman of the University of Delaware.

*Second Paragraph* (pages 9 and 10) - Considering open land is one thing but the Supervisors' submission ignores the extensive suburban development which occupies former farmland.

*Third Paragraph* (page 10) - It is the Supervisors that cannot "see the forest for the trees." Their interest in the eligibility of an historic landscape is only a means to block the construction of an interchange at Walker Road. The Chambersburg *Public Opinion* (Monday, October 30, 1995) has quoted Supervisor Paul Ambrose as stating, "I have no intentions with trying to do anything to restrict development [in the area of the Supervisors' submission]." The Supervisors see only the agricultural lands, and apparently use blinders when passing through the suburban development.

*Fourth Paragraph* - The example hypothesized by the Supervisors is inappropriate. Hypothetical examples can be used to illustrate any specific point. Let us discuss reality rather than hypothetical examples. The reality is that 64 percent of the properties are modern. Only 62 percent (of nearly 100 percent throughout much of the last century) remains in agricultural use. Suburban development has occurred extensively and in the heart of the area of the Supervisors' submission.

*Fifth Paragraph* (pages 10 and 11) - The Supervisors contend that a "building inventory" is "but one discrete factor" in considering eligibility. The inventory of the *Reevaluation* demonstrated the extent of the suburban development in the area which certainly detracts from its integrity. FHWA does not agree with their additions to the number of historic properties. The Brindle family cemetery was included as part of the Brindle Farmstead, and should not be counted separately (unlike the Fry Family Cemetery, which has ceased to be part of the Fry Farmstead on the northwest side of I-81).

**Number 4:** The extensive suburban development at the center of the area of the Supervisors' submission effectively bisects the area. This is apparent Photos 3-7 of the *Reevaluation*.

**Number 5:** The assertion that the farmsteads have "substantial linkage" is not demonstrated. If document research had been performed, the Supervisors would not have "substantial linkage." If the farmsteads were to be assumed to be individually eligible, their boundaries would likely

be the existing tax parcel. Other tax parcels owned by the family could not be demonstrated to be part of the farmstead historically. Considerable land transactions have occurred, as documented in the *Reevaluation*. If such an assumption were to be made, the farmsteads would thus have only one boundary in common with another farmstead.

For example, the White family, which occupies the Nissely Farmstead, also owns land separated from their existing plot that contains the buildings of the Farmstead. This separated land would not likely be considered to be part of the Farmstead, if it were to be considered eligible. This separated land was not historically owned by the Nissely family, or any other owner of the Nissely Farmstead. [This was not a hypothetical example, but utilized actual documents.]

**Number 6 (pages 11 and 12):** The presently-wooded area along Conococheague Creek, from Woodstock Road to the northwest, was historically cleared of trees and used for garden production. It thus should be included in land that is no longer farmed. The approximate number of the *Reevaluation* is accurate.

**Number 7 (page 12):** The area of the Supervisors' submission contains so much suburban development that the FHWA initially believed an inventory was unnecessary. However, upon realizing the Supervisors' submission was fundamentally flawed,by not including a full description of the modern intrusions, FHWA provided an inventory.

**Number 8:** The contextual information of the *Reevaluation* is neither questionable nor unsubstantiated. The research performed can be replicated, and appropriate documentation is provided.

**Number 9:** The fact that considerable suburban development occurs on Witwer, Ebersole, and Kirkpatrick lands indicates the extent of the intrusions.

**Number 10:** The area of the Supervisors' submission exhibits historic features. However, the broadly-curved lanes of suburban development are also present.

**Number 11:** Extensive suburban development occurs along Walker Road. Walker Road has not been "shielded" from development. Twenty-one modern residences, not counting the nine of Pheasant Run, exist along Walker Road.

A kilometer with heavy farm machinery on a 4.9 meter-side (16 foot-wide) road is a long distance. Farm machinery is built to work in lightly-packed fields. The speed is slow, and tires are made to bite deeply. The slow speed results in a hazard (slow-moving vehicle signs are required) and the tires wear badly on paved roads.

**Number 12:** General Philip Sheridan did order the destruction of building and crops in the Shenandoah Valley.

16

2115

**Number 13 (pages 12 and 13):** The Supervisors suggest that the Zugs' mill was not important to the surrounding agricultural area. In contrast, the fact that the mill continued until 1946 is clear evidence that it was important to the local farmers. The mill could grind any grain, including barley, oats, and maize for feed for both cattle and horses. The decline of the local wheat culture did not automatically mean the decline of local grist mills. It is the Supervisors that do not understand the interrelationships of agricultural areas.

**Number 14 (page 13):** Many mills exist in the Cumberland Valley. Again, the Supervisors have misidentified the mill. The building they persist in calling a mill sits upstream of the dam, where water could not have flowed a wheel. The Supervisors' confusion apparently has resulted in a misreading of the 1868 map, confounded with inadequate documents research. Farm fields remain; however, extensive suburban development also exists.

