

# In the United States District Court for the Middle District of Pennsylvania

| | |
|---|---|
| GREENE/GUILFORD ENVIRONMENTAL ASSOCIATION, a non-profit corporation incorporated under the laws of the Commonwealth of Pennsylvania, CITIZENS FOR PLANNED COMMUNITY GROWTH, an unincorporated association organized under the laws of the Commonwealth of Pennsylvania, PAUL B. AMBROSE, JOHN G. ENDERS, CHARLES F. RAHAUSER, BETSY RAHAUSER, DOUGLAS A. WARNOCK, U.X VAGNERINI, THOMAS W. BUNDY, STEPHEN P. BUCHER, ROGER J. ROBERTSON, JAMES A. STRITE, JR., DAVID A. GUTHRIE<br><br>v.<br><br>KEN WYKLE, Administrator, Federal Highway Administration, ROBERT GATZ, Federal Highway Administration<br><br>and<br><br>BRADLEY L. MALLORY, Secretary for The Department of Transportation, Commonwealth of Pennsylvania<br>          Defendant-Intervenor | Civ. No. 1:CV-01-0910<br><br>(Judge Rambo)<br><br>FILED<br>HARRISBURG, PA<br><br>DEC 1 4 2001<br><br>MARY E. D'ANDREA, CLERK<br>PER_____ DEPUTY CLERK |

### MEMORANDUM OF LAW IN SUPPORT OF

### PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD AND FOR JUDICIAL NOTICE OF CERTAIN DOCUMENTS

# I. PROCEDURAL HISTORY

This lawsuit was filed on May 24, 2001. On June 6th, the Plaintiffs filed an Amended Complaint.

On August 15, 2001, Bradley Mallory, the Secretary of the Pennsylvania Department of Transportation, filed a Motion to Intervene in the case.

On August 30, 2001, the Plaintiffs filed a Motion seeking limited discovery in addition to the Administrative Record. That Motion was denied by this Court via a written opinion on October 17, 2001.

On November 20, 2001, this Court granted the Motion to Intervene filed by Bradley Mallory, the Secretary of Transportation for the Commonwealth of Pennsylvania.

# II. STATEMENT OF THE FACTS

On April 2, 1987, the United States Congress adopted the Surface Transportation and Uniform Relocation Assistance Act (STURAA). As part of this legislation, Congress appropriated $5.2 million for a "demonstration project", which would "demonstrate[] how construction of an interchange on a north-south interstate route [would] provide access to Chambersburg, Pennsylvania, and relieve traffic congestion on an existing interchange on such interstate route." Pub. L. No. 100-17, §149(a)(74), 101 Stat. 132, 192 (April 2, 1987). Funding for such a "demonstration project" was secured through the efforts of Representative Bud Shuster for his home Congressional District.

In May of 1994, a Draft Environmental Impact Statement (DEIS) was approved by the Defendants for the proposed interchange. Through that document, PennDOT selected the Walker Road location for the exit interchange as the "Preferred Alternative." In May of 1995, a Final Environmental Impact Statement (FEIS) was

approved by the Defendants. That document selected an Interchange at Walker Road as the "Selected Alternative." On March 24th and 25th, 1999, the Record of Decision ("ROD") for the Interstate 81 Interchange Project was signed by David Lawton of the Eastern Resource Center of FHWA and Ronald W. Carmichael, Division Administrator, FHWA, Pennsylvania Division.

A Re-evaluation of the FEIS was released in January of 1999, and a "Re-evaluation" of the ROD was released June 28, 2001.

### III. STATEMENT OF QUESTIONS INVOLVED

A. Should various letters, documents, and studies prepared and circulated by the highway agencies during the planning and design process for the interchange project be made part of the Administrative Record compiled for judicial review?

*Proposed Answer:* Yes.

### IV. STANDARD OF REVIEW

The Administrative Procedure Act requires Courts to "review the whole record." when an agency's decision is subjected to judicial review. *See* 5 U.S.C.A. section 706. In addition, under the authority of 23 CFR Subpart 771.109, the Defendants are required to "independently evaluate[]" documents prepared by State agencies to comply with the National Environmental Policy Act. Independent evaluation requires that all documents prepared by the State agency become part of the official Record reviewed by the Defendants.

