

ORIGINAL

# In the United States District Court for the Middle District of Pennsylvania

GREENE/GUILFORD ENVIRONMENTAL
ASSOCIATION, a non-profit corporation incorporated
under the laws of the Commonwealth of Pennsylvania,
CITIZENS FOR PLANNED COMMUNITY GROWTH,
an unincorporated association organized under the laws of
the Commonwealth of Pennsylvania, PAUL B. AMBROSE,
JOHN G. ENDERS, CHARLES F. RAHAUSER,
BETSY RAHAUSER, DOUGLAS A. WARNOCK, U.X
VAGNERINI, THOMAS W. BUNDY, STEPHEN P.
BUCHER, ROGER J. ROBERTSON, JAMES A.
STRITE, JR., DAVID A. GUTHRIE

v.

KEN WYKLE, Administrator, Federal Highway
Administration, ROBERT GATZ, Federal
Highway Administration

and

BRADLEY L. MALLORY, Secretary for
The Department of Transportation, Commonwealth
of Pennsylvania
          Defendant-Intervenor

Civ. No. 1:CV-01-0910

(Judge Rambo)

FILED
HARRISBURG, PA

DEC 14 2001

MARY E. D'ANDREA, CLERK

PER _____ DEPUTY CLERK

## ATTACHMENTS TO PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

## Table of Contents
Attachments to Plaintiffs' Motion to Supplement the Administrative Record

a. A February 10, 1995 Letter from FHWA's "Bill" to "Seppo".

b. A June 4, 1998 "Potential Issues with Proposed I-81, D Modified Avoidance Alternative" Memorandum.

c. An April 7, 1998 letter from Richard Heimbach, II, of Skelly and Loy [a PennDOT consultant] to the USDA National Resources Conservation Service with an attachment entitled "Alternative D Modified, Preliminary Engineering."

d. The July 13, 1998 Draft of the Record of Decision.

e. An October 7, 1998 Letter from FHWA's Ronald Carmichael to John Szajna of Nassaux-Hemsley, Inc.

f. Letter and attachment dated June 1, 1994 from PennDOT's L. Nace to Ron Huber.

g. Draft of Letter from Howard Yerusalim to Congressman Shuster dated June 5, 1992 with the handwritten notations: "Sent to Larry King, 6-5-92 at 4:05 p.m. 7-3154." "Resent to L.K. 6-9-92."

h. Draft of Letter from Howard Yerusalim to Congressman Shuster, dated May 29, 1992.

i. Letter from George W. Fike, Board Secretary of the Chambersburg Area School District Board of Directors, to PennDOT's Barry Hoffman, dated November 13, 1998.

j. A Study, entitled "Project Locations Study: U.S. Route 30, Section S01, prepared by Gannett Fleming under contact to PennDOT, dated June, 1993. [Cover and First Page Enclosed].

k. A Letter from PennDOT's Michael Ryan to FHWA's Manuel Marks, dated March 20, 1995, entitled "Agreement No. 085164, Work Order No. 4."

l. A Memorandum from PennDOT's William J. Greene, dated March 21, 1995, entitled "Proposal Evaluation for Work Order No. 4."

m. A Letter from FHWA's Manuel Marks [via Phil Ouellet] to Mr. Richard P. Kramer, Chairman of the Greene Township Board of Supervisors, dated June 30, 1993.

n. A Letter and Attachment from PennDOT's Harvey Haack, P.E. to Dr. Paul Ambrose, dated December 2, 1987.

o. A Letter with Enclosures from John Hart, Chief Clerk of the Franklin County Commissioners to PennDOT's Harvey Haack, dated September 5, 1989.

p. A Letter from Franklin County Commissioner Joe W. Ausherman to PennDOT's Robert R. Mueser, dated June 12, 1990.



*"Highway Excellence—100 Years and Beyond"*
**1893 FHWA 1993**

Slater
Region

ontrol of
crator. If
ved subject
delegation.

Bill,                              10 February 199

This is a demo project from the 1987 STURAA.

It is apparently very important to Bud
Shuster.  My understanding is that the
Division provides him with and updated statu
every two weeks.

It is very controversial locally because of
environmental issues and other issues.

After discussing with Environment (Cleckley
and Bednar) we decided to use the same
approach as we did with a California project
for Route 231 Eastern Transportation Corrido
in December 1993.

Seppo

*In my discussion with
Seppo & Jim on 2/15/95. I asked
them to approve using normal...
normal wording.*

U.S. Department
of Transportation
Federal Highway
Administration

**POTENTIAL ISSUES WITH PROPOSED**
**I-81**
**D MODIFIED AVOIDANCE ALTERNATIVE**


I.    Supplemental EIS

    A. Noise
    B. Air Quality
    C. Vibration
    D. Traffic
    E. Projected Development vs. Actual Development


II.   A.L.C.A.B. - The New Bridge

III.  Wayne Avenue Traffic Studies - compared to 1995
                               ORA Studies


IV.   Condemnation of Franklin County Property

V.    Franklin Farm Lane - Need for geometric improvement
                            - Poor sight distance
                            - Safety improvements
                            - Increased cross traffic associated with existing County
                                facilities and the soon to be completed Stat Police
                                Barracks
                            - Widening


VI.   Potential 4(f) issues

    A. Turning radius at Walker Road and Franklin Farm Lane
    B. North bound on-ramp
    C. Gass House - potential widening of Franklin Farm Lane


VII.  Cost Benefit Analysis

Revised
6/4/98

## AIR QUALITY AND NOISE

*     C. Frey, Jr. House    -      not a receptor.  Although the Paul Nolt residence is identified as a receptor in the DEIS, it (R-51) appears to have been located in the vicinity of the Seylor residence (H.R. 129 and 130).

*     Kiser Residence (R-52) -      east of Franklin Farm Lane.

*     Zook Residence (R-31) -      west side, between I-81 and Walker Road.  Projected noise levels for 2016 exceeded Category B.  Note existing levels were monitored in 1991.

*     Wolf Residence (R-32) -      west side, between I-81 and Walker Road.  Projected noise levels for 2016 exceeded Category B.  Note existing levels were monitored in 1991.

*     Franklin County Nursing Home (R-4) - receptor located between Nursing Home and I-81.

*     Human Services Building -      not a receptor.

*     Franklin County Prison -      not a receptor

*     Franklin County Prison Annex -      not a receptor.

*     Gass House -      not a receptor, approximately 72 feet west of Franklin Farm Lane.

**NOTE**:     The existing air quality conditions which were contained in the FEIS were derived from studies conducted in 1993.  The text of the FEIS indicates that the noise levels were monitored on April 3 and 4, 1991 and June 28, 1993.  However, Table II-15 contained in the FEIS only indicates monitoring in 1991.

Revised
6/4/98

Sender: Write or type message, pull out yellow sheet, fold at (>) to fit 771 DU-O-VUE® ENVELOPE.

PRODUCT 187    (WEBS) Inc., Groton, MA 01471. To Order PHONE TOLL FREE 1-800-225-6380

NO CARBON PAPER REQUIRED: Type or write on original – impression will automatically appear on copies ben...

**SKELLY and LOY, INC.**
2601 North Front Street
HARRISBURG, PENNSYLVANIA 17110

(717) 232-0593
FAX (717) 232-1799

*Message Reply*

DATE: 04/07/98

FILE NO. M 880127

PRIORITY
☐ URGENT!
☒ SOON AS POSSIBL
☐ NO REPLY NEEDE

ATTENTION: Mr. John Akers

SUBJECT: I 81 Interchange SR 8016
Franklin County, PA
FPPA / FCIR

**FROM:**

**TO:**
USDA
Natural Resources Conservation Service
218 North Second Street
Chambersburg  PA 17201

**MESSAGE:**

Enclosed is the soils map information that you requested.
Please do not hesitate to call if you need anything else, or
if I can be of assistance in explaining the enclosure's
details.

CC: RE McClure
DA Scharkoske

Respectfully,

SIGNED: Richard J Heimbach, II

DATE OF REPLY:

REPLY TO:

**REPLY:**

SIGNED:

RECYCLED PAPER
Contents: 40% Pre-Consumer • 10% Post-Consumer

SENDER: MAIL RECIPIENT WHITE AND PINK SHEETS.
RECIPIENT: WRITE REPLY. RETURN WHITE TO SENDER. KEEP THIS PINK COPY.



FIGURE 2
ALTERNATIVE D MODIFIED
PRELIMINARY ENGINEERING

DRAFT

——— ALTERNATIVE D MODIFIED
— · — LEGAL RIGHT OF WAY
— · · — REQUIRED RIGHT OF WAY
— — — MUNICIPAL BOUNDARY

1. Gablers    6.2 Acre
2. Gablers    1.8 Acre
3. L. White   1.4 Acre
4. L. White   1.8 Acre
5. L. White   13.2 Acre
6. Franklin G. 4.1 Acre
7. Franklin G. 3.7 Acre

Remaining Question: 32.2 Acre
Direct Impact: 9.8 Acre
Probable Addn'l Impact 8.0 Acre

Total Potential Lost 17.8 Acre
FPPA Farmland

Likely to cease farming as a result of project

SCALE
300   0   300

I 87-Draft Rod
draft dated: 13 July, 1998

# RECORD OF DECISION
# FEDERAL HIGHWAY ADMINISTRATION
# INTERSTATE 81 EXIT 7 INTERCHANGE PROJECT
# S.R. 8016
# FRANKLIN COUNTY, PENNSYLVANIA

## I.     SELECTED ALTERNATIVE

The selected alternative for the Interstate I-81 (I-81) Interchange, Exit 7 project is Alternative D

Modified, a diamond interchange with a new bridge over I-81 approximately 412 meters (1,350

feet) south of the existing Walker Road (T-517) overpass.  The southbound ramps will be located

on the east side of the existing Walker Road, and will tie in to existing Walker Road near the

Greene Township-Chambersburg Borough line.  The northbound ramps will be located on the

west side of Franklin Farm Lane.  The existing Walker Road overpass will be removed and a new

bridge over I-81 will be constructed 412 meters (1,350 feet) south of the existing overpass.  The

existing portion of Walker Road relocated during construction of I-81 will be terminated on both

sides of I-81.  Alternative D Modified will provide ramps with a 4.6-m (15-foot) lane width, a

1.2-m (4-foot) left shoulder, and a 3.0-m (10-foot) right shoulder.  The bridge carrying the

relocated portion of Walker Road over existing I-81 will have 3.7-m (12-foot) lanes, one lane in

each direction and a left-turn lane, and a 3.0-m (10-foot) outside shoulders.  Alternative D

Modified is described in greater detail in Section IV of the **DRAFT** Re-evaluation of the Final

Environmental Impact Statement, Interstate 81 Interchange, SR8016, Franklin County,

Pennsylvania, dated June, 1998 (the "Re-evaluation Report"), and graphically depicted in Figure 2

of the Re-evaluation Report.

document draftrod
draft dated: 15 July, 1998

The Final EIS (FEIS) was circulated in May, 1995. During the circulation period, PennDOT received a letter on June 12, 1995, from the State Historic Preservation Officer (SHPO) stating that the FEIS adequately addressed the identification and evaluation of historic and archaeological resources in relation to the project. The FEIS identified the Preferred Alternative as Alternative D-C. At the time, Alternative D-C met the project needs and avoided direct impacts to historic resources. Subsequently, on June 19, 1995, PennDOT received a letter from the Greene Township Board of Supervisors, refusing to execute the Memorandum of Agreement (MOA) which had been prepared for the project in conjunction with the Section 106 process, stating that neither the Section 106 process nor the MOA had addressed the adverse impact the Preferred Alternative would have on the Greene Township-Conococheague Rural Historic District. The letter was based on a May 24, 1995, designation by PHMC that the Green Township-Conococheague Rural Historic District is a National Register-eligible resource. The designation of the Green Township-Conococheague Rural Historic District was sought independently of the 106 process, and neither FHWA nor PennDOT had been apprised of the submission or of the determination by the SHPO until receiving the comment to the MOA.

