FILED
HARRISBURG, PA

JUN 0 7 2002

MARY E. D'ANDREA, CLERK
Per _____

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREENE/GUILFORD ENVIRONMENTAL ASSOCIATION, a non-profit Corporation incorporated under the laws of the Commonwealth of Pennsylvania, CITIZENS FOR PLANNED COMMUNITY GROWTH, an unincorporated association organized under the laws of the Commonwealth of Pennsylvania, PAUL B. AMBROSE, JOHN G. ENDERS, CHARLES F. RAHAUSER, BETSY RAHAUSER, DOUGLAS A. WARNOCK, U.X. VAGNERINI, THOMAS W. BUNDY, STEPHEN P. BUCHER, ROGER J. ROBERTSON, JAMES A. STRITE, JR., DAVID A. GUTHRIE,  Plaintiffs, | : : : : : : : : : : : : : : : : : : | CIVIL ACTION NO. 1:CV-01-0910  (Judge Rambo) |
| v. | : : | |
| KEN WYKLE, Administrator, Federal Highway Administration, ROBERT GATZ, Federal Highway  Defendants, | : : : : : | |
| and | : : | |
| BRADLEY L. MALLORY, Secretary for the Department of Transportation, Commonwealth of Pennsylvania,  Intervenor | : : : : | |

FEDERAL DEFENDANTS' AND INTERVENOR'S BRIEF IN
SUPPORT OF THEIR JOINT MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    PROCEDURAL HISTORY ............................... 2

II.   STATEMENT OF FACTS ............................... 3

   A.    Compliance with the National Environmental
         Policy Act .................................. 3

   B.    Compliance with Section 106 of the National
         Historic Preservation Act .................. 6

III.  STATEMENT OF QUESTIONS PRESENTED ................ 7

IV.   STATEMENT OF STANDARD OF REVIEW ................. 7

V     ARGUMENT ........................................ 8

   A.    Defendants fully complied with the NEPA in
         completing the studies for the I-81
         Interchange project ........................ 8

      1.    The project needs for the I-81
            Interchange project were properly
            identified under NEPA, and Alternative D
            Modified best satisfies the identified
            project needs ........................ 10

      2.    The traffic studies for the I-81
            Interchange project did examine the
            impact of the proposed interchange on
            the local roadways ................... 17

      3.    Defendants did examine the cumulative
            impacts of the proposed interchange
            with the proposed extension of Norland
            Avenue ............................... 19

      4.    Defendants properly determined that the
            preparation of a Supplemental EIS (SEIS)
            was not required under NEPA ........... 23

i

5.    Defendants were not required to examine
      new alternatives under NEPA as a result
      of the amendment to the statute
      authorizing funding for the project
      ....................................... 31

6.    The studies for the I-82 Interchange
      project were completed with good faith
      objectivity ............................ 34

B.    Defendants fully complied with the NHPA in
      completing the studies for the I-81
      Interchange project ........................ 41

VI.   CONCLUSION ....................................... 50

## CASES

Ashwood Manor Civic Ass'n v. Dole, 619 F. Supp. 52
(E.D. Pa. 1985) ..................................... 8,9

Baltimore Gas & Elec. Co. v. Natural Resources Defense
Council, Inc., 462 U.S. 87 (1983) .................... 10

Buckingham Township v. Wykle, 157 F.Supp. 2d 457
(E.D. Pa. 2001), aff'd w/o op. 2002 U.S. Lexis 240
(3d Cir. Jan. 7, 2002) ............................... 7

Citizens Against Burlington, Inc. v. Busey, 938 F.2d
190 (D.C. Cir. 1991) ................................. 9,33

Citizens for the Scenic Severn River Bridge v. Skinner,
802 F. Supp. 1325 (D. Md. 1991), affirmed 972
F.2d 338 (1992) ...................................... 42

Citizens to Preserve Overton Park v. Volpe, 401 U.S.
402 (1971) ........................................... 7

City of Grapevine v. U.S. Dept. of Transp., 17 F.3d
1503 (D.C. Cir.), cert. denied, 513 U.S. 1043
(1994) ............................................... 9

Clairton Sportsmen's Club v. Pennsylvania Turnpike
Comm'n, 882 F. Supp. 455 (W.D. Pa. 1995)
..................................................... 8

Coalition Against Raised Expressway, Inc. v. Dole, 835
F.2d 803 (11th Cir. 1988) ............................ 34,35

Coalition on Sensible Transp. v. Dole, 826 F.2d 60
(D.C.Cir. 1987) ...................................... 21,22

Concerned Citizens Alliance, Inc. v. Slater, 176 F.3d
686 (3d Cir. 1999) ................................... 8,9,10,42

Connecticut Trust for Historic Preservation v. I.C.C.,
841 F.2d 479 (2d Cir. 1988) .......................... 42

Druid Hills Civic Ass'n v. Fed. Highway Admin., 772
F.2d 700 (11th Cir. 1985) ............................ 33

Environmental Defense Fund v. U.S. Army Corps of
Engr's, 470 F.2d 289 (8th Cir. 1972) cert. denied 412
U.S. 931 (1973) ...................................... 34,35

Fayetteville Area Chamber of Commerce v. Volpe, 515
F.2d 1021 (4th Cir. 1975) .............................. 36

Florida Power & Light Co. v. Lorion, 470 U.S. 729
(1985) .................................................. 7

Friends of the Atglen-Susquehanna Trail, Inc. v.
Surface Transp. Bd., 252 F.3d 246 (3d. Cir. 2001)
.................................................. 8,10,45

Kleppe v. Sierra Club, 427 U.S. 390 (1976)
...................................................... 50

Klinger v. Yamaha Motor Corp., 738 F. Supp. 898
(E.D. Pa. 1990) ........................................ 14

Laguna Greenbelt, Inc. v. U.S. Dept. of Transp., 42
F.3d 517 (9th Cir. 1994) ............................... 33

Marsh v. Oregon Natural Resources Council, 490 U.S.
360 (1989) ......................................... 8,23,24

Piedmont Heights Civic Club, Inc. v. Moreland, 637
F.2d 430 (5th Cir. 1981) ............................... 33

Presidio Golf Course v. Nat'l Park Serv., 155 F.3d
1153 (9th Cir. 1998) ................................. 35,40

Robertson v. Methow Valley Citizens Council, 490 U.S.
332 (1989) ......................................... 8,19

Sierra Club v. Froehlke, 816 F.2d 205 (5th Cir. 1987)
.................................................. 24

Sierra Club v. Marsh, 744 F. Supp. 352 (D. Me. 1989)
.................................................. 24

Society Hill Towers Owners Ass'n v. Rendell, 210 F.3d
168 (3d. Cir. 2000) ................................ 8,10,21,
                                                   22,23

South Trenton Residents Against 29 v. Fed. Highway
Admin., 176 F.3d 658 (3d Cir. 1999) ................... 24

State of S. Carolina v. O'Leary, 953 F. Supp. 699
(D.S.C. 1996) ......................................... 36

Strycker's Bay Neighborhood Council, Inc. v. Karlen,
444 U.S. 223 (1980) ................................. 8-9

iv

Township of Springfield v. Lewis, 702 F.2d 426
(3d. Cir. 1983) ...................................... 9,10

Vermont Yankee Nuclear Power Corp. v. Natural
Resources Defense Council, Inc., 435 U.S. 519 (1978)
...................................................... 9

White v. PA Dept. of Transp., 738 A.2d 26
(Pa. Commw. 1999) .................................... 29

## STATUTES

5 U.S.C. §706 ........................................ 8

16 U.S.C. §470f ...................................... 41

16 U.S.C. §470a ...................................... 43

23 U.S.C. §111 ....................................... 14

101 stat. 192 (sec. 149 (a)(74)) ..................... 32

F.R.C.P §56(c) ....................................... 7

## REGULATIONS

40 C.F.R. §1502.16(c) (2001) ......................... 14

23 C.F.R. §630 (2001) ................................ 14

23 C.F.R. §771.130 (2001) ............................ 23

23 C.F.R. §771.129 (2001) ............................ 29

23 C.F.R. §712.501 (1999) ............................ 28

23 C.F.R. §710.601 (2001) ............................ 28

36 C.F.R. §800.9(a)(1998) ............................ 47

## TABLE OF ACRONYMS[1]

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| ALCAB | Agricultural Land Condemnation Assessment Board |
| APA | Administrative Procedure Act |
| APE | Area of Potential Effect |
| DBA | Decibels |
| DEIS | Draft Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| FEIS | Final Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| LOS | Level of Service |
| MCC | Municipal Coordination Committee |
| MOA | Memorandum of Agreement |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| PennDOT | Pennsylvania Department of Transportation |
| PHMC | Pennsylvania Historical and Museum Commission |
| ROD | Record of Decision |
| SEIS | Supplemental Environmental Impact Statement |
| SHPO | State Historic Preservation Officer |
| SMF | Defendants' and Intervenor's Statement of Undisputed Material Facts filed in support of their Motion for Summary Judgment |
| STURAA | Surface Transportation and Uniform Relocation Assistance Act |
| V/C ratio | Volume to Capacity Ratio |
| 1999 re-evaluation | The re-evaluation of the FEIS dated January 1999 |
| 2001 re-evaluation | The re-evaluation of the ROD dated June 2001 |

---

[1]     These acronyms are used in this brief and are provided here for the Court's ease of reference.  They are not included in the word count.

## I.  PROCEDURAL HISTORY

On May 24, 2001, plaintiffs filed an action challenging the Federal Highway Administration's (FHWA) approval of Alternative D Modified for the I-81 Interchange project located in Franklin County, Pennsylvania.  Plaintiffs claim that FHWA failed to comply with the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA).

On May 29, 2001, the Court impounded the original complaint and ordered plaintiffs to file an amended complaint.  On June 6, 2001, plaintiffs filed an amended complaint.  On August 15, 2001, defendants filed an answer to the amended complaint.  On that same day, the Secretary of the Pennsylvania Department of Transportation (PennDOT) filed a motion to intervene with his answer attached, which the Court ultimately granted.  Plaintiffs filed their motion for limited discovery on or about August 30, 2001.  The Court denied plaintiffs' motion.

