ORIGINAL

73
6/10/02

FILED
HARRISBURG, PA

JUN 0 7 2002

MARY E. D'ANDREA, CLERK
Per _____

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| GREENE/GUILFORD ENVIRONMENTAL ASSOCIATION, a non-profit Corporation incorporated under the laws of the Commonwealth of Pennsylvania, CITIZENS FOR PLANNED COMMUNITY GROWTH, an unincorporated association organized under the laws of the Commonwealth of Pennsylvania, PAUL B. AMBROSE, JOHN G. ENDERS, CHARLES F. RAHAUSER, BETSY RAHAUSER, DOUGLAS A. WARNOCK, U.X. VAGNERINI, THOMAS W. BUNDY, STEPHEN P. BUCHER, ROGER J. ROBERTSON, JAMES A. STRITE, JR., DAVID A. GUTHRIE,<br>          Plaintiffs,<br><br>                    v.<br><br>KEN WYKLE, Administrator, Federal Highway Administration, ROBERT GATZ, Federal Highway Administration,<br>          Defendants,<br><br>                   and<br><br>BRADLEY L. MALLORY, Secretary for the Department of Transportation, Commonwealth of Pennsylvania,<br>          Intervenor | CIVIL ACTION NO.<br>  1:CV-01-0910<br><br>(Judge Rambo) |

## FEDERAL DEFENDANTS' AND INTERVENOR'S STATEMENT
## OF UNDISPUTED MATERIAL FACTS IN SUPPORT
## OF THEIR JOINT MOTION FOR SUMMARY JUDGMENT

1.    The southbound ramps of the interchange to I-81 of Alternative D Modified will be located on the east side of existing Walker Road, and will tie into existing Walker Road near the Greene Township-Chambersburg Borough line.  (AR-82 at 1.)

2.    D Modified's northbound ramps to and from I-81 will be located on the west side of Franklin Farm Lane.  (AR-82 at 1.)

3.    The selected alternative is a modification of Alternative D, which was developed in response to comments received on the Final Environmental Impact Statement (FEIS) and to avoid, minimize, and mitigate project impacts.  (AR-82 at 1.)

**A.    Compliance with the National Environmental Policy Act (NEPA)**

4.    Defendants prepared a Draft Environmental Impact Statement (DEIS) dated May 1994, a FEIS dated May 1995, a re-evaluation of the FEIS dated January 1999 (1999 re-evaluation), and a re-evaluation of the Record of Decision (ROD) dated June 2001 (2001 re-evaluation).  (AR-12, AR-46, AR-47, AR-48, AR-80, AR-82, AR-83.)

5.    The DEIS, FEIS, and re-evaluations: (1) identified the project's needs and objectives; (2) discussed Defendants' development of a range of alternatives; and/or (3) discussed the social, environmental, cultural, and economic impacts associated with these alternatives.  (AR-12, AR-46, AR-47, AR-48, AR-80, AR-82, AR-83.)

6.    The DEIS and FEIS studied the following alternatives in detail:  (1) the No-Build alternative, (2) Alternative B (Interchange at Kriner Road) (3) Alternative C (Interchange at Franklin Farm Lane/Walker Road); (4) Alternative D (Interchange at Walker Road); (5) Alternative B-1 (historic property avoidance alternative for the interchange at Kriner Road); and (6) Alternative D-C (initially a historic property avoidance alternative for interchange at Walker Road).  (AR-12 at 1-25; AR-47 at II-1-20; AR-82 at 3-4.)

7.    Other alternatives were considered during the NEPA process, but were determined to be unreasonable either for not substantially meeting the project needs or resulting in unacceptable adverse impacts; therefore, these alternatives were not studied in detail in the DEIS or FEIS.  (AR-46 at 11-1-3; AR-82 at 2.)

8.    The No Build alternative would have involved no major improvements to the existing roadway transportation network in the vicinity of Chambersburg associated with I-81 access.  (AR-46 at ES-11, ES-19.)

9.    The No Build alternative would not include the Route 30 improvements or Norland Avenue Extended.  (AR-46 at ES-11.)

10.    The DEIS and FEIS were circulated to obtain public and agency comments.  (AR-82 at 11; AR-92 at 211-15; AR-93 at 390-417; AR-98 at 1219-20.)

11.  A public hearing was held for DEIS.  (AR-47 at 387-493; AR-93 at 390-417.)

12.  Defendants considered and responded to each of the substantive comments received on the DEIS and FEIS.  (AR-78; AR-47.)

13.  Defendants received comments on the DEIS and FEIS regarding the identification of historic properties.  (AR-82 at 4-5.)

14.  Several years of additional studies, coordination, and consultation ultimately resulted in the identification of additional historic properties on the east side of I-81 in 1997.  (AR-81 at 2-6; AR-82, Attach. C at 8-21.)

15.  After the FEIS, the Christian Fry Jr. House and associated farmland were determined to be eligible for listing on the National Register.  (AR-80 at 4.)

16.  Alternative D-C, the preferred alternative, required land from the Christian Fry Jr. House and associated farmland.  (AR-80 at 4; AR-82 at 5.)

17.  Alternative D was modified to avoid taking land from this historic property.  (AR-80 at 6, 11; AR-82 at 5.)

18.  Local officials of Franklin County, Greene Township, Guilford Township, and Chambersburg Borough had been kept abreast of the progress through a series of Municipal Coordination Committee (MCC) Meetings.  (AR-80 at 1.)

4

19.   The MCC includes PHMC, ACHP, Greene Township, Guildford Township, the Chambersburg Area Development Corporation, the Greene/Guilford Environmental Association, G.S. and G. Properties, FHWA, and PennDOT.  (AR-46 at VII-2.)

20.   MCC meetings were held on the following dates:  March 2, 1995; March 16, 1995; April 13, 1995; May 11, 1995; May 25, 1995; October 19, 1995; October 31, 1995; November 9, 1995; and June 4, 1998.  (AR-95 at 442-47, 510-16; AR-96 at 744-50; AR-97 at 1069-73; AR-98 at 1146; AR-100 at 1908-19; AR-102 at 106-21; AR-107 at 637-44.)

21.   Comments of the MCC and the public were solicited for Alternative D Modified and responses are contained in the administrative record.  (AR-80 at 6; AR-105 at 153-56, 186-89; AR-71 (video shown a public meeting).)

22.   On June 4, 1998, Alternative D Modified and the status of the environmental studies were presented at a public meeting. (AR-80 at 6; AR-105 at 153-56, 186-89; AR-71.)

