# ORIGINAL

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREENE/GUILFORD ENVIRONMENTAL : 
ASSOCIATION, a non-profit corporation :
incorporated under the laws of the :
Commonwealth of Pennsylvania, CITIZENS :
FOR PLANNED COMMUNITY GROWTH, :
an unincorporated association organized under : CIVIL NO. 1:CV-01-0910
the laws of the Commonwealth of Pennsylvania, : (Judge Rambo)
PAUL B. AMBROSE, JOHN G. ENDERS, :
CHARLES F. RAHAUSER, BETSY :
RAHAUSER, DOUGLAS A. WARNOCK, :
U.X. VAGNERINI, THOMAS W. BUNDY, :
STEPHEN P. BUCHER, ROGER J. :
ROBERTSON, JAMES A. STRITE, JR., :
and DAVID A. GUTHRIE, :
               Plaintiffs, :

        v. :

KEN WYKLE, Administrator, Federal :
Highway Administration, ROBERT GATZ, :
Federal Highway Administration, :
               Defendants, :

        And :

BRADLEY L. MALLORY, Secretary for :
The Department of Transportation, :
Commonwealth of Pennsylvania, :
               Intervenor. :

**FILED**
HARRISBURG, PA

JUL 2 5 2002

MARY E. D'ANDREA, CLERK
Per _____
     Deputy Clerk

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

AND NOW, come the Plaintiffs in the above captioned case and submit this separate, short, and concise statement of the undisputed material facts in the above captioned case under the authority of Local Rule 56.1. Due to the existence of the Administrative Record and the nature of this case as an administrative record review case, the Plaintiffs hereby incorporate the Administrative Record into this Statement, and list the following concise and undisputed statement of material facts for this Court's review:

## I. The Interchange Project

1. The proposed interchange which is the subject of this action is a "demonstration" project created by Congress in 1987 through the adoption of Public Law 100-17.

2. Public Law 100-17, also known as the Surface Transportation and Uniform Relocation Assistance Act of 1987 [STURAA] provided that

> The Secretary [of the U.S. Department of Transportation] shall carry out a highway project which demonstrates how construction of an interchange on a north-south interstate route will provide access to Chambersburg, Pennsylvania, and relieve traffic congestion on an existing interchange on such interstate route. Pub. L. No. 100-17, section 149(a)(74), 101 Stat. 132, 192 (April 2, 1987).

3. A Preliminary Alternatives Report ["PAR"] for the project was released by the agencies in May of 1990. (AR-3).

4. A Draft Environmental Impact Statement ["DEIS"], which selected a Walker Road location north of Chambersburg as the "preferred alternative", was released in May of 1994. (AR-12).

5. A Final Environmental Impact Statement ["FEIS"], which selected a Walker Road location for the interchange north of Chambersburg as the "selected alternative", was released in May of 1995. (AR-46).

6.  In November of 1995, Congress overhauled this demonstration project as part of the adoption of the National Highway System Designation Act of 1995. Pub. L. No. 104-59, section 340(c) (November 28, 1995).

7.  As part of that overhaul, Congress released the funding dedicated to the interchange project in the Chambersburg area to be spent on any other project in "the counties of Bedford, Blair, Centre, Franklin, and Huntingdon, Pennsylvania." *Id.*

8.  As part of that overhaul, Congress deleted the title block of the section to remove any references to Chambersburg. *Id.*

9.  On June 4, 1998, the highway agencies unveiled a new interchange project and labeled it "Alternative D-Modified."

10. The new interchange proposal contemplates moving the proposed exit interchange 1,400 feet south of the interchange selected in the FEIS, demolishing the existing Walker Road bridge, building a new overpass bridge, reconstructing and redesigning the local road network feeding the proposed interchange, building a connector road from Chambersburg Borough to the interchange, and feeding interchange traffic directly onto rural and sub-standard Township roads. (AR-80 at Figure "2"; AR-82 at Exhibit "A").

11. The newly designed and relocated interchange increases the overall cost of the construction of the interchange by over 400%. (Compare AR-169 at 52 and the Norland Avenue Extension with AR-46 at II-17).

12. "Alternative D-Modified" was not identified or examined within the Draft or Final Environmental Impact Statements because it was developed three years after the release of the FEIS.

13. In January of 1999, the agencies released a "Re-evaluation of the Final Environmental Impact Statement", which purported to conclude that a Supplemental Environmental Impact Statement ["SEIS"], to examine "Alternative D-Modified", was unnecessary. (AR-80).

14. The "Re-evaluation of the Final Environmental Impact Statement" was not approved via signature by either the state or federal agency. (AR-80)

15. On March 15, 1999, the Record of Decision ["ROD"] for the project was approved and signed by the agencies. (AR-82).

16. On June 28, 2001, the agencies released a "Re-evaluation" of the ROD for the interchange project, even though a "Re-evaluation" of an ROD is not recognized by any statutory or regulatory authority. (AR-83).

**II. The Agencies' Efforts to Find a Need for the Project**

17. The agencies' Preliminary Alternatives Report ["PAR"], prepared in May of 1990, identifies the project need as Public Law 100-17. (AR-3 at 7).

18. Several consulting agencies questioned the ability of the project Alternatives developed in the PAR to meet the project need. (AR-88 at 26, 33-37, 44-49, 92-93).

19. In a letter dated July 3, 1990, the Pennsylvania Fish Commission declared that "it appears the I-81 interchange proposal was politically conceived for some unseen reason. The Department is trying to incorporate a project that does not belong and has no meaning." (AR-88 at 41).

20. In September of 1991, the state highway agency admitted that it was using two separate consulting firms in an effort to identify a need for the project. (AR-89 at 6).

21. At a meeting held on April 16, 1992, the state agency declared that the problems with the build alternatives "include the inability to divert sufficient traffic from a major east-west route (such as U.S. Route 30) and the placing of any diverted traffic on a rural road network incapable of handling more traffic." (AR-90 at 5).

22. At a meeting held on April 27, 1992, PennDOT's District Engineer for the district in which the interchange is proposed, admitted that that the agency was "unable to develop a project need" and that the agency was considering whether to suspend the project, place the project on hold or "expand" the study area with the hope of identifying a project need. (AR-90 at 11).

**III. Intervention by Then U.S.-Representative Bud Shuster**

23. On April 14, 1992, then-U.S. Representative Bud Shuster wrote to Howard Yerusalim, then-Secretary of PennDOT, that "[a]n exit at Walker Road with direct connections to Walker Road will provide increased access to the areas north of Route 30, relieve congestion at the other exits, and attract development. . . Your decision to build this exit at Walker Road will provide the necessary link to connect the planned development site and the Interstate." (AR-90 at 3).

24. Then-U.S. Representative Bud Shuster served as the ranking Republican member of the powerful Transportation and Infrastructure Committee of the U.S. House of Representatives.

25. In January of 1995, then-U.S. Representative Bud Shuster ascended to the Chairmanship of that Committee.

26. In his July 6, 1992 response to Shuster's letter, Howard Yerusalim declared that PennDOT was committed to building Exit 7 "at or near Walker Road to service and promote economic development." (AR-90 at 20).

27. In a July 14, 1992 letter to Shuster from Yerusalim, Yerusalim declared that PennDOT was "restructuring the project scope by focusing on the objective to provide access to developing land adjacent to Walker Road." (AR-90 at 25).

28. Yerusalim's letters were copied to seven high-ranking PennDOT officials holding a variety of positions within PennDOT. Those officials exercised direct managerial control over various aspects of the planning and design process for the interchange project.

29. Economic development was not a project need identified by Public Law 100-17.


**IV. The Agencies' Predetermination of the Location of the Interchange at Walker Road North of Chambersburg**

30. In 1987, the agencies initiated their scope of study by stating that the interchange inferred by Public Law 100-17 as the "existing interchange" was the I-81/Route 30 Interchange. (AR-86 at 7).

31. In that scope of study, the agencies posited that an interchange north of Chambersburg would "serve a future land developer." (AR-86 at 8).

32. PennDOT's Official Twelve Year Highway and Bridge Program listings, prepared from 1987 to 1994, refer to an interchange "north" of Chambersburg and north of the existing I-81/Route 30 interchange. (AR-169 at 66, 67, 69; AR-169 at 56, 58, 60 and 64).

33. On January 26, 1988, PennDOT advertised in the Pennsylvania Bulletin to solicit an engineering firm to conduct a Design Location and Environmental Study for the interchange. (AR-161 at 63).

34. In that advertisement, the agency declared that the objective of the study was to develop an interchange that relieves present traffic congestion at "Exit 6 and on U.S. 30." (AR-161 at 63).

35. In the Federal Aid Project Agreement entered into between PennDOT and FHWA on January 11, 1989, the agencies pledged to coordinate to develop an "Exit 7" north of Chambersburg. (AR-167 at 2299).

36. On October 31, 1988, PennDOT entered into a Contract for the preparation of a Design Location Study and an Environmental Impact Statement. (AR-163 at 1022).

37. In the Scope of Work prepared for that Contract, PennDOT declared that a consultant would compare alternatives on the basis of their "ability to relieve traffic congestion at Interchange 6," identified as the main goal of the project. (AR-163 at 1027).

38. Public Law 100-17 did not mention Interchange #6 or Route 30 as the focus of the legislation's efforts to alleviate congestion.

39. In the Scope of Work prepared for the Contract to develop an Environmental Impact Statement, PennDOT declared that the purpose of the project was to build an interchange in a desirable location to "divert traffic from Exit 6." (AR-163 at 1038).

