# ORIGINAL

*2 foot*

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GREENE/GUILFORD ENVIRONMENTAL ASSOCIATION, a non-profit corporation incorporated under the laws of the Commonwealth of Pennsylvania, CITIZENS FOR PLANNED COMMUNITY GROWTH, an unincorporated association organized under the laws of the Commonwealth of Pennsylvania, PAUL B. AMBROSE, JOHN G. ENDERS, CHARLES F. RAHAUSER, BETSY RAHAUSER, DOUGLAS A. WARNOCK, U.X. VAGNERINI, THOMAS W. BUNDY, STEPHEN P. BUCHER, ROGER J. ROBERTSON, JAMES A. STRITE, JR., and DAVID A. GUTHRIE,<br>Plaintiffs,<br><br>v.<br><br>KEN WYKLE, Administrator, Federal Highway Administration, ROBERT GATZ, Federal Highway Administration,<br>Defendants,<br><br>And<br><br>BRADLEY L. MALLORY, Secretary for The Department of Transportation, Commonwealth of Pennsylvania,<br>Intervenor. | : <br> : <br> : <br> : <br> : <br> : <br> : CIVIL NO. 1:CV-01-0910<br> : (Judge Rambo)<br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

FILED
HARRISBURG, PA

JUL 25 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**Table of Contents**

Table of Citations.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    iv

I. Procedural History of the Case    .    .    .    .    .    .    .    .    .    .    .    .    .    .    1

II. Statement of Facts    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    1

      A.  The History of the Interchange Project.    .    .    .    .    .    .    .    .    .    1

      B.  The "Alternative D-Modified" Interchange Project.    .    .    .    .    .    .    4

III. Statement of Questions Presented.    .    .    .    .    .    .    .    .    .    .    .    .    6

IV. Statement of Standard of Review.    .    .    .    .    .    .    .    .    .    .    .    .    7

**Argument**

V. The Agencies Predetermined the Location of the Interchange in Response to Political
Pressure and Local Developers, Violating the Letter and Underlying Purpose of the
National Environmental Policy Act and National Historic Preservation Act.    .    .    .    .    .    7

VI. The Agencies Violated the National Environmental Policy Act by Refusing to
Examine Alternatives Created by Congressional Amendment of the Interchange's
Funding Legislation.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    30

VII. The Agencies Violated the National Environmental Policy Act by Illegally
Segmenting the Project's Impact on Local Roadways from the Environmental Studies
Conducted for the Interchange.    .    .    .    .    .    .    .    .    .    .    .    .    .    35

      A. The Agencies Violated NEPA and the NHPA by Segmenting the Impacts of
      Local Road Upgrades and Widening Necessitated by the Interchange From the
      Interchange Project.    .    .    .    .    .    .    .    .    .    .    .    .    .    35

      B. The Agencies Violated NEPA and the NHPA by Segmenting the Construction
      and Impact of the Federally-Funded Norland Avenue Extension Connector from
      the Interchange Project.    .    .    .    .    .    .    .    .    .    .    .    .    36

VIII. The Agencies Violated the Law by Refusing to Prepare a Supplemental
Environmental Impact Statement to Examine Impacts Resulting from the 1998 Newly
Designed and Located Interchange; and Impacts Resulting from the 2000 Ruling of the
Pennsylvania Supreme Court Recognizing Farmland in the Walker Road Area as
Specially Protected by State Law.    .    .    .    .    .    .    .    .    .    .    .    .    36

A. The Agencies Violated the National Environmental Policy Act by Refusing to Prepare a Supplemental Environmental Impact Statement Following the Complete Redesign and Relocation of the Interchange in 1998, and Significant Land Use Changes Surrounding the Kriner Road Location for the Interchange. . . . . 37

B. The Agencies Violated the National Environmental Policy Act by Refusing to Prepare a Supplemental Statement Following a Pennsylvania Supreme Court Ruling That Farmland in the Project Area Is Specially Protected by State Law. .37

IX. The Agencies Violated the National Environmental Policy Act and the National Historic Preservation Act by Intentionally Selecting a Stunted Study Area for Historic Resources to Avoid Identifying Impacts to Those Resources. . . . . . . . . . 38

X. The Agencies Misused Funding for the Demonstration Project Because the Construction of a Walker Road Interchange to Relieve Traffic Congestion "Near" an Existing Interchange Fails to Meet the Stated Needs of the Congressionally Authorized Demonstration Project Requiring Relief of Traffic Congestion "On" an Existing Interchange. . . . . . . . . . . . . . . . . . . . . . . .39

XI. The Agencies Violated Their Own Regulations and Ignored Their Own Invented Project Need by Failing to Reconcile the Selection of a Walker Road Location With Local Comprehensive Land Use Plans. . . . . . . . . . . . . . . . . .49

XII. Conclusion . . . . . . . . . . . . . . . . . . . . . . . 50

# Table of Citations

## *Cases*

*Alaska Wilderness Recreation v. Morrison*, 67 F.3d 723 (9th Cir. 1995). . . . . . . 32

*Ashwood Manor Civic Association v. Dole*, 619 F.Supp. 52 (E.D. PA 1985). . . . . 10

*Assocs. Working for Aurora's Res. Env't v. Colorado Dept. of Transp.*,
    153 F.3d 1122 (10th Cir. 1998). . . . . . . . . . . . . . . . . .10

*Brooks v. Volpe*, 380 F.Supp. 1287 (W.D. Wash. 1974). . . . . . . . . . . . . 9,29

*Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission*,
    449 F.2d 1109 (D.C. Cir. 1971). . . . . . . . . . . . . . . . . .31

*Cedar-Riverside Environmental Defense Fund v. Hills*, 422 F.Supp. 294 (D. Minn. 1976),
    *vacated and remanded for mootness*, 560 F.2d 377 (8th Cir. 1977). . . . . 9,28

*City of Carmel-By-The-Sea, et al. v. United States Department of Transportation*,
    95 F.3d 892 (9th Cir. 1996). . . . . . . . . . . . . . . . . .31-32,34

*Curry v. United States Forest Serv.*, 988 F.Supp. 54 (W.D. PA 1997). . . . . . . .31

*Davis v. Mineta*, 2002 U.S. App. LEXIS 12285 (10th Cir. 2002). . . . . . 9,10,28,31

*Idaho Conservation League v. Mumma*, 956 F.2d 1508 (9th Cir. 1992). . . . . . . 31

*Isle of Hope Historical Ass'n, Inc. v. U.S. Army Corps of Engineers*,
    646 F.2d 215 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . 9

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000). . . . . . . . . . . . . . .9,28

*Natural Resources Defense Council v. Callaway*, 524 F.2d 79 (2nd Cir. 1975). . . .9,29

*Pennsylvania Protect Our Water and Environmental Resources, Inc. v. Appalachian*
    *Regional Commission*, 574 F. Supp. 1203 (M.D. PA 1982). . . . . . . . .7,9

*Resources Ltd. v. Robertson*, 35 F.3d 1300 (9th Cir. 1994). . . . . . . . . . . 32

*Ross v. FHWA*, 162 F.3d 1046 (10th Cir. 1998). . . . . . . . . . . . . . . . 39

*Sierra Club v. U.S. Dep't of Transp.*, 962 F.Supp. 1037 (N.D. Ill. 1997). . . . . . 9

*Sierra Club v. Watkins*, 808 F.Supp. 852 (D.D.C. 1991). . . . . . . . . . . . 31

*Simmons v. United States Army Corps. of Eng'rs*, 120 F.3d 664 (7th Cir. 1997). . . .31

*Society Hill Towers Owners Ass'n v. Rendell*, 210 F.3d 168 (3rd Cir. 2000). . . . . .7

*State of South Carolina v. O'Leary*, 953 F.Supp. 699 (D.S.C. 1996). . . . . . . . 31

*Township of Lower Alloways Creek v. Public Service Electric & Gas Co.*,
    687 F.2d 732 (3rd Cir. 1982). . . . . . . . . . . . . . . . . . 7

*Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978). . . . . . .7

*Wade v. Dole*, 561 F.Supp. 913 (D.Ct. Ill. 1983). . . . . . . . . . . . 9,40

### Statutes and Regulations

Pub. L. No. 100-17, 101 Stat. 132 (April 2, 1987). . . . . . . . . . . *passim*

Pub. L. No. 100-17, 101 Stat. 132 (April 2, 1987), *as amended by* Pub. L. No. 104-59,
    109 Stat. 568 (Nov. 28, 1995). . . . . . . . . . . . . . . *passim*

23 U.S.C. §138. . . . . . . . . . . . . . . . . . . . . . . . .27

42 U.S.C. §4332(C) . . . . . . . . . . . . . . . . . . . . . .30

49 U.S.C. §303. . . . . . . . . . . . . . . . . . . . . . . . .27

23 CFR §112(b)(3) . . . . . . . . . . . . . . . . . . . . 8,17,24

23 CFR §625.4. . . . . . . . . . . . . . . . . . . . . . . . .21

23 CFR §771.130. . . . . . . . . . . . . . . . . . . . . . . 4

40 CFR §1500.1. . . . . . . . . . . . . . . . . . . . . . . . 8

40 CFR §1500.2. . . . . . . . . . . . . . . . . . . . . . . .30

40 CFR §1502.1. . . . . . . . . . . . . . . . . . . . . . . . 7

40 CFR §1502.2. . . . . . . . . . . . . . . . . . . . . . . . 8

40 CFR §1502.5. . . . . . . . . . . . . . . . . . . . . . . . 8

40 CFR §1506.1. . . . . . . . . . . . . . . . . . . . . . . 8,30

40 CFR §1506.2. . . . . . . . . . . . . . . . . . . . . . . . .49


*Misc.*

133 Cong. Rec. H1604 (daily ed. March 30, 1987). . . . . . . . . . . . . . 2

Fed. Reg. Vol. 55, No. 204 at 42670, 42671 (October 22, 1990). . . . . . . .21,49

62 Fed. Reg. 7045. . . . . . . . . . . . . . . . . . . . . .49

GAO, *Highway Demonstration Projects: Improved Selection and Funding Controls
    Are Needed*, U.S. GAO/RCED-91-146 at 5 (May, 1991). . . . . . . . .39

H.R. 2274 (104th Congress, 1st Session). . . . . . . . . . . . . . 33

Al Gore, *From Red Tape to Results – Creating a Government that Works Better & Costs
    Less* (Report of the National Performance Review) 103 (1993). . . . . . . 2

Mandelker, *NEPA Law and Litigation* (2000 ed.). . . . . . . . . . . .30

## I. Procedural History of the Case

This suit was filed on May 24, 2001 by eleven individual Plaintiffs and two nonprofit organizations, alleging that the planning for an interchange project in Franklin County, Pennsylvania violated the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and other federal laws and regulations. In addition, Plaintiffs contend that the Defendants illegally misused federal funds for the project. Plaintiffs filed an Amended Complaint on June 6, 2001.

On August 15th, the Defendants filed their Answer to the Plaintiffs' Amended Complaint. On the same day, the Pennsylvania Department of Transportation filed a Motion to Intervene, which was granted by this Court.

On September 28th, the agencies filed the Administrative Record with the parties and this Court.

On December 13th, the Plaintiffs filed a Motion to Supplement the Administrative Record with sixty-one documents that had been excluded from the Record. On March 1st, 2002, this Court issued a written decision granting, in part, the Plaintiffs' Motion.

