84

# ORIGINAL

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREENE/GUILFORD ENVIRONMENTAL
ASSOCIATION, a non-profit corporation
incorporated under the laws of the
Commonwealth of Pennsylvania, CITIZENS
FOR PLANNED COMMUNITY GROWTH,
an unincorporated association organized under
the laws of the Commonwealth of Pennsylvania,
PAUL B. AMBROSE, JOHN G. ENDERS,
CHARLES F. RAHAUSER, BETSY
RAHAUSER, DOUGLAS A. WARNOCK,
U.X. VAGNERINI, THOMAS W. BUNDY,
STEPHEN P. BUCHER, ROGER J.
ROBERTSON, JAMES A. STRITE, JR.,
and DAVID A. GUTHRIE,
          Plaintiffs,

          v.

KEN WYKLE, Administrator, Federal
Highway Administration, ROBERT GATZ,
Federal Highway Administration,
          Defendants,

          And

BRADLEY L. MALLORY, Secretary for
The Department of Transportation,
Commonwealth of Pennsylvania,
          Intervenor.

: CIVIL NO. 1:CV-01-0910
: (Judge Rambo)

**FILED**
HARRISBURG, PA

JUL 2 5 2002

MARY E. D'ANDREA, CLERK
Per _____
       Deputy Clerk

## PLAINTIFFS' ANSWER TO AGENCIES' JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS

AND NOW, come the Plaintiffs and file the following Answer to the Joint Statement of Undisputed Facts filed by the Defendants and the Intervenor in the above captioned action.

1. The Plaintiffs agree that this material fact is undisputed.

2. The Plaintiffs agree that this material fact is undisputed.

3. The Plaintiffs disagree that "Alternative D-Modified" is a "modification" of the agencies' Alternative D - one of the Alternatives examined in the agencies' original environmental documents. (AR-46 at II-11). "Alternative D-Modified" is a significant new interchange project that would be located over fourteen hundred feet (1400') south of Alternative D with interchange ramps slightly more than a half-mile north of the existing I-81/Route 30 interchange. (AR-80 at 6; AR-22 at 28). "Alternative D-Modified" would consist of a new connector highway linking Franklin Farm Lane in Guilford Township to Walker Road in Chambersburg Borough, the construction of a new bridge over I-81, and the demolition of the existing bridge which currently carries Walker Road over I-81. (AR-82 at Exhibit "A"). In addition, federal funding has been obtained for extending the Norland Avenue Extension connector road from Chambersburg Borough to the proposed interchange area at a cost of $3 million. "Alternative D-Modified" thus increases the initial projected FEIS construction cost for the project by over four hundred percent (400%). (AR-82; AR-46 at II-17).

4. The Plaintiffs agree that this material fact is undisputed. By way of further reply, the agencies issued the Record of Decision (ROD) for the project on March 25, 1999. The agencies' "Re-evaluation of the Record of Decision", released two years after the

issuance of the Record of Decision in June of 2001, is not authorized by any statute or regulation, and was issued to avoid the preparation of a Supplemental Environmental Impact Statement (SEIS). (AR-82; AR-83).

5.  The Plaintiffs disagree that this statement of material fact is undisputed. The environmental documents prepared by the agencies to comply with federal law failed to properly identify the project's needs. The needs for the project were fully identified by Public Law 100-17, and those needs were not reflected in the planning process for the interchange. (AR-3 at 7; AR-12 at Appendix "D"; AR-88 at 26, 33-37, 44-49, 92-93; AR-89 at 6; AR-90 at 5, 11). The agencies failed to develop and study an adequate range of alternatives to the interchange and the agencies failed to discuss the full range of impacts associated with those alternatives. (AR-104 at 23; AR-169 at 145, 148, 151, 154, 155, 158, 161, 164, 168, 172, 176; AR-106 at 408; AR-82 at 5; AR-96 at 637; AR-133 at 698; AR-79 at 42; AR-80 at 8; AR-79 at 42; AR-10 at 70; AR-132 at 388; AR-34 at 4; AR-18 at 3; AR-122 at 2848; AR-93 at 493; AR-159 at 31; AR-93 at 638; AR-139 at 475; AR-80 at 18; AR-172 at 18; AR-92 at 91; AR-99 at 1542).

6.  The Plaintiffs disagree that this material fact is undisputed. The agencies failed to study the delineated alternatives "in detail." The agencies examined the alternatives listed in varying degrees of detail, and failed to update and examine impacts resulting from those alternatives in a symmetrical fashion, as required by the NEPA and its implementing regulations. (AR-176 at 676, 696; AR-95 at 236; AR-133 at 698).

7. The Plaintiffs disagree that this material fact is undisputed. The Plaintiffs agree that the agencies made these determinations, but contend that the determinations were erroneous.

8. The Plaintiffs disagree that this material fact is undisputed. The Plaintiffs agree that the "No Build" Alternative – as devised by the agencies – did not assume the construction of any improvements to the existing roadway transportation network. (AR-46 at ES-19). The purpose of including a "No Build" Alternative, however, is to examine the situation resulting from a "no build" of only the project itself. Instead, the agencies assumed that no transportation improvements whatsoever would occur under the "No Build" scenario. That resulted in the agencies' exclusion of the Route 30 widening project – which was already programmed and had physically begun prior to the release of several agency studies; and the Norland Avenue Extension connector road, which will now be constructed with state and federal funding. (AR-46 at ES-19).

9. Plaintiffs agree that this material fact is undisputed The Plaintiffs disagree that the "No Build" Alternative was properly developed because that Alternative excluded the Norland Avenue Extension connector and the Route 30 widening project – two highway projects which have been funded and initiated, and were used as parts of the Traffic Studies to project future traffic volumes. (AR-46 at ES-19; AR-37 at i). In the 1995 Traffic Study, released with the FEIS, the agencies admitted that the U.S. Route 30 widening and the extension of Norland Avenue were roadway improvements. (AR-37 at i).

10. The Plaintiffs agree that this material fact is undisputed.

11. The Plaintiffs agree that this material fact is undisputed.

12. The Plaintiffs disagree that this material fact is undisputed. The agencies provided
    inadequate responses to many public comments received on the DEIS and FEIS. As
    one example, in response to comments submitted by the Pennsylvania Fish & Boat
    Commission - that impacts to the local road network from the interchange must be
    examined as part of the project - the agencies inadequately replied that "traffic on the
    load roadway system will increase with or without the interchange." (AR-47 at 11). In
    another example, Plaintiff Ambrose asked the agencies to quantify the impact to the
    traffic model resulting from increased development in the Chambers-5 Business Park
    in the Kriner Road area. (AR-47 at 72). The agencies failed to answer the question.
    (AR-47 at 72). In a final example, legal counsel for Plaintiff Citizens for Planned
    Community Growth raised the issue of the interchange's impact on "Franklin Farms"
    – a historic area located along Franklin Farm Lane near the interchange. (AR-93 at
    493). His query never received a response from the agencies.

13. The Plaintiffs agree that this material fact is undisputed. Comments on the failure of
    the agencies to adequately identify and examine historic properties in the study area
    for the interchange were submitted by Franklin County Heritage, the Franklin County
    Commissioners, several plaintiffs, State Senator J. Barry Stout, the Kittochtinny
    Historical Society, the Pennsylvania Historic and Museum Commission ["PHMC"],
    the Greene Township Board of Supervisors, and others. (AR-12 at Appendix E-10;
    AR-141 at 342; AR-123 at 2978; AR-92 at 91; AR-92 at 229; AR-95 at 261; AR-97
    at 877; AR-99 at 1483; AR-109 at 1457; AR-81 at 89; AR-110 at 2; AR-83 at 3).

14. The Plaintiffs disagree that this material fact is undisputed. The agencies failed to identify a complete inventory of historic properties in 1997. Additional historic properties not recognized by the agencies were discovered by the Pennsylvania Historic and Museum Commission ["PHMC"], the Greene Township Board of Supervisors, the Greene/Guilford Environmental Association, and the Keeper of the National Register of Historic Places. The Keeper required the agencies to examine those historic properties and land. (AR-99 at 1493, 1495-1523).

15. The Plaintiffs agree that this material fact is undisputed.

16. The Plaintiffs agree that this material fact is undisputed.

17. The Plaintiffs disagree that this material fact is undisputed. "Alternative D-Modified" is not a "modification" of Alternative D, as examined within the agencies' environmental documents. "Alternative D-Modified" consists of a completely redesigned and relocated interchange project. (*See* Plaintiffs' Response to paragraph three). Historic agencies have determined that "Alternative D-Modified" will result in impacts to historic properties and land. (AR-107 at 591, 731-32; AR-110 at 186).

18. The Plaintiffs agree that this material fact is undisputed, but note that the MCC meetings were not consistently held throughout the duration of the study process for the interchange. Thus, no municipal officials were "kept abreast" of the study process from the initiation of the project in 1987 to March of 1995 – a period of eight years before the first MCC meeting was held. (*Agencies' SMF* at paragraph twenty). In addition, although the gatherings were supposedly limited to municipalities, the agencies invited the Chambersburg Area Development Corporation and G.S. & G Properties (owned by the Gabler developers) to attend the meetings as equals to the

participating municipalities. (*Agencies' SMF* at paragraph nineteen). The first meeting of the MCC occurred in March of 1995, five years after the release of the Preliminary Alternatives Report (PAR), two years after the Historic Structures Inventory and Determination of Eligibility Report was prepared and released, and one year after the release of the agencies' Criteria of Effect Report, the agencies' Justification for an Additional Interchange, and the Draft Environmental Impact Statement. (AR-95 at 442; AR-12; AR-3; AR-7).

19. The Plaintiffs agree that this material fact is undisputed. Members of the MCC included private developers and development corporations holding a financial interest in the outcome of the interchange project. (*See* Plaintiffs' Response to paragraph eighteen). The Greene Township Board of Supervisors did not participate in the initial meetings of the MCC due to their opposition to the interchange project. (AR-95 at 442, 443).

20. The Plaintiffs agree that this material fact is undisputed.

21. The Plaintiffs agree that this material fact is undisputed. Release of plans for "Alternative D-Modified" and comments to those plans failed to meet NEPA guidelines for documents and comments because "Alternative D-Modified" was produced three years after the FEIS was prepared and released and a Supplemental Environmental Impact Statement (SEIS) was never completed.

22. The Plaintiffs agree that this material fact is undisputed.

23. The Plaintiffs disagree that this material fact is undisputed. The agencies "responded" to issues raised at the public hearing by solely generating a Memorandum exclusively for the Administrative Record. (AR-105 at 153).

24. The Plaintiffs disagree that all public and agency comments were considered in the agencies' decision to select "Alternative D-Modified." The FEIS did not include "Alternative D-Modified" as a project Alternative because it was developed three years after the release of the FEIS. The "Selected" Alternative in the FEIS was "Alternative D-C". (AR-46 at ES-27). No comments to the FEIS therefore included comments on "Alternative D-Modified". (AR-46). The agencies failed to present "Alternative D-Modified" as an Alternative in comparison with the other Alternatives developed in the study process because a Supplemental Environmental Impact Statement (SEIS) was never prepared by the agencies. (*See* Plaintiffs' Response to paragraph three).

25. The Plaintiffs disagree that the agencies studied "Alternative D-Modified" in detail, that the agencies objectively weighed the benefits and impacts of the redesign and relocation of the interchange with Alternatives studied in the FEIS, or that they "clearly illustrated why" the agencies selected "Alternative D-Modified" in the ROD.

