# ORIGINAL

*2 to cv*

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GREENE/GUILFORD ENVIRONMENTAL ASSOCIATION, a non-profit corporation incorporated under the laws of the Commonwealth of Pennsylvania, CITIZENS FOR PLANNED COMMUNITY GROWTH, an unincorporated association organized under the laws of the Commonwealth of Pennsylvania, PAUL B. AMBROSE, JOHN G. ENDERS, CHARLES F. RAHAUSER, BETSY RAHAUSER, DOUGLAS A. WARNOCK, U.X. VAGNERINI, THOMAS W. BUNDY, STEPHEN P. BUCHER, ROGER J. ROBERTSON, JAMES A. STRITE, JR., and DAVID A. GUTHRIE, <br>             Plaintiffs, <br><br>          v. <br><br> KEN WYKLE, Administrator, Federal Highway Administration, ROBERT GATZ, Federal Highway Administration, <br>             Defendants, <br><br>          And <br><br> BRADLEY L. MALLORY, Secretary for The Department of Transportation, Commonwealth of Pennsylvania, <br>             Intervenor. | CIVIL NO. 1:CV-01-0910 <br> (Judge Rambo) |

FILED
HARRISBURG, PA

JUL 2 5 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## PLAINTIFFS' ANSWER IN OPPOSITION TO JOINT MOTION FOR SUMMARY JUDGMENT

# Table of Contents

Table of Citations.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   . iv

Counter-History of the Case.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   1

Counter-Statement of Facts.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   1

Counter-Statement of Questions Involved.   .   .   .   .   .   .   .   .   .   .   1

# Argument

I. The Agencies' Argument that Congestion Exists at the I-81/Route 30 Interchange, and that a Walker Road Interchange Thus Complies With Public Law 100-17, is Contradicted by the Agencies' Own Studies and the Administrative Record. Those Studies and the Record Reveal that the Agencies Misused Demonstration Project Monies by Failing to Develop an Interchange That Relieves Congestion "On" an Existing Interchange.   .   .   .1

II. The Agencies' Contention That the Failure to Reconcile the Construction of a Walker Road Interchange with Greene Township's Comprehensive Plan Complied with Federal Regulations is Erroneous and Not Supported by the Law or by the Administrative Record.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .2

III. The Agencies' Argument That They Did Not Illegally Segment Necessary Local Road Upgrades and a Connector Road From the Interchange Project is Not Supported by the Law or the Administrative Record.   .   .   .   .   .   .   .   .   .   .   .   .   .   .2

    A. The Agencies' Contention that Local Road Upgrades Were Not Illegally Segmented from the Interchange Project is Not Supported by the Law or the Administrative Record.   .   .   .   .   .   .   .   .   .   .   .   .   .   . 7

    B. The Agencies Violated NEPA and the NHPA by Segmenting the Publicly-Funded Norland Avenue Extension Connector from the Interchange.   .   .   .15

IV. The Agencies' Contention That an SEIS is Not Required to Examine Impacts Resulting from the New Interchange, or from the Pennsylvania Supreme Court's 2000 Ruling that Farmland in the Walker Road Area Was Specially Protected by State Law, is Unsupported by the Law and by the Record. The Agencies also Erroneously Contend that New Development in the Kriner Road Area Does Not Require a Supplemental Statement.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   . 19

A.  The Agencies Erroneously Contend That They are Not Legally Required to Prepare a Supplemental Environmental Impact Statement Following the Complete Redesign and Relocation of the Interchange in 1998, and Significant Land Use Changes Impacting the Kriner Road Alternatives.  .  21

   (1)  The Agencies Failed to Examine the Impact of Guilford Township's New Zoning Ordinance on the Kriner Road Alternatives.  .  .  .  .  22

   (2)  The Agencies Failed to Integrate Greater Than Projected Development In the Chambers-5 Business Park and the Construction of Three Warehouse Distribution Centers in Traffic Studies Conducted to Determine the Relative Merits of Traffic Relief in the Kriner Road Area.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  24

   (3)  The Agencies Failed to Examine Impacts Resulting from the Change in Boundaries of the Secondary and Cumulative Impacts Area (SCIA) Caused by the Southward Shift in the Location of the Walker Road Interchange.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  26

B.  The Agencies Violated the National Environmental Policy Act by Refusing to Prepare a Supplemental Statement Following a Pennsylvania Supreme Court Ruling That Farmland in the Project Area Was Specially Protected by State Law.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  27

V. The Agencies' Contention That They Were Not Obligated to Examine Alternatives Created by the Overhaul of Public Law 100-17 is Not Supported by Law.  .  .  .  .  .  31

VI. The Agencies' Argument That Interchange Studies Were Conducted in Good Faith is Not Supported by the Administrative Record.  .  .  .  .  .  .  .  .  .  .  .  .  .  31

VII. The Agencies' Argument That They Studied Impacts to All Historic Resources in the Walker Road Area is Not Supported by the Record.  .  .  .  .  .  .  .  .  .  .  .  31

A.  The Original "Project Study Area" as the Area for the Study of Historic Resources.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .34

B.  The Agencies Manipulated the "Project Study Area" Into the Interchange's "Right-of-Way" to Eliminate Consideration of Impact on Historic Resources.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .36

VIII. Conclusion.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  41

( )

## **Table of Citations**

### *Cases*

*Citizen Advocates for Responsible Expansion v. Dole*, 770 F.2d 423 (5th Cir. 1985). . 33

*Citizens Against Destruction of NAPA v. Lynn*, 391 F.Supp. 1188 (N.D. CA 1975). . . 3

*City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 95 F.3d 892 (9th Cir. 1996). . . . 5

*City of Rochester v. United States Postal Service*, 541 F.2d 967 (2nd Cir. 1976). . . . 3

*City of Williams v. Dombeck*, 151 F.Supp.2d 9 (D.D.C. 2001). . . . . . . . . 6

*Coalition Against a Raised Expressway v. Dole*, 835 F.2d 803 (8th Cir. 1988). . . . 33

*Colorado River Tribes v. Marsh*, 605 F.Supp. 1425 (C.D. Cal. 1985). . . . . . 33-34

*Conservation Law Found. v. Department of the Air Force,*
     864 F.Supp. 265 (D.N.H. 1994) . . . . . . . . . . . . . . 20

*Dickman v. City of Santa Fe*, 724 F.Supp. 1341 (D.N.M. 1989). . . . . . . . 3

*Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860 (5th Cir. 1975). . . . . 3

*Friends of the Earth, Inc. v. U.S. Army Corps. of Eng'rs,*
     109 F.Supp.2d 30 (D.D.C. 2000). . . . . . . . . . . . . . .5

*Fritiofson v. Alexander*, 772 F.2d 1225 (5th Cir. 1985). . . . . . . . . . . 4

*Fund for Animals v. Clark*, 27 F.Supp.2d 8 (D.D.C. 1998). . . . . . . . . . .3

*Indian Lookout Alliance v. Volpe*, 484 F.2d 111 (8th Cir. 1973). . . . . . . . .3

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976). . . . . . . . . . . . . . 20

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989). . . . . . . .20

*Monroe County Conservation Council v. Adams*, 566 F.2d 419 (2nd Cir. 1977). . . . 33

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999). . . . . 5

*NRDC v. Callaway*, 524 F.2d 82 (2nd Cir. 1975). . . . . . . . . . . . .6

*Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988). . . 5

*Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827 (D.C. Cir. 1972).  . 20

*Pennsylvania Protect Our Water and Environmental Resources v. The Appalachian
    Regional Commission*, 574 F.Supp. 1203 (M.D. PA 1982). . . . . . . . 20

*People of Enewetak v. Laird*, 353 F.Supp. 811 (D. Haw. 1973). . . . . . . . . .3

*Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669 (5th Cir. 1992),
    *cert. denied*, 113 S.Ct. 75 (1992). . . . . . . . . . . 4

*Sadler v. 218 Housing Corp.*, 417 F.Supp. 348 (N.D. Ga 1976). . . . . . . . 3

*Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985). . . . . . . . . . .3

*Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1101 (2nd Cir. 1983). . . . . . 20

*Society Hill Towers Owners Ass'n v. Rendell*, 210 F.3d (3rd Cir. 2000). . . . . . . 6

*Swain v. Brinegar*, 542 F.2d 364 (7th Cir. 1976). . . . . . . . . . .3

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985). . . . . . . . . . . 5

*Town of Huntington v. Marsh*, 859 F.2d 1134 (2d. Cir. 1988). . . . . . . . . . 5

*Trout Unlimited v. Morton*, 509 F.2d 1276 (9th Cir. 1974). . . . . . . . . . . 5

*Utahns for Better Transp. v. U.S. DOT*, 180 F.Supp.2d 1286 (N.D. UT 2001). . . . 20

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
    435 U.S. 519 (1978) . . . . . . . . . . . . . . . . .20

*Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017 (9th Cir. 1980). . . . . . .20

*Webb v. Gorsuch*, 699 F.2d 157 (4th Cir. 1983). . . . . . . . . . . 6

*White v. PennDOT*, 738 A.2d 27 (Pa Commw. 1999). . . . . . . . . . 28

## Statutes and Regulations

Pub. L. No. 100-17, 101 Stat. 132 (April 2, 1987). . . . . . . . . . . . *passim*

Pub. L. No. 100-17, 101 Stat. 132 (April 2, 1987), *as amended by* Pub. L. No. 104-59,
    109 Stat. 568 (Nov. 28, 1995). . . . . . . . . . . . . . . . . *passim*

16 U.S.C. §470h-2. . . . . . . . . . . . . . . . . . . . . 32

16 U.S.C. §470w(7) . . . . . . . . . . . . . . . . . . . .32

24 U.S.C. §138. . . . . . . . . . . . . . . . . . . . . .32

49 U.S.C. §303. . . . . . . . . . . . . . . . . . . . . .32

3 P.S. §913. . . . . . . . . . . . . . . . . . . . . 27,30

23 CFR §771.111(f)(2). . . . . . . . . . . . . . . . . . . 2

23 CFR §771.130. . . . . . . . . . . . . . . . . . . . . 19

36 CFR §800.4(b) . . . . . . . . . . . . . . . . . . . . 32

36 CFR §800.16. . . . . . . . . . . . . . . . . . . . . .32

40 CFR §1502.1. . . . . . . . . . . . . . . . . . . . . . 3

40 CFR §1502.9. . . . . . . . . . . . . . . . . . . . . 19

40 CFR §1502.16. . . . . . . . . . . . . . . . . . . . . 3

40 CFR §1508.25. . . . . . . . . . . . . . . . . . . . . .4

### *Misc.*

55 Fed. Reg. 42670, 42672 (October 22, 1990). . . . . . . . . . . . . . . . . . 3

**<u>Counter-History of the Case</u>**

The Plaintiffs' Counter-History of this Case is presented at page one of the

Plaintiffs' *Memorandum of Law in Support of Summary Judgment.*

**<u>Counter-Statement of Facts</u>**

The Plaintiffs' Counter Statement of Facts is presented at page one to six of the

Plaintiffs' *Memorandum of Law in Support of Summary Judgment.*

**<u>Counter-Statement of Questions Involved</u>**

The Plaintiffs' Statement of Questions Involved is presented at page six of the

Plaintiff's *Memorandum of Law in Support of Summary Judgment.*

# <u>ARGUMENT</u>

**<u>I. The Agencies' Argument that Congestion Exists at the I-81/Route 30 Interchange, and that a Walker Road Interchange Thus Complies With Public Law 100-17, is Contradicted by the Agencies' Own Studies and the Administrative Record. Those Studies and the Record Reveal that the Agencies Misused Demonstration Project Monies by Failing to Develop an Interchange That Relieves Congestion "On" an Existing Interchange.</u>**

The agencies contend that the construction of the interchange in the Walker Road

area complies with the needs established by Public Law 100-17, because the existing I-

81/Route 30 interchange is congested. *See* Agencies' *Brief in Support of Joint Motion for*

*Summary Judgment* at 11-14. The agencies' argument is not supported by the

Administrative Record. For a full response to this argument, see the *Plaintiffs'*

*Memorandum of Law in Support of Summary Judgment* at 38-49; *Plaintiffs' Statement of Material Facts* at paragraphs 305-344.

**II. The Agencies' Contention That the Failure to Reconcile the Construction of a Walker Road Interchange with Greene Township's Comprehensive Plan Complied with Federal Regulations is Erroneous and Not Supported by the Law or by the Administrative Record.**

The agencies contend that their proposal to construct an interchange in the Walker Road area in direct conflict with the Greene Township Comprehensive Plan does not violate federal regulations or the agencies' own contrived project need. *See* Agencies' *Brief in Support of Joint Motion for Summary Judgment* at 14-17.

The agencies' failure to reconcile the proposed interchange with the Township's Comprehensive Plan violates regulations promulgated under the National Environmental Policy Act and rules promulgated by the agencies for the approval of point of access applications for new interchanges. For a full response to this argument, see *the Plaintiffs' Memorandum of Law in Support of Summary Judgment* at 49-50; *Plaintiffs' Statement of Material Facts* at paragraphs 345-366.

**III. The Agencies' Argument That They Did Not Illegally Segment Necessary Local Road Upgrades and a Connector Road From the Interchange Project Is Not Supported by the Law or the Administrative Record.**

Regulations governing the highway agencies clearly state that

[i]n order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each EIS. . . shall. . . [have] independent utility or independent significance, i.e., be usable and be a **reasonable expenditure even if no additional transportation improvements in the area are made**. 23 CFR §771.111(f)(2) (emphasis added).

FHWA rules also require that all new access points must include "crossroads and other roads and streets" in any analysis "to the extent necessary to assure their ability to collect and distribute traffic to and from" an interchange. 55 Fed. Reg. 42670, 42672 (October 22, 1990).

Courts have generally disallowed segmentation, or division of highway projects, which enable agencies to avoid preparing impact statements on the entire project. *See Swain v. Brinegar*, 542 F.2d 364 (7th Cir. 1976); *Indian Lookout Alliance v. Volpe*, 484 F.2d 111 (8th Cir. 1973); *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860 (5th Cir.1975); *Dickman v. City of Santa Fe*, 724 F.Supp. 1341 (D.N.M. 1989). Segmentation of projects by agencies when one project is dependent upon the construction of the other has also been disallowed. *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985); *City of Rochester v. United States Postal Service*, 541 F.2d 967 (2nd Cir. 1976); *People of Enewetak v. Laird*, 353 F.Supp. 811 (D. Haw. 1973).

Several courts have adopted a "coercion" rule, under which projects are deemed improperly segmented if the construction of a project coerces the carrying out of another. *Sadler v. 218 Housing Corp.*, 417 F.Supp. 348 (N.D. Ga 1976*); Citizens Against Destruction of NAPA v. Lynn*, 391 F.Supp. 1188 (N.D. Cal. 1975). Other courts have held that geographic proximity of projects is a primary test for determining whether agency segmentation was legal. *See Fund for Animals v. Clark*, 27 F.Supp.2d. 8 (D.D.C. 1998).

NEPA regulations require agencies to prepare environmental impact statements which "provide full and fair discussion of significant environmental impacts" and which include discussions of both direct and indirect effects of projects. 40 CFR §§1502.1 and 1502.16. In addition, NEPA regulations require that environmental impact statements

include discussions of "connected actions", "cumulative actions", and "similar actions." 40 CFR §1508.25.

"Connected actions" expressly include actions which "are closely related and therefore should be discussed in the same impact statement." NEPA regulations state that "[a]ctions are connected if they. . . cannot or will not proceed unless other actions are taken previously or simultaneously. . . or are interdependent parts of a larger action and depend on the larger action for their justification." 40 CFR §1508.25 (a).

"Cumulative actions" which must be discussed and evaluated within the environmental studies, are defined as those actions "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." *Id.* at (a)(2). "Similar actions" are those actions that have "similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." *Id.* at (a)(3).

The Fifth Circuit Court of Appeals has articulated a set of guidelines for the determination of impacts resulting from cumulative actions. Such an analysis must include:

> (1) the area in which effects of the proposed project will be felt; (2) the impacts that are expected in the area from the proposed project; (3) other actions – past, proposed, and reasonably foreseeable – that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate. *Fritiofson v. Alexander*, 772 F.2d 1225, 1245 (5th Cir 1985); *Sabine River Auth. v. United States Dep't of Interior*, 951 F.2d 669 (5th Cir. 1992); *cert. denied*, 113 S.Ct. 75 (1992).

The Ninth Circuit has also adopted these guidelines, and has held that any cumulative impacts analysis must be sufficiently "detailed or specific to permit a reasoned analysis."

*City of Carmel-By-The-Sea v. United States Department of Transportation*, 95 F.3d 892 (9th Cir. 1996).

Under a cumulative impacts analysis, courts have routinely struck down those NEPA statements in which the agencies failed to closely examine consequent impacts resulting from a project. *See Muckleshoot Indian Tribe v. United States Forest Serv.*,177 F.3d 800 (9th Cir. 1999) (declaring agency discussion concerning the cumulative impacts resulting from a land exchange to be defective); *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988) (declaring the failure of the agency to consider cumulative impacts of development resulting from offshore lease sale inadequate); *Town of Huntington v. Marsh*, 859 F.2d 1134 (2d. Cir. 1988) (finding the agency's discussion of the cumulative impacts of waste disposal from a disposal site inadequate*); Friends of the Earth, Inc. v. United States Army Corps of Eng'rs*, 109 F.Supp.2d 30 (D.D.C. 2000).

A leading case in the area of cumulative impacts is *Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985). In *Thomas*, the Plaintiffs sought to enjoin construction of a timber road in a National Forest on the grounds that the Forest Service had failed to discuss the cumulative impacts of the road together with proposed timber sales that relied upon the road. *Thomas* at 755. The court phrased the central question in the case as whether the "road and the timber sales [were] sufficiently related so as to require combined treatment in a single EIS." *Id.* at 757. In explaining the test to be applied, the court cited to *Trout Unlimited v. Morton*, 509 F.2d 1276 (9th Cir. 1974) for the proposition that an EIS must address all parts of a project when "[t]he dependence is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken." *Id.* at 759. Analogizing to unlawful attempts to segment highway

construction, the court concluded that construction of the road and the timber sales were "connected" because the timber sales could not proceed without the road and the road was built to service the timber sales. *Id.* The court thus overturned the environmental assessment and held that the agency had illegally failed to examine the connected and cumulative impacts of the projects.

The *Thomas* standard – of determining cumulative and connected actions by deciding whether failure to construct other phases of the project would be "irrational" or "unwise" if the first component of the project was constructed – was adopted by the Third Circuit Court of Appeals in *Society Hill Towers Owners Association v. Rendell*, 210 F.3d (3rd Cir. 2000) (*citing* to *Webb v. Gorsuch*, 699 F.2d 157 (4th Cir. 1983)). A similar test has been adopted by other courts. *See, e.g., NRDC v. Callaway*, 524 F.2d 82 (2nd Cir. 1975) (ruling that related projects must be evaluated as a whole); *City of Williams v. Dombeck*, 151 F.Supp.2d. 9 (D.D.C. 2001) (ruling that project to import water from the Colorado River was "connected" to an agency's land exchange sought for the construction of a tourist complex at the Grand Canyon).

In the instant case, the agencies violated NEPA and its implementing regulations by segmenting the interchange project from both (1) the necessary upgrades and widening of local Township roads connecting to the interchange; and (2) the construction of the Norland Avenue Extension – a connector road to be constructed between the proposed Walker Road interchange and Chambersburg Borough. That illegal segmentation led to the refusal of the agencies to examine cumulative and connected impacts from that local road construction and upgrades.

## A. The Agencies' Contention that Local Road Upgrades Were Not Illegally Segmented from the Interchange Project is Not Supported by the Law or the Administrative Record.

If "Alternative D-Modified" is constructed as currently designed, both Walker Road and Franklin Farm Lane will be transformed from local Township roadways into interstate collector roads. Franklin Farm Lane and Walker Road will then serve as links between I-81 and U.S. Route 30, Norland Avenue, U.S. Route 11, and Route 997. Traffic volumes will greatly increase as traffic enters and exits the interstate via Franklin Farm Lane and Walker Road.[1]

As described in a 1999 submission by the Greene Township Board of Supervisors to the highway agencies, the Township's engineers explained that

> [b]oth Walker Road and Franklin Farm Lane currently function as local roads rather than collector roads as is contemplated in connection with Alternative D-Modified. They have deficient lane and shoulder widths. Turning lanes are not provided. The vertical and horizontal alignments of Walker Road and Franklin Farm Lane preclude design speeds of 40 miles per hour. Both roads are speed restricted. Walker Road is also weight restricted within Greene Township. (AR-79 at 8).

In January, 1999 comments provided to the agencies, the engineers explained that "Walker Road passes through two sharp 90 degree curves in close proximity to each other", and that both of those curves are bounded by historic properties and land. (AR-79 at 8, 9-10, and 12-14). The engineers commented that the demolition of the existing Walker Road bridge over I-81 will create a 90 degree T-intersection at the juncture of Franklin Farm Lane and Walker Road, and that all traffic would be forced through the

---

[1] In a study completed by engineering consultants for the Greene Township Board of Supervisors, those consultants characterized the increase as a "threefold increase in the current traffic level." (AR-105 at 299).

intersection "and then immediately through another 20 degree curve along Franklin Farm Lane." *Id.*

The agencies' own consultants offer a similar description of the roads, stating that

Walker Road is a rural two-lane roadway with typical lane widths of nine to ten feet and shoulders varying in width from one to three feet. The posted speed limit is 35 miles per hour. The roadway is characterized by poor vertical and horizontal geometry over most of its alignment from the Chambersburg Borough limits, east to Ragged Edge Road. In Greene Township, the roadway is posted with a 16-ton weight limit restriction. (AR-37 at 6).
. . .
Franklin Farm Lane is a two lane roadway, intersecting with both U.S. Route 30 and Walker Road at unsignalized intersections. Lane widths along the alignment vary between ten feet and eleven feet, with shoulders [sic] widths of only one to two feet and a posted speed limit of 35 miles per hour. (AR-37 at 7).

Since the inception of this project, the agencies have admitted that the feeding of interstate traffic directly onto rural country roads would require upgrading those roads. In Meeting Minutes prepared in 1987, the agencies declared that "the interchange would have to dump traffic onto township roads. These roads would have to be upgraded. Would PennDOT take over these roads?" (AR-86 at 8); *See also* AR-1 at 1 (project supporters in Franklin County recognize that local roads must be upgraded and maintained).

In a Preliminary Alternatives Report, dated May of 1990, the agencies explained that "[t]he proposed interchange ties into local roads. The geometry and pavement structure of these roads are not adequate to handle future traffic volumes." (AR-3 at 53). The Report also stated that the "local road network . . . is not suited for heavy traffic volumes" and that "increased traffic on secondary rural and township roadway[s will] result in additional maintenance and increased maintenance costs." (AR-2 at 41, 63).

Other state and federal agencies also found the Preliminary Alternatives Report to be deficient with regard to local road upgrades. (AR-88 at 48) (Army Corps of Engineers' comments that interchange must have "independent utility"); (AR-12 at "Appendix D") (Pennsylvania Department of Agriculture comments that the local roads "do not appear adequate to handle increased traffic. Potential improvements to local roads should be included in the report so that traffic problems are not merely shifted to other locations.").

The general public and area elected officials have also noted that the local roads are deficient to service an interchange. (AR-87 at 3) (survey taken in 1989 ranked "increased traffic on local road systems" as a "very important" issue); (AR-141 at 345) (declaration by the Franklin County Commissioners that they would oppose any interchange - like "Alternative D-Modified" - which uses Franklin Farm Lane as a primary collector road); (AR-169 at 182) (a 1998 resolution of the Chambersburg Area School District opposing the removal of the existing Walker Road bridge, due to safety concerns for school buses resulting from increased traffic); (AR-109 at 1505) (a 1998 resolution of the Franklin County Farm Bureau declaring that farmers would be forced to contend with tractor-trailers and cars exiting and entering the interstate).

Prior to the issuance of the Draft Environmental Impact Statement, the issue was repeatedly raised by both agency staff and commenting agencies. In Minutes prepared in 1992, the agencies stated that the failure to upgrade the local roads would result in pushing traffic onto "a rural road network incapable of handling more traffic in its present condition." (AR-90 at 5). PennDOT also declared that "[a]ll of these roads are narrow and would require substantial funds to bring them up to acceptable standards. . . .[t]he Kohler Road underpass has a restricted under clearance which would have to be

increased in order to serve as a collector" if an interchange at Walker Road was

constructed. (AR-90 at 12).

In a statement by the FHWA, the agency declared that

> the roadway network from the interchange locations in Chambersburg will require
> upgrading and/or construction of new roadways in order to adequately address the
> demonstration of provided [sic] access to Chambersburg and to meet the Federal
> Point of Access requirements. Because these improvements are a direct
> requirement of this project, the commitment to construct these improvements
> must be obtained and the impacts of such improvements addressed in the DEIS.
> (AR-91 at 109).

In a 1993 "Status Meeting", however, the agencies abruptly and succinctly

declared that "[t]he scope of the Interstate 81 Interchange project does not include

improvements to secondary roads." (AR-91 at 167).

In the DEIS, the agencies shifted the problem, declaring that "[s]ince both Walker

Road and Franklin Farm Lane are Township roads, increased maintenance and/or

upgrading of the roads would be needed **by Greene Township** to handle the expected

increased traffic volumes." (AR-12 at II-15) (emphasis added); (AR-22 at 22). This

declaration was made shortly after the agencies admitted that the "increase in traffic on

Franklin Farm Lane may impede access by emergency vehicles to the County Nursing

Home and prison" and may "cause additional capacity problems at the intersection of

Route 30 with both Walker Road and Franklin Farm Lane." (AR-6 at 68).[2]

Following the release of the DEIS, the FHWA bluntly declared to PennDOT that

> [d]ecisions and commitments must be made regarding which roads will be
> improved and the financial responsibility for the work. We cannot complete the
> proposed interchange only to create an intolerable condition on the local
> connecting roads. The additional environmental impacts, if significant, will

---

[2] The document also refers generally to the local roadways as "access roads to interchange" (AR-
6 at 1), even though PennDOT's own planners have admitted that the "roadways are not currently
built to collector road standards." (AR-110 at 125).

require the preparation of a Supplemental Draft Environmental Impact Statement.
. . The proposed Walker Road interchange causes changes in traffic patterns that
require local roadway improvements if the network is to function safely and
efficiently. . . necessary road improvements, particularly the Norland Avenue
Extension, may produce both [historic and environmental] impacts. (AR-93 at
687).[3]

Other agencies continued to recognize the responsibility of the highway agencies

to include the local road upgrades as part of the interchange project. Those agencies

included the Pennsylvania Game Commission[4], the Pennsylvania Fish and Boat

Commission[5], and a Franklin County municipal coordination group hosted by Eleanor

Winsor.[6]

At a public hearing following the release of the DEIS, a large number of residents

expressed specific concerns about dumping interstate traffic onto local, Township

roadways. (AR-14 at 24, 40, 44). Indicative of the comments received was one resident

who asked "[w]hen you exit the interstate . . . within Greene Township, on narrow, two

lane Township roads, not designed to handle the proposed additional traffic, who will pay

to upgrade these roads?" (AR-14 at 44).

In July of 1994, an engineering firm produced a study for the Greene Township

Board of Supervisors, in which the firm described the inadequacy of the local roads for

---

[3] The preparation of an SDEIS was avoided when Bud Shuster secured a commitment in early
1995 from Jane Garvey, Acting Administrator for the FHWA, that an SDEIS would not be
prepared. *See Plaintiffs' Brief in Support of Summary Judgment* at 25.
[4] That official stated that the proposed interchange "would also increase traffic on Walker Road,
Franklin Farm Lane and Mower Road requiring these township roads to be upgraded." (AR-47 at
7).
[5] That agency commented that "the proposed project will transport traffic onto a township road
which does not meet current standards to handle large volumes of traffic and cannot accept trucks
due to weight restrictions." (AR-47 at 11).
[6] In a press release issued by Winsor, she stated that one of the primary concerns of the
participants was that "if an interchange is built, local roads must be able to handle future traffic."
(AR-92 at 112).

traffic from the interstate, and explained how the rural roadways failed to meet engineering and safety specifications for interstate collector roads. (AR-18 at 13).[7]

On September 29, 1994, Region 3 of the FHWA cautioned PennDOT that "the necessary local road improvements, particularly the Norland Avenue Extension, may produce both Section 106 and Section 4(f) impacts [to historic resources]. Therefore, it is prudent to delay further determination of effect actions until the **necessary local road impact study** has progressed sufficiently to give definition to these impacts." (AR-93 at 687) (emphasis added). PennDOT ignored FHWA's comments, FHWA allowed PennDOT to ignore them, and no local road impact study was ever done.

The agencies admitted in December of 1994 that "[t]he local roadway connections do not have the capacity to support a connection to the interstate." (AR-93 at 786).  In the same Briefing, the agencies explained that the interchange would cause "changes in traffic patterns that require local roadway improvements if the network is to function safely and efficiently. The proposed interchange locations are currently served by narrow, substandard roadways." *Id.*

In January of 1995, the agencies recognized that sweeping the segmentation under the rug would be difficult to successfully accomplish. In an FHWA memo, a staff member stated that "[o]ur weaknesses are, and will be, in the project need and secondary impact area as relates to the rural historic area and traffic on local roads." (AR-113 at 187). To resolve the issue, the agencies even considered taking over the Township

---

[7] In response to a query, the agencies admitted that only two existing interchanges were connected to Township roads between Maryland and New York "along I-81 and within the state's boundaries." (AR-96 at 639).

roadways as "state highways", in a revealing memo from PennDOT's legal counsel, Chris Clements, to PennDOT's Bill Greene.[8]

At around the same time that the agencies were mulling over how to avoid scrutiny on this issue, PennDOT submitted its *Justification for an Additional Interchange* to the FHWA. In that document, the agency once again explicitly conceded that local road upgrades would be necessary. In addition to admitting that the interchange would create large traffic increases on local roads,[9] the agency also admitted that "increased traffic would require that Walker Road, Mower Road, and Franklin Farm Road be upgraded to current criteria." (AR-13 at 41). Yet, in the same breath, the agency maintained that "[t]his upgrade would not be part of this project." *Id.*

The statements in the FEIS dealing with the necessary upgrades to local roadways are as convoluted and mystical as the statements made in the DEIS. In the FEIS, the agencies stated that traffic increases on "local roads" will "necessitate increases in maintenance and/or upgrading of these roads." (AR-46 at II-17). While explicitly admitting that Walker Road on the west side of I-81 would need to be "upgraded" to two 12-foot wide lanes to handle increased traffic, the agencies refused to consider the interchange's impact on Franklin Farm Lane and Walker Road on the east side of the Interstate. Since the Walker Road upgrade on the west side of I-81 will cost

---

[8] In that Memo, Clements declared that state law would permit portions of the "local roads to be taken over and integrated into the state highway system." (AR-138 at 181).

[9] The agency stated that construction of an interchange in the Walker Road area "would cause an increase in traffic. . . on Ragged Edge Road, Mower Road, Franklin Farm Lane, Walker Road east of I-81, Norland Avenue, and U.S. Route 11 south of Norland Avenue." (AR-13 at 39). In addition, the agency stated that "the increase of traffic on Ragged Edge Road, Mower Road, and Franklin Farm Road would cause an increase in traffic at the intersection of these roads with U.S. Route 30." (AR-22 at 37).

approximately $4.5 million, it is likely that the comprehensive upgrades and widening required on the east side of I-81 would be of comparable, or greater, cost.

In a conclusion reached by three separate engineering firms hired by the Greene Township Board of Supervisors, increased traffic projected for Walker Road and Franklin Farm Lane will require significant and comprehensive safety upgrades for those roads.[10] As summarized by those engineers,

> [t]o bring this stretch of roadway into conformance with current design standards for collector roads would require, among other things, rebuilding the roadway to eliminate the sharp 90 degree turn at the intersection between Walker Road and Franklin Farm Lane. This could only be accomplished by reconstructing the roadway to the south and east, thereby allowing for an acceptable transition from existing Walker Road onto the proposed connector road associated with Alternative D-Modified. However, such improvements would require the direct taking of land from the unnamed rural historic district lying generally to the south of Walker Road and would mandate Section 4(f) coordination.
> . . .
> Using [agency] projections set forth in the 1998 Supplemental Traffic Studies, between 9,200 and 14,350 vehicles per day at a minimum will use the northern segment of Franklin Farm Lane. This volume of traffic will snarl the local road network, cause substantial delays and result in a reduced level of service. . . Conditions along the southern segment of Franklin Farm Lane will likewise result in substantial congestion and inadequate levels of service. (AR-79 at 23).

As late as June 4th of 1998, the agencies were continuing to admit that Franklin Farm Lane would need to be upgraded as a result of a Walker Road interchange. On that date, in a Memorandum entitled "Potential Issues with Proposed I-81 D-Modified Avoidance Alternative", the agencies listed "Franklin Farm Lane" with the following notes:

> Need for geometric improvement
> Poor sight distance

---

[10] As projected by those engineers, whereas Franklin Farm Lane currently services 1,000 to 2,000 vehicles per day, "[t]he projected levels of traffic on Franklin Farm Lane resulting from the proposed interchange are many times this capacity and will overwhelm the ability of Franklin Farm Lane to carry such volumes of traffic." (AR-79 at 22).

Safety improvements
Increased cross traffic associated with existing County facilities and the soon to
     be completed State Police Barracks
Widening. (AR-159 at 153).

Clearly, the proposed interchange cannot function without significant improvements to the local road network upon which it would rely. The agencies have, however, segmented those necessary upgrades from the interchange project to accelerate the development process for the interchange, avoid discussion of increased costs, and circumvent a discussion of the historic properties which will be impacted by local road widening and upgrades along Walker Road and Franklin Farm Lane.

**B. The Agencies Violated NEPA and the NHPA by Segmenting the Publicly-Funded Norland Avenue Extension Connector from the Interchange.**

In addition to segmenting necessary upgrades to local roads from the interchange project, the agencies also segmented the "Norland Avenue Extension" (which would connect Chambersburg directly to the interchange at the Walker Road location) from the interchange project. The agencies refused to consider any environmental impacts, historic impacts, or cost increases which would result from the Connector road - even though the agencies used the Extension to bolster traffic volumes in traffic studies prepared to support the need for the interchange - and openly admitted that the intensity of development on the Gabler tract is contingent upon the construction of the Connector.[11] In addition to the unknown impacts of building the Connector – a situation NEPA was designed specifically to prevent, namely, the making of decisions without knowledge of

---

[11] The agencies have also admitted that "[i]f Norland Avenue is not extended, the intersection of Walker Road and Kohler Road operates at [a failing] level of service "E" in the afternoon peak hour", even with the construction of an interchange at Walker Road. (AR-72 at 5).

impacts – at the time of the issuance of the Final Environmental Impact Statement, the

Extension was within a rural historic district. (AR-113 at 215); *See* AR-46 at IV-8 for a

map of the East[ern] Greene Township Rural Historic District.

In a draft of the DEIS, the agencies stated that the recommendation of a Walker

Road interchange was "predicated upon. . . the extension of Norland Avenue from Fifth

Avenue to Walker Road. . . and the build-out of the Gabler property." (AR-6 at 68). This

reference was removed in the DEIS released in May of 1994. (*See* AR-12 at V-1).

In an early "Exit 7 Issue Analysis", prepared prior to 1990, the agencies declared

that "the selection of the Walker Road site must not be examined alone; but rather as an

integral part of a larger plan which includes the extension of Norland Avenue." (AR-4 at

unnumbered 5). In a 1993 Agency Coordination Meeting, the issue was again raised by

the Environmental Protection Agency, which questioned whether the Connector would be

"evaluated in the EIS since [Walker Road Alternatives] appear to have a direct influence

on the location of the Norland Avenue Extension." (AR-91 at 185). Also in 1993, a

PennDOT consultant reported that "it is unclear whether Alternative C and D [at Walker

Road] are viable alternatives without the construction of Norland Avenue Extended, an

unrelated project. The success of these alternatives to meet the project need should not

rest on the potential construction of a private endeavor." (AR-92 at 153).

In June of 1994, in an electronic mail from FHWA's Scouten to Gamble, Scouten

declared that the "[p]lan is to extend Norland Avenue through historic property to new

interchange. . . The **Shuster Interchange** is certainly as related to this development (and

destruction of historic resources) as the I-66 access/interchange" was closely related to

the proposed Disney facilities in Virginia. (AR-113 at 215) (emphasis added).

The agencies attempted to assert that "Norland Avenue Extended is also not part of this project and would not be built with federal funds. In order for significant development to take place on the Gabler property, this road must be built." (AR-10 at 205). In an even blunter statement, the agencies stated that "[t]he basic model for generating and distributing future traffic trips was programmed to include projected economic growth including development of the Gabler property. Assuming this development in place, a new connecting roadway between Fifth Avenue and Walker Road [the Norland Avenue Extension connector road] was recognized as essential and was therefore included in the model." (AR-12 at ES-6).

In July of 1994, in perhaps one of the bluntest communications sent between agency personnel, PennDOT's Wayne Kober declared that "if the Norland Avenue Extension were a state funded project it could not be **segmented** the way it is currently and would need to be addressed. . ." (AR-138 at 155) (emphasis added).

That statement was followed in August of 1994, when PennDOT's consultant stated definitively that the Connector project was independent because "[n]o state or federal funds would ever be used to construct the Norland Avenue Extension." (AR-138 at 159; AR-139 at 499).

In November of 2000, however, U.S. Representative Bud Shuster announced that $3 million in state and federal money had been secured to build the Norland Avenue Extension connector road. That November announcement occurred more than six months prior to the release of the "Re-Evaluation" of the ROD, but it failed to mention that state and federal monies were being used to construct the Extension, and it failed to discuss any impacts resulting from the connector road. (AR-83 at 7).

In March of 1995, at an Agency Coordination Meeting, the EPA again commented on the failure of the agencies to include the Norland Avenue Extension connector road as part of the overall project, stating that the "EIS document does not look at impacts of Norland Avenue. The report must look at both the direct and indirect effects." (AR-96 at 727).

To avoid examining the necessary local road upgrades and the Norland Avenue Extension connector road as part of the interchange project, the agency was forced to advance two questionable propositions: first, that the interchange project would **not** increase traffic on local roadways (even though the interchange was ostensibly being constructed to relieve congestion), and second, that the Norland Avenue Connector project was independent of the construction of the interchange (even though agency staff admitted that the Connector enabled the Interchange to operate as projected).

Hence, in 1998 in a Memo generated exclusively for the Administrative Record, the agencies curiously attempted to explain that "the proposed interchange will not generate new traffic or increase traffic volumes beyond what is anticipated to be generated by future land use changes." (AR-122 at 2918). One page later, as part of that Memo, the agencies stated that "improvements to Norland Avenue are not associated with the proposed construction of an interchange [at the Walker Road location]. Future improvements or alterations" to these roadways will be a separate undertaking. (AR-122 at 2919).

Had the $3 million additional construction cost for the Norland Avenue Extension been added to the total cost of the project, a total contemporary cost of $12.2 million for

the interchange project is produced.[12] That project cost dwarfs the predicted costs for an interchange south of Chambersburg, projected to be $4 million. (AR-46 at II-14).

Thus, the highway agencies attempted to avoid scrutiny of their segmentation actions by advancing arguments that had been undermined by years of planning which supported the completely opposite conclusions. In doing so, they are now forced to argue that an interchange originally planned to relieve traffic congestion will produce no traffic increases on local roadways feeding the interchange, and that a new connector road used to repeatedly support traffic projections – and by their own admission serve as an integral connector for the interchange - is an "independent" project.

**IV. The Agencies' Contention That an SEIS is Not Required to Examine Impacts Resulting from the New Interchange, or from the Pennsylvania Supreme Court's 2000 Ruling that Farmland in the Walker Road Area Was Specially Protected by State Law, is Unsupported by the Law and by the Record. The Agencies also Erroneously Contend that New Development in the Kriner Road Area Does Not Require a Supplemental Statement.**

The preparation of a Supplemental Environmental Impact Statement ("SEIS") is required if an agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 CFR §1502.9(c); *See also* 23 CFR §771.130.

The underlying purpose of the requirement of an SEIS is to ensure that changes to the project are addressed - and new information evaluated - to enable agency

---

[12] Total contemporary cost for the interchange, without the Norland Avenue Connector, is over $12 million, according to PennDOT's most recent Transportation Improvement Program of July 15, 2002. Adding the Connector to that cost yields a total cost of over $15 million. Prior to the release of the "Re-Evaluation of the ROD", the agencies projected a total cost for the interchange of over $9 million. Adding in the cost of the Norland Connector yields a total cost of over $12 million, or four times the cost projected in the FEIS. (AR-169 at 52).

decisionmakers to make the best decisions with the best information. That, in turn, fulfills

NEPA's basic requirement that agencies "objectively evaluate all reasonable alternatives"

and "identify and assess the reasonable alternatives to proposed actions that will avoid or

minimize adverse effects." 40 CFR §§1502.14, 1500.2.

The United States Supreme Court has considered the duty of agencies to prepare

an SEIS and has explained that it would be inconsistent with the principle of NEPA if

"the blinders to adverse environmental effects, once unequivocally removed, [would] be

restored prior to the completion of agency action simply because the relevant proposal

has received initial approval." *Marsh v. Oregon Natural Resources Council*, 490 U.S.

360 (1989); *See also Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017 (9th Cir.

1980); *Sierra Club v. United States Army Corps of Engineers*, 701 F.2d 1011 (2d Cir.

1983); *Conservation Law Found. v. Department of the Air Force*, 864 F.Supp. 265

(D.N.H. 1994).

Thus, agencies must take a continuing "hard look" at environmental

consequences to satisfy the requirements of NEPA. *Kleppe v. Sierra Club*, 427 U.S. 390,

411 (1976) (*quoting Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827

(D.C. Cir. 1972); *Utahns for Better Transp. v. United States DOT*, 180 F.Supp.2d 1286

(N.D. Utah 2001) (stating that NEPA imposes a continuing duty to evaluate new and

changed information and to consider the most recent data). To accomplish that "hard

look", agencies must make a "fully informed and well-considered decision." *Vermont

Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519

(1978); *See also Pennsylvania Protect Our Water and Environmental Resources, Inc. v.

The Appalachian Regional Commission*, 574 F.Supp. 1203, 1212 (M.D. PA 1982).

The agencies violated NEPA, NEPA's regulations, and the agencies' own regulations by arbitrarily refusing to prepare a Supplemental Environmental Impact Statement (SEIS) to address new impacts and additional costs resulting from the 1998 relocation and complete redesign of the interchange, new development in the Kriner Road area, and the Pennsylvania Supreme Court's ruling that farmland in the Walker Road area was specially protected by the Agricultural Area Security Law.

### A. The Agencies Erroneously Contend That They are Not Legally Required to Prepare a Supplemental Environmental Impact Statement Following the Complete Redesign and Relocation of the Interchange in 1998, and Significant Land Use Changes Impacting the Kriner Road Alternatives.

In mid-1998, four years after the preparation of the DEIS, and three years after the issuance of the FEIS, the agencies proposed a new interchange project, labeled "Alternative D-Modified." The newly designed interchange now proposes the complete demolition of the current Walker Road overpass and Bridge, the dead-ending of Walker Road on either side of Interstate 81, the construction of a new Bridge 1400' south of the existing Walker Road overpass, and the construction of a direct connection between the proposed interchange and Franklin Farm Lane.[13] In addition, the newly designed and relocated interchange increases the cost of the project by over 400% - from $3.2 million to over $12 million.[14] (AR-82; AR-169 at 52); *See* FEIS at AR-46 at II-7.

In January of 1999, through the release of a "Re-Evaluation" of the FEIS, the agencies concluded that a Supplemental Environmental Impact Statement was unnecessary. (AR-80). The Re-Evaluation, the first document produced by the agencies

---

[13] A description of the new design can also be found at AR-108 at 1177, in an article entitled "PennDOT Suggests Moving Exit 7 Ramp" dated November 3, 1997.

following the announcement of "Alternative D-Modified", was never circulated for

public review and comment. Nor was the Re-Evaluation approved via signature by the

agencies, as were the DEIS, the FEIS, the ROD, and the "Re-Evaluation of the ROD".

(AR-12; AR-46; AR-80; AR-83).

Under the newly designed project, traffic entering and exiting the proposed

interchange on the eastern side of I-81 would no longer feed from, and to, both Walker

Road and Franklin Farm Lane (as under the FEIS "selected" Alternative), but would

instead exit and enter solely from Franklin Farm Lane. Historic resources located along

Franklin Farm Lane, including the Gass House and the Poor House, would suffer greater

adverse impacts from the redirection of traffic flow onto Franklin Farm Lane.[15]

Demolition of the existing overpass bridge, and construction of a new bridge increases

the time, resources, costs, and engineering costs for the proposed interchange project.

The new interchange will also take land protected in a Rural Historic District for

necessary upgrades to local roads for the handling of interstate traffic. (AR-82 at 1); (AR-

80 at Figure 2 (Map of New Design)).

(1) The Agencies Failed to Examine the Impact of Guilford Township's New
Zoning Ordinance on the Kriner Road Alternatives

Since the approval of the original environmental studies in 1995, Guilford

Township – the Township within which the alternative locations for the interchange

could be constructed – has adopted zoning regulations which zone for, and encourage,

---

[14] The Record of Decision confirms that "estimated costs" of the interchange project for each
Alternative must be a fundamental component of any consideration of Alternatives. (AR-82 at 2).
[15] The relationship between the historic properties on Franklin Farm Lane (within the "Franklin
Farms" Complex) and the proposed interchange is shown at AR-12 at I-12 and at AR-46 at III-4.

commercial and industrial development in the Kriner Road area.[16] Whereas the agencies took great pains to take the re-zoning of the Gabler land[17] in the Walker Road area into consideration in traffic[18] and development scenarios, the agencies failed to concurrently examine the new information that arose from the zoning of the Kriner Road area.[19] (*See* AR-96 at 637 for the agencies' explanation of their analysis of the re-zoning of the Gabler Tract).

With the Guilford zoning and the greater-than-projected build-out of the Chambers-5 Business Park at Kriner Road[20], the area surrounding the Kriner Road location has a significantly greater potential to generate interstate traffic and truck traffic than the area surrounding the proposed location for the interchange at Walker Road.

A 1999 study prepared by Greene Township engineers revealed that twice as much commercial and industrial land existed within two miles of the Kriner Road location than existed within two miles of "Alternative-D Modified" at Walker Road.[21]

---

[16] Adopted in 1997, the Guilford Township Zoning Ordinance is located at AR-134 at 1001.

[17] The agencies closely examined the impact of the Gabler Tract re-zoning shortly after the re-zoning occurred, while failing to examine the impact of the Guilford zoning which occurred in 1997. (AR-95 at 236; AR-133 at 698) (no parallel examination of potential development activity in the Kriner Road area).

[18] The agencies have explicitly admitted that "[t]he basic model for generating and distributing future traffic trips was programmed to include projected economic growth including development of the Gabler property." (AR-11 at ES-6).

[19] The agencies have admitted that projected future development in the Kriner Road area was input directly into the 1995 "traffic model". (AR-29 at 72). That traffic model was never altered to account for the zoning of the Kriner Road area, the build-out of the Chambers-5 Business Park, or the construction of three new Distribution Warehouses in the Kriner Road area.

[20] The Chambers-5 Business Park is located immediately adjacent to the proposed Kriner Road interchange, and is the centerpiece of development efforts by the Chambersburg Area Development Corporation.

[21] The study revealed 2,040 acres of industrially and commercially zoned districts in the Kriner Road area, as compared to 1,020 acres of industrially and commercially zoned districts surrounding "Alternative D-Modified" at Walker Road in Guilford Township and Chambersburg Borough. (AR-79 at 41).

The research completed by the Greene Township consultants also revealed that the Kriner Road interchange area "is rapidly evolving into a commercial and industrial area." *Id.*

### (2) The Agencies Failed to Integrate Greater Than Projected Development in the Chambers-5 Business Park and the Construction of Three Warehouse Distribution Centers in Traffic Studies Conducted to Determine the Relative Merits of Traffic Relief in the Kriner Road Area.

Amazingly, in the agencies' 1995 Traffic Studies, it was assumed that the design year (2016) estimated build-out in the Chambers-5 Business Park would only include 1,320,000 square feet – over 860,000 square feet **less** than what existed at the Chambers-5 Business Park in 1998. The agencies' assumption was almost 2,000,000 square feet less than what currently exists in the Park. (AR-79 at 42); *See Plaintiffs' Statement of Material Facts* at 197-201. In addition, the agencies have failed to consider the greater than 2,600,000 square feet developed for the Target, Ingram Books, and K-Mart (formerly Toys R'Us) Distribution Centers which have been constructed in the Kriner Road area over the past several years. Collectively, those Distribution Centers enclose over sixty acres of land within the Kriner Road area.

The gross under-projection of development within the Chambers-5 Business Park and the construction of the Warehouse Distribution Centers has a dramatic impact on the traffic numbers and Levels of Service generated for an interchange built in the Kriner Road area. That impact undermines the agencies' elimination of a Kriner Road interchange based on their contention that the existing I-81/Wayne Avenue interchange is not congested.

In 1995, the agencies admitted that 1,800,000 square feet of total development in Chambers-5 would trigger a worsening in congestion from LOS "C" to LOS "D" during morning and afternoon hours on the existing Wayne Avenue interchange.[22] (AR-105 at 155). Currently, Chambers-5 has over 3 million square feet of development and the Warehouse Distribution Centers contain over 2.5 million square feet of development.

However, in the Record of Decision, the agencies dismissed a Kriner Road alternative by explaining that it would "not meet the need of the project to relieve congestion on an existing interchange." (AR-82 at 6).

In December of 2000, in a Memo generated exclusively for the Administrative Record, the agencies also confirmed that Guilford Township was building a new bridge to the Wayne Avenue interchange from Kriner Road, thus providing an adequate collector road to handle truck traffic. (AR-132 at 388). That widening enables a Kriner Road interchange to effectively carry large volumes of traffic and trucks onto local roads, unlike Franklin Farm Lane or Walker Road servicing "Alternative D-Modified."

From July of 1994 to the issuance of the "Reevaluation of the ROD" in June of 2001, the agencies were informed of these developments by engineers working for Greene Township. (AR-18 at 3; AR-133 at 703; AR-79). The agencies, however, refused to prepare an SEIS to evaluate the impacts resulting from these new developments.

---

[22] Under Public Law 100-17 and the environmental studies completed by the agencies, the Wayne Avenue/I-81 Exit #5 interchange is the "existing interchange" upon which traffic congestion would be relieved by the construction of a new interchange at the Kriner Road overpass.

(3) The Agencies Failed to Examine Impacts Resulting from the Change in Boundaries of the Secondary and Cumulative Impacts Area (SCIA) Caused by the Southward Shift in the Location of the Walker Road Interchange.

The agencies have also refused to examine the impacts resulting from the shift in the boundaries of the "Secondary and Cumulative Impacts Area" (SCIA) caused by the 1400' southward shift of the interchange location that occurred in 1998.[23] In a revealing Memorandum dated January 25, 1999, agency consultants declared that the shift was "irrelevant" to the delineation of the SCIA. (AR-122 at 2848). In line with that view, and unsupported by any documents, evidence, or arguments, the consultant refused to adjust the boundaries for the SCIA 1400' further south to "re-center the new interchange around the SCIA boundary." *Id.* New SCIA boundaries would have explicitly included the Gass House, the Poor House, and other historic resources which front on Franklin Farm Lane. (AR-79 at 38).

The relocated interchange will also now impact potentially historic farmland – both through actual (for construction of a weaving lane between exit #6 and the new interchange) and constructive use – known as "Franklin Farms." This issue was originally raised by legal counsel for Plaintiff Citizens for Planned Community Growth in 1994. (AR-93 at 493). Under the original contract with the consulting firm conducting the historic resource studies, the consultants were obligated to examine "collections of buildings that are historically and/or architecturally related" and identify them as "historic districts." (AR-159 at 31). As can be seen from any map of the newly designed

---

[23] The inevitable result of that shift is displayed in Figure "3", (AR-79 at 38), which illustrates the historic properties not analyzed in the environmental studies.

interchange, construction of the project at its present location will require the taking of

land from that potentially historic district, which has been County-owned since 1808.[24]

### B. The Agencies Violated the National Environmental Policy Act by Refusing to Prepare a Supplemental Statement Following a Pennsylvania Supreme Court Ruling That Farmland in the Project Area Was Specially Protected by State Law.

The Draft Environmental Impact Statement prepared and approved by the

Defendants admitted that a "hearing with the [Agricultural Lands Condemnation

Approval Board ["ALCAB"] would be necessary" to condemn farmland necessary for

the construction of the interchange at the Walker road location. (AR-12 at page IV-52). In

the *Point of Access* Report prepared and approved by the agencies in January of 1995,

PennDOT admitted that approval from ALCAB would be necessary prior to condemning

land for construction of the interchange at the Walker Road location. (AR-22 at 24-25).

That conclusion was identical to conclusions previously drawn about the necessity of

ALCAB approval for the construction of a Walker Road interchange.[25]

As the agencies were instructed to accelerate the construction of the interchange,

and after Pennsylvania and local Farm Bureau opposition to the taking of Walker Road-

area farmland, the agencies did an abrupt turn-about in the FEIS by declaring that "a

hearing with the Agricultural Lands Condemnation Approval Board will not be

necessary." (AR-46 at IV-65).

---

[24] The location of "Franklin Farms" can be viewed in the FEIS (AR-46 at III-4) and the DEIS (AR-12 at I-12). The Gass House and Poor House are located within the "Franklin Farms" Complex, a collection of buildings and land adjacent to Franklin Farm Lane that may be eligible as a Rural Historic District. (AR-107 at 710).

[25] A Preliminary Alternatives Report also stated that "[t]he acquisition of these lands must be approved by a condemnation board. . . and the local Agricultural Area Advisory Committee." (AR-3 at 89). The project has never been submitted to the local Agricultural Area Advisory Committee for review as required by 3 P.S. 913.

In response to the agencies' refusal to seek ALCAB approval, the Pennsylvania Farm Bureau wrote a series of letters to the highway agencies and the Pennsylvania Secretary of Agriculture, in which the Bureau questioned the ability of the agencies to ignore farmland preservation laws.[26] The local Greene Township Supervisors also raised the issue to the Secretary of Agriculture – fearing the impact of the agencies' interpretation on Township Agricultural Security Areas ("ASA's"), and the threat of condemnation against Township farmers by the highway agencies.[27]

On May 10, 1999, after the highway agencies sent a notice of intent to enter farmland at the Walker Road location, a Greene Township farm couple sued PennDOT in Commonwealth Court. Following the issuance of a temporary restraining order and a preliminary injunction enjoining PennDOT from entering their farmland, the Commonwealth Court issued a permanent injunction against the agency, barring it from condemning the farmland without ALCAB approval. *White v. PennDOT*, 738 A.2d 27 (Commw. 1999). An appeal of the ruling was filed by PennDOT, and in a *per curiam* ruling, the Pennsylvania Supreme Court affirmed the Commonwealth Court decision. 738 A.2d 27 (Pa. 1999).

In those rulings, the Courts held that the continuation of "Alternative D-Modified" hinged upon the ALCAB's approval because the farmland was specially protected by Pennsylvania farmland preservation laws. That ruling, by itself, thus created new, serious impacts that further distinguished "Alternative D-Modified" from the Kriner Road alternatives.

---

[26] Those letters are dated May 3, 1995; June 5, 1995; and July 18, 1995, and are contained within the Administrative Record at AR-102 at 153-161.
[27] Greene Township's letter to the Secretary of Agriculture is located at AR-97 at 1109.

Because of the political drive to jam the interchange into the Walker Road location, the agencies continued to press the issue by expending taxpayer – and, ostensibly, project - monies to compose a three day presentation to the ALCAB, which convened to hear the agencies' reluctant submission. Unfortunately, during the hearing, the Hearing Examiner applied an erroneous legal standard[28] to the proposed condemnation, and thus, the ALCAB approved the condemnation after attaching numerous conditions. (AR-138 at 268-69).

The two year delay and the substantial expenditure of project monies for the ALCAB hearing were never considered as part of the project cost for "Alternative D-Modified."

Materials in the Administrative Record explain why the agencies attempted to avoid ALCAB review. In notes made at a Coordination Meeting, agency staff wrote that "Lou Schultz of PennDOT who sits on the ALCAB as PennDOT representative made some suggestions." Handwritten notes then bluntly declare that "ASA [in the Walker Road area] is real problem", "need to develop project need and explain it to justify anything other than no-build", "ASA/Twp. Opposition-real problems." In perhaps the most directly worded section of this document, it states that "if Walker Rd's a "given", use lots of words to play up the minimal farmland impact – handwringing re: ASA – tough decision, etc." (AR-93 at 638).

Not only was the analysis of alternatives fundamentally skewed as a result of the agencies' attempt to circumvent ALCAB, but the agencies themselves admitted – as late

---

[28] The Hearing Examiner erred by asking whether the taking of farmland was the only "reasonable and prudent alternative" for the construction of "Alternative D-Modified." (AR-138 at 266). The correct standard, under the law, is whether there were "reasonable and prudent"

as November and December of 2000 – that the farmlands impact information was outdated and needed to be revised. In one letter to area farmers, the agencies explained that the consultant was updating farmland data "due to changes that have occurred in the area encompassing Greene Township and Guilford Township since previous studies conducted in 1995." (AR-169 at 186, 188).

Finally, although the "Re-Evaluation" of the ROD purported to show that only minor changes to farmland impacts had occurred between the time of the issuance of the ROD to the commencing of final design in 2001, it actually revealed much greater impacts to farmlands. Whereas the "Re-Evaluation" purported to recite that the ROD concluded that "42.0 acres" of prime soils might be lost[29], the ROD did not. In fact, the ROD listed "17.8 acres" of potential loss.[30] In addition, whereas the original ROD projected that only one Agricultural Security Area ("ASA") would be impacted, for 4.7 acres, the "Re-Evaluation" now lists that two ASA's would be impacted, for 6.5 acres. (AR-83 at 3). Even the revised acreage amounts, however, are erroneous because prior to the issuance of the "Re-Evaluation", the agencies purchased twenty-two (22) acres of farmland in the Walker Road area, thus increasing the total amount of farmland to be used for the interchange to over thirty-two (32) acres. *See Agencies Brief in Support of Summary Judgment* at 28, fn. 14. Those changes alone requires the preparation of an SEIS; when combined with the impact of the Pennsylvania Supreme Court decision, the situation clearly requires the preparation of a Supplemental statement.

---

alternatives for the construction of the interchange other than at the Walker Road location. 3 P.S. §913(d)(2)(i).
[29] AR-83 at 3.
[30] AR-82 at 22.

30

**V. The Agencies' Contention That They Were Not Obligated to Examine Alternatives Created by the Overhaul of Public Law 100-17 is Not Supported by Law.**

The agencies contend that the legislative overhaul of Public Law 100-17, which re-directed demonstration project monies to highway projects in a five County area, did not require the agencies to consider those other alternatives. *See* Agencies' *Brief in Support of Joint Motion for Summary Judgment* at 31-34.

The agencies' argument is not supported by the law or by the Administrative Record. For a full response to this argument, see the *Plaintiffs' Memorandum of Law in Support of Summary Judgment* at 30-35; *Plaintiffs' Statement of Material Facts* at paragraphs 82-91.

**VI. The Agencies' Argument That Interchange Studies Were Conducted in Good Faith is Not Supported by the Administrative Record.**

The agencies contend that the studies for the I-81 interchange were completed with good faith objectivity. *See* Agencies' *Brief in Support of Joint Motion for Summary Judgment* at 34-41.

The agencies' argument is not supported by the Administrative Record. For a full response to the agencies' argument, see the *Plaintiffs' Memorandum of Law in Support of Summary Judgment* at 7-30; *Plaintiffs' Statement of Material Facts* at paragraphs 30-81.

**VII. The Agencies' Argument That They Studied Impacts to All Historic Resources in the Walker Road Area is Not Supported by the Record.**

The National Historic Preservation Act requires federal agencies to "take into account the effect" of a project on any "district, site, building, structure, or object that is

included in or eligible for inclusion in the National Register." 16 U.S.C. §470h-2. That proactive duty on the part of the agency to identify and analyze impacts applies to all projects "carried out with Federal financial assistance." 16 U.S.C. §470w(7).

36 CFR §800.4(b) specifically requires that the highway agencies "make a reasonable and good faith effort" to identify historic properties that may be affected by proposed projects. (AR-96 at 788). To carry out that goal, 36 CFR §800.16 requires that agencies delineate an area that encompasses "the geographic area or areas within which an undertaking **may** directly or indirectly" impact historic properties. (emphasis added). PennDOT's *Environmental Impact Statement Handbook* reinforces that goal – requiring a "broad area" which ensures that the study area "encompasses **all** of the project's potential effects on natural, **cultural**, and socioeconomic resources." (AR-172 at 18) (emphasis added).

The law specifically prohibits agencies from approving any project which requires the use of any land from a historic site of national, state, or local significance unless there is no "feasible and prudent alternative" to the use of that land, and only if the project includes "all possible planning" to minimize harm to the historic site resulting from such use. *See* 49 U.S.C. §303; 24 U.S.C. §138.[31]

Construction of a highway project may also result in a "constructive" use of a historic resource, which requires the preparation of a 4(f) Statement. A "constructive" use occurs when a project will not physically take property from a historic resource, but will result in impacts to that resource. Many courts have specifically recognized that "constructive uses" must be recognized and mitigated by agencies. *See Coalition Against*

---

[31] For PennDOT's own description of what a "4(f)" analysis entails, *see PennDOT's Section 4(f) Handbook.* (AR-170 at iii).

*a Raised Expressway v. Dole*, 835 F.2d 803, 810-812 (8th Cir. 1988); *Citizen Advocates for Responsible Expansion v. Dole*, 770 F.2d 423, 440-442 (5th Cir. 1985); *Monroe County Conservation Council v. Adams*, 566 F.2d 419, 424 (2nd Cir. 1977).

At least one court has recognized that agencies violate the NHPA if they use an improper scoping process to exclude historic properties from the NEPA process. In *Colorado River Tribes v. Marsh*, 605 F.Supp. 1425 (C.D. Cal. 1985), the Corps of Engineers issued a bank stabilization permit to a private developer to "riprap" the Colorado River Bank in preparation for commercial and residential development. In carrying out the responsibility of the federal agency to determine the existence of historic resources impacted by the project, the agency demarcated a "permit area" and a much larger "affected area." *Id.* at 1432. Although recognizing that historic resources existed in the "affected area", the Corps decided to only examine resources within the "permit area" because the river and the river bank were the only areas under the jurisdiction of the agency. The Court characterized the agencies' actions as improperly "narrowing the parameters of the word 'impact.'" *Id.*

In rejecting the Corps' interpretation, the Court held that "[i]n limiting the scope of its inquiry, the Corps acted improperly and contrary to the mandates of NEPA. . . The Corps [have] proceeded to assess the project with tunnel vision." *Id.* at 1433. Reasoning that the plain language of the NHPA requires all agencies to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register", the Court declared that the agency did not have the discretion to override the law to narrow the parameters of the area affected by the project. *Id.* at 1437-38. The Court stressed that the agency's contention that it had the

discretion to separate the "permit area" from the "affected area. . .eludes basic logic and reasoning." *Id.* at 1438.

Throughout the planning process for the interchange, the agencies continually altered the scope of the study area for cultural resources to avoid identification of historic buildings and land impacted by the interchange.

At the inception of the project, the agencies identified the scope of the "Project Study Area" for the interchange, and confirmed that the "Project Study Area" was used to examine historic resources. (AR-46 at ES-4).[32] As concerns from local citizens and historic organizations about potential impacts to historic buildings and lands grew, the agencies responded by narrowing the "Project Study Area" into a "project impact area" for historic resources and then into an area which solely included the right-of-way surrounding the physical construction of the interchange ramps.

A. The Original "Project Study Area" as the Area for the Study of Historic Resources.

Under the October 31, 1988 Work Order for the preparation of the initial Cultural Resources Study, agency consultants were required to identify "all significant historic resources subject to possible project effects." (AR-159 at 32; AR-174 at 113).

In the agencies' Preliminary Alternatives Report, the "Project Study Area" was designated as an area whose "length extends from approximately 2 miles north of Exit 4 to Exit 8 on Interstate Route 81. The typical width is 5,000 feet on either side of Interstate Route 81." (AR-2 at 3). At a public meeting held on January 24, 1989, the "Engineering,

---

[32] An identical "Study Area" was identified in the DEIS. (AR-12 at ES-13). An identical area was delineated in all agency documents. (AR-46 at II-9; AR-82 at 7; AR-83 at 5; AR-80 at 11).

Traffic, and Environmental Study Area" was identified as a mirror image of the "Project

Study Area" delineated in other documents. (AR-143 at 1191).

In the agencies' own Plan of Study, the document explicitly noted that "[t]he

study area described above will be the primary area of influence for each environmental

issue to be considered. . . [and] detailed project area maps showing the locations of . . .

known and potential [historic] sites will be prepared." (AR-85 at 3, 16).

On February 22, 1990, the FHWA published its Notice of Intent to prepare an

Environmental Impact Statement. In that Notice, the FHWA declared that the "study

area" would include an area encompassing the existing interchange #8 (in the north)

extending southward to approximately two miles north of interchange #4. The study area

was identified as the area for data collection on "historical and archaeological sites." Fed.

Reg. Vol. 55, No. 36 (February 22, 1990).

As early as June 4, 1990 - in response to the agencies' failure to consider historic

sites in the "Project Study Area" - a local historic organization, Franklin County

Heritage, alerted the agencies to the "presence of the Patrick Gass House" as well as to

the presence of the "Franklin County Poor House."[33] (AR-12 at "Appendix E-10"). The

Kittochtinny Historical Society – Franklin County's official County historical society –

along with the Franklin County Commissioners, expressed similar concerns about those

properties to PennDOT and FHWA. (AR-12 at "Appendix E-2"); (AR-141 at 342).

---

[33] The Franklin County Poor House (also known as the Administration Building at the "Franklin Farms" Complex) was deemed eligible for the National Register of Historic Places in 1993. (AR-81 at 9). The Gass House is already on the National Historic Register. *See also* Kittochtinny Historical Society Letter, dated September 22, 1998, at AR-123 at 2978, and the Map of the "Franklin Farms" Complex at AR-123 at 2986. Both properties front on Franklin Farm Lane, the local road planned as a collector road for all traffic entering, and exiting from, the proposed interchange on the east side of I-81.

In a 1992 letter from Secretary Yerusalim to Representative Shuster, Yerusalim affirmed the extent of the Study Area, stating that the sixteen square mile "study area" was used to identify potential impacts to national register buildings and residences. (AR-90 at 22).

### B. The Agencies Manipulated the "Project Study Area" Into the Interchange's "Right-of-Way" to Eliminate Consideration of Impact on Historic Properties.

The agencies' continuing failure to study historic buildings and land in the Walker Road area was raised by the Advisory Council on Historic Preservation in a letter dated March 14, 1994. (AR-92 at 61).

Instead of re-starting their study process to ensure that all historic properties were examined, the agencies simply unilaterally narrowed the study area to avoid discussion of impacts to those properties. The Draft Environmental Impact Statement (DEIS) for the project thus shifted from an examination of cultural resources within the "Project Study Area", to one which focused solely on the *right-of-way* to be used for each alternative. In a clear mis-statement of the cultural resources studies completed since 1990 – which utilized the "Project Study Area" for the scope of the studies - the DEIS proclaimed that "the cultural resources study area for this project was defined as the potential right-of-way around each proposed alternative." (AR-10 at 77). The DEIS invented this scope of study, even while including an "Engineer, Traffic, and Environmental Study Area" on the map of the project area, which clearly encompassed unexamined historic buildings and land on Franklin Farm Lane. (AR-6 at 13).

That shift in the DEIS occurred a month after the agencies' own Criteria of Effects Report was released, which contended that "historic resources within the **project**

**area**" had been studied for impacts. (AR-9 at 1) (emphasis added). In addition, in the

agencies' *Justification for an Additional Interchange*, prepared in May of 1994, the

agencies stated that the "cultural resources survey" had been carried out "within the

**project study area**." (AR-13 at 25) (emphasis added). Figure IV-1 within the Report,

entitled "Identified Historic Resources" was even overlaid with an "Engineer, Traffic and

Environmental Study Area" which clearly included areas on Franklin Farm Lane with

known historic properties that were never studied. (AR-13 at 20).

 The refusal of the Defendants to examine the impact of a Walker Road

interchange on historic properties in a proper study area became the subject of numerous

letters from local historic organizations, municipal governments, and the Plaintiffs. (AR-

92 at 91; AR-92 at 95, 229, 261, 284).

 In a 1995 e-mail, agency staff even recognized that "[o]ur weaknesses are, and

will be, in the project need and secondary impact area as relates to the rural historic area

and traffic on local roads." (AR-113 at 187).

 The issuance of the Farmlands Technical Memorandum,[34] at around the same

time as the FEIS, illustrated how disingenuous the agencies had become. At the same

time that the agencies were manipulating the study area in the FEIS to avoid examining

historic properties, they sought to assure the state Agricultural Lands Condemnation

Approval Board (ALCAB) that they had comprehensively studied the broadest area

possible. Thus, the Farmlands Technical Memorandum touted that the "Project Study

Area" (reflecting the original delineation in the Preliminary Alternatives Report) had

---

[34] The Farmlands Technical Memorandum was originally prepared as the "Farmlands Assessment Report" for submission to the Agricultural Lands Condemnation Approval Board (ALCAB). After the Defendants refused to submit the project to ALCAB for approval, they retitled the

effect that only the "agency determines the APE [area of potential effect]." (AR-137 at 72). In another part of the Record, following Greene Township's statement that the FHWA was responsible for mitigating impacts to historic resources, agency staff wrote, in a handwritten scrawl, "absolutely not! Read the law!" (AR-137 at 83).

In a letter from the FHWA to the Pennsylvania Historic and Museum Commission, the agency candidly admitted that "[p]otential project effects due to increased traffic, noise, and new development to the specific resources listed above [Poor House, Gass House, Cashdollar House, the Chambersburg Historic District] were not evaluated under the Section 106 process for this project."(AR-110 at 9). In comments to Greene Township, the agency stated - without a shred of foundation or study - that "[t]he proposed project itself will not result in increased traffic near" the historic resources. (AR-110 at 21). Because of this and other actions by the agencies, the Greene Township Supervisors refused to sign the Memorandum of Agreement (MOA) drafted between the highway agencies and the Pennsylvania Historic and Museum Commission. (AR-110 at 1).

In their January 7, 1999 letter explaining the Township's refusal to agree to the MOA, the Supervisors explained that the MOA "fails to protect adequately historical resources in the area of the interchange." Quoting PennDOT's *EIS Handbook*, the Township stated that "to satisfy the requirements of the integrated NEPA/404 process, the environmental overview must identify **all** natural, cultural, and socioeconomic resource in **the entire study area** before alternatives are developed." *Id.* (emphasis added). The Township reviewed the agency's designation of a "Project Study Area" and

an "Engineer, Traffic, and Environmental Study Area" and concluded that the agencies

had failed to identify, or study, all cultural resources in those areas.[35] (AR-110 at 2).

Finally, the Township emphasized another important issue – that the re-routing of

traffic through the newly designed and located interchange would create an unsafe

condition at the 90 degree "T" intersection of Franklin Farm Lane and Walker Road.[36] As

such, the increased volumes of traffic will necessitate significant road reconstruction

activities in the unnamed rural historic district lying generally to the south of Walker

Road. This situation was outlined by an engineer in June of 1998, with the explanation

that

> [t]he total increase in traffic to Franklin Farm Lane would then be 4,200 and
> a Design Year ADT [Average Daily Traffic] of 6,500. This would represent
> a threefold increase in the current traffic level. . . The geometry of this proposal
> ["Alternative D-Modified"] will dead end Walker Road and force traffic from
> Walker Road onto Franklin Farm Lane using a 90 degree stop turn. This turning
> movement could not handle the 3,550 ADT if only 50% of the traffic is diverted
> onto Franklin Farm Lane and would far exceed the 9,400 ADT if the current
> traffic report is not revised to reflect the change in interchange alignment. (AR-
> 105 at 299).

In a Memorandum produced on June 4, 1998 by the highway agencies, entitled

"Potential Issues with Proposed I-81 D-Modified Avoidance Alternative," the agencies

underscored this point by declaring that "Potential 4(f) issues" were caused by an

inadequate "[t]urning radius at Walker Road and Franklin Farm Lane." (AR-159 at 153).

---

[35] In a January 13, 1999 submission by the Plaintiff Greene-Guilford Environmental Association,
the group raised an identical point – that the agencies' *Handbooks* required the designation of a
"broad area" around the project site as the "study area" which would encompass "all of the
project's potential effects on natural, **cultural**, and socioeconomic resources." (AR-81 at 89)
(emphasis added).

[36] This "T" intersection is illustrated best by the Map located at AR-74 at Exhibit E. The Map
shows the intersection of Franklin Farm Lane with Walker Road on parcel #137, within the
"Unnamed Rural Historic District."

Thus, the routing of traffic will require a 4(f) taking, and that taking of land within a historic resource has not been identified or analyzed by the agencies, in violation of the NHPA.[37]

The intentional narrowing of the geographic boundaries of the historic resources study area in an attempt to avoid studying those historic properties impacted by the interchange project, violates NEPA and the NHPA. These attempts to avoid compliance with historic preservation laws have been repeatedly recognized by the Pennsylvania Historic and Museum Commission ("PHMC"), which has ruled that the project will have an "adverse effect" on historic resources. (AR-83 at 3).

## VIII. Conclusion

Accordingly, the Plaintiffs respectfully request that this Court declare that agency decisionmaking on this project, including but not limited to the Record of Decision and the FEIS, failed to comply with federal law. The Plaintiffs respectfully request that this Court issue a permanent injunction enjoining the agencies from expending funds, or taking further action to design and construct the proposed interchange, until the agencies prepare new and objective traffic and environmental studies, and/or prepare a Supplemental Environmental Impact Statement in conformity with federal law.

Respectfully Submitted on the **25**[th] Day of **July**, 2002.

---

[37] *See* Section III of this Brief for a complete description of the necessity of upgrading Franklin Farm Lane and Walker Road to serve as "collector" roads for the interchange.

Thomas Alan Linzey, Esq.
Community Environmental Legal Defense Fund (CELDF)
2859 Scotland Road
Chambersburg, Pennsylvania 17201
(717) 709-0457

*Counsel for the Plaintiffs*