ORIGINAL

FILED
HARRISBURG, PA

AUG 1 9 2002

MARY E. D'ANDREA, CLERK
Per _____
            Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREENE/GUILFORD ENVIRONMENTAL ASSOCIATION, a non-profit Corporation incorporated under the laws of the Commonwealth of Pennsylvania, CITIZENS FOR PLANNED COMMUNITY GROWTH, an unincorporated association organized under the laws of the Commonwealth of Pennsylvania, PAUL B. AMBROSE, JOHN G. ENDERS, CHARLES F. RAHAUSER, BETSY RAHAUSER, DOUGLAS A. WARNOCK, U.X. VAGNERINI, THOMAS W. BUNDY, STEPHEN P. BUCHER, ROGER J. ROBERTSON, JAMES A. STRITE, JR., DAVID A. GUTHRIE,  Plaintiffs, | : : : : : : : : : : : : : : : : : : : : : | CIVIL ACTION NO. 1:CV-01-0910 (Judge ~~Rambo~~) Connor |
| v. | : : | |
| KEN WYKLE, Administrator, Federal Highway Administration, ROBERT GATZ, Federal Highway Administration,  Defendants, | : : : : : | |
| and | : : | |
| BRADLEY L. MALLORY, Secretary for the Department of Transportation, Commonwealth of Pennsylvania,  Intervenor | : : : : | |

**FEDERAL DEFENDANTS' AND INTERVENOR'S JOINT REPLY TO PLAINTIFFS'**
**ANSWER IN OPPOSITION TO JOINT MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.    DEFENDANTS DID NOT IMPROPERLY SEGMENT THE EXTENSION OF
      NORLAND AVENUE FROM THE I-81 INTERCHANGE PROJECT.1

II.   ALTHOUGH NOT REQUIRED UNDER NEPA, DEFENDANTS DISCUSSED
      THE CUMULATIVE IMPACTS OF THE EXTENSION OF NORLAND
      AVENUE........................................6

III.  DEFENDANTS DID NOT IMPROPERLY SEGMENT UPGRADES TO
      LOCAL ROADS FROM THE I-81 INTERCHANGE PROJECT....9

IV.   A SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT (SEIS)
      IS NOT REQUIRED FOR THIS PROJECT................13

      A.    Alternative D Modified does not result in any
            significant social, environmental, or cultural
            impacts that were not discussed in the FEIS for
            the project..............................14

      B.    The Guilford Township Zoning Ordinance does not
            require an SEIS...........................16

      C.    The increase development at Chambers 5 has no
            impact on the traffic analysis performed for
            Wayne Avenue.............................16

      D.    Defendants properly applied the secondary and
            cumulative impact study area set forth in the
            FEIS for D Modified......................18

      E.    There are no significant new farmland impacts
            that would require the development of a
            SEIS.....................................19

V.    THE "AREA OF POTENTIAL EFFECT" WAS PROPERLY IDENTIFIED
      FOR PURPOSES OF COMPLYING WITH THE NATIONAL HISTORIC
      PRESERVATION ACT (NHPA).......................21

# TABLE OF AUTHORITIES

## CASES

Baltimore Gas & Electric Co. v. Natural Res. Def. Council, 462 U.S. 87, 97-98 (1983)..........................13,16

Clairton Sportsmens Club v. Pennsylvania Turnpike Comm'n, 882 F. Supp. 455, 471 (W.D. Pa. 1995)............1,2,8

Colorado River Indian Tribes v. Marsh, 605 F. Supp. 1425 (Cal. 1985)....................................23-24

Coalition on Sensible Transp. Inc. v. Dole, 642 F. Supp. 573, 591 (D.D.C. 1986)..........................1,3,8

Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transportation Board, 252 F.3d 246, 253 (3d Cir. 2001)................................................7

Friends of the Earth v. U.S. Army Corps of Eng'rs, 109 F. Supp.2d 30, 41-42(D.D.C. 2000).......................8

Hughes River Watershed Conservancy v. Dep't of Agric., 165 F.3d 283, 288 (4th Cir. 1999).......................10

Life of the Land v. Brinegar, 485 F.2d 460, 472-73 (9th Cir. 1973), cert. denied, 416 U.S. 961 (1974).......10

Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 377-78 (1989)................................................9,20

Muckleshoot Indian Tribe v. U.S. Forest Service 177 F.3d 800 (9th Cir. 1999) ...................................8

National Res. Def. Council, Inc. v. Hodel, 865 F.2d 288 (D.C. Cir. 1988)....................................8

Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 439 (5th Cir. 1981)..........................1,2,3

Price Rd. Neighborhood Ass'n, Inc. v. United States Dep't of Transp., 113 F. 3d 1505, 1511, fn. 1 (9th Cir. 1997)...............................................10

Oregon Envtl. Council v. Kunzman, 817 F.2d 484, 496 (9th Cir. 1987)........................................9-10

Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989)..........................................13

Save Barton Creek Ass'n v. Federal Highway Admin., 950 F.2d 1129, 1142 (5th Cir. 1992) ..........................2

Society Hill Towers Owners Ass'n v. Rendell, 210 F.3d 168, 180-81 (3d. Cir. 2000)..............................6,8

Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294, 289 (D.C. Cir. 1987)..................................2,3

Thomas v. Peterson, 753 F.2d 754, 760 (9th Cir. 1985) .7

Town of Huntington v. Marsh, 859 F.2d 1134, 1142-43 (2d Cir. 1988)..........................................7

Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 553 (1973)..............16

## STATUTES AND REGULATIONS

42 U.S. §4321.........................................15

42 U.S. §4332.........................................15

23 C.F.R. §771.129(c)................................18

23 C.F.R. §771.130(a)...............................13

40 C.F.R. §1500.1(c)................................15

# I.  DEFENDANTS DID NOT IMPROPERLY SEGMENT THE EXTENSION OF NORLAND AVENUE FROM THE I-81 INTERCHANGE PROJECT.[1]

Plaintiffs claim that the extension of Norland Avenue was improperly segmented from the I-81 Interchange project ("Project"). In determining the proper scope of a project which requires an environmental impact statement under the National Environmental Policy Act (NEPA), the project must have independent utility, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements are made. 23 C.F.R. §771.111(f); Clairton Sportsmens Club v. Pennsylvania Turnpike Comm'n, 882 F. Supp. 455, 471 (W.D. Pa. 1995); Coalition on Sensible Transp. Inc. v. Dole, 642 F. Supp. 573, 591 (D.D.C. 1986); Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 439 (5th Cir. 1981). This Project was studied with and without the construction of the separate Norland Avenue project. It is not dependent upon nor does it

---

[1] Presently, a motion to strike Plaintiffs' Answer in Opposition to Joint Motion for Summary Judgment (opposition brief) and Plaintiffs' brief in support of their Motion for Summary Judgment (summary judgment brief) for violating this Court's orders and local rules 5.1 and 7.8. The filing of this Reply Brief should not be viewed as a waiver of that motion to strike. Moreover, due to the limitation on the length of this Reply Brief, this Brief does not address the issues that were incorporated by reference in plaintiffs' opposition brief in violation of local rule 7.8. The issues incorporated by reference are set forth in plaintiffs' summary judgment brief. Defendants and intervenor will address those issues in their brief in opposition to plaintiffs' motion for summary judgment if defendants' motion to strike is not granted. We apologize to the Court for any inconvenience.

1

require construction of the Norland Avenue project.  The Project

satisfies the identified needs independent of any other project

and has "independent utility".

A project has independent utility when it satisfies

transportation needs or corrects transportation problems and

does not depend on another project for its justification.  Save

Barton Creek Ass'n v. Federal Highway Admin., 950 F.2d 1129,

1142 (5th Cir. 1992); Taxpayers Watchdog, Inc. v. Stanley, 819

F.2d 294, 289 (D.C. Cir. 1987); Piedmont Heights, 637 F.2d at

433; Clairton Sportsmens Club, 882 F. Supp. at 474-75.  In Save

Barton Creek, 950 F.2d at 1142, the appeal involved one segment

(segment 3) of an 82-mile circumferential freeway around Austin,

Texas, that had been divided into five segments for planning and

construction.  The court found the segment to have independent

utility, stating:

> It increases the utility of the existing roadway network by
> providing effective access between two major radial
> highways.  Segment 3 also will serve local needs.  It will
> provide improved access to business and residential
> developments and to community and recreational features
> which will be assessable by intersecting roads.
> Furthermore, it will relieve traffic on arterial and city
> streets.

Id.

See also, Clairton Sportsmens Club, 882 F. Supp. at 474-75,

(the I-70 to Route 51 project (one of five projects) had

independent utility because it met the needs identified by the

agencies and does not depend on a larger action for its
justification); Piedmont Heights, 637 F.2d at 433 (three
segments of highway improvements within Atlanta had independent
utility); Taxpayers Watchdog, 819 F.2d at 289 (first leg (MOS-1)
of a subway system had independent utility); Coalition on
Sensible Transp., 642 F. Supp. at 592 (four (4) projects: MD
124, an intersection improvement; MD 189, an intersection
improvement; I-370, Y-split to access I-270; and I-270, widening
of a section of roadway - each had "independent utility").

The present Project has independent utility because it
offers a solution to various transportation problems identified
in the study area.  Defendants identified the following needs
for the Project:

> (1)  complying with the Congressionally-legislated
> demonstration project to provide access to
> Chambersburg and to relieve congestion on an existing
> interchange (Public Law 100-17);
>
> (2)  accommodating existing and future traffic volumes;
>
> (3)  adhering to comprehensive plans of area
> municipalities; and
>
> (4)  providing for existing and proposed development in the
> study area.

(AR-46 at I-1.)  The traffic analysis identified concerns
regarding congestion at the Route 30 interchange of I-81.  The
traffic analysis of present (1995) conditions revealed the
following:

Detailed observations indicate long platoons of vehicles waiting at the three traffic signals within the interchange complex.  These signals are as follows:

- U.S. Route 30 and Walker Road;
- U.S. Route 30 and the Northbound On-Off Ramps to I-81; and
- U.S. Route 30 and the Southbound On-Off Ramps to I-81.

On roadways where traffic signals are spaced closely together, traffic flow is controlled by the roadway link or intersection that has the least capacity or ability to accommodate its traffic demands, much like the neck of a bottle controls the rate a liquid flows from the bottle. As a result, some intersections and intersection approaches in the area influenced by the bottleneck will either be blocked by the traffic backing up from the bottleneck or be relatively delay-free because traffic is metered by the bottleneck.

The detailed observations revealed that there are two components of the roadway network that form the bottleneck – the intersection of U.S. Route 30/Walker Road/Stouffer Avenue and the 232 meter (760 foot) section of U.S. Route 30 between the Walker Road/Stouffer Avenue intersection and the I-81 southbound ramp intersection.  Vehicles leaving the southbound off-ramp of I-81, entering U.S. Route 30, and attempting to turn left onto Stouffer Avenue must cross through traffic on U.S. Route 30.  In the other direction, vehicles turning right from Stouffer Road onto U.S. Route 30 and attempting to turn left to enter northbound I-81 must also cross through traffic on U.S. Route 30.  In fact, during a typical weekday, these two movements cause congestion such that U.S. Route 30 between Walker Road and southbound I-81 ramp intersection operates at Level of Service [LOS] E or F between 6:00 A.M. and 8:00 P.M., a total of 14 hours.[2]

---

[2]  Plaintiffs claim that the Route 30 interchange is not congested because the LOS on the ramps appear to be at an acceptable LOS.  "The discrepancy at the interchange ramps between the traffic model results (which indicates acceptable LOS) and actual conditions (congestion) is due to the fact that conventional LOS methodology analyzes intersections in isolation and does not account for the influence of adjacent intersection congestion.  Put differently, traffic volumes move so slowly through the interchange ramp intersections as a result of the

(AR-46 at III-83.)  By 2016, the traffic at the I-81 interchange with U.S. Route 30, where congestion currently affects operation for 14 hours a day, traffic congestion under the No-Build alternative will increase by as much as 141%.  (AR-46 at IV-89.)

As indicated in the Final Environmental Impact Statement (FEIS), an interchange at Walker Road, will improve the level of service of the critical intersection (Route 30/Walker Road/Stouffer Avenue), which controls the level of congestion through the interchange area.  (AR-46 at III-83; IV-85-89.) Constructing an interchange at Walker Road will improve the volume-to-capacity ration of this critical intersection by an additional 22% resulting in a change from LOS E to LOS C during the A.M. peak hour(assuming Route 30 improvements are completed) and from LOS F to LOS E during the P.M. peak hour.[3]    (AR-46 at IV-85, 87-88.)

---

poor operation at the adjacent U.S. Route 30 and Walker Road/Stouffer Avenue intersection, that the traffic counted as being processed by the interchange ramp intersections is artificially lowered.  Under these conditions, traffic processed by the upstream intersection is not only a function of its own traffic signal, but also the ability of the next downstream intersection to dissipate a queue, and these conditions are not accurately portrayed by the Highway Capacity Software techniques."  (AR-83 at 9; Exhibit "B", Declaration of Jeff Greene at ¶7.)

[3]  Plaintiffs erroneously claim that the Project would not be needed but for the Extension of Norland Avenue.  With just the extension of Norland Avenue, the critical Walker Road/Stouffer Avenue/Route 30 intersection will be LOS E during the A.M. peak

Based upon the above discussion, an alternative at Walker Road satisfies needs unique to this project, and therefore, has independent utility .

## II.   ALTHOUGH NOT REQUIRED UNDER NEPA, DEFENDANTS DISCUSSED THE CUMULATIVE IMPACTS OF THE EXTENSION OF NORLAND AVENUE.

Plaintiffs claim that cumulative impacts of the extension of Norland Avenue[4] should have been discussed in the NEPA documents for the Project.  This argument is without merit for several reasons.  First, the Third Circuit has applied the same test used for segmentation when deciding the issue of cumulative impacts under NEPA.  Society Hill Towers Owners Ass'n v. Rendell, 210 F.3d 168, 180-82 (3d. Cir. 2000)  If the Project has "independent utility", the cumulative impacts of Norland Avenue extended do not have to be discussed in the NEPA document for the Project.  Id.  As demonstrated above, the I-81 Interchange project has independent utility.  Second, the record demonstrates that defendants did discuss the cumulative impacts of the extension of Norland Avenue.  The FEIS considered the

---

hour and LOS F during the P.M. peak hour (with improvements to Route 30).  (AR-46 at 87-88.)  The Norland Avenue project offers no improvement to the critical Walker Road/Stouffer Avenue/Route 30 intersection.  (AR-46 at 87-88.)  However, an interchange at Walker Road will significantly improve this critical intersection which will in turn improve the congestion on the I-81/Route 30 interchange ramps.

[4]  Norland Avenue is a local road, serves a different purpose from the Project, is independent of the Project, and will have its own environmental studies.

traffic and development impacts of the interchange project with
and without the extension of Norland Avenue.[5]   (SMF 81-92.)

Finally, the cases cited by plaintiffs in support of this
cumulative impact analysis are not on point with the facts here.
Town of Huntington v. Marsh, 859 F.2d 1134, 1142-43 (2d Cir.
1988)(court found that when the ACOE designates a site to
dispose of dredge material, the EIS must discuss the types and
quantities of sediments that that may be dumped at the site
because the ACOE knows of three projects that will use the
site); Thomas v. Peterson, 753 F.2d 754, 760 (9th Cir.
1985)(court found that because the location, timing, and

---

[5]  Plaintiffs claim that the environmental impacts of the
Extension of Norland Avenue should have been discussed in the
FEIS.  They state two reasons in support of this argument.
First, there is now federal funding for the extension of Norland
Avenue.  Federal funding was not issued for this project until
well after the issuance of the Record of Decision (ROD) of the
Project.  Second, they state that the FEIS failed to identify
that the extension of Norland Avenue would go through the
Eastern Greene Township Rural Historic District.  Plaintiffs are
attempting to mislead the Court.  First, as previously stated,
Norland Avenue is a separate independent project.  Second,
during the course of the project's development, the boundaries
of the Eastern Greene Township Rural Historic District were
changed by the Keeper of the National Register.  (AR-107 at
828.)  The Keeper of the National Register is charged with
identifying resources eligible for the National Register – no
other agency trumps the Keeper on the determination of
eligibility.  Friends of the Atglen-Susquehanna Trail, Inc. v.
Surface Transportation Board, 252 F.3d 246, 253 (3d Cir. 2001).
This boundary change removed the Eastern Greene Township Rural
Historic District within the Borough of Chambersburg from
eligibility in the National Register.  (AR-107 at 828.)
Therefore, no historic resources would be impacted by the
extension of Norland Avenue.

decision to sell timber affects the location, routing,
construction techniques, and other aspects of the road, the
cumulative impacts of the timber sales should be discussed);
Muckleshoot Indian Tribe v. U.S. Forest Service 177 F.3d 800 (9th
Cir. 1999)(involved several logging projects); National Res.
Def. Council, Inc. v. Hodel, 865 F.2d 288 (D.C. Cir.
1988)(involved impacts to migratory species of endangered marine
mammals and costal birds and the cumulative impacts of all state
and federal oil and gas leasing on these animals); Friends of
the Earth v. U.S. Army Corps of Eng'rs, 109 F. Supp.2d 30, 41-
42(D.D.C. 2000)(involved cumulative impacts of floating casinos
on the Mississippi River and its coastline).  None of these
cases present circumstances similar to the present case.

Moreover, plaintiffs failed to distinguish the cases cited
by defendants that are on point:  Coalition on Sensible Transp.
v. Dole, 826 F.2d 60, 71 (D.C. Cir. 1987)(court held cumulative
impact analysis for I-270 project was adequate under NEPA where
environmental assessment for the project mentioned the four
separate interchange projects) and Society Hill, 210 F.3d at 182
(court held that environmental assessment to construct a
hotel/parking garage was not required to discuss the cumulative
impacts of a proposed entertainment complex because each project
had independent utility).  See also, Clairton Sportsmen's Club,
882 F. Supp. at 470-72.

8

The administrative record and the relevant case law clearly shows that defendants properly discussed the cumulative impacts of the extension of Norland Avenue.

## III. DEFENDANTS DID NOT IMPROPERLY SEGMENT UPGRADES TO LOCAL ROADS FROM THE I-81 INTERCHANGE PROJECT.

Plaintiffs claim that defendants improperly segmented upgrades to local roads from the Project. This conclusory statement is not supported by the record. First, upgrades to Walker Road are an integral part of the Project. A portion of Walker Road will be relocated and the existing Walker Road/I-81 overpass will be removed and replaced with a structure that meets current design criteria. (SMF 80.) Relocated Walker Road will be the main connector road for the new interchange. (AR-80 at 5.) Moreover, a section of Walker Road will be resurfaced from the Route 30 intersection to Relocated Walker Road. (AR-83 at 1.)

Second, the condition of local roads was considered in the FEIS.[6] (AR-46 at III-64-66.) Plaintiffs admit that the FEIS and

---

[6] Plaintiffs cite to several engineering reports conducted on behalf of Greene Township to support its arguments regarding the condition of the local roads and the predicted traffic on the local roads. (Plaintiffs' Answer in Opposition at 11-12, 14.) These reports are part of the administrative record for the project and have been considered and addressed by defendants' traffic engineers. (AR-18; AR-47 at 48-62; AR-79; AR-110 at 123.) Moreover, when confronted with technical issues under NEPA, it is well-settled that the court's role is not to resolve conflicts among experts. Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 377-78 (1989); Oregon Envtl. Council v.

its supporting technical studies did examine the effect of the

project on local roads.[7] (Plaintiffs' Answer to Agencies' Joint

Statement of Undisputed Material Facts[8] at 69, 70.) For the

Walker Road alternatives, plaintiffs admit that, in 1995,

defendants analyzed the no build and build scenarios in terms of

traffic volumes and midblock LOS on the following local roads:

Franklin Farm Lane, Mower Road, Ragged Edge Road, Walker Road,

---

Kunzman, 817 F.2d 484, 496 (9th Cir. 1987); Life of the Land v.
Brinegar, 485 F.2d 460, 472-73 (9th Cir. 1973), cert. denied,
416 U.S. 961 (1974); Price Rd. Neighborhood Ass'n, Inc. v.
United States Dep't of Transp., 113 F. 3d 1505, 1511, fn. 1 (9th
Cir. 1997). In reviewing an EIS, the court should give latitude
to the agency to rely on its own experts. Hughes River
Watershed Conservancy v. Dep't of Agric., 165 F.3d 283, 288 (4th
Cir. 1999).

[7] Plaintiffs note that these studies were conducted in 1995 and
question why the local roads were not studied in the 1998
traffic analysis. In 1998, supplemental traffic studies were
performed for D Modified. (AR-72 at 1.) The 1998 studies
analyzed the immediate interchange area and the next
intersection beyond the interchange area (Relocated Walker
Road/Franklin Farm Lane). (AR-72 at 37.) The 1998 traffic
studies did not analyze the local roads beyond these
intersections because D Modified has the same connectivity to
the local road network. (AR-72 at 36-37; AR-46 at 95.) D
Modified performs the same functions and involves the same
travel times as the other Walker Road alternatives for purposes
of traffic analysis. (Exhibit B, Declaration of Jeff Greene at
¶4.) Therefore, the traffic on Relocated Walker Road, Franklin
Farm Lane, Kohler Road, and Norland Avenue is the same as the
other Walker Road alternatives as represented in the FEIS (which
is based on the 1995 traffic studies). (AR-72 at 36-37; AR-46
at App. B at 95-96.)

[8] Plaintiffs' Answer to Agencies Joint Statement of Undisputed
Material Facts will be referred to as "Plaintiffs' Answer to
SMF".

Sixth Street, Fifth Avenue, Kohler Road, Woodstock Road,
Scotland Road, Edgar Avenue, Brindle Road, Hafer Road and
Norland Avenue.  (Plaintiffs' Answer to SMF 69.)  Plaintiffs
also admit that, in 1995, defendants analyzed the traffic
volume, LOS, and volume to capacity ratios during peak morning
and evening hours at the following intersections which involved
local roads:  Kohler/Walker Road; Franklin Farm Lane/Walker
Road; Mower/Walker Road; Ragged Edge/Brindle Road; Brindle/Hafer
Road and Woodstock/Ragged Edge Road; Route 30/ Ragged Edge Road;
Route 30/Mower Road; Route 30/ Franklin Farm Lane; Scotland
Avenue and Woodstock/Roland Road; Scotland Road/Norland Avenue;
Route 30/Fifth Avenue; Route 30/Sixth Avenue; and Route
30/Walker Road/Stouffer Avenue.  (Plaintiffs' Answer to SMF 70,
74.)

The results of the traffic analysis revealed that traffic
will increase on local roadways with or without an interchange
at Walker Road, due to existing and planned development.  (SMF
75.)  Moreover, Plaintiffs admit that traffic will increase on
local roadways with or without an interchange at Walker Road.
(Plaintiffs' Answer to SMF 75.)  Plaintiffs admit that traffic
will increase in northern Chambersburg and western Greene
Township with or without construction of the Walker Road
interchange.  (Plaintiffs' Answer to SMF 76.)  Plaintiffs admit
that traffic along Walker Road is expected to increase by as

much as four-fold, and traffic along Norland Avenue is expected
to double between 1995 and 2016 for No-Build conditions.
(Plaintiffs' Answer to SMF 77.)  With the Walker Road
interchange, increases in traffic can be expected on some local
roadways; however, when compared to the increases expected on
some local roads due to the identified developments, the
increases due to the interchange are not as significant (e.g.,
only 6.9% increase of average daily traffic on Walker Road east
of Franklin Farm Lane considering only the Walker Road
interchange construction compared to the No-Build alternative).
(SMF 78.)  The average daily traffic on other local roads
remains substantially the same with or without the intersection,
namely Franklin Farm Lane, Mower Road, Ragged Edge Road, Norland
Avenue west of Scotland Road and Scotland Road South of Norland
Avenue.  (SMF 79.)  Therefore, because there is a significant
increase in traffic on the local roads without the construction
of a new interchange, the need for improvements to local roads
is necessary even if the interchange is not built.[9]  The need for
improvements to local roads is independent of the interchange

---

[9]  In their answer in opposition, plaintiffs list a number of
comments made during the project's development process regarding
the adequacy of local roads and whether the project would
require upgrades to these local roads.  (Plaintiffs' Answer in
Opposition at 7-12.)  These issues were considered, addressed,
and responded to through the traffic analysis conducted for the
project.  (AR-37; AR-46, App. B at 66, 91-96.)

project.  Improvements to local roads has "independent utility"
under NEPA and is not required to be addressed by this project.

NEPA requires defendants to take a "hard look" at the
environmental consequences of the I-81 Interchange project.
Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350
(1989).  The record demonstrates that defendants have done so,
thereby satisfying the requirements of NEPA.

**IV.  A SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT (SEIS) IS NOT
REQUIRED FOR THIS PROJECT.**

All that is required under NEPA is the identification,
disclosure, and consideration of environmental impacts.
Baltimore Gas & Electric Co. v. Natural Res. Def. Council, 462
U.S. 87, 97-98 (1983).  A SEIS is only required if:

> (1) Changes to the proposed action result in significant
> environmental impacts that were not evaluated in the EIS;
> or
>
> (2)  New information or circumstances relevant to
> environmental concerns and bearing on the proposed action
> or its impacts would result in significant environmental
> impacts not evaluated in the EIS.

23 C.F.R. §771.130(a).  Plaintiffs claim that the following
factors necessitate a SEIS:  (1)  development of D Modified
after the FEIS was circulated; (2)  alleged failure to consider
the impact of Guilford Township's new zoning ordinance; (3)
alleged greater development in the Chambers-5 Business Park; (4)
an alleged change in the secondary and cumulative impact area as

a result of the development of D Modified; and (5) farmland
impacts.

**A.    Alternative D Modified does not result in any
significant social, environmental, or cultural impacts
that were not discussed in the FEIS for the project.**

Alternative D was modified to avoid taking land from a
historic property.  (SMF 17.)  On June 4, 1998, a public meeting
was held to announce the development of D Modified and the
status of the environmental studies.  (SMF 22.)  Comments were
solicited from the Municipal Coordination Committee (MCC) and
the public and responses are contained in the administrative
record.  (SMF 21.)

NEPA is concerned with the identification, consideration,
and disclosure of significant impacts caused by a major federal
project.  Alternative D Modified is in the same general location
of Alternative C.  (AR-46 at ES-14; III-39; III-26.)  Therefore,
D Modified did not result in any significant social, cultural,
or environmental impacts that were not discussed in the FEIS.
(SMF 98.)  Moreover, the 1998 traffic analysis indicated that,
from a traffic standpoint, the operations of D Modified are
comparable to those under Alternative D-C.  (AR-80 at 19.)

Plaintiffs attempt to make an issue out of the increase in
cost.  Comparing the cost contained in the FEIS to final design
costs (6 years later) is like comparing apples to oranges.  The

overpass would most likely be replaced for all alternatives,

which is a substantial portion of this increase.

Moreover, the purpose of NEPA is:

To declare a national policy which will encourage
productive and enjoyable harmony between man and his
environment; to promote efforts which will prevent or
eliminate damage to the environment and biosphere and
stimulate the health and welfare or man; to enrich the
understanding of the ecological systems and natural
resources important to the Nation. . . .

42 U.S. §4321.  NEPA also requires that the EIS contain:

(i)  the environmental impact of the proposed action,

(ii)  any adverse environmental effects which cannot be
avoided should the proposal be implemented,

(iii)  alternative to the proposed alternative,

(iv)  the relationship between local short-term uses of
man's environment and the maintenance and enhancement of
long-term productivity, and

(v)  any irreversible and irretrievable commitments of
resources which would be involved in the proposed action
should be implemented.

42 U.S. §4332.  The regulations promulgated by the Council of

Environmental Quality further provide:

The NEPA process is intended to help public officials make
decisions that are based on understanding of environmental
consequences, and take actions that protect restore, and
enhance the environment.

40 C.F.R. §1500.1(c).  The United States Supreme Court has held

that NEPA "places upon an agency the obligation to consider

every significant aspect of the environmental impact of the

proposed action" and that the agency take a "hard look" at the

environmental impacts of the project during its decision making process.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1973); *Baltimore Gas*, 462 U.S. at 97.  Evaluation of the cost of the project does not fall within the purview of NEPA.

**B.    The Guilford Township Zoning Ordinance does not require an SEIS.**

Plaintiffs claim that a SEIS is necessary because Guilford Township has adopted a zoning ordinance since the FEIS was circulated for public comment.  The 1999 Re-evaluation of the FEIS considered the Guilford Township Zoning Ordinance and found that zoning ordinance will not affect the planned land uses within the study area which were described in the FEIS.  (AR-80 at 8-9; AR-46, App. B Development Activity Table.)  Moreover, the potential development analysis was updated in 2000.  (AR-156 at 37.)  Again, the 2000 update revealed that potential development in Guilford Township was consistent with what was reported in the FEIS.  The Guilford Township zoning ordinance did not result in a significant new impact compared to what was reported in the FEIS, therefore, a SEIS is not required under NEPA.

**C.    The increase development at Chambers 5 has no impact on the traffic analysis performed for Wayne Avenue.**

In 2000, PennDOT reanalyzed the traffic in the Wayne Avenue area to validate traffic projections generated in the 1995

(FEIS) traffic studies.  The 2000 traffic analysis considered the additional development in Chambers 5 in addition to other proposed development in Guilford Township.  (Exhibit "B", Declaration of Jeff Greene at ¶6.)  PennDOT took additional traffic counts along Wayne Avenue just west of I-81, between Stouffer Avenue and I-81.  (AR-83 at 8.)  A comparison of the actual 2000 counts with the 1995 traffic analysis reveals a lower actual traffic growth rate of .4% per year (compared to 2.8% per year) for the Wayne Avenue area.[10]  (AR-83 at 8.)  The lower growth in traffic in the Wayne Avenue area relates to the type of development that has been occurring in the Chambers 5 Industrial Park (distribution warehouses verses manufacturing complexes) and the smaller development areas surrounding it. (AR-83 at 8.)  Therefore, the conclusion contained in the 1995 traffic studies remains valid with regard to Wayne Avenue – existing congestion along Wayne Avenue in the vicinity of the I-81 interchange will be improved to acceptable levels of service through programmed improvements which have since been completed.

---

[10]  Plaintiffs attempt to discredit the 2000 traffic analysis by claiming that only traffic counts were taken and that the entire traffic model should have been re-run.  The first step to reanalyzing traffic data is collection, i.e., traffic counts. If the growth rate resulting from the counts is equal to or lower, the results of the model run in 1995 are confirmed.  In other words, if the traffic counts are less or comparable, re-running the model would result in the same conclusions with regard to the Wayne Avenue interchange.  (Exhibit "B", Declaration of Jeff Greene at ¶5.)

(AR-37 at vi, 47.)   The 2000 traffic analysis confirms that a

SEIS is not necessary.[11]

    **D.    Defendants properly applied the secondary and
           cumulative impact study area set forth in the FEIS for
           D Modified.**

    Plaintiffs claim that because D Modified is located 1400

feet south of Alternative D, the secondary and cumulative impact

study area should have been moved.   Plaintiffs are wrong.   The

secondary and cumulative impact study area included all of the

Walker Road alternatives.   (AR-46 at V-1.)   Alternative D

Modified is in the same general location as Alternative C.   (AR-

46 at ES-14; III-39; III-26.)   Therefore, the secondary and

cumulative impact study area set forth in the FEIS is applicable

to D Modified.   Moreover, defendants did analyze secondary and

cumulative impacts for D Modified in the 1999 re-evaluation of

the FEIS.   (AR-80 at 20-21.)

    In making this argument, plaintiffs claim that the Gass

House and Franklin County Poor house should have been evaluated

in the cumulative impact analysis.[12]   The studies conducted for

---

[11]   The results of the 2000 traffic analysis were documented in
the 2001 Re-evaluation of the ROD.   Plaintiffs erroneously claim
that there is no regulatory authority for a NEPA document of
this type, and therefore, the information and data contained in
this document should not be considered by the Court.   Regulatory
authority for a re-evaluation of a ROD is located at 23 C.F.R.
§771.129(c).

[12]   Plaintiffs erroneously state that the Keeper was never
consulted during the course of this Project regarding the

the Project show that these properties would not be impacted by

the Project.  (See the discussion in Section V of this brief.)

This confirms that the secondary and cumulative impact area used

in the FEIS was properly used for D Modified.

**E.    There are no significant new farmland impacts that
would require the development of a SEIS.**

Plaintiffs erroneously claim that there has been a

significant change in the impacts to productive agricultural

land for the Project which requires a SEIS.  Whether or not

PennDOT had to go to ALCAB prior to condemning productive

agricultural land is not relevant to whether or not a SEIS is

required under NEPA.[13]  The only question that is relevant under

NEPA and its regulations with regard to productive agricultural

impacts is whether there has been a **significant change** in the

---

identification of historic resources located along Franklin Farm
Lane.  (Plaintiffs' Answer to SMF 164.)  Plaintiffs also
erroneously state that "Franklin Farms" is a potentially
eligible historic resource that may be impacted by the project.
The only portions of Franklin Farms that are eligible for the
National Register are the Gass House and the Franklin Poor
House.  The northern portion of the area known as "Franklin
Farms" was included within the boundaries of the Greene
Township-Conococheague Rural Historic District, which was
submitted to the Keeper of the National Register for
determination of eligibility during the course of this project.
(AR-63 at Drawings 1-3.)  Eventually, the Keeper determined that
the Greene Township-Conococheague Rural Historic District was
not eligible for the National Register, but that portions of
this district were eligible.  The Keeper did not include
Franklin Farms in the areas determined to be eligible for the
National Register.  (AR-104 at 4.)

[13]  ALCAB approved the use of productive agricultural lands for
the present project.  (AR-138 at 222-269).)

impacts compared to what was presented in the FEIS for the Project. <u>Marsh</u>, 490 U.S. at 372-73. The rulings by the Pennsylvania Commonwealth and Supreme Courts, that approval must be obtained from ALCAB prior to condemning productive agricultural lands for the Project, was not a new impact to productive agricultural lands. This approval is simply a procedural hurtle that PennDOT must overcome prior to condemning productive agricultural land.

Plaintiffs allege that a SEIS is required because the ROD only identified an impact to one Agricultural Security Area (ASA) when D Modified actually impacted two ASAs. (SMF 121.) This is not a change in impacts because the ROD did consider the additional 1.8 acre ASA as an impact to productive agricultural land. (SMF 122.)

Finally, Plaintiffs claim that the impacts to productive agricultural land have increased because PennDOT purchased twenty-two (22) acres from the Whites[14] when the 1999 Re-evaluation only showed an impact of 6.5 acres from the White parcel (4.7 acres directly impacted and 1.8 acres indirectly impacted by the Project). (AR-80 at 22.) Plaintiffs are attempting to mislead the Court. The project still only requires the use of 6.5 acres from the White parcel. See

---

[14]  Thomas Linzey was one of the attorneys for the Whites in the amicable sale of their property to PennDOT.

20

Exhibit "A", deed transferring White property to PennDOT compare to figure in 1999 Reevaluation at AR-80 at 7. The deed recorded following the purchase of the White parcel contains a covenant that provides the following use restrictions:

> THE LANDS REMAINING AFTER THE HIGHWAY PROJECT IS CONSTRUCTED SHALL NOT BE USED FOR ANY PURPOSE OTHER THAN SAID TRANSPORTATION AND HIGHWAY PURPOSES AS EXCEPTED FROM THE BUILDING RESTRICTIONS IN PARAGRAPH 1 AS SET FORTH ABOVE, AGRICULTURAL PURPOSES TO THE MAXIMUM EXTENT POSSIBLE AND OPEN SPACE.

See Exhibit "A", deed transferring White property to PennDOT.

Based upon the above discussion, a SEIS is not required under NEPA.

**V.    THE "AREA OF POTENTIAL EFFECT" WAS PROPERLY IDENTIFIED FOR PURPOSES OF COMPLYING WITH THE NATIONAL HISTORIC PRESERVATION ACT (NHPA)**

Plaintiffs continue to ignore the results of the traffic and noise studies and continue to assert that the "area of potential effect" (APE) under the NHPA was improper. Specifically, plaintiffs claim that the Gass House and Franklin County Poor House should have been included in the APE for the Project. Both the Gass House and the Franklin County Poor House are located along Franklin Farm Lane near its intersection with Route 30. (SMF 200.) As documented in the FEIS and confirmed in the additional traffic analysis for the project, impacts along Franklin Farm Lane due to increased traffic, noise, and

development as a result of this project are non-existent or insignificant.  (SMF 205.)

With no technical support, plaintiffs erroneously claim that traffic will increase on Franklin Farm Lane due to the interchange.  (Plaintiffs' Answer to SMF 207-09.)  Plaintiffs continue to blindly ignore the results of this Project's studies.  The traffic analysis found that traffic volumes on Franklin Farm Lane will continue to increase without the proposed interchange.  (SMF 206.)  The volume of traffic using Franklin Farm Lane is anticipated to increase from 450 to 2,300 vehicles per day by year 2016 either with or without construction of the Walker road intersection.  (SMF 207, 209.) Accordingly, the Project does not change the traffic volumes near the Gass House and Franklin County Poor House.

By 2016, there will be an increase in noise along Franklin Farm Lane; however, as with the increase in traffic volumes, the increase in noise will be essentially the same with or without the proposed interchange.  (SMF 211.)  The FEIS and 1999 re-evaluation included results of noise monitoring for the Walker Road alternatives at receptor R-4 that is located on Franklin Farm Lane near the nursing home.  (SMF 212.)  The nursing home is adjacent to the Gass House and Franklin County Poor House. (SMF 212.)  Comparing the No Build alternative to D Modified, noise levels increase from 55.4 dBA to 55.8 dBA at this

receptor.  (SMF 213.)  Noise levels of 66 dBA approach noise
abatement criteria.  (SMF 214.)  These 2016 noise levels at
noise receptor R-4 are well below the noise abatement criteria.
(SMF 215.)  Moreover, the noise increase attributable to the
Project is only 0.4 dBA as a result.  (SMF 216.)  Since the
human ear cannot detect a change in noise levels of less than 3
dBA, this slight increase will be imperceptible.  (SMF 217.)

The area surrounding these historic resources is already
developed.  (SMF 218.)  Therefore, the only impact that
secondary development would have on these resources would be
with regard to traffic.  Future development was considered in
calculating the 2016 projected traffic.  (SMF 220.)

Finally, plaintiffs cite Colorado River Indian Tribes v.
Marsh, 605 F. Supp. 1425 (Cal. 1985), as support for their
contention that the "area of potential effect" (APE) was
improperly defined in accordance with the NHPA.  This case is
easily distinguishable from the present case.  In Colorado
River, a developer proposed to subdivide a parcel into
approximately 447 lots for single-family homes, mobile homes,
and commercial facilities.  Id. at 1428.  The development plan
calls for the stabilization of the bank along the Colorado River
with riprap, which requires a permit from the ACOE.  Id.  For
properties that may be eligible for the National Register, the
ACOE only evaluated the "permit area" which was only a small

section of the overall development plan.  Id. at 1436-37.  The

ACOE identified no historic properties in the permit area, and

therefore, concluded that it was not obligated to initiate the

consultation process.  Id.  The court held that the ACOE

violated the NHPA because it did not consider the effects to

potentially eligible properties in the area effected by the

entire development plan.  Id. at 1438.  In the present case, the

APE was identified as the area around each proposed alternative.

(AR-46 at III-18.)  Unlike Colorado River, the entire area where

potential effects could occur was considered part of the APE for

the Project; Pennsylvania Historic and Museum Commission (PHMC),

the State Historic Preservation Office (SHPO), and the Advisory

Council for Historic Preservation (ACHP) were consulted and

agreed with the APE[15]; and a Memorandum of Agreement was signed

by PHMC, ACHP, FHWA, and PennDOT.  (AR-82 at Attach. F; AR-110

at 187-192.)

_____

[15]  Plaintiffs admit that defendants and the agencies with
expertise over historic resources (PHMC and ACHP) received
comments from the public questioning whether the Project would
have an adverse effect on the Gass House and Franklin County
Poor House.  (Plaintiffs' Answer to SMF 189.)  Plaintiffs admit
that PHMC asked defendants to address concerns expressed by the
public regarding the Gass House and Franklin County Poor House.
(SMF 191.)  FHWA addressed these concerns by sending a letter to
Greene/Guilford Environmental Association and copying PHMC and
ACHP with the response.  (SMF 192.)  In addition, defendants
sent a letter to PHMC and copied ACHP addressing the allegations
of potential effects to these properties on January 8, 1999.
(SMF 193.)

Base on the above discussion, defendants fully complied with the NHPA.

Respectfully submitted,

THOMAS A. MARINO
United States Attorney

*Anne Fiorenza* AKMG

ANNE K. FIORENZA
Assistant United States Attorney
Federal Building - 2nd Floor
228 Walnut Street
P.O. Box 11754
Harrisburg, PA   17108-1754

*Kendra Jo Gardner*

KENDA JO M. GARDNER
Assistant Counsel
JOHN M. HRUBOVCAK
Assistant Counsel-in
Charge
ROBERT J. SHEA
Assistant Chief Counsel
ANDREW S. GORDON
Chief Counsel
Pennsylvania Department of
Transportation
Office of Chief Counsel
P.O. Box 8212
Harrisburg, PA   17105

Date:  August 19, 2002

## CERTIFICATE OF SERVICE

I, Kenda Jo M. Gardner, hereby certify that on this 12th day of August, 2002, I served a copy of the foregoing documents by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and placed said envelope and contents in the United States Mail at Harrisburg, Pennsylvania:

Thomas Alan Linzey, Esquire
Community Environmental Legal Defense Fund
2859 Scotland Road
Chambersburg, PA  17201

KENDA JO M. GARDNER
Assistant Counsel
Office of Chief Counsel
Pennsylvania Department of
    Transportation
Commonwealth of Pennsylvania
P.O. Box 8212
Harrisburg, PA  17105-8212
(717) 787-5299
Fax: (717) 772-2741