**Number 15 (pages 13 and 14):** Pheasant Run development is not hidden behind "rolling hills and undulating landscape." Some of the homes are prominently visible from other areas. (Photograph 13 of the *Reevaluation* shows a modern residence of Pheasant Run in a quite visible position.) The trees of Pheasant Run comprise part of an upscale modern suburban development, and would not have been historically present. The woodlots utilized by the historical population were located on South Mountain (several deeds to such land were encountered by the FHWA researchers).

**Number 16 (page 14):** There is no legal or physical impediment to extensive development in the area of the Supervisors' submission. The area is zoned R2, for single-dwelling residential development. Permits for sewage disposal must be obtained. However, judging from the extensive development that has already occurred, such permits can be easily obtained. If the Supervisors were really interested in maintaining the historic integrity of their area, it would be zoned agricultural, so that no additional residences could be constructed without a variance.

**Number 17 (pages 14 and 15):** In general, agencies such as the Pennsylvania Historical and Museum Commission utilize the concept of a goal of less than 15 percent intrusions. The area of the Supervisors' submission contains 64 percent intrusions. These intrusions consist of single-family residential development, and are not hidden behind hills or in sunken areas. Although some are not as visible as others, some of the historic properties are also less visible than others. The photos of the Supervisors have been carefully chosen to show only fields. The more general photos of the *Reevaluation* demonstrate the lack of historic viewsheds.

**Number 18 (page 15):** The boundary referred to on page 14, footnote 20 of the *Reevaluation* does not run along the edge of new development. It runs through the middle of an agricultural field. It does so to avoid running along one side of the road, then crossing the road to encompass properties on the other side. Because the boundary runs through an agricultural field, the Supervisors should have explained why a portion of an agricultural field was not included in a submission that emphasized agriculture. The Supervisors included the field to gerrymander the boundary to exclude as much of the already-existing development as possible. (The development along Cook Road is also prominently visible, running along a ridge, clearly not hidden behind

hills or in a sunken area.)

**Number 19 (page 15 and 16):** **[First bullet]** The development shown in *Photo 15* is noted in the *Reevaluation* to be "excluded from the area of the Supervisors' submission" (page 24). The suburban development shown in the photograph is, like that of Cook Road, prominent and visible.

**[Second bullet]** The modern suburban development has not been "blatantly exaggerated." It has been documented, and can be delineated in a field view.

**[Third bullet]** The boundary utilized was the most accurate for which the FHWA had been provided. The power substation is itself modern development.

**[Fourth bullet]** The subdivision in question has two residences under construction, and four others sold.

**[Fifth bullet]** The equestrian training track is entirely modern in construction, has a modern residence on its grounds, and faces additional modern residences across Walker Road. It is not "surrounded by an agricultural landscape."

**[Sixth bullet]** Although the stippling runs too far to the west, the development noted is present, and is accessed from Smoketown Road.

The extent of development is apparent; it has not been intentionally exaggerated. In addition, the extant historic features of the area of the Supervisors' submission are noted. However, contrary to the Supervisors' wishes, the extensive development has also been noted.

**Number 20 (pages 16 and 17):** On page 31 of the *Reevaluation*, in paragraphs 7 and 8 (immediately preceding paragraphs 9 and 10), it is stated that the development along both Cook and Hafer Roads was excluded from the area of the Supervisors' submission. Both developments, although outside the area, are prominently visible from it, diminishing the viewshed.

**Number 21 (page 17):** The information of paragraph 11 of page 31 of the *Reevaluation* is not "opinion." It was described by three different informants, two of which farmed the area prior to 1972. On the east side of Woodstock Road, the forest existed in one form or another throughout the early twentieth century, and perhaps in the last century. On the east side of Woodstock Road, the terrain is largely swamp. However, on the west side of Woodstock Road, the site of the six substantial concrete dams of the Kennedy-Zug agreement, extensive gardening activities occurred. The Supervisors continue to argue about a "natural state," which is never explained. (Do they mean a climax forest?)

**Number 22:** The Supervisors assert that the *Reevaluation*, despite its detailed context, depicts the area as a "single moment of time." To the contrary, the *Reevaluation* covered the entire time

18

span of the Supervisors' submission. The *Reevaluation* noted and documented the extensive suburban development that has occurred within the area of the Supervisors' submission, most within the last 50 years.

**Number 23 (page 17 and 18):**  The FHWA has stated the reasons why the forest from Woodstock Road to the northwest should not be included, it has lost its historic integrity. Only 62 percent of the area of the Supervisors' submission retains its historic use.

The number of farm lanes was extrapolated from field patterns extant in the area of the Kirkpatrick Farmstead. Although an extrapolation, farming practices were similar, and thus field size would have been similar throughout the area of the Supervisors' submission. The extrapolation is not "baseless," a word the Supervisors use when something does not fit with their interpretation.

Edgewood Road is obviously a modern highway, with its wide berms and banked curves. The Road is clearly different from the other roads in the area (see *Reevaluation* photos 5, 6, and 23).

The fields have been made larger; this statement reflects the Supervisors' poor understanding of the changes that have occurred in agricultural in the last two centuries. Smaller fields represented the mixed farming that was largely the practice of the latter half of the nineteenth and early part of the twentieth centuries. As farmers moved to more dependence on only a few crops, fields grew in size. In addition, the change from animal traction to internal-combustion traction resulted in less stops to rest animals during plowing (the original concept of the furlong).

**Number 24 (page 18):**  The amount of barley, rye, and wheat comprised a small proportion of the total crops observed.

**Number 25:**  As noted in earlier submissions, several individual properties may be eligible for inclusion in the National Register of Historic Places within the area of the Supervisors' submission. These statements were not concessions, but accurate identification, which has occurred throughout this project.

The statement that "Nolts Road is the last remaining tar and chip surfaced road in Greene Township" is inaccurate. On Nolts Road (originally Walker Road prior to the construction of existing I-81), the asphalt has leeched out of the surface, giving the chips more prominence. Tar and chip roads exist throughout the Township, and are still used today.

**Number 26:**  The building has been misidentified; the Supervisors should look at Deed Book 8, page 271 and Deed Book 177, page 494, as referenced in the *Reevaluation*. In addition, logic would dictate that a mill cannot sit above the dam, where gravity cannot carry water to a wheel. The dam immediately below the building is the Zug family's dam. Simple document research would have demonstrated the fallacy of the misidentification.

19



U.S. Department
of Transportation

**Federal Highway
Administration**

Office of the Administrator

April 15, 1996

HRA-03
HDA-PA (2)
400 Seventh St., S.W.
Washington, D.C. 20590

Refer to:  HPD-1

Mr. Stephen P. Bucher
President, Green/Guilford
  Environmental Association, Inc.
5125 Lincoln Way East
Fayetteville, PA  17222

Dear Mr. Bucher:

Thank you for your January 26 letter to the President, cosigned by Mr. John G.
Enders, regarding the proposed I-81 interchange project in Franklin County,
Pennsylvania.  I have been asked to reply.

As you mentioned, funding for this project was authorized when Congress
earmarked funds for a highway "demonstration project" to construct an inter-
change that provides access to Chambersburg.  We have long opposed the congres-
sional practice of earmarking because we believe that apportioning funds to the
States by statutory formula is a fairer way of distributing limited funds.
However, when Congress earmarks funds, we have no choice but to make those funds
available to the State transportation departments.  They have the option of
developing the project for which the funds are authorized, but cannot use the
funds for any other purpose.

Our role, when the State transportation department decides to use Federal-aid
funds for any eligible project, is to review the State's work to make sure it
meets Federal requirements, including the National Environmental Policy Act of
1969 (NEPA) and other environmental and related laws, regulations, and policies.
We also provide technical guidance to the State and grant approvals at key
stages of project development.

Environmental documents prepared for Federal-aid highway projects, such as the
environmental impact statement (EIS) for the I-81 project, are Federal Highway
Administration (FHWA), not State, documents.  As explained in our regulation on
"Environmental Impact and Related Procedures" (Title 23, Code of Federal
Regulations, Subpart 771.109):

> If the applicant is a public agency that has statewide jurisdiction
> (for example a State highway agency or a State department of trans-
> portation) . . . the applicant may prepare the environmental impact
> statement (EIS) and other environmental documents with the Adminis-
> tration furnishing guidance, participating in the preparation, and
> independently evaluating the document.

In the case of the I-81 project as in all other Federal-aid projects, the FHWA
is responsible for ensuring that all reasonable alternatives are rigorously
explored and objectively evaluated.  We work through the State transportation
department to accomplish this Council on Environmental Quality requirement, but
it is our responsibility to ensure compliance.

2

You raised concerns about correspondence from 1992 that discusses locating the interchange at or near Walker Road. This issue was also raised in the comments received following release of the final EIS. In the course of considering the substantive comments received, we are reviewing this issue and will address it in the Record of Decision (ROD).

I also want to assure you that the Pennsylvania Department of Transportation and the FHWA are working closely with the Keeper of the National Register of Historic Places, National Park Service, regarding the "Greene Township-Conococheague Rural Historic District." All issues related to the district for the National Register will be resolved before we issue a ROD on the project.

Public involvement is an important part of any projects. We appreciate, therefore, your letting us know of your concerns. I cannot predict the outcome, but I can assure you that all substantive issues raised by the public will be fully considered as we complete review of the proposed I-81 interchange project in accordance with NEPA.

Sincerely yours,

Rodney E. Slater
Administrator

cc:
Ms. Sue J. Smith
Director, Office of Agency Liaison
Room 6, OEOB
The White House
Washington, DC  20500

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

On this 17th day of September, 2001, she served a copy of the foregoing document by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by deposition said envelope and contents in the United States Mail at Harrisburg, Pennsylvania to:

Thomas Alan Linzey, Esquire
Community Environmental Legal Defense Fund
2859 Scotland Road
Chambersburg, PA  17201


*Rebecca A Plesic*
REBECCA A. PLESIC
Legal Secretary

15