The Third Circuit Court of Appeals has determined that a "reasonableness" standard of review applies to determine whether an agency took a "hard look"

at the environmental consequences of the action, whether the agency identified the relevant areas of environmental concern, and whether the agency made a "convincing" case that the impacts were insignificant. *Township of Lower Alloways Creek v. Public Service Electric & Gas Co., 687 F.2d 732, 742* (3rd Cir. 1982). Thus, the Administrative Record must be complete to enable a reviewing Court to exercise effective judicial review.

Other Circuit Courts have held that the Administrative Record must include "all materials compiled by the agency at the time the decision was made." *See James Madison Ltd. ex rel. Hecht v. Ludwig,* 82 F. 3d 1085 (D.C. Cir. 1996), *cert denied* 117 S.Ct. 737 (1997); *National Audubon Society v. Hoffman,* 132 F. 3d 7 (2nd Cir. 1997). In addition, Courts have held that supplementation of the Administrative Record is appropriate "when an agency deliberately or negligently excludes certain documents." *Sierra Club v. Slater,* 120 F. 3d 623 (6th Cir. 1997).

## V. ARGUMENT

### A. The 1977 Franklin County Comprehensive Plan Must Be Supplemented to the Administrative Record Because One of the Primary Identified Needs of the Project is the Project's Consistency with Municipal Comprehensive Plans.

The original Franklin County Comprehensive Plan was not included within the Administrative Record produced for this project. That Plan must have been considered by the Defendants, in addition to the Comprehensive Plans of other municipalities, to determine whether the alternatives for the project satisfied the Defendants' stated project need of consistency with municipal comprehensive plans. The 1977 Comprehensive Plan was in effect from the date of the inception of the Exit project until 1998.

### B. Contracts, Work Orders, and Proposals for Work Orders for the Planning and Design of the Exit Project Must be Included Within the Administrative Record Because the Documents are an Integral Part of the Project

Contracts and work orders prepared for the planning and design work necessary for the Exit interchange project must be made part of the Administrative Record. Plaintiffs' allegations, in part, focus on the Defendant and Intervenor's predetermination of the location of the exit, and resources committed to the project prior to the satisfaction of environmental, and other, requirements. As such, the omission of documents - which show the pattern of contracting and the scope of contracting of the highway agencies - from the Administrative Record frustrates judicial review on those claims.

Proposals for Work Orders are also essential to judicial review of the Plaintiffs' claims, as they contain a scope of work in response to Defendants' advertisement for specific work to be completed on the exit project. No Proposals for Work Orders were included in the Administrative Record produced by the Defendants.

### C. FHWA's Electronic Mail Sent Between January of 1999 and June 28, 2001; and PennDOT's Electronic Mail Sent Between 1988 and June 28, 2001 Pertaining to the Exit Project Must be Included in the Administrative Record

Included in the Administrative Record compiled by the Defendants are electronic mail communications sent between and amongst FHWA staff between the inception of the project and January of 1999. No electronic mail communications after that date were included in the Record. In addition, no electronic mails between or amongst PennDOT staff were included in the Record. Finally, no electronic mails between the highway agencies and the staff of U.S. Representative Bud Shuster have been included in the Record. The "Re-evaluation" of the ROD, the final document to be prepared by the highway agencies on the project, was released June 28, 2001. Thus, the Plaintiffs are

requesting all electronic mails which were circulated up until that final date.

A cursory review of the electronic mail included in the Record reveals that many decisions concerning the project were made and transmitted via electronic mail. The absence of electronic mail from the Administrative Record frustrates judicial review because the Plaintiffs' claims focus on decisions made by the highway agencies which predetermined the location of the interchange and which circumvented provisions of federal law. Taking a "hard look" at the actions of the highway agencies requires that electronic mails be included as part of the Administrative Record, as well as hardcopy communications sent by - and to - the Defendants.

D. Various Items Referenced Within the Administrative Record Must be Made Part of the Administrative Record for a Complete Record to be Produced for Judicial Review

This Motion to Supplement is composed to a large extent of documents referenced by materials within the Administrative Record which the Defendants have chosen not to include in the Administrative Record. Those documents include:

a. At AR-97, page 999, the Record references a memorandum prepared by the Defendants which is not included in the Record, stating "[a]lso enclosed is a copy of the Department's justification for not preparing a supplemental EIS."

b. At AR-87, page 1, the Record includes incomplete minutes from a PennDOT public meeting held on January 24, 1989.

c. At AR-102, page 182, the Record references a "draft Section 4(f) Evaluation", which was not included in the Record.

d. At AR-100, page 1693, the Record refers to a map of the "potential avoidance alternative for the I-81 interchange", which was not included in the Record.

e. At AR-3, page 115, the Record refers to a "background research and site visit" document prepared pre-May, 1990 by Archaeological & Historic Consultants, Inc. under contract to the Defendants, which was not included in the Record.

f. In AR-85, the Record contains a "Interstate 81 Interchange: SR 8016: Plan of Study", but the date of the preparation of the Study is not contained within the Record.

g. At AR-91 at page 113, paragraph 14, the Record refers to a "recent interpretation of Act 61 by FHWA, PennDOT, and the Pennsylvania Turnpike Commission", which is not included in the Record.

h. At AR-94, page 152, the Record refers to a "Impact Study for U.S. 30" which was prepared by the Wal-Mart Corporation and is identified as one of the "Documents Acquired" by the Defendants. That Study was not included within the Record.

i. At AR-35, the Defendants have included an original Farmlands Assessment Report (FAR) prepared for the exit interchange, but have failed to include the updated Farmlands Assessment Report prepared in early 2000, or the Draft Farmlands Assessment Report prepared in June of 1994.

j. In AR-93 at page 481 and 482 appears a July 8, 1994 Letter from Barry Hoffman of PennDOT to Ronald G. Huber. Page 2 of that communication was not included in the Record.

k. At AR-97, page 937, the Record refers to "Progress Reports" filed by Orth-Rodgers, Inc. with the Defendants and the Intervenor. Those "Progress Reports" have not been included in the Record.

l. At AR-113, page 107, the Record refers to monthly Updates provided to U.S. Representative Bud Shuster by the Defendants and/or Intervenor. Those Updates were not included in the Record.

m. At AR-77, the Record contains the final version of a document entitled "Mitigation Measures and Project Conditions, Interstate 81 Interchange, Franklin County, Pennsylvania", but the Record does not contain the referenced August, 1998 version of that document.

n. At AR-90, page 21, the Record contains a July 13, 1992 Letter from U.S. Representative Bud Shuster to PennDOT Secretary Howard Yerusalim. An Attachment to the Letter is referenced in the index, but is not attached to the Letter.

o. Two Letters from Richard Heimbach of Skelly and Loy [consultant to PennDOT] to D. LaMar and Lois White, and to another farmer in the Walker Road area, dated November 16, 2000 and December 29, 2000 are not included in the Administrative Record.

p. A Letter and Attachment from Brad Brosius of Johnson, Mirmiran and Thompson, P.C. [consultant to PennDOT] to Daryl Kerns dated April 20, 1989, is not included in the Administrative Record.

### E. The Defendants Chose to Include the Final Decision of the Agricultural Lands Condemnation Approval Board in the Administrative Record, but Failed to Include the Transcript of the Hearing or Pre-Hearing Memoranda filed by the Parties in that Hearing - Which Consisted of Testimony from Agency Staff Who Prepared NEPA Documents and Who Asserted That No Alternative Location Existed for the Proposed Interchange.

As a result of PennDOT's refusal to submit its plans for farmland condemnation to a special board established to approve or deny those condemnations, a Franklin County farm family sued to force PennDOT to comply with the law. As a result of rulings in favor of the farm couple by the Pennsylvania Commonwealth and Supreme Courts, PennDOT was forced to submit condemnation plans to the special board. That Board - the Agricultural Lands Condemnation Approval Board (ALCAB) - was then presented with PennDOT's plans. If ALCAB had denied the condemnation plans of the agency, the project - as currently designed - would have been unable to proceed, resulting in a cancellation of plans for the interchange..

That hearing, held from May 9th to 11th, 2001, consisted of the presentation of sworn witnesses by the highway agency, who testified concerning many aspects of the planning and design phases of the interchange. That testimony was focused on PennDOT's responsibility to examine all reasonable alternatives to the placement of the interchange, and other aspects of NEPA-related issues. Testimony was offered by PennDOT staff and consultants who physically prepared many of the documents contained within the Administrative Record.

Although the Board's hearing examiner used an erroneous legal standard to deny the farm couple's attempts to introduce relevant testimony - leading to an approval of the farmland condemnation - the testimony presented at the hearing from PennDOT staff and consultants is crucial to the exercise of effective judicial review of the Plaintiffs' claims in the instant case. In addition, the pre-hearing Memoranda of the parties raised a myriad of issues prior to the issuance of the "Re-evaluation" of the ROD" which was released June 28, 2001. That "Re-evaluation" included farmland impact information

which was specifically collected for the hearing.

The Defendants have chosen to include the final decision rendered by ALCAB at AR-138, pages 222 to 269, but have omitted the Transcript of the hearing from the Administrative Record. Given the importance of such testimony in determining whether the highway agencies complied with the National Environmental Policy Act (NEPA) and other relevant laws, the Transcript must be included within the Administrative Record.

### F. Correspondence and Documents Authored by the Defendants, the Intervenor, and/or Agency Consultants During the Development of the Interchange Project Must be Included in the Administrative Record

This Motion to Supplement identifies several documents and letters which were prepared by the highway agencies and/or their consultants but which were not included within the Administrative Record prepared for the project. The Plaintiffs have attached copies of these documents to this Motion. Those documents and letters include:

a. A February 10, 1995 Letter from FHWA's "Bill" to "Seppo" which reads, in part, "This is a demo project from the 1987 STURAA. It is apparently very important to Bud Shuster. My understanding is that the Division provides him with and [sic] updated status every two weeks."

b. A June 4, 1998 "Potential Issues with Proposed I-81, D Modified Avoidance Alternative" Memorandum. Page two of the Memorandum is entitled "Air Quality and Noise."

c. An April 7, 1998 letter from Richard Heimbach, II, of Skelly and Loy [a PennDOT consultant] to the USDA National Resources Conservation Service with an attachment entitled "Alternative D Modified, Preliminary Engineering", which outlines farmland

-10-

which will be impacted by the Interchange project.

d. The July 13, 1998 Draft of the Record of Decision.

e. An October 7, 1998 Letter from FHWA's Ronald Carmichael to John Szajna of Nassaux-Hemsley, Inc. denying access to several documents under a FOIA request.

f. Letter and attachment dated June 1, 1994 from PennDOT's L. Nace to Ron Huber. The attachment contains a policy statement which applies to access point justifications.

g. Draft of Letter from Howard Yerusalim to Congressman Shuster dated June 5, 1992 with the handwritten notations: "Sent to Larry King, 6-5-92 at 4:05 p.m. 7-3154." "Resent to L.K. 6-9-92."

h. Draft of Letter from Howard Yerusalim to Congressman Shuster, dated May 29, 1992.

i. Letter from George W. Fike, Board Secretary of the Chambersburg Area School District Board of Directors, to PennDOT's Barry Hoffman, dated November 13, 1998.

j. A Study, entitled "Project Locations Study: U.S. Route 30, Section S01, prepared by Gannett Fleming under contact to PennDOT, dated June, 1993.

k. A Letter from PennDOT's Michael Ryan to FHWA's Manuel Marks, dated March 20, 1995, entitled "Agreement No. 085164, Work Order No. 4."

l. A Memorandum from PennDOT's William J. Greene, dated March 21, 1995, entitled "Proposal Evaluation for Work Order No. 4."

m. A Letter from FHWA's Manuel Marks [via Phil Ouellet] to Mr. Richard P. Kramer, Chairman of the Greene Township Board of Supervisors, dated June 30, 1993.

n. A Letter and Attachment from PennDOT's Harvey Haack, P.E. to Dr. Paul Ambrose, dated December 2, 1987.

o. A Letter with Enclosures from John Hart, Chief Clerk of the Franklin County Commissioners to PennDOT's Harvey Haack, dated September 5, 1989.

p. A Letter from Franklin County Commissioner Joe W. Ausherman to PennDOT's Robert R. Mueser, dated June 12, 1990.

### G. The Twelve Year Plans Generated by PennDOT Between 1987 and 1989 Support the Contention that the Location of the Interchange was Determined Prior to Compliance with Relevant Laws, and Those Plans Were Not Included in the Administrative Record.

Twelve year transportation plans released October 23, 1987; April 12, 1988; April 22, 1988; May 11, 1988; and July 18, 1989 all make reference to the Interchange project which is the subject of this action. Those documents provide support for the Plaintiffs' contention that the location of the interchange was determined prior to compliance with relevant law.

The Plans themselves, or the portions of those published Plans which deal specifically with the interchange - identified by page number in the accompanying Motion - should be included in the Administrative Record as they serve as integral documents for the planning and design process implemented by PennDOT for the use of federal funding for this interchange project.

### H. PennDOT Planning and Design Manuals Delineate Agency Action Which Must be Taken to Comply with Federal and State Laws Governing the Highway Development and Construction Process. Inclusion of These Manuals in the Record - or Judicial Notice of the Manuals - is Necessary Due to the Central Role in Highway Planning Served by These Manuals

The Motion to Supplement identifies several PennDOT Publications which are used by the agency to comply with relevant laws during highway planning, design, and construction. Those PennDOT Manuals include:

a. PennDOT Design Manual, Part I, Chapter 2, Section 5, entitled "Justification Requirements for Additional Interchanges, Access Points, and Ramps on Completed Interstate and Other Limited-Access Highway Facilities."

b. PennDOT Publication No. 349, March, 1998, entitled "The Transportation Project Development Process: Section 4(f) Handbook" Volumes I and II.

c. PennDOT Publication No. 319, September, 1996, "The Transportation Project Development Process: Needs Study Handbook."

d. PennDOT Publication No. 278, August, 1993, "The Transportation Project Development Process: Environmental Impact Statement Handbook."

e. PennDOT Publication No. 324, February, 1997, "The Transportation Project Development Process: Agricultural Resource Handbook."

### I. Several Other Documents, Not Included Within the Administrative Record, Must Have Been Considered by the Highway Agencies During the Planning and Design of the Proposed Interchange and Must be Included in the Administrative Record

Several documents exist, which are not in the possession of the Plaintiffs, which must have been considered by the highway agencies during the planning and design process for the proposed exit interchange. Those documents include:

a. Subdivision plans for residential developments submitted by Guilford Township, Franklin County, to PennDOT, from 1999 to the present. Counts Two and Six of the Plaintiffs' Amended Complaint deal precisely with the issue of developmental changes within Guilford Township, and these materials - submitted to PennDOT during that time period - are relevant to the Plaintiffs' allegations.

b. All advertisements prepared by the highway agencies for work to be completed on the exit interchange. The advertisements establish the scope of work to be performed by contractors to the highway agencies. The scope of the work to be performed is the focus of Plaintiffs' Count One, Count Four, Count Five, and Count Six.

c. All traffic studies prepared to support and examine the "Route 30 Improvements" implemented by PennDOT. As alleged by the highway agencies, the "Need" for the exit rests upon the interchange's purported relief of congestion on Route 30. Traffic studies which focused on congestion relief provided solely by the "Route 30 Improvements" provides relevant information concerning the extent of additional congestion relief, if any, provided by the exit interchange. The existence of the studies was admitted by PennDOT traffic consultants during the ALCAB hearing held May 9th to May 11th.

d. Letter from U.S. Senator Rick Santorum to Ms. Carol Shull, the Keeper of the National

Register, dated August 19, 1996, which dealt with Senator Santorum's request to the Keeper, on behalf of Franklin County developers, to reverse her decision that land impacted by the interchange was historic. The historic designation, if it had not been removed as a result of political intervention, would have prevented portions of the interchange from being built in the proposed location.

e. Letter from U.S. Senator Rick Santorum to Katherine Stevenson, National Park Service, dated November 21, 1996, recounting a meeting between Bryan Salzmann, Esq. - legal counsel representing Franklin County developers - Santorum's staff, and Ms. Stevenson, concerning the request for removal of historic designation of certain land necessary for the construction of the interchange.

f. A Newspaper article, dated October 25, 2001 which appeared in the Chambersburg Public Opinion at page 6A, entitled "Guilford Plans for Growth: Sewers, Roads Will be Upgraded." The Article recounts additional plans for development being made by Guilford Township in the Kriner Road alternative location for the Interchange. The material is relevant to Count Two and Count Six of Plaintiffs' Amended Complaint.

THEREFORE, the Plaintiffs respectfully request that this Court GRANT the Motion to Supplement the Administrative Record and/or take judicial notice of documents and letters identified in the accompanying Motion to Supplement.

Respectfully Submitted this <u>13th</u> Day of December, 2001

_____
Thomas Alan Linzey, Esq.
Supreme Court I.D. #76069
Community Environmental Legal Defense Fund (CELDF)
2859 Scotland Road
Chambersburg, Pennsylvania 17201

*Counsel for the Plaintiffs*