On October 25, 1995, PennDOT and FHWA submitted a request for re-evaluation to the Keeper of the National Register (the "Keeper"). On January 15, 1997, the Keeper rescinded the determination of eligibility for the Green Township-Conococheague Rural Historic District.

2

dmz.word. draftrod
draft dated: 13 July, 1998

However, in that same letter, the Keeper determined that 14 properties were individually eligible for the National Register, including the Christian Fry, Jr. House, and that two rural historic districts were also eligible: an unnamed district to the east of I-81; and, the McKee Historic District. For a detailed discussion of the re-evaluation process, see pages 2-4 in the Re-evaluation Report.

As a consequence of these events, the selection of the Preferred Alternative in the FEIS was re-evaluated. In the Re-evaluation Report it was noted that Alternative D-C as designed, would have required the acquisition of agricultural lands north of the existing Walter Road overpass which contribute to the significance of the Fry Family Farm Historic District. To avoid the acquisition of property which contributes to a National Register-eligible resource, Alternative D (presented in the FEIS) was modified.

Alternative D Modified best meets the needs identified in Section I of the FEIS. The Re-evaluation Report confirms that Alternative D Modified would not result in significant new environmental impacts than those associated with Alternative D-C. Therefore, Alternative D Modified was selected as the environmentally preferred alternative from the Build Alternatives and No-Build Alternative for the following reasons:

Requires no use of Section 4(f) resources;

3

dmz.word. draftrod
draft dated: 13 July, 1998

Has the same number of displacements (one (1)), as the Preferred Alternative;

(3)     Is compatible with local zoning and planned land uses;

(4)     Requires no direct impacts or measurable indirect impacts to surface water or aquatic biota;

(5)     Requires the least acreage of forest habitat

(6)     Requires similar or less land from agricultural security areas, although direct impacts to productive agricultural land would be more with Alternative D Modified than Alternative D-C;

(7)     Has no impacts to public utilities; and

(8)     Has less potential for secondary development and destruction of farmland, and there will be no constructive use of historic resources.

The PHMC, the borough of Chambersburg, Guilford Township, [others???] and a large percentage of public participants [is this accurate???] indicated their support for the originally preferred alternative, Alternative D-C. The Re-evaluation Report concluded that other than the designation of additional historic resources, there have been no significant additional impacts to environmental or historical resources as a result of the new selected alternative, Alternative D Modified. A summary of the environmental impacts of Alternative D Modified is found at Table 3, of the Re-evaluation Report. Based on the above reasons, Alternative D Modified has been chosen as the Selected Alternative.

## II.     ALTERNATIVES CONSIDERED

This project was developed in accordance with the Pennsylvania Department of Transportation's (PennDOT) *Transportation Project Development Process*, Publication 278, dated August 1993.

4

dmz.word. draftrod
draft dated: 13 July, 1998

This process defines the 10 Steps to be followed in proceeding from the planning and programming stages of a project through preliminary design and environmental documentation to the Record of Decision (ROD) and preparation of a Mitigation Memorandum/Report.

During the preliminary alternatives analysis for I-81 Interchange Project, a full range of alternatives were considered which encompassed the following:

(1)     No-Build Alternative;

(2)     Transportation System Management (TSM); and

(3)     New Interchange Alternatives

Two locations (Kriner Road and Walker Road) and five new interchange alternatives were developed during the preliminary alternative evaluation phase.  Each location has an existing overpass around which the new interchange alternatives were developed.  These alternatives are depicted on Figures ES-4 through ES-9; and described in Section II.B. of the FEIS.  As a result of the Preliminary Alternatives Analysis Process, the No-Build Alternative and three (3) interchange alternatives were carried through the detailed EIS process.  The other preliminary alternatives were dismissed from further review because they did not satisfy the project need or had excessive impacts.  Those alternatives and their deficiencies are discussed in Section II.A. of the FEIS.

5

dmz.word. draftrod
draft dated: 13 July, 1998

Historical resources were identified within the immediate vicinity of the proposed interchanges during the Preliminary Alternatives Analysis Process. These resources were determined to be affected by construction of the three (3) interchange alternatives. Therefore, in early 1994, two additional Build Alternatives were developed to avoid property takes from historic resources. Build Avoidance Alternatives were designated D-C at Walker Road and B-1 at Kriner Road. The No-Build Alternative was carried through the EIS process as a baseline for the assessment analysis, notwithstanding the fact the No-Build Alternative did not satisfy the project need.

The TSM Alternative was reviewed for the I-81 Project. A description of the TSM Alternative and the proposed improvements is contained on page II-18 of the FEIS. The TSM Alternative, alone, will not satisfy the needs of the project. However, TSM improvements are being advanced separately from the I-81 Interchange Project.

A total of five Build interchange alternatives emerged to be presented in detail in the DEIS. These alternatives were Alternative B, Interchange at Kriner Road; Alternative C, Interchange at Franklin Farm Lane/Walker Road; Alternative D, Interchange at Walker Road; Alternative B-1, Historic Property Avoidance Alternative for Interchange at Kriner Road; and Alternative D-C, Historic Property Avoidance Alternative for Interchange at Walker Road. These alternatives are described in detail in Section II of the FEIS.

dmz.word. draftrod
draft dated: 13 July, 1998

Each alternative was evaluated in terms of its ability to solve the traffic congestion and poor level of service problems in the project area.  In addition, the environmental impacts associated with each alternative was considered in detail.  The goal was to identify a safe, efficient transportation facility that satisfies the project needs while avoiding, minimizing, and balancing impacts to environmental and cultural resources.

Alternative B did not meet the needs of the project to relieve congestion on an existing interchange and required taking property for historic resources.  Alternative C and Alternative D required taking of contributing elements from a historic district.  Alternative B-1 did not meet the needs of the project to relieve congestion on an existing interchange.  Alternative D-C satisfied the needs of the project, as stated in Section I of the FEIS, and was originally thought to avoid property acquisition from historic resources.  However, information acquired after the FEIS comment period indicated that historic resources would, in fact, be impacted by Alternative D-C.

The Project Study Area is characterized by a broad variety of resources, including agricultural land and National Register-eligible resources.  Impacts to these resource categories varied among the alternatives and necessitated a balancing of all impacts to arrived at an environmentally preferred alternative.  These resources include productive agricultural lands, National Register-eligible resources, and community and social issues.  The impacts to each of these resource categories, as well as others, for each of the alternatives carried into the detailed alternatives

7

dmz.word. draftrod
draft dated: 13 July, 1998

evaluation can be found in Table ES-1 of the FEIS. However, to avoid the acquisition of property which contributes to a National Register-eligible resource, Alternative D (presented at page II-10 in the FEIS) was modified. Alternative D Modified satisfies the needs of the project as stated in Section I of the FEIS and avoids impacts to or acquisition from historic resources.

Based on the above, the Alternative D Modified is now identified as the Preferred Alternative and the environmentally selected alternative, and this Record of Decision supports that alternative as the Selected Alternative for this project. Section VI of the FEIS and Section V of the Re-evaluation Report describes the balancing process used to identify the Selected Alternative. Of all the alternatives considered, the Alternative D Modified minimizes impacts to agricultural lands and avoids Section 4(f) resources.

## III.    MEASURES TO MINIMIZE HARM

Throughout the project development process, alternatives have been designed to minimize, to the extent practical, impacts to identified resources. In response to coordination with the agencies at the Agency Coordination Meetings (ACM) and the public involvement program, there were specific efforts to refine the alternatives carried into detailed study. All practicable measures to minimize negative impacts on environmental and cultural resources have been incorporated into the project design. Documentation of the coordination among individuals, municipalities,

8

dmz.word. draftrod
draft dated:  13 July, 1998

agencies, the Pennsylvania DOT and the FHWA is contained in a separately bound volume of the FEIS.

Mitigation measures have been proposed to offset the minimal, yet unavoidable, impacts to the resources in the project area.  These measures may included, among other activities, the posting of historical/educational signage and the development of other informational materials regarding the historic districts and farmlands, and compensation, and consideration of special design criteria, to minimize the right of way impacts on productive agricultural lands.  These mitigation measures, as well as others, are discussed in Section IV of the FEIS, and to the extent relevant, Section V of the Re-evaluation Report.  Specific mitigation commitments are made in pages IV-90 through IV-94 of the FEIS; mitigation to productive agricultural lands is contained on pages IV-65 through IV-67 of the FEIS.  During final design, further attempts will be made to refine the engineering design to further provide attempts to avoid and minimize impacts to resources in the Project Area.

## IV.    SECTION 4(f) RESOURCES

Although there are several Section 4(f) resources in the vicinity of the Project Area, no Section 4(f) resources are affected by the Selected Alternative, Alternative D Modified.  A detailed analysis of the historic resource impacts and the applicability of Section 4(f) is contained in pages IV-6 through IV-23 of the FEIS and Section V.C. of the Re-evaluation Report.

9

dmz.word. draftrod
draft dated: 13 July, 1998

## MONITORING OR ENFORCEMENT PROGRAM

Normal coordination during final design, right-of-way acquisition and construction will ensure that the environmental commitments will be followed.  Furthermore, PennDOT will use the Mitigation Memorandum as a tool to ensure that the mitigation commitments are implemented during final design and construction.  These mitigation measures are discussed in Section IV of the FEIS.  All mitigation commitments associated with the Selected Alternative have been consolidated into a single final Mitigation Memorandum which is included as Attachment xxx.  The Mitigation Report will be provided to design and construction personnel for their use and reference to ensure that all mitigation commitments are incorporated into final design plans, and implemented during construction.  These mitigation commitments are hereby incorporated into this Record of Decision by reference.

All appropriate permits will be obtained prior to the initiation of construction activities.  This project may require a National Pollutant Discharge Elimination System (NPDES) permit.  An Erosion and Sedimentation Control Plan will be prepared in the final design stage of the project to conform to the Pennsylvania Department of Environmental Resources Erosion and Sedimentation Control Program Manual.

dmz.word. draftrod
draft dated: 13 July, 1998

## VI.    COMMENTS ON THE FINAL EIS

The Notice of Availability of the FEIS was published in the Federal Register on June 16, 1995.

Legal notices were printed in *The Public Opinion* on June 16, 1995 and on June 23, 1995, and

notice was printed in a newsletter which was distributed to over 500 people.  The notices

announced the availability of the FEIS and requested that comments be provided to PennDOT by

July 17, 1995, fulfilling the 30 day comment period required for a FEIS.  Due to the extent of

comments received during the Draft EIS, copies of the FEIS were made available for review at a

number of locations identified in the Preface to the FEIS, including five locations in

Chambersburg, Pennsylvania, and at two locations in the Harrisburg, Pennsylvania, area.  A list of

specific agencies, governments, groups and individuals to who copies of the FEIS were sent is

contained in Section IV of the FEIS.


Ten comment letters were received during the initial FEIS comment period.  Of the ten, three

were received from state and Federal agencies (two state and one Federal), one letter from a local

municipality and one from an area development corporation; two letters from area historic

organizations and three letters from the general public.  A listing of each of the letters, including a

summary of the issues raised or comments provided is included in Attachment xxx.


During the FEIS comment period, PennDOT received several letters concerning potential impacts

dmz.word. draftrod
draft dated: 13 July, 1998

to historical and cultural resources. These letters prompted the review of the Preferred Alternative, which then resulted in the selection of a new alternative described in the Re-evaluation Report as Alternative D Modified. The Re-evaluation Report fully reviews the potential for environmental, cultural and other resource impacts for Alternative D Modified. The Re-evaluation Report concludes that the impacts associated with Alternative D Modified are substantially the same as the originally Preferred Alternative, Alternative D-C. According to the analysis of the Re-evaluation Report and application of 40 CFR 1508.27 which defines "significant," Alternative D Modified does not result in significant new impacts from that which was discussed in the FEIS. In fact, the modification made to Alternative D lessens environmental impacts by avoiding historic resources and reducing visual effects to historic resources, without causing significant environmental impacts. Alternative D Modified does not amount to a substantial change to the proposed action which results in "significant environmental impacts" that were not evaluated in the EIS. Accordingly, a supplemental EIS is not required, and further distribution and comment on the Selected Alternative not required.



RECEIVED OCT  3 1998

**U. S. DEPARTMENT
OF TRANSPORTATION**

*Region 3
Pennsylvania Division*

*228 Walnut Street, Room 558
Harrisburg, PA 17101-1720*

**Federal Highway
Administration**

*IN REPLY REFER TO:*

HAM-PA

OCT 0 7 1998

Mr. John J. Szajna
Nassaux-Hemsley, Incorporated, Consultants
NHI Building
56 North Second Street
Chambersburg, Pennsylvania  17201-1896

Dear Mr. Szajna:

In your letter dated September 2, 1998 (FOIA Control No. 03-42-98-013), you requested the opportunity to review records pertaining to the I-81 Interchange in Franklin County, Pennsylvania.  Based on your on-site review of these records conducted on October 2, 1998, we are forwarding herewith copies of those documents you identified.  By prior agreement, it is our understanding that your review concurrently encompassed a similar FOIA request (FOIA Control No. 03-42-98-014) submitted by Mr. Jonathan Rinde on September 8, 1998.

Because the number of copies did not exceed the 100 page deductible, there is no charge for reproduction services. However, records search time (exclusive of the two hour deductible) involved ten hours at a cost of $32.26 per hour including fringe benefits.  Based on our past professional relationship we are agreeable to releasing the above documents immediately.  **However, please submit a check in the amount of $322.60 payable to the Treasurer of the United States and forward to this office to the attention of Mr. James G. Miller, Financial Manager, within 30 days.**

Certain documents as described below have been withheld under FOIA Exemption 5 USC 552(b)(5) which protects attorney-client and other intra governmental communications.

1.     Four draft versions of a response to the U.S. Department of Transportation Office of Inspector General(OIG) from the Federal Highway Administration (FHWA) Pennsylvania Division Office regarding a confidential hotline complaint-- interagency correspondence, attorney-client privilege and Inspector General Act privacy provisions are reasons for withholding.

2.   E-Mail from James Scouten, Assistant Regional Counsel to
     DGAMBLE
     Date: 6/8/94 1:41pm.
     Subject: Chambersburg Interchange
     Attorney-Client Privilege reason for withholding.

3.   E-Mail from James Scouten, Esq., to DGAMBLE, RGATZ, KGEE
     Date: 6/14/94 9:16am.
     Subject I-81 Interchange, Chambersburg, PA
     Attorney-Client Privilege reason for withholding.

4.   E-mail from Francis Locke, Regional Counsel to DGAMBLE
     Dated 2/14/95 1:34pm.
     Subject: Chambersburg
     Attorney-Client Privilege reason for withholding

5.   E-mail from: James Scouten  (JSCOUTEN) to: DGAMBLE
     Date: Monday, May 22, 1995  8:06 am
     Subject: Exit 7 4(f) memo -Reply
     Attorney-Client Privilege reason for withholding.

6.   E-mail From James Scouten to: LSSMITH
     Date: 3/18/96 2:16pm
     Subject: Draft 4(f) for Exit 7.
     Attorney-Client Privilege reason for withholding.

7.   E-mail from James Scouten, Assistant Regional Counsel to
     DLAWTON and DGENDELL,
     Date: 6/21/96 12:45pm
     Subject: Response to OIG Complaint -Forwarded -Reply
     Attorney-Client Privilege and IG Act privacy reasons for
     withholding.

8.   E-mail from James Scouten to JSGUHIN
     Date: 7/1/96 9:38am
     Subject:  Exit 7  Draft Letter to OIG -Reply
     Attorney-Client Privilege and IG Act privacy reasons for
     withholding.

9.   E-mail from: James Scouten to: KMAHONEY, DLAWTON, LSSMITH
     Date: 10/7/97 9:02am
     Subject:  draft letter -Reply
     Attorney-Client Privilege reason for withholding.

10.  E-mail from James Scouten, Esq. To DSUCIUSMITH, and
     DWJOHNSON
     Date: 12/18/97 3:40pm
     Subject: Keeper's Determinations
     Attorney-Client Privilege reason for withholding.

11.  E-mail from James Scouten to DSUCIUSMITH, DWJOHNSON
     Date: 1/26/98 11:02am
     Subject: I-81 Interchange
     Attorney-Client Privilege reason for withholding.

The person responsible for the withholding of these documents is
Mr. James W. Scouten, Senior Attorney, Office of the Chief
Counsel at Baltimore, Maryland.  You may appeal this decision, in
writing, to the Associate Administrator for Administration,
Federal Highway Administration, 400 7th Street, S.W., Washington,
D.C. 20590.  A copy of your appeal letter should be
simultaneously sent to Pennsylvania Division Office at the above
address.  The decision of the Associate Administrator for
Administration is administratively final.

Please contact Mr. James G. Miller, Financial Manager, at (717)
221-4438 should you have any questions.

                         Sincerely yours,

                         Ronald W. Carmichael
                         Division Administrator

cc: Mr. Jonathan Rinde

PROBLEMS - DIAL 717-787-5927
FAX - DIAL 717-783-4788

<u>PennDOT</u>
<u>District 8-0</u>
<u>Harrisburg Pa.</u>
<u>Consultant Liaison Unit</u>

<u>TELECOPIER TRANSMITTAL COVER SHEET</u>

Date _____6-1-94_____    Time __3:45__

Please deliver the following pages to:

Name _____Ron Huber_____

Agency _____United Tele._____

Location _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This telecopy is being sent by:

Name _____L. L Nace_____

Phone Number _____783-5162_____

Sender - Do you want copy back?

Circle one    ( Yes )    No

Sender - Count <u>pages</u> and <u>transmittal cover sheet.</u>

____7____ TOTAL PAGES SENT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HD/FAX.LAR

1.2.60
Rev. 06/91

Section 5:     JUSTIFICATION REQUIREMENTS FOR ADDITIONAL INTERCHANGES,
               ACCESS POINTS AND RAMPS ON COMPLETED INTERSTATE AND
               OTHER LIMITED ACCESS HIGHWAY FACILITIES

Requests received by the Department and the Federal Highway Administration
(FHWA) for new or revised access points on completed sections of Interstate
and Limited Access highway facilities are considered very important.  A
majority of the additional access requests involve significant
modifications to existing interchanges or the addition of ramps, especially
for urban area system development, that affect already closely spaced
access, heavy traffic volumes and complex traffic operations.  These
proposed access request modifications have the potential to significantly
influence the level of service on existing Interstate and Other Limited
Access highway facilities.

It is imperative that coordination between potential developers and local,
responsible officials be established to assure that the new or proposed
facility is developed in an orderly manner.  Local zoning officials should
not approve major, additional point of access developments without
sufficient local roads and funding in place for the necessary
transportation improvements.  Since developers can only make improvements
on their land, a governmental agency with the power of eminent domain
should be involved in order to obtain the required permits and approvals,
even if the developer is providing funding for the improvements.

The development of new or revised access points may also require additional
coordination to accommodate utility companies.  Utility company access to
these facilities may not appear obvious or readily visible in the field and
could be missed in the planning process.  Where it is necessary to provide
access for utility companies and/or their emergency equipment, these access
points should be included as part of the coordination process for
developers.  The policy and guidelines presented in Design Manual, Part 5
shall be used for all utility installations or adjustments.

The following shall serve to provide information and guidelines to assist
in the preparation and review of proposed new or revised point of access
requests on completed sections of Interstate and Other Limited Access
highway facilities.  The guidelines shall serve to enhance the application
of uniform analysis and documentation procedures for new development or
redevelopment as justification to support a submission request.

These guidelines shall apply to all Federal aid and non-Federal aid highway
projects, regardless of the funding source for the original construction or
for the proposed access points.  All requests for access shall be submitted
to be reviewed and approved by the Central Office Bureau of Design.  All
new or revised point of access requests on completed sections of all
Interstate highway facilities shall require FHWA review and approval.  In
addition, FHWA review and approval shall be required for point of access
requests on Other Limited Access Highway Facilities when Federal funding
was involved in any manner previously or in the proposed access points.

Control of access for new highway facilities shall be achieved as indicated
in Design Manual, Part 2, Chapter 1, Section 1.5.

1.2.61
Rev. 06/91

PRELIMINARY JUSTIFICATION REPORT GUIDELINES AND APPROVAL PROCEDURES

The following guidelines list requirements that should be provided to promote a request for access approval. This information should be incorporated into a Preliminary Justification Report for submission and approval by the Central Office Bureau of Design and the FHWA. New access points in rural areas may not require the same level of detail.

1.  Purpose of access.

2.  All proposed access points shall be evaluated in consideration with currently known or planned highway transportation improvement programs or facilities and/or land use planning so as to avoid any future conflict with other, possibly more needed access facilities.

3.  Distances to and size of communities or activities directly served.

4.  Description of existing and proposed access.

    a.  Configuration of the existing and proposed interchange(s) including an arrow diagram depicting the number of lanes throughout the affected area to assist in visualizing the critical areas for the Level of Service.

    b.  Distances to adjacent interchanges in each direction, from gore to gore area (rounded to the nearest one hundred foot increment) including any anticipated improvements determined necessary.

    c.  Reasonable alternatives considered including improvements to existing local roads and streets in lieu of new access.

    d.  Description of any exceptions to existing design criteria.

    e.  Main line and crossroad traffic volumes (ADT) including turning movements for current year, implementation year and design year.

    f.  The relationship of the proposed access point to adjacent highway facilities (area of influence), as diagnosed from a traffic engineering and Level of Service standpoint, to properly evaluate the submission request. The evaluation shall be sufficient, on both the local roadway system and the limited access facility (upstream and downstream), to analyze the true effects on capacity of the limited access facility and on the local roadway system and related intersections. This evaluation should include affected interchanges and intersections, connecting roads, the major access point facility itself and the acceptable merge and diverge lengths and the ability to sign adequately. It is highly desirable to preclude or minimize any significant degradation of the limited access facility and to limit additional congestion on local roadways and intersections.

1.2.62
Rev. 06/91

    g.  The existence and number of other main line lanes, crossroads
and/or streets, including any auxiliary lanes or
collector-distributor roads. Also, the feasibility of
developing the above, generally parallel to the existing
Interstate or Limited Access system, for use by the
Interstate or Limited Access facility traffic by way of
access other than the one under consideration in connecting
trip origins and destinations.

5.  Traffic and operational analysis for existing and proposed
conditions including analysis of the crossroads and other roads
and streets to the extent necessary to assure the ability of the
streets and roads to effectively collect and distribute traffic
from the new access point. The traffic analysis should demonstrate
that the additional access point is necessary to serve the regional
traffic needs and is not just to solve local circulation system needs
or problems. The area of analysis should extend to the highway
facilities in the corridor and appropriate nearby highways and
streets.

6.  A benefit/cost ratio analysis may be helpful to the decision-making
process to determine the acceptability of a new or revised point of
access request. However, such an analysis is considered optional in
determining the acceptability of a new or revised access proposal.
This analysis, when performed, would not be the sole or even the major
determinant for justification of an access request.

Because the access issue is increasing in complexity, especially in
urban areas, it is extremely important that all requests for revised or new
access points not be viewed in isolation, but incorporate the highway
network as a whole with its existing access and operation problems. From
the standpoint of safety and in particular to prevent wrong-way movements,
it is required that all freeway interchanges with nonaccess-controlled
highways provide ramps to serve all basic directions unless justified
otherwise (complete as opposed to partial). With justification, stage
construction may be approved, but specific commitments to assure completion
shall be required. Such commitments could include purchase of all
Right-of-Way initially and letter of credit from the developer to complete
the interchange within a specific period of time. Special purpose access
for high-occupancy vehicles (HOV's), for transit vehicles or into park and
ride lots should be treated as special cases and the movements to be
provided should be decided on a case-by-case basis.

The assessment and techniques applied for computing highway capacity shall
be performed in accordance with the design and operational guidelines
presented to the 1985 Highway Capacity Manual (HCM) and with the Manual's
associated software program. The following shall be provided when checking
the Level of Service calculations and evaluating the operational analysis
impact.

1.2.63
Rev. 06/91

1.  Lane widths and offset distances to side obstructions if less than six (6) feet.

2.  Distances (rounded to the nearest ten-foot increment) between gore points.

3.  Peak hour traffic and directional factors and peak hour AM and PM traffic volumes.

4.  Qualitative (level, rolling or mountainous) and quantitative (percent and length of grade) terrain characteristics.

5.  Composition of truck traffic for all movements expressed as a percentage of the total traffic during the design hour of total two-way traffic (for two-lane highway facilities) or as a percentage of total traffic in the predominant direction of travel (for multilane highway facilities).

6.  Any special situations relative to truck type and power (truck weight/horsepower ratios).

7.  Design speed of the facility.

8.  Adjustment factors (driver population factor) for the character of the traffic stream that reflect the influence of driver population (see HCM, Page 3-17).

9.  Special weave details for the operation and presentation of weaving sections if they are not obvious from the configuration and arrow diagram.

10. Length of weaving sections (see HCM, page 4-2).

11. A schematic diagram with the Level of Service superimposed for the AM and PM peak traffic volumes for existing and proposed situations.

12. A summary of the operational analysis showing the Level of Service of each element (basic freeway, all ramp gores, weaving sections) for the AM and PM and for existing and proposed situations.

The design of all access points shall conform to the design criteria, procedures and guidelines presented in Design Manual, Part 2. A twenty (20) year design period shall be required. Compliance is also required with all necessary studies, environmental documents, development of plans, public hearing notices and advertisements and the holding of public hearings, if required. The environmental documents shall be processed in accordance with established Department procedures.

Prior to approval to proceed with the environmental documents and public hearing requirements, the Preliminary Justification Report shall be

required for concept approval by the Central Office Bureau of Design and the FHWA, if applicable. This report should demonstrate the need for the facility and the benefits derived therefrom through utilization of the above guidelines. Preliminary Justification Reports shall be clear, concise and comprehensive in presentation.

Subsequent to approval of the Preliminary Justification Report and completion of public hearing procedures and receipt of environmental clearance, appropriate procedures as outlined in Design Manual, Part 1 shall be followed for project development.

## FEDERAL ENVIRONMENTAL REGULATIONS

FHWA approval of activities such as joint and multiple use permits, changes/modifications of access control, modification of ramps, additional ramps and additional interchanges is considered to be an Administration Action as defined in 23 CFR 771.107. Therefore, the requirements of the National Environmental Policy Act (NEPA) and of other related environmental regulations shall be completed. These could include, for instance, compliance with the U.S. Corps of Engineers Section 404 permit requirements. These regulations apply whether or not the proposed activity is to be Federally funded.

Construction of additional interchanges on existing limited access facilities may significantly affect the environment. Those projects which significantly affect the environment require the preparation of an Environmental Impact Statement (EIS). In general, the determination of the level of environmental documentation for interchange projects shall be based on an assessment of project impacts. Factors such as the previous planning history of the proposed additional interchange, the type and extent of traffic service to be provided and the amount of new right-of-way to be acquired should be considered as determinants in the development of project assessment.

When the significance of the project's environmental impacts are not clearly established, preparation of an Environmental Assessment (EA) shall be required. Actions such as geometric changes to existing interchanges, minor alterations to horizontal and/or vertical geometry, completion of missing movements, replacement of a loop ramp with a diamond configuration, combining multiple ramps in close proximity, auxiliary lanes and work involving the construction of ramps to rest areas and weigh stations shall generally be processed as Environmental Assessments as the significance of these project's environmental impacts may not be clearly established.

Minimal actions such as a simple change or modification to access control, operational measures, maintenance access, ramp widening projects, temporary ramps, weave improvements, deletion of unauthorized accesses and acceleration/deceleration lane lengthening can be processed as Categorical Exclusions.

1.2.65
Rev. 06/91

Projects which involve both point-of-access features and multiple use proposals shall require varying levels of environmental documentation based on an assessment of project impacts. Environmental documentation for these point-of-access/joint use projects shall be determined on a case by case basis.

For detailed requirements and guidance, see 23 CFR 771.

CONTROL OF ACCESS ON THE INTERSTATE SYSTEM

On all sections of the Interstate System, access shall be controlled by acquiring access rights outright prior to construction or by the construction of frontage roads, or both. Control of access shall be required for all sections of the Interstate System including the full length of ramps and terminals on the crossroads. Control for connections to the crossroads should be effected beyond the ramp terminals by purchasing access rights, providing frontage roads to control access and controlling added corner right-of-way areas. Such control should extend along the crossroads beyond the ramp terminal about one hundred (100) feet or more in urban areas and about three hundred (300) feet or more in rural areas and should include both sides of the crossroads even when ramp construction is limited to one side.

CONTROL OF ACCESS ON OTHER LIMITED ACCESS FACILITIES

The policy stated above for Interstate facilities shall apply to all Limited Access facilities.

CONTROL OF ACCESS ON INTERCHANGE RAMPS

In the development of all Limited Access facilities, the need to protect the operation and safety of that facility, with respect to access control, has long been recognized. This is particularly applicable in interchange areas where merge and exit conditions as well as cross traffic and turning movements occur.

New or additional access points to and from existing full-access controlled interchange ramps can reduce the capacity of the ramp(s), create a safety problem by increasing accident potential through conflicting movements and may not serve the interests of the general public. These access points within interchanges, especially on freeway-to-freeway ramp facilities, generally violate driver expectancy, introduce additional decision points where the information processing task is already complex, provide high potential for traffic back-up and create the possibility of wrong-way movements since full directional service is seldom provided. Since complete control of access along all interchange ramps and their terminals is essential for preservation of highway capacity and improved safety to highway users, approval for new or additional ramp access points should be strictly limited.

*Sent to Larry King (500rd)*
*6-5-92*
*@ 4:05 pm JLK/*
*7-3154*

June 5, 1992

*Resent to L.K*
*6-9-92*

Honorable E. G. (Bud) Shuster
U.S. House of Representatives
Room 2268, Rayburn House Office Building
Washington, D.C.  20515

Dear Congressman Shuster:

Thank you for your letter of April 14, 1992, concerning the construction of an additional interchange on Interstate 81 near Chambersburg.

After our follow-up meeting of May 13, 1992 in your Washington office, we had further internal discussions between District and Central Office staff.  We have formulated the following approach:

o   We will restructure the project scope by ~~adding~~ *focusing on* the objective to provide access to developing land adjacent to Walker Road.  We will make sure our consultant fully understands the development potential at this location.

o   We will pursue the elimination of the direct connection of Walker Road relocated to Kohler Road.

o   We will investigate the need to upgrade *and expand* local roads in conjunction with the interchange.

o   We will work with our consultant to shorten the study timetable with the objective of having an approved draft Environmental Impact Statement (EIS) by Spring 1993.  The draft EIS will include a preferred alternative.

In order to support the need for this project, we will need the cooperation of all interested parties.  I suggest a meeting *or meetings* be scheduled with Chambersburg Borough, Greene Township, development interests, county officials, the Department, and your office attending.  A show of support will greatly assist the Department in expediting the project schedule, particularly in our required coordination with state and Federal agencies.  I look forward to working with you throughout the study process.

Sincerely,


Howard Yerusalim, P.E.
Secretary of Transportation


cc:  Secretary's Reading File
     Governor's Washington Office
     L. King, Deputy Secretary for Planning
     B. G. Hoffman, P.E, District 8-0 Engineer

May 29, 1992


Honorable E. G. (Bud) Shuster
U.S. House of Representatives
Room 2268, Rayburn House Office Building
Washington, D.C. 20515

Dear Congressman Shuster:

Thank you for your letter of April 14, 1992, concerning the construction of an additional interchange on Interstate 81 near Chambersburg.


I agree that the probability of a new Department of Defense Finance Accounting Service along with other potential development does elevate the need for a new interchange at Walker Road. I have ~~directed~~ asked District Engineer Barry Hoffman to ~~direct~~ work with the consultant engineers ~~to~~ or add the evaluation of this new information to ~~his~~ the scope of work. We will also consider the elimination of the direct connection of Walker Road to Kohler Road and the possible construction of local roadways in the vicinity.

We will make sure our consultant fully understands the development potential adjacent to Walker Road.


We look forward to continuing with this project and ~~are working with the~~ will ~~keep you advised of its status.~~ We will keep you advised of the ~~If you have any~~ gathering support from the local community project status, and you have any

questions, please feel free to contact

_____.


                              Sincerely,


                              Howard Yerusalim, P.E.
                              Secretary of Transportation

080/JTK/pac
cc:

## 11 SOUTH SIXTH STREET
## CHAMBERSBURG, PA 1720
## TELEPHONE (717) 263-9281



November 13, 1998

Pennsylvania Department of Transportation
Attn: Barry Hoffman
District 8-0
2140 Herr Street
Harrisburg, PA 17103-1699

Dear Mr. Hoffman:

The Chambersburg Area School District Board of School Directors at their meeting held on
November 10, 1998, passed the attached Resolution which requests consideration from the
Pennsylvania Department of Transportation concerning the removal of the bridge on Walker
Road.

Sincerely,

George W. Fike, Jr.
Board Secretary

GWF:dc

Enclosure (1)

AN EQUAL OPPORTUNITY EMPLOYER

## RESOLUTION

WHEREAS THE PENNSYLVANIA DEPARTMENT OF TRANSPORTATION HAS ANNOUNCED PLANS TO CONSIDER REMOVING THE WALKER ROAD BRIDGE OVER I 81 AND WHEREAS A NUMBER OF CHAMBERSBURG AREA SCHOOL DISTRICT BUSES TRAVERSE THIS BRIDGE DAILY AND WHEREAS REMOVAL WOULD REQUIRE CHAMBERSBURG AREA SCHOOL DISTRICT BUSES TO TRAVEL MORE MILES AND WHEREAS IT WOULD CREATE MORE CONGESTION AND IMPACT ON SAFETY OF OUR BUSES NOW BE IT RESOLVED THAT WE PETITION THE PENSYLVANIA DEPARTMENT OF TRANSPORTATION TO KEEP THE CURRENT WALKER ROAD BRIDGE IRRIGARDLESS OF ANY PLANS TO ADD ADDITIONAL BRIDGES.



# CHAMBERSBURG AREA SCHOOL DISTRICT

## November 10, 1998

**Roll Call**

The Board of School Directors of the Chambersburg Area School District met in Regular Session at 7:30 p.m., in the Board Room of the Chambersburg Area Senior High School, with the following member present: D. Eugene Gayman, President; Penny W. Stoner, Vice-President; Harold W. Fosnot, Joel E. Happel, Robert L. Helman, Stanley J. Helman, Fred E. Rice, Thomas P. Orndorf, William N. Wingerd.

Superintendent Edwin H. Sponseller, Asst. Superintendent for Pupil Personnel Services Lynda Cook, Asst. Superintendent for Elementary Education James Taylor, Asst. Superintendent for Curriculum and Instruction Kenneth Byers, Asst. Business Manager and Treasurer Marvin Rife, Supervisor of Buildings and Grounds Richard Bender, Board Solicitor Jan Sulcove, Director of Human Resources Lynn Lerew and various members of the Press were also present.

Mr. Gayman called the meeting to order and welcomed all those in attendance.

**Minutes Approved**

On motion of Mr. Fosnot, seconded by Mr. Wingerd, all members present voting affirmatively, "Move approval of the minutes of October 14th and 28th, 1998 as per copies delivered to each member prior to the meeting".

**Treasurer's Report Approved**

On motion of Mr. Fosnot, seconded by Mrs. Stoner, voting yes: Gayman, Stoner, Fosnot, Happel, R. Helman, S. Helman, Rice, Orndorf, Wingerd, "Move approval of the Treasurer's Report for the month of October 1998 plus the Paid Bills for the month of October 1998 and the Unpaid Bills for the month of November 1998". The Treasurer's Report and the listing of bills is attached to and hereby becomes a part of this set of minutes.

**Audit Report**

Mr. Charles Frame, III, presented the Audit Report for the School Year ending June 30, 1998. On motion of Mr. S. Helman, seconded by Mr. Rice, all members present voting affirmatively, the Audit of the 1997-98 school year was approved".

**Related Boards and Councils**

**Franklin County Career and Technology Center** – Mr. Robert Helman noted a number of retirements would be acted on next week.

**Franklin Learning Center** – Mr. Wingerd stated there was nothing of consequence at the meeting. Mrs. Stoner noted the Audit Report was received and there was a significant increase in the reserve account and the Board will decide if they want the money returned to the Districts or left in the account.

**Lincoln Intermediate Unit** – Mr. Gayman reported the Board has made a selection for Executive Director which will not be announced until after November 24th when it will be official.

**Legislative Update** – On December 10th the Franklin and Adams School Boards and Staff are invited to Fairfield High School at 7:30 p.m. to meet the representative of PSBA to assist in selecting the priority issues for legislation next year. The Pennsylvania Legislature will in some manor be addressing the issue of vouchers for public and private schools within the next week. PSBA is strongly opposed to the voucher system.

**Wage Tax Board** – Mrs. Stoner reported the November meeting was cancelled; however, there are some items that need addressed:

| | |
|---|---|
| **Financial Reports** | On motion of Mr. Fosnot, seconded by Mrs. Stoner, voting yes: Gayman, Stoner, Fosnot, Happel, R. Helman, S. Helman, Rice, Orndorf, Wingerd, "Move approval of the Financial Reports for the period July 1, 1998 through September 30, 1998". |
| **Hamilton Heights** | On motion of Mr. Fosnot, seconded by Mr. Wingerd, voting yes: Gayman, Stoner, Fosnot, Happel, R. Helman, S. Helman, Rice, Orndorf, Wingerd, "Move approval to submit 731 Forms for removal of Asbestos at Hamilton Heights Elem.". |
| **Used Dump Truck Bid** | On motion of Mr. Fosnot, seconded by Mr. S. Helman, voting yes: Gayman, Stoner, Fosnot, Happel, R. Helman, S. Helman, Rice, Orndorf, Wingerd, "Move approval to develop specifications, advertise and solicit bids for a Used Dump Truck". |
| **Oven/CAMS Cafeteria Bid** | On motion of Mr. Fosnot, seconded by Mr. Rice, voting yes: Gayman, Stoner, Fosnot, Happel, R. Helman, S. Helman, Rice, Orndorf, Wingerd, "Move approval to develop specifications, advertise and solicit bids for a New Oven for CAMS Cafeteria". |
| **Bus Contract Agreements** | On motion of Mr. R. Helman, seconded by Mr. Rice, voting yes: Gayman, Fosnot, Happel, R. Helman, S. Helman, Rice, Orndorf, Wingerd, abstain: Stoner, "Move approval of the Bus Contract Agreements as presented". |
| **Policy Policy #121 "Field Trips"** | On motion of Mr. S. Helman, seconded by Mr. Wingerd, voting yes: Gayman, Stoner, Fosnot, Happel, R. Helman, S. Helman, Rice, Orndorf, Wingerd, "Move approval of the Amended Policy No. 121 **Field Trips** on 1st Reading". |
| **Other 7th Grade Girls Team** | On motion of Mr. Fosnot, seconded by Mr. Happel, voting yes: Gayman, Stoner, Fosnot, Happel, R. Helman, S. Helman, Rice, Orndorf, Wingerd, "Move approval to establish a 7th Grade Girls Basketball Team at Faust Junior High School". |
| **CISCO Local Academy** | On motion of Mr. S. Helman, seconded by Mr. Fosnot, voting yes: Gayman, Stoner, Fosnot, Happel, R. Helman, S. Helman, Rice, Orndorf, Wingerd, "Move approval to continue the process of becoming a CISCO Networking Local Academy". |
| **PDE Grant 1998-99** | On motion of Mr. S. Helman, seconded by Mr. Happel, voting yes: Gayman, Stoner, Fosnot, Happel, R. Helman, S. Helman, Rice, Orndorf, Wingerd, "Move approval to accept Grant Award from PDE for the 1998-99 Alternative Education for Disruptive Youth in the amount of $52,160.23". |
| **School Calendar 1998-99** | On motion of Mr. S. Helman, seconded by Dr. Orndorf, voting yes: Gayman, Stoner, Fosnot, Happel, R. Helman, S. Helman, Rice, Orndorf, Wingerd, "Move approval to amend the 1998-99 School Calendar to use Friday, April 16, 1999 as a Staff Development Day". April 16th will remain a Staff Development Day provided schools are not closed for emergencies for more than three (3) days by April 1st. |
| **CASHS Ski Club** | On motion of Mrs. Stoner, seconded by Mr. Happel, voting yes: Gayman, Stoner, Fosnot, Happel, R. Helman, S. Helman, Rice, Orndorf, Wingerd, "Move approval for the CASHS Ski Club to participate in a Ski Trip to Stowe and Sugarbush, Vermont, from December 30, 1998 through January 3, 1999". |
| **Resolution Walker Rd. Bridge** | Mr. Gayman read a Resolution, RE: the Walker Road Bridge, to all those in attendance. The Resolution is attached to and hereby becomes a part of this set of minutes. On motion of Mrs. Stoner, seconded by Mr. Rice, voting yes: Gayman, Stoner, Happel, R. Helman, S. Helman, Rice, Wingerd, no: Fosnot, Orndorf, "Move approval of Resolution concerning the Walker Road Bridge for reasons of Safety and Efficiency for Pupil Transportation". |



# PROJECT LOCATIONS STUDY

## US ROUTE 30, Section S01
### Franklin, Adams, and York Counties

Pennsylvania
Department of Transportation

prepared by:

## Gannett Fleming
ENGINEERS AND PLANNERS

June 1993

**Gannett Fleming**

# PROJECT PLANNING STUDY
# US ROUTE 30, SECTION S01
# FRANKLIN, ADAMS, AND YORK COUNTIES

## EXECUTIVE SUMMARY

The following Project Planning Study was conducted to determine improvements necessary to support future traffic growth through the year 2014 along the US Route 30 corridor between Mercersburg Road (PA Route 416) and Hanover Road (PA Route 116), a distance of approximately 57 miles. The study spanned Franklin, Adams and York Counties and was broken into two Phases, A and B. Phase A included an analysis of critical locations along the corridor as well as a need for bypasses around Chambersburg and Gettysburg. Phase B addressed additional concerns raised by the public, elected officials, and the advisory committee subsequent to presentation of the results of Phase A. The following summarizes the results and recommendations for Phases A and B.

## PHASE A

The initial phase of the study addressed overall corridor needs as well as specific area improvements. The analysis was broken into the following sections:

- ▸ Intersection and Roadway Improvements
- ▸ Travel Demand Modeling and Bypass Evaluation of Gettysburg and Chambersburg.

The following paragraphs set forth a summary of our analysis procedures, results and subsequent recommendations.

1



**COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF TRANSPORTATION**

Harrisburg, PA  17120
March 20, 1995



IN REPLY REFER TO

Agreement No. C85164, Work Order No. 4
District 8-0, Franklin County
SR 0081, Section 001
Engineer: Sheladia Associates, Inc.
Federal Project No.:  309-007-4801

Mr. Manuel A. Marks
Division Administrator
Federal Highway Administration
P.O. Box 1086
Harrisburg, Pennsylvania  17108

Dear Mr. Marks:

Attached is one (1) copy of the Engineering Work Order and one (1) copy of the Engineering Work Order without Exhibit "A" which we are proposing to execute for this project.

This Work Order provides for the consultant to perform pre-final design.

A detailed description of the work is included in the Engineer's proposal dated January 6, 1995, and attached to this Work Order as Exhibit "A".

The District reviewed the Engineer's proposal and one copy of their report is attached as Exhibit 1.

The method of payment for this Work Order is Cost Plus Net Fee.

We believe the cost to be fair and equitable for the work involved. The total cost of all Work Orders executed to date under this Agreement is $552,977.86.

The Department recommends this Work Order and requests your approval.

Making It Happen

Recycled Paper 

please return the Engineering Work Order copy without Exhibit "A"
with your stamp of approval.

Sincerely,

Michael M. Ryan, P.E.
Chief Engineer
Highway Administration

Attachments

Approved: 3-21-95

Bradley Krager
for Division Administrator FHWA

PROPOSAL FOR

WORK ORDER NO. 4

AGREEMENT NO. 085164

INTERSTATE 81 INTERCHANGE

S.R. 8016

FRANKLIN COUNTY

Prepared for:

PENNSYLVANIA DEPARTMENT OF TRANSPORTATION
ENGINEERING DISTRICT 8-0
2140 HERR STREET
HARRISBURG, PA 17103-1699

Submitted by:

SHELADIA ASSOCIATES, INC.
4660 TRINDLE ROAD
SUITE 301
CAMP HILL, PA 17011

JANUARY 6, 1995

# SCOPE OF WORK

## INTRODUCTION

The purpose of this Work Order is to perform Pre-Final Design Activities for the Interstate 81 Interchange, S.R. 8016, near Chambersburg, Franklin County, PA.  The Interchange will connect S.R. 0081 with Walker Road.  Alternative D-C of the Draft Environmental Impact Statement will be designed as the preferred alternative.

Included in the project are 3R type improvements to Walker Road from its intersection with Route 30 north to the relocated section just west of the bridge over I-81.  Walker Road is a local road located in the Borough of Chambersburg and Greene Township.

The Pre-Final Design Activities that will be performed are addressed in the following Scope of Work, and are taken from PennDOT's Strike-Off Letter 430-85-93, Concurrent National Environmental Policy Act and Design Activities, dated September 3, 1985. Additionally, work to be performed was discussed at meetings held in PennDOT's Engineering District 8-0 Office on May 16, 1994 and June 28, 1994.

## 1.    PRELIMINARY FIELD SURVEY

This work will be performed by PennDOT's District Surveyors. SHELADIA ASSOCIATES, INC. will have coordination effort involved in this task to obtain the survey information required to prepare plans for a preliminary field view to fix line, grade and typical sections, intersection/ interchange schematics, and structure widening, and enable subsequent preparation of right-of-way plans.  Base mapping will be prepared by the District and supplied to SHELADIA on disk for our use in developing plans.

## 2.    PRELIMINARY FIELD VIEW

Utilizing all preliminary drawings prepared in development of the EIS alternatives, SHELADIA will refine the design to 1" = 25' scale plans for the Preliminary Field View (Step 9). All work outlined in Chapter 1, Section 2.9 of Design Manual 1 will be addressed as applicable. Walker Road work will also be included.  SHELADIA ASSOCIATES will attend the Preliminary Field View to answer any questions and explain the project.

Current design parameters from Design Manual, Part 2 will be listed along with design year traffic to ensure that the proper criteria are met.  Any design exceptions required will be identified and justified in accordance with the latest Department criteria.

PennDOT's District 8-0 Surveyors will stake the baselines and flag the proposed interchange in the field for use during the Preliminary Field View.

### 3.    LINE, GRADE AND TYPICAL SECTIONS

SHELADIA will prepare line, grade and typical sections for the Preliminary Field View as outlined in Design Manual 1, Chapter 1, Section 2.9. Preliminary work prepared for the Draft EIS will be utilized to develop the information required.

### 4.    INTERSECTION/INTERCHANGE SCHEMATICS

Intersection and Interchange Schematics will be prepared in accordance with Design Manual 1, Chapter 4, Section 10. Expanded traffic analyses which are required will be developed from the DEIS information. These schematics will be drawn at a scale of 1" = 200'. Enlargements will be developed for clarity as necessary.

### 5.    PRELIMINARY INTERSECTION/INTERCHANGE GEOMETRICS

Subsequent to approval of the Intersection/Interchange Schematics, SHELADIA will prepare geometrics for the intersection and interchange. These geometrics will be shown on the Step 9 Plans, and will be drawn at a scale of 1" = 25'.

### 6.    CRITICAL CROSS-SECTIONS

Existing ground will be plotted at 50-foot intervals along mainline I-81 (for ramp tie-ins) and along all ramps. The cross-sections will be stripped off of the topographic plans with contours which will be supplied by the District surveyors. Only those cross-sections which are in critical areas (for environmental and/or right-of-way concerns) will be templated during Pre-Final Design. We assume that cross-sections will be templated every 200 feet along the ramp tie-ins, and elsewhere on the ramps as needed.

### 7.    PAVEMENT DESIGN ANALYSIS

PennDOT's District Pavement Design Engineer will perform the pavement design for: 1) I-81 Ramp Widening; 2) Interchange Ramps and; 3) Walker Road. SHELADIA ASSOCIATES, INC. will provide all traffic data needed by utilizing and manipulating the information in the DEIS.

### 8.    PRELIMINARY DRAINAGE

This plan information will be developed to assist in the Design Field View in setting alignment and providing supportive information in analyzing required erosion and sediment pollution control measures. Swale and ditch locations, along with low points, will be identified. Specific attention will be given to ensuring that all required drainage appurtenances will be within the right-of-way.

Pavement base drain will be provided as needed throughout the project. The pavement base drains will be indicated on the typical sections for the Preliminary Field View Submission.

9.    STRUCTURE TYPE, SIZE, AND LOCATION (TS&L)

**General**

An existing overhead bridge which carries Township Road T-517 (Walker Road) over I-81 must be widened to accommodate new lane configurations and increased shoulder widths for the proposed interchange facility. A description of the existing bridge and proposed construction are as follows:

*Bridge Description*

Superstructure Type:    Four Span P/S Concrete Spread Box Beams
Pier Type:    Reinforced Concrete Bents on Spread or Pile Foundations
Abutments:    Stubs on Piles

*Proposed Construction*

- Widen from 33'-6" (existing) to 59'-6". Perform widening on south side.
- Replace existing bridge deck.
- Maintain a single lane of T-517 traffic during construction.

Specific engineering work tasks are as follows:

**Field Inspection**

A field inspection will be performed on the bridge to determine existing conditions. A visual examination will be performed on the prestressed concrete beams and substructure units. It is assumed that no testing is required, and that examination of the deck is not necessary since the District has established that the deck will be replaced in its entirety.

In addition to a visual examination, all exposed surfaces of the abutments and piers will be sounded with a hammer to delineate areas of incipient and visible deterioration. This data will be recorded on copies of the original construction plans.

Results of the inspection, along with photo documentation, will be presented in an inspection report. This report will be transmitted with the TS&L submission.

**Structural Analyses**

A capacity analysis will be performed on the prestressed spread box beams to determine live load ratings for the H, HS, ML80, and 204 kip permit loadings. The PennDOT Prestressed Concrete Girder Computer Program will be used for this analysis.

An analysis will be performed on the existing prestressed beams for proposed conditions using the existing beam spacing. If load capacities are found to be below minimum levels

established in PennDOT Design Manual Part 4, consideration will be given to reducing deadload on the beams. Analyses for respacing of the beams, if necessary, will be considered as supplemental work.

Recent NBIS inspections have identified various cracks in the pier caps. In order to verify the adequacy of the piers and abutments, each substructure unit will be analyzed for proposed conditions. One analysis will be performed for each substructure unit (three piers and two abutments). Additional analyses, if necessary, will be considered as supplemental work.

**Seismic Analysis**

The bridge is located in Seismic Performance Category A. Therefore, the seismic analysis will consist of verifying the adequacy of beam seat widths and superstructure to substructure connections.

**Type, Size and Location Plan**

A type, size and location plan submission will be developed. The submission will include an inspection report, recommendations, a cost estimate, and a TS&L plan. Specific items that will be considered include:

- Reduced underclearance due to widening (16'-6" minimum will be provided).
- 10° flared end transitions for existing parapets.
- Use of strip seal expansion dams.
- Consideration of eliminating deck joints by use of deck continuity at piers.
- Relocation of bearing fixities for deck continuity over piers.
- Staged construction to allow for a single lane traffic pattern on T-517 during construction.

The TS&L plan will be prepared in accordance with Design Manual Part 4, Policies and Procedures, Chapter 1.9.3.3 and current Strike-Off Letters. Additionally, rehabilitation concepts and requirements contained in DM4, Chapter 5 will be incorporated into the design.

All new design will be performed in accordance with Design Manual Part 4 using the load factor method. Live loads will include the HS25, 125% alternate military, and the 204 kip permit vehicle.

## 10. FOUNDATION EXPLORATION

The drilling of test borings and preparation of Engineer's Logs will be performed by the District. SHELADIA ASSOCIATES, INC. will review the boring logs and incorporate subsurface data into the TS&L Plan development. SHELADIA ASSOCIATES, INC. will also draft the Engineer's Logs onto mylar drawings.

### 11. PRELIMINARY SOILS AND GEOLOGICAL REPORT AND PROFILE

The Reconnaissance Soils and Geological Engineering Report will be prepared by the District. SHELADIA ASSOCIATES, INC. will meet with the District Geotechnical personnel to discuss the proposed bridge and roadway work. SHELADIA ASSOCIATES, INC. will also draft the Roadway Augers onto mylar sheets.

### 12. PRELIMINARY EROSION AND SEDIMENTATION

The Preliminary Erosion and Sediment Pollution Control Plan will be developed for the Design Field View. General erosion and sediment pollution control features will be addressed, and specific locations where right-of-way is required for ponds or other erosion and sediment pollution control devices will be identified. Separate plans will not be prepared; all E&S devices will be shown on the roadway plans. A separate CADD layer will be developed to show E&S data that the County Conservation District requires that PennDOT does not require.

### 13. PRELIMINARY UTILITY PLAN AND COORDINATION

The District Utility Unit will make initial utility contacts. SHELADIA ASSOCIATES will coordinate with the District, and submit base plans to the District for distribution to the affected utility companies as soon as the base plans showing the proposed interchange are prepared. Upon receipt of line locations from affected companies, we will transfer the mark-ups onto our base plans.

### 14. PRELIMINARY SIGNING

Preliminary signing design will be performed and shown on the step 9 plans. This will include regulatory, warning and destination signing. Upon approval of the preliminary signing layout, separate base plans will be developed to show the signing and pavement marking details.

Also included will be the preparation of plans and fabrication details for modifying existing signs beyond the limits of construction.

### 15. PRELIMINARY TRAFFIC CONTROL

Preliminary Traffic Control Schematics will be developed for the Design Field View. Upon approval of the preliminary traffic control schematic, separate plans will be developed to show traffic control details. It is assumed that Walker Road will be open during construction of the roadway and bridge work. One lane of traffic will be maintained over the bridge with signals controlling traffic at each end of the bridge.

### 16. PRELIMINARY TRAFFIC SIGNALS

Based on information contained in the Draft EIS, one signalized intersection at the interchange is required (Ramps C & D and Kohler Road at Relocated Walker Road) in the design year.

Highway Capacity Manual software for Signalized Intersections will be utilized to determine appropriate timing and associated levels of service. A Traffic Signal Permit will be prepared indicating the proposed intersection with signal layouts, timing and appropriate general notes.

## 17.    PRELIMINARY NOISE ANALYSIS

Based upon results of preliminary noise studies conducted as a part of the environmental documentation, noise impacts appear to be likely, but cost effective mitigation may be difficult to attain. Therefore, noise issues are to be reassessed as part of pre-final design, in accordance with the Department's Design Manual, Part 1A, Chapter 8 (DM 1A.8), but this effort is expected to include preliminary, analytical tasks only. The current scope of work must be expanded if further elements (e.g., detailed mitigation design, public involvement) are required.

The noise analyses will include both noise monitoring and noise modeling. It is expected that monitoring will be conducted at up to five sites during afternoon peak and off-peak traffic periods. The area will be modeled with the same traffic volumes, to calibrate site conditions. The Vanderbilt University implementation of the FHWA models (Traffic Noise CAD) will be utilized. Design year levels will be predicted for the proposed alignment. If warranted, mitigation measures will be considered. It is expected that one barrier scenario (one location approximately 2000 feet in length) will be considered. Barrier heights will be adjusted to establish an optimal abatement approach. The guidelines for evaluating the "Feasibility and Reasonableness of Noise Abatement Measures" (SOL 440-94-02) will be applied. The results of this reassessment will be presented in a Final Noise Report.

## 18.    SAFETY REVIEW

Prior to the Design Field View Submission, data will be submitted to the District for the Safety Review Committee to review the project and make comment. This data will consist of plans and profiles developed by Johnson, Mirmiran & Thompson, P.C., for the Alternatives Analyses. SHELADIA ASSOCIATES, INC. will submit colored-up Step 9 Plans for the Final Safety Review submission.

## 19.    PRELIMINARY RIGHT-OF-WAY ACTIVITIES

The District Surveyor has already obtained Tax Maps and Deeds and has sent the Letters of Intent to Enter to all potentially involved properties. SHELADIA ASSOCIATES will prepare property mosaics and show all property lines on the Design Field View Plans. Subsequent to Step 9 approval, preliminary Right-of-Way Plans will be developed at a scale of 1" = 25'. Separate property plats will be developed for each affected parcel. It is assumed that 7 plats will be prepared.

## 20.   RIGHT-OF-WAY INCIDENTALS

The District Right-of-Way Unit will perform this work.  SHELADIA ASSOCIATES, INC. will have coordination effort involved in this task.

## 21.   MEETINGS AND PROJECT MANAGEMENT

SHELADIA ASSOCIATES will provide the appropriate knowledgeable individuals at all project meetings with the Department, utilities, Greene Township, the Borough of Chambersburg, and all other involved agencies.  Minutes of all meetings will be prepared and distributed.

Also included in this task is the weekly review of the project status by our Project Manager and Principal-in-Charge, monthly preparation of status reports and invoices, and the programmed administration of the Open-End Contract.

Exhibit A, Page 9 of

DS-600 (3-89)

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF TRANSPORTATION

DATE:     March 21, 1995                                    Harrisburg

SUBJECT:  SR 0081-001, Franklin County
          PMS No. 083C012

TO:       Proposal Evaluation for Work Order No. 4
          Under Open-End Contract No. 085164

FROM:     William J. Greene, Consultant Liaison Engineer
          District 8-0

The following comments are applicable to the proposal dated
January 6, 1995 submitted by Sheladia Associates, Inc.:

1.  The scope of work appears satisfactory.

2.  The consultant's man-hour estimate of 1768 man-hours is
    satisfactory when compared to the District's estimate of 1691
    man-hours.

3.  The overhead rate of 130% is satisfactory when compared to the
    maximum rate established in Exhibit "B" of the open-end
    contract.

4.  Payroll rates appear reasonable.

5.  Net Fee requested by the consultant represents 10% percent of
    direct and indirect labor costs and is satisfactory when
    compared to the net fee used by the consultant in the sample
    project.

6.  Other in-house direct costs appear to be reasonable.

7.  Direct Costs by Others appear to be reasonable.

8.  A completion date of February 1, 1996 has been written into
    the Work Order.

9.  Based on the above, a negotiation meeting will not be
    required.



**U.S. Department
of Transportation**

**Federal Highway
Administration**

Region 3
Pennsylvania Division

Courthouse and Federal Building
228 Walnut Street
P.O. Box 1066
Harrisburg, Pennsylvania
17108-1066

IN REPLY REFER TO:

JUN 3 0 1993

Franklin County
Proposed I-81 Interchange

HE-PA.3

Mr. Richard P. Kramer, Chairman
Greene Township Board of Supervisors
P.O. Box 215
Scotland, Pennsylvania  17254

Dear Mr. Kramer:

This is in response to your June 23, 1993 correspondence requesting information on the proposed new I-81 Interchange in Franklin County under PL100-17.  Your request included several questions to which we will respond in the order presented.

1.  Has the required "needs" document been completed?  If so, we would appreciate receiving a copy of it.

Answer:  The needs document for this Project is part of the Draft Environmental Impact Statement (DEIS) report.  When the DEIS report is released for public comment, you may request and obtain a copy.

2.  Have the various federal and state resource agencies concurred in the location of an interchange?  We would appreciate receiving copies of their position statements.

Answer:  The resource agencies have not concurred on the interchange location and have not yet been requested to do so.  The DEIS will identify the interchange locations and the no build alternative.  At that time the resource agencies will be asked for review and comments, which will be incorporated into the Final Environmental Impact Statement (FEIS).  Upon completion of the FEIS, the resource agencies will be asked for review and concurrence.

3.  Is I-81 in Greene Township considered a rural or urban interstate?  What is the minimum distances permitted between interchanges?

Answer:  I-81 in Greene Township, Franklin County is considered a rural interstate.  The American Association of State Highway and Transportation Officials' "Policy on Design Standards – Interstate System", which provides the basic design guidance for highways in

the United States, indicates that "As a rule, minimum spacing should be one mile in urban areas and two miles in rural areas". Variations from this must be justified.

4.  Any "point of access" regulations that may bear on the proposed interchange.

Answer:  The process for changes in access on the Interstate System requires approval of new interchanges by the Federal Highway Headquarters office in Washington D.C.  Issues such as adjacent interchange spacing, land use/zoning, traffic on the interstate and connecting highway, etc. are evaluated and analyzed in the review and approval determination.  A copy of PennDOT Design Manual Part 1, Chapter 2, Section 5 is enclosed.

We hope the above information represents a satisfactory response to your concerns.  If we can be of more assistance, please feel free to contact us.

Sincerely yours,

*Phil Ouellet*

*for* Manuel A. Marks
Division Administrator

Enclosure

1.2.60
Rev. 11/89

Section 5:    JUSTIFICATION REQUIREMENTS FOR ADDITIONAL INTERCHANGES,
ACCESS POINTS AND RAMPS ON COMPLETED INTERSTATE AND
OTHER LIMITED ACCESS HIGHWAY FACILITIES

During the past several years, there has been an increase in the number of requests received by the Department and the Federal Highway Administration (FHWA) for new or revised access points on completed sections of Interstate and Limited Access highway facilities. A majority of the additional access requests involve significant modifications to existing interchanges or the addition of ramps, especially for urban area system development, that affect already closely spaced access, heavy traffic volumes and complex traffic operations. These proposed access request modifications have the potential to significantly influence the level of service on existing Interstate and Other Limited Access facilities.

It is imperative that coordination between potential developers and local, responsible officials be established to formulate an adequate transportation network. Local zoning officials should not approve major, additional point of access developments without sufficient local roads and funding in place for the necessary transportation improvements. Since developers can only make improvements on their land, a governmental agency with the power of eminent domain should be involved, even if the developer is providing funding for the improvements, to effect an efficient and viable transportation network.

Therefore, the following shall serve to provide information and guidelines to assist in the preparation and review of proposed new or revised point of access requests on completed sections of Interstate and Other Limited Access highway facilities. Also, the guidelines shall serve to enhance the application of uniform analysis and documentation procedures for new development or redevelopment as justification to support a submission request, whether funding involves public or private investment, for approval of new or revised points of access for Interstate and Other Limited Access facilities. These guidelines shall apply to all Federal aid and non-Federal aid highway projects. Control of access for new highway facilities shall be achieved as indicated in Design Manual, Part 2, Chapter 1, Section 1.5.

## PRELIMINARY JUSTIFICATION REPORT GUIDELINES AND APPROVAL PROCEDURES

The following guidelines list requirements that should be provided to promote a request for access approval. This information should be incorporated into a Preliminary Justification Report for submission and approval by the Central Office Bureau of Design and the FHWA. New access points in rural areas may not require the same level of detail.

1.    Purpose of access.

2.    The relationship of the proposed access point to other planned highway improvements and programs.

1.2.61
Rev. 11/89

3.  Distances to and size of communities or activities directly served.

4.  Description of existing and proposed access.

   a.  Configuration of the existing and proposed interchange(s) including an arrow diagram depicting the number of lanes throughout the affected area to assist in visualizing the critical areas for the Level of Service.

   b.  Distances to adjacent interchanges in each direction, from gore to gore area (rounded to the nearest one hundred foot increment) including any anticipated improvements determined necessary.

   c.  Alternatives considered.

   d.  Description of any exceptions to existing design criteria.

   e.  Main line and crossroad traffic volumes (ADT) including turning movements for current year, implementation year and design year.

   f.  The relationship of the proposed access point to adjacent highway facilities (area of influence), as diagnosed from a traffic engineering and Level of Service standpoint, to properly evaluate the submission request. The evaluation shall be sufficient, on both the local roadway system and the limited access facility (upstream and downstream), to analyze the true effects on geometry to the limited access facility and on the local roadway system and related intersections. This evaluation should include affected interchanges and intersections, connecting roads, the major access point facility itself and the acceptable merge and diverge lengths and the ability to sign adequately. It is highly desirable to preclude or minimize any significant degradation of the limited access facility and to limit additional congestion on local roadways and intersections.

   g.  The existence and number of other main line lanes, crossroads and/or streets, including any auxiliary lanes or collector-distributor roads. Also, the feasibility of developing the above, generally parallel to the existing Interstate or Limited Access system, for use by the Interstate or Limited Access facility traffic by way of access other than the one under consideration in connecting trip origins and destinations.

5.  Traffic and operational analysis for existing and proposed conditions including analysis of the crossroads and other roads and streets to the extent necessary to assure the ability of the streets and roads to effectively collect and distribute traffic from the new access point.

1.2.62
Rev. 11/89

6. Any other pertinent information that shall explain and/or support the proposal, such as a cost-effectiveness analysis that includes a statement of the cost resulting from construction of the proposed access and an estimated benefit-cost ratio, source of funding and implementation schedule.

Because the access issue is increasing in complexity, especially in urban areas, it is extremely important that all requests for revised or new access points not be viewed in isolation, but incorporate the highway network as a whole with its existing access and operation problems. From the standpoint of safety and in particular to prevent wrong-way movements, it is recommended that all freeway interchanges with nonaccess-controlled highways provide ramps to serve all basic directions (complete as opposed to partial).

The assessment and techniques applied for computing highway capacity shall be performed in accordance with the design and operational guidelines presented to the 1985 Highway Capacity Manual (HCM) and with the Manual's associated software program. The following shall be provided when checking the Level of Service calculations and evaluating the operational analysis impact.

1. Lane widths and offset distances to side obstructions if less than six (6) feet.

2. Distances (rounded to the nearest ten-foot increment) between gore points.

3. Peak hour traffic and directional factors and peak hour AM and PM traffic volumes.

4. Qualitative (level, rolling or mountainous) and quantitative (percent and length of grade) terrain characteristics.

5. Composition of truck traffic for all movements expressed as a percentage of the total traffic during the design hour of total two-way traffic (for two-lane highway facilities) or as a percentage of total traffic in the predominant direction of travel (for multilane highway facilities).

6. Any special situations relative to truck type and power (truck weight/horsepower ratios).

7. Design speed of the facility.

8. Adjustment factors (driver population factor) for the character of the traffic stream that reflect the influence of driver population (see HCM, Page 3-17).

1.2.63
Rev. 11/89

9.  Special weave details for the operation and presentation of weaving
    sections if they are not obvious from the configuration and arrow
    diagram.

10. Length of weaving sections (see HCM, page 4-2).

11. A schematic diagram with the Level of Service superimposed for the AM
    and PM peak traffic volumes for existing and proposed situations.

12. A summary of the operational analysis showing the Level of Service of
    each element (basic freeway, all ramp gores, weaving sections) for the
    AM and PM and for existing and proposed situations.

The design of all access points shall conform to the design criteria,
procedures and guidelines presented in Design Manual, Part 2.
Compliance is also required with all necessary studies, environmental
documents, development of plans, public hearing notices and
advertisements and the holding of public hearings, if required.
The environmental documents shall be processed in accordance with
established Department procedures.

Prior to approval to proceed with the environmental documents and public
hearing requirements, the Preliminary Justification Report shall be
required for concept approval by the Central Office Bureau of Design and
the FHWA, if applicable. This report should demonstrate the need for the
facility and the benefits derived therefrom through utilization of the
above guidelines. Preliminary Justification Reports shall be clear,
concise and comprehensive in presentation. Where the FHWA has participated
in any manner in the establishment of the original access control, it shall
be necessary to secure their approval for the additional access points.
The FHWA is considered to have been a party to the establishment of the
original access control if they participated in any of the following:
design, utility relocation, right-of-way acquisition or construction. For
non-Federal aid facilities, all requests shall be reviewed and approved by
the Central Office Bureau of Design.

Subsequent to approval of the Preliminary Justification Report and
completion of public hearing procedures and receipt of environmental
clearance, appropriate procedures as outlined in Design Manual, Part 1
shall be followed for project development.

FEDERAL ENVIRONMENTAL REGULATIONS

FHWA approval of activities such as joint and multiple use permits,
changes/modifications of access control, modification of ramps, additional
ramps and additional interchanges is considered to be an Administration
Action as defined in 23 CFR 771.107. Therefore, the requirements of the
National Environmental Policy Act and of other related environmental
regulations should be completed. These could include, for instance,
compliance with the U.S. Corps of Engineers Section 404 permit
requirements. These regulations apply whether or not the proposed activity
is to be Federally funded.

1.2.64
Rev. 11/89

Construction of additional interchanges on existing limited access facilities may significantly affect the environment. Those projects which significantly affect the environment require the preparation of an Environmental Impact Statement (EIS). In general, the determination of the level of environmental documentation for interchange projects shall be based on an assessment of project impacts. Factors such as the previous planning history of the proposed additional interchange, the type and extent of traffic service to be provided and the amount of new right-of-way to be acquired should be considered as determinants in the development of project assessment.

When the significance of the project's environmental impacts are not clearly established, preparation of an Environmental Assessment (EA) shall be required. Actions such as geometric changes to existing interchanges, minor alterations to horizontal and/or vertical geometry, completion of missing movements, replacement of a loop ramp with a diamond configuration, combining multiple ramps in close proximity, auxiliary lanes and work involving the construction of ramps to rest areas and weigh stations shall generally be processed as Environmental Assessments as the significance of these project's environmental impacts may not be clearly established.

Minimal actions such as a simple change or modification to access control, operational measures, maintenance access, ramp widening projects, temporary ramps, weave improvements, deletion of unauthorized accesses and acceleration/deceleration lane lengthening can be processed as Categorical Exclusions.

Projects which involve both point-of-access features and multiple use proposals shall require varying levels of environmental documentation based on an assessment of project impacts. Environmental documentation for these point-of-access/joint use projects shall be determined on a case by case basis.

For detailed requirements and guidance, see 23 CFR 771.

CONTROL OF ACCESS ON THE INTERSTATE SYSTEM

On all sections of the Interstate System, access shall be controlled by acquiring access rights outright prior to construction or by the construction of frontage roads, or both. Control of access shall be required for all sections of the Interstate System including the full length of ramps and terminals on the crossroads. Control for connections to the crossroads should be effected beyond the ramp terminals by purchasing access rights, providing frontage roads to control access and controlling added corner right-of-way areas. Such control should extend along the crossroads beyond the ramp terminal about one hundred (100) feet or more in urban areas and about three hundred (300) feet or more in rural areas and should include both sides of the crossroads even when ramp construction is limited to one side.

1.2.65
Rev. 11/89

CONTROL OF ACCESS ON OTHER LIMITED ACCESS FACILITIES

The policy stated above for Interstate facilities shall apply to all Limited Access facilities.

CONTROL OF ACCESS ON INTERCHANGE RAMPS

In the development of all Limited Access facilities, the need to protect the operation and safety of that facility, with respect to access control, has long been recognized. This is particularly applicable in interchange areas where merge and exit conditions as well as cross traffic and turning movements occur.

New or additional access points to and from existing full-access controlled interchange ramps can reduce the capacity of the ramp(s), create a safety problem by increasing accident potential through conflicting movements and may not serve the interests of the general public. These access points within interchanges, especially on freeway-to-freeway ramp facilities, generally violate driver expectancy, introduce additional decision points where the information processing task is already complex, provide high potential for traffic back-up and create the possibility of wrong-way movements since full directional service is seldom provided. Since complete control of access along all interchange ramps and their terminals is essential for preservation of highway capacity and improved safety to highway users, approval for new or additional ramp access points should be strictly limited.



COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF TRANSPORTATION
HARRISBURG, PENNSYLVANIA 17120

OFFICE OF
SECRETARY OF TRANSPORTATION

December 2, 1987

Dr. Paul B. Ambrose
Professor of Government
Shippensburg University
Shippensburg, Pennsylvania  17257

Dear Dr. Ambrose:

I am writing in response to your November 27th letter to the State Transportation Commission, concerning the 1986-98 Twelve Year Program.

Per your request, I've attached a copy of the Twelve Year Program for Franklin County as adopted by the Commission.  The Commission adopted the 1986-98 Twelve Year Program on July 16, 1987 based on revenue currently estimated to be available.  On August 26th, the Commission adopted an alternate Twelve Year Program subject to additional revenues.  You will find the status of each project on the attached listing under both scenarios.  I note that neither Governor Casey nor Secretary Yerusalim are supporting an increase in fuel taxes or fees at this time.

The proposed new interchange on I-81 (Exit 7) is included in the 1986-98 Twelve Year Program.  This project was included in the program based on interest expressed by the Borough of Chambersburg.  Special earmarked funding secured through the efforts of Congressman Shuster for this project means that this project does not have to compete with other projects statewide for limited, regular, funding.  We intend to advance this project to construction so long as community support for it remains evident; the funding dedicated to it cannot be transferred to other projects.

The State Transportation Commission does not utilize a formal set of standards to judge transportation projects.  Rather, factors such as the degree to which the project contributes to economic development, safety, or system preservation, and community support, feasibility and the availability of funding are considered on a case by case basis. Input received at the regional public hearings on the Twelve Year Program (held this past Spring for the 1986-98 Twelve Year Program) is also reviewed by the Commission.

Thank you for your interest in Pennsylvania's transportation system.

Sincerely,

Harvey Haack, P.E.
Deputy Secretary

Attachment



COMMISSIONER
Samuel W. Worley, Cha
Joe W. Aushermar
Dennis A. Zeger

CHIEF CLERK
John A. Hart

COUNTY SOLICIT
Robert E. Graham J

**Franklin County Commissioners' Office**

Court House

157 Lincoln Way East

Chambersburg, PA 17201-2211

717-264-4125

September 5, 1989

Harvey Haack, P.E.
Deputy Secretary
Department of Transportation
Commonwealth of Pennsylvania
Harrisburg, PA 17120

Dear Mr. Secretary:

Please find enclosed a letter, pertaining to Exit #7, I have approved by the majority of the Board of Commissioners. I have been instructed by the Commissioners to write this letter to further explain and express their views and opinions on Exit #7.

A majority of the Board members are in favor of constructing Exit #7 between Exit #6 and Exit #8.

All of the Board members further concur that the use and loss of County owned land at Franklin Farm is not acceptable, due to long range plans reserved for this land.

Additionally, any construction plan which would include Franklin Farm Lane as a primary route of travel is not supported by the Board of Commissioners, due to all the inconveniences and hazardous conditions which are associated with increased traffic on this route.

I am hopeful that this information will assist you in your understanding the positions of the County of Franklin in your considerations of Exit #7. If you have any additional questions on this subject or require any clarification of the opinions expressed in the Commissioners' of my letter, please contact the Franklin County Commissioners office.

Sincerely,

FRANKLIN COUNTY COMMISSIONERS

John A. Hart
Chief Clerk

JAH/bjg

Enclosures

cc: Mr. Micheal Liptak
    Mr. Daryl L. Kerns



**Franklin County Commissioners' Office**

Court House

157 Lincoln Way East

Chambersburg, PA 17201-2211

717-264-4125

COMMISSIONERS
Samuel W. Worley, *Chai*
Joe W. Ausherman
Dennis A. Zeger

CHIEF CLERK
John A. Hart

COUNTY SOLICITO
Robert E. Graham, J

September 1, 1989

Harvey Haack, P.E.
Deputy Secretary
Department of Transportation
Commonwealth of Pennsylvania
Harrisburg, PA  17120

RE: Exit #7, Interstate #81
    Franklin County

Dear Mr. Secretary:

Your willingness to take a look at the Proposed Exit #7 on Interstate #81 in Franklin County has prompted us to write you and express an opinion regarding the desires of the Commissioners.

As you know, five million dollars have been appropriated by the Federal Government, spearheaded by Congressman Shuster, as a demonstration project for an exit in Franklin County. When the Interstate was built, exit #7 was omitted, leaving Exit #8 at Scotland and Exit #6 at Route #30. Obviously, the intent was to construct Exit #7 in the future to assist in alleviating the heavy traffic volume on Route #30 and the vicinity.

Franklin County owns approximately 193 acres north of Route #30 and south of Walker Road overpass on Interstate #81. This large area is serviced by Franklin Farm Lane and accommodates the Franklin County Nursing Home, District Justice Office, Office of Aging, Children and Youth Office, Probation Office, Agriculture Extension Office, 4-H Club Office, Veterans Affairs Office, JTPA Office, and the Franklin County Prison. Presently, under construction is a new two million dollar Human Services Building, which will house Mental Health/Mental Retardation and Drug and Alcohol administrative offices. We point this out to tell you that the County is developing this area extensively and is also planning for future development. We see a need to retain the County owned land for future expansion purposes.

Being aware that a by-pass is not on the twelve (12) year plan, the County strongly urges the construction of Exit #7 north of Route #30 and south of Exit #8 at Scotland, more particularly as alternate D in the Engineers studies as prepared for District Engineer Robert R. Mueser and presented at the public hearing held June 7, 1989, in Chambersburg. In our opinion the optimum site for the proposed exit is just north of the present Walker Road overpass. This will give more accessibility to the use of Interstate #81 and the secondary roads in that area.

Harvey Haack, P.E.
September 1, 1989
Page 2

Your favorable consideration will be greatly appreciated.

Sincerely yours,

FRANKLIN COUNTY COMMISSIONERS

Samuel W. Worley, Chairman

Dennis A. Zeger

Enclosure:  Alternate D

cc:  Mr. Michael Liptak
     Mr. Daryl L. Kerns

2



**Franklin County Commissioners' Office**

Court House

157 Lincoln Way East

Chambersburg, PA 17201-2211

717-264-4125

COMMISSI

Samuel W. Worle

Joe W. Aus

Dennis A.

CHIEF CL

John A. F

COUNTY SOL

Robert E. Gra

June 12, 1990

Mr. Robert R. Mueser, P.E., District Engineer
Pennsylvania Department of Transportation
District 8-0
21st and Herr Sts.
Harrisburg, PA 17103-1699

Re:  I-81, Chambersburg

Dear Mr. Mueser:

On June 7, 1989, at a public meeting in Chambersburg, and by letters dated June 8, 1989, and September 8, 1989, I expressed my opposition to the possibility of selecting alternates C or D or any other plan that would increase traffic on Franklin Farm Lane.

The I-81 interchange update still lists C and D as possible alternates, and again I want the records to indicate that I am opposed to any alternate that would increase traffic on Franklin Farm Lane.

Franklin Farm Lane is a very narrow county road built to serve county facilities.  Along this road the county has a 224 bed Nursing Home that will see expansion in a few years; a County Prison that plans have been prepared for expansion; a new Human Services Build-ing costing over two million dollars that houses many important departments; an Administration Building having many important depart-ments; the 4-H sponsored ring and stable for Handicapped Horsemanship; and a Fish Hatchery operated by the Chambersburg Rod and Gun Club that has a waterway and holding tanks on both sides of the lane.

Enclosed is a copy of a letter from Franklin County Heritage, Inc., pointing out the fact that a number of these buildings are of historic value and the Gass House is on the National Register of Historic Places.

I hope that you take my objections seriously.  We are very proud of the facilities along Franklin Farm Lane and of the services the county employees provide to our citizens.

Very truly yours,

Joe W. Ausherman

cc: Franklin County Heritage, Inc.
    Chambersburg Rod and Gun Club
    4-H Horsemanship for the Handicapped
    Judge John W. Keller
    Senator Terry Punt

Representative Pat Fleagle
Representative Jeff Coy
Franklin County Commissioners' Of
Department Heads along Franklin F