Finally, defendants filed the administrative record for the I-81 Interchange project with the Court on September 28, 2001.  The 12 boxes, which comprise the administrative record, include the documentation required by NEPA and NHPA, technical studies, correspondence, etc.  On December 13, 2001, defendants filed a motion to supplement the administrative record.  The Court granted the motion to supplement in part, and denied the motion in part.  On March 29, 20002, defendants filed with the Court the supplement to the record.

2

## II.   STATEMENT OF FACTS

Plaintiffs challenge FHWA's approval of Alternative D Modified for the Interstate 81 Interchange project.  The southbound ramps of the interchange to I-81 will be located on the east side of existing Walker Road, and will tie into existing Walker Road near the Greene Township-Chambersburg Borough line.  (SMF 1.)[1]  D Modified's northbound ramps to and from I-81 will be located on the west side of Franklin Farm Lane.  (SMF 2.)  The selected alternative is a modification of Alternative D, which was developed in response to comments received on the Final Environmental Impact Statement (FEIS) and to avoid, minimize, and mitigate project impacts.  (SMF 3.)

### A.   Compliance with the National Environmental Policy Act

Defendants prepared a Draft Environmental Impact Statement (DEIS) dated May 1994, a FEIS dated May 1995, a re-evaluation of the FEIS dated January 1999 (1999 re-evaluation), and a re-evaluation of the Record of Decision (ROD) dated June 2001 (2001 re-evaluation).  (SMF 4.)  These documents: (1) identified the project's needs and objectives; (2) discussed Defendants' development of a range of alternatives; and/or (3) discussed the social, environmental, cultural, and economic impacts associated with these alternatives.  (SMF 5.)

---

[1]   "SMF" is a reference to the Statement of Material Facts which was filed by defendants and intervenor.  The SMF contains citations to the administrative record.

The DEIS and FEIS studied the following alternatives in detail: (1) the No-Build alternative, (2) Alternative B (Interchange at Kriner Road) (3) Alternative C (Interchange at Franklin Farm Lane/Walker Road); (4) Alternative D (Interchange at Walker Road); (5) Alternative B-1 (historic property avoidance alternative for the interchange at Kriner Road); and (6) Alternative D-C (initially a historic property avoidance alternative for interchange at Walker Road).[2] (SMF 6.)

The DEIS and FEIS were circulated to obtain public and agency comments. (SMF 10.) A public hearing was held for the DEIS. (SMF 11.) Defendants considered and responded to each of the substantive comments received on the DEIS and FEIS. (SMF 12.)

Defendants received comments on the DEIS and FEIS regarding the identification of historic properties. (SMF 13.) Several years of additional studies, coordination, and consultation ultimately resulted in the identification of additional historic properties on the east side of I-81 in 1997. (SMF 14.) Alternative D Modified was developed to avoid the use of these newly defined historic resources. (SMF 17.) Local officials of Franklin County, Greene Township, Guilford Township, and Chambersburg Borough had been kept abreast of the progress

---

[2]    Other alternatives were considered during the NEPA process, but were determined to be unreasonable either for not substantially meeting the project needs or resulting in unacceptable adverse impacts. Therefore, these alternatives were not studied in detail in the DEIS or FEIS. (SMF 7.)

through a series of Municipal Coordination Committee meetings.
(SMF 18-20.)

On June 4, 1998, Alternative D Modified and the status of
environmental studies were presented at a public meeting.  (SMF
22.)  Defendants considered and responded to the comments
received at the June 4, 1998 public meeting.  (SMF 23.)  In
January of 1999, a written re-evaluation of the FEIS was
prepared in accordance with FHWA regulations.  (SMF 94.)  The
1999 re-evaluation concluded that D Modified does not result in
significant new impacts from those which were discussed in the
FEIS.  (SMF 96.)  Therefore, PennDOT recommended that a
Supplemental Environmental Impact Statement (SEIS) was not
required for D Modified.  (SMF 96.)  FHWA reviewed and concurred
with the findings presented in the 1999 re-evaluation.  (SMF
97.)  All of the public and agency comments received during the
review period for the FEIS and comments received through the
Section 106 (NHPA) coordination consultation process were
considered in the decision to select D Modified.  (SMF 24.)

FHWA weighed the resulting benefits and impacts from the
alternatives studied in detail and clearly illustrated why it
selected D Modified in the ROD. On March 25, 1999, FHWA issued
the ROD, which completed the NEPA process. (SMF 25.)

In June of 2001, another written re-evaluation was prepared
in accordance with FHWA regulations. (SMF 114.) The 2001 re-
evaluation considered the additional studies conducted to verify

the results of studies conducted prior to the ROD (e.g., traffic
projections, existing and proposed developments, land use
regulations, and agricultural impacts). (SMF 115.) The 2001 re-
evaluation concluded that there are no significant additional
adverse impacts as a result of the selected alternative as
compared to the information presented in the ROD; therefore, a
SEIS is not warranted.(SMF 116.)

**B. Compliance with Section 106 of the National Historic
Preservation Act**

FHWA complied with the procedural requirements under the
NHPA for the I-81 Interchange project.  First, defendants
identified historic resources and included its findings in
Determination of Eligibility Report and Rural Historic Landscape
Assessment.  (SMF 160.)  Second, defendants assessed the effect
of the project on the historic resources in the Criteria of
Effects Report and its addenda.  (SMF 166, 174.)  The EIS and
1999 re-evaluation also summarized the identification of
historic resources and the effects that alternatives would have
on the historic resources.  (SMF 159.)

Defendants coordinated with PHMC, the State Historic
Preservation Officer (SHPO), and the Secretary of the Interior
(the Keeper of the National Register) in identifying historic
properties.  (SMF 161-64.)  Defendants coordinated with PHMC and
ACHP in assessing the effects of the project on these historic
properties.  (SMF 181.)  The Determination of Eligibility, the
Criteria of Effects Report, its addenda, and the MOA were

submitted to PHMC and ACHP for review.  (SMF 182.)  Both PHMC

and ACHP provided comments on the draft MOA and revisions were

made to the MOA.  (SMF 183.)  The Municipal Coordination

Committee was also consulted during the assessment of effects.

(SMF 168.)  PHMC and ACHP signed the MOA, which concluded the

Section 106 process.  (SMF 194, 197.)

## III. STATEMENT OF QUESTIONS PRESENTED

The following issues are presently before this Court:

(1)  Whether FHWA complied with NEPA in issuing the ROD for the

I-81 Interchange project in Franklin County, Pennsylvania.

Suggested answer: **Yes.**

(2)  Whether FHWA complied with the NHPA for the project.

Suggested answer: **Yes.**

## IV. STATEMENT OF STANDARD OF REVIEW

Summary judgment shall be issued when "there is no genuine

issue of material fact and the moving party is entitled to

judgment as a matter of law."  Buckingham Township v. Wykle, 157

F.Supp. 2d 457, 462 (E.D. Pa. 2001), aff'd w/o op. 2002 U.S.

Lexis 240 (3d Cir. Jan. 7, 2002); F.R.C.P §56(c).

> Under the APA [Administrative Procedures Act], the court
> bases its decision on the review of the administrative
> record.  See 5 U.S.C. §706; Florida Power & Light Co. v.
> Lorion, 470 U.S. 729, 744 (1985).  There are thus generally
> no issues of material fact in an APA case.  See Clairton
> Sportsmen's Club v. Pennsylvania Turnpike Comm'n, 882 F.
> Supp. 455, 463 (W.D. Pa. 1995).

Buckingham Township, 157 F.Supp. 2d at 462.

Section 706(2) of the APA governs the Court's review of an agency decision under NEPA and NHPA.  5 U.S.C. § 706(2); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-17 (1971); Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd., 252 F.3d 246, 262 (3d. Cir. 2001); Society Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 178-79 (3d. Cir. 2000).  Specifically, the Court must determine whether the agency's decision was arbitrary, capricious, or an abuse of discretion.  5 U.S.C. § 706(2)(A); Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 376-77 (1989)(NEPA case); Friends of the Atglen-Susquehanna Trail, 252 F.3d at 262 (NHPA case); Society Hill Towers, 210 F.3d at 178-79 (NHPA and NEPA case); Concerned Citizens Alliance, Inc. v. Slater, 176 F.3d 686, 695, 705 (3d Cir. 1999)(NHPA and NEPA case).

**V.    ARGUMENT**

**A.    DEFENDANTS FULLY COMPLIED WITH THE NEPA IN COMPLETING THE STUDIES FOR THE I-81 INTERCHANGE PROJECT.**

NEPA requires entities to comply with certain procedural requirements when undertaking any major action involving federal funds.  Concerned Citizens, 176 F.3d at 704-05; Ashwood Manor Civic Ass'n v. Dole, 619 F. Supp. 52, 82 (E.D. Pa. 1985).  NEPA mandates that defendants take a "hard look" at the environmental consequences of a particular project.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).  "NEPA itself does not mandate particular results, but simply prescribes the necessary process."  Id. at 350 (citing Strycker's Bay

8

Neighborhood Council, Inc. v. Karlen, 444 U.S. 223 (1980);

Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense

Council, Inc., 435 U.S. 519 (1978)). NEPA does not require

agencies to elevate environmental concerns over other

considerations.  Strycker's Bay, 444 U.S. at 228 n.2.

The adequacy of the content of an EIS is determined by a

rule of reason, which requires only a reasonably thorough

discussion of the significant aspects of the probable

environmental consequences.  Township of Springfield v. Lewis,

702 F.2d 426, 442 (3d Cir. 1983).  The EIS need not discuss all

possible details bearing upon the proposed action.  The agency's

discussion of alternatives is to be upheld, as long, as the

alternatives discussed are reasonable and the agency discusses

them in sufficient detail.  Citizens Against Burlington, Inc. v.

Busey, 938 F.2d 190, 196 (D.C. Cir. 1991); see also City of

Grapevine v. U.S. Dept. of Transp., 17 F.3d 1503, 1506 (D.C.

Cir.), cert. denied, 513 U.S. 1043 (1994); Ashwood Manor, 619 F.

Supp. at 82-83.  An agency is not required to conduct an

environmental analysis on alternatives which the agency

previously found not to be reasonable  Concerned Citizens, 176

F.3d at 705-06; Ashwood Manor, 619 F. Supp. at 83.

The Court's role in reviewing agency action to determine if

the agency complied with NEPA's procedural requirements is

limited.  "Once an agency has made a decision subject to NEPA's

procedural requirements, the only role for a court is to insure

that the agency has considered the environmental consequences .

. ." Township of Springfield, 702 F.2d at 441. The court's

role is "simply to ensure that the agency has adequately

considered and disclosed the environmental impact of its actions

and that its decision is not arbitrary or capricious."

Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,

Inc., 462 U.S. 87, 97-98 (1983); Concerned Citizens, 176 F.3d at

705; Society Hill, 210 F.3d at 178-79; Friends of the Atglen-

Susquehanna Trail, 252 F.3d at 262.

1.  **The project needs for the I-81 Interchange project were
    properly identified under NEPA, and Alternative D Modified
    best satisfies the identified project needs.**

In Count Seven of their Amended Complaint, plaintiffs

question whether D Modified satisfies the project needs by

relieving traffic congestion on an existing interchange.  In

Count Two, plaintiffs also question the selection of D Modified

based on project needs because it conflicts with Greene

Township's Comprehensive Plan.

Section I of the FEIS identifies the needs for the project.

(SMF 26.)  The project needs are straightforward:

(1)  complying with a Congressionally-legislated
     demonstration project to provide access to
     Chambersburg and to relieve congestion on an existing
     interchange (Public Law 100-17);

(2)  accommodating existing and future traffic volumes;

(3)  adhering to comprehensive plans of area
     municipalities; and

(4)  providing for existing and proposed development in the
     study area.

10

(SMF at 27.)

Plaintiffs claim that the Route 30 Interchange is not congested, and therefore, relieving traffic on this interchange would not satisfy the first need.  Pls. Am. Complaint at ¶¶ 129-30.  The 1995 traffic study shows that there is congestion at the I-81/Route 30 interchange.  (SMF 28.)  Analysis of current traffic volumes indicates that the intersection of Route 30 and Walker Road/Stouffer Avenue operates at unacceptable levels of service[3] (LOS D, E, or F) for 10 hours per day (with LOS E or F during peak hours).  (SMF 32.)  The section of Route 30 between the Walker Road/Stouffer Avenue intersection and the I-81 ramps will by 2016 operate at unacceptable LOS for 16 hours of the day and at LOS E or F for 14 hours of the day in the 2016 design year.  (SMF 33.)  This combination of unacceptable traffic operations causes congestion through the entire I-81/Route 30 interchange area, restricting the ability of traffic to smoothly progress through the interchange area, at times blocking the interchange ramps at Route 30.  (SMF 34.)  In the future (No Build), at the Route 30/Walker Road/Stouffer Avenue

---

[3]     Level of service (LOS) is a qualitative measure describing operational conditions.  Six LOS are defined in letter designation, A to F, with LOS A representing the best operating conditions and LOS F the worst.  LOS D through F are considered unacceptable in rural areas and LOS E through F are considered unacceptable in all areas. (SMF 29-31.)

intersection, this congestion will worsen as traffic volumes are expected to increase 47%. (SMF 35.)

The primary cause of congestion at this interchange is the volume of traffic traveling through the interchange on Route 30 and the weaving of traffic between the ramps and the Walker Road/Stouffer Avenue intersection.[4] (SMF 36.) Furthermore, traffic analysis and field observations show that the poor operation of the Route 30/ Walker Road/Stouffer Avenue intersection severely impacts the operation of the I-81 interchange ramps at Route 30. (SMF 39.) Based on the analysis conducted for the traffic studies, congestion at the I-81/Route 30 interchange ramps could be reduced by improving the LOS of the Walker Road/Stouffer Avenue intersection with Route 30. (SMF 40.) Improvements ranging from 4% to 14% in the volume/capacity ratio at the I-81/Route 30 interchange intersections, with greater improvements made in congestion at the Walker Road/Stouffer Avenue intersection would result from the construction of an interchange in the vicinity at D Modified. (SMF 41.) The 1998 traffic study for D Modified demonstrates that the above conclusions are valid. (SMF 45.)

---

[4]    When considered as isolated intersections or as intersections which are not influenced by the operation or congestion of other surrounding intersections, the LOS which are obtained for the two I-81/Route 30 interchange ramps appear to be acceptable. (SMF 37.) However, these intersections (the I-81 ramps with Route 30) cannot be considered in isolation because of the close spacing with the congested Walker and Falling Spring Road intersections. (SMF 38.)

Presently, the Route 30 interchange carries the largest volume of traffic in the Chambersburg area. (SMF 46.) If construction of an interchange on I-81 is to relieve traffic congestion on an existing interchange, it is reasonable to relieve congestion on the interchange, which is currently, and in the future will be, experiencing the worst congestion. (SMF 47.) As described in the 1995 and 1998 traffic studies, an interchange at Walker Road (such as D Modified) would serve approximately 9,000 to 10,900 vehicles per day in the 2016 design year, depending on the combination of other roadway improvements (Route 30 improvements and proposed Norland Avenue Extension). (SMF 42.) D Modified will remove a minimum of 6,000 vehicles from the I-81/Route 30 interchange. (SMF 43.) When combined with other expected roadway network improvements, congestion at the Route 30/I-81 interchange, including the Route 30/Walker Road/Stouffer Avenue intersection area, would be reduced by as much as 60% over the No-Build alternative, providing acceptable or near acceptable LOS. (SMF 44.) Therefore, Alternative D Modified satisfies the need to relieve traffic on a congested I-81 interchange in Franklin County.[5]

_____

[5]    In paragraph 131 of the Amended Complaint, plaintiffs allege that Wayne Avenue will function at unacceptable LOS in 2016; therefore, the Kriner Road interchange location will satisfy the need to relieve congestion. This claim is incorrect. Improvements to Wayne Avenue are constructed. These improvements include signalization of the I-81 ramps intersections and widening to a five-lane cross section between Orchard Road and Gerber Road. (SMF 49.) With these

Plaintiffs attempt to argue that Alternative D Modified fails to satisfy the identified project need of "adhering to comprehensive plans of area municipalities", and therefore, is not a reasonable alternative.  Defendants did acknowledge that the Walker Road alternatives (Alternatives C, D, D-C, and D Modified) are not in keeping with Greene Township's latest Comprehensive Plan.  (SMF 55.)  According to NEPA's regulations, the EIS must only acknowledge and describe the potential conflicts between the project and local land use plans, policies, or controls.[6]  40 C.F.R. §1502.16(c).  Defendants have satisfied this requirement.

---

improvements, in the design year 2016, the intersections of both northbound and southbound I-81 ramps with Wayne Avenue will operate at LOS B or C (uncongested) without the Kriner Road interchange.  (SMF 50.)  Since LOS C is acceptable, no further improvements are necessary.  (SMF 51.)  Additional traffic counts were taken in 2000 along Wayne Avenue.  (SMF 52.)  Analysis of these 2000 counts showed a much lower actual traffic growth rate for Wayne Avenue than what was projected in the FEIS (from a projected 2.8% per year (1995 rate) to an actual 0.4% per year (2000 rate)).  (SMF 53.)  The 2000 traffic counts confirms that Wayne Avenue will operate at an acceptable LOS in the design year.  (SMF 54.)

[6]    In paragraph 48 of their Amended Complaint, plaintiffs also argue that FHWA violated its policy statements because the project is inconsistent with Greene Township's Comprehensive Plan.  Plaintiffs have alleged violations only of NEPA and NHPA.  The policy cited deals with the point of access approval and the interpretation of 23 U.S.C. §111 and 23 C.F.R. part 630, subpart C, and therefore, is irrelevant to their claims.  55 Fed. Reg. 42670 (1990).  Moreover, federal policies are not legally enforceable.  See Klinger v. Yamaha Motor Corp., 738 F. Supp. 898 (E.D. Pa. 1990).

In fact, no alternative at Walker Road or Kriner Road satisfies or can satisfy this project need.  (SMF 56.)  The area municipalities have conflicting comprehensive plans with regard to the transportation component.  (SMF 57.)  Specifically, Greene Township's transportation component conflicts with transportation component contained in Franklin County's comprehensive plan.[7]  (SMF 58.)  Franklin County's comprehensive plan provides for an interchange in the Walker Road area in the proposed project are.  (SMF 59.)

Moreover, D Modified is in full compliance with every applicable comprehensive land use plan and conflicts only with the transportation component of Greene Township's comprehensive plan.  Plaintiffs claim that an interchange at Walker Road is inconsistent with Greene Township's goal of preservation of its agricultural land and historic resources.  However, the Township has zoned the Walker Road area as residential, not agricultural. (SMF 62.)  The Township's land use portion of its comprehensive plan provides:  "to promote planning objectives, zoning should reflect the intended uses."  (SMF 63.)  Therefore, according to the Township's planning documents, the intended use of the area surrounding Walker Road is residential.  (SMF 64.)  As pointed out by the Agricultural Land Condemnation Assessment Board (ALCAB) (whose primary purpose is to ensure that excessive amounts of farmlands are not condemned), the Township's planning

---

[7]    Greene Township is located in Franklin County.  (SMF 60.)

practices provide for the development of the Township's

agricultural land.  (SMF 65.)  ALCAB found:

> The intention of Greene Township, however, in desiring to
> remain predominantly an agricultural municipality are
> contradicted by certain policies that the Township has been
> undertaking.  For instance, the Township re-zoned
> agricultural land at the interchange of Exit 8 to permit
> the construction of a Sheetz mini market and a storage
> building project adjacent thereto.  The Township has also
> zoned most of its agricultural land as R-1 rather than as
> agricultural in order to permit farmers to build additional
> residences on their farms.  However, by doing this the
> Township has given up control over how much land the
> farmers can convert to non-agricultural housing purposes.
> Furthermore, the Township has also permitted other parcels
> to be carved out of farmland without Township approval such
> as the two new houses along Walker Road . . . .  Permitting
> these types of structures to be erected without Township
> approval of any kind does not show a good faith effort to
> limit conversion of productive agricultural land in Greene
> Township.

(SMF 66.)  Therefore, an interchange at Walker Road would not be

inconsistent with the land use plan for Greene Township as

provided in the land use section of its comprehensive plan

(which provides for the development of the Township's

agricultural lands) and its daily practices.

To be a reasonable alternative under NEPA, an alternative

does not have to satisfy all of the needs identified for the

project.  A Walker Road alternative(such as Alternative D

Modified) meets the project needs of providing access to

Chambersburg and relieving congestion on an existing interchange

(see above discussion), accommodating existing and future

traffic volumes, and providing for existing and proposed

development.  (SMF 48.)  Therefore, the Walker Road alternatives

(including D Modified) are reasonable alternatives under NEPA.

**2.  The traffic studies for the I-81 Interchange project did examine the impact of the proposed interchange on the local roadways.**

In Count Five of their Amended Complaint, plaintiffs allege

that defendants failed to consider the impact of the project on

local roads.  Plaintiffs also allege that the project will

generate additional traffic that the local road system will be

unable to handle.  Both of these allegations are incorrect.

First, the FEIS and its supporting technical studies did

examine the effect of the project on local roads.  (SMF 68.)

For the interchange alternative at Walker Road, defendants

analyzed the no build[8] and build scenarios in terms of traffic

volumes and midblock LOS on the following local roads:  Franklin

Farm Lane, Mower Road, Ragged Edge Road, Walker Road, Sixth

Street, Fifth Avenue, Kohler Road, Woodstock Road, Scotland

Road, Edgar Avenue, Brindle Road, Hafer Road and Norland Avenue.

(SMF 69.)  Defendants also analyzed the traffic volume, LOS, and

volume to capacity ratios (V/C ratio)[9] during peak morning and

---

[8]    The No Build alternative would have involved no major
improvements to the existing roadway transportation network in
the vicinity of Chambersburg associated with I-81 access.  (SMF
8.)  Moreover, the No Build alternative evaluated in the FEIS
did not include the Route 30 improvements or proposed Norland
Avenue Extended.  (SMF 9.)

[9]    V/C ratio relates to the volume of traffic passing through
the intersection in one hour to the maximum amount of traffic
that can pass through the intersection in the same period.  A

evening hours at the following intersections which involved local roads:  Kohler/Walker Road; Franklin Farm Lane/Walker Road; Mower/Walker Road; Ragged Edge/Brindle Road; Brindle/Hafer Road and Woodstock/Ragged Edge Road; Route 30/ Ragged Edge Road; Route 30/Mower Road; Route 30/ Franklin Farm Lane; Scotland Avenue and Woodstock/Roland Road; Scotland Road/Norland Avenue; Route 30/Fifth Avenue; Route 30/Sixth Avenue; and Route 30/Walker Road/Stouffer Avenue.  (SMF 70, 74.)

The results of the traffic analysis on the above local roads revealed that traffic will increase on local roadways with or without an interchange at Walker Road due to existing and planned development.  (SMF 75.)  Traffic will increase in northern Chambersburg and western Greene Township with or without construction of the Walker Road interchange.  (SMF 76.) In fact, traffic along Walker Road is expected to increase by as much as four-fold, and traffic along Norland Avenue is expected to double between 1995 and 2016 for No-Build conditions.  (SMF 77.)  With the Walker Road interchange, increases in traffic can be expected on some local roadways; however, when compared to the percent increases expected on some of the local roads due to the identified developments, the increases due to the interchange are not as significant (e.g., only 6.9% increase of

---

V/C ratio of 1.00 or 100% indicates that the intersection is operating at its capacity.  When the V/C ratio exceeds 1.00, the intersection will operate with congestion (i.e., backups and travel delays).  (SMF 71-73.)

average daily traffic on Walker Road[10] east of Franklin Farm Lane
considering only the Walker Road interchange construction
compared to the No-Build alternative).  (SMF 78.)  However, the
average daily traffic on some of the local roads remains
substantially the same with or without the intersection, namely
Franklin Farm Lane, Mower Road, Ragged Edge Road, and Norland
Avenue east of Scotland Road.  (SMF 79.)

NEPA requires defendants to take a "hard look" at the
environmental consequences of the I-81 Interchange project.
Robertson, 490 U.S. at 350.  As the record indicates, defendants
have taken a "hard look" at the traffic impacts to local
roadways satisfying the requirements of NEPA.

**3.    Defendants did examine the cumulative impacts of the
proposed interchange with the proposed extension of Norland
Avenue.**

In Count Five of their Amended Complaint (paragraphs 105
and 108), plaintiffs claim that defendants failed to include the
extension of Norland Avenue in the NEPA documents as a
cumulative impact.  This is incorrect.  Defendants considered
the traffic and development impacts of proposed Norland Avenue
Extended in the FEIS and 1999 re-evaluation.

In addition to Alternatives C, D, D-C, D Modified, B, and
B-1, the traffic studies analyzed these alternatives together
with identified improvements that may or may not occur.  (SMF

---

[10]    For D Modified, a portion of Walker Road will be relocated
and some sections of Walker Road will be resurfaced.  (SMF 80.)

81.)  Alternatives C, D, D-C, and D Modified were analyzed under the following scenarios:  (1) without Route 30 improvements with Walker Road Interchange and with Norland Avenue Extended; (2) without Route 30 improvements without Walker Road Interchange and with Norland Avenue Extended; (3) without Route 30 improvements with Walker Road Interchange and without Norland Avenue Extended; (4) with Route 30 improvements with Walker Road Interchange and with Norland Avenue Extended; (5) with Route 30 improvements without Walker Road Interchange and with Norland Avenue Extended; and (6) with Route 30 improvements with Walker Road Interchange and without Norland Avenue Extended; and (7) with Route 30 improvements only.  (SMF 82.)  Without dispute, the traffic impacts of Norland Avenue extended were considered in the FEIS and 1999 re-evaluation.  (SMF 83.)

The proposed development with and without the Norland Avenue extension was also considered in the EIS studies.  (SMF 84.)  Norland Avenue extended will take place entirely on the Gabler Tract (privately owned).  Prior to development, the Gabler Tract was primarily farmlands.  (SMF 86.)  The Gabler Tract will be developed with or without the interchange.  (SMF 87.)  If a Walker Road interchange is constructed, the Gabler Tract development will be more intensive.  (SMF 88.)  If a Walker Road interchange is constructed and the Norland Avenue is extended, 140 residential units (154 acres) and 173 acres of commercial space would be developed on the property by 2016.

(SMF 89.)  If the interchange is not built at Walker Road and Norland Avenue is not extended, 287 residential dwelling units (224 acres) and 103 acres of commercial space would be developed by 2016.  (SMF 90.)  Therefore, a reduction of 70 acres of residential development and an increase of commercial development by 70 acres were identified as a cumulative impact of a Walker Road interchange and the extension of Norland Avenue.  (SMF 91.)  Either with or without the interchange 327 acres of the Gabler Tract will be developed.  (SMF 92.)

As previously stated, the I-81 Interchange project's FEIS did note the possibility of the extension of Norland Avenue.[11] FEIS did not discuss other impacts of the extension of Norland Avenue because, besides impacts to farmlands, the extension of Norland Avenue does not appear to result in any other significant permanent impacts to environmental or historic resources.  (AR-46 at V-4-19.)  Nevertheless, the FEIS did consider the traffic and development impacts of the interchange project with and without the extension of Norland Avenue.

The present case is analogous to the factual situation presented in <u>Coalition on Sensible Transp. v. Dole</u>, 826 F.2d 60, 71 (D.C. Cir. 1987), and <u>Society Hill</u>, 210 F.3d at 182.  In <u>Coalition on Sensible Transp.</u>, the project involved modification

_____

[11]   Since the circulation of the FEIS, the Norland Avenue Extended roadway has been graded between Fifth Avenue and Walker Road by the developer, but does not have a pavement overlay and is not yet open to traffic.  (SMF 93.)

of I-270.  Plaintiffs claimed that four separate interchange

projects along I-270 should have been discussed in detail in the

EA for the I-270 project because of the concept of cumulative

impacts.  Id.  These four interchanges were mentioned in the EA

for I-270.  Id.  The court held that the EA was sufficient to

alert interested members of the public to any cumulative impacts

involving these other four interchange projects.  Id. at 71.  In

the present case, defendants did more than mention the extension

of Norland Avenue.  Defendants considered in detail the traffic

and development impacts of the extension of Norland Avenue.

In Society Hill, 210 F.3d at 182, plaintiffs claimed that

the EA for grant application under HUD to construct a

hotel/parking garage should have also discussed the cumulative

impacts of a proposed entertainment complex.  The Third Circuit

held that NEPA did not require the discussion of the

entertainment complex as cumulative impacts.  Id.  This Court

found that the hotel/parking garage and entertainment center had

independent utility.  Id.  "The success of the hotel and parking

garage . . . is not tied to construction of an entertainment

complex."  Id.  Both the interchange project and the extension

of Norland Avenue projects have independent utility, i.e.,

satisfy identified transportation needs irrespective of the

other project.  Therefore, according to Society Hill, supra,

defendants were not required to address the cumulative impacts

of the extension of Norland Avenue in the I-81 Interchange EIS

(although as discussed above, the traffic and development impacts of Norland Avenue Extended were considered in the EIS).

**4.    Defendants properly determined that the preparation of a Supplemental EIS (SEIS) was not required under NEPA.**

In Count Six of their Amended Complaint, plaintiffs claim that a SEIS is required for the project in Franklin County based on the following allegations:  (1) D Modified was not discussed in the EIS; and (2) the development projections for the Chambers 5 Business Park were severely underestimated which would impact the analysis for the Kriner Road alternative.  In Count Three, plaintiffs claim that an SEIS is required based on a ruling by the Pennsylvania Supreme Court regarding condemnation proceedings for agricultural property.  As discussed below, none of these allegations merit the preparation of a SEIS.

FHWA's decision not to prepare a SEIS can be set aside only if this Court finds that the decision was arbitrary, capricious, or an abuse of discretion.  <u>Marsh</u>, 490 U.S. 360; <u>See</u> <u>Society</u> <u>Hill</u>, 210 F.3d at 178-79.  FHWA's regulations state that a SEIS is required when:

> (1)  Changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or
>
> (2)  New information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS.

23 C.F.R. §771.130(a).  In applying the requirements of a SEIS, courts have held that not every new circumstance warrants the

23

preparation of a SEIS; the new circumstance must "present a seriously different picture of the environmental impact of the proposed project from what was previously envisioned." <u>South Trenton Residents Against 29 v. Fed. Highway Admin.</u>, 176 F.3d 658, 663 (3d Cir. 1999), quoting <u>Sierra Club v. Froehlke</u>, 816 F.2d 205, 210 (5th Cir. 1987). The test is whether the new information so alters the project's character in a manner not previously evaluated and considered. <u>South Trenton Residents</u>, 176 F.3d 658. "If the new information is sufficient to show the remaining action will 'affect the quality of human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." <u>Sierra Club v. Marsh</u>, 744 F.Supp. 352, 367 (D. Me. 1989) *citing* <u>Marsh</u>, 490 U.S. at 373.

First, plaintiffs allege that the modification of Alternative D after the circulation of the FEIS required the preparation of a SEIS. To the contrary, this project is an excellent example of NEPA's core purpose at work — informed decision-making. After the FEIS, the Christian Fry Jr. House and associated farmland were determined to be eligible for listing on the National Register. (SMF 15.) Alternative D-C, the preferred alternative, required land from this property. (SMF 16.) Alternative D was modified to avoid taking land from this historic property. (SMF 17.) On June 4, 1998, a public meeting was held to inform the public of the development of

Alternative D Modified and the status of the environmental

studies.  (SMF 22.)  Comments of the Municipal Coordination

Committee (MCC)[12] and the public were solicited and responses are

contained in the administrative record.  (SMF 21.)

In January, 1999, defendants prepared a re-evaluation of the

FEIS.  (SMF 94.)  The purpose of the 1999 re-evaluation was to

analyze whether a SEIS was necessary due to the modification of

Alternative D.  (SMF 95.)  The 1999 re-evaluation concluded that

D Modified does not result in significant new impacts from those

which were discussed in the FEIS.  (SMF 96.)  FHWA concluded

that a SEIS was not necessary finding:

> The reevaluation report fully reviews the potential for
> environmental, cultural and other resource impacts for
> Alternative D Modified....  Alternative D Modified does not
> result in significant new impacts from that which was
> discussed in the final EIS.  In fact, the modification made
> to Alternative D lessens environmental impacts by avoiding
> historic resources and reducing visual effects to historic
> resources, without causing significant environmental
> impacts.  Alternative D Modified does not amount to a
> substantial change to the proposed action which results in
> "significant environmental impacts" that were not evaluated
> in the EIS.  Accordingly, a supplemental EIS is not
> required, and further distribution and comment on the
> Selected Alternative [is] not required.

(SMF 97.)

NEPA is concerned with the identification, consideration,

and disclosure of significant impacts caused by a major federal

project.  Alternative D Modified did not result in any

---

[12]    The MCC includes PHMC, ACHP, Greene Township, Guildford
Township, the Chambersburg Area Development Corporation, the
Greene/Guilford Environmental Association, G.S. and G.
Properties, FHWA, and PennDOT.  (SMF 19.)

significant social, environmental or cultural impacts that were
not discussed in the FEIS for the project.  (SMF 98.)
Alternative D Modified is in the same general location of
Alternatives D, C, and D-C.  (SMF 99.)  The areas of concern for
this project, as discussed in the FEIS and re-evaluations, have
been historic properties, farmlands, traffic, and noise.  (SMF
100.)  As evidenced by the table below, unlike the other Walker
Road alternatives, D Modified impacts no historic resources and
results in no residential displacements.  (SMF 101.)  With
regard to farmlands, noise, and traffic impacts, D Modified is
comparable to the other Walker Road alternatives, which were
discussed in the FEIS.  (SMF 102.)  The other Walker Road
alternatives would have directly taken 8 to 18.6 acres of
productive agricultural land and would have indirectly taken 0
to 10.6 acres of productive agricultural land, whereas D
Modified would directly take 12.1 acres and would indirectly
take 4.1 acres.  (SMF 103.)  Likewise, the other Walker Road
alternatives would have taken 2.9 to 8.9 acres from agriculture
security areas, whereas, D Modified would take 6.5 acres from
agriculture security areas.  (SMF 104.)  Alternative D Modified
results in imperceptible noise increases to four receptors,
three of these four receptors result in similar noise increases
for all of the Walker Road alternatives.  (SMF 105.)  Moreover,
D Modified would result in similar (imperceptible) noise

ENVIRONMENTAL IMPACT SUMMARY MATRIX
WALKER ROAD ALTERNATIVES

| Environmental Subject Area | Alternative C | Alternative D | Alternative D-C | Alternative D Modified |
|---|---|---|---|---|
| Cultural Resources: Historic  Archaeological | Adverse Effect  0 | Adverse Effect  0 | Adverse Effect[1]  0 | Adverse Effect[1]  None anticipated |
| Section 4(f) Resources Impact | 1 Rural Historic District | 1 Rural Historic District | 1 Historic District | 0 |
| Vegetation and Wildlife | Loss of 3.1a of old field wildlife habitat | Loss of 2.5a of old field wildlife habitat | Loss of 1.0a of forest habitat | Loss of 2.12a of old field/rangeland, forest land, mixed forest/old field habitat |
| Groundwater and Water Supplies | No direct impact; indirect impacts not anticipated, but possible due to geology. | One residence and well displaced, indirect impacts not anticipated, but possible due to geology. | One residence and well displaced; indirect impacts not anticipated, but possible due to geology. | No residential wells displaced. |
| Farmlands<br>- FPPA Soils<br>  Direct Conversion<br>  Potential Loss | 13.1a<br>22.8a | 10.1a<br>11.9a | 10.2a<br>19.3a | 9.7a<br>17.8a |
| -Farmed Parcels:<br>Impacted Operations<br>Segmented Parcels | Four impacted<br>Five segmented (Kuhns, 3 Gabler tracts, White) | Three impacted<br>One segmented (Kuhns) | Three impacted<br>One segmented (Gabler) | Three impacted<br>Three segmented (Gabler, White & Franklin County) |
| -Productive Land:<br>Direct Take<br>Indirect Take | 18.6a<br>10.6a | 9.3a<br>0 | 8.0a<br>7.9a | 12.1a<br>4.1a |
| -Ag. Security Area | Two impacted (White & Kuhns) 8.0a | Two impacted (White & Kuhns) 8.9a | Two impacted (White & Kuhns) 2.9a | Two impacted (White) 6.5a |
| -Secondary Development | No unplanned development likely. | No unplanned development likely. | No unplanned development likely. | No unplanned development likely. |
| Secondary Impacts | Potential. Restrictions in place. | Potential. Restrictions in place. | Potential. Restrictions in place. | Potential. Restrictions in place. |
| Displacements | No displacements. | One residential displacement. | One residential displacements. | No displacements. |
| Traffic Relief at Another Interchange | Reduce by 7,680 vehicles per day by year 2016 at Exit 6.[2] | Reduce by 7,680 vehicles per day by year 2016 at Exit 6.[2] | Reduce by 5,800 vehicles per day by year 2016 at Exit 6.[3] | Reduce by 5,800 vehicles per day by year 2016 at Exit 6.[4] |
| Construction Costs | $2.53 million | $3.29 million | $3.17 million. | $7.8 million |
| Noise<br>- Receptors impacted<br>- Receptor locations | 4<br>R-3, R-31, R-32, R-5 | 4<br>R-3, R-31, R-32, R-34 | 3<br>R-3, R-31, R-32 | 4<br>R-3, R-31, R-32, R-5 |

[1]FHWA determined that the project would have No Adverse Effect to historic resources.
[2]Reflect DEIS traffic studies.
[3]Reflect FEIS traffic studies.
[4]Reflects FEIS and 1998 supplemental traffic studies.
"a" represents acres.
(AR-46 at ES-20-21; AR-80 at 22; AR-83 at 3.)

increases to the same four receptors as Alternative C[13].  (SMF

106.)  Based on the above comparison, D Modified does not result

in any significant impacts not previously considered in the FEIS

for the other Walker Road Alternatives.

Plaintiffs also attempt to argue that the completion of the

state condemnation proceeding before the ALCAB[14] after the ROD

was issued for the project, justifies the completion of a SEIS.[15]

---

[13]    The design year No Build alternative results in changes at
the following receptors due to increased traffic in the design
year 2016:  R-3 is 73.3 decibels (dBA); R-31 is 68.9 dBA; R-32
is 71.9 dBA; R-33 is 67.7 dBA; and R-5 at 68.9 dBA.  (SMF 107.)
D Modified results in imperceptible noise increases to the
following receptors:  R-3 is 74.3 dBA; R-31 is 69.3 dBA; R-32 is
71.5 dBA; and R-5 is 68.0 dBA.  (SMF 108.)  When comparing the
No Build and D Modified, D Modified only results in an increase
of 1.0 dBA to R-3, an increase of 0.4 dBA to R-31, decrease of
0.4 dBA to R-32, decrease of 0.4 dBA to R-32, and decrease of
0.9 dBA to R-5.  (SMF 109.)  Increases of less than 3 dBA are
not perceptible to the human ear. (SMF 217.)   Therefore,
compared to the No Build, D Modified does not result in
significant noise impacts.

[14]    The ALCAB proceedings are purely state law proceedings
involving PennDOT (and its ability to condemn farmlands) which a
federal court has no jurisdiction to review.  If ALCAB approval
was not received for the project, FHWA would have the authority
to condemn property.  23 C.F.R § 712.501 (1999); 23 C.F.R §
710.601 (2001).  PennDOT has amicably acquired the farmland
required for the project.  The ALCAB approval is no longer
relevant.

[15]    In paragraph 68 of the Amended Complaint, plaintiffs also
claim that the Pennsylvania Commonwealth and Supreme Courts held
that "impacts to agricultural land were greater than those
analyzed in the environmental impact studies."  Plaintiffs
misrepresent these court findings.  Neither court found that
impacts to productive agricultural lands were greater than
represented in the NEPA documentation.  The issue before the
courts was whether approval was necessary from ALCAB under state
law prior to PennDOT condemning the land.  The order issued by
the Commonwealth Court stated: "PennDOT must obtain ALCAB
approval for all or part of the proposed interchange project

Again, all that is required under NEPA is the identification, disclosure, and consideration of environmental impacts. The DEIS and FEIS for the project identified the impacts to farmlands as a result of the Walker Road and Kriner Road alternatives. (SMF 112.) As discussed in detail above, in the 1999 re-evaluation, D Modified's farmland impacts are comparable to the other Walker Road alternatives that were discussed in the FEIS. (SMF 113.) Therefore, the farmland impacts resulting from Alternative D Modified did not require a SEIS.

In June 2001, pursuant to 23 C.F.R § 771.129, defendants conducted a re-evaluation to ensure that there was no new information based on final design activities regarding project impacts to social, environmental, and cultural resources that would warrant the preparation of an SEIS. (SMF 114.) The only changes found were to residential displacements and indirect impacts to agricultural land; however, these impacts were insignificant. (SMF 117.) The one residential impact was eliminated, so D Modified resulted in no displacements. (SMF 118.) The indirect impacts to farmlands increased slightly from 1.8 acres to 4.1 acres because one of the farm operators felt that a 2.2 acre remnant parcel would be impractical to farm. (SMF 119.) However, the number of farmed parcels affected by D

---

before it can file a declaration of taking involving lands used for productive agricultural purposes." White v. PA Dept. of Transp., 738 A.2d 26, 32 (Pa. Commw. 1999). The Pennsylvania Supreme Court affirmed the order issued by the Commonwealth Court without opinion.

Modified was unchanged and the number of parcels bisected remains the same. (SMF 120.) In addition, D Modified resulted in taking 1.8 acres from an Agricultural Security Area (ASA) because a portion of one of the parcels was enrolled in the Guilford Township ASA. (SMF 121.) This 1.8 acre ASA impact was considered in the ROD as a direct impact to productive agricultural land, but was not referred to as an ASA. (SMF 122.) These changes were not significant, and therefore, did not warrant the preparation of a SEIS.

Finally, plaintiffs claim that the development scenario for the Chambers 5 business park has changed and requires the completion of a SEIS; however, there has not been a change warranting the completion of a SEIS. The FEIS assumed that the Chambers 5 development would have 1,320,000 square feet of manufacturing and distribution space, generating 15,700 trips per day. (SMF 123.) In 2000, updated development data was collected, which showed that Chambers 5 was built out except for one or two smaller lots. (SMF 124.) Since 1995, a Toys R Us distribution center had been constructed. (SMF 125.)

As stated in the 2001 re-evaluation, the present (2000) uses that exist in Chambers 5 actually generate traffic at a lower intensity than originally projected. (SMF 126.) This conclusion was reached through traffic counts taken in 2000 along Wayne Avenue just west of I-81 (between Stouffer Avenue and I-81). (SMF 127.) When comparing the projected and actual

average daily traffic (ADT) for the same area, the projected
1995-2016 growth rate was 80% or 2.8% per year while the actual
1995-2000 growth rate (based on traffic counts) was only 2% or
0.4% per year.  (SMF 128.)  "This lower growth in traffic in the
Wayne Avenue/Kriner Road area relates to the type of development
that has been occurring in Chambers 5 Industrial Park and the
smaller development areas surrounding it."  (SMF 129.)
Defendants actually overestimated the trips generated by
Chambers 5 in the FEIS as compared to the 2000 traffic studies.
(SMF 130.)  Therefore, the conclusions in the FEIS are
unchanged.  Namely, (1) Wayne Avenue does not have congestion
problems, and (2) the Kriner Road alternative (which would
relieve traffic on Wayne Avenue) does not best satisfy the
project needs.

Based upon the above discussion, a SEIS is not warranted
for the I-81 Interchange project.

**5.    Defendants were not required to examine new alternatives
under NEPA as a result of the amendment to the statute
authorizing funding for the project.**

In Count Eight of their Amended Complaint, plaintiffs claim
that an amendment to the funding language in 1995 required
defendants to consider a wider range of alternatives.  This is
incorrect.  Moreover, plaintiffs fail to propose any
alternatives that were not addressed during the NEPA process.

The Surface Transportation and Uniform Relocation Assistance Act (STURAA) authorized funding for a demonstration project in Chambersburg Area.  Specifically, the law provides:

> . . . The Secretary shall carry out a highway project, which demonstrates how construction of an interchange on a north-south interstate route will provide access to Chambersburg, PA, and relieve traffic congestion on an existing interchange on such interstate route.

101 stat. 192 (sec. 149 (a)(74)).

In May of 1994, the DEIS for the project was distributed which identified the project needs and the alternatives considered, and evaluated the socioeconomic, historic, and environmental impacts of the project.  (SMF 4-5.)  In May of 1995, the FEIS for the project was distributed which included, in addition to the above, copies of comments from the various agencies, local municipalities, and the public and responses to these comments.

In 1995, the National Highway System Designation Act added the following at the end of the above quoted authorization language for the project:  "and other projects in the counties of Bedford, Blair, Centre, Franklin, and Huntingdon, Pennsylvania".  Plaintiffs claim that the use of this catch-all phrase requires the consideration of additional alternatives for the I-81 Interchange project in Franklin County.  However, the original purpose of Section 149 (a)(74) of STURAA remains the same - construct an interchange to provide access to Chambersburg, PA and relieve traffic congestion on existing

interchange.  The purpose of the catch-all phrase was simply to ensure that the money for the I-81 Interchange project would be used in this geographic area if the project was not constructed.

The needs for the project were well established as set forth in the DEIS and FEIS, and this additional language in the funding authorization does not change these project needs.  (SMF 27.)  Courts have repeatedly held that NEPA requires only the consideration of reasonable alternatives.  Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517, 524 (9th Cir. 1994); Citizens Against Burlington, 938 F.2d at 195; Druid Hills Civic Ass'n v. Fed. Highway Admin., 772 F.2d 700, 713 (11th Cir. 1985); Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 436 (5th Cir. 1981).  The range of alternatives that must be considered in an EIS need not extend beyond those reasonably related to the purposes of the project  Laguna Greenbelt, 42 F.3d at 524.  Alternatives in Bedford, Blair, Centre, and Huntingdon Counties would not be reasonable alternatives under NEPA because these alternatives would not satisfy the project needs of providing access to Chambersburg, relieving congestion on an existing interchange, and providing for existing and proposed development in Chambersburg.

Therefore, based on the above discussion, NEPA does not require the consideration of additional alternatives in these counties.

**6.    The studies for the I-81 Interchange project were completed with good faith objectivity.**

In Count One of their Amended Complaint, plaintiffs claim that the selected alternative was pre-determined prior to the completion the environmental studies for the project.  However, the administrative record indicates that FHWA took a "hard look" at the environmental consequences of and alternatives for the I-81 Interchange project with good faith objectivity.

The courts may only examine the EIS to ensure that the government "with good faith objectivity has taken a hard look at the environmental consequences of a proposed action and at alternatives to that action." Coalition Against Raised Expressway, Inc. v. Dole, 835 F.2d 803, 807 (11th Cir. 1988). When challenging an EIS as defective, the plaintiffs have the burden of persuasion. Id.

With regard to allegations of pre-determination "the test of compliance with Section 102 of NEPA, . . . is one of good faith objectivity rather than subjective impartiality." Environmental Defense Fund v. U.S. Army Corps of Eng'rs, 470 F.2d 289, 296 (8th Cir. 1972) cert. denied 412 U.S. 931 (1973). Agency officials are not required to be subjectively impartial so long as they objectively evaluate their project.  Id. at 295. In fact, "NEPA assumes as inevitable an institutional bias within an agency proposing the project" and has created procedures so that the decision maker is forced to review all

the relevant information, thus limiting the effects of any bias.
Id. at 295-96.

    Plaintiffs' allegations of pre-determination rest **solely** on
a couple of statements made in letters from the Secretary of
PennDOT during the NEPA process (not statements made by FHWA,
the federal decision-maker under NEPA for this project).
Regardless, statements made by agency officials, regarding a
preference for a specific alternative, prior to issuing the
FEIS, do not in themselves create a violation of NEPA.
Environmental Defense Fund, 470 F.2d at 295-96; Coalition
Against Raised Highways, 834 F.2d at 808.  The courts have found
these statements permissible expressions of confidence.
Environmental Defense Fund, 470 F.2d at 295-96 (found that the
EIS satisfied the full disclosure requirements of NEPA despite a
statement by Colonel Vernon W. Pinkey, District Engineer in
charge of preparing the EIS that "the Gillham Dam would
definitely be built"); Coalition Against Raised Highways, 834
F.2d at 808 (found statement by FHWA to develop the "spur"
alternative and Blakely Island Route sufficiently so that these
alternatives could be dismissed in the EIS was just an
expression of confidence - the record showed that FHWA took the
required "hard look" at the alternatives); Presidio Golf Course
v. Nat'l Park Serv., 155 F.3d 1153, 1161 (9th Cir. 1998) (found
that the National Park Services' decision to build a new
clubhouse prior to completing the EA was again an expression of

confidence.)  <u>See</u> <u>also</u>, <u>State of S. Carolina v. O'Leary</u>, 953 F.
Supp. 699, 707 (D.S.C. 1996); <u>Fayetteville Area Chamber of</u>
<u>Commerce v. Volpe</u>, 515 F.2d 1021, 1026 (4th Cir. 1975).

Moreover, although plaintiffs make numerous allegations
regarding PennDOT officials, they have failed to raise any
allegations regarding FHWA.  The letters quoted by plaintiffs in
making its pre-determination argument are by state officials,
not the federal decision-maker.  (SMF 133.)  These letters were
included in comments on the FEIS for FHWA to review.  (SMF 134.)
The present appeal is from FHWA's decision to approve the I-81
interchange at Walker Road, not of decisions made by non-federal
entities.  Although FHWA considers the position and interest of
the product owner (PennDOT in this case) and of congressional
officials, numerous other relevant factors are also considered.
(SMF 136.)

In the present case, the administrative record shows that
FHWA took the required "hard look" at the environmental
consequences and the alternatives as required by NEPA.  FHWA
participated in the development of the DEIS and FEIS for the
project which evaluated in detail several alternatives at Walker
Road and Kriner Road.  (SMF 137.)  In 1992, at the time the
letters were exchanged between former Pennsylvania Secretary
Yerusalum and former Congressman Shuster, the preliminary
alternatives report was prepared and distributed, which
identified Walker and Kriner Roads as two potential locations

for the new interchange.  (SMF 138.)  The selection of these two
locations was based on environmental and engineering studies.
The DEIS and FEIS evaluated in detail several alternatives at
the Walker Road and Kriner Road locations and identified
Alternative D-C as the preferred alternative.  (SMF 141.)  The
DEIS and FEIS evaluated in detail the impacts of the project on
the following:  socioeconomic and land use, visual resources,
utilities, energy, cultural resources, air quality, noise,
vibration, surface water and aquatic biota, flood plains,
wetlands, vegetation and wildlife, threatened and endangered
species, groundwater, soils and geology, hazardous waste,
farmlands, traffic and transportation.  (SMF 142.)  The impacts
evaluated included secondary and cumulative impacts.  (SMF 143.)

     None of the alternatives would result in any impacts to
wetlands, surface water, floodplains, hazardous waste sites, and
threatened or endangered species and air quality receptors were
well below National Ambient Air Quality Standards.  (SMF 144.)
The Walker Road alternatives would result in one residential
displacement (none for D Modified), one well displaced (none for
D Modified), limited potential for secondary development but
development restrictions were put in place as mitigation, direct
take of productive agricultural lands ranging from 8.0 acres to
18.6 acres, indirect take of productive agricultural lands
ranging from 0 acres to 10.6 acres, no anticipated permanent
impacts to utilities, three to four noise receptors would result

37

in an imperceptible increase,[16] and all the Walker Road
alternatives except D Modified would impact one historic
resource (also a Section 4(f) resource).  (SMF 145.)  The Kriner
Road alternatives would result in potential for secondary
development, direct take of productive agricultural lands
ranging from 12.7 acres to 14.2 acres, indirect take of
productive agricultural lands ranging from 2.9 acres to 8.5
acres, utility relocation of a high pressure gas line and water
main, four noise receptors would continue to exceed criteria for
noise abatement, no residential or well displacements, and one
alternative impacting four historic resources (Section 4(f)
resources) and one alternative avoiding historic resources.
(SMF 146.)  Plaintiffs' Amended Complaint does not question the
quantification of these impacts or the methods used to quantify
these impacts (except for their allegations that two historic
resources would be adversely affected (not taken) under the
NHPA, which is discussed in detail in the next section).

The only impacts caused by the project alternatives are
residential displacements, farmlands, and historic resources.
(SMF 148.)  In balancing these potential impacts, D Modified
compared to the Kriner Road alternatives causes the least
impacts.  (SMF 149.)  The Kriner Road alternatives and D
Modified each have no displacements and 4 noise receptors are
imperceptibly increased.  (SMF 150.)  However, D Modified

---

[16]    See footnote 12.

impacts a total of 16.2 acres of productive agricultural land and no historic resources compared to the Alternative B which impacts 17.1 acres of productive agricultural land and 4 historic resources[17] and Alternative B-1 which impacts 21.2 acres of productive agricultural land and no historic resources.  (SMF 151.)  Moreover, the Walker Road alternatives better satisfy the project need of relieving congestion on an existing interchange.[18]

After the FEIS was circulated an additional historic property was identified in the Walker Road area.  The alternative identified in the FEIS as the preferred alternative would require acquisition from the newly identified historic property.  Therefore, Alternative D was modified to avoid taking property for this historic property.  A re-evaluation of the FEIS was conducted which concluded that Alternative D Modified did not result in any significant new impacts from those which were discussed in the FEIS.  (SMF 15, 16, 17, 94-98.)  The ROD was issued on March 25, 1999 – approximately 7 years after the Yerusalum letters.  (SMF 155.)  Contrary to

---

[17]    Since the issuance of the ROD, two of the four historic properties in the Kriner Road area have been demolished by private entities.

[18]    The Kriner Road alternatives would relieve congestion on the Wayne Avenue (Route 316)/I-81 Interchange which is not congested.  (SMF 153.)  The Walker Road alternatives would relieve congestion on the Route 30/I-81 Interchange which does experience congestion.  (SMF 153.)

plaintiffs' claims, there was no pre-determination or rush to judgment on this project.

Finally, the pre-determination issue was raised throughout the NEPA process for the project and said correspondence are included in the administrative record for the project.  Indeed, the administrative record reflects that FHWA considered and addressed the allegations of pre-determination on numerous occasions.  (SMF 156-157.)  In fact, the Inspector General's Office, an independent arm of the U.S. Department of Transportation, investigated the complaints of pre-determination and found nothing improper.  (SMF 158.)

As stated by this Court, <u>Presidio Golf Course</u>, 155 F.3d at 1161, is applicable to the present appeal.  Memorandum Decision dated October 17, 2001 at 13-14.  In <u>Presidio Golf Course</u>, the court found that defendants exhibited a preference to build a public clubhouse near a private one.  Plaintiffs claimed that defendants tailored the process to insure a finding of no significant impact (FONSI) under NEPA.  Plaintiffs pointed to the following statements in the administrative record:  (1) "NEPA compliance will end with the [Park Service] preparation and approval of a Finding of No Significant Impact"; and (2) the environmental analysis schedule listed the final step as "Approved by [the National Park Service]" which was followed by an arrow pointing to the term "FONSI".  <u>Id.</u>  The court held that the preference towards one alternative, even with statements

that NEPA's requirements would be satisfied, was not a violation of NEPA. <u>See</u> Memorandum Decision dated October 17, 2001 at 12-13.

Applying <u>Presidio Golf Course</u>, Yerusalim's statements regarding the location of the project at Walker Road are expressions of confidence. Yerusalim's letter also stated: "It is our [PennDOT's] intention to satisfy the environmental requirements". (SMF 139.) As indicated in the above discussion, Defendants have in fact satisfied the requirements under NEPA.

**B.   DEFENDANTS FULLY COMPLIED WITH THE NHPA IN COMPLETING THE STUDIES FOR THE I-81 INTERCHANGE PROJECT.**

In Count Four of their Amended Complaint, plaintiffs claim that area of potential effect (APE) defined by FHWA under Section 106 of the NHPA was arbitrary, capricious, and an abuse of discretion. Specifically, plaintiffs allege that FHWA failed to consider the impacts to the following historic properties: the Gass House and the Franklin County Poor House. These resources were outside the APE for the project.

Section 106 of NHPA provides that any agency having jurisdiction over a federally funded project "shall, prior to the approval of the expenditure of Federal funds on the undertaking, . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. §470f.

41

Like NEPA, the NHPA is a procedural statute. <u>Connecticut Trust for Historic Preservation v. I.C.C.</u>, 841 F.2d 479, 483-84 (2d Cir. 1988). Section 106 of NHPA is a "stop, look, and listen" provision that merely requires that FHWA acquire information before acting. <u>Concerned Citizens</u>, 176 F.3d at 695-96. As long as the effect on the historic properties is considered and the recommendations of the ACHP are considered in the decision making process, NHPA is satisfied. <u>Citizens for the Scenic Severn River Bridge v. Skinner</u>, 802 F. Supp. 1325, 1337 (Md. 1991), <u>aff'd</u>, 972 F.2d 338 (1992).

Defendants fulfilled the procedural requirements of NHPA for the project. Defendants prepared an Historic Structures Inventory, a Determination of Eligibility Report, and a Rural Historic Landscape Assessment, which identified the APE for the project and the historic resources located in the project's APE. (SMF 160.) These eligibility documents were submitted to PHMC[19] for review and concurrence. (SMF 161.) Numerous meetings and correspondence between PHMC, PennDOT, and FHWA occurred which resulted in the identification of historic resources and their boundaries in the APE for the project. (SMF 163.) FHWA also requested a determination of eligibility from the Secretary of

---

[19] PHMC is the State Historic Preservation Officer (SHPO) for Pennsylvania. (SMF 162.)

the Department of Interior (the Keeper of the National

Register)[20] for the historic structures evaluated.  (SMF 164.)

In 1994 and 1995, FHWA prepared a Criteria of Effects

Report and addenda on the recommended effect of the project

(Alternative D-C) on the eligible historic resources.  (SMF

166.)  FHWA found that Alternative D-C (the DEIS and FEIS

preferred alternative) would have a "no adverse effect" as a

result of the project.  (SMF 167.)  These reports were submitted

to PHMC, ACHP, and consulting parties for review and

concurrence.  (SMF 168.)  PHMC and ACHP did not concur with

FHWA's "no adverse effect" determination.  (SMF 169.)  PHMC and

ACHP commented that Alternative D-C would have an adverse effect

on the Eastern Greene Township Rural Historic District due to

the potential for secondary development.  (SMF 170.)  FHWA

continued to disagree with PHMC's and ACHP's effect opinion[21],

but accepted the opinion for Alternative D-C and prepared a MOA

for the project that included measures to minimize purported

impacts to the historic district. (SMF 171.)

As a result of public and agency involvement following the

circulation of the FEIS, additional historic resources were

---

[20]    The Secretary of the Department of Interior maintains the
National Register of Historic Places through the Keeper of the
National Register under the NHPA.  16 U.S.C. §470a.

[21] Defendants' studies showed that development and traffic would
occur without the construction of the interchange at Walker
Road.  (SMF 172.)  The project was not the cause of the
secondary development.

identified in the project area.  Ultimately, the Keeper
determined that the Christian Fry, Jr. House and associated Fry
family lands and an unnamed historic district to the east of
Franklin Farm Lane were eligible for listing on the National
Register.  (SMF 15.)  Alternative D-C (the FEIS recommended
selected alternative) would require the acquisition of land from
the newly defined Christian Fry, Jr. House/Fry Property.  (SMF
16.)  Therefore, alternatives at Walker Road were reexamined.
(SMF 17.)  Alternative D was modified to avoid the permanent
acquisition of lands from historic resources in the study area.
(SMF 17, 173.)

     In 1998, FHWA prepared an Addendum to the Criteria of
Effects Report for D Modified.  (SMF 174.)  This Addendum was
submitted to the PHMC and the ACHP for review and concurrence.
(SMF 175.)  FHWA determined that D Modified would have "no
adverse effect" to the Eastern Greene Township Rural Historic
District, the unnamed historic district, and the Christian Fry
Jr. House.  (SMF 176.)  However, PHMC and ACHP opined that D
Modified would have an "adverse effect" on these resources due
to the potential for secondary development.  (SMF 177.)  Again,
FHWA continued to disagree with PHMC's and ACHP's effect
opinions for D Modified, but accepted these opinions for the
purpose of moving the project forward and prepared a MOA for the

project to document measures to minimize the purported impacts.[22]
(SMF 178.)   FHWA received comments on the draft MOA from PHMC
and a final MOA was prepared and signed.   (SMF 183.)

As evidenced by the administrative record, this project has
had an abundance of coordination with PHMC and ACHP.   (SMF 179.)
PHMC and ACHP are very familiar with this project and the issues
raised by plaintiffs.   (SMF 180.)   On January 23, 1995,
defendants, PHMC, ACHP and the municipalities met to discuss
Section 106 issues.   (SMF 184.)   PHMC actually conducted a field
view of the project area.   (SMF 185.)   ACHP and PHMC provided
comments throughout the Section 106 process to FHWA regarding
proposed revisions to the MOA.   (SMF 183.)

During the Section 106 process, PHMC and ACHP also received
comments from the public regarding the alleged potential impacts
to the Gass House and the Franklin County Poor House.   (SMF
186.)   For example, the comments on the MOA and Addendum to the
Criteria of Effects Report from Greene Township a consulting
party to the Section 106 process were provided to PHMC and ACHP.
(SMF 187.)   These comments included challenges to the area of
potential effect and allegations that the Addendum should have
considered adverse effects to other resources such as the Gass

---

[22]   The Section 106 regulations do not require the execution of
an MOA when FHWA, the federal agency, makes the determination of
no adverse effect.   See Friends of Atglen-Susquehanna Trail, 252
F.3d at 254 (Third Circuit found that the execution of an MOA
was not required under Section 106; however, Section 106 did
require consideration of ACHP's comments).

House.  (SMF 188.)  As the record indicates, PHMC and the ACHP received copies of, at least, twelve letters regarding alleged impacts to the Gass House and Franklin County Poor House:  the earliest dated May 2, 1994 and the latest dated March 2, 1999. (SMF 189.)

Defendants received the above comments on the Gass House and Franklin County Poor House and provided a detailed response to PHMC and ACHP prior to PHMC's and ACHP's signing of the MOA. (SMF 190.)  PHMC asked defendants to address concerns expressed by the public regarding the Gass House and Franklin County Poor House.  (SMF 191.)  FHWA addressed these concerns by sending a letter to the Greene/Guilford Environmental Association and copying PHMC and ACHP with the response.  (SMF 192.)  In addition, defendants sent a letter to PHMC and copied ACHP addressing the allegations of potential effects to the Gass House and Franklin County Poor House on January 8, 1999.  (SMF 193.)

PHMC and ACHP, the agencies with expertise in matters involving historic resources, agreed that the areas of potential effects were properly identified and the identification of historic resources and the adverse effects of the project were complete by signing the MOA.  PHMC signed the MOA on December 17, 1998.  (SMF 194.)  The PHMC's letter transmitting the signed MOA stated:

> The Bureau of Historic Preservation (the State Historic
> Preservation Office) has reviewed the above named project

in accordance with Section 106 of the National Historic
Preservation Act . . . .  These requirements include the
consideration of the project's potential effect upon both
historic and archaeological resources.

(SMF 196.)  ACHP signed the MOA on March 23, 1999 and stated

that the "Alternative D Modified . . . will best serve to

minimize effects to historic properties in keeping with

applicable laws and regulations."  (SMF 197.)  By signing the

MOA, PHMC and ACHP accepted the APE and minimization measures

provided for the purported adverse effects caused by the

project.  (SMF 198.)

Regardless of PHMC's and ACHP's acceptance of FHWA's

response to comments and the MOA for this project, this project

clearly has no adverse effect on the Gass House, Franklin County

Poor House or any other potentially eligible resource along

Franklin Farm Lane.  In applying the Criteria of Adverse Effect,

an agency looks at the undertaking, not development that has

already occurred and will continue to occur.  The Section 106

regulation states:  "An undertaking has an effect on a historic

property when the undertaking may alter characteristics of the

property that may qualify the property for inclusion in the

National Register."  36 C.F.R. § 800.9(a)(1998)  (emphasis

added)  The regulations further state:  "An undertaking is

considered to have an adverse effect when the effect on historic

property may diminish the integrity of the property's location,

design, setting, materials, workmanship, feeling, or

association."  Id. at §800.9(b)

47

Both the Gass House and the Franklin County Poor House
(also referred to jointly as the Union Plantation) are located
along Franklin Farm Lane near its intersection with Route 30.
(SMF 200.)  The Gass House and Franklin County Poor House are
eligible for listing on the National Register based on their
architecture – as examples of Scotch-Irish farm house
architecture.  (SMF 201.)  As indicated by the National Register
of Historic Places Nomination Form, these historic properties
have already been altered.  (SMF 202.)  The Gass House and
Franklin County Poor House are presently being used as offices
for Franklin County.  Other modern office buildings and a
nursing home surround these historic properties.  (SMF 204.)

As documented in the FEIS and confirmed in the additional
traffic analysis for the project, impacts along Franklin Farm
Lane due to increased traffic, noise, and development as a
result of this project are non-existent or insignificant.  (SMF
205.)  The traffic analysis found that traffic volumes on
Franklin Farm Lane will continue to increase without the
proposed interchange.[23]  (SMF 206.)  This increase is due to
traffic diverting from U.S. 30 and present and planned
development in Guilford and Greene Township.  (SMF 208.)  The
volume of traffic using Franklin Farm Lane is anticipated to

---

[23]    Traffic on Franklin Farm Lane is projected to be the same
under the No-Build scenario (2,300 vehicles per day) as with any
of the combinations of improvements described in the FEIS
(Walker Road Interchange, Norland Avenue Extension, and Route 30
improvements).  (SMF 207.)

48

increase by 450 to 2,300 vehicles per day by year 2016 with or without the Walker Road interchange.  (SMF 209.)  Accordingly, the I-81 Interchange project would not cause changes in traffic volumes near the Gass House and Franklin County Poor House.

For the year 2016, there will be an increase in noise along Franklin Farm Lane; however, as with the increase in traffic volumes, the increase in noise will occur with or without the proposed interchange.  (SMF 211.)  The FEIS and 1999 re-evaluation included results of noise monitoring for the Walker Road alternatives at receptor R-4 that is located on Franklin Farm Lane near the nursing home.  (SMF 212.)  The nursing home is adjacent to the Gass House and Franklin County Poor House. (SMF 212.)  Comparing the No Build alternative to D Modified, noise levels increase from 55.4 dBA to 55.8 dBA at this receptor.  (SMF 213.)  Noise levels of 66 dBA approach noise abatement criteria.  (SMF 214.)  These 2016 noise levels at R-4 are well below the noise abatement criteria.  (SMF 215.) Moreover, the increase of noise is only 0.4 dBA as a result of the project.  (SMF 216.)  Since the human ear cannot detect a change in noise levels of less than 3 dBA, this slight increase will be imperceptible.  (SMF 217.)

The area surrounding these historic resources is already developed.  (SMF 218.)  Therefore, the only impact that secondary development would have on these resources would be

with regard to traffic.  Future development was considered in calculating the 2016 projected traffic.  (SMF 220.)

These traffic, noise, and secondary development studies confirm defendants' delineation of the Section 106 APE for the project.  (SMF 221.)  <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 413-414 (1976), supports defendants' definition of the APE.  The Supreme Court held that the determination of the geographic area within which effects of a project occur is "a task assigned to the special competency of the appropriate agency." <u>Id.</u>

Defendants fully complied with the requirements of NHPA.


## VI.    CONCLUSION

For the foregoing reasons, this Court should issue an order granting the Federal and State Government's motion for summary judgment.

Respectfully submitted,

MARTIN C. CARLSON
United States Attorney


ANNE K. FIORENZA
Assistant United States Attorney
Federal Building - 2nd Floor
228 Walnut Street
P.O. Box 11754
Harrisburg, PA  17108-1754

KENDA JO M. GARDNER
Assistant Counsel
JOHN M. HRUBOVCAK
Assistant Counsel-in-Charge
ROBERT J. SHEA
Assistant Chief Counsel
ANDREW S. GORDON
Chief Counsel
Pennsylvania Department of
    Transportation
Office of Chief Counsel
P.O. Box 8212
Harrisburg, PA  17105

## CERTIFICATE OF NONCONCURRENCE AND CONCURRENCE PURSUANT TO RULE 7.1

I, Anne K. Fiorenza, do hereby certify that Plaintiffs'
counsel, Thomas Linzey, Esquire, was contacted by telephone on
June 6, 2002, and that he NONCONCURRED with Defendants' Motion
for Summary Judgment.


ANNE K. FIORENZA
Assistant United States Attorney
Federal Building - 2nd Floor
228 Walnut Street
Harrisburg, PA  17108-1754

51

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of Chief Counsel of the Department of Transportation, Commonwealth of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

On this 7 day of June, 2002, she served a copy of the foregoing documents by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by deposition said envelope and contents in the United States Mail at Harrisburg, Pennsylvania to:

Thomas Alan Linzey, Esquire
Community Environmental Legal Defense Fund
2859 Scotland Road
Chambersburg, PA 17201


KENDA JO M. GARDNER
Assistant Counsel
Office of Chief Counsel
Pennsylvania Department of
   Transportation
Commonwealth of Pennsylvania
P.O. Box 8212
Harrisburg, PA 17105-8212
(717) 787-5299
Fax: (717) 772-2741