23.   Defendants considered and responded to the comments received at the public meeting held on June 4, 1998.  (AR-105 at 153-56, 186-89.)

24.   All of the public and agency comments received during the review period for the FEIS and comments received through the Section 106 (NHPA) coordination consultation process were considered in the decision to select Alternative D Modified. (AR-82 at 11-13; AR-105 at 153-56.)

25.   FHWA weighed the resulting benefits and impacts from the alternatives studied in detail; clearly illustrated why it selected Alternative D Modified in the Record of Decision (ROD); and on March 25, 1999, issued the ROD.  (AR-82 at 14.)

**i.    Project Needs**

26.   Section I of the FEIS identifies the needs for the project.  (AR-46 at I-1-16.)

27.   The project needs are straightforward:  (1) complying with a congressionally legislated demonstration project to provide access to Chambersburg and to relieve congestion on an existing interchange (Public Law 100-17); (2) accommodating existing and future traffic volumes;(3) adhering to comprehensive plans of area municipalities; and (4) providing for existing and proposed development in the study area.  (AR-46 at I-1.)

28.   The 1995 traffic study shows that there is congestion at the I-81/Route 30 interchange.  (AR-78 at 83.)

29.   Level of service (LOS) is a qualitative measure describing operational conditions.  (AR-46 at III-80-81.)

30.   Six LOS are defined in letter designation, A to F, with LOS A representing the best operating conditions and LOS F the worst.  (AR-46 at III-80-81.)

31.   LOS D through F are considered unacceptable in rural areas and LOS E through F are considered unacceptable in all areas. (AR-46 at III-80-81.)

32.   Analysis of current traffic volumes indicates that the intersection of Route 30 and Walker Road/Stouffer Avenue operate at unacceptable LOS (LOS D, E, or F) for 10 hours per day (with LOS E or F during peak hours).   (AR-46 at I-18.)

33.   The section of Route 30 between the Walker Road/Stouffer Avenue intersection and the I-81 ramps will by 2016 operate at unacceptable LOS for 16 hours of the day and at LOS E or F for 14 hours of the day in the 2016 design year. (AR-46 at I-18, IV-81, App. B.)

34.   This combination of unacceptable traffic operations causes congestion through the entire I-81/Route 30 interchange area, restricting the ability of traffic to smoothly progress through the interchange area, at times blocking the interchange ramps at Route 30.   (AR-46 at I-18.)

35.   In the future (No Build), at the Route 30/Walker Road/Stouffer Avenue intersection, this congestion will worsen as traffic volumes are expected to increase 47%.   (AR-46 at I-18; IV-77.)

36.   The primary cause of congestion at the I-81/Route 30 interchange is the volume of traffic traveling through the interchange on Route 30 and the weaving of traffic between the ramps and the Walker Road/Stouffer Avenue intersection.   (AR-78 at 83.)

37.   When considered as isolated intersections, or intersections which are not influenced by the operation or

7

congestion of other surrounding intersections, the levels of
service which are obtained for the two I-81/Route 30 interchange
ramps appear to be acceptable.   (AR-78 at 83.)

38.   The intersections of the I-81 interchange ramps with
Route 30 cannot be considered isolated intersections because of
the close spacing with the congested Walker Road and Falling
Spring Road intersections.   (AR-78 at 83.)

39.   Traffic analysis and field observations show that the
poor operation of the Route 30/Walker Road/Stouffer Avenue
intersection severely impacts the operation of the I-81
interchange ramps at Route 30.   (AR-78 at 83; AR-136 at 1377,
1446.)

40.   Based on the analysis conducted for the traffic
studies, congestion at the I-81/Route 30 interchange ramps could
be reduced by improving the LOS of the Walker Road/Stouffer
Avenue intersection with Route 30.   (AR-78 at 83.)

41.   Improvements ranging from 4% to 14% in the
volume/capacity ratio at the I-81/Route 30 interchange
intersections, with greater improvements made in congestion at
the Walker Road/Stouffer Avenue intersection would result from
the construction of an interchange in the vicinity at
Alternative D Modified.   (AR-78 at 83.)

42.   As described in the 1995 and 1998 traffic studies, an
interchange at Walker Road (such as Alternative D Modified)
would serve approximately 9,000 to 10,900 vehicles per day in

8

the 2016 design year, depending on the combination of other roadway improvements (Route 30 improvements and proposed Norland Avenue Extension).  (AR-78 at 77.)

43.  Alternative D Modified will remove a minimum of 6,000 vehicles from the I-81/Route 30 interchange.  (AR-78 at 73.)

44.  When combining D Modified with other expected roadway network improvements, congestion at the Route 30/I-81 interchange, including the Route 30/Walker Road/Stouffer Avenue intersection area, would be reduced by as much as 60% over the No-Build alternative, providing acceptable or near acceptable LOS.  (AR-78 at 73.)

45.  The 1998 traffic study for Alternative D Modified demonstrates that the above conclusions are valid.  (AR-78 at 83.)

46.  Presently, the Route 30 interchange carries the largest volume of traffic in the Chambersburg area.  (AR-78 at 76.)

47.  If construction of an interchange on I-81 is to relieve traffic congestion on an existing interchange, it is reasonable to relieve congestion on the interchange, which is currently, and in the future will be, experiencing the worst congestion.  (AR-78 at 76.)

48.  Alternative D Modified satisfies the need to provide access to Chambersburg and relieve traffic on a congested I-81 interchange in Franklin County; to accommodate existing and

9

future traffic volumes; and to provide for existing and proposed developments.  (AR-46 at I-18-19, VI-3; AR-78 at 89; AR-80 at 19-20.)

49.  Improvements to Wayne Avenue include signalization of the I-81 ramps intersections and widening to a five-lane cross section between Orchard Road and Gerber Road.  (AR-37 at 41; AR-46 at III-84; AR-78 at 83.)

50.  With these Wayne Avenue improvements, in the design year 2016, the intersections of both northbound and southbound I-81 ramps with Wayne Avenue will operate at LOS B or C (uncongested) without the Kriner Road interchange.  (AR-37 at 46; AR-78 at 83.)

51.  Since LOS C is acceptable, no further improvements are necessary at the Wayne Avenue interchange.  (AR-37 at 46.)

52.  Additional traffic counts were taken in 2000 along Wayne Avenue.  (AR-83 at 8.)

53.  Analysis of these 2000 counts (along Wayne Avenue) showed a much lower actual traffic growth rate for Wayne Avenue than what was projected in the FEIS (from a projected 2.8% per year (1995 rate) to an actual 0.4% per year (2000 rate)).  (AR-83 at 8.)

54.  The 2000 traffic counts confirms that Wayne Avenue will operate at an acceptable LOS in the design year.  (AR-83 at 8.)

10

55.  Defendants did acknowledge that the Walker Road alternatives (alternatives C, D, D-C, and D Modified) are not in keeping with Greene Township's latest Comprehensive Plan.  (AR-46 at I-11-12; AR-78 at 88.)

56.  No alternative at Walker Road or Kriner Road satisfies or can satisfy the project need of "adhering to comprehensive plans of area municipalities".  (AR-134 at 956; AR-139 at 1377, 1446.)

57.  The area municipalities have conflicting comprehensive plans with regard to the transportation component.  (AR-134 at 956; AR-136 at 1377, 1446.)

58.  Greene Township's transportation component conflicts with transportation component contained in Franklin County's comprehensive plan.  (AR-136 at 1377, 1446.)

59.  Franklin County's comprehensive plan provides for an interchange in the Walker Road area in the proposed project area.  (AR-136 at 1377, 1446.)

60.  Greene Township is located in Franklin County.  (AR-46 at ES-4, 8.)

61.  Alternative D Modified is in full compliance with every applicable comprehensive land use plan and conflicts only with the transportation component of Greene Township's comprehensive plan.

62.  Greene Township has zoned the Walker Road area as residential.  (AR-46 at III-2; AR-134 at 931.)

11

63.   Green Township's land use portion of its comprehensive plan provides:  "to promote planning objectives zoning should reflect the intended uses."  (AR-19 at 7-12.)

64.   According to Greene Township's planning documents, the intended use of the area surrounding Walker Road is residential, not agricultural.  (AR-134 at 931; AR-136 at 1712; AR-19 at 7-12.)

65.   As pointed out by the Agricultural Land Condemnation Assessment Board (ALCAB) (whose primary purpose is to ensure that excessive amounts of farmlands are not condemned), the Township's planning practices provides for the development of the Township's agricultural land.  (AR-138 at 253.)

66.   ALCAB found:

> The intention of Greene Township, however, in desiring to remain predominantly an agricultural municipality are contradicted by certain policies that the Township has been undertaking.  For instance, the Township re-zoned agricultural land at the interchange of Exit 8 to permit the construction of a Sheetz mini market and a storage building project adjacent thereto.  The Township has also zoned most of its agricultural land as R-1 rather than as agricultural in order to permit farmers to build additional residences on their farms.  However, by doing this the Township has given up control over how much land the farmers can convert to non-agricultural housing purposes. Furthermore, the Township has also permitted other parcels to be carved out of farmland without Township approval such as the two new houses along Walker Road . . . .  Permitting these types of structures to be erected without Township approval of any kind does not show a good faith effort to limit conversion of productive agricultural land in Greene Township.

AR-138 at 252-253)

67.  An interchange at Walker Road would not be inconsistent with the land use plan for Greene Township as provided in the land use sections of its comprehensive plan (which provide for the development of the Township's agricultural lands) and its daily practices.  (AR-138 at 253.)

**ii.  Traffic studies on local roads**

68.  The FEIS and its supporting technical studies did examine the effect of the project on local roads.  (AR-46 at a IV-78, 81, 87-88; AR-47, App. A at 19-24; AR-46, App. B at 62, 66, 68, 72, 76-97, 109-122, 123-36.)

69.  For the interchange alternative at Walker Road, defendants analyzed the no build and build scenarios in terms of traffic volumes and midblock LOS on the following local roads: Franklin Farm Lane, Mower Road, Ragged Edge Road, Walker Road, Sixth Street, Fifth Avenue, Kohler Road, Woodstock Road, Scotland Road, Edgar Avenue, Brindle Road, Hafer Road and Norland Avenue.  (AR-46 at IV-78; AR-46, App. A at 19-24; AR-46, App. B at 62, 66, 68, 76-97, 123-36.)

70.  Defendants also analyzed the traffic volume, LOS, and volume to capacity ratios (V/C ratio) at the following intersections which involved local roads:  Kohler/Walker Road; Franklin Farm Lane/Walker Road; Mower/Walker Road; Ragged Edge/Brindle Road; Brindle/Hafer Road and Woodstock/Ragged Edge Road; Route 30/ Ragged Edge Road; Route 30/Mower Road; Route 30/ Franklin Farm Lane; Scotland Avenue and Woodstock/Roland Road;

Scotland Road/Norland Avenue; Route 30/Fifth Avenue; Route 30/Sixth Avenue; and Route 30/Walker Road/Stouffer Avenue.  (AR-46 at IV-81, 87-88; AR-46, App. B at 72, 109-122.)

71.  V/C ratio relates to the volume of traffic passing through the intersection in one hour to the maximum amount of traffic that can pass through the intersection in the same period.  (AR-46 at III-81.)

72.  A V/C ratio of 1.00 or 100% indicates that the intersection is operating at its capacity.  (AR-46 at III-81.)

73.  When the V/C ratio exceeds 1.00, the intersection will operate with congestion (i.e., backups and travel delays).  (AR-46 at III-81.)

74.  The traffic volumes and LOS were analyzed on the above local roads during peak morning and evening hours.  (AR-46 at IV-81, 87-88; AR-46, App. B at 72, 109-122.)

75.  The results of the traffic analysis on the above local roads revealed that traffic will increase on local roadways with or without an interchange at Walker Road due to existing and planned development.  (AR-37 at iv, 34; AR-78 at 77, 91.)

76.  Traffic will increase in northern Chambersburg and western Greene Township with or without construction of the Walker Road interchange.  (AR-37 at iv, 34; AR-78 at 91.)

77.  Traffic along Walker Road is expected to increase by as much as four-fold, and traffic along Norland Avenue is

14

expected to double between 1995 and 2016 for No-Build

conditions.  (AR-78 at 91.)

78.  With the Walker Road interchange, increases in traffic

can be expected on some local roadways; however, when compared

to the percent increases expected on some of the local roads due

to the identified developments, the increases due to the

interchange are not as significant (e.g., only 6.9% increase of

average daily traffic on Walker Road east of Franklin Farm Lane

considering only the Walker Road interchange construction

compared to the No-Build alternative).  (AR-46, App. B at 66,

92; AR-72 at 4, 35.)

79.  The average daily traffic on some of the local roads

remains substantially the same with or without the intersection,

namely Franklin Farm Lane, Mower Road, Ragged Edge Road, and

Norland Avenue east of Scotland Road.  (AR-46, App. B at 66, 92-

96; AR-72 at 4, 35.)

80.  For Alternative D Modified, a portion of Walker Road

will be relocated and some sections of Walker Road will be

resurfaced.  (AR-82 at 6.)

**iii. Cumulative impacts of the proposed interchange with the
      proposed extension of Norland Avenue**

81.  In addition to Alternatives C, D, D-C, D Modified, B,

and B-1, the traffic studies analyzed these alternatives

together with identified improvements that may or may not occur.

(AR-46 at IV-68; AR-72 at 1.)

82.    Alternatives C, D, D-C, and D Modified were analyzed under the following scenarios:  (1) without Route 30 improvements with Walker Road Interchange and with Norland Avenue Extended; (2) without Route 30 improvements without Walker Road Interchange and with Norland Avenue Extended; (3) without Route 30 improvements with Walker Road Interchange and without Norland Avenue Extended; (4) with Route 30 improvements with Walker Road Interchange and with Norland Avenue Extended; (5) with Route 30 improvements without Walker Road Interchange and with Norland Avenue Extended; and (6) with Route 30 improvements with Walker Road Interchange and without Norland Avenue Extended; and (7) with Route 30 improvements only.  (AR-46 at IV-68-69; AR-72 at 1.)

83.    The traffic impacts of Norland Avenue extended were considered in the FEIS and re-evaluation.  (AR-46 at IV-68-69; AR 72 at 1.)

84.    The proposed development with and without the Norland Avenue extension was also considered in the EIS studies.  (AR-46 at V-15 and App. B, Development Activity Table.)

85.    Norland Avenue extended will take place entirely on the Gabler Tract (privately owned).

86.    Prior to development, the Gabler Tract was primarily farmlands.  (AR-46 at V-18.)

87.    The Gabler Tract will be developed with or without the interchange.  (AR-46, App. B, Development Activity Table.)

16

88.  If a Walker Road interchange is constructed, the Gabler Tract development will be more intensive.  (AR-46 at IV-70, IV-74, V-15.)

89.  If a Walker Road interchange is constructed and the Norland Avenue is extended, 140 residential units (154 acres) and 173 acres of commercial space would be developed on the property by 2016.  (AR-46 at V-15 and App. B, Development Activity Table.)

90.  If the interchange is not built at Walker Road and Norland Avenue is not extended, 287 residential dwelling units (224 acres) and 103 acres of commercial space would be developed by 2016.  (AR-46 at V-15 and App. B, Development Activity Table.)

91.  A reduction of 70 acres of residential development and an increase of commercial development by 70 acres was identified as a cumulative impact of a Walker Road interchange and the extension of Norland Avenue.  (AR-46 at V-15 and App. B, Development Activity Table.)

92.  Either with or without the interchange 327 acres of the Gabler Tract will be developed.  (AR-46 at App. B, Development Activity Table.)

93.  Since the circulation of the FEIS, the Norland Avenue Extended roadway has been graded between Fifth Avenue and Walker Road by the developer, but does not have a pavement overlay and is not yet open to traffic.  (AR-80 at 19.)

17

**iv.  Decision not to complete a Supplemental Environmental Impact Statement (SEIS)**

94.  In January, 1999, a written re-evaluation of the FEIS was prepared in accordance with FHWA regulations.  (AR-80.)

95.  The purpose of the 1999 re-evaluation was to analyze whether a SEIS was necessary due to the modification of Alternative D.  (AR-80 at 1.)

96.  The 1999 re-evaluation concluded:

Based on the above analysis and the application of 40 C.F.R. §1508.27 which defines "significant", the modification of Alternative D does not result in significant new impacts from those which were discussed in the Final EIS . . . .  The affected environment of the study area is substantially the same as presented in the FEIS, and the environmental consequences of the proposed action are not significantly different from those presented in the FEIS.  Alternative D Modified lessens environmental impacts by avoiding historic resources and reducing visual effects to historic resources in the Walker Road vicinity without causing other significant environmental impacts.

(AR-80 at 21.)

97.  FHWA concluded that a SEIS was not necessary finding:

The reevaluation report fully reviews the potential for environmental, cultural and other resource impacts for Alternative D Modified....  Alternative D Modified does not result in significant new impacts from that which was discussed in the final EIS.  In fact, the modification made to Alternative D lessens environmental impacts by avoiding historic resources and reducing visual effects to historic resources, without causing significant environmental impacts.  Alternative D Modified does not amount to a substantial change to the proposed action which results in "significant environmental impacts" that were not evaluated in the EIS.  Accordingly, a supplemental EIS is not required, and further distribution and comment on the Selected Alternative [is] not required.

(AR-82 at 14.)

18

98.   The modification of Alternative D did not result in any significant social, environmental or cultural impacts that were not discussed in the FEIS for the project.   (AR-80 at 21.)

99.   Alternative D Modified is in the same general location of Alternatives D, C, and D-C.   (AR-80 at 5-6; AR-46 at 11-16, 7.)

100. The areas of concern for this project, as discussed in the FEIS and re-evaluations, have been historic properties, farmlands, traffic, and noise.   (AR-AR-83 at 3-9; AR-80 at 10-21; AR-46 at IV-6-23, IV-30-46, IV-60-89.)

101. Unlike the other Walker Road alternatives, Alternative D Modified impacts no historic resources and results in no residential displacements.   (AR-80 at 22.)

102. With regard to farmlands, noise, and traffic impacts, Alternative D Modified is comparable to the other Walker Road alternatives, which were discussed in the FEIS.   (AR-46 at ES-20-21; AR-80 at 22; AR-83 at 3.)

103. The other Walker Road alternatives would have directly taken 8 to 18.6 acres of productive agricultural land and would have indirectly taken 0 to 10.6 acres of productive agricultural land, whereas Alternative D Modified would directly take 12.1 acres and would indirectly take 4.1 acres.   (AR-80 at 22; AR-83 at 3.)

104. The other Walker Road alternatives would have taken 2.9 to 8.9 acres from agriculture security areas, whereas,

19

Alternative D Modified would take 6.5 acres from agriculture security areas.  (AR-80 at 22; AR-83 at 3.)

105. Alternative D Modified results in imperceptible noise increases to four receptors, three of these four receptors result in similar noise increases for all of the Walker Road Alternatives.  (AR-80 at 15.)

106. Alternative D Modified would result in similar imperceptible noise increases to the same four receptors as Alternative C.  (AR-80 at 15.)

107. The design year No Build alternative results in changes at the following receptors due to increased traffic in the design year 2016:  R-3 is 73.3 dBA; R-31 is 68.9 dBA; R-32 is 71.9 dBA; R-33 is 67.7 dBA; and R-5 at 68.9 dBA.  (AR-80 at 15.)

108. Alternative D Modified results in imperceptible noise increases to the following receptors:  R-3 is 74.3 dBA; R-31 is 69.3 dBA; R-32 is 71.5 dBA; and R-5 is 68.0 dBA.  (AR-80 at 15.)

109. When comparing the No Build and Alternative D Modified, D Modified only results in an increase of 1.0 dBA to R-3, an increase of 0.4 dBA to R-31, decrease of 0.4 dBA to R-32, decrease of 0.4 to R-32, and decrease of 0.9 dBA to R-5. (AR-80 at 15.)

110. Compared to the No Build, Alternative D Modified does not result in significant noise impacts.  (AR-80 at 15.)

20

111. Based on the above comparison of impacts, Alternative D Modified does not result in any significant impacts not considered in the FEIS for the other Walker Road Alternatives.

112. The DEIS and FEIS for the project identified the impacts to farmlands as a result of the Walker Road and Kriner Road alternatives.  (AR-46 at III-56-61; AR-46 at IV-61-67.)

113. As discussed in detail above, in the 1999 re-evaluation, Alternative D Modified's farmland impacts are comparable to the other Walker Road alternatives that were discussed in the FEIS.  (AR-80 at 22; AR-83 at 3.)

114. In June, 2001, defendants conducted a re-evaluation to ensure that there was no new information based on final design activities regarding project impacts to social, environmental, and cultural resources that would warrant the preparation of an SEIS.  (AR-83.)

115. The 2001 re-evaluation considered the additional studies conducted to verify the results of studies conducted prior to the ROD (e.g., traffic projections, existing and proposed developments, land use regulations, and agricultural impacts).  (AR-83 at 1.)

116. The 2001 re-evaluation concluded:

> The nature of the I-81 Interchange Project has not changed since the adoption of the ROD. . . .  As presented in this Re-evaluation, it has been determined that based on updated information about the surrounding environment, final design of Alternative D-Modified, and associated environmental impacts; there are no significant additional adverse impacts as a result of the Selected Alternative as compared

21

to the information presented in the ROD.  Accordingly, a supplemental EIS is not warranted.

(AR-83 at 10.)

117. In the 2001 re-evaluation, the only changes found to Alternative D Modified were to residential displacements and indirect impacts to agricultural land; however, these impacts were insignificant.  (AR-83 at 3.)

118. In the 2001 re-evaluation, the one residential impact was eliminated, so Alternative D Modified resulted in no displacements.  (AR-83 at 3-4.)

119. In the 2001 re-evaluation for Alternative D Modified, the indirect impacts to farmlands increased slightly from 1.8 acres to 4.1 acres because one of the farm operators felt that a 2.2 acre remnant parcel would be impractical to farm.  (AR-83 at 4.)

120. In the 2001 re-evaluation, the number of farmed parcels affected by Alternative D-Modified was unchanged and the number of parcels bisected remains the same.  (AR-83 at 4.)

121. In the 2001 re-evaluation, Alternative D Modified resulted in taking 1.8 acres from an Agricultural Security Area (ASA) because a portion of one of the parcels was enrolled in the Guilford Township ASA.  (AR-83 at 3, 4.)

122. This 1.8 acre ASA impact was considered in the ROD as a direct impact to productive agricultural land.  (AR-83 at 4.)

123. The FEIS assumed that the Chambers 5 development would have 1,320,000 square feet of manufacturing and distribution

space, generating 15,700 trips per day.  (AR-46 at App. B, page 2 of Development Table; AR 83 at 8.)

124. In 2000, updated development data was collected, which showed that Chambers 5 was built out except for one or two smaller lots.  (AR-83 at 8.)

125. Since 1995, a Toys R Us distribution center had been constructed.  (AR-132 at 391.)

126. As stated in the 2001 re-evaluation, the present (2000) uses that exist in Chambers 5 actually generate traffic at a lower intensity than originally projected.  (AR-83 at 8.)

127. This conclusion was reached through traffic counts taken in 2000 along Wayne Avenue just west of I-81 (between Stouffer Avenue and I-81).  (AR-83 at 8.)

128. When comparing the projected and actual average daily traffic (ADT) for the same area, the projected 1995-2016 growth rate was 80% or 2.8% per year while the actual 1995-2000 growth rate (based on traffic counts) was only 2% or 0.4% per year. (AR-83 at 8.)

129. "This lower growth in traffic in the Wayne Avenue/Kriner Road area relates to the type of development that has been occurring in Chambers 5 Industrial Park and the smaller development areas surrounding it."  (AR-83 at 8.)

130. Defendants actually overestimated the trips generated by Chambers 5 in the FEIS as compared to the 2000 traffic studies.  (AR-83 at 8.)

131. Therefore, the conclusions in the FEIS (1) - Wayne Avenue does not have congestion problems, and (2) - the Kriner Road alternative, which would relieve traffic on Wayne Avenue, does not best satisfy the project needs) are unchanged.

**v.   Good faith objectivity**

132. Although plaintiffs make numerous allegations regarding PennDOT officials, they have failed to raise any allegations regarding FHWA.

133. The letters quoted by plaintiffs in making its pre-determination argument are by state officials, not the federal decision maker.  (AR-79 at 80, 108-11; AR-103 at 356.)

134. The letters quoted by plaintiffs were included in comments on the FEIS for FHWA to review.  (AR-78 at 80, 108-11; AR-103 at 356.)

135. The present appeal is from FHWA's decision to approve the I-81 interchange at Walker Road, not of decisions made by non-federal entities.  (AR-78 at 80.)

136. Although FHWA considers the position and interest of the product owner (PennDOT in this case) and of congressional officials, numerous other relevant factors are also considered. (AR-78 at 80.)

137. FHWA participated in the development of the DEIS and FEIS for the project which evaluated in detail several alternatives at Walker Road and Kriner Road.  (AR-12 at signature page; AR-46 at signature page.)

24

138. In 1992, at the time the letters were exchanged between former Pennsylvania Secretary Yerusalum and former Congressman Shuster, the preliminary alternatives report was prepared and distributed, which identified Walker and Kriner Roads as two potential locations for the new interchange.  (AR 101 at 2000.)

139. Yerusalim's letter also stated:  "It is our [PennDOT's] intention to satisfy the environmental requirements".  (AR-101 at 2048.)

140. The selection of the Walker Road and Kriner Road locations were based on environmental and engineering studies. (AR-101 at 3.)

141. The DEIS and FEIS evaluated in detail several alternatives at the Walker Road and Kriner Road locations and identified Alternative D-C as the preferred alternative.  (AR-12 at II-1-25; AR-46 at II-1-20.)

142. The DEIS and FEIS evaluated in detail the impacts of the project on the following:  socioeconomic and land use, visual resources, utilities, energy, cultural resources, air quality, noise, vibration, surface water and aquatic biota, flood plains, wetlands, vegetation and wildlife, threatened and endangered species, groundwater, soils and geology, hazardous waste, farmlands, traffic and transportation.  (AR-12 at IV-1-62; AR-46 at IV-1-89.)

143. The impacts evaluated included secondary and cumulative impacts.  (AR-46 at V-1-21.)

144. None of the alternatives would result in any impacts to wetlands, surface water, floodplains, hazardous waste sites, and threatened or endangered species and air quality receptors were well below National Ambient Air Quality Standards.  (AR-80 at 22 (Table 3); AR-83 at 3.)

145. The Walker Road alternatives would result in one residential displacement (none for Alternative D Modified), one well displaced (none for Alternative D Modified), limited potential for secondary development but development restrictions were put in place as mitigation, direct take of productive agricultural lands ranging from 8.0 acres to 18.6 acres, indirect take of productive agricultural lands ranging from 0 acres to 10.6 acres, no anticipated permanent impacts to utilities, three to four noise receptors would result in an imperceptible increase, and all the Walker Road alternatives except Alternative D Modified would impact one historic resource (also a Section 4(f) resource).  (AR-80 at 15, 22 (Table 3); AR 83 at 3.)

146. The Kriner Road alternatives would result in potential for secondary development, direct take of productive agricultural lands ranging from 12.7 acres to 14.2 acres, indirect take of productive agricultural lands ranging from 2.9 acres to 8.5 acres, utility relocation of a high pressure gas

line and water main, four noise receptors would continue to exceed criteria for noise abatement, no residential or well displacements, and one alternative impacting four historic resources (Section 4(f) resources) and one alternative avoiding historic resources. (AR-80 at 15, 22 (Table 3).)

147. Plaintiffs' Amended Complaint does not question the quantification of these impacts or the methods used to quantify these impacts, except for their allegations that two historic resources would be adversely affected (not taken) under Section 106 of the NHPA (which is discussed in detail in the next section).

148. The only impacts caused by the project alternatives are residential displacements, farmlands, and historic resources. (AR-80 at 15, 22 (Table 3); AR 83 at 3.)

149. In balancing these potential impacts, Alternative D Modified compared to the Kriner Road alternatives causes the least impacts. (AR-80 at 15, 22 (Table 3); AR 83 at 3.)

150. The Kriner Road alternatives and Alternative D Modified each have no displacements and 4 noise receptors continue to exceed criteria for consideration noise abatement. (AR-80 at 15, 22 (Table 3); AR-83 at 3.)

151. Alternative D Modified impacts a total of 16.2 acres of productive agricultural land and no historic resources compared to the Alternative B which impacts 17.1 acres of productive agricultural land and 4 historic resources and

Alternative B-1 which impacts 21.2 acres of productive
agricultural land and no historic resources.  (AR-80 at 15, 22
(Table 3); AR-83 at 3.)

152. The Walker Road alternatives better satisfy the
project needs of relieving congestion on an existing
interchange.

153. The Kriner Road Alternatives would relieve congestion
on the Wayne Avenue (Route 316)/I-81 Interchange, which is not
congested.  (AR-82 at 6.)

154. The Walker Road Alternatives would relieve congestion
on the Route 30/I-81 Interchange, which does experience
congestion.  (AR-82 at 6.)

155. The ROD was issued on March 25, 1999 - approximately 7
years after the Yerusalum letters.

156. The pre-determination issue was raised throughout the
NEPA process for the project and said correspondence are
included in the administrative record for the project.  (AR-78
at 80; AR-103 at 355; AR-82 at 12; AR-101 at 2099-2100; AR-103
at 274-75.)

157. Indeed, the administrative record reflects that FHWA
considered and addressed the allegations of pre-determination on
numerous occasions.  (AR-78 at 80; AR-103 at 355; AR-82 at 12;
AR-101 at 2099-2100; AR-103 at 274-75.)

158. The Inspector General's Office, an independent arm of
the U.S. Department of Transportation, investigated the

complaints of predetermination and found nothing improper.  (AR-103 at 355.)

## B. Compliance with Section 106 of the National Historic Preservation Act

159. The EIS and 1999 re-evaluation summarized the identification of historic resources and the effects that alternatives would have on the historic resources.  (AR-46 at IV-6-23.)

160. Defendants prepared an Historic Structures Inventory, a Determination of Eligibility Report, and a Rural Historic Landscape Assessment, which identified the APE for the project and the historic resources located in the project's APE.  (AR-7; AR-50; AR-62; AR-84.)

161. These eligibility documents were submitted to PHMC for review and concurrence.  (AR-91 at 195-97, 201-02; AR-92 at 338-39.)

162. PHMC is the State Historic Preservation Officer (SHPO) for Pennsylvania.  (AR-91 at 201; AR-92 at 338.)

163. Numerous meetings and correspondence between PHMC, PennDOT, and FHWA occurred which resulted in the identification of historic resources and their boundaries in the APE for the project.  (AR-46, App. C; AR-82, Attach. C; AR-80.)

164. FHWA also requested a determination of eligibility from the Secretary of the Department of Interior (the Keeper of the National Register) for the historic structures evaluated. (AR-82, Attach. C; AR-80, App. B.)

165. The Secretary of the Department of Interior maintains the National Register of Historic Places through the Keeper of the National Register under the Section 101(a)(1)(A) of the NHPA.

166. In 1994 and 1995, FHWA prepared a Criteria of Effects Report and addenda on the recommended effect of the project (Alternative D-C) on the eligible historic resources. (AR-9; AR-16; AR-57.)

167. FHWA found that Alternative D-C (the DEIS and FEIS preferred alternative) would have a "no adverse effect" as a result of the project. (AR-16 at 75-76)

168. The 1994 and 1995 Criteria of Effects Report and addenda were submitted to PHMC, ACHP, and the consulting parties (the Municipal Coordination Committee) for review and concurrence. (AR-92 at 100, 344-45; AR-97 at 861-64.)

169. PHMC and ACHP did not concur with FHWA's "no adverse effect" determinations. (AR-80 at 11; AR-96 at 603-04.)

170. PHMC and ACHP commented that Alternative D-C would have an adverse effect on the Eastern Greene Township Rural Historic District due to the potential for secondary development. (AR-80 at 11; AR-96 at 603-04.)

171. FHWA continued to disagree with PHMC's and ACHP's effect opinions for Alternatives D-C, but accepted the opinions and prepared a MOA for the project that included measures to

30

minimize purported impacts to the historic district.  (AR-57 at 21-22; AR-80 at 11; AR-99 at 1559-64.)

172. Defendants' studies showed that development and traffic would occur without the construction of the interchange at Walker Road, and therefore, the project was not the cause of noise impacts or secondary development.  (AR-46 at IV-77-80; AR-80 at 20-21; AR-46, App B at 92; AR-82 at 12; AR-70 at 9-10.)

173. After the FEIS was circulated, Alternative D was modified to avoid the permanent acquisition of lands from historic resources in the study area.  (AR-80 at 11.)

174. In 1998, FHWA prepared an Addendum to the Criteria of Effects Report for Alternative D Modified.  (AR-70.)

175. This Addendum (AR-70) was submitted to the PHMC and the ACHP for review and concurrence.  (AR-105 at 160-69.)

176. FHWA determined that Alternative D Modified would have "no adverse effect" to the Eastern Greene Township Rural Historic District, the unnamed historic district, and the Christian Fry Jr. House.  (AR-70 at 7-8, 10.)

177. PHMC and ACHP opined that Alternative D Modified would have an "adverse effect" on these resources due to the potential for secondary development.  (AR-107 at 591, 731-32; AR-110 at 186.)

178. FHWA continued to disagree with PHMC's and ACHP's effect opinion for Alternative D Modified, but accepted these opinions for the purpose of moving the project forward and

prepared a MOA for the project to document measures to minimize the purported impacts.  (AR-80 at 12; AR-107 at 659-60.)

179. As evidenced by the administrative record, this project has had an abundance of coordination with PHMC and ACHP. (AR-82, Attach. C.)

180. PHMC and ACHP are very familiar with this project and the issues raised by plaintiffs.  (AR-82, Attach. C; AR-94 at 233-34.)

181. Defendants coordinated with PHMC and ACHP in assessing the effects of the project on these historic properties.  (AR-97 at 861-64; AR-96 at 603-04; AR-105 at 160-69; AR-107 at 731-32.)

182. The Determination of Eligibility, the Criteria of Effects Report, its addenda, and the MOA were submitted to PHMC and ACHP for review.  (AR-97 at 861-63, 853-60; AR-105 at 160-69; AR-109 at 1460, 1581, 1632.)

183. FHWA received comments on the draft MOA from PHMC and the ACHP and revisions were made to the MOA.  (AR-98 at 1144-45; 1167-73; AR-97 at 853-60, 993; AR-99 at 1559, 1572-74; AR-107 at 589-92, 659-62; AR-109 at 1427, 1581, 1632.)

184. On January 23, 1995, defendants, PHMC, ACHP and the municipalities met to discuss Section 106 issues.  (AR-82, Attach. C at 5; AR-94 at 225-34.)

185. PHMC actually conducted a field view of the project area.  (AR-92 at 33.)

186. During the Section 106 process, PHMC and ACHP also received comments from the public regarding the alleged potential impacts to the Gass House and the Franklin County Poor House.  (AR-106 at 419-20, 426, 431-32; AR-107 at 664, 670; AR-109 at 1457, 1478, 1488-89, 1509-12, 1542-43, 1548-50, 1553-55, 1562-64; AR-110 at 1,2, 15-20, 132-36, 144, 151-52.)

187. For example, the comments on the MOA and Addendum to the Criteria of Effects Report from Greene Township a consulting party to the Section 106 process were provided to PHMC and ACHP. (AR-106 at 404-06, 419-32.)

188. These comments included challenges to the area of potential effect and allegations that the Addendum should have considered adverse effects to other resources such as the Gass House.  (AR-106 at 426, 431-32; AR-109 at 1478, 1488-89.)

189. As the record indicates, PHMC and the ACHP received copies of the following correspondence regarding impacts to the Gass House and Franklin County Poor House:  May 2, 1994 letter from Franklin County Heritage, Inc. (AR-109 at 1542-43); June 14, 1994 letter from Kittochtinny Historical Society (AR-109 at 1548-50); July 6, 1998 letter from Manko, Gold & Katcher on behalf of Green Township (AR-106 at 419-20, 426, 431-32); September 8, 1998 letter from Kittochtinny Historical Society sent only to PHMC (AR-109 at 1553-55); September 8, 1998 letter from Manko, Gold & Katcher on behalf of Greene Township (AR-107 at 664, 670); September 22, 1998 letter from Kittochtinny

33

Historical Society (AR-109 at 1562-64); October 18, 1998 letter
from Greene/Guilford Environmental Association Inc. (AR-109 at
1509-12); November 23, 1998 letter from Manko, Gold & Katcher
(on behalf of Greene Township) (AR-109 at 1478, 1488-89);
January 7, 1999 letter from Greene Township (AR-110 at 1, 2);
January 13, 1999 letter from Greene/Guilford Environmental
Association, Inc.  (AR-110 at 15-20); February 24, 1999 letter
from Manko, Gold & Katcher (on behalf of Greene Township) (AR-
110 at 132-36, 144); March 2, 1999 letter from Greene/Guilford
Environmental Association, Inc. (AR-110 at 151-52).

190. Defendants received the above comments on the Gass
House and Franklin Community Poor House and provided a detailed
response to PHMC and ACHP prior to PHMC's and ACHP's signing of
the MOA.  (AR-109 at 1507-08; AR-110 at 9-11.)

191. PHMC asked defendants to address concerns expressed by
the public regarding the Gass House and Franklin County Poor
House.  (AR-109 at 1457.)

192. FHWA addressed these concerns regarding the Gass House
and Franklin County Poor House by sending a letter to the
Greene/Guilford Environmental Association and copying PHMC and
ACHP with the response.  (AR-109 at 1507-08.)

193. In addition, defendants sent a letter to PHMC and
copied ACHP addressing the allegations of potential effects to
the Gass House and Franklin County Poor House on January 8,
1999.  (AR-110 at 9-11.)

194. PHMC signed the MOA on December 17, 1998.  (AR-110 at 223.)

195. PHMC and ACHP, the agencies with expertise in matter involving historic resources, agreed that the areas of potential effects were properly identified and the identification of historic resources and the adverse effects of the project were complete by signing the MOA.  (AR-110 at 52, 186-92, 223.)

196. The PHMC's letter transmitting the signed MOA stated:

> The Bureau of Historic Preservation (the State Historic Preservation Office) has reviewed the above named project in accordance with Section 106 of the National Historic Preservation Act . . . .  These requirements include the consideration of the project's potential effect upon both historic and archaeological resources.

(AR-110 at 52.)

197. ACHP signed the MOA on March 23, 1999 and stated that the "Alternative D Modified . . . will best serve to minimize effects to historic properties in keeping with applicable laws and regulations."  (AR-110 at 186-92.)

198. By signing the MOA, PHMC and ACHP accepted the APE and minimization measures provided for the purported adverse effects caused by the project.  (AR-110 at 52, 186-92, 223.)

199. Regardless of PHMC's and ACHP's acceptance of FHWA's response to comments and the MOA for this project, this project clearly has no adverse effect on the Gass House, Franklin County Poor House or any other potentially eligible resource along Franklin Farm Lane.

200. Both the Gass House and the Franklin County Poor House (also referred to jointly as the Union Plantation) are located along Franklin Farm Lane near its intersection with Route 30. (AR-109 at 1558; AR-110 at 10; AR-137 at 115-19.)

201. The Gass House and Franklin County Poor House are eligible for listing on the National Register based on their architecture – as examples of Scotch-Irish farm house architecture.  (AR-137 at 117.)

202. As indicated by the National Register of Historic Places Nomination Form,  the Gass House and Franklin County Poor House have already been altered.  (AR-137 at 116.)

203. The Gass House and Franklin County Poor House are presently being used as offices for Franklin County.

204. Other modern office buildings and a nursing home surround these historic properties.  (AR-46 at III-26.)

205. As documented in the FEIS and confirmed in the additional traffic analysis for the project, impacts along Franklin Farm Lane due to increased traffic, noise, and development as a result of this project are non-existent or insignificant.  (AR-46, App. B at 66, 92-96; AR-110 at 10, 32; AR-72 at 35.)

206. The traffic analysis found that traffic volumes on Franklin Farm Lane will continue to increase without the proposed interchange.  (AR-78 at 87; AR-110 at 32, 194.)

207. Traffic on Franklin Farm Lane is projected to be the same under the No-Build scenario (2,300 vehicles per day) as with any of the combinations of improvements described in the FEIS (Walker Road Interchange, Norland Avenue Extension, and Route 30 improvements). (AR-78 at 87.)

208. This increase is due to traffic diverting from U.S. 30 and present and planned development in Guilford and Greene Township. (AR-110 at 194.)

209. The volume of traffic using Franklin Farm Lane is anticipated to increase by 450 to 2,300 vehicles per day by year 2016 with or without the Walker Road interchange. (AR-110 at 194; AR-46 App. B at 66, 92; AR-72 at 35.)

210. Future noise levels are predicted using the projected traffic volume for 2016 (the design year); therefore, noise is directly related to traffic volumes. (AR-46 at IV-33.)

211. For the year 2016, there will be an increase in noise along Franklin Farm Lane; however, as with the increase in traffic volumes, the increase in noise will occur with or without the proposed interchange. (AR-46 at III-26, IV-40; AR-80 at 15.)

212. The FEIS and 1999 re-evaluation included results of noise monitoring for the Walker Road alternatives at receptor R-4 that is located on Franklin Farm Lane near the nursing home, which is located adjacent to the Gass House and Franklin County Poor House. (AR-46 at III-26, IV-40; AR-80 at 15.)

213. Comparing the No Build alternative to Alternative D Modified, noise levels increase from 55.4 dBA to 55.8 dBA at receptor R-4.  (AR-80 at 15.)

214. Noise levels of 66 dBA approach noise abatement criteria.  (AR-46 at IV-31.)

215. These 2016 noise levels at R-4 are well below the noise abatement criteria.  (AR-46 at IV-31; AR-80 at 15.)

216. Moreover, the increase of noise is only 0.4 dBA as a result of the project.  (AR-80 at 15.)

217. Since the human ear cannot detect a change in noise levels of less than 3 dBA, this slight increase will be imperceptible.  (AR-46 at IV-46; AR-80 at 15.)

218. The area surrounding these historic resources is already developed.  (AR-46 at III-26.)

219. Therefore, the only impact that secondary development would have on the Gass House and Franklin County Poor House would be with regard to traffic.

220. Future development was considered in calculating the 2016 projected traffic.  (AR-46 at IV-69-74.)

221. These traffic, noise, and secondary development studies confirm defendants' delineation of the Section 106 APE for the project.   (AR-46 at III-26, IV-40; AR-80 at 15; AR-110 at 194; AR-46 App. B at 66, 92; AR-72 at 35.)

Respectfully submitted,

MARTIN C. CARLSON
United States Attorney

*Anne K. Fiorenza*

ANNE K. FIORENZA
Assistant United States Attorney
Federal Building – 2nd Floor
228 Walnut Street
P.O. Box 11754
Harrisburg, PA   17108-1754

*Kenda Jo M. Gardner*

KENDA JO M. GARDNER
Assistant Counsel
JOHN M. HRUBOVCAK
Assistant Counsel-in-Charge
ROBERT J. SHEA
Assistant Chief Counsel
ANDREW S. GORDON
Chief Counsel
Pennsylvania Department of
  Transportation
Office of Chief Counsel
P.O. Box 8212
Harrisburg, PA   17105

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of Chief Counsel of the Department of Transportation, Commonwealth of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

On this 7 day of June, 2002, she served a copy of the foregoing documents by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by deposition said envelope and contents in the United States Mail at Harrisburg, Pennsylvania to:

Thomas Alan Linzey, Esquire
Community Environmental Legal Defense Fund
2859 Scotland Road
Chambersburg, PA  17201

KENDA JO M. GARDNER
Assistant Counsel
Office of Chief Counsel
Pennsylvania Department of
   Transportation
Commonwealth of Pennsylvania
P.O. Box 8212
Harrisburg, PA  17105-8212
(717) 787-5299
Fax: (717) 772-2741