40. On September 21, 1990, PennDOT staff met with the Chairman of the Chambersburg Area Chamber of Commerce and Ann Eppard, chief of staff for then-U.S. Representative Bud Shuster. (AR-88 at 24).

41. The purpose of that meeting was for PennDOT to begin working with the Chamber of Commerce to develop a strategy to consolidate support for an exit at the Walker Road location. (AR-88 at 24).

42. Prior to 1990, the agencies prepared an "Exit 7 Coloring Book" for Franklin County children, which promoted an "Exit 7" north of Chambersburg in the Walker Road area. (AR-112 at 58-69).

43. In 1992, due to intense public, agency, and local governmental opposition to the interchange, PennDOT hired Winsor Associates to host a series of meetings among those entities. (AR-90 at 69, 83).

44. Eleanor Winsor, the author of several reports summarizing the meetings, stated that "there appears to be another agenda which is driving the project. . . the long term development goals of the property owners in the north end of Chambersburg suggests that the development plans may be the 'hidden agenda.'" (AR-90 at 83).

45. Beginning on February 1, 1994, PennDOT prepared regular Transportation Briefing Papers for then-U.S. Representative Bud Shuster. Those Briefing Papers declared that the interchange project was focused on relieving "congestion at the existing U.S. 30 interchange." (AR-169 at 111, 113, 115, 117, 119, 123, 125, and 128).

46. Eight of those Briefing Papers were issued prior to the release of the Final Environmental Impact Statement (FEIS).

47. In June of 1994, the agencies accelerated the schedule for the interchange and initiated "pre-final" design on a Walker Road interchange, a year before the release of the FEIS which chose a "Selected Alternative", and almost five years before the Record of Decision (ROD) was issued. (AR-162 at 651, 550; AR-103 at 369).

48. Work Orders prepared in 1995 and 1996 state that the purpose of those Orders was to continue pre-final design activities for the I-81 interchange and that the interchange would connect I-81 with Walker Road. (AR-165 at 1664; AR-165 at 1707; AR-165 at 1681).

49. "Pre-Final Design" activities are not mentioned in PennDOT's own *Transportation Development Process Handbooks*, and are not recognized by any statutory or regulatory authorities.

50. "Pre-Final Design" activities are not recognized by PennDOT's *Environmental Impact Statement Handbook*, which does not include "pre-final" design in the master flow chart used to delineate the project development process. (AR-172 at 149).

51. The agencies decided not to ask for concurrence on the DEIS from agencies comprising the Agency Coordination Meeting (ACM). (AR-91 at 167).

52. The minutes of that ACM meeting state that PennDOT promised the agencies that a preferred alternative would not be included in the DEIS. (AR-91 at 185).

53. PennDOT announced that an interchange at the Walker Road location was the "preferred alternative" in the DEIS. (AR-91 at 185).

54. Following the release of the DEIS, the Gabler land developers requested a re-zoning of two hundred and forty (240) acres of farmland to accelerate development of the land for highway and commercial purposes. (AR-132 at 473).

55. In May of 1994, FHWA staff told a Franklin County resident that the construction of a Walker Road interchange would solely benefit local land developers, and that the FHWA would not be in favor of traffic using a weight restricted Township road to access the interchange. (AR-45 at Section VII-1).

56. In December of 1994, the agencies appointed a "ramrod" for the construction of an interchange in the Walker Road area, as a response to Congressman Shuster's desire that the project advance quickly. (AR-113 at 200; AR-113 at 202; AR-93 at 787).

57. In an internal communication within FHWA, Manuel Marks (Division Administrator) stated that "the study and coordination process has suffered from the accelerated finalization of the DEIS. . . We have serious reservations concerning what is apparently a proposal to accelerate the FEIS and design schedule." (AR-93 at 532).

58. In an internal communication within FHWA, staff wrote that Marks expected to authorize final design on a Walker Road interchange on December 28, 1994 – a year prior to the issuance of the FEIS, and five years prior to the issuance of the ROD. (AR-113 at 200).

59. In January of 1995, four months before the issuance of the FEIS, PennDOT submitted a *Justification for a New Interchange* to FHWA for approval of the project. (AR-22).

60. The *Justification* stated that the interchange would be located north of Chambersburg. (AR-22 at 28).

61. The *Justification* recognized that the distance between a Walker Road interchange and existing Exit 6 did not meet the two mile interchange spacing required by the American Association of State Highway and Transportation Officials (AASHTO). (AR-79 at 6).

62. The AASHTO industry standards, incorporated by reference by the FHWA at 23 CFR section 625.4, are recognized as a standard for design of all projects on the Interstate system. Fed. Reg. Vol. 55, No. 204 at 42671 (October 22, 1990).

63. The proposed interchange within the *Justification* – Alternative D-C – was closer to the existing Route 30 interchange than is permissible under the AASHTO standards. (AR-79 at 6).

64. "Alternative D-Modified", the current interchange project, would be 1,400 feet closer to Exit 6 than Alternative D-C, placing its ramps slightly more than a half-mile north of the existing I-81/Route 30 (Exit 6) interchange.

65. In January of 1995, in an internal communication, the FHWA recognized that PennDOT had received additional political pressure to accelerate the schedule for the construction of a Walker Road interchange. (AR-113 at 186).

66. In another internal communication within FHWA, agency staff declared that Shuster was pushing for construction of the interchange by "cutting our already accelerated process by a couple of months." Agency staff then declared that there are "a lot of things out of our control." (AR-113 at 192).

67. On May 1, 1995 – over a month prior to the release of the FEIS – Intervenor Mallory pledged to State Senator Barry Stout that the interchange would be located at the Walker Road overpass one mile north of the U.S. Route 30 interchange. (AR-97 at 877).

68. FHWA staff, in an internal communication sent five months prior to the release of the FEIS, declared that the decision to authorize the final design of the Walker Road interchange was made in a meeting between then-Representative Shuster and the Washington Office of FHWA. (AR-113 at 198).

69. In that internal communication, agency staff declared that "[w]e'll do what we can to comply with the various regulations but I'm told it's a done deal. The FHWA

Washington Office has committed the agency to the following schedule. . . ."(AR-113 at 198).

70. On January 18, 1995, an internal FHWA communication confirmed that Jane Garvey (Acting Administrator of FHWA) had met with Representative Bud Shuster, who secured a commitment from her that a supplemental draft environmental impact statement would not be prepared. (AR-94 at 208).

71. Garvey's decision to waive the preparation of an SDEIS in January of 1995 was unsupported by any documentation or analysis in the Administrative Record. (AR-96 at 755).

72. On August 3, 1995, the Keeper of the National Register of Historic Places issued a determination that land around a Walker Road interchange qualified as a rural historic district. (AR-99 at 1667).

73. The Keeper's finding would have required the highway agencies to make a finding that no other reasonable alternative existed to the construction of the interchange that would avoid historic resources. 49 U.S.C. section 303; 23 U.S.C. section 138.

74. The highway agencies decided to challenge the determination by the Keeper even though no law or regulation authorized an appeal. (AR-100 at 1731, 1848).

75. The agencies were joined in their appeal by the Gabler developers, who arranged a meeting with U.S. Senator Rick Santorum; the Keeper's superior at the Department of Interior; and members of Santorum's staff. (AR-104 at 3, 33; AR-113 at 93; AR-105 at 47)..

76. FHWA staff pursued the appeal of the Keeper's decision to demonstrate to Representative Shuster that the agencies were taking steps to accelerate the siting of the interchange. (AR-113 at 95).

77. As a result of the political pressure supporting the appeal, the Keeper reversed parts of her original determination. (AR-104 at 3, 33).

78. On May 28, 1996, several Franklin County organizations filed a Complaint with the FHWA's Office of Inspector General, requesting a formal investigation into the agencies' actions.

79. FHWA staff recognized that the issues raised in the Complaint were the same as "those that we may have to litigate in the future." (AR-113 at 81).

80. In their response to the Complaint, the highway agencies declared that the Shuster/Yerusalim letters were "regrettable." (AR-103 at 373).

81. The agencies predetermined the location of an interchange in the Walker Road area prior to the completion of environmental studies and the issuance of the ROD for the project.

## V. Agencies' Refusal to Examine Alternatives After Congressional Amendment of Public Law 100-17

82. In response to the Keeper's determination in August of 1995 that the land around Walker Road was part of a rural historic district (AR-99 at 1667), then-Representative Bud Shuster inserted language into federal highway legislation to allow the monies to be expended for any project in any of five Counties in his District. H.R. 2274 (104th Congress, 1st Session).

83. The language, which became part of the National Highway System Designation Act of 1995, fundamentally altered the scope and nature of the demonstration project. Public Law 104-59, section 304, 109 Stat. 568.

84. Under that overhaul, the title block for the original law was altered to remove any reference to Chambersburg and the text of the section was amended to read that the Secretary "shall carry out. . . projects in the counties of Bedford, Blair, Centre, Franklin, and Huntingdon, Pennsylvania", using the funds previously earmarked for the interchange. *Id.*

85. The FHWA acknowledged the amendment in April of 1996, and stated that PennDOT had "the option of developing the project for which the funds are [now] authorized." (AR-103 at 274).

86. The highway agencies acknowledged the scope of the amendment in a series of Transportation Briefing Papers issued from October 23, 1996 to December 19, 2000. Those briefings declared that the "National Highway System Designation Act of 1995 made these funds available for projects in the counties of Bedford, Blair, Centre, Franklin, and Huntingdon." (AR-169 at 145, 148, 151, 154, 155, 158, 161, 164, 168, 172, 176).

87. The FHWA refused to examine any other highway projects in the designated Counties as Alternatives to the proposed interchange. (AR-106 at 408; AR-82 at 5).

88. PennDOT's Twelve Year Transportation Program lists a multitude of ongoing and planned construction projects in Bedford, Blair, Centre, Franklin, and Huntingdon Counties.

89. The Twelve Year Transportation Program identifies over seventy transportation projects in Blair County alone which could have been supported by the federal monies designated by Public Law 100-17. The Program also identifies a multitude of projects in the Franklin County area. (AR-169 at 52-72).

90. The "Re-evaluation" of the FEIS was issued over three years after the amendment; the Record of Decision for the project was issued five years after the amendment; and the "Re-evaluation of the ROD" was issued over five years after the amendment. (AR-46; AR-80; AR-82; AR-83).

91. The agencies never considered or examined the Alternatives created by the legislative overhaul of Public Law 100-17.

## VI. Agency Segmentation of Local Roads from the Proposed Interchange

92. "Alternative D-Modified" will transform rural, Township roadways into interstate interchange connector roads which will funnel traffic from the I-81 arterial onto other collector roads or rural roads. (AR-79 at 7).

93. Traffic volumes will greatly increase as traffic carried by these roads will no longer be characterized as local, but will have origins and destinations outside of the vicinity of these roads. (AR-105 at 299; AR-79 at 7).

94. Walker Road and Franklin Farm Lane currently function as local roads. (AR-79 at 8).

95. Walker Road and Franklin Farm Lane have deficient lane and shoulder widths, lack turning lanes, and their horizontal and vertical alignments preclude design speeds of 40 miles per hour. (AR-79 at 8; *see* photographs of both roads at AR-79 at 9-14).

96. Walker Road passes through two sharp 90 degree curves in close proximity to each other. (AR-79 at 8).

97. Both of those curves are bordered by historic buildings and land. (AR-79 at 8).

98. The demolition of the existing Walker Road bridge over I-81 will create a ninety degree T-intersection at the junction of Franklin Farm Lane and Walker Road. (AR-79 at 11).

99. Upgrading of that intersection will require a taking of land from the Historic District that surrounds that intersection. (AR-79 at 23; AR-82 at 1; AR-80 at "Figure 2").

100. Under "Alternative D-Modified", all traffic would be forced through that intersection and then immediately through another "20 degree curve along Franklin Farm Lane." (AR-79 at 11).

101. The highway agencies have recognized that Walker Road is characterized by poor vertical and horizontal geometry over most of its alignment, and that the Road is a rural two-lane roadway with typical lane widths of nine to ten feet and shoulders varying in width from one to three feet. (AR-37 at 6).

102. The highway agencies have recognized that Franklin Farm Lane is a two lane roadway with unsignalized intersections at U.S. Route 30 and Walker Road, with lane widths varying between ten and eleven feet, and shoulder widths of only one to two feet. (AR-37 at 7).

103. The highway agencies have recognized that the speed limit on both roadways is 35 miles per hour. (AR-37 at 6, 7).

104. Since the inception of the project, the agencies have recognized that the feeding of interstate traffic directly onto rural Township roads would require upgrading of the

local roads, and that the upgrading would be necessary for the interchange to operate safely. (AR-86 at 8).

105.    Other parties in favor of the construction of the interchange in the Walker Road area conceded in January of 1989 that additional funding must be secured to maintain and upgrade the rural roads surrounding the proposed interchange. (AR-1 at 1).

106.    In the agencies' Preliminary Alternatives Report, issued in May of 1990, the agencies explained that "[t]he proposed [Walker Road] interchange ties into local roads. The geometry and pavement structure of these roads are not adequate to handle future traffic volumes." (AR-3 at 53).

107.    In that Report, the agencies stated that the local road network in the Walker Road area was not suited for heavy traffic volumes and that increased traffic on secondary rural and township roadways would result in additional maintenance and increased maintenance costs. (AR-2 at 41, 63).

108.    The Army Corps of Engineers and other commenting agencies stated that upgrades to the local roads would be a necessary component of an interchange project in the Walker Road area. (AR-88 at 48; AR-12 at Appendix "D").

109.    In those comments, the Pennsylvania Department of Agriculture stated that traffic diverted from I-81 in the Walker Road area would be routed to existing local roads, and that "potential improvements to local roads should be included in the report so that traffic problems are not merely shifted to other locations." (AR-12 at Appendix "D").

110.    President Judge John W. Keller of the Franklin/Fulton County Court of Common Pleas urged the agencies not to consider a Walker Road interchange because Franklin

Farm Lane would be unable to handle interstate traffic, and because vehicles would be unable to access the prison or the nursing home during an emergency at those facilities. (AR-88 at 36).

111.    A survey taken by the agencies in 1989 confirmed that the general public felt that "increased traffic on local road systems" was a "very important" issue. (AR-87 at 3).

112.    In September of 1989, the Franklin County Commissioners declared their opposition to the construction of an interchange in the Walker Road area that would include Franklin Farm Lane as a primary route of travel. (AR-141 at 345).

113.    "Alternative D-Modified" makes Franklin Farm Lane a primary route of travel for vehicles entering and exiting the interchange on the east side of I-81. (AR-79 at 7).

114.    The Chambersburg Area School District has adopted a Resolution calling on the highway agencies to leave the existing Walker Road bridge in place, explaining that its removal would cause safety problems for school buses navigating busy local roadways carrying traffic to and from the interchange. (AR-169 at 182).

115.    Minutes prepared during meetings of the highway agencies reveal that the question of upgrades to local roads surrounding a Walker Road interchange was raised repeatedly by agency staff. (AR-90 at 5; AR-90 at 12).

116.    In 1992, the agencies stated that placing diverted traffic on a "rural road network incapable of handling more traffic in its present condition" would result from the construction of a Walker Road interchange in the absence of improvements to local roads. (AR-90 at 5).

117.   In 1992, the agencies declared that "all of these [local] roads are narrow and would require substantial funds to bring them up to acceptable standards." (AR-90 at 12).

118.   During that same period, the FHWA stated that the local roadway network would require upgrading "and/or construction of new roadways. . . Because these improvements are a direct requirement of this project, the commitment to construct these improvements must be obtained. . ." (AR-91 at 109).

119.   Agency consultants and agency staff commented in the pre-DEIS that traffic volumes would not be substantially reduced on U.S. Route 30 with the construction of a Walker Road interchange, but that traffic would merely be added to local roads. (AR-91 at 123; AR-10 at 221).

120.   The agencies recognized that traffic increases on Franklin Farm Lane would impede access by emergency vehicles to the County Nursing Home and Prison and would cause additional capacity problems at the intersection of Route 30 with both Walker Road and Franklin Farm Lane. (AR-6 at 68).

121.   The agencies refer to the local roadways as "access roads to [the] interchange." (AR-6 at 1), even though the agencies' own planners admit that the "roadways [in the Walker Road area] are not currently build to collector road standards." (AR-110 at 125).

122.   At a 1993 Status Meeting for the Interchange, the agencies declared that the scope of the interchange project did not include improvements to secondary roads. (AR-91 at 167).

123.    In the DEIS, the agencies declared that maintenance and upgrading costs for the local roads in the Walker Road area would be the responsibility of Township governments. (AR-12 at II-15).

124.    On September 29, 1994, the FHWA declared that "[w]e cannot complete the proposed interchange only to create an intolerable condition on the local connecting roads. . . The proposed Walker Road interchange causes changes in traffic patterns that require local roadway improvements, if the network is to function safely and efficiently. . . necessary road improvements, particularly the Norland Avenue Extension, may produce both [historic and environmental] impacts." (AR-93 at 687).

125.    In Comments on the DEIS, the FHWA declared that the document "should address the need for upgrades to the local transportation network. . ." in the Walker Road area. (AR-93 at 667).

126.    Comments submitted on the DEIS by several state agencies, and by a consultant hired by the agencies, raised the issue of the ability of local roadways in the Walker Road area to carry additional traffic volumes. (AR-47 at 7; AR-47 at 11; AR-92 at 112).

127.    At the public hearing following the release of the DEIS, many residents of Franklin County expressed concern over the dumping of interstate traffic onto local, Township roadways, and asked who would pay for the upgrading and maintenance of local roads. (AR-14 at 24; AR-14 at 40; AR-14 at 44).

128.    In July of 1994, Greene Township's engineering firm released a study which revealed that the rural roadways in the Walker Road area failed to meet engineering and safety specifications for interstate collector roads. (AR-18 at 13).

129.    The highway agencies admitted that only two existing interchanges along I-81 (between New York and Maryland) within the state's boundaries are connected to Township – and not state – roads. (AR-96 at 639).

130.    In September of 1994, the FHWA asked PennDOT to prepare a "necessary local road impact study" to examine the impacts resulting from the upgrades of local roads. (AR-93 at 687).

131.    No local road impact study was ever completed, and no reasons for that failure to complete an impact study are included in the Administrative Record.

132.    The agencies admitted in December of 1994 that the local roadway connections in the Walker Road area did not have the "capacity to support a connection to the interstate" and that the interchange would require local roadway improvements to function safely and efficiently. (AR-93 at 786).

133.    The agencies also admitted that the proposed Walker Road interchange location was served by "narrow, substandard roadways" and that either new roads must be constructed or "significant improvements" to existing roads must be made. (AR-93 at 785, 786).

134.    In January of 1995, FHWA staff declared that the project's weaknesses lie in the lack of project need, the secondary impacts to historic areas, and the increased traffic on rural roads. (AR-113 at 187).

135.    The agencies considered taking over the local, Township roadways in the Walker Road area and transforming them into state highways, to avoid the question of financial responsibility for the upgrading and maintenance of those roads. (AR-138 at 181).

136.    In the agencies' *Justification for an Additional Interchange*, the agencies admitted that local road upgrades were an integral part of the Walker Road project, and specifically noted that Walker Road and Franklin Farm Lane must be upgraded to current criteria for interstate collector roads. (AR-13 at 41).

137.    The agencies have recognized that a Walker Road interchange (Alternative D-C) will increase traffic on local roads by at least 1,900 vehicles daily. (AR-112 at 80).

138.    The agencies have recognized that the northern segment of Franklin Farm Lane will carry between 9,200 and 14,350 vehicles per day in 2016 if "Alternative D-Modified" is constructed. (AR-72 at 34-37).

139.    The agencies have concluded that the same segment of Franklin Farm Lane will only carry 2,300 vehicles in 2016 if "Alternative D-Modified" is not constructed. (AR-79 at 19).

140.    According to 2000 Traffic Studies conducted by the agencies, the intersection of Franklin Farm Lane and Route 30 already operates at a level of service "D" and "E" with current traffic volumes. (AR-156 at 226, 229).

141.    In a revision of the *Justification*, the agencies stated that necessary local road upgrades would not be considered part of the project and that Township governments would have the responsibility of upgrading and maintaining local roads in the Walker Road area. (AR-22 at 22).

142.    In February of 1995, the agencies agreed that roadway improvements would be part of the interchange project, and that the secondary impact analysis in the FEIS would document the extent of the interchange's impact on local roadways. (AR-95 at 321).

143.    In the Draft FEIS, the agencies noted that "[t]raffic on Franklin Farm Lane will increase significantly with construction" of an interchange at Walker Road. (AR-40 at IV-1).

144.    The word "significantly" was then crossed-out and removed prior to the release of the FEIS. (AR-40 at IV-1).

145.    In the FEIS, the agencies admitted that traffic increases on local roads would necessitate increases in maintenance and upgrading of those roads. (AR-46 at II-17).

146.    In the FEIS, the agencies admitted that Walker Road on the west side of I-81 would be upgraded, relocated, and reconstructed with federal and state monies, but the agencies failed to consider or examine the impact of interchange traffic on Franklin Farm Lane or Walker Road east of I-81. (AR-46 at II-17).

147.    Three separate engineering firms hired by the Greene Township Board of Supervisors concluded that traffic volumes produced by the interchange would overwhelm the ability of local roadways to accommodate that traffic. (AR-79 at 22, 23).

148.    Those engineers concluded that if "Alternative D-Modified" was built, the 90 degree T-intersection of Walker Road and Franklin Farm Lane would have to be reconstructed, and other fundamental alterations made to accommodate interchange traffic on those roads. (AR-79 at 23).

149.    As late as June 4, 1998, the highway agencies were continuing to admit that Franklin Farm Lane would need to be upgraded to handle interchange traffic, because the roadway had poor sight distance, needed safety improvements and widening, and needed geometric improvement. (AR-159 at 153).

150.    The highway agencies have failed to consider the cumulative impacts associated with the upgrade and maintenance of the local roadways necessary to handle increased traffic volumes from the proposed interchange.

151.    The Norland Avenue Extension connector would connect the proposed interchange area with Chambersburg Borough. (AR-113 at 215).

152.    The agencies improperly created a "No Build" Alternative for the DEIS and the FEIS which assumed no road improvements would be made in the region, even though the agencies had admitted in the Traffic Studies that the Norland Avenue Extension connector road and the Route 30 improvements would be built. (AR-37 at i).

153.    The intensity of development on the Gabler Tract is contingent upon the construction of the interchange in the Walker Road area and the construction of the Norland Avenue Extension. (AR-72 at 5).

154.    The agencies have admitted that if the Norland Avenue Extension is not constructed, that the intersection of Walker Road and Kohler Road will operate at a failing level of service "E" in the afternoon peak hour, even with the construction of an interchange in the Walker Road area. (AR-72 at 5).

155.    At the time of the preparation of the FEIS, Norland Avenue Extension was within a rural historic district. (AR-113 at 215; AR-46 at IV-8 (for a map of the Eastern Greene Township Rural Historic District)).

156.    In a DEIS draft, the agencies stated that the selection of a Walker Road interchange as the "preferred Alternative" was predicated upon the extension of Norland Avenue and the build-out of the Gabler Tract. (AR-6 at 68).

157.    That text was removed from the DEIS which was released in May of 1994. (AR-12 at V-1).

158.    In an early analysis prepared by the agencies, the agencies declared that any Walker Road project must be examined as part of a larger plan that included an examination of the extension of Norland Avenue. (AR-4 at unnumbered 5).

159.    In 1993, the Environmental Protection Agency urged the agencies to study the impacts resulting from the Norland Avenue Extension, because an interchange at Walker Road had a direct influence on the construction of the Extension. (AR-91 at 185).

160.    In 1993, a PennDOT consultant stated that the Walker Road Alternatives were not viable without the construction of the Norland Avenue Extension, and that success of those Alternatives "should not rest on the potential construction of a private endeavor." (AR-92 at 153; AR-10 at 205).

161.    In a June, 1994 internal FHWA communication, FHWA staff declared that the plan to extend Norland Avenue through historic properties to the new interchange was as closely related to the "Shuster Interchange" as development was contingent upon a proposal for an interchange in Virginia. (AR-113 at 215).

162.    To avoid examining the impacts from the extension of Norland Avenue, the agencies contended that the Avenue was not part of the interchange project, and that the Extension would not be built with federal funds. (AR-10 at 205).

163.    The model used for generating and distributing future traffic trips was programmed to include projected growth of the Gabler Tract, and the Extension was included in the model as a necessary road to support that growth. (AR-12 at ES-6).

164.    In July of 1994, a PennDOT manager declared that "if the Norland Avenue

Extension were a state funded project, it could not be segmented the way it is

currently and would need to be addressed." (AR-138 at 155).

165.    In August of 1994, one of PennDOT's consultants declared that the Extension

was an independent project because neither state nor federal funds would ever be

used to build it. (AR-138 at 159; AR-139 at 499).

166.    In November of 2000, then-Representative Bud Shuster announced that $3

million in state and federal monies had been secured to build the Extension.

167.    The announcement occurred more than six months prior to the agencies' issuance

of the "Re-evaluation of the ROD", which failed to consider any historic,

environmental, or cost impacts resulting from the construction of the Extension. (AR-

83).

168.    In March of 1995, the Environmental Protection Agency commented that the "EIS

document does not look at impacts of Norland Avenue. The report must look at both

the direct and indirect effects." (AR-96 at 727).

169.    In a 1998 Memorandum generated exclusively for the Administrative Record, the

agencies stated that the Norland Avenue Extension was not associated with the

proposed construction of an interchange in the Walker Road area, and that

improvements or alterations would be a separate undertaking. (AR-122 at 2919).

170.    The agencies failed to respond to comments that the construction of the Norland

Avenue Extension would cause impacts to historic resources. (AR-29 at 45).

171.    The $3 million in additional public monies secured for the construction of the

Extension as a connector road, when added to the contemporary cost of the

interchange itself, yields a total cost of $12.2 million for the interchange project. (AR-169 at 52).

172.    Addition of funds necessary for the upgrading and reconstruction of local roadways on the east side of I-81 yields a project cost exponentially larger than any of the other Alternatives for the interchange project.

173.    The total cost estimate for an interchange in the Kriner Road location (Alternatives B and B-1) is approximately $4 million. (AR-46 at II-14).

174.    Because the costs for the Extension, and the additional costs imposed by "Alternative D-Modified" – including the construction of a new overpass bridge and reconfiguration and upgrades of local roadways – were never included in the DEIS or FEIS, a weighing of the costs and benefits of the Alternatives was rendered an impossibility. (AR-12; AR-46).

175.    The highway agencies failed to examine the cumulative impacts of necessary local road upgrades and the construction of the Norland Avenue Extension with the interchange project.


**VII. Agency Failure to Prepare an SEIS to Examine the Impacts of the New Interchange and the Traffic Impact of New Developments in the Kriner Road Area**

176.    The "Alternative D-Modified" interchange project was developed in mid-1998, three years after the release of the FEIS. (AR-72).

177.    "Alternative D-Modified" consists of the demolition of the current Walker Road overpass and Bridge, the stubbing of Walker Road on either side of I-81, the construction of a new Bridge fourteen hundred feet (1400') south of the existing

Walker Road overpass, and the construction of direct connections between the proposed interchange and Franklin Farm Lane on the east side of I-81. (AR-82).

178.    "Alternative D-Modified" is over 400% more expensive than the Walker Road Alternatives evaluated in the FEIS. (AR-46 at II-7, AR-169 at 52).

179.    In January of 1999, the "Re-evaluation of the FEIS" erroneously concluded that an SEIS was unnecessary. (AR-80).

180.    The "Re-evaluation of the FEIS" was the first planning document prepared by the agencies following the announcement of the newly designed and relocated interchange. (AR-80).

181.    The "Re-evaluation of the FEIS" was never circulated for public review and comment. (AR-80).

182.    The "Re-evaluation of the FEIS" was not approved via signature by either the state or federal highway agency. (AR-80).

183.    Under the newly conceived "Alternative D-Modified", traffic from the proposed interchange would no longer feed onto both Walker Road and Franklin Farm Lane on the east side of I-81 (as under Alternative D-C), but would instead feed directly onto Franklin Farm Lane on the east side of I-81. (AR-80; AR-108 at 1177).

184.    Historic resources located along Franklin Farm Lane, including the Gass House and the Poor House, would suffer greater adverse impacts from the redirection of traffic flow onto Franklin Farm Lane on the east side of I-81. (AR-79 at 7; For the geographic relationship between the historic properties and the interchange, *see* AR-12 at I-12; AR-46 at III-4).

185.    Demolition of the existing overpass bridge and construction of a new overpass bridge increases the time, resources, costs, and engineering costs for the proposed interchange.

186.    Necessary upgrades to local roads in the Walker Road area will necessitate the taking of land protected in a Rural Historic District. (AR-79 at 23; AR-82 at 1; AR-80 at Figure 2).

187.    In 1997, Guilford Township adopted a Zoning Ordinance that designates land for, and encourages, commercial and industrial development in the Kriner Road area. (AR-134 at 1001).

188.    While the highway agencies went to great lengths to examine the impact of the re-zoning of the Gabler Tract to highway/commercial uses on a Walker Road interchange, the agencies failed to examine, in a parallel fashion, the impacts of the Guilford zoning on a Kriner Road interchange. (AR-95 at 236; AR-133 at 698; AR-96 at 637).

189.    With the adoption of the Guilford Township Zoning Ordinance, and the greater than expected build-out of the Chambers-5 Business Park, the areas surrounding the Kriner Road Alternatives have a significantly greater potential to generate interstate traffic and truck traffic than the area surrounding the proposed location for the interchange at Walker Road.

190.    Several new, truck-intensive Warehouse Distribution Centers have been built in the Kriner Road area over the past three years, and those Centers will greatly increase the amount of traffic in the Kriner Road area.

191.    Those new Distribution Centers include the Target Warehouse Distribution Center, the K-Mart Distribution Center (formerly Toys R'Us Warehouse), and the Ingram Book Group Warehouse Distribution Center which will use existing Exit #5 to access Interstate 81.

192.    Collectively, those Centers add 2,657,160 square feet, or over sixty acres of development, to the Kriner Road area.

193.    The agencies have never examined the impact of these new developments on congestion on the Wayne Avenue/I-81 interchange.

194.    In early 1999, several engineering firms hired by the Greene Township Board of Supervisors concluded that the amount of land available for industrial development in a two mile radius of the Kriner Road location was double the amount of land available for industrial development in the Walker Road location. (AR-79 at 41).

195.    That research revealed that the Kriner Road area is "rapidly evolving into a commercial and industrial area." (AR-79 at 41; AR-93 at 644; AR-18 at 3; AR-133 at 703).

196.    No study was ever completed by the agencies on the impact that the Guilford Township industrial and commercial zoning of the Kriner Road area would cause on congestion on the existing I-81/Wayne Avenue interchange.

197.    In the agencies' 1995 Traffic Studies, it was projected that the Chambers-5 Business Park in the Kriner Road area would have a build-out of 1,320,000 square feet by 2016. (AR-79 at 42).

198.    By 1998, the Chambers-5 Business Park had over 2,000,000 square feet of build-out. (AR-79 at 42).

199.    Currently, the Chambers-5 Business Park has over 3,000,000 square feet of build-out, with a full build-out of over 3.7 million square feet.

200.    The agencies admitted that the use of 1,820,000 square feet of building space would trigger a worsening in congestion from a level of service "C" to a level of service "D" on the ramps of the existing Wayne Avenue interchange. (AR-105 at 155).

201.    The agencies contend that an interchange at Kriner Road, which would relieve congestion at the Wayne Avenue interchange, does not comply with Public Law 100-17 because the Wayne Avenue interchange is not congested. (AR-82 at 6).

202.    In the Record of Decision, the agencies admit that an interchange at Kriner Road would offer a greater volume of traffic reduction than one constructed in the Walker Road area. (AR-82 at 6).

203.    The recognition of greater traffic reduction from the construction of a Kriner Road interchange was made prior to the additional development which has occurred in that area.

204.    The sole reason for eliminating a Kriner Road location for the interchange was the agencies' contention that a Kriner Road interchange would only further improve acceptable levels of service. (AR-37 at vi; AR-82 at 6).

205.    In the Walker Road area, the type of development on the Gabler Tract generates only local traffic, not interstate traffic; and the zoning around a Walker Road interchange provides for less intense residential and agricultural use. (AR-79 at 2; AR-136 at 1712).

206.   The agencies have admitted that the zoning in Greene Township is intended to preserve "agricultural lands" and retain the "rural character of the area." (AR-46 at III-1).

207.   The 2000 Census revealed that population growth numbers for Greene Township were much lower than those originally projected by the agencies. The 2000 Population for Greene Township is 12,284. Agency projections had placed the population growth at 13,777. (AR-46 at IV-72).

208.   The agencies overestimated the Township's population growth because the agencies extrapolated from building permits to estimate future population in the Township. (AR-46 at IV-72).

209.   A building permit extrapolation method was not used to project future population growth for Chambersburg Borough, Guilford Township, or Hamilton Township. (AR-46 at IV-72).

210.   In December of 2000, the agencies recognized that Guilford Township was building a new Kriner Road bridge capable of handling tractor trailer and truck traffic. That new bridge provides increased capacity for a Kriner Road interchange to carry large volumes of traffic onto local roadways. (AR-132 at 388).

211.   The agencies acted arbitrarily in failing to prepare a Supplemental Environmental Impact Statement to examine impacts resulting from the new interchange, the Guilford zoning of the Kriner Road area, the under-projection of development within the Chambers-5 Business Park, and the development of new Warehouse Distribution Centers in the Kriner Road area.

## VIII. Agencies' Failure to Examine Impacts Resulting from Shift of the Secondary and Cumulative Impacts Area (SCIA)

212.    "Alternative D-Modified" proposes a new interchange project fourteen hundred feet (1400') south of the Walker Road bridge used by the Walker Road Alternatives examined in the FEIS.

213.    In the environmental documents, the agencies delineated a "Secondary and Cumulative Impacts Area" for the Walker Road alternatives examined in the FEIS. (AR-46 at V-3).

214.    Following the release of plans for "Alternative D-Modified", the agencies refused to shift the "Secondary and Cumulative Impacts Area" southward by fourteen hundred feet (1400'), stating that the new design for the interchange was "irrelevant" to the SCIA. (AR-122 at 2848).

215.    Movement of the SCIA southward by fourteen hundred feet (1400') would explicitly include the Gass House, the Poor House, and an area known as "Franklin Farms" within the SCIA, thus forcing the agencies to examine the impact of the interchange on those historic resources. (AR-79 at 38; AR-46 at V-3; AR-93 at 493).

216.    "Franklin Farms", a collection of historically significant buildings and historic land, has been in County ownership since 1808, yet was never examined by the agencies for impacts caused by the interchange. (AR-107 at 710; AR-12 at I-12; AR-46 at III-4).

217.    The agencies refused to recognize the relocated SCIA as a legitimate study area for historic resources, even though NHPA regulations require the agencies to study historic resources that may be impacted by the project.

**IX. Agencies' Failure to Re-Examine Farmland Impacts Following a Ruling by the Pennsylvania Supreme Court That Farmland in the Walker Road Area was Specially Protected by Farmland Preservation Laws**

218.    In the DEIS, the agencies concluded that a hearing with the Agricultural Lands Condemnation Approval Board ["ALCAB"] would be necessary to condemn farmland for an interchange at the Walker Road location. (AR-12 at IV-52).

219.    In the Point of Access Report released in January of 1995, the agencies reiterated that conclusion. (AR-22 at 24-25).

220.    As opposition to the project grew, the agencies reversed their position in May of 1995, and announced that ALCAB approval was unnecessary for the construction of the interchange in the Walker Road area. (AR-46 at IV-65).

221.    The Pennsylvania Farm Bureau formally objected to that determination and in a series of letters, urged PennDOT to submit the proposed condemnation to the ALCAB. (AR-102 at 153-161).

222.    The Greene Township Board of Supervisors, fearful of the impact of the agencies' decision on Agricultural Security Areas (ASA's) located within Greene Township, wrote to the Secretary of Agriculture to urge him to convince PennDOT to submit the proposed condemnation to the ALCAB. (AR-97 at 1109).

223.    On or about May 10, 1999, the highway agencies sent a notice of intent to enter farmland owned by D.LaMar and Lois White, a Franklin County farm couple.

224.    The farm couple filed a lawsuit in Commonwealth Court to force the highway agencies to comply with Pennsylvania farmland preservation laws, contending that their farmland was protected by those laws.

225.    The Commonwealth Court ruled in favor of the farm couple and issued a temporary restraining order, a preliminary injunction, and a permanent injunction barring the agencies from condemning the farmland without the ALCAB's approval. *White v. PennDOT*, 738 A.2d 27 (Commw. 1999).

226.    PennDOT appealed the Commonwealth Court's ruling to the Pennsylvania Supreme Court.

227.    The Pennsylvania Supreme Court affirmed the Commonwealth Court's decision in a *per curiam* opinion. 738 A.2d 27 (Pa 1999).

228.    In those decisions, the Commonwealth Court and Supreme Court held that the agencies' determination – that farmland in the Walker Road area was not protected from condemnation by the Agricultural Area Security Law – was an erroneous interpretation of the law.

229.    Under the courts' ruling, a decision by the ALCAB to disapprove the condemnation of farmland in the Walker Road area would have prevented the agencies from constructing an interchange in the Walker Road area.

230.    After the rulings, the agencies were required to prepare a Supplemental Environmental Impact Statement (SEIS) to use this new information to re-examine and compare the Alternatives for the construction of the interchange.

231.    The Kriner Road Alternative B-1 would not require the taking of any farmland within an Agricultural Security Area. (AR-80 at 22).

232.    The ALCAB met to consider the proposed condemnation on May 9, 10, and 11, 2001 – almost two years after the Pennsylvania Supreme Court ruling.

233.    One of the ALCAB members was a representative of the Pennsylvania Department of Transportation.

234.    The Hearing Examiner erred by establishing an incorrect legal standard for the review of the proposal – asking only whether the taking of farmland was the only reasonable alternative "for the construction of Alternative D-Modified." (AR-138 at 266).

235.    The proper legal standard established by statute is whether other reasonable alternatives existed for the construction of the interchange that would not result in the taking of farmland within an Agricultural Security Area. 3 P.S. section 913(a).

236.    The Board approved the condemnation contingent upon the satisfaction of numerous conditions. (AR-138 at 268-269).

237.    Neither the two year delay in the project nor the substantial expenditure of project monies for the ALCAB hearing were included in any studies issued by the agencies to examine the comparative costs of the Alternatives.

238.    Notes by agency staff made at a Coordination Meeting state that "ASA [in the Walker Road area] is real problem. . . if Walker Rd's a 'given', use lots of words to play up the minimal farmland impact – handwringing re: ASA, touch decision, etc." (AR-93 at 638).

239.    The agencies have conceded that Alternatives B and B-1 (Kriner Road) both have less impact on farmlands overall than an interchange constructed at the Walker Road location. (AR-80 at 18).

240.    The agencies were updating the farmlands impact data in the Walker Road area as late as November and December of 2000. (AR-138 at 120; AR-169 at 186, 188).

241.   In a letter from the agencies' consultant to a property owner in December of 2000, the consultant declared that the agencies must update the environmental studies "due to changes that have occurred in the area encompassing Greene Township and Guilford Township since previous studies conducted in 1995." (AR-169 at 186,188).

242.   The Farmland Conversion Impact Rating ["FCIR"] form for the Alternatives was not properly completed by the agencies, giving the Walker Road Alternatives a more favorable score than the other Alternatives. (AR-53 at 11).

243.   With a maximum point value of 20, the agencies repeatedly assigned values of "1" and "O" to the differing Alternatives to reflect differing protections on land provided by Greene and Guilford Townships, and the lack of public infrastructure in Greene Township. (AR-53 at 11).

244.   At least one set of point values assigned by the agencies violated the regulations that required a point difference of ten or more. 7 CFR section 658.5(b)(4). (AR-53 at 12).

245.   The "Re-evaluation of the ROD" incorrectly cited to the ROD for the proposition that forty-two (42) acres of prime soils would potentially be lost at the Walker Road area with the construction of the interchange. (AR-83 at 3).

246.   The "Re-evaluation of the ROD" incorrectly claimed that "no change" had occurred in this category between the date of the ROD and the "Re-evaluation of the ROD." (AR-83 at 3).

247.   The ROD, however, only recognized 17.8 acres of potential loss of prime farmland soils. (AR-82 at 22).

248.    The ROD projected that 4.7 acres of Agricultural Security Area farmland would be taken for a Walker Road interchange, while the "Re-evaluation of the ROD" revealed that 6.5 acres – from two different ASA's – would be taken for the interchange. (AR-83 at 3; AR-82 at 22).

249.    In 2001, prior to the issuance of the "Re-evaluation of the ROD", the agencies purchased twenty-two (22) acres of farmland - within two Agricultural Area Security Areas (ASA's) - to settle a planned appeal of the ALCAB ruling by the Franklin County farm couple. (*See Agencies' Brief in Support of Summary Judgment* at 28, fn. 4).

250.    The purchase of the acreage, added to other acreage impacted by a Walker Road interchange, reveals that "Alternative D-Modified" will result in impacts to at least thirty-two (32) acres of farmland in the Walker Road area. (AR-138 at 229-237).

251.    The Re-evaluation of the FEIS, the only document to examine impacts caused by "Alternative D-Modified", concluded that only fourteen (14) acres of farmland would be directly and indirectly taken by the agencies for "Alternative D-Modified". (AR-80 at 22).

252.    The Kriner Road Alternatives (B and B-1) are projected to take between seventeen (17) and twenty-one (21) acres of farmland. (AR-80 at 22).

253.    The agencies violated the law by refusing to prepare an SEIS to examine additional impacts and re-evaluate project Alternatives following rulings by the Pennsylvania Commonwealth and Supreme Courts that farmland in the Walker Road area was protected by the state's farmland preservation laws.

## X. Agencies' Arbitrary Selection of a Stunted Study Area for Historic Resources

254.   Throughout the planning process for the interchange, the agencies continuously
       altered and narrowed the scope of the study area for cultural resources. (AR-12 at ES-
       13; AR-10 at 77; AR-40 at III-7; AR-137 at 72).

255.   At the inception of the project, the agencies identified a "Project Study Area" for
       the interchange.  (AR-2 at 3; AR-12 at ES-13; AR-46 at ES-4).

256.   The consultants hired by the agencies to prepare the initial Cultural Resources
       Study in 1988 were required to identify "all significant historic resources subject to
       possible project effects" in the study area. (AR-159 at 32).

257.   The consultants were also required to investigate "all structures of potential
       historic significance within the area of the project's impact." (AR-174 at 113).

258.   The Preliminary Alternatives Report ["PAR"] identified a "Project Study Area"
       extending from approximately two miles north of Exit 4 to Exit 8 on Interstate 81
       with a typical width on either side of I-81 of 5,000 feet. (AR-2 at 3).

259.   At a public meeting held in 1989, the "Engineering, Traffic, and Environmental
       Study Area" was identified as a mirror image of the "Project Study Area" delineated
       in the PAR. (AR-143 at 1191).

260.   Questionnaires and agency documents produced in 1989 and 1990 identify an
       identical "Project Study Area". (AR-144 at 1487; AR-85 at 2; AR-88 at 17).

261.   On February 22, 1990, the agencies published their Notice of Intent to prepare an
       EIS, which declared that an identical "study area" would serve as the area for data
       collection on "historical and archaeological sites." Fed. Reg. Vol. 55, No. 36
       (February 22, 1990).

262.    As early as June 4, 1990, Franklin County Heritage and the Kittochtinny

Historical Society – Franklin County's official County historical society – expressed

concerns about the impact of a Walker Road interchange on the Patrick Gass House

and the Franklin County Poor House. (AR-12 at Appendix "E-10" and Appendix "E-

24").

263.    The Franklin County Poor House was deemed eligible for the National Register of

Historic Places in 1993. (AR-81 at 9).

264.    The Patrick Gass House is listed on the National Register of Historic Places. (AR-

81 at 9).

265.    The Gass House and the Poor House are part of the "Franklin Farms" property.

(AR-123 at 2986). Both houses front on Franklin Farm Lane.

266.    In May of 1991, the Franklin County Commissioners expressed concern about the

impact of a Walker Road interchange on the Gass House and other County owned

historic buildings along Franklin Farm Lane. (AR-141 at 342).

267.    In 1992, the Secretary of PennDOT declared that the environmental studies

conducted throughout the 16-square mile study area included a consideration of

"national register buildings and residences." (AR-90 at 22).

268.    The Secretary's affirmation was followed by a description of the Study Area

identical to the one delineated in the PAR and earlier agency documents. (AR-8 at 2).

269.    On March 14, 1994, the Advisory Council on Historic Preservation ["ACHP"]

informed the FHWA that the agency had received several requests for a hearing to

explore the impact of the interchange on historic properties in the Walker Road area.

(AR-92 at 61).

270.    In that communication, the ACHP requested that the agencies provide the ACHP with a "description of the means employed thus far to solicit public input regarding the project's effects to historic properties." (AR-92 at 61).

271.    In the DEIS, the agencies shifted from an examination of cultural resources within the "Project Study Area" to one which focused solely on the right-of-way to be used for each Alternative. (AR-10 at 77).

272.    In a mis-statement of earlier studies, the DEIS proclaimed that the "cultural resources study area for this project [had always been] defined as the potential right-of-way around each proposed alternative." (AR-10 at 77).

273.    The DEIS continued to recognize an "Engineering, Traffic, and Environmental Study Area" identical to the broad "Project Study Area" identified in earlier agency documents. (AR-12 at II-12).

274.    The agencies' *Justification for an Additional Interchange*, prepared in May of 1994, included a map which identified the "Engineering, Traffic, and Environmental Study Area" as encompassing the same area as the "Project Study Area." The map clearly included areas on Franklin Farm Lane with known historic properties. (AR-13 at 20, 25).

275.    The failure of the agencies to study the impacts to historic properties in the Walker Road area prompted a multitude of comment letters to the agencies from the Plaintiffs, concerned individuals, and historic preservation groups. (AR-92 at 91; AR-92 at 95; AR-92 at 229; AR-92 at 284; AR-95 at 261).

276.    Four months prior to the issuance of the FEIS, the agencies continued to identify the "EIS study area" as the same area used as the "Project Study Area" in earlier documents. (AR-95 at 265).

277.    An FHWA project manager admitted that one of the weaknesses of the environmental studies was the lack of study of the secondary impact area as it related to the rural historic area and traffic on local roads. (AR-113 at 187).

278.    From the development of the FEIS to as late as 1999, the agencies contended that the Gass House was out of the "study area." (AR-96 at 638; AR-122 at 2848).

279.    The agencies used the development of the FEIS to further narrow the scope of the study of historic resources, by shifting the examination from the "potential right of way around each alternative" to the "project impact area." (AR-40 at III-7).

280.    That "project impact area" encompassed an area limited to 300' around the right-of-way for the physical construction of the interchange ramps. (AR-110 at 9).

281.    The agencies ignored the law, which requires the agencies to identify an "area of potential effects" within which a project "*may* cause changes in the character or use of historic properties." 36 CFR section 800.2(c); 36 CFR section 801.6 (d); (AR-96 at 788).

282.    The agencies failed to delineate an "area of potential effects" in the DEIS or the FEIS, even though regulations defining an "area of potential effects" were promulgated prior to 1993. (*See* 36 CFR Ch. VIII, section 800.2 (c) (7-1-93 Edition)).

283.    At the same time the agencies were narrowing the scope of the study for historic resources, they were assuring the state Agricultural Lands Condemnation Approval

Board ["ALCAB"] that the agencies were using the original, broad "Project Study Area" to examine impacts to all farmlands in the area. (AR-35 at VII, Figure ES-5).

284.    Draft Copies of the FEIS reveal that the highway agencies attempted to avoid consideration of historic properties on Franklin Farm Lane by simply concluding that no alternative would have an impact on them, while drawing boundaries for the Secondary and Cumulative Impact Areas (SCIA) that clearly encompassed the historic properties. (AR-40 at V-2).

285.    FHWA has admitted that "upgrading the local roadway system is likely to have impacts on Historical Resources" and that improvements to the local roadway network will have environmental impacts and impacts to historic properties in the Walker Road area. (AR-93 at 214; AR-93 at 718; AR-93 at 786).

286.    The agencies erroneously represented to a State Senator that the Gass House had its entrance on U.S. Route 30, and therefore, would not be impacted by the interchange project. (AR-97 at 877).

287.    The Gass House's entrance is on Franklin Farm Lane. (AR-46 at III-20).

288.    Franklin County historic societies, noticing the manipulation of the boundaries for the study of historic resources by the agencies, repeatedly questioned the ability of the agencies to change the study area contours mid-project to eliminate certain historic resources. (AR-99 at 1483; AR-99 at 1542).

289.    In a communication sent from the Kittochtinny Historical Society, the organization expressed disbelief at the agencies' contention that impacts to the Gass House were not part of the study because it was outside of the project area, writing "[p]lease note that the maps on pg. ES-4 and on pg. II-9 of the FEIS clearly indicate

Franklin Farm Lane as being within the 'project study area' and the 'EIS study area.'"
(AR-99 at 1483, 1542).

290.    The Pennsylvania Historic and Museum Commission ["PHMC"] raised the
concern that the increased traffic and new development caused by the interchange
might affect historic properties along Franklin Farm Lane and that the impact on
those properties should be addressed by the agencies. (AR-109 at 1457).

291.    Throughout the environmental study process, the agencies contended that only the
agencies themselves had the ultimate authority to determine which area would be
examined for historic resources. (AR-137 at 72, 83).

292.    As late as 1999, the agencies were still unsure whether the Gass House had been
studied, or whether the methodology for identifying an "area of potential effect" was
part of the agencies' process in 1989. (AR-122 at 2848).

293.    FHWA staff even suggested that the agency "ignore the new supposedly eligible
property and move on", stating that "[t]his has been a ridiculous misuse of the process
by the public opposed to a minor project." (AR-113 at 59, 69).

294.    FHWA admitted to the PHMC that project effects due to "increased traffic, noise,
and new development" on the Gass House and the Poor House were "not evaluated
under the Section 106 process for this project." (AR-110 at 9).

295.    The Greene Township Board of Supervisors objected to the agencies' failure to
examine historic resources in the area of the Walker Road interchange. (AR-110 at 1,
2).

296. The routing of traffic through the newly designed and located Walker Road interchange creates an unsafe condition at the 90 degree "T" intersection of Franklin Farm Lane and Walker Road. (AR-74 at Exhibit "E"; AR-79 at 23).

297. Lying outside of that "T" intersection is land within a rural historic district, and upgrading that intersection will require a taking of that historic land. (AR-79 at 23).

298. In a June 4, 1998 Memorandum produced by the highway agencies, the agencies admitted that remedying the inadequate turning radius at Walker Road and Franklin Farm Lane would necessitate an impact to historic land. (AR-159 at 153).

299. The agencies have never examined this 4(f) "taking", because the agencies continue to contend that a Walker Road interchange will not increase traffic on local roadways, and that the necessary upgrades to local roadways are not part of the interchange project. (*See* Agencies' *Statement of Material Facts* at paragraph seventy-five).

300. In an attempt to deal with the agencies' own failure to adequately examine impacts to historic properties, the agencies prepared a Memorandum exclusively for the Administrative Record on January 13, 1999. (AR-110 at 22).

301. In that Memo, the agencies continued to argue that the cultural resources study area had been properly delineated. (AR-110 at 22; AR-110 at 135).

302. In the FEIS, the agencies stated that the "Secondary and Cumulative Impacts Area" was used to delineate those areas "most likely to be affected by secondary or cumulative impacts" for compliance with NEPA. (AR-46 at V-1).

303.    Movement of the SCIA fourteen hundred feet (1400') south, to parallel the southward shift of the interchange location, places the historic properties along Franklin Farm Lane within the SCIA for "Alternative D-Modified". (AR-79 at 38).

304.    The agencies have attempted to use a broad standard of secondary and cumulative impacts to comply with certain legal mandates, while arbitrarily narrowing historic resource boundaries to avoid compliance with the National Historic Preservation Act.

## XI. Agencies' Misuse of Congressional Funding by Designing a Project Which Will Not Relieve Congestion on an Existing Interchange

305.    Section 149(a)(74) of the Surface Transportation and Uniform Relocation Assistance Act of 1987 specifically provided funding for a highway project which would demonstrate how construction of an interchange on a north-south interstate route would provide access to Chambersburg and "relieve traffic congestion on an existing interchange."

306.    The plain language of that provision reveals that Congress had no intention of authorizing the construction of a highway project that would provide for "economic growth", encourage "development", or provide for the reduction of "traffic congestion" "near" an interchange.

307.    Under the STURAA, a highway project in Fort Smith, Arkansas was funded to "demonstrate the economic growth and development benefits" of the widening of a road. STURAA at section 149(a)(4).

308.    Under the STURAA, new road construction was funded in Columbia, Missouri for the purpose of "encouraging economic development." STURAA at section 149(a)(17).

309.    "Encouraging economic development" and "enhancing" economic development
were recurring purposes of road projects in Johnstown, Pennsylvania; Compton,
California; Wood County, Ohio; Pine City, Minnesota; Paso Robles, California;
Minden, Louisiana; New River, West Virginia; and Saint Louis County, Minnesota.
STURAA at section 149(a)(3), (a)(15), (a)(27), (a)(33), (a)(34), (a)(48), (a)(62), and
(a)(76).

310.    Under the STURAA, a highway was funded in northeast Baton Rouge, Louisiana,
specifically to reduce "traffic congestion" and improve "traffic flow" in the
"immediate vicinity of a highway on the Interstate System." STURAA at section
149(47)(C).

311.    Under the STURAA, a highway was funded in Baton Rouge, Louisiana, for the
purpose of reducing traffic congestion "in the immediate vicinity of a split-diamond
interchange which connects an east-west highway on the Interstate System."
STURAA at section 149(47)(B).

312.    Under the STURAA, an Alameda Island, California project was funded to
alleviate congestion on "a north-south route designated as part of the Interstate
System" and its "access roads." STURAA at section 149(71).

313.    Under the STURAA, Congress gave the Secretary of Transportation broad
authority on several designated highway projects to reduce "traffic congestion" in the
area of the project. STURAA at section 149(a)(15), (a)(17), (a)(27), (a)(37), (a)(38),
(a)(49), (a)(64), (a)(67), (a)(72), (a)(71), and (a)(75).

314.    Under the STURAA, Congress drew a sharp distinction between those projects funded to aid traffic "on" particular roadways and bridges, and those projects funded to aid traffic "near" particular facilities.

315.    In Dover Township, New Jersey, Congress authorized a project to reduce traffic congestion "on" an existing bridge, and Congress authorized a project in Beaumont, Texas to construct a highway "over" an interstate route. STURAA at section 149(a)(37) and (a)(75).

316.    For the project that is the subject of this litigation, Congress authorized a project which would relieve traffic congestion "on" an existing interchange, and directed the FHWA to build an interchange which would relieve congestion on an already congested interchange.

317.    The agencies have admitted that the existing I-81/Route 30 interchange is not congested, and their Preliminary Alternatives Report ["PAR"] affirmed that the Route 30/I-81 interchange ramps were operating at a premier level of service (LOS "A" on a scale of A-F). (AR-2 at 32).

318.    The agencies have stated in the FEIS that the "interchange ramps (at the I-81/Route 30 interchange) have adequate capacity to handle current and future traffic." (AR-46 at ES-6; AR-29 at 27).

319.    The agencies have declared that the existing I-81/Route 30 interchange is "not a traffic problem." (AR-29 at 27).

320.    The 1995 Traffic Studies prepared by the agencies arrive at a similar conclusion, stating that the I-81 northbound and southbound exit ramps at Route 30 operate at an uncongested level of service "B" at peak hour levels of service; and that those ramps

will operate at an uncongested level of service "B" in 2016, even without any highway improvements. (AR-37 at 20, 37; AR-97 at 957; AR-31 at 4).

321.    From the inception of the project, the agencies have declared that the purpose of the demonstration project is to "relieve congestion on the existing U.S. 30 interchange" and build an interchange north of Chambersburg. (AR-86 at 18; AR-86 at 27; AR-87 at 80; AR-139 at 448).

322.    Failing to find congestion "on" the existing interchange at that location, the agencies then attempted to document traffic congestion at a nearby intersection – where Stouffer Road, Walker Road, and U.S. Route 30 converge. (AR-79 at 4).

323.    The 1995 Traffic Studies show that during the PM Peak Time, the construction of a Walker Road interchange will have little, if any, impact on congestion at that interchange. (AR-37 at 44).

324.    The agencies have admitted that a proposed interchange at Walker Road "reduces the traffic on Route 30 so slightly that the reduction is of essentially no value." (AR-93 at 784).

325.    The agencies have admitted that "nearly all the traffic" using the existing Route 30 interchange is "headed to downtown Chambersburg". (AR-22 at 33).

326.    Traffic exiting from, and entering "Alternative D-Modified" on the east side of I-81 would use the interchange to access Chambersburg via Franklin Farm Lane and Route 30.

327.    All traffic that would exit on the interchange headed to Chambersburg would be routed along local roadways back to Route 30, thus failing to alleviate any traffic congestion on Route 30. (AR-72 at 8; AR-79 at 7).

328.    The 1998 Traffic Studies failed to examine the impact of the Route 30 Widening Project on traffic volumes on Route 30. (Compare AR-37 at 43 with AR-72).

329.    The 1998 Traffic Studies used only four of the eight scenarios used in the 1995 Traffic Studies for determining traffic volumes at intersections, thus preventing a reviewer from comparing differences in results obtained by the two Studies. (AR-176 at 676, 696; AR-37 at 43; AR-72).

330.    The 1998 Traffic Studies prevent a reviewer from determining the traffic impact resulting solely from the construction of a Walker Road interchange or solely from the Route 30 improvements. (AR-176 at 676, 696).

331.    FHWA staff have declared that the purpose of a Walker Road interchange is to provide access to development on the Gabler Tract. (AR-93 at 667).

332.    In a Draft of the DEIS, the agencies mis-stated that STURAA provided funding for a "demonstration project to promote economic development in the Chambersburg area." (AR-6 at 1; AR-10 at 7).

333.    At one point in the planning, the FHWA chastised PennDOT, stating that "Public Law 100-17 does not include reference to the promotion of economic development in the Chambersburg area." (AR-91 at 112).

334.    In an internal FHWA communication, one of the project managers declared that the other locations for the interchange would be feasible and prudent unless access to the Gabler tract was a need. (AR-113 at 164).

335.    A PennDOT Consultant questioned whether service of the Gabler development by a Walker Road interchange would change the "intent of the project from a public law (demonstration project) to economic development." (AR-90 at 16).

336.    In the agencies' *Addendum to the Criteria of Effect* Report, issued in October of 1995, the agencies stated that the "No Build" Alternative was discarded because it did not reduce congestion "on" an existing I-81 interchange. (AR-57 at 8).

337.    An interchange at Walker Road does not reduce congestion "on" an existing I-81 interchange, yet the Walker Road location became the "preferred" and "selected" location for the interchange. (AR-37 at 20, 37; AR-46 at ES-27).

338.    The agencies' 1995 Traffic Study reveals that the existing I-81/Wayne Avenue interchange will operate at a congested level of service "F" in design year 2016. (AR-37 at 37; AR-79 at 3).

339.    Improvements to Wayne Avenue fail to accommodate increased traffic volumes produced by the accelerated build-out of the Chambers-5 Business Park, the construction of new Warehouse Distribution Centers, and the Guilford zoning of the Kriner Road area for industrial and commercial use.

340.    The agencies have projected that "Alternative D-Modified" – upon construction - will become congested itself, even with the Route 30 improvements and the construction of the Norland Avenue Extension. (AR-72 at 24, 25; AR-72 at 33; AR-72 at 4).

341.    In the 1998 Traffic Studies prepared by the agencies, the level of service on Walker Road, and for traffic turning onto the interchange ramps of "Alternative D-Modified", is a congested "f" by 2016 during the peak morning hours. (AR-72 at 24).

342.    During the Afternoon Peak Hour, several intersections around the new interchange fall to failing LOS's, and all of the feeder roads – and the interchange

itself – operate at a failing LOS "D" or "E" during the A.M. and P.M. Peak Hours in 2016. (AR-72 at 33).

343.    The 1998 Traffic Studies explicitly admit that "off-ramp left turning traffic experiences level of service 'e'" and that "southbound left-turns experience level of service 'f'". (AR-72 at 4).

344.    The agencies have misused Congressionally-directed highway funds in an attempt to construct a highway interchange which fails to relieve congestion "on" an existing interchange.


**XII. Agencies' Failure to Reconcile Conflicts with Local Comprehensive Plan**

345.    The DEIS, the FEIS, and the ROD declare that one of the primary "Project Needs" for the proposed interchange is to "adhere to comprehensive plans of area municipalities." (AR-46 at I-1; AR-12 at I-1; AR-82 at 2).

346.    The FEIS openly declares that highway development has forced "unwanted highway commercial sprawl or development pressure upon areas that the local communities wish to preserve historic resources, farmlands, and open space." (AR-46 at ES-1).

347.    The FEIS declares that the selection of an interchange location should "accommodate differing development plans and concerns of adjacent areas." (AR-46 at ES-1).

348.    The FEIS declares that the interchange must protect farmland and historic resources that have been designated for preservation. (AR-46 at ES-1).

349.    Since February of 1988, the Greene Township Board of Supervisors has opposed a Walker Road location for the interchange, as part of the Township's vision to preserve agricultural lands and prevent sprawl within the Township. (AR-86 at 16).

350.    The local, elected officials of the Township have taken many actions to preserve and protect the rural quality of life for its residents. (AR-142 at 860).

351.    The Township was one of the first in Franklin County to establish Agricultural Security Areas (ASA's) and the Township had previously established ASA's on farmland surrounding "Alternative D-Modified". (AR-19 at Map 7-2 at 7-8).

352.    The Franklin County Commissioners have expressed their opposition to the construction of an interchange that would develop land in an area known as "Franklin Farms" near Franklin Farm Lane. (AR-141 at 345).

353.    The Franklin County Commissioners have expressed their opposition to the construction of an interchange that makes Franklin Farm Lane a "primary route of travel" due to the "inconveniences and hazardous conditions which are associated with increased traffic" on that route. (AR-141 at 345).

354.    "Alternative D-Modified" makes Franklin Farm Lane a primary route of travel. (AR-80 at 6, 7).

355.    The Franklin County Comprehensive Plan in effect at the inception of the interchange project made no mention of an interchange. (AR-158 at 255, 256).

356.    In comments on the DEIS, the Greene Township Supervisors noted that neither the Comprehensive Plan of the Township nor the Comprehensive Plan of Franklin County identified or projected the construction of a new interchange on I-81 near Walker Road. (AR-96 at 591).

357.    In those comments, the Township Supervisors informed the agencies that
Guilford Township lacked a Comprehensive Plan. (AR-96 at 591).

358.    In 1995, the Greene Township Supervisors hired a local engineering firm to
project the cost of extending sewer and water lines to the proposed interchange area.
(AR-109 at 1403).

359.    That study revealed that the cost of extending infrastructure to the area around the
proposed interchange was prohibitive. (AR-109 at 1403).

360.    In the "Re-evaluation of the ROD", the agencies attempted to sidestep the issue of
a Walker Road interchange's inconsistency with the Greene Township Plan by
declaring that the project was "largely consistent" with the "land use regulations and
comprehensive plans" of area municipalities. (AR-83 at 6).

361.    In the DEIS and the FEIS, the agencies admitted that Greene Township's zoning
of land in the Walker Road area sought to preserve "agricultural lands" and retain
"the rural character of the area." (AR-12 at III-1; AR-46 at III-1)

362.    In a footnote in the "Re-evaluation of the ROD", the agencies ignored the
inconsistency of the interchange with the Greene Township plan, and stated that the
project was, instead, consistent with the "zoning, development approvals, and future
land use patterns" of the Township. (AR-83 at 6).

363.    That phrasing appeared in the "Re-evaluation of the ROD" for the first time, and
did not appear in the DEIS, the FEIS, or the ROD.

364.    In the FEIS, the agencies declared that a Walker Road interchange was
"consistent with. . . Franklin County plans" even though the agencies failed to

explain, summarize, or analyze any portion of the County's Comprehensive Plan. (AR-46 at ES-29).

365.    When the Plaintiffs requested a copy of the Franklin County Comprehensive Plan, the agencies were unable to produce it for the Administrative Record, stating that they did not have the Plan in their files. (*See* the agencies' *Memorandum of Law in Opposition to Plaintiffs' Motion to Supplement the Administrative Record* at Exhibit "A").

366.    The agencies acted arbitrarily by failing to reconcile the construction of the interchange with the Comprehensive Plans of area municipalities.

Respectfully submitted this 25th Day of July, 2002.

Thomas Alan Linzey, Esq.
Community Environmental Legal Defense Fund (CELDF)
2859 Scotland Road
Chambersburg, Pennsylvania 17201

*Counsel for the Plaintiffs*