On March 29, 2002, the agencies produced nineteen volumes of Supplemental materials to the Record.

On June 10. 2002, the agencies filed a Joint Motion for Summary Judgment.

## II. Statement of the Facts

### A. The History of the Interchange Project

The proposed interchange that is the subject of this suit is a "demonstration" project created in 1987 by the Congressional adoption of Public Law 100-17. U.S.

Representative Bud Shuster inserted funding authorization for this "demonstration" interchange project into that law to benefit his home Congressional district.[1]

Specifically, Section 149(a)(74) of Public Law 100-17, also known as the Surface Transportation and Uniform Relocation Assistance Act of 1987 [STURAA], provided for demonstration and priority surface transportation projects including the following:

> Chambersburg, Pennsylvania -
>
> The Secretary [of the U.S. Department of Transportation] shall carry out a highway project which demonstrates how construction of an interchange on a north-south interstate route will provide access to Chambersburg, Pennsylvania, and relieve traffic congestion on an existing interchange on such interstate route.

Pub. L. No. 100-17, §149(a)(74), 101 Stat. 132, 192 (April 2, 1987).

In May of 1994, a Draft Environmental Impact Statement ("DEIS") was issued by the highway agencies. The DEIS selected a Walker Road location for the interchange as the "Preferred Alternative". (AR-12 at ES-26). In May of 1995, a Final Environmental

---

[1] "Demonstration" highway projects traditionally have committed federal funds to be spent in particular legislative districts, often with little real benefit except to direct the largesse of the federal government to benefit a narrowly defined constituency. Concerns over the "unjustifiable funding for narrow, individual special interest highway and transit construction projects" led President Ronald Reagan to veto STURAA. *See* 133 Cong. Rec. H1604 (daily ed. March 30, 1987). President Reagan specifically stated that STURAA "represent[ed] a failure to exercise the discipline that is required to constrain Federal spending, especially pork barrel spending," and thereafter identified 152 highway special interest projects (one of which was the proposed interchange currently before this Court) as part of the unaffordable aspects of STURAA. *Id.* Moreover, in a report entitled "From Red Tape to Results - Creating a Government that Works Better & Costs Less" (Report of the National Performance Review) issued in September 1993, Vice President Al Gore recommended that appropriations for existing highway demonstration projects, such as the proposed interchange, be rescinded. Vice President Gore specifically cited a study performed by the General Accounting Office in 1991 which found that most of the demonstration projects authorized by STURAA "did not respond to states' and regions' most critical federal-aid needs." Vice President Gore summarized these findings, stating that "[i]n other words, many highway demonstration projects are little more than federal pork." Al Gore, "From Red Tape to Results -- Creating a Government that Works Better & Costs Less" (Report of the National Performance Review), 103 (1993). (AR-105 at 98).

Impact Statement ("FEIS") was approved by the agencies which designated the Walker

Road location for the interchange as the "Selected Alternative". (AR-46 at ES-27).

In November of 1995, Public Law 100-17 was overhauled as part of the adoption

of the National Highway System Designation Act of 1995. The legislative provision

pertaining to the proposed interchange now states as follows:

> Pennsylvania -
>
> The Secretary shall carry out a highway project which
> demonstrates how construction of an interchange on a
> north-south interstate route will provide access to
> Chambersburg, Pennsylvania, and relieve traffic congestion
> on an existing interchange on such interstate route and
> **other projects in the counties of Bedford, Blair, Centre,**
> **Franklin, and Huntingdon, Pennsylvania.**

Pub. L. No. 100-17, §149(a)(74), 101 Stat. 132, 192 (April 2, 1987), *as amended* by Pub.

L. No. 104-59, §340(c), 109 Stat. 568, 607 (Nov. 28, 1995) (emphasis added).

As such, the legislation now provides in relevant part that "[t]he Secretary shall

carry out ... projects in the counties of Bedford, Blair, Centre, Franklin, and Huntingdon,

Pennsylvania" using the funds previously earmarked for the interchange. The title block

for the provision was also amended to remove any reference to Chambersburg.

On June 4, 1998, the highway agencies unveiled a proposal for a new interchange

in the Walker Road area – "Alternative D-Modified." (AR-80 at 6).

In January of 1999, the agencies decided not to prepare a Supplemental

Environmental Impact Statement (SEIS) to address the new interchange project. Instead,

the agencies released a "Re-Evaluation" of the Final Environmental Impact Statement.

(AR-80). The "Re-Evaluation" was not approved via signature by either the state or

federal agency.

On March 25, 1999, the Record of Decision ("ROD") for the interchange project was approved and signed by the highway agencies. (AR-82).

On June 28, 2001, the agencies released a "Re-Evaluation" of the Record of Decision for the interchange project. A "Re-Evaluation" of an ROD is not recognized by law or regulation.[2] (AR-83).

## B.  The "Alternative D-Modified" Interchange Project

The current interchange project was proposed by the agencies on June 4, 1998, over three years after the FEIS was issued. (AR-80, AR-46). The project – designated "Alternative D-Modified" - was thus not one of the alternatives evaluated in any of the environmental or planning documents prepared for the interchange project. It has never been subject to public review or made part of any comparative examination of alternatives.

The proposed interchange, as currently configured, will encompass a web of new roadways and would be located approximately fourteen hundred feet (1400') south of the point where Walker Road currently crosses I-81 north of Chambersburg.[3] That location would be slightly more than a half-mile north of the existing I-81 interchange with U.S. Route 30 at Exit #6. (AR-22 at 28).  The web of new roadways associated with the proposed interchange will ultimately connect I-81 directly with Walker Road on the west and Franklin Farm Lane on the east, both of which drain onto Route 30 immediately

---

[2] A "revised" ROD is only authorized if the agencies select a project alternative that has already been "fully evaluated in an approved FEIS but not identified as the preferred alternative." 23 CFR §771.130. A "Re-Evaluation" of an ROD is not recognized by statutory or regulatory authority.
[3] Thus, the newly designed and located interchange would be constructed 1,400 feet south of the "selected" FEIS Alternative. (AR-80 at 6).

adjacent to the existing I-81/Route 30 Exit #6 interchange. (*See* AR-82 at Attachment "A").

The proposed interchange will involve constructing new north-bound and south-bound on and off access ramps to I-81 on farmland where no highway structures currently exist. Lands located in Agricultural Security Areas ("ASA's") surround proposed "Alternative D-Modified" to the north, south and east. (AR-136 at 1717). The proposed interchange will involve construction of a new connector road directly linking Franklin Farm Lane and Walker Road. That connector road will pass over I-81 on a new bridge that will be constructed as part of "Alternative D-Modified". The on and off access ramps will in turn terminate in the new connector highway. Finally, the existing bridge that carries Walker Road over I-81 will be demolished, thereby severing Walker Road by stubbing it on either side of I-81. (AR-80 at 6). The newly designed and relocated interchange increases the overall cost of construction of the interchange by over 400%. [4]

Increased traffic on local roadways resulting from the interchange will require comprehensive improvements and upgrades to Walker Road located to the west and east of I-81, and to Franklin Farm Lane east of I-81, but only improvements to Walker Road on the west side of I-81 have been planned and funded. (AR-46 at II-10). In addition, a road to connect the Borough of Chambersburg to the proposed interchange – the Norland Avenue Extension – will now be constructed with over $3 million in state and federal

---

[4] PennDOT's most current Transportation and Improvement Program (TIP, July 15, 2002) listings now reveal a final cost for the interchange of over $12 million. Figures released prior to the issuance of the "Re-Evaluation of the ROD" reveal a cost of over $9 million - three times the original estimated cost for the interchange. (AR-169 at 52). The construction of a connector road – known as the "Norland Avenue Extension" - and now funded with state and federal monies,

funds, but the project was never included by the agencies as part of the interchange project. The cost of – and impacts resulting from - the Norland Avenue Extension connector or upgrades to the local road network were never considered by the agencies in the environmental studies.

### III. Statement of Questions Presented

(1) Did the highway agencies violate federal law by predetermining the location of the interchange in the Walker Road area, and by refusing to consider alternatives to the project after Congress overhauled the funding legislation in 1995?

*Answer: Yes.*

(2) Did the highway agencies violate federal law by segmenting necessary local road upgrades and a connector road from the cost and impacts of the interchange project?

*Answer: Yes.*

(3) Did the highway agencies violate federal law by arbitrarily narrowing the study area for historic resources and by refusing to prepare an SEIS after developing a new interchange project in 1998, and after significant changes within the project study area had occurred?

*Answer: Yes.*

(4) Did the highway agencies misuse federal funds by proposing the construction of an interchange which failed to meet Congressionally established needs, and by proposing an interchange which failed to meet agency-contrived needs?

*Answer: Yes.*

---

adds an additional $3 million to the cost of the interchange. The FEIS reports that the total construction cost for the original interchange was $3,165,330. (AR-46 at II-17).

## IV. Statement of Standard of Review

This Court must insure that the agencies took a "hard look" at the impacts of the proposed project, that the agencies actually considered alternatives to the proposed action, and that the agencies made a "fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978); *See Pennsylvania Protect Our Water and Environmental Resources, Inc. v. Appalachian Regional Commission*, 574 F.Supp. 1203, 1212 (M.D. PA 1982). This Court must also determine whether the agencies gave "good faith consideration" to the environmental consequences resulting from the proposed project. *Pennsylvania Protect Our Water and Environmental Resources* at 1213.

If this Court determines that the agencies' decisions were arbitrary, capricious, an abuse of discretion, or not in accordance with the law, this Court shall set aside the decisions of the agencies. 5 U.S.C. §706(2)(A); *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168 (3rd Cir. 2000).

## ARGUMENT

## V. The Agencies Predetermined the Location of the Interchange in Response to Political Pressure and Local Developers, Violating the Letter and Underlying Purpose of the National Environmental Policy Act and National Historic Preservation Act.

The entire thrust of the National Environmental Policy Act (NEPA) is to "ensure that environmental concerns are integrated into the very process of agency decisionmaking." *Township of Lower Alloways Creek v. Public Service Electric & Gas Co.*, 687 F.2d 732 (3rd Cir. 1982); *See* 40 CFR §1502.1. To achieve that goal, NEPA

assists public officials to "make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 CFR §1500.1. The law also recognizes that NEPA documents must be "prepared early enough so that [they] can serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." 40 CFR §1502.5.

The law and its implementing regulations specifically recognize that agency decisions that establish a project location or design prior to compliance with NEPA, defeat the goal of the "well-informed decisionmaker" which NEPA seeks to create. 40 CFR §1500.1(b). The predetermination of a project's location or design allows agencies to use the NEPA process to simply rationalize decisions already made, rather than using the NEPA process to arrive at a fully informed decision. Regulations implementing NEPA specifically guard against this misuse of the process by forbidding agencies from committing resources to a project prior to completion of NEPA documents.[5] NEPA regulations prohibit agency action on any proposals which would "limit the choice of reasonable alternatives." 40 CFR §1506.1; *See also* 40 CFR §1502.2. In furtherance of that goal, NEPA specifically prohibits agencies from taking action which would prejudice the ultimate decision on a project, declaring that "[i]nterim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives." 40 CFR §1506.1.

Courts interpreting these sections of NEPA have uniformly held that such predetermination – committing an agency to a certain course of action prior to

---

[5] *See, e.g.*, 23 U.S.C. §112(b)(3) which prohibits the highway agencies from commencing design activities prior to compliance with NEPA and the issuance of a Record of Decision.

completion of the NEPA process – unlawfully manipulates the NEPA process to achieve

a predetermined conclusion. At least one court has proclaimed that "[e]nvironmental laws

are not [merely] arbitrary hoops through which government agencies must jump." *Sierra*

*Club, Illinois Chapter v. U.S. Department of Transportation*, 962 F.Supp. 1037 (N.D. Ill.

1997). In addition, courts have frequently stated that the analysis of environmental effects

in an EIS must illustrate a "good-faith" objectivity on the part of the agency. *See Isle of*

*Hope Historical Ass'n, Inc. v. United States Army Corps of Engineers*, 646 F.2d 215 (5th

Cir. 1981); *Davis v. Mineta*, 2002 U.S. App. LEXIS 12285 at *9 (10th Cir. 2002); *Metcalf*

*v. Daley*, 214 F.3d 1135, 1143-44 (9th Cir. 2000); *Cedar-Riverside Environmental*

*Defense Fund v. Hills*, 422 F.Supp. 294 (D. Minn. 1976), *vacated and remanded for*

*mootness*, 560 F.2d 377 (8th Cir. 1977). This Court has declared that agencies must give

"good faith consideration" to the consequences of their actions. *Pennsylvania Protect*

*Our Water and Environmental Resources v. The Appalachian Regional Commission*, 574

F.Supp. 1203, 1213 (M.D. PA 1982).

Courts have also emphasized that impact statements must not simply be

"promotional" documents "in favor of [a] proposal at the expense of a thorough and

rigorous analysis of environmental risks." *See Brooks v. Volpe*, 380 F.Supp. 1287 (W.D.

Wash. 1974). At least one Circuit Court has held that EIS's should not be prepared by a

"state agency with an individual 'axe to grind', i.e. an interest in seeing the project

accepted and completed in a specific manner as proposed" and that "[a]uthorship by such

a biased party might prevent the fair and impartial evaluation of a project envisioned by

NEPA." *Natural Resources Defense Council v. Callaway*, 524 F.2d 79 (2nd Cir. 1975);

*Wade v. Dole*, 561 F.Supp. 913 (D.Ct. Ill. 1983) (stating that in an agencies' "anxiety to

approve the predetermined route, [it] failed to exercise the diligence which NEPA requires"); *See also Assocs. Working for Aurora's Res. Env't v. Colorado Dept. of Transp.*, 153 F.3d 1122, 1129 (10th Cir. 1998) (discussing the type of independent review by the federal agency necessary to eliminate the bias of the preparer). The U.S. District Court for the Eastern District of Pennsylvania has declared that an EIS must be more than simply a "rubber-stamping" of a foregone conclusion reached by the agency and cannot be "merely a post hoc rationalization" of the decision made by the agency. *Ashwood Manor Civic Association v. Dole*, 619 F.Supp. 52, 87 (E.D. PA 1985).

Courts have held that contracts between agencies and consultants can create a bias that unlawfully predetermines the outcome of NEPA decisionmaking. *Metcalf v. Daley*, 214 F.3d 1135, 1143-44 (9th Cir. 2000). Courts have also held that failure to insulate a reviewing agency from the biases of the preparer of NEPA documents can be fatal to the NEPA process. *Davis v. Mineta*, 2002 U.S. App. LEXIS 12285 at*9 (10th Cir. 2002).

The Administrative Record in this case is replete with evidence that the highway agencies predetermined the location of the interchange in response to political pressures, and then manipulated the NEPA process to produce the desired result of an interchange in the Walker Road area. To accomplish that desired result, the agencies ignored the Congressionally-established needs for the project, invented additional needs, avoided the examination of historic resources, avoided the examination of project alternatives following the legislative overhaul of Public Law 100-17, segmented major parts of the project from the interchange, and issued repeated "Re-Evaluations" to circumvent statutory requirements for additional studies.[6]

---

[6] To avoid the preparation of a Supplemental Draft Environmental Impact Statement (SDEIS) and a Supplemental Environmental Impact Statement (SEIS), the agencies issued a "Re-Evaluation"

As early as 1987, the highway agencies were focused on delivering an interchange in the Walker Road area, regardless of the wording of Public Law 100-17. Disregarding the funding legislation's open-ended language about the location of the interchange[7], the agencies initiated their NEPA Scope of Study by bluntly stating that "[t]he Route 30 Interchange #6 is inferred [by Public Law 100-17] as the existing interchange with traffic congestion." (AR-86 at 7). In addition, the agencies declared that the proposed interchange would be located "north of Chambersburg" and would "serve a future land developer." (AR-86 at 8). In an Early Coordination Form, the agencies again ignored the broad scope of the funding legislation and declared that the entire purpose of the law was to determine "a location for an interchange with I-81 for the purpose of alleviating traffic congestion *on U.S. Route 30* **(SR0030)**, a major east-west arterial highway." (AR-112 at 1) (emphasis added).

An "Exit 7 Coloring Book" prepared by the agencies at the inception of the project, again reveals the agencies' dogged predetermination of a Walker Road location for the project. That Coloring Book, prepared for area children to build support for an interchange in the Walker Road area, pictorially illustrates traffic traveling on Route 30 and promotes an interchange north of Chambersburg as a panacea to traffic congestion on Route 30. In a sign displayed in the Coloring Book, declaring "Coming Soon! Exit 7:

---

of the Final Environmental Impact Statement and a "Re-Evaluation" of the Record of Decision. (AR-80; AR-83). Whereas a Supplemental Environmental Impact Statement (SEIS) requires compliance with NEPA regulations and public review, the "Re-Evaluations" were issued without public review and comment.

[7] The language of Public Law 100-17 mandated that the interchange project "demonstrate[] how construction of an interchange on a north-south interstate route [would] provide access to Chambersburg, Pennsylvania, and relieve traffic congestion on an existing interchange on such interstate route." There are several interchanges near Chambersburg, but the highway agencies – beginning with the original scoping done for the project – focused solely on a Walker Road location north of Chambersburg which would ostensibly relieve congestion at exit #6 - the I-81/Route 30 interchange.

PennDOT's Answer to Your Travel Needs!", the agencies continued to predetermine the location of the interchange near Walker Road north of Chambersburg, even though the study area for the interchange was designated as extending from just north of Exit #4 to Exit #8, and even though Public Law 100-17 made no mention of relieving congestion on Route 30. (AR-112 at 58-69).

PennDOT's official Twelve Year Highway and Bridge Program, published on September 2, 1987, referred to the interchange project as "I-81 Exit 7, NB & SB Exit Ramps, North of Chambersburg." (AR-169 at 66). That reference – to an interchange "North" of Chambersburg - was repeated in the Twelve Year Plan published on October 23, 1987. (AR-169 at 67). On April 12, 1988, PennDOT's Twelve Year Plan referred to the interchange as being "[n]orth of Chambersburg, [in] Greene Township." (AR-169 at 69). Plans from 1989 to 1994 referred to an interchange to be constructed north of Exit #6 and thus, north of Chambersburg. (AR-169 at 56, 58, 60, and 64).

On January 26, 1988, PennDOT published an advertisement in the Pennsylvania Bulletin, soliciting an engineering firm to conduct a Design Location and Environmental Study for the interchange. In the advertisement, the agency bluntly declared that "[t]he objective of the studies is the development of a recommended location that will relieve the present traffic congestion **at Exit 6 and on U.S. 30**." (AR-161 at 63) (emphasis added).

On February 24, 1988, PennDOT requested FHWA authorization to conduct preliminary engineering for a "study to determine the location for a new interchange, **Exit 7**, with I-81. . . **between Exit 5 and Exit 8**." (AR-167 at 2233) (emphasis added). Those parameters – examining only locations north of Chambersburg for an interchange,

and expressly excluding the Kriner Road Alternatives[8] – were repeated in the Federal Aid Project Agreement entered into January 11, 1989 between PennDOT and FHWA. (AR-167 at 2299).

      On October 31, 1988, PennDOT entered into a Contract for a Design Location Study and the preparation of an Environmental Impact Statement. The consultants' proposal declared that "[t]he purpose of the proposed interchange is to relieve traffic congestion at the existing Interstate 81/U.S. Route 30 Interchange (Interchange 6)." (AR-163 at 1022). The Scope of Work in the proposal then stated that comparison between alternatives for the project must include "the ability to relieve traffic congestion at Interchange 6 (main goal of project)." (AR-163 at 1027). In addition, the Scope of Work declared that the purpose of the project was to "[l]ocate a new interchange on Interstate 81 that will be in a desirable location to **divert traffic from Exit 6**." (AR-163 at 1038). (emphasis added).

      On September 21, 1990 – almost four years prior to the completion of the initial environmental studies on the project, a PennDOT District Engineer met with the Chairman of the Chambersburg Area Chamber of Commerce and U.S. Representative Bud Shuster's Chief of Staff, Ann Eppard. The purpose of the meeting was for PennDOT to begin working with the Chamber to develop a strategy to consolidate support for the construction of an exit north of Chambersburg. (AR-88 at 24). That meeting occurred even though the agencies had admitted that "there may be no solid project need at this time" over a year prior to the meeting. (AR-89 at 7; AR-90 at 5).

---

[8] The Kriner Road Alternatives (Alternatives "B" and "B-1") would be constructed between Exit #4 and Exit #5 south of Chambersburg. (AR-46 at II-4, II-12).

The lack of project need for the construction of a Walker Road interchange plagued the agencies. At one point, PennDOT declared that "[j]ust because project need can't be successfully defended before the Transportation Project Development Interagency Coordination Committee doesn't mean that the project has to be stopped." (AR-89 at 6). That state of affairs was reiterated by Barry Hoffman, PennDOT's District Engineer, who – in a Briefing Paper prepared for the project – stated that PennDOT's consultants have "been unable to develop a project need." (AR-90 at 11).

Staff of the highway agencies weren't the only ones recognizing that no project "need" existed for an interchange in the Walker Road location. Other agencies, asked to comment on the Defendants' 1990 Preliminary Alternatives Report, not only raised the lack of "need" as a reason to cancel the project, but honed in on the concocted political nature of the interchange.

The Pennsylvania Fish Commission perhaps stated it best when the agency declared that "[i]t appears the I-81 interchange proposal was politically conceived for some unseen reason. The Department is trying to incorporate a project that does not belong and has no meaning." (AR-88 at 41). In recounting a meeting between PennDOT and other reviewing agencies, the Pennsylvania Historic and Museum Commission stated that all of the agencies had "expressed their concern that the need for this project has not been discussed or demonstrated." (AR-88 at 44). Comments submitted by the Army Corps of Engineers declared that "[t]he need for the project is not apparent." (AR-88 at 48).

At about the same time that the staff of the highway agency was considering the suspension of the project due to the lack of a need, U.S. Representative Bud Shuster

became concerned about the lack of progress towards construction of the exit. On April 14, 1992, Shuster sent the first of several "smoking gun" letters to then-Secretary of Transportation Howard Yerusalim, stating that "the five year hold up on this project . . . could cost the area 4,000 jobs. . . Your decision to build this exit at Walker Road will provide the necessary link to connect the planned development site and the Interstate." (AR-90 at 3). One of the planned development sites referenced by Shuster in his letter is the tract of land known as the "Gabler Tract" – the last undeveloped farmland left in Chambersburg Borough whose development is contingent upon the construction of the exit at the Walker Road location.[9]

In his July 6, 1992 reply to Shuster's letter – sent two years prior to the completion of the Draft Environmental Impact Statement – Yerusalim bluntly declared that

> PennDOT is committed to **pursuing construction of Exit 7 at or near Walker Road to service and promote economic development in the area**. . . I will personally guarantee the Governor's and my full attention to the completion of this project. (AR-90 at 20) (emphasis added).

Perhaps even more remarkable than his July 6th, 1992 communication is Yerusalim's July 14th communication, in which he assured Shuster that the entire agency decisionmaking process had been manipulated to focus on the goal of constructing the interchange in the Walker Road area. In that letter, Yerusalim stated that

> We are now **restructuring** the project scope by focusing on the objective to **provide access to developing land adjacent to Walker Road.** We will make sure our consultant fully understands the development potential. . . PennDOT is committed to pursuing construction of Exit 7 **at or near Walker Road to service**

---

[9] The agencies have recognized in the FEIS that the intensity of development on the Gabler tract of farmland is wholly dependent upon the construction of the interchange at the Walker Road location. (AR-46 at V-15).

**and promote economic development in the area.** (AR-90 at 25) (emphasis added).

To ensure that his directives were carried out, and that the decisionmaking process was restructured to achieve the desired result, Yerusalim sent copies of the letters to seven high ranking PennDOT officials who exercised direct control over the planning and preliminary design process for the proposed interchange.[10]

In 1992, due to the intense public, agency, and local government opposition to the interchange project, PennDOT hired Winsor Associates to host a series of meetings among Franklin County groups. Eleanor Winsor, who authored several reports summarizing the meetings, was convinced that there was "another agenda . . . driving the project. . . the long term development goals of the property owners in the north end of Chambersburg [the Gabler developers] suggests that the[ir] development plans may be the 'hidden agenda.'" (AR-90 at 83). One of the participants at the meetings, State Representative Jeff Coy – an advocate for the Walker Road location and for the Gabler developers – bluntly stated to Winsor that the environmental studies were simply a formality, and "suggested that Congressman Shuster, [himself], and [state] Senator Punt meet with Secretary Yerusalim to make the decision" to locate the interchange. (AR-90 at 69).

Beginning on February 1, 1994, "Transportation Briefing Papers" were prepared by PennDOT for Representative Shuster and others. Those Briefing papers contain the statement that "[t]he project is intended to . . . relieve traffic congestion at the existing

---

[10] Those individuals included Larry King, Barry Hoffman, James McCarron, Robert Mustin, Gerald Fritz, Thomas TenEyck and Wayne Kober. All of the individuals cc:ed on Yerusalim's letter were managers of the planning and design process for the interchange, and several are listed as formal preparers of the FEIS. (AR-46 at VIII-5).

U.S. 30 interchange." (AR-169 at 111, 113, 115, 117, 119, 123, 125, and 128). All eight of those Updates were issued prior to the release of the FEIS.

Disregarding the rule that final design is prohibited prior to the issuance of a Record of Decision[11], the agencies supplemented their "Open End" Contract with Sheladia Associates, Inc. in June of 1994 to authorize design activities on an interchange in the Walker Road area. In a letter from PennDOT's District Engineer to the Bureau of Design, the Engineer declared that

> [t]he Department has moved onto an accelerated schedule for the above referenced project. It has been determined that pre-final design and final design will be accomplished under open-end Agreement No. 085164 with Sheladia Associates.

(AR-162 at 651).

In December of 1994, PennDOT formalized that Contract supplement, again announcing that it included "prefinal and final design activities on the I-81 Exit 7 project in Franklin County." (AR-162 at 550).

A letter accompanying the request for the supplement, sent from William Moyer, (Deputy Secretary for Highway Transportation for PennDOT) and the PennDOT District Engineer, noted that "[p]refinal tasks were approved by FHWA on December 29, 1994." *Id.* In an FHWA electronic mail of December 27, 1994, FHWA's Gatz declared that "Manny [Marks – FHWA Division Administrator] expects to authorize final design tomorrow." (AR-113 at 200).

In both the original Contract and the Amendment to that Contract made on January 24, 1995, Defendant Mallory – successor to Secretary Yerusalim - "concur[red] with performing the prefinal and final design activities." (AR-103 at 369).

---

[11] 23 U.S.C. §112(b)(3) prohibits agencies from "commenc[ing]" final design prior to full compliance with NEPA and the approval of a Record of Decision for the project.

Thus, even before a Selected Alternative had been chosen in the Final

Environmental Impact Statement (FEIS) – and five years before the Record of Decision

would be issued - the agencies were contracting with their consultant to move beyond

preliminary engineering and proceed to pre-final and final design on the construction of

the interchange in the Walker Road location.

Prompted by a formal citizen complaint, that agency decision even raised a red

flag to the FHWA. In a letter sent from the FHWA to PennDOT, the agency chastised

PennDOT that it was only "appropriate to conduct engineering activities to define the

elements of a proposed action or alternatives so that social, economic, and environmental

effects can be assessed. Engineering and design-related tasks beyond this level should not

be undertaken until a ROD has been issued." (AR-103 at 384). Notably absent from the

Administrative Record, however, are any further efforts by the FHWA to ensure that

PennDOT complied with these limitations.

Various Work Orders prepared in 1995 and 1996 state that "[t]he purpose of this

Work Order is to perform the continuation of Pre-Final Design Activities for the

Interstate 81 Interchange. . . The Interchange will connect S.R. 0081 with Walker Road."

(AR-165 at 1664; AR-165 at 1707). A February 23, 1996 Letter from PennDOT's Bureau

of Design to Manuel Marks, the Division Administrator of the FHWA, states that the

Work Orders provide for "**final design** activities for the Exit 7 Interstate 81 interchange."

(AR-165 at 1681). (emphasis added). These confirmations were sent over two years

before a Record of Decision was issued for the project.

In preparing the Draft Environmental Impact Statement (DEIS) for release in

1994, the agencies continued to focus on their goal of forcing the interchange project into

the Walker Road area north of Chambersburg. Although the FHWA specifically directed PennDOT to "not select a preferred alternative [in the DEIS because] none of the Build Alternatives stand out" (AR-91 at 116), the state agency proceeded to do just that – designating a Walker Road interchange as the "preferred" alternative and declaring that the DEIS would be circulated without the concurrence of other agencies. (AR-12 at ES-26; AR-91 at 167).

In addition to enshrining the Walker Road location as the "preferred" alternative, PennDOT abruptly dismissed the possibility of discussing road upgrades as a potential solution to traffic problems, stating without review or consideration, that "[e]valuation of upgrading an existing interchange is not required for this project." (AR-91 at 185).

After the release of the DEIS, several agencies questioned the apparent predetermination of the location for the interchange. The Department of Agriculture, in comments filed in July of 1994, declared that the selection of the Walker Road location was focused on "servicing projected growth areas" rather than solving any real transportation neeeds. (AR-93 at 536). FHWA itself declared that "plans to address the public and local area concerns, ways in which this controversy can be addressed, and possible remedies or mitigation" were missing from the DEIS. (AR-102 at 62).

The release of the DEIS also alerted the Gabler developers that it was time to obtain a re-zoning of their property, because the construction of the interchange in the Walker Road area was rapidly becoming a reality. Immediately following the release of the DEIS – in May of 1994 - the Gabler land developers requested a re-zoning of 240 acres to highway and commercial use. (AR-132 at 473). In an agency briefing completed during this period, the agencies admitted that "[t]he Borough of Chambersburg and local

developers support the interchange at Walker Road because it would provide direct interstate access to an undeveloped portion [the Gabler Tract] of the Borough." (AR-93 at 787).

At this point, even staff within the FHWA understood that the project location had been politically predetermined. When a Franklin County resident contacted the FHWA's Harrisburg office in May, 1994, a FHWA staff member told him that the "exit seems to be of no use to everyone except the so called developers" and that "they [FHWA] would not be in favor of an Exit exiting onto a township weight restricted road." (AR-45 at Section VII-1, at 1). As designed, "Alternative D-Modified" feeds interstate traffic directly onto local, Township roads. (AR-79 at 19).

Following the release of the DEIS, the highway agencies were politically prompted to accelerate the rest of the project. In an electronic mail from FHWA's Slye to FHWA Administrator Slater, dated October of 1994, Slye explained that "Congressman Shuster would like to see the captioned project advance quickly." (AR-113 at 202). In response to Shuster's pressure, the agencies appointed a "ramrod" for the project, stating that "this project has a higher priority than anything else." (AR-113 at 200; AR-113 at 202).

Even the FHWA expressed concerns over a PennDOT proposal to accelerate the release of the FEIS and the Record of Decision for a Walker Road interchange. In a bluntly worded letter from Manuel Marks - FHWA Division Administrator - to King, Marks stated that "we believe that the study and coordination process has suffered from the accelerated finalization of the DEIS. . . We have serious reservations concerning what is apparently a proposal to accelerate the FEIS and design schedule." (AR-93 at 532).

Instead of responding to those concerns, PennDOT simply pushed forward with plans for

a Walker Road interchange north of Chambersburg, stating in a briefing at the end of

1994, that

> U.S. Representative Bud Shuster is keenly interested in this project being
> advanced quickly and apparently believes that FHWA and PennDOT have
> unnecessarily delayed the project. As a result, the project schedule has been
> advanced such that it is proposed to complete a final EIS in May of 1995 and a
> Record of Decision (ROD) in July of 1995. (AR-93 at 787).

The acceleration of the planning process also required that the interchange be

exempted from industry design standards for spacing of interchanges. In PennDOT's

*Justification for a New Interchange*, produced in January of 1995 – months prior to the

completion and release of the FEIS, and four years prior to the approval of the Record of

Decision – the agency declared that the proposed interchange would be located in the

Walker Road area north of Chambersburg. (AR-22 at 1). In an even more blatant

circumvention of the rules applicable to interchange projects, the *Justification* stated that

"the proposed interchange was located to access the area that will be developed and

experience substantial growth. Therefore, the distance between Alternative D-C [Walker

Road] and Exit 6 does not meet the recommended" two mile interchange spacing for rural

areas, or the one mile interchange spacing for urban areas. (AR-22 at 28). The American

Association of State Highway and Transportation Official's 1990 industry standards

require such a spacing for interchanges. The AASHTO industry standards, incorporated

by reference by the FHWA at 23 CFR §625.4, are recognized as a "standard for design of

all projects on the Interstate System." Fed. Reg. Vol. 55, No. 204 at 42671 (October 22,

1990).[12] "Alternative D-Modified" – the current interchange project – would be located

---

[12] Interchange Design Criteria, and the failure of the Defendant agencies to fulfill generally
recognized engineering standards for the interchange, are presented in detail in the Traffic

fourteen hundred feet (1400') south of the alternatives examined in the *Justification*,

placing it slightly more than a half-mile north of the existing I-81/Route 30 interchange.

(AR-22 at 28).

Shuster's intimate involvement with the planning process, and the highway

agencies' lapdog approach to responding to Shuster's goal of predetermining the

project's location at the Walker Road location, is also reflected throughout the inter-

agency electronic mails that circulated during this period. In an e-mail from FHWA's

King to Gatz, in January of 1995, King stated that

> Manny [Marks] called this afternoon and said that PA DOT has received
> additional pressure to move the schedule up two months. Manny doesn't think
> that's possible. . . Larry King and Manny plan on getting back to the person
> involved on Tuesday to argue that its impossible to shorten the EIS schedule any
> more. What was Jane's [Jane Garvey, Acting FHWA Administrator] commitment
> to Shuster?" (AR-113 at 186).

In an electronic mail from Smith to Bednar, also in January of 1995, Smith

admitted that the agency was simply reacting to the wishes of Shuster, declaring that

> Manny Marks called this afternoon to give us a heads up. . . Bud may be pushing
> for a very accelerated process, like cutting our already accelerated process by a
> couple of months. I have not examined it closely, but I remember thinking in the
> meeting and when I saw the schedule that it was going to be tough. There are a lot
> of things out of our control. (AR-113 at 192).

One of the things "out of control" of the highway agencies, since Representative

Shuster's commandeering of the planning process, was the construction of the

interchange in any location other than the Walker Road area. In a May 1, 1995 letter from

Defendant Mallory to Senator Barry Stout, the PennDOT Secretary pledged that the

"proposed interchange would be located within Greene Township at the Walker Road

---

Impacts Report prepared by Lichty Engineering, Nassaux-Hemsley, Inc., and David Black
Associates, Inc. on behalf of the Greene Township Board of Supervisors in January of 1999. (AR-
79 at 6).

overpass . . . north of the interchange at U.S. Route 30." (AR-97 at 877). Incredibly, this letter was sent before the FEIS or the Record of Decision were even released and made it perfectly clear that Mallory – just like his predecessor Yerusalim – was intent on constricting the alternatives to make an interchange at Walker Road a foregone conclusion. Such a process violated both NEPA and the plain language of Public Law 100-17.

While attempting to deliver the Walker Road location to Shuster, the highway agencies engaged in a delicate balancing act – predetermining the interchange location in the Walker Road area while attempting to avoid the appearance of doing so. Following a December, 1995 briefing for Shuster on the interchange, the agencies engaged in a public relations attempt to make their predetermination more palatable. In an electronic mail from FHWA's Gamble to Smith during this time period, Gamble stated

> I would prefer to see a different term than "accelerate" in the first two sentences [of the Shuster Update]. Maybe something like "expedite" and/or "to manage timely project development activities", you know what I mean? "Accelerate" sends a negative message; we need to be kindler and gentler. (AR-113 at 157).

And, in another electronic mail sent from Robert Lee, on January 19, 1995, Lee stated that

> [I]t looks like we will need a more positive version of your 12/29 briefing on the I-81 interchange. Also, Tony mentioned that Manny [Marks] and Larry King were to follow-up with Shuster's staff this week (add'l ways to expedite the project) so you may need to follow up with Manny on this. Do you think Shuster will raise the issue with Rodney? [Slater, Administrator, FHWA]. (AR-113 at 185).

The accelerated timetable pushed by Shuster and implemented by the highway agencies again required the violation of regulations that govern the contracting for design

activities on projects prior to the issuance of a Record of Decision.[13] In several electronic mails, agency staff even questioned their own ability to move towards final design of the interchange in the Walker Road area prior to completing the FEIS or issuing the ROD. In an illuminating series of electronic mails sent over five months prior to the release of the FEIS, FHWA's Gatz declared to Gendell that the decision was out of the agency's hands, and that

> [t]he "decision" to authorize design was a "decision" made by the WO [Washington Office] during their meeting with Rep. Shuster. The DO [District Office] will be sending us a "draft" to look at before Manny [Marks] takes any action. We'll do what we can to comply with the various regulations but I'm told it's a "done deal". The FHWA Washington Office has committed the agency to the following schedule. . . (AR-113 at 198).

In response to the blatant suggestion that the agencies simply alter the Record to avoid scrutiny of the decision to proceed with final design activities, FHWA's Gatz wrote

> I don't think you can just change your mind and proceed. . . It seems to me you can attempt to show why you changed your mind or the state can provide the additional information which allows you to reach a different conclusion. It seems to me you need more information/facts before you can change the "record." The issue before you is the ability to authorize "pre-final" design. (AR-113 at 200).

Representative Shuster's ubiquitous involvement[14] - pushing the highway agencies to deliver an interchange at Walker Road to assist with development plans by the Gabler developers - became increasingly apparent as Shuster applied pressure to overcome any opposition to an accelerated project schedule. When FHWA's Manuel

---

[13] 23 U.S.C. §112(b)(3) prohibits agencies from "commenc[ing]" final design prior to compliance with NEPA and the issuance of a Record of Decision.

[14] During this time period, FHWA staff sent numerous "updates" to Shuster on the interchange project. (AR-96 at 742; AR-95 at 235; AR-95 at 426; AR-100 at 1731; AR-1012 at 1979). An FHWA Memo from February 10, 1995 declared that the interchange "is apparently very important to Bud Shuster. My understanding is that the Division provides him with an updated status every two weeks. It is very controversial locally because of environmental issues and other issues." (AR-159 at 151).

Marks questioned the accelerated timetable and the impact of that timeline on compliance with NEPA, Representative Shuster went over Marks' head – to Mortimer Downey, Marks' superior - complaining of Marks' opposition with the handwritten notation "Please help." (AR-93 at 563). Shuster also blatantly circumvented the NEPA planning process by going directly to the Acting FHWA Administrator to secure a waiver of agency plans to prepare a Supplemental DEIS ("SDEIS") for the project.

On January 18, 1995 – over five months prior to the release of the FEIS - FHWA staff recounted that meeting, stating that the interchange was a "demo project sponsored by Congressman Bud Shuster, now in charge of DOT appropriations. He has met personally with Jane Garvey [Acting Administrator of the FHWA] and **secured a commitment from her that a supplemental draft will not be prepared** and that we will work to keep [the agencies] on their very aggressive and compressed time schedule. This is probably the most controversial project we'll see in some time." (AR-94 at 208) (emphasis added). The result of Garvey's "commitment" was the April 17, 1995 "official" decision by FHWA not to issue an SDEIS. (AR-96 at 755). The Administrative Record contains absolutely no materials, studies, or analysis that supported Garvey's commitment to Shuster.

On August 3, 1995, the Defendants' push for the interchange at the Walker Road location hit a substantial snag. The Keeper of the National Register of Historic Places issued a determination that certain land within the Walker Road area qualified as a Rural Historic District.[15] Under provisions of the NHPA, such a designation forces an agency to make a new finding that no other reasonable alternative exists to the siting of the

_____

[15] The Keepers' original letter, dated August 3, 1995, is at AR-99 at 1667.

project.[16] In their myopic push for the construction of the interchange at the Walker Road

location, the highway agencies decided to challenge the determination by the Keeper,

declaring in an update to Shuster that the determination by the Keeper "will result in the

need for additional studies, a delay in the project schedule and a likely increase in project

cost." (AR-100 at 1731).

The agencies were joined in their attempt to overturn the decision of the Keeper

by the Gabler developers, who arranged a meeting with U.S. Senator Rick Santorum.

(AR-105 at 47). In response to the developers, Santorum arranged a meeting among the

Keeper's superior at the Department of Interior, the Gabler developers' attorney, and

members of Santorum's staff. (AR-104 at 33; AR-104 at 3). The inevitable result of this

meeting, combined with political pressure exerted by Shuster and the formal appeal

submitted by the highway agencies, was the rescission of the historic lands designation

originally conferred by the Keeper on the land to be used for the interchange at the

Walker Road location.

The steps taken by the agencies were incredible in light of the public stance of

FHWA staff that "they were not aware of any such regulatory authority" which

authorized the agencies to request a redetermination of the Keeper's original decision.

(AR-100 at 1848).

Electronic mails sent during that period reflect the highway agencies' continued

attempts to please Shuster. In an e-mail sent from FHWA's Manuel Marks in August of

1995, Marks illustrated the changes in planning which were implemented by FHWA as a

result of responding to Shuster's pressure, stating that

---

[16] Known as a "Section 4(f)" determination. If a project adversely impacts historic resources, the
highway agencies must make a finding that no other reasonable alternative to the project exists

[p]ersonally, unless Shuster's office gets behind this appeal [to the Keeper of the National Register of Historic Places], I don't think it will be successful. However, by making this appeal, it positions us favorably, as doing the right thing and pointing the finger at those people who really caused the latest delay. . . This way, the full impact of this latest decision on the project schedule can be seen!!! (AR-113 at 93).

Additional evidence of Shuster's push for a predetermination of the interchange location, and the willingness of the highway agencies to manipulate the planning process to accommodate Shuster's wishes, can be seen in an electronic mail sent from FHWA's Bednar in August of 1995. In that e-mail, he outlined the strategy of the highway agencies, stating that "[w]e had agreed that the appeal [of the Keeper's decision] is attractive from 3 directions. First, it demonstrates politically to Shuster's office that we are taking all steps possible, within our power, to advance this project. . . Shuster's office has been informed of these latest developments." (AR-113 at 95).

On May 28, 1996, upon learning of Shuster's involvement and the highway agencies' predetermination of the location of the interchange, several Franklin County organizations filed a Complaint with the FHWA's Office of Inspector General - requesting a formal investigation into the predetermination of the location of the interchange. In an illuminating electronic mail sent from FHWA's Kevin Mahoney, reacting to the filing of the Complaint, Mahoney explained that

[t]he issues raised here are largely the same as those that we may have to litigate in the future. Therefore, our response here should not be inconsistent with what our future defense is likely to be . . . as you will note, we are recommending that we undertake a review of the NEPA process. To be credible, it should be conducted by someone that has a level of detachment (distance) from the project. That eliminates everybody here in the Division and some others. (AR-113 at 81).

In their formal response to the Complaint - in an understatement of immense proportions - the highway agencies called the Shuster/Yerusalim letters and actions taken

which avoids historic resources, pursuant to 49 U.S.C. §303 and 23 U.S.C. §138.

by the agencies to predetermine the Walker Road location "regrettable". (AR-103 at 373). In a clear case of the left hand not wanting to acknowledge what the right hand had already committed, FHWA attempted to respond to the complainants' allegations about pre-final and final design being authorized prior to the issuance of the Record of Decision by asking PennDOT to "ensure" that the agency didn't proceed to final design without the issuance of the ROD. (AR-103 at 384). Of course, as early as April of 1994, the agencies had authorized their consultants to move forward for prefinal and final design on the interchange at the Walker Road location. (AR-103 at 369; AR-113 at 198; AR-165 at 1664, 1681, 1707; AR-162 at 550, 651) .

Several Courts have held that such predetermination – which permeates the planning process – constitutes a fatal defect to the NEPA process. *Metcalf v. Daley*, 214 F. 3d 1135 (9th Cir. 2000) (contractually created predetermination is a fatal defect in the NEPA process); *Davis v. Mineta*, 2002 U.S. App. LEXIS 12285 (10th Cir. 2002) (stating that an agencies' contrivance of a slender purpose which forecloses alternatives and predetermines the outcome of environmental studies, renders the NEPA process fatally defective).

In *Cedar-Riverside Environmental Defense Fund v. Hills*, 422 F.Supp. 294 (D.Minn. 1976), the Plaintiffs brought suit challenging an agency's compliance with NEPA for an urban renewal project. The urban renewal project, slated for downtown Minneapolis, consisted of the completion of over 12,500 dwelling units and over 2 million square feet of commercial and cultural space. *Id.* at 297. Federal control and funding of the project required compliance with NEPA, and the Plaintiffs alleged (among

other claims) that the selection of the intensive development alternative was the result of agency predetermination. *Id.*

In its ruling, the Court declared that the Environmental Impact Statement was wholly inadequate, and that the agency demonstrated "a pattern showing bias" which rendered the Statement fatally defective. *Id.* at 322. The Court found that the EIS demonstrated a "biased selection of evidence" by misinterpreting the provisions of a study on environmental impacts resulting from housing developments; that the EIS adopted the comprehensive open space plan developed by the City of Minneapolis although it "apparently conflict[ed] with the proposal for housing"; that the EIS failed to acknowledge conflicts between neighboring land uses; and that there was no study undertaken to determine the "actual impact of alternatives" with parallel "cost[s] and benefits" *Id.* at 322-323. Finally, the Court concluded that "the EIS does not meet the standard of objective good faith required by NEPA." *Id.* at 328. *See also Brooks et al. v. Volpe et al.*, 350 F.Supp. 269, 277 (W.D. Wash. 1972); *Natural Resources Defense Council*, 524 F.2d 79, 92 (2nd Cir. 1975) (declaring that agency decisions must only be made after environmental documents are completed because otherwise, "the process becomes a useless ritual, defeating the purpose of NEPA, and rather making a mockery of it.").

Clearly, the environmental documents prepared for the interchange project violate those - or any - standards of "good faith" which could be applied to the actions of the agencies. Predetermination of project location and agency bias, which permeated the planning process for this interchange, created real and measurable impacts to the NEPA process for this project. Those impacts included agency avoidance of conflicts with local

land use plans, refusal to prepare Supplemental EIS's to reflect significant changes in the project area, selection of a stunted historic resources study area to avoid addressing the impact of the interchange on historic properties, refusal to examine the impact of the interchange on local roadways, refusal to comply with Congressional funding mandates, and refusal to examine alternatives created by Congressional amendment of the original funding law. These prejudicial impacts to the NEPA process are identified and examined in the pages that follow.

By itself, agency predetermination of the location of the interchange renders the environmental documents fatally defective because the predetermination violates the "good faith" requirement that underlies the NEPA process. When combined with the prejudicial impacts that the predetermination caused to the planning process, it is clear that the agencies have violated federal law.

## VI. The Agencies Violated the National Environmental Policy Act by Refusing to Examine Alternatives Created by Congressional Amendment of the Interchange's Funding Legislation.

The National Environmental Policy Act requires that agencies review alternatives to all proposed projects. 42 U.S.C. §4332(C). 40 CFR §1500.2 requires decisionmakers to use "the NEPA process to identify and assess the reasonable alternatives to proposed actions." In addition, 40 CFR §1506.1 expressly prohibits agency actions that would "limit the choice of reasonable alternatives" and interim actions which would "limit alternatives" to the proposed project. Finally, it is well-settled law that NEPA's "full disclosure mandate" is not satisfied if the "agency is allowed to excessively restrict the alternatives it considers." Mandelker, *NEPA Law and Litigation* 10-56 (2000 ed.).

In one of the first landmark NEPA cases, *Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission*, 449 F.2d 1109 (D.C. Cir. 1971), the Court of Appeals explained that the alternatives analysis must

> [e]nsure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit analysis. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made.

The discussion of alternatives is oft-referred to as the "linchpin" of the impact statement. *Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693 (2nd Cir. 1972). Accordingly, courts in several jurisdictions have ruled that Environmental Impact Statements are fatally deficient if they fail to adequately examine a broad range of alternatives. *See, e.g., Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997); *Davis v. Mineta*, 2002 U.S. App. LEXIS 12285 at *33 (10th Cir. 2002); *Wade v. Lewis*, 561 F.Supp. 913 (N.D. Ill 1983); *Curry v. United States Forest Serv.*, 988 F.Supp. 54 (W.D. Pa 1997); *Sierra Club v. Watkins*, 808 F.Supp. 852 (D.D.C. 1991); *State of South Carolina v. O'Leary*, 953 F.Supp. 699 (D.S.C. 1996).

At least one Circuit Court of Appeals has held that a change in the need for a project requires a parallel analysis of a new range of alternatives focused on meeting those changed purposes. In *City of Carmel-By-The-Sea, et al. v. United States Department of Transportation*, 95 F.3d 892 (9th Cir. 1996), the California Department of Transportation and the U.S. Department of Transportation proposed to realign a State Highway from the City of Carmel-by-the-Sea to nearby Hatton Canyon to relieve traffic congestion. *Id.* at 897. Whereas the Draft Environmental Impact Statement declared that the purpose of the project was to "improve the capacity" of the existing highway, the

agencies altered the original project goals by requiring the attainment of a "specific traffic flow Level of Service C" in the Final Environmental Impact Statement. *Id.* at 898. The agencies, however, failed to examine a range of new alternatives that would attain that new, revised goal. The agencies then determined that only one project alternative would meet a Level of Service of "C". *Id.*

In finding that the agencies' failure to examine a new range of alternatives to match the revised goals of the Project violated NEPA, the Court cited to an earlier ruling which held that an "agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice." *Id.* (*citing Alaska Wilderness Recreation v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) (*quoting Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992)). Precisely because the alternatives considered in the Final Environmental Impact Statement were not "dictated by the nature and scope of the proposed action", the Court held that the agencies had violated NEPA.

In a 1994 decision dealing with similar issues, the Ninth Circuit Court of Appeals concisely declared that

> [w]hen a statement of purpose and need is materially changed such that the alternatives designed to satisfy the former statement of purpose and need do not satisfy the revised statement of purpose and need, new alternatives are necessary to fulfill the requirement that an EIS consider 'an appropriate range of alternatives.'" *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1994).

In the instant case, the agencies violated NEPA by refusing to consider the new range of alternatives created when Public Law 100-17 was overhauled by Congress in 1995.

In response to the Keeper of the National Historic Register's determination that a rural historic district surrounded a proposed Walker Road interchange, U.S. Representative Bud Shuster inserted language into a federal highway Bill that fundamentally amended the scope and nature of the Demonstration Project.[17] The title block for the original provision was altered to remove any reference to Chambersburg and the law was amended to read that "[t]he Secretary shall carry out. . .projects in the counties of Bedford, Blair, Centre, Franklin, and Huntingdon, Pennsylvania" using the funds previously earmarked for the interchange. National Highway System Designation Act of 1995, Public Law 104-59, §304, 109 Stat. 568.

In an April, 1996 letter from the FHWA to Plaintiff Bucher, the FHWA acknowledged the legislative amendment and declared that PennDOT had "the option of developing the project for which the funds are authorized." (AR-103 at 274). A Transportation Briefing Paper prepared in April of 1998 also raised the possibility of funding a broad range of projects under the legislative amendment, stating that "[t]he NHS Designation Act of 1995 includes a provision that makes this funding eligible for other projects in Bedford, Blair, Centre, Franklin, and Huntingdon Counties." (AR-104 at 23).

In the series of "Transportation Briefing Papers" prepared by PennDOT for Representative Bud Shuster and others, PennDOT specifically stated that "[t]he National Highway System Designation Act of 1995 made [federal] funds available for projects in the counties of Bedford, Blair, Centre, Franklin, and Huntingdon." (AR-169 at 145, 148,

---

[17] Shuster's amendment was introduced on September 7, 1995, a little over a month after the Keeper issued her original decision designating land in the Walker Road area as part of a "rural historic district." H.R. 2274 (104th Congress, 1st Session); (AR-99 at 1667).

151, 154, 155, 158, 161, 164, 168, 172, and 176). The statement was contained in each of the Briefing Papers until December 19, 2000.

When confronted with the request to consider the alternatives which were created by the amendment, the highway agencies flatly refused to examine any other highway projects – even though the ink on the FEIS was barely dry at the time that Shuster's amendment was adopted. (AR-106 at 408). Thus, no range of alternatives was developed that met the scope and nature of the project outlined in the amended legislation.

In a January 22, 1999 letter from the FHWA to the Advisory Council on Historic Preservation, the agencies reiterated their refusal to examine other alternatives, stating again that:

> [t]he language regarding the project in Chambersburg, Pennsylvania on which the project needs were based in part has remained unchanged. (AR-82 at 5).

The amendment, and the agencies' refusal to examine a range of alternatives dictated by the "nature and scope of the proposed action," clearly violate the "heart" of NEPA, which lies in the informed analysis of alternatives. As in the *City of Carmel-By-The-Sea*, the change in the project goals did not produce a subsequent analysis of alternatives which matched those goals.

PennDOT's Twelve Year Transportation Program identifies a multitude of ongoing construction projects in Bedford, Blair, Centre, Franklin, and Huntingdon Counties. *See* PennDOT's *2001 Twelve Year Transportation Program*, January 25, 2001. In Blair County alone, the January 25, 2001 Twelve Year Program identifies over seventy transportation projects which could have been supported through the amended Public Law 100-17. The Twelve Year Program listings in the Administrative Record also

identify a myriad of projects in Franklin County. (AR-169 at 52-72). None of these alternatives, however, were considered by the agencies.

That gerrymandering of the NEPA process to attain one, predetermined result, violates the plain language of NEPA.

## VII. The Agencies Violated the National Environmental Policy Act by Illegally Segmenting the Project's Impact on Local Roadways from the Environmental Studies Conducted for the Interchange.

"Alternative D-Modified" feeds interstate traffic directly onto rural Township roads unable to safely accommodate that traffic. In addition, a connector road – the Norland Avenue Extension – is being used to connect Chambersburg Borough to a Walker Road interchange. Both of these projects are integral to the construction of an interchange in the Walker Road area, and the agencies violated both NEPA and the NHPA by failing to examine the impacts resulting from, and the cost of, these projects.

For a full discussion of this argument, see the *Plaintiffs' Answer to the Joint Motion for Summary Judgment* at 2-6; *Plaintiffs' Statement of Material Facts* at paragraphs 92-175.

### A. The Agencies Violated NEPA and the NHPA by Segmenting the Impacts of Local Road Upgrades and Widening Necessitated by the Interchange From the Interchange Project.

"Alternative D-Modified" feeds interstate traffic directly onto rural Township roadways unable to accommodate that traffic, yet the agencies have failed to consider the necessary road upgrades as cumulative, connected, or similar actions to the interchange project.

For a full discussion of this argument, see the *Plaintiffs' Answer to the Joint Motion for Summary Judgment* at 7-15; *Plaintiffs' Statement of Material Facts* at paragraphs 92-151.

### B. The Agencies Violated NEPA and the NHPA by Segmenting the Construction and Impact of the Federally-Funded Norland Avenue Extension Connector from the Interchange Project.

The Norland Avenue Extension connector road was proposed to connect a Walker Road interchange to Chambersburg Borough. The intensity of development on the Gabler Tract of farmland located near the interchange is contingent upon the construction of an interchange at Walker Road and the Extension, yet the Extension was not considered a cumulative, connected, or similar action to the interchange project.

For a full discussion of this argument, see the *Plaintiffs' Answer to the Joint Motion for Summary Judgment* at 15-19; *Plaintiffs' Statement of Material Facts* at paragraphs 151-175.

### VIII. The Agencies Violated the Law by Refusing to Prepare a Supplemental Environmental Impact Statement to Examine Impacts Resulting from the 1998 Newly Designed and Located Interchange; and Impacts Resulting from the 2000 Ruling of the Pennsylvania Supreme Court Recognizing Farmland in the Walker Road Area as Specially Protected by State Law.

"Alternative D-Modified", proposed three years after the FEIS was released, is a newly designed and relocated interchange project that will create significant new impacts not examined within the environmental documents. Significant new developments in the Kriner Road area, and a Pennsylvania Supreme Court ruling that declared farmland in the Walker Road area to be specially protected under Pennsylvania farmland preservation laws, required the preparation of a Supplemental Environmental Impact Statement.

For a full discussion of this argument, see the *Plaintiffs' Answer to the Joint Motion for Summary Judgment* at 19-21; *Plaintiffs' Statement of Material Facts* at paragraphs 176-253; 212-217.

**A. The Agencies Violated the National Environmental Policy Act by Refusing to Prepare a Supplemental Environmental Impact Statement Following the Complete Redesign and Relocation of the Interchange in 1998, and Significant Land Use Changes Surrounding the Kriner Road Location for the Interchange.**

Significant developments in the Kriner Road area, including the zoning of the area to specifically encourage commercial and industrial use, the agencies' gross under-estimate of the development in the Chambers-5 Business Park, and the construction of several Warehouse Distribution Centers, require the preparation of a Supplemental Environmental Impact Statement. In addition, the complete redesign and relocation of the interchange project required the agencies to examine the new impacts resulting from the project in an SEIS, and to shift the Secondary and Cumulative Impacts Area (SCIA) southward to reflect the scope of "Alternative D-Modified."

For a complete discussion of this argument, see the *Plaintiffs' Answer to the Joint Motion for Summary Judgment* at 21-27; *Plaintiffs' Statement of Material Facts* at paragraphs 176-217.

**B. The Agencies Violated the National Environmental Policy Act by Refusing to Prepare a Supplemental Statement Following a Pennsylvania Supreme Court Ruling That Farmland in the Project Area is Specially Protected by State Law.**

In 1998 and 1999, the Commonwealth Court and the Supreme Court of Pennsylvania issued a ruling to resolve a lawsuit filed by a Franklin County farm couple

against the highway agencies. That ruling determined that farmland in the Walker Road area was specially protected by the state's farmland preservation laws, and that the agencies had violated those laws by initiating condemnation of Walker Road-area farmland while refusing to seek the approval of the Agricultural Lands Condemnation Approval Board (ALCAB). Those rulings, and the impacts of those rulings on a comparison of alternative locations for the interchange, were never considered by the agencies in an SEIS.

For a full discussion of this argument, see the *Plaintiffs' Answer to the Joint Motion for Summary Judgment* at 27-31; *Plaintiffs' Statement of Material Facts* at paragraphs 218-253.

### IX. The Agencies Violated the National Environmental Policy Act and the National Historic Preservation Act by Intentionally Selecting a Stunted Study Area for Historic Resources to Avoid Identifying Impacts to Those Resources.

The National Historic Preservation Act (NHPA) requires all agencies to examine the impacts of a proposed project on historic resources. Instead of examining all historic buildings and land within the "Project Study Area" or other appropriate study area, the agencies continually narrowed the study area for historic resources, intentionally selecting a stunted study area for historic resources in violation of federal law.

For a full discussion of this argument, see the *Plaintiffs' Answer to the Joint Motion for Summary Judgment* at 31-41; *Plaintiffs' Statement of Material Facts* at paragraphs 254-304.

38

**X. The Agencies Misused Funding for the Demonstration Project Because the Construction of a Walker Road Interchange to Relieve Traffic Congestion "Near" an Existing Interchange Fails to Meet the Stated Needs of the Congressionally Authorized Demonstration Project Requiring Relief of Traffic Congestion "On" an Existing Interchange.**

In a May, 1991 Report from the General Accounting Office, entitled *Highway Demonstration Projects: Improved Selection and Funding Controls Are Needed*, the GAO stated that demonstration project funding must be used solely to construct the specific project defined in the funding legislation. In addition, the Report cautioned that states did not have the authority to alter the projects defined in that legislation. U.S. GAO/RCED-91-146 at 5 (May, 1991).

Several courts have declared that federal funds authorized by Congress for specific projects must "only be spent on the specified project" described in that law. In *Ross v. FHWA*, 162 F.3d 1046, 1052 (10th Cir. 1998), STURAA had provided funding for a fourteen mile Trafficway in Douglas County, Kansas. After completion of two segments of the Trafficway, the FHWA prepared a draft Supplemental Environmental Impact Statement for the alignment of the third and final segment. *Id.* at 1050. At that point, the FHWA, the state Department of Transportation, and the County became deadlocked over the alignment for the road, and the Kansas Department of Transportation (KDOT) "defederalized" the funding of the third segment by providing state funding for its completion. KDOT and the FHWA then argued that the third segment was not a "federal" action and therefore, that the provisions of NEPA were inapplicable. The plaintiffs sued to prevent the segment from being constructed without the preparation of an SEIS.

In ruling that the segmentation of the project did not "de-federalize" the project, the Court explained that the very nature of demonstration projects reveals a "high degree of federal involvement" in the construction of those projects. *Id.* at 1052. The Court also stated that demonstration funding "specifies the particular project on which the money must be spent" and that demonstration monies "may only be spent on the specified project." *Id. See also Wade v. Dole*, 561 F.Supp. 913 (N.D. Ill. 1983) (declaring that funds appropriated by Congress specifically for bridge replacement and rehabilitation could not be used to construct new bridges.).

Section 149(a)(74) of the Surface Transportation and Uniform Relocation Assistance Act of 1987 provided funding for the demonstration project which is the subject of this action. The authorizing language for the interchange project stated that

> [t]he Secretary shall carry out a highway project which demonstrates how construction of an interchange on a north-south interstate route will provide access to Chambersburg, Pennsylvania, and **relieve traffic congestion on an existing interchange** on such interstate route. (Emphasis added).

Thus, to fulfill the congressionally designated purpose of the project, the highway agencies were required to construct an interstate which would "relieve traffic congestion **on** an existing interchange". (Emphasis added).

The plain language of this particular section of STURAA clearly reveals that Congress intended the demonstration project monies to be used solely to relieve traffic volumes on congested interchange ramps. Thus, Congress had no intention of authorizing the construction of a highway project that would provide for "economic growth", encourage "development", or provide for the reduction of traffic congestion *near* – rather than "on" - an interchange.

Indeed, STURAA is replete with specific demonstration projects that were approved to achieve those particular goals. For instance, a highway project in Fort Smith, Arkansas was funded to "demonstrate the economic growth and development benefits" of the widening of a road.[18] New road construction was funded in Columbia, Missouri for the purpose of "encouraging economic development."[19] In addition, Congress was very clear about designating certain projects to reduce congestion on certain roads.

In northeast Baton Rouge, Louisiana, Congress explicitly declared that the highway project's purpose was to reduce "traffic congestion" and improve "traffic flow" in the "**immediate vicinity** of a highway on the Interstate System."[20] (Emphasis added). In Baton Rouge, Congress directed the Secretary of Transportation to carry out a highway project for the purpose of reducing traffic congestion "**in the immediate vicinity** of a split-diamond interchange which connects an east-west highway on the Interstate System."[21] (Emphasis added). In still another example of the plain language used by Congress for the placement of particular projects to achieve specific purposes, an Alameda Island, California project was authorized to alleviate congestion on "a north-south route designated as part of the Interstate System" and its "access roads".[22]

Many projects simply instructed the Secretary of Transportation to carry out projects that would generally reduce "traffic congestion" in the area of the project.[23]

---

[18] STURAA at §149 (a)(4).
[19] *Id.* at §149(a)(17). "Encouraging economic development" and "enhancing" economic development were recurring purposes of several road projects, including ones in Johnstown, Pennsylvania (a)(3); Compton, California (a)(15); Wood County, Ohio (a)(27); Pine City, Minnesota (a)(33); Paso Robles, California (a)(34); Minden, Louisiana (a)(48); New River, West Virginia (a)(62); and Saint Louis County, Minnesota (a)(76).
[20] *Id.* at §149(47)(C) .
[21] *Id.* at §149(47)(B).
[22] *Id.* at §149(71).
[23] Those projects included ones in Compton, California (a)(15); Columbia, Missouri (a)(17); Wood County, Ohio (a)(27); Dover Township, New Jersey (a)(37); Los Angeles County,

Authorization for several demonstration projects drew a sharp distinction between those projects funded to aid traffic *on* particular roadways and bridges, and those projects funded to aid traffic *near* particular facilities. For example, in Dover Township, New Jersey, Congress authorized the Secretary of Transportation to reduce traffic congestion "**on** an existing bridge." STURAA at §149(a)(37) (emphasis added). On another project in Beaumont, Texas, the Secretary was authorized to construct an overpass "**over** an interstate route". STURAA at §149(a)(75) (emphasis added).

The authorizing language for this interchange project was similarly very precise. The Secretary of the Department of Transportation was directed to construct a highway project which would "relieve traffic congestion **on** an existing interchange." STURAA at §149(a)(74) (emphasis added).

Ignoring that specific Congressional mandate because the existing I-81/Route 30 interchange ramps are not congested[24], the agencies were intent on finding a way to build an interchange in the Walker Road area. Even though numerous interchanges are included in the stretch of I-81 near Chambersburg, a 1988 Transportation Briefing Paper ignored those interchanges, and the agencies specifically declared that the "purpose of the demonstration project" was to "relieve congestion on the *existing U.S. 30 interchange*", and to build an interchange north of Chambersburg. (AR-86 at 18) (emphasis added). That statement was repeated in a Project Newsletter, in which the agencies stated that the

---

California (a)(38); Anaheim, California (a)(49); Aurora-Hoyt Lakes, Minnesota (a)(64); Lincoln, Illinois (a)(67); Douglas County, Kansas (a)(72); Alameda Island, California (a)(71); and Beaumont, Texas (a)(75).

[24] Exit #6 is the "existing interchange" which would ostensibly be relieved by an Exit built in the Walker Road area. In the Final Environmental Impact Statement, however, the agencies explicitly admit that those "interchange ramps have adequate capacity to handle current and future traffic." (AR-46 at ES-6). In response to comments, the agencies were even more blunt, declaring that "[t]he existing Exit 6 Interchange itself is not a traffic problem." (AR-29 at 27).

goal of the project was to design a new interchange that will "best satisfy the project need of relieving traffic congestion at Interchange 6 (Route 30) in Chambersburg." (AR-86 at 27). At a Development Interagency Coordination Meeting in 1989, the agencies stated that the project need was to "primarily alleviate present congestion on the existing Exit 6 Interchange." (AR-87 at 80). In a letter from PennDOT's consultant to Bill Swailes, the agency again reiterated that the "objective of the project is to determine a location for the interchange . . . for the purpose of alleviating traffic congestion on U.S. Route 30." (AR-139 at 448).

The Preliminary Alternatives Report, completed in 1990, affirmed that the Route 30/I-81 interchange ramps were operating at a premier level of service (LOS "A" on a scale of A-E")[25] and therefore, were not congested. (AR-2 at 32). Early agency studies revealed that the interchange itself would continue to operate at an acceptable LOS into 2016. (AR-97 at 957).

The agencies' 1995 Traffic Studies again confirmed that the four ramps associated with the Route 30/I-81 (exit #6) interchange were functioning at a level of service "B" at the time of the studies, and that, in design year 2016, three of the four ramps would continue to function at a level of service "B" while one would function at an acceptable level of service "C", even assuming that no improvements were made to Route 30. (AR-31 at 4; AR-37 at 43, 44).

---

[25] According to agency consultants, "[l]evels of service D(d) through F(f) are considered unacceptable in rural areas. Levels of service E(e) through F(f) are considered unacceptable in all areas." Moreover, according to those consultants, PennDOT "designs improvements to a level of service "C" standard (except in urban areas where level of service "D" conditions represent the level of service"). (AR-37 at vi, 18).

Thus, the agencies' own studies show that congestion does not currently exist **on** the U.S. Route 30 interchange with I-81, at interchange #6, and that the interchange will not be congested in the design year of 2016.

Because of the lack of congestion "*on* an existing interchange", the agencies then attempted to find traffic congestion at a nearby intersection – where Stouffer Road, Walker Road, and U.S. Route 30 converge. (AR-79 at 4). That transition forced the agencies to argue that Public Law 100-17 actually authorized an interchange to be built to reduce congestion *near* an existing interchange, although the plain language of the funding legislation stated otherwise. Unfortunately for the agencies, even their own traffic studies reveal that any congestion at the nearby intersection would not be relieved by the construction of a Walker Road interchange. (AR-37 at 43). Curiously, however, the agencies failed to calculate, or at least failed to publish, LOS's in the 1998 Traffic Studies which would enable reviewers to draw that conclusion.[26]

The admitted uncongested nature of the existing Exit #6 Interchange and the agencies' struggle to fit the square peg into a round hole prompted other agencies to question the need for the construction of the interchange in the Walker Road area. In

---

[26] The agencies' 1998 Traffic Studies did not include tables that listed the degree of reduction of traffic congestion attributed solely to the Route 30 widening project. (AR-72). The 1995 Traffic Studies, however, did include such tables, which enabled reviewers to determine the true reduction in congestion resulting solely from the construction of a Walker Road interchange and solely from the Route 30 improvements. (AR-37 at 43).

For a side by side comparison of how the 1995 traffic analysis differed substantially from the 1998 analysis, *see* AR-176 at 676 and 696. In the 1995 analysis, the traffic consultants were directed to analyze a Walker Road interchange without either the Route 30 improvements or the Norland Avenue Connector. In addition, the consultants analyzed the traffic situation solely with the Route 30 improvements and without the Norland Avenue Extension and the Interchange. That study thus gave the reviewer the ability to isolate what traffic impact the Route 30 improvements would have, and what traffic impact the construction of the Interchange would have, without any other roadway improvements. In 1998, however, the agencies only directed the consultant to study four of the eight traffic scenarios originally studied in 1995, curiously omitting the original

1990, both the Pennsylvania Fish Commission and the Department of Environmental
Protection commented that PennDOT had "not yet documented the purpose or the need
for building an additional interchange in the Chambersburg area" and that "the major
flaw with this document [the Preliminary Alternatives Report] is that a 'need' for the
project has not been established." (AR-88 at 41).

In response to the political drive by Representative Shuster to get the project
moving, the agencies focused on local development plans in the Walker Road area that
could serve as a Need for the project. That goal, to service local development by the
Gabler developers, became the "hidden agenda" discovered by Eleanor Winsor –
PennDOT's own consultant - during meetings with the parties involved in the interchange
project.[27] Because of that new emphasis on servicing land development, even PennDOT
consultant Bob McClure became concerned enough to ask whether "the proposed
development would change the intent of the project from a public law (demonstration
project) to economic development." (AR-90 at 16). FHWA also became concerned about
the ability to substantiate the project, declaring that "the primary component of the stated
purpose and need appears to be to provide access for a major planned development on the
Gabler tract." (AR-93 at 667).That concern was all but admitted by the agencies with the
submission of the *Justification for an Additional Interchange* in January of 1995, which
bluntly stated that the interchange was located "to access the area that will be developed
and experience substantial growth." (AR-22 at 28).

---

#6 parameter, which examined traffic impacts "without Norland Avenue Connector, with Route
30 Improvements, without the Walker Road Interchange." (AR-176 at 677).
[27] During those meetings, Winsor noted that "[t]his is a development issue, and it needs to be
framed as such." (AR-90 at 69). In another statement, Winsor declared that the project was being
driven by "development plans" which she believed were the "hidden agenda." (AR-90 at 83).

This controversy over the manipulation of project need to get the project built found its way into the drafts of the environmental studies. In one of the drafts, the agencies misquoted STURAA's authorization language as providing funding for a "demonstration project to promote economic development in the Chambersburg area." (AR-6 at 1). A handwritten note by a reviewer above the statement reads "Act does not say economic development." In the next draft, the same misquotation appears with the handwritten notation "still here." (AR-10 at 7).

In response to PennDOT's drive to use economic development in the area to provide the Need for the project, FHWA specifically chastised the agency that "Public Law 100-17 does not include reference to the promotion of economic development in the Chambersburg area." (AR-91 at 112). Other agencies also castigated the highway agencies for using private development to provide the need for the project. The Pennsylvania Fish and Boat Commission stated that "it is apparent that the major need for this project is to provide for existing and proposed development in the study area." (AR-93 at 516). The U.S. Fish & Wildlife Service, in a blunt comment, wrote "[y]ou have stated in previous meetings that the Department will not build unneeded highway projects in the State. In our opinion, this is such a project and should be dropped from further consideration." (AR-91 at 123). In an electronic mail, FHWA's Gamble wrote

> [s]till guessing on how to best define the need for an interchange at Walker Road. Wayne K [Kober – on the Steering Committee of the I-81 Interchange Management Team] said to be upfront and mention that providing access to Gabler is a component. . . In other words, the other location [for the interchange] is feasible and prudent unless the access [for the Gabler developers] is a need. (AR-113 at 164).

The illusion of using congestion on Route 30 to circumvent Public Law 100-17's requirement of relieving congestion "on an existing interchange" was so thin that even

local farmers readily understood what was occurring. In one farm interview, a local farmer stated that "even at Walker Road, [an interchange] would probably not alleviate Route 30 traffic but merely handle traffic generated by new development they would create." (AR-138 at 93).

The agencies did, however, use the language of Public Law 100-17 specifically to eliminate other alternatives on the basis that they failed to relieve congestion "*on* an existing interchange." In an Addendum to the Criteria of Effects Report, the agencies specifically discarded the "No Build" Alternative because it did not reduce congestion on an existing I-81 interchange. (AR-57 at 8).

While eliminating project alternatives on that basis, the agencies and their consultants were privately admitting that even an interchange in the Walker Road location would not significantly impact traffic on Route 30. In FHWA comments on the DEIS, the agency stated that "the traffic data presented in the document indicates a slight reduction in traffic" on the existing interchange. The agency continued by stating that "if the traffic congestion relief is minor or insignificant as the document currently indicates, then it should be stated as such." (AR-91 at 109).

In December of 1994, at a Briefing by the agency, the agencies stated that "there is no consensus on the ability of an interchange at Walker Road to relieve this congestion. . . The proposed interchange at Walker Road reduces the traffic on Route 30 so slightly that the reduction is of essentially no value." (AR-93 at 784). That view was reiterated by the Department of Agriculture, which stated that "the development of the interchange at Walker Road is questionable in meeting all the needs described on Page I-1 of the FEIS." (AR-99 at 1601). Given the fact that the agencies continued to admit that "nearly all the

traffic" (86%) using the existing I-81/Route 30 interchange is "headed to downtown Chambersburg", traffic exiting at a Walker Road interchange will drive directly to Route 30 to access Chambersburg, ending up on Route 30 adjacent to the existing interchange. (AR-22 at 33).

Finally, it would make absolutely no sense to construct an interchange to "relieve congestion on an existing interchange" which will become congested itself. Yet, that is precisely what the agencies admit will happen to "Alternative D-Modified" upon construction. In the 1998 Traffic Studies prepared by the agency for the project, traffic Level of Service Maps clearly show that, even with the Norland Avenue Extension connector, the Route 30 improvements, and the proposed interchange, that the LOS on Walker Road will be at "f" and that traffic turning onto the interchange ramps will also experience failing "f" congested conditions by 2016. (AR-72 at 24 (Morning Peak Hour)). During the Late Afternoon Peak Hour, the situation worsens appreciably, with several intersections around the interchange, in addition to the interchange ramps, falling to failure LOS's. (AR-72 at 25). The Mid-Block Levels of Service bear out these contentions, revealing that almost all of the feeder roads, and the interchange itself, will operate at a failing "D" or "E" during A.M. Peak Hour and P.M. Peak Hour in 2016. (AR-72 at 33).

Clearly, the agencies have misused federal highway funds in their attempt to construct an interchange that fails to accomplish the goals established by Congress in Public Law 100-17. In addition, the agencies continue to attempt to construct a project that will not solve any transportation problems, but simply re-route existing traffic onto

already congested roadways. As such, the agencies must be forced to objectively evaluate

the entire project to achieve the specific needs established by Public Law 100-17.

### XI. The Agencies Violated Their Own Regulations and Ignored Their Own Invented Project Need by Failing to Reconcile the Selection of a Walker Road Location With Local Comprehensive Land Use Plans.

On October 22, 1990, the FHWA issued a Policy Statement in the Federal

Register which declared that "new or revised access points to the existing Interstate

System" would be approved only if "[t]he proposal considers and is consistent with local

and regional land use and transportation plans." 55 Fed. Reg. 42670. In 1998, the FHWA

updated its Statement by declaring that access points should "meet the following

requirements:"

> (5) The proposal considers and is consistent with local and regional land use and transportation plans. 63 Fed. Reg. 7045.

40 CFR §1506.2(d) requires that the environmental documents address the

"inconsistency of a proposed action with any approved State or local plan or laws. . .

[and] where an inconsistency exists, the statement should describe the extent to which the

agency would reconcile its proposed action with the plan or law."

The Draft Environmental Impact Statement, the Final Environmental Impact

Statement, and the Record of Decision all declare that one of the primary "Project Needs"

for the proposed interchange is to "adhere to comprehensive plans of area

municipalities." (AR-46 at I-1 (FEIS); AR-12 at I-1 (DEIS); AR-82 at 2 (ROD)).

Since February of 1988, the Greene Township Board of Supervisors has opposed

a Walker Road interchange because it interferes with the Township's preservation of

agricultural lands and prevention of sprawl. (AR-86 at 16; AR-142 at 860).

The agencies have admitted that an interchange at Walker Road does not comply with the Greene Township Comprehensive Plan. (AR-46 at ES-23, ES-29). However, the FEIS and subsequent documents simply state that conflict, and fail to outline any attempts by the agencies to reconcile the proposed interchange with that Comprehensive Plan. (*See Plaintiffs' Statement of Material Facts* at paragraphs 345-366).

## XII. Conclusion

Accordingly, the Plaintiffs respectfully request that this Court declare that agency decisionmaking on this project, including but not limited to the Record of Decision and the FEIS, failed to comply with federal law. The Plaintiffs respectfully request that this Court issue a permanent injunction enjoining the agencies from expending funds, or taking further action to design and construct the proposed interchange, until the agencies restart the NEPA process for the preparation of entirely new and objective traffic and environmental studies, or prepare a Supplemental Environmental Impact Statement (SEIS) in conformity with federal law.

Respectfully Submitted on the **25**[th] Day of **July**, 2002.

Thomas Alan Linzey, Esq.
Community Environmental Legal Defense Fund (CELDF)
2859 Scotland Road
Chambersburg, Pennsylvania 17201
(717) 709-0457

*Counsel for the Plaintiffs*