26. The Plaintiffs disagree that this statement of material fact is undisputed. The FEIS fails to identify the Congressionally-established needs for the project. The "needs" outlined by the DEIS and FEIS add additional "needs" to Public Law 100-17 in an attempt to predetermine the location of the interchange in the Walker Road area. Public Law 100-17 requires that federal funding for the interchange be expended to construct an interchange that will provide access to Chambersburg and relieve congestion on an existing interchange. The agencies failed to compare the Alternatives for the project based on those "needs" and instead, added "needs" to the Congressionally-directed ones which predetermined the location of the interchange in

the Walker Road area. (AR-3 at 7; AR-88 at 41; AR-12 at Appendix "D"; AR-88 at

26, 33-37, 44-49, 92-93; AR-88 at 15; AR-89 at 6; AR-90 at 5; AR-90 at 11). The

agencies then failed to meet their own contrived needs, placing the interchange in a

Township whose Comprehensive Plan opposes the interchange. (AR-46 at I-11, 12).

27. The Plaintiffs disagree that this material fact is undisputed. The Congressionally-

established purpose and needs for this demonstration project are not delineated in this

paragraph. Public Law 100-17 established the purpose and need for this project, and

that legislation mandated that an interchange be constructed that provided access to

Chambersburg and relieved congestion on an existing interstate interchange. (*See*

Plaintiffs' Response to paragraph twenty-six).

28. The Plaintiffs disagree that this material fact is undisputed. The agencies fail to cite to

the Traffic Study itself, but only to a response of the agencies to comments made on

the FEIS. (AR-78 at 83). The agencies' 1995 Traffic Study revealed that the Route 81

Northbound on/off ramps' intersection with Route 30 would operate at an

uncongested LOS of "B" or "C" in the design year of 2016. In the FEIS, the agencies

candidly admitted that "the interchange ramps [of the existing I-81/Route 30

interchange] have adequate capacity to handle current and future traffic." (AR-46 at

ES-6). In comparison, the 1995 Traffic Study revealed that the on/off ramps of I-81

and Wayne Avenue (existing exit #5, which a Kriner Road interchange Alternative

would relieve) would operate at a congested LOS of "F" in design year 2016. (AR-37

at 37; AR-79 at 3).

29. The Plaintiffs disagree that this material fact is undisputed. Level of service (LOS) is

not a "qualitative measure" which describes roadway conditions. The LOS of a

roadway consists of a letter designation that represents a range of volume to capacity ratios. It is therefore a "quantitative measure" of performance. (AR-37 at 16-18).

30. The Plaintiffs disagree with this general definition of LOS as indicating a "best" or "worst" operating condition for a roadway. As defined by the agencies' own documents, an LOS of "A" for signalized intersections is defined as "very low delay, good progression". An LOS of "F" is defined as "excessive delay in some areas, frequently an indication of over-saturation." (AR-37 at 19).

31. The Plaintiffs agree that this material fact is undisputed. According to the agencies, the agencies design improvements "to a level of Service 'C' standard (except in urban areas where level of service 'D' conditions represent the level of service." (AR-37 at vi.).

32. The Plaintiffs agree that the intersection of Walker Road and Stouffer Avenue currently operates at unacceptable LOS's during parts of the day. Plaintiffs assert, however, that the congestion on Route 30 will be alleviated by the Route 30 widening improvements, which have already been initiated. That intersection's traffic volumes, however, are irrelevant to question of congestion on the I-81/Route 30 interchange itself. The agencies' 1995 Traffic Study, which was used to support traffic conclusions in the FEIS, clearly states that – even in design year 2016 – the interchange itself will operate at acceptable levels of service. (AR-37 at 37). The agencies contend that congestion "near" an existing interchange equates with congestion "on" an existing interchange. (AR-46 at ES-6). Using parallel logic, the intersection of Wayne Avenue and Stouffer Avenue (near existing exit #5 which would be relieved by an interchange built in the Kriner Road Area), will operate at

LOS's of "E" and "F" in 2016, and the intersection of I-81 ramps at Wayne Avenue will operate at failing LOS's in 2016. Thus, that traffic congestion presents a compelling scenario requiring a new interchange in the Kriner Road area to relieve that congestion. (AR-37 at 37).

33. The Plaintiffs disagree that this is a material fact. (*See* Plaintiffs' Response to paragraph thirty-two).

34. The Plaintiffs disagree that this material fact is undisputed. The conclusion drawn in this paragraph is taken verbatim from the FEIS. That section of the FEIS specifically states that the congestion in the "area" in the future will be produced if no "roadway improvements to the roadway network" are undertaken. (AR-46 at I-17). According to the agencies' own 1995 Traffic Study, the already initiated major Route 30 improvements – which include widening significant stretches of that roadway – will achieve an acceptable LOS of "C" at the intersection of the I-81 ramps and Route 30 in 2016. (AR-37 at 43). In addition, that Study also reveals that the addition of an interchange in the Walker Road area will not result in significant traffic improvement where the interchange ramps meet Route 30. (AR-37 at 43).

35. The Plaintiffs disagree that this material fact is undisputed. The agencies designed the "No Build" Alternative with assumptions that no traffic improvements would be constructed in the area – even those already programmed and initiated, as admitted in the agencies' 1995 Traffic Study. (AR-37 at i). As such, the "No Build" Alternative ignores the Route 30 Widening Project and the construction of the Norland Avenue Extension connector. The agencies' 1995 Traffic Study reveals that the Route 30 Widening Project itself results in significant improvement to that intersection. (AR-37

at 43). Regardless, congestion at this intersection is not a material fact because the "need" for the interchange has been identified as relieving congestion "on" an existing interchange, not "near" an existing interchange.

36. The Plaintiffs disagree that this material fact is undisputed. According to the agencies' own Traffic Study, the I-81/Route 30 Interchange is not congested, and will operate at an LOS of "B" and "C" in the year 2016. (AR-37 at 37). Therefore, there is no "cause" for the congestion, because the congestion doesn't exist.

37. The Plaintiffs disagree that this material fact is undisputed. The intersections of the I-81 interchange ramps with Route 30 will operate at acceptable LOS's in the design year 2016. (AR-37 at 37; AR-46 at ES-6).

38. The Plaintiffs disagree that this material fact is undisputed. To support this contention, the agencies cite solely to a response by PennDOT to a comment raised by the law firm representing the Greene Township Board of Supervisors, and fail to refer to any data that supports this contention. (AR-78 at 83). The agencies' conclusory response to the comment letter does not rely on any data, studies, or other materials developed in support of the FEIS. (AR-78 at 73-83). Neither the agencies' 1995 or 1998 Traffic Studies state that the intersection of I-81 ramps with Route 30 is not considered an "isolated intersection." The agencies did not examine the Falling Spring Road intersection in any of the Traffic Studies prepared for the project.

39. The Plaintiffs disagree that this material fact is undisputed. Again, the agencies rely entirely upon a one paragraph reply to a comment submitted on the FEIS, and not on any data or material contained within the FEIS itself or any other environmental or traffic documents. (AR-78 at 83). The second reference asserted by the agencies in

this paragraph is a citation to the Franklin County Comprehensive Plan, which fails to state the agencies' conclusion. (AR-136 at 1377). In fact, the Franklin County Comprehensive Plan does not support the construction of "Alternative D-Modified", but states that a new interchange should be considered between exit 4 and exit 8. (AR-136 at 1439). Finally, the County Plan calls for an interchange to be constructed in compliance with Public Law 100-17, which "demonstrates how construction of an interchange on a north-south interstate route will provide access to Chambersburg, Pennsylvania, and relieve traffic congestion on an existing interchange on such interstate route." (AR-136 at 1439).

40. The Plaintiffs disagree that this material fact is undisputed. Again, the agencies cite solely to a single response to a comment submitted on the FEIS, and fail to identify any documents in the Administrative Record which support their conclusion. (AR-78 at 83).The I-81/Route 30 interchange ramps are not congested, and will not be congested in 2016. (*See* Plaintiffs' Response to paragraph thirty-eight and thirty-nine).

41. The Plaintiffs disagree that this material fact is undisputed. The I-81/Route 30 interchange ramps are not congested, and will not be congested in 2016. (*See* Plaintiffs' Response to paragraph thirty-eight).

42. The Plaintiffs disagree that this material fact is undisputed, and assert that the conclusion drawn by the agencies is too vague to elicit a reasoned response. In this paragraph, the agencies use an example of "an interchange at Walker Road" – which could include any Alternatives – and insert a variability clause of "depending on the combination of other roadway improvements." Plaintiffs agree that an interchange in

the Walker Road area would be used by traffic traveling on Interstate 81, and would

feed that traffic onto the local Township road network. Plaintiffs also agree that all

traffic exiting on the interchange and traveling to Chambersburg would feed directly

onto Route 30 via the collector roads, thus failing to relieve any traffic volumes on

Route 30.

43. The Plaintiffs disagree that this material fact is undisputed. The Plaintiffs agree that

by design year 2016, the Traffic Study prepared by the agencies shows that there

would be a reduction of 5,800 vehicles daily at the Route 30/I-81 interchange if a

Walker Road Alternative was built. However, that Traffic Study shows that even with

the "No Build" Alternative, the Route 81 northbound and southbound on and off

ramps will continue to operate at LOS of "B" or "C" – acceptable levels of service.

(AR-37 at 37). Again, the agencies cite solely to an agency response to a comment

submitted on the FEIS and not to traffic studies, projections, or other agency

documents examining traffic volumes. (AR-78 at 77). The agencies' 1998 Traffic

Study fails to examine these projections, and both the 1995 and 1998 Traffic Studies

rely on stale origin/destination surveys prepared for the project in 1989. (AR-3 at 29;

AR-22 at 39).

44. The Plaintiffs disagree that this material fact is undisputed. Again, the agencies use

congestion at the "Route 30/Walker Road/Stouffer Avenue intersection area" as

grounds for the agencies' conclusion that the "Route 30/I-81" interchange is

congested. Such is not the case, as the agencies' own traffic studies reveal that the

interchange will operate at acceptable levels of service in 2016. (AR-37 at 37).

45. The Plaintiffs disagree that this material fact is undisputed. Again, the agencies cite solely to the agencies' response to a comment submitted on the FEIS, and not to the 1998 Traffic Studies themselves. (*See* Plaintiffs' Response to paragraph thirty-eight). The 1998 Supplemental Traffic Studies rely wholly on the traffic data and projections presented in the 1995 Traffic Studies, and the 1998 "Study" itself is five pages long. (AR-72 at 2). The consultant for the agencies did not collect any new traffic data in preparing the 1998 Supplemental Traffic Studies nor did it attempt to verify that its assumptions and projections from three years earlier remained valid. (AR-79 at 4). Instead, the consultant simply reallocated traffic flows from the 1995 Traffic Studies onto the new road network associated with "Alternative D-Modified" in the immediate vicinity of "Alternative D-Modified." (AR-72 at 9-37). As a result, the deficiencies associated with the 1995 Traffic Studies have been propagated in the 1998 Supplemental Traffic Studies. With respect to locations outside of the immediate vicinity of "Alternative D-Modified", the 1998 Supplemental Traffic Studies fail to examine those locations. (AR-73 at 4).

46. The Plaintiffs disagree that this material fact is undisputed. Interstate 81 carries the largest volume of traffic in the Chambersburg area.

47. The Plaintiffs agree that this material fact is undisputed. Plaintiffs agree that Congressionally-directed transportation projects which require the construction of a new interchange to "relieve congestion on an existing interchange" should be focused on relieving congestion that already exists. According to the agencies' own Traffic Studies, the I-81/Route 30 interchange is not congested, nor will it be congested in 2016. (AR-2 at 32; AR-10 at 222; AR-37 at 37; AR-79 at 3; AR-46 at ES-6). In

comparison, the agencies own studies conclude that the existing Route 81/Wayne Avenue interchange at exit #5 (which would be relieved by a new interchange in the Kriner Road area) will operate at a failing level of service in design year 2016 (AR-37 at 37; AR-79 at 40).

48. The Plaintiffs disagree that this material fact is undisputed. "Alternative D-Modified" fails to satisfy the need to relieve congestion "on" an existing interchange, because the I-81/Route 30 interchange is not congested, nor will it be congested in 2016. (AR-2 at 32; AR-10 at 222; AR-37 at 37; AR-46 at ES-6). The other "needs" conceived by the agencies are not a lawful application of the Congressionally-directed needs for the project delineated in Public Law 100-17. "Alternative D-Modified" fails to meet the additional needs contrived by the agency. (AR-86 at 16; AR-40 at II-11, II-17).

49. The Plaintiffs agree that this material fact is undisputed.

50. The Plaintiffs disagree that this material fact is undisputed. For this contention, the agencies rely upon the 1995 Traffic Studies, which were completed prior to any new development in that area, including the construction of the new K-Mart Distribution Center (formerly Toys R' Us) (696,960 square feet enclosing sixteen acres of land); the Ingram Book Warehouse Distribution Center (653,400 square feet enclosing fifteen acres of land); the Target Warehouse Distribution Center (1,306,880 square feet enclosing thirty acres of land); and the zoning of the Kriner Road area by Guilford Township which designates acreage for industrial and commercial development. This new development results in an increase in truck traffic accessing I-81, and causes worsening traffic conditions in the Kriner Road area. In addition, the 1995 Traffic Studies relied on projections for the Chambers-5 Business Park which

have proven to be extremely conservative. While admitting that future development in the Kriner Road area must be used to project future traffic volumes (AR-29 at 72), the agencies have refused to update their development information to account for the zoning in the Kriner Road area, the new Target, K-Mart, or Ingram Book Warehouse Distribution Centers, or the build-out of the Chambers-5 Business Park - which is located immediately adjacent to the proposed Kriner Road interchange. Guilford Township's zoning resulted in the establishment of 2,040 acres of industrially and commercially zoned districts in the Kriner Road area, as compared to only 1,020 acres of industrially and commercially zoned districts surrounding "Alternative D-Modified" in the Walker Road area. (AR-79 at 41). The agencies have admitted that the use of 1,820,000 square feet of building space in the Chambers-5 Park (more than 360,000 square feet less than what existed in the Park in 1998, and more than 1,000,000 square feet less than what currently exists, not including the 2,657,160 additional square feet built for the K-Mart, Ingram Book, and Target Warehouse Distribution Centers) would trigger a worsening in congestion from LOS "C" to "D" on the ramps of the existing Wayne Avenue interchange. (AR-105 at 155). In addition, in the agencies' Record of Decision, the agencies admitted that a Kriner Road interchange would reduce traffic by over 1,000 more vehicles per day than an interchange in the Walker Road area. (AR-82 at 6).

51. The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph fifty).

52. The Plaintiffs agree that this material fact is undisputed. The 2000 data consisted solely of traffic counts, and did not use different assumptions than the 1995 or 1998

Traffic Studies. Thus, projections to design year 2016 – using that data – still did not consider the impact of the Guilford Township zoning of land surrounding a Kriner Road interchange or other developments which have occurred in the area. Nor did the 2000 traffic counts update origin/destination studies originally prepared in 1989 (AR-37 at 29). Finally, the 2000 Traffic Counts were collected after the Record of Decision (ROD) was issued for the interchange, and thus, cannot be used to support the assumptions used in the environmental studies supporting the release of the Record of Decision (ROD).

53. The Plaintiffs disagree that this material fact is undisputed. In 2000, the agencies conducted traffic counts on Wayne Avenue west of I-81 and Wayne Avenue east of I-81. (AR-156 at 104). The agencies failed, however, failed to examine traffic volumes at the U.S. Route 30/I-81 interchange, as they did in 1995. (AR-37 at 42). Failure to examine traffic flow on the interchange itself prevents the drawing of conclusions of traffic growth based on data solely derived from Wayne Avenue traffic counts. (*See* Plaintiffs' Response to paragraphs fifty-one and fifty-two).

54. The Plaintiffs disagree that this material fact is undisputed. The 2000 traffic counts were simply counts – they did not project traffic volumes based on the new developments in the Kriner Road area, the zoning of the Kriner Road area, or the accelerated build-out of the Chambers-5 Business Park. They also did not include updated origin/destination studies, but relied on studies completed in 1989. (*See* Plaintiffs' Response to paragraphs fifty-two and fifty-three).

55. The Plaintiffs disagree that this material fact is undisputed. The agencies failed to acknowledge that the Walker Road Alternatives were not in keeping with Greene

Township's Comprehensive Plan in the agencies' Preliminary Alternatives Report (which narrowed the Alternatives considered for the Interchange) (AR-3), or the Draft Environmental Impact Statement which selected a Walker Road interchange as the "preferred" Alternative. (AR-12 at I-11). PennDOT's own Handbook for developing Environmental Impact Statements requires that the projects be "consistent with existing and planned community land use that could interact with transportation facilities." (AR-81 at 89). Beginning as early as February of 1988, the Greene Township Supervisors alerted the agencies to their opposition to the interchange. (AR-86 at 16). The National Environmental Policy Act (NEPA) requires more than an acknowledgement of a conflict, but requires the agency to describe how it will "reconcile its proposed action with the plan or law." (40 CFR section 1506.2(d)). An interchange constructed in the Kriner Road area would not conflict with any municipal Comprehensive Plans. (AR-46 at II-6).

56. The Plaintiffs disagree that this material fact is undisputed. The Kriner Road Alternatives satisfy the agencies' need of adhering to comprehensive plans. A Kriner Road Alternative would comply with the Franklin County Comprehensive Plan and the Guilford Township Zoning Ordinance – all of the municipalities with jurisdiction over that region. (AR-134 at 1001; AR-136 at 1439; AR-46 at II-6).

57. The Plaintiffs disagree that this material fact is undisputed. Area municipalities do not have conflicting comprehensive plans with regard to the transportation component for the construction of an interchange in the Kriner Road Area. Guilford Township lacks a Comprehensive Plan, but its Zoning Ordinance supports the construction of an interchange at Kriner Road, the Greene Township Comprehensive Plan supports the

construction of an interchange outside of Greene Township, and the Franklin County Comprehensive Plan supports the construction of an interchange in the Kriner Road area. Thus, as they apply to an interchange in the Kriner Road area, there are no conflicts between the Comprehensive Plans and Zoning Ordinances for municipalities potentially impacted by a Kriner Road interchange. (AR-46 at II-6).

58. The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph fifty-seven).

59. The Plaintiffs disagree that this material fact is undisputed. Franklin County's Comprehensive Plan states that the County should "consider" the construction of an interchange between exit 4 and exit 8, north and south of Chambersburg. (AR-136 at 1439). As early as September of 1989, the Franklin County Commissioners expressed their opposition to any interchange that would feed traffic directly onto Franklin Farm Lane – as "Alternative D-Modified" would do. (AR-141 at 345). The Franklin County Comprehensive Plan explicitly states that "this plan does not propose the installation of specific facilities" for transportation within the County. (AR-158 at 255-56).

60. The Plaintiffs agree that this material fact is undisputed.

61. The Plaintiffs disagree that this material fact is undisputed. "Alternative D-Modified" is inconsistent with all components of the Greene Township Comprehensive Plan, including the transportation and land-use components of the Plan. Beginning in February of 1988, the Township Supervisors made it clear to the agencies that the Township was opposed to the construction of the interchange in the Township because it would interfere with the Township's attempts to protect agricultural land and ASA's within the Township. (AR-86 at 18; AR-142 at 860; AR-102 at 41). The

only municipal Comprehensive Plan in the region that calls for the construction of an
interchange in the Walker Road area is the Comprehensive Plan of the Borough of
Chambersburg.

62. The Plaintiffs disagree that this material fact is undisputed. The area around the
proposed Walker Road interchange is currently zoned "R-1" in Greene Township.
"R-1" zoning is the least intensive residential zoning allowed in the Township and the
District specifically allows agricultural uses. (AR-46 at III-1). The FEIS states that
such zoning is intended to retain the "rural character of the area" and preserve
"agricultural lands." (AR-46 at III-1, 2).

63. The Plaintiffs agree that this material fact is undisputed.

64. The Plaintiffs disagree that this material fact is undisputed. The "R-1" zoning
designation specifically allows for agricultural uses, and the Township has
established several Agricultural Security Areas (ASA's) in the area to protect
farmland. (AR-136 at 1717); (*See* Plaintiffs' Response to paragraph sixty-two).

65. The Plaintiffs disagree that this material fact is undisputed. The Agricultural Lands
Condemnation Approval Board (ALCAB) was formed to ensure that only necessary
condemnations of farmland were undertaken by state agencies. While the Draft
Environmental Impact Statement and the agencies' Point of Access Report (prepared
by the agencies in January of 1995), admitted that a hearing with the ALCAB would
be necessary for the construction of an interchange in the Walker Road area, the
agencies reversed their position four months later in the Final Environmental Impact
Statement. (AR-12 at IV-52; AR-22 at 24-25; AR-46 at IV-65). On May 10, 1999,
after attempting to enter farmland owned by a Franklin County farming couple,

PennDOT was sued by that farming couple, to force the agency to seek ALCAB approval for the condemnation. The Commonwealth Court and the Pennsylvania Supreme Court agreed that PennDOT had violated the provisions of the Agricultural Area Security Law by not seeking ALCAB approval for its proposed condemnation of farmland. *White v. PennDOT*, 738 A.2d 27 (Commw. 1999); 738 A.2d 27 (Pa. 1999). Greene Township's planning and zoning practices do not provide for the development of the Township's agricultural land, but have sought to protect farmland in the Township through the establishment of large blocks of farmland in Agricultural Security Areas (ASA's) (AR-136 at 1717). The agencies have admitted that Greene Township's zoning was implemented to preserve "agricultural lands" and retain the "rural character of the area." (AR-46 at III-1, 2).

66. The Plaintiffs agree that ALCAB's decision contained the text that the agencies have reprinted in this paragraph. The Plaintiffs disagree that the testimony elicited during the ALCAB hearing supports the conclusion drawn by the Board. To avoid an appeal of ALCAB's decision, PennDOT purchased twenty-two (22) acres of farmland, at several times market value, which would be impacted by the interchange. This purchase was not reflected in the June 28, 2001 "Re-evaluation of the Record of Decision", although it occurred prior to the issuance of the "Re-evaluation." (AR-83).

67. The Plaintiffs disagree that this material fact is undisputed. The Greene Township Supervisors have declared that the Township is opposed to an interchange constructed in the Walker Road area, and have consistently stated that opposition since February of 1988. (AR-86 at 16). Since that time, Greene Township has participated in all aspects of the planning process and has prepared a multitude of formal reports and

studies on all aspects of the interchange. (AR-18; AR-19; AR-20; AR-21; AR-52; AR-53; AR-54; AR-55; AR-69; AR-74; AR-79; and AR-81). Nothing in the Greene Township Comprehensive Plan supports the construction of an interchange in the Walker Road area. The Greene Township Supervisors have sought to protect farmland in the Township through the establishment of Agricultural Security Areas (ASA's) and their refusal to alter the zoning designation to allow industrial or commercial uses. (AR-136 at 1717). The agencies have admitted in the FEIS that Greene Township's zoning is intended to preserve "agricultural lands" and retain the "rural character of the area." (AR-46 at III-1).

68. The Plaintiffs disagree that this material fact is undisputed. While the agencies did measure and project traffic volumes on local roadways, the agencies failed to examine the "effect" of the project on local roads. As early as 1987, the agencies recognized that the interchange would "dump traffic onto township roads" and that those roads would "have to be upgraded." (AR-86 at 8; AR-112 at 1; AR-46 at II-17; AR-3 at 53; AR-2 at 41, 63; AR-90 at 5, 12; AR-112 at 118; AR-91 at 109; AR-10 at 221; AR-93 at 687, 786; AR-93 at 785; AR-13 at 41; AR-159 at 153). The agencies have refused to examine the "effect" of the interchange on the local roadway because they claim that road upgrades to township roads "would not be part of this project" and that it is the Township's responsibility to upgrade local roadways to "handle the expected increased traffic volumes." (AR-22 at 22; AR-91 at 167).

69. The Plaintiffs disagree that this material fact is undisputed. The agencies examined traffic volumes and LOS on these roads in the 1995 Traffic Study, but not in the 1998 Traffic Study or any other studies. (AR-37; AR-72).

70. The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph sixty-nine).

71. The Plaintiffs agree that this material fact is undisputed.

72. The Plaintiffs agree that this material fact is undisputed.

73. The Plaintiffs agree that this material fact is undisputed.

74. The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph sixty-nine).

75. The Plaintiffs disagree that this material fact is undisputed. Traffic will increase on local roadways with or without an interchange at Walker Road. However, directing interstate traffic onto the proposed interchange - which feeds directly onto rural Township roads - will substantially increase traffic on those rural roadways. (AR-79 at 8; AR-112 at 80) The agencies have admitted that the local roadways are not "currently built to collector road standards" and are not adequate for servicing the interchange. (AR-110 at 125; AR-12 at Appendix "D"; AR-86 at 8; AR-37 at 6, 7). In addition, the construction of the interchange will shorten the time span in which traffic growth occurs, and truck and tractor-trailer traffic will constitute different traffic composition than the vehicles currently using those roadways. (AR-79 at 24).

76. The Plaintiffs agree that this material fact is undisputed. Traffic will increase on local roadways with or without an interchange at Walker Road. However, this does not relieve the agencies of the responsibility of examining the impacts attributable to the increased traffic caused by the interchange itself. (*See* Plaintiffs' Response to paragraph seventy-five).

77. The Plaintiffs agree that traffic will increase on local roadways with or without an interchange at Walker Road. The Plaintiffs disagree that this conclusion is material to the inquiry as to whether the agencies properly examined the impact of the interchange on the local roadways. The "No Build" Alternative improperly assumed that no traffic improvements would occur in the area, even though the Route 30 Widening Project was already underway, and both the Norland Avenue Extension connector and the Route 30 improvements were assumed in the Traffic Studies prepared for the interchange. (AR-37 at i). (*See* Plaintiffs' Response to paragraph seventy-five).

78. The Plaintiffs disagree that this material fact is undisputed and assert that the statement is too convoluted to elicit a reasoned response. Plaintiffs disagree that the increase of traffic on local roadways, produced by the interchange, will be insignificant. The agencies' 1998 Supplemental Traffic Studies indicate that the northern segment of Franklin Farm Lane is expected to have Average Daily Traffic (ADT) levels of between 9,200 and 14,350 vehicles per day if "Alternative D-Modified" is constructed. (AR-72 at 34-37). In contrast, the agencies' consultants state that this same segment of Franklin Farm Lane would only have an ADT level of 2,300 vehicles per day if "Alternative D-Modified" was not constructed. (AR-37 at 66, 90, 91, 93). Based on the agencies' own projections, the northern segment of Franklin Farm Lane will experience an increase in ADT levels of between 6,900 and 12,050 vehicles per day. Franklin Farm Lane currently services 1,000 to 2,000 vehicles per day, revealing that an increase of the projected traffic will "overwhelm

the capacity of Franklin Farm Lane to carry such volumes of traffic." (AR-79 at 22);
(*See* Plaintiffs' Response to paragraph seventy-seven).

79. The Plaintiffs disagree that this material fact is undisputed. Logically, if the
interchange is being constructed to relieve congestion, the local roadways must
experience an increase in traffic. (*See* Plaintiffs' Response to paragraphs seventy-
seven and seventy-eight)

80. The Plaintiffs agree that the construction of "Alternative D-Modified" would result in
Walker Road being relocated. The Plaintiffs disagree that those changes would be the
only result of the construction of "Alternative D-Modified." "Alternative D-
Modified" will result in the demolition of the existing Walker Road bridge over I-81,
the construction of a new bridge fourteen hundred feet (1400') south of the existing
bridge, and the stubbing of Walker Road on either side of I-81. (AR-80 at Figure 2);
(*See* Plaintiffs Response to paragraph three).

81. The Plaintiffs disagree that this material fact is undisputed, and contend that this
paragraph is too vague to elicit a reasoned response.

82. The Plaintiffs disagree that this material fact is undisputed. Whereas the 1995 Traffic
Studies evaluated Alternatives C, D, and D-C, "Alternative D-Modified" was
introduced three years after the preparation of those Studies. The 1998 Traffic Studies
curiously omit tables that list the degree of reduction of traffic congestion attributable
solely to the Route 30 improvements or solely to the construction of a Walker Road
interchange. (Compare AR-72 with AR-37 at 43). A side by side comparison of how
the parameters were altered for the 1998 Traffic Studies can be found at AR-176 at

676 and 696. Finally, both the 1995 and 1998 Traffic Studies relied on stale origin/destination surveys originally conducted in 1989. (AR-3 at 29; AR-22 at 29).

83. The Plaintiffs disagree that this material fact is undisputed. Although the traffic studies assumed the construction of Norland Avenue Extended when developing traffic numbers for several Alternatives, no direct or indirect "impacts" of the construction of Norland Avenue Extended were considered in the environmental studies. Throughout the study process, the agencies asserted that the Norland Avenue project was not a "federal" project because the connector road would not be funded by federal monies, and therefore, that impacts from the construction of the road were irrelevant. (AR-138 at 159; AR-139 at 499) In November of 2000, $3 million in state and federal monies were dedicated to build the Norland Avenue Extension. The public announcement of the release of these monies occurred six months prior to the release of the agencies "Re-evaluation of the ROD", yet the document made no mention of the funding. (AR-83). The addition of $3 million to the overall cost of the interchange project was never factored into the agencies' consideration of alternatives. (*See* Plaintiffs' Response to paragraph three).

84. The Plaintiffs disagree that this material fact is undisputed. Only the impact of the Norland Avenue Extension connector on traffic volumes flowing to and from the interchange was ever examined by the agencies. Impacts resulting from that traffic, and resulting from the development of the road itself, were never analyzed in any documents produced by the agencies. At the time of the release of the FEIS, the entire length of Norland Avenue lie in the Eastern Greene Township Rural Historic District. No impacts to that historic district were ever examined by the agencies. (AR-93 at

687; AR-113 at 215; AR-46 at IV-8). (*See* Plaintiffs' Response to paragraph eighty-three).

85. The Plaintiffs disagree that this material fact is undisputed. A short section of the Norland Avenue Extension was previously owned by the Chambersburg Area Development Corporation (CADC). The Extension connector will be built with public funds.

86. The Plaintiffs disagree that this material fact is undisputed. Most of the Gabler Tract remains undeveloped and the Gabler Family is awaiting the construction of the interchange to develop the Tract. The agencies have admitted that the intensity of development on the Gabler Tract depends entirely upon the construction of the interchange. (AR-97 at 870; AR-13 at 41; AR-12 at ES-6; AR-113 at 215; AR-92 at 153; AR-91 at 185; AR-6 at 68).

87. The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph eighty-six).

88. The Plaintiffs agree that this material fact is undisputed. In addition, development on the Gabler Tract will be accelerated by the construction of the interchange.

89. The Plaintiffs disagree that this material fact is undisputed. According to agency consultants at the time of the development of the FEIS, 50% less acreage would be developed on the Gabler Tract without the Exit by the design year of 2016. (AR-133 at 698). All projected development activity on the Gabler Tract was based solely on discussions with the developer and the developer's planner. All projections were based on sketches provided by the developer. (AR-133 at 698). In 2001, the agencies revised the Gabler development activity that was projected in the FEIS, and found

those projections to be almost completely unrealized. As of January 2, 2001, agency

consultants found that no development plans had been submitted to Chambersburg for

development of the Gabler Tract, that a church had been constructed and an

outpatient health facility was scheduled for construction. (AR-132 at 389). Of the

residential housing units projected for construction in 1995, only 30 multifamily units

have been constructed. (AR-132 at 389). A Supplemental Environmental Impact

Statement (SEIS) would have documented the faulty projections and analyzed the

true impact of the interchange construction on accelerating development on the

Gabler Tract.

90. The Plaintiffs disagree that this material fact is undisputed. The agencies cite solely to

the FEIS, prepared in 1995, for this information. (*See* Plaintiffs' Response to

paragraph eighty-nine).

91. The Plaintiffs agree that the agencies identified additional development on the Gabler

Tract as a result of the construction of an interchange in the Walker Road area. The

Plaintiffs disagree that this statement is material because that inclusion failed to

satisfy the requirements imposed by the National Environmental Policy Act (NEPA)

and the National Historic Preservation Act (NHPA) to fully examine the adverse

environmental and historic impacts resulting from the accelerated development of the

Gabler Tract. At the time of the development of the FEIS, the entire length of the

proposed Norland Avenue Extension lie within the Eastern Greene Township Rural

Historic District. (AR-93 at 687; AR-113 at 215; AR-46 at IV-8).

92. The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response

to paragraph ninety). From the data collected by the agencies themselves in 2001, it is

unclear whether the Gabler Tract would be developed without the construction of the interchange in the Walker Road area. (AR-132 at 389).

93. The Plaintiffs disagree that this material fact is undisputed. Norland Avenue Extended is currently a farm lane in the middle of farm fields used for the grazing of dairy cows. It has no proper base to support a pavement overlay. Without state and federal monies obtained to build the road, it is unlikely that the roadway would ever be paved and opened to traffic. The agencies' statement in this paragraph conflicts with the agencies' statement in the "Re-evaluation of the ROD" that the Extension is "open to traffic." (AR-83 at 7).

94. The Plaintiffs agree that the agencies prepared a "Re-evaluation" of the FEIS in January of 1999. The Plaintiffs disagree that the "Re-evaluation" was prepared in accordance with FHWA regulations, because the document failed to recognize that a Supplemental Environmental Impact Statement (SEIS) was necessary to examine the significant changes to the project which resulted in significant, new, impacts to historic properties and the environment. In addition, the "Re-evaluation" was not approved via signature by either the state or the federal decisionmakers. (AR-80).

95. The Plaintiffs disagree that this material fact is undisputed. The agencies prepared the "Re-evaluation" of the FEIS four years after the release of the FEIS to circumvent the necessity of preparing a Supplemental Environmental Impact Statement (SEIS). An SEIS would have forced the agencies to update and re-examine alternatives for the proposed interchange. The newly designed and relocated interchange was not a "modification" of Alternative D, but a completely new interchange project proposed by the agencies. (*See* Plaintiffs' Response to paragraph three).

96. The Plaintiffs agree that the text of the "Re-evaluation" has been reprinted by the agencies in this paragraph. "Alternative D-Modified" was never studied in the original environmental documents, and is not a "modification" of Alternative D. Under "Alternative D-Modified", traffic from the proposed interchange would feed solely from, and onto, Franklin Farm Lane on the east side of I-81 for traffic traveling from, and to, Chambersburg. Historic resources located along that road, including the Gass House and the Poor House, would suffer greater adverse impacts from the redirection of traffic flow. (For the location of these resources to the interchange, *see* AR-12 at I-12; AR-46 at III-4). Demolition of the existing overpass bridge, construction of a new overpass, construction of the connector road, and other significant changes to the project have increased the cost of the project by over 400%. (AR-169 at 52, compared to AR-46 at II-7); (*See* Plaintiffs' Response to paragraph three).

97. The Plaintiffs agree that the text of the "Re-evaluation" has been reprinted in this paragraph. The Plaintiffs disagree that "Alternative D-Modified" is a modification of Alternative D, as studied in the FEIS. "Alternative D-Modified" represents a substantial change to the proposed action that results in significant impacts that were not evaluated in the environmental documents. (*See* Plaintiffs' Response to paragraphs three and ninety-six).

98. The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraphs three and ninety-six).

99. The Plaintiffs disagree that this material fact is undisputed. This paragraph is too vague for a response, using the word "general location" to avoid the conclusion that

"Alternative D-Modified" is not a modification of any of the Walker Road

Alternatives examined in the environmental documents. Fourteen hundred feet

(1400') south is not the same "general location" as other Walker Road Alternatives.

(*See* Plaintiffs' Response to paragraph ninety-six).

100.    The Plaintiffs disagree that this material fact is undisputed. These four areas of

concern are not the sole areas of concern expressed by commenting parties and the

agencies. Other concerns include impact of traffic on local, rural roadways, the total

cost for the interchange, sprawl which would be created by an interstate interchange,

the cost of extending infrastructure to residential developments occurring because of

the interchange, the construction of Norland Avenue Extended, the predetermination

of the location of the interchange, the lack of consideration of alternatives, the failure

of the interchange to comply with local comprehensive land-use plans, the misuse of

Congressionally-directed funding for the interchange, and other concerns. (AR-105 at

299; AR-79 at 8; AR-37 at 6, 7; AR-1 at 1; AR-46 at ES-1; AR-86 at 16; AR-96 at

591; AR-89 at 6; AR-90 at 12; AR-88 at 41; AR-88 at 96; AR-91 at 123; AR-99 at

1601).

101.    The Plaintiffs disagree that this material fact is undisputed. "Alternative D-

Modified" impacts historic buildings and historic districts to a greater extent than any

of the Alternatives studied in the environmental documents, because "Alternative D-

Modified" feeds interchange traffic directly onto Franklin Farm Lane, instead of onto

Walker Road and Franklin Farm Lane on the east side of I-81. The Gass House and

the Poor House - and other recognized historic properties - front on Franklin Farm

Lane. (AR-107 at 710). Franklin Farm Lane would become the primary travel

corridor for truck and vehicle traffic exiting (and entering) the proposed interchange

on the east side of Interstate 81 traveling to, and from, Chambersburg. (AR-79 at 19).

Necessary improvements to Franklin Farm Lane to accommodate traffic will result in

adverse impacts to those historic properties. (AR-79 at 22-23).

102.    The Plaintiffs disagree that this material fact is undisputed. The use of the term

"comparable" in this paragraph is too vague to elicit a reasoned response from the

Plaintiffs. By way of further answer, the Plaintiffs disagree that impacts from

"Alternative D-Modified" are comparable to, or lesser than, the impacts of the

Alternatives examined in the environmental documents.

103.    The Plaintiffs disagree that this material fact is undisputed. Farmland acreage to

be used by any of the Alternatives is not properly reflected in any of the

environmental documents prepared by the agencies, because major improvements to

local roads – which would necessitate the use of additional agricultural land – were

not included in these estimates. In addition, the agencies have purchased twenty-two

(22) acres of farmland within an Agricultural Security Area (ASA) for the

construction of the proposed interchange, thus increasing the amount of farmland

impacted by the project in the Walker Road area. (*See Agencies' Brief in Support of*

*Summary Judgment* at 28, fn. 4). When combined with other farmland impacted, a

Walker Road interchange consumes two to three times the amount of farmland used

by the other alternatives. (AR-80 at 22).

104.    The Plaintiffs disagree that this material fact is undisputed. The state highway

agency has already purchased twenty-two (22) acres of farmland within two

Agricultural Security Areas (ASA's) in preparation for the construction of the

interchange, and to settle a dispute with a farm couple owning that land. (*See Agencies' Brief in Support of Summary Judgment* at 28, fn. 4). Thus, construction of an interchange in the Walker Road area has already resulted in the use of at least twenty-two (22) acres of farmland within ASA's. Combining that acreage with other acreage to be condemned for the interchange results in the use of over thirty-two (32) acres of farmland for "Alternative D-Modified." (AR-138 at 229-237)  In comparison, no land within an ASA would be taken for the construction of an interchange in the Kriner Road area, and the amount of farmland used by "Alternative D-Modified" dwarfs the amount of farmland used by the other alternatives. (AR-82 at Attachment "D" at 22; AR-80 at 22). The increased use of farmland for "Alternative D-Modified" was not considered in the "Re-evaluation of the ROD." (AR-83 at 3).

105.    The Plaintiffs disagree that this material fact is undisputed. Because the agencies failed to include tractor-trailer and truck traffic as noise generators, and none of the noise testing sites were located on Franklin Farm Lane, these results fail to show that noise impacts will be negligible. (AR-79 at 21; AR-159 at 154).

106.    The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph one hundred and five).

107.    The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph one hundred and five).

108.    The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph one hundred and five).

109.    The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph one hundred and five).

110.    The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph one hundred and five).

111.    The Plaintiffs disagree that this material fact is undisputed. "Alternative D-Modified" is a new project with significant, new environmental impacts. (*See* Plaintiffs' Response to paragraphs three and ninety-six).

112.    The Plaintiffs agree that the DEIS and FEIS identified farmland impacts, but disagree that the analysis in the 1994 and 1995 environmental documents is relevant to "Alternative D-Modified."

113.    The Plaintiffs disagree that this material fact is undisputed. The use of the term "comparable to" prevents a reasoned response. By way of further answer, an interchange constructed in the Kriner Road area would have less impact to farmlands than "Alternative D-Modified" and would not result in any impacts to farmland within Agricultural Security Areas (ASA's). (AR-80 at 18). "Alternative D-Modified" already has produced impacts to twenty-two (22) acres of farmland, within two Agricultural Security Areas (ASA's), which were purchased by the agencies in 2001 for the construction of a Walker Road interchange. *(See Agencies' Brief in Support of Summary Judgment* at 28, fn. 4). When added to farmland to be condemned for "Alternative D-Modified", over thirty two (32) acres of farmland will now be used for the interchange. (*See* Plaintiffs' Response to paragraph one hundred and four).

114.    The Plaintiffs agree that a "re-evaluation of the ROD" was prepared in June of 2001. No legal or regulatory authority supported the issuance of that document, because it was completed and released after the Record of Decision (ROD) for the

project had been signed. (AR-82). The "re-evaluation" failed to examine any new information regarding the Kriner Road Alternative, or new developments in the Kriner Road area that would inevitably increase traffic volumes. (*See* Plaintiffs' Response to paragraph fifty).

115.  The Plaintiffs disagree that this statement of material fact is undisputed. The "re-evaluation" had no legal or administrative value, because the Record of Decision (ROD) for the project had already been signed. As such, no public comment was solicited on the document. The issuance of the "re-evaluation" represented an attempt by the agencies to circumvent the necessity of preparing a Supplemental Environmental Impact Statement. The "re-evaluation" failed to consider any new information impacting the construction of the interchange and failed to consider new information that impacted the comparison of alternatives within the environmental documents. (AR-83).

116.  The Plaintiffs agree that the text of the "re-evaluation" has been reprinted in this paragraph, but disagree with the conclusions drawn by the agencies within that text.

117.  The Plaintiffs disagree that this material fact is undisputed. The "re-evaluation" of the ROD found changes in several areas in the period between the issuance of the Record of Decision (ROD) and the "re-evaluation." Identified as "change in impacts" by the agencies were "groundwater & water supplies", an increase in indirectly impacted agricultural land, an increase in the acreage impacted within Agricultural Security Areas, a pending application for an agricultural conservation easement, and relocations of public utilities. (AR-83 at 3). In addition, the "re-evaluation" incorrectly stated that there was no change in the acreage of farm soils potentially

impacted by the interchange, when in reality, the impacted acreage had increased

from 17.8 acres to 42 acres. (AR-83 at 3; AR-82 at Attachment "D" at 22).  The

change in impacts between the issuance of the Record of Decision (ROD) and the "re-

evaluation", however, is not the test for whether a Supplemental Environmental

Impact Statement should be prepared. The true test must inquire as to whether the

changes to the project (and the resulting impacts) from the date of the issuance of the

FEIS to the date of the issuance of the "re-evaluation" were significant and not

examined by the environmental documents.

118.    The Plaintiffs agree that this material fact is undisputed.

119.    The Plaintiffs disagree that this material fact is undisputed. Over thirty-two (32)

acres of farmlands will now be impacted by the interchange. (*See* Plaintiffs' Response

to paragraphs one hundred and four and one hundred and seventeen).

120.    The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs'

Response to paragraphs one hundred and four and one hundred and seventeen).

121.    The Plaintiffs disagree that this material fact is undisputed. The highway agencies

purchased twenty-two (22) acres of farmland lying within an Agricultural Security

Area on the east side of I-81 for the construction of the interchange, before the

issuance of the 2001 "Re-evaluation*." (See Agencies' Brief in Support of Summary

Judgment* at 28, fn. 4). As such, the ASA and farmlands data contained in the "Re-

evaluation" is incorrect. (*See* Plaintiffs' Response to paragraphs one hundred and four

and one hundred and seventeen).

122.    The Plaintiffs disagree that this material fact is undisputed. Farmland within two

Agricultural Security Areas (ASA's), and over thirty-two (32) acres of farmland,

would be impacted by the construction of an interchange in the Walker Road area. (AR-136 at 1717; AR-83 at 3).

123.    The Plaintiffs disagree that this material fact is undisputed. The agencies predicted that 1,320,000 square feet would be developed within Chambers-5 by the design year of 2016. As of May of 1998, 2,180,542 square feet had already been developed within the Chambers-5 Business Park. (AR-79 at 42). Over 3,000,000 square feet has now been developed within Chambers-5. Thus, the agencies' 1995 predictions for 2016 were over 860,000 square feet less than what existed in 1998, and almost 2,000,000 square feet less than what currently exists. In response to comments on the FEIS, the agencies admitted that the use of 1,820,000 square feet of building space (more than 360,000 square feet less than what existed in 1998) would trigger a worsening in congestion from an LOS "C" to LOS "D" at the existing Wayne Avenue interchange. In a Memorandum created by the agencies on June 4, 1998, the agencies admitted that 500,000 more square feet of development than anticipated in the FEIS will result in a failing level of service on the Wayne Avenue interchange ramps. (AR-105 at 155).

124.    The Plaintiffs agree that this material fact is undisputed. Full build-out of the Chambers-5 Business Park would be 3,711,742 square feet of development. (AR-79 at 42). The agencies failed to project the traffic impact of new development produced by Guilford Township's zoning of the Kriner Road area for commercial and industrial development. (AR-134 at 1001). Updated development information for the Kriner Road Alternatives was not collected by the agencies.

125.    The Plaintiffs agree that this material fact is undisputed. The agencies have failed to examine the traffic impacts resulting from the Toys R Us Distribution Center in any environmental studies. Although the agencies knew of the construction of the Distribution Center as early as December 11, 2000 (AR-132 at 391), no attempt was made by the agencies to consider the truck or car traffic generated by the Distribution Center in any traffic studies. In addition to the Toys R' Us Distribution Center, several other truck-intensive facilities have been built in the Kriner Road area. (*See* Plaintiffs' Response at paragraph fifty).

126.    The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph one hundred and twenty-seven).

127.    The Plaintiffs disagree that this material fact is undisputed. The conclusion was reached through traffic counts taken solely on Wayne Avenue west of I-81. However, traffic exiting and entering the Chambers-5 Business Park uses both Wayne Avenue and Kriner Road. (AR-46 at III-7). No counts were taken by the agencies at the intersection of Kriner Road and Wayne Avenue in 2000, although counts were taken at that intersection in 1995. (AR-46 at I-9). Therefore, the conclusion reached by the agencies is based on a selective use of data. (*See* Plaintiffs' Response to paragraph fifty-three).

128.    The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraphs one hundred and twenty-five and one hundred and twenty-seven).

129.     The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs'

Response to paragraphs one hundred and twenty-five and one hundred and twenty-

seven).

130.     The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs'

Response to paragraphs one hundred and twenty-seven).

131.     The Plaintiffs disagree that this material fact is undisputed. Wayne Avenue does

have, and will have, congestion problems and the Kriner Road Alternative

(Alternative B-1) best meets the project needs. (*See* Plaintiffs' Response to

paragraphs one hundred and twenty-five and one hundred and twenty-seven).

132.     The Plaintiffs disagree that this material fact is undisputed. The decision to

construct the interchange in the Walker Road area was predetermined from the

inception of the project, and decisions made to predetermine the project's location

were made throughout the planning process by staff of both the state and federal

highway agencies. In 1987, in Meeting Minutes provided by the agencies, the

agencies concluded that an interchange located north of Chambersburg would "serve

a future land developer." (AR-86 at 7). PennDOT's own Twelve Year Highway and

Bridge Program listings refer to the interchange being constructed "north of

Chambersburg" and north of the existing I-81/Route 30 interchange. (AR-169 at 67;

AR-169 at 56, 58, 60, and 64). In the contract for the preparation of an Environmental

Impact Statement, the agencies agreed to the consultants' statement that the purpose

of the interchange is to "relieve congestion at the existing Interstate 81/U.S. Route 30

Interchange." (AR-163 at 1022). The state agency, with the FHWA's knowledge,

approval, and oversight, thus predetermined the location of the

interchange years before the official selection of an Alternative via the Record of Decision (ROD). (AR-163 at 1038; AR-88 at 24; AR-89 at 7; AR-90 at 5; AR-90 at 3; AR-90 at 20; AR-90 at 25; AR-90 at 83; AR-169 at 111, 113, 115, 117, 119, 123, 125, 128; AR-162 at 651; AR-162 at 550; AR-103 at 369; AR-165 at 1664; AR-165 at 1707; AR-165 at 1681; AR-91 at 167; AR-93 at 536). Many decisions about accelerating the schedule for the interchange, and approving contracts for "pre-final" design prior to the Record of Decision, were made directly by FHWA. (AR-93 at 532; AR-113 at 200; AR-113 at 186; AR-113 at 192; AR-113 at 157; AR-113 at 185; AR-159 at 151). At one point, the FHWA's Acting Administrator gave a commitment to then – U.S. Representative Bud Shuster that a supplemental DEIS would not be prepared, before any studies had been completed to support that commitment. (AR-94 at 208; AR-96 at 755). The FHWA also requested a redetermination of the Keeper of the National Historic Register's decision concerning a historic designation of land, even though there was no regulatory authority to do so. (AR-100 at 1848). Plaintiffs disagree that PennDOT's planning process and decisionmaking is irrelevant to the FHWA's determinations, as PennDOT was delegated the responsibility of performing environmental studies by FHWA. PennDOT was also a signatory to the DEIS and the FEIS, and the introduction to the FEIS specifically declares that it is a PennDOT document, prepared in coordination with the FHWA. (AR-46 at preface). In addition, PennDOT has voluntarily chosen to intervene and become a party to this litigation.

133.    The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph one hundred and thirty-two).

134.    The Plaintiffs agree that this material fact is undisputed. However, many other

PennDOT letters, actions, and decisions were never submitted to FHWA for review.

(*See* Plaintiffs' Response to paragraph one hundred and thirty-two).

135.    The Plaintiffs disagree that this material fact is undisputed. The current litigation

challenges the agencies' compliance with the National Environmental Policy Act

(NEPA), the National Historic Preservation Act (NHPA) and other federal laws and

regulations. The entire planning process for the interchange was focused on

predetermining the location of the interchange in the Walker Road area. (*See*

Plaintiffs' Response to paragraph one hundred and thirty-two).

136.    The Plaintiffs disagree that this material fact is undisputed. The phrase "product

owner" is a phrase unfamiliar to the Plaintiffs. Under the legal requirements

established by the National Environmental Policy Act, the FHWA is required to

consider reasonable alternatives for the proposed action. Relevant factors

"considered" by the agency cannot legally interfere with an objective consideration of

those alternatives.

137.    The Plaintiffs disagree that this material fact is undisputed. While the FHWA

certainly "reviewed" some documents prepared by the state agency, the federal

agency failed to insure that the state agency carried out an unbiased, objective

evaluation of the alternative locations for the project.

138.    The Plaintiffs disagree that this material fact is undisputed. The Preliminary

Alternatives Report (PAR) examined five Build Alternatives, which included

Alternative construction locations at Guilford Springs Road (Alternative A); Kriner

Road (Alternative B); Franklin Farm Lane (Alternative C); Walker Road (Alternative

D); and Woodstock Road (Alternative E). (AR-3 at 3,4). The Report identified the

Project Objective solely as carrying out the Congressional directive of Public Law

100-17. (AR-3 at 3). The Report was issued in May of 1990. (AR-3 at I).

139.    The Plaintiffs agree that this material fact is undisputed. In addition, Yerusalim's

letter also stated that "PennDOT is committed to pursuing construction of Exit 7 at or

near Walker Road to service and promote economic development in the area." (AR-

101 at 2048).

140.    The Plaintiffs disagree that this material fact is undisputed. The selection of the

location of the interchange at Walker Road was determined by political factors. (AR-

105 at 47-50). The environmental and engineering studies were prepared to support

that predetermination. "Alternative D-Modified" was not examined in any

environmental documents, as that interchange project was not developed until three

years after the release of the FEIS.

141.    The Plaintiffs disagree that the DEIS and the FEIS evaluated "in detail"

alternatives at the Walker Road and Kriner Road locations. "Alternative D-Modified"

was not evaluated in any environmental documents because the project was not

introduced until three years after the release of the FEIS. One failure, among others,

of the DEIS and the FEIS, was the refusal of the agencies to acknowledge that the

1995 Traffic Studies – completed to support conclusions within the FEIS – revealed

that the existing I-81/Route 30 interchange was not congested. (AR-37 at 37; AR-46

at I-8). The FEIS declares that "the interchange ramps [at the I-81/Route 30

Interchange] have adequate capacity to handle current and future traffic." (AR-46 at

ES-6). The FHWA warned the state agency not to select a "preferred alternative" in

the DEIS because "none of the Build Alternatives stand out." (AR-91 at 116). After promising other agencies that a "preferred alternative" would not be included in the DEIS, the state agency then announced in the DEIS that the Walker Road location was the "preferred alternative" for the interchange. (AR-91 at 185).

142.    The Plaintiffs disagree that those environmental documents evaluated Alternatives "in detail." "Alternative D-Modified" was not evaluated in the environmental studies because the interchange project was introduced three years after the release of the environmental documents. The Plaintiffs agree that sections of the Draft and Final Environmental Impact Statements contained information about the subjects delineated in this paragraph.

143.    The Plaintiffs disagree that this material fact is undisputed. No secondary and cumulative impacts analysis was done for "Alternative D-Modified" because that interchange project was developed three years after the release of the FEIS. After the development of "Alternative D-Modified", the agencies refused to shift the "Secondary and Cumulative Impacts Area" fourteen hundred feet (1400') south to parallel the new location of the interchange. (AR-122 at 2848; AR-79 at 38). If the SCIA had been shifted south, it would have explicitly included historic properties located on Franklin Farm Lane. (AR-79 at 38).

144.    The Plaintiffs disagree that this material fact is undisputed. It is unknown whether "Alternative D-Modified" would result in any impacts to these areas, because the design was developed three years after the completion of the environmental studies, and the agencies have refused to prepare an SEIS to examine the impacts of the new project.

145.    The Plaintiffs disagree that this material fact is undisputed. The Plaintiffs assert

that all "Walker Road alternatives" cannot be discussed as one Alternative because

each of the design alternatives has different impacts. The Final Environmental Impact

Statement examined three alternatives in the Walker Road area: an interchange at

Franklin Farm Lane (Alternative C), an interchange at Walker Road (Alternative D),

and an alternative which avoided historic resources (Alternative D-C). (AR-46 at II-6

to II-12). The agencies have already directly taken twenty-two (22) acres of

productive agricultural land via a purchase of that farmland from a farm couple in

anticipation of the construction of "Alternative D-Modified." (*See Agencies' Brief in

Support of Summary Judgment* at 28, fn. 4); (*See* Plaintiffs' Response to paragraph

one hundred and four). "Alternative D-Modified" has been determined by historic

preservation agencies to have an "adverse effect" on cultural and historic resources in

the Walker Road area. (AR-80 at 22). "Alternative D-Modified" was developed three

years after the FEIS was released, and was therefore not studied alongside the

alternatives examined for the Walker Road area in the Final Environmental Impact

Statement. "Alternative D-Modified" results in an over 400% increase for the cost of

this interchange project. (*See* Plaintiffs' Response to paragraph three).

146.    The Plaintiffs disagree that this material fact is undisputed. The Plaintiffs assert

that all "Kriner Road alternatives" cannot be discussed together because each

alternative has different impacts.  In the Final Environmental Impact Statement, the

agencies examined an interchange at Kriner Road (Alternative B) and an interchange

at Kriner Road that avoided historic resources (Alternative B-1). (AR-46 at II-4, II-

12). Developments in the Kriner Road area, which include the adoption of a zoning

ordinance which encourages industrial and commercial development, the construction

of several distribution warehouses in the area, and the accelerated build-out of the

Chambers-5 Business Park, require a Supplemental Environmental Impact Statement

to determine the true impacts of interchange construction in the Kriner Road area.

(*See* Plaintiffs' Reply to paragraph fifty).

147.    The Plaintiffs disagree that this material fact is undisputed. The Plaintiffs'

Amended Complaint alleges that the agencies failed to re-examine impacts to

farmlands in the Walker Road area following a Pennsylvania Supreme Court ruling

that the farmland was specially protected under Pennsylvania law; that the agencies

arbitrarily established a stunted study area to examine historic properties and land;

that the agencies failed to prepare a Supplemental Environmental Impact Statement to

examine new developments in the Kriner Road area and the cumulative impact of the

Norland Avenue Extension; that the agencies failed to examine impacts to local roads

serving as connector roads to the interchange; that the agencies misused federal

funding by selecting a Walker Road alternative which does not relieve congestion on

an existing interchange; and that the agencies violated federal law by refusing to

reconcile the interchange construction with local Comprehensive Plans.

148.    The Plaintiffs disagree that this material fact is undisputed. Impacts caused by

project alternatives include secondary development, impacts to rural roads,

construction costs, secondary impacts, impacts to historic resources, and impacts to

farmlands. (AR-79; AR-80 at 22).

149.    The Plaintiffs disagree that this material fact is undisputed. A comparison of

potential impacts resulting from an interchange constructed in the Walker Road area

with potential impacts resulting from an interchange constructed in the Kriner Road

area reveals significantly lesser impacts in the Kriner Road area. The cumulative cost

of "Alternative D-Modified" (including the interchange and the cost of the Norland

Avenue Extension) is over $12 million. (AR-169 at 52). The cost of Alternative B is

$3.63 million, and the cost of Alternative B-1 is $4.07 million. (AR-80 at 22).

Alternative B-1 would not result in the taking of any farmland within an Agricultural

Security Area. (AR-82 at 22). "Alternative D-Modified" has already resulted in a

twenty-two (22) acre loss of farmland within an Agricultural Security Area and will

result in the use of over thirty-two (32) acres of farmland. (*See* Plaintiffs' Response to

paragraph one hundred and four). Alternative B-1 would not result in any impacts to

section 4(f) resources. (AR-82 at 22). "Alternative D-Modified" will result in adverse

impacts to historic properties and land located along Franklin Farm Lane. Alternative

B-1 would encourage development in an area designated for commercial and

industrial development. (AR-80 at 22). "Alternative D-Modified" would encourage

development in an area where agriculture is a permitted use and agricultural land is

protected in Agricultural Security Areas (ASA's) (AR-136 at 1717; AR-46 at III-1).

Alternative B-1 would remove 6,500 vehicles per day from Exit 5 by 2016;

"Alternative D-Modified" would only remove 5,800 vehicles per day from Exit 6 by

2016. (AR-80 at 22).

150.    The Plaintiffs agree that this material fact is undisputed.

151.    The Plaintiffs disagree that this material fact is undisputed. "Alternative D-

Modified" has already resulted in the loss of twenty-two (22) acres of farmland

within an Agricultural Security Area, and will result in the total use of thirty-two (32)

acres of farmland. (*See* Plaintiffs' Response to paragraph one hundred and four). "Alternative D-Modified" will impact historic buildings and land located on Franklin Farm Lane, which have not been considered by the agencies. Alternative B-1 would not impact any farmland located within an Agricultural Security Area, will not result in any impacts to historic resources, and will result in a direct taking of farmland of only 12.7 acres. (AR-80 at 22).

152.    The Plaintiffs disagree that this material fact is undisputed. The Kriner Road Alternative (B-1) best satisfies the project need of relieving congestion on an existing interchange. (AR-46 at I-8, showing level of service "d" through "f" on the existing I-81/Wayne Avenue interchange). The Walker Road alternatives do not satisfy the project needs established by Public Law 100-17 because the existing I-81/Route 30 interchange is not congested. (AR-46 at I-8, AR-37 at 20). Public Law 100-17 requires the construction of an interchange that relieves congestion on an existing interchange. The Walker Road alternatives do not comply with Public Law 100-17.

153.    The Plaintiffs disagree that this material fact is undisputed. The Kriner Road Alternatives would relieve congestion on the existing I-81/Wayne Avenue interchange, which is currently congested and will be congested in 2016, according to 1995 Traffic Studies conducted by the agencies. (AR-37 at 20, 37; AR-46 at I-8). Those studies show that the interchange ramps at the I-81/Wayne Avenue intersection operate at a congested LOS of "d", "e", and "f" during peak hours. (AR-37 at 20). In 2016, the agencies have projected that the interchange will operate at complete failure. (AR-37 at 37). The 1995 Traffic Study is the sole traffic study to examine the

Wayne Avenue interchange, as the 1998 Traffic Study solely examined the area

immediately surrounding "Alternative D-Modified." (AR-72 at 9-37).

154.    The Plaintiffs disagree that this material fact is undisputed. The Walker Road

Alternatives do not relieve congestion on the I-81/Route 30 Interchange because no

congestion currently exists on that interchange, nor will congestion exist on that

interchange in 2016. (AR-37 at 20, 37). (*See* Plaintiffs' Response to paragraphs one

hundred and fifty-two and one hundred and fifty-three).

155.    The Plaintiffs agree that this material fact is undisputed.

156.    The Plaintiffs disagree that this material fact is undisputed. The

Shuster/Yerusalim correspondence was discovered shortly after the FEIS had been

released, through a file review conducted by the Greene Township Board of

Supervisors. The pre-determination issue was thus discovered and raised only in

comments submitted after the FEIS had been released. Although the

Shuster/Yerusalim letters were authored in 1992, the agencies decided to not include

these letters in the DEIS or the FEIS.

157.    The Plaintiffs disagree that this material fact is undisputed. The FHWA was made

aware of these communications by individuals and groups, and PennDOT never

produced these letters for FHWA review. The FHWA failed, however, to consider

and address the allegations in any meaningful fashion. Even after being presented

with evidence that the location of the interchange had been predetermined, the

FHWA failed to require the state agency to re-start the environmental study process

to eliminate the fatal defect.

158.    The Plaintiffs disagree that this material fact is undisputed. The Office of
Inspector General, in response to a formal Complaint filed by residents of Franklin
County, solicited a response from the highway agencies. A formal ruling on the
allegations was never issued, and the agencies' response was accepted by the
Inspector General's Office.

159.    The Plaintiffs disagree that this material fact is undisputed. Due to the designation
of an arbitrary study area for historic resources, the effects of the Alternatives and
"Alternative D-Modified" have never been determined. The agencies failed to
examine historic resources in the "Project Study Area" designated for the interchange
project in the FEIS, which clearly included historic land and buildings along Franklin
Farm Lane, the Cashdollar House and Wilson College. (AR-46 at I-2 and II-9).
Instead, the agencies limited themselves to examining historic resources within three
hundred feet (300') of the right-of-way of the physical construction of the
interchange. (AR-10 at 77; AR-40 at III-7; AR-110 at 9).

160.    The Plaintiffs disagree that this material fact is undisputed. Throughout the
planning for the interchange, the agencies have altered the scope of the study area for
historic resources to avoid identification of historic buildings and land impacted by
the interchange. Initially, the agencies designed a "project study area" which
encompassed various historic resources. (AR-46 at ES-4, I-2, and II-9). Concerns
about impacts to those resources expressed by local historic organizations prompted
the agencies to narrow the "study area" into the "project impact area", and then
further into an "area of potential effects." (AR-159 at 32; AR-163 at 1104; AR-88 at
17; AR-12 at Appendix "E-10"; AR-141 at 342; AR-10 at 77; AR-6 at 13; AR-96 at

638; AR-40 at III-7; AR-40 at V-2; AR-99 at 1483; AR-137 at 72; AR-110 at 9, 22).

Eventually, the agencies examined historic resources only in the area of the physical

construction of the interchange ramps. (AR-10 at 77).

161.    The Plaintiffs disagree that this material fact is undisputed. While the agencies did

submit these documents to PHMC, concurrence by the PHMC to those studies was

not a legal pre-requisite to the use of those studies within the environmental

documents prepared for the project.

162.    The Plaintiffs agree that this material fact is undisputed.

163.    The Plaintiffs disagree that this material fact is undisputed. Numerous meetings

were held, and correspondence sent, between the PHMC and the agencies prior to the

release of the FEIS. Those meetings solely concerned the failure of the agencies to

identify a Rural Historic District that would be adversely impacted by the

construction of an interchange in the Walker Road area. (AR-99 at 1570). The 1995

Memorandum of Agreement (MOA) contained within the FEIS solely addresses the

impact of the interchange on the Eastern Greene Township Rural Historic District.

(AR-46 at Appendix "C"). The revised Memorandum of Agreement, dated December

14, 1998, addressed the impact of the interchange on two Rural Historic districts and

a historic farmstead, but not the historic properties on Franklin Farm Lane. (AR-82 at

Attachment "F"). The highway agencies have steadfastly maintained that only the

highway agencies themselves have the authority and jurisdiction to define the "Area

of Potential Effect" for historic resources. (AR-137 at 72; AR-137 at 83).

164.    The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs'

Response to paragraph one hundred and sixty-three). The Keeper of the National

Register of Historic Places was consulted solely over the identification of the Rural

Historic Districts in the area of a Walker Road interchange. She was not consulted on

the question of whether the interchange would adversely impact historic properties on

Franklin Farm Lane, because the highway agencies had already determined that those

properties were not in the "area of potential effects."

165.    The Plaintiffs agree that this material fact is undisputed.

166.    The Plaintiffs disagree that this material fact is undisputed. The agencies prepared

a "Criteria of Effects" Report which examined historic resources only within the area

chosen by the agencies for an examination of historic resources – not within the

"Project Study Area" designated in the FEIS. (AR-46 at I-2, II-9). While the

agencies' "Criteria of Effects" Report recognized that a Walker Road interchange

would increase "noise and traffic" and result in additional residential and commercial

development near the proposed interchange, the Report failed to consider impacts to

historic properties located along Franklin Farm Lane, the Cashdollar House, or

historic Wilson College. (AR-16 at 53). None of the Reports, or Addenda, examined

"Alternative D-Modified" because that project was developed three years after the

issuance of the Reports identified in this paragraph.

167.    The Plaintiffs agree that the FHWA opined that Alternative D-C would have a

"no adverse effect" as a result of the project. Plaintiffs and state historic agencies

disagreed that the finding was a correct one. (AR-46 at Appendix "C"). In the

Memorandum of Agreement signed by the FHWA, the highway agencies agreed that

the project "may have an adverse effect" on a Rural Historic District. (AR-46 at

Appendix "C").

168.    The Plaintiffs disagree that this material fact is undisputed. The Municipal

Coordination Committee (MCC), the PHMC, and the ACHP have no legally

enforceable role during this process to formally "concur" with the agencies' findings.

169.    The Plaintiffs agree that this material fact is undisputed. In 1995, the PHMC and

the ACHP found that a Walker Road interchange (Alternative D-C) would have an

adverse effect on the Eastern Greene Township Rural Historic District due to the

potential for secondary development as a result of the interchange. (AR-80 at 11).

170.    The Plaintiffs agree that this material fact is undisputed. (*See* Plaintiffs' Response

to paragraph one hundred and sixty-nine).

171.    The Plaintiffs agree that this material fact is undisputed.

172.    The Plaintiffs disagree that this material fact is undisputed. Some development

and increased traffic will occur in the Walker Road area without the interchange.

However, the proper and legally required inquiry must include an examination of the

impacts resulting from the development and increased traffic that will be caused by

the construction of the interchange.

173.    The Plaintiffs disagree that this material fact is undisputed. "Alternative D-

Modified" is not a modification of Alternative D or Alternative D-C, as examined in

the FEIS. (*See* Plaintiffs' Response to paragraph three). "Alternative D-Modified"

was designed by the agencies to avoid being forced to argue that no other "feasible

and prudent alternatives" existed to the taking of historic resources for the

interchange under 23 CFR section 771.135(a)(1). Given that the Kriner Road

Alternative B-1 does not impact any historic resources – and is a "feasible and

prudent alternative" - that legal standard would have been difficult for the agencies to satisfy.

174.    The Plaintiffs agree that this material fact is undisputed. The document, prepared in June of 1998, identified two rural historic districts and a historic farmstead within the area of a Walker Road interchange and found that the construction of an interchange would have an effect on two of those districts. (AR-70 at 7-8). The agencies continued to refuse to examine historic buildings and land located along Franklin Farm Lane, or historic resources located on the west side of I-81.

175.    The Plaintiffs agree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph one hundred and sixty-eight).

176.    The Plaintiffs agree that this material fact is undisputed. The highway agencies determined that there would be an "effect" on two of the three historic districts. (AR-70 at 7-8). The highway agencies then opined that the "effects" on those districts would not be "adverse." (AR-70 at 7-8). The Plaintiffs and the state historic agencies disagreed with that determination. The highway agencies continued to refuse to examine historic resources located along Franklin Farm Lane or historic resources located on the west side of I-81.

177.    The Plaintiffs agree that this material fact is undisputed.

178.    The Plaintiffs disagree that this material fact is undisputed. The highway agencies decided to move the project forward despite the determination by the agencies tasked with protecting historic resources that "Alternative D-Modified" would adversely effect historic resources in the Walker Road area.

179.    The Plaintiffs agree that this material fact is undisputed. The "abundance" of coordination was the result of the failure of the agencies to adequately identify and examine historic resources within the study area for the interchange, and the failure of the agencies to examine impacts to historic resources as requested by the Keeper of the National Historic Register. (AR-99 at 1493, 1495-1523; AR-80 at Appendix "B", "FHWA did not provide the additional information" requested by the Keeper.").

180.    The Plaintiffs agree that this material fact is undisputed.

181.    The Plaintiffs disagree that this material fact is undisputed. The highway agencies did not coordinate with the PHMC or the ACHP to delineate the study area for historic resources. The highway agencies did submit requests and provide information to the PHMC and the ACHP during the assessment of the impacts of the interchange on the highway agency-designated "area of potential impacts" which arbitrarily narrowed the study area for historic resources. (*See* Plaintiffs' Response to paragraph one hundred and sixty).

182.    The Plaintiffs agree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph one hundred and sixty-eight).

183.    The Plaintiffs agree that this material fact is undisputed.

184.    The Plaintiffs agree that this material fact is undisputed.

185.    The Plaintiffs agree that this material fact is undisputed.

186.    The Plaintiffs agree that this material fact is undisputed.

187.    The Plaintiffs agree that this material fact is undisputed.

188.    The Plaintiffs agree that this material fact is undisputed. Comments included the request that the "Secondary and Cumulative Impacts Area" be shifted south to reflect

the southward shift for "Alternative D-Modified." The highway agencies refused to

shift the SCIA. (AR-122 at 2848; AR-79 at 38).

189.    The Plaintiffs agree that this material fact is undisputed.

190.    The Plaintiffs disagree that this material fact is undisputed. The "detailed

response" consisted of a two page and three page letter, dated November 25, 1998

and January 8, 1999. (AR-109 at 1507, 1508; AR-110 at 9-11). In those letters, the

agencies failed to respond to the contention that impacts to the Gass House, the Poor

House, and other historic resources, should have been evaluated by the agencies.

Instead, Ronald Carmichael of the FHWA – who wrote both letters – simply

concluded that the historic resources lay outside of the "area of potential effect",

which consisted of an area 300' "of the centerline of the proposed improvements."

(AR-110 at 9).  While recognizing that potential "project effects due to increased

traffic, noise, and new development to the[se] specific resources. . . were not

evaluated under the section 106 process for this project", the FHWA ignored the

impacts to the historic properties because they were purportedly outside of the

agencies' "area of potential effects." (AR-110 at 10). The FHWA also failed to

respond to comments requesting a southward shift of the agencies' "Secondary and

Cumulative Impacts Area" to reflect the southward shift of "Alternative D-Modified."

(*See* Plaintiffs' Response at paragraph one hundred and eighty-nine).

191.    The Plaintiffs agree that this material fact is undisputed. (*See* Plaintiffs' Response

to paragraph one hundred and sixty-eight).

192.    The Plaintiffs disagree that this material fact is undisputed. The agencies failed to

"address" any concerns regarding the Gass House or the Poor House – or other

historic resources in the Walker Road area – in the two page letter sent on November 25, 1988. (*See* Plaintiffs' Response to paragraph one hundred and ninety). In addition, the highway agencies continued to refuse to address their failure to shift the "Secondary and Cumulative Impacts Area" southward to parallel the shift of the interchange location. (*See* Plaintiffs' Response to paragraph one hundred and eighty-nine).

193.    The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph one hundred and ninety).

194.    The Plaintiffs agree that this material fact is undisputed. The Memorandum of Agreement signed by the PHMC did not delineate an "area of potential effects" for the agencies, nor did it address impacts to the Gass House, the Poor House, or other historic buildings along Franklin Farm Lane. It solely addressed the impact of a Walker Road interchange on two rural historic districts and one historic farmstead within the area. (AR-110 at 219). The highway agencies' January 8, 1999 letter - which allegedly "addressed" impacts to the historic buildings and land located on Franklin Farm Lane  - was sent a month after the MOA was signed. (AR-110 at 9).

195.    The Plaintiffs disagree that this material fact is undisputed. The highway agencies have contended that only they possess the authority to delineate the study area used for consideration of impacts to historic resources. (AR-137 at 72; AR-137 at 83; AR-109 at 1507). The PHMC never endorsed or approved the "area of potential effects" used by the agencies to arbitrarily narrow the highway agencies' consideration of impacts to historic resources. The December 17, 1998 letter from PHMC cited by the agencies in this paragraph did not endorse the agencies' "area of potential effects",

which was drastically different than the "Project Study Area" presented in the FEIS. (AR-110 at 52; AR-46 at I-2, II-9). The second citation used by the agencies in this paragraph refers to a letter from the ACHP that accompanied the Memorandum of Agreement (MOA). That letter recognized that the agencies had complied with the Section 106 process as it applied solely to two rural historic districts and one historic farmstead. (AR-110 at 186).

196.     The Plaintiffs agree that the agencies have reprinted part of the text of that letter in this paragraph. The Plaintiffs disagree that the PHMC approved or endorsed the "area of potential effects" which was arbitrarily designated by the highway agencies for the study of historic resources. (*See* Plaintiffs' Response to paragraph one hundred and ninety-five).

197.     The Plaintiffs agree that some of the text of the ACHP's letter is reprinted in this paragraph. The ACHP also declared that "we do not agree Alternative D Modified avoids all adverse effects." (AR-110 at 186). In addition, the ACHP specifically declared that the MOA was drafted to accommodate the "legislative limitations" of "Alternative D-Modified" – legislative limitations originally set by Public Law 100-17 that no longer existed at the time of the drafting of the letter. (AR-110 at 186). The Plaintiffs disagree that the ACHP endorsed or approved the "area of potential effects" which was arbitrarily designated by the highway agencies.

198.     The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraphs one hundred and ninety-six and one hundred and ninety-seven).

199.    The Plaintiffs disagree that this material fact is undisputed. Contending that the historic resources lie outside of the 300' arbitrary "area of potential effects", the agencies have failed to conduct any studies, prepare any documents, or engage in any analysis, of whether an interchange constructed in the Walker Road area would have impacts to historic resources and land located along Franklin Farm Lane. Accordingly, the agencies have failed to cite to any portion of the Administrative Record for this conclusion.

200.    The Plaintiffs agree that this material fact is undisputed. Those historic buildings are located on Franklin Farm Lane between the proposed interchange and Route 30.

201.    The Plaintiffs disagree that this material fact is undisputed. The Gass House is already on the National Register of Historic Places, and the Franklin County Poor House has been determined to be eligible for listing on the National Register of Historic Places.

202.    The Plaintiffs disagree that this material fact is undisputed. As indicated by the Nomination Form for the Gass House, only the interior has been altered. (AR-137 at 116). The Nomination Form recognizes that the Gass House was built around 1760, that the building stands in good condition, and that the House represents a "well preserved stone structure." (AR-137 at 116, 117). The Gass House is named after Patrick Gass, the diarist for the Lewis and Clark expedition. (AR-137 at 117). Alterations to the interior have not altered the building's National Register status. The Nomination Form for the Poor House was not included in the Administrative Record.

203.    The Plaintiffs agree that this material fact is undisputed.

AR-90 at 12; AR-91 at 109; AR-10 at 221; AR-93 at 667; AR-93 at 786; AR-113 at 187; AR-159 at 153). In addition, the agencies have failed to consider the impacts of tractor-trailer and truck traffic on Franklin Farm Lane. (AR-79 at 21).

207.    The Plaintiffs disagree that this material fact is undisputed. (*See* Plaintiffs' Response to paragraph two hundred and six). For this contention, the agencies cite solely to a response to a comment submitted on the FEIS, and not to any traffic studies. (AR-78 at 87). Logically, if the interchange is being constructed to relieve congestion on another interchange, it must cause traffic volume increases on other roadways.

208.    The Plaintiffs agree that traffic will increase on Franklin Farm Lane without the construction of an interchange in the Walker Road area. The interchange itself will increase traffic on Franklin Farm Lane because that rural roadway will become a connector road between Route 30 and the interchange. (*See* Plaintiffs' Response to paragraph two hundred and six).

209.    The Plaintiffs disagree that this material fact is undisputed. The agencies' own 1998 Traffic Study reveals ADT levels of between 9,200 and 14,350 vehicles per day on the northern segment of Franklin Farm Lane if "Alternative D-Modified" is constructed. (AR-72 at 34-37). An independent evaluation of that Traffic Study arrived at similar conclusions. (AR-79 at 19). The agencies' contention that the interchange is being constructed to relieve traffic flow at another interchange is not consistent with the agencies' contention that the interchange will not result in additional traffic on Franklin Farm Lane. Under "Alternative D-Modified", Franklin

220.    The Plaintiffs disagree that this material fact is undisputed. The agencies cite

solely to the FEIS for this contention, even though "Alternative D-Modified" was

conceived three years after the release of the FEIS. In addition, future development in

the Kriner Road area was not examined in the FEIS, as that development has only

recently occurred. (*See* Plaintiffs' Response to paragraph fifty).

221.    The Plaintiffs disagree that this material fact is undisputed. The agencies' "project

study area" extended 5,000 feet on either side of I-81." (AR-2 at 3; AR-144 at 1487;

AR-85 at 2; AR-88 at 17; AR-8 at 2). The agencies' "Engineering, Traffic and

Environmental Study Area" has been identified by the agencies as a mirror image of

the "project study area." (AR-46 at I-2 and II-9; AR-143 at 1191). The agencies

arbitrarily shifted their consideration of historic resources from the "project study

area" to the interchange's "right of way", and finally to an "area of potential effect" to

avoid consideration of historic resources in the Walker Road area. (AR-92 at 61; AR-

10 at 77; AR-40 at III-7). Finally, the agencies' "Secondary and Cumulative Impacts

Area", created to examine potential secondary and cumulative impacts resulting from

the interchange, was not used by the agencies to fulfill their duties under the NHPA –

which requires the agency to examine all historic resources potentially effected by the

project.

Respectfully submitted this 25th day of July, 2002,

_____

Thomas Alan Linzey, Esq.
Community Environmental Legal Defense Fund (CELDF)
2859 Scotland Road
Chambersburg, Pennsylvania 17201

*Counsel for the Plaintiffs*