(102)
9-10-0[...]
sc

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREENE/GUILFORD ENVIRONMENTAL : 
ASSOCIATION, a non-profit :
Corporation incorporated under the :
laws of the Commonwealth of :
Pennsylvania, CITIZENS FOR PLANNED :
COMMUNITY GROWTH, an unincorporated :
association organized under the :
laws of the Commonwealth of : CIVIL ACTION NO.
Pennsylvania, PAUL B. AMBROSE, : 1:CV-01-0910
JOHN G. ENDERS, CHARLES F. :
RAHAUSER, BETSY RAHAUSER, DOUGLAS : (Judge Conner)
A. WARNOCK, U.X. VAGNERINI, THOMAS :
W. BUNDY, STEPHEN P. BUCHER, :
ROGER J. ROBERTSON, JAMES A. :
STRITE, JR., DAVID A. GUTHRIE, :
          Plaintiffs, :
  :
  v. :
  :
KEN WYKLE, Administrator, Federal :
Highway Administration, ROBERT :
GATZ, Federal Highway :
Administration, :
          Defendants, :
  :
  and :
  :
BRADLEY L. MALLORY, Secretary for :
the Department of Transportation, :
Commonwealth of Pennsylvania, :
          Intervenor :

FILED
HARRISBURG, PA

SEP 0 9 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

### FEDERAL DEFENDANTS' AND INTERVENOR'S JOINT RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.   COUNTER STATEMENT OF FACTS........................1

II.  COUNTER STATEMENT OF QUESTIONS INVOLVED..........1

III. ARGUMENT.........................................1

A.   Alternative D Modified satisfies the needs identified
     in Public Law 100-17 – to provide access to
     Chambersburg, Pennsylvania and to relieve congestion
     on an existing interchange.......................1

B.   Defendants were not required to examine new
     alternatives under the National Environmental Policy
     Act (NEPA) as a result of the amendment to the statute
     authorizing funding for the project. ...........10

C.   The studies for the I-81 Interchange project were
     completed with good faith objectivity – the project
     was not pre-determined. ........................14

D.   The local municipalities for the project have
     conflicting transportation components of their
     comprehensive plans.............................34

E.   The "area of potential effect" was properly identified
     for purposes of complying with the National Historic
     Preservation Act................................37

i

## TABLE OF AUTHORITIES

### CASES

Alaska Wilderness Recreation & Tourism v. Morrison, 67 F.3d
723, 730 (9th Cir. 1995). .....................12,13,14

AWARE v. Colorado Dep't of Transp., 153 F.3d 1122 (10th Cir.
1998).........................................29,31,32

Brooks v. Volpe, 350 F. Supp. 269 (W.D. Wash. 1972)..25

Cedar-Riverside Envtl. Def. Fund v. Hills, 422 F. Supp. 294
(D. Minn. 1976)...................................29

Citizens Against Burlington, 938 F.2d 190, 195 (D.C. Cir.
1991).............................................11

Citizens Committee Against Interstate Route 675 v. Lewis,
542 F.Supp. 496 (S.D. Ohio 1982).................33-34

City of Carmel-By-The-Sea v. Dep't of Transp., 95 F.3d 892,
903 (9th Cir. 1996). .........................8,12,13

Coalition Against Raised Expressway, Inc. v. Dole, 835 F.2d
803, 808 (11th Cir. 1988). ........................33

Davis v. Mineta, 2002 U.S. App. Lexis 12285 (10th Cir.
2002).........................................27,28

Druid Hills Civic Ass'n v. Fed. Highway Admin., 772 F.2d
700, 713 (11th Cir. 1985)......................11-12

Environmental Def. Fund v. Army Corps of Engineers, 470
F.2d 289, 295-96 (8th Cir. 1972), cert. denied 412 U.S. 931
(1973).............................................33

Fayetteville Area Chamber of Commerce v. Volpe, 515 F.2d
1021, 1026 (4th Cir. 1975). ........................33

Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d
517, 524 (9th Cir. 1994)........................11,12

Metcalf v. Daley, 214 F.3d 1135, 1143, 1145 (9th Cir.
2000).....................................25,26,27,28

Natural Res. Def. Council v. Callaway, 524 F.2d 79 (2[d] Cir. 1975)...........................................25

Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 436 (5th Cir. 1981)...........................12

Presidio Golf Course v. Nat'l Park Serv., 155 F.3d 1153, 1161 (9th Cir. 1998). ..........................33

Resources Ltd., Inc. v. Robertson, 35 F.3d 1300, 1307 (9th Cir. 1993)...................................12

Ross v. Fed. Highway Admin., 162 F.3d 1046 (10th Cir. 1998)...........................................1,11

State of S. Carolina v. O'Leary, 953 F. Supp. 699, 707 (D.S.C. 1996).....................................33

Wade v. Dole, 561 F. Supp. 913, 947-48 (N.D. Ill. 1983).............................................11,29,31

**STATUTES**

23 U.S.C. §112(b)(3)...................................18

42 U.S.C. §4332(D)....................................25

**REGULATIONS**

40 C.F.R. §1501.4(b)..................................27

40 C.F.R. §1503.1.....................................19

40 C.F.R. §1503.4.....................................19

40 C.F.R. §1506.1.....................................18

40 C.F.R. §1506.2(d)............................34,36,37

## I.    COUNTER STATEMENT OF FACTS

Defendants and Intervenor (hereinafter "Defendants") rely on the Statement of Facts contained on pages 3 through 7 of Defendants' and Intervenor's Brief in Support of Their Joint Motion for Summary Judgment (defendants' summary judgment brief).

## II.    COUNTER STATEMENT OF QUESTIONS INVOLVED

Defendants rely on the statement of questions involved on page 7 of defendants' summary judgment brief.

## III.    ARGUMENT[1]

A.    **Alternative D Modified satisfies the needs identified in Public Law 100-17 – to provide access to Chambersburg, Pennsylvania and to relieve congestion on an existing interchange.**

Plaintiffs erroneously claim that D Modified does not comply with the need identified in Public Law 100-17. Plaintiffs maintain that compliance with the needs set forth in Public Law 100-17 is necessary based on the project's classification as a demonstration project.[2]  Public Law 100-17

---

[1]  This Brief does not address the issues that were incorporated by reference from Plaintiffs' Answer in Opposition to Defendants' Motion for Summary Judgment.  These issues are addressed in Defendants' Reply to Plaintiffs' Answer in Opposition.

[2]  Plaintiffs cite <u>Ross v. Federal Highway Administration</u>, 162 F.3d 1046 (10th Cir. 1998) which is not applicable to plaintiffs' argument regarding project needs.  The issue in this case focused on an attempt by the state to de-federalize the project and whether the requirements contained in NEPA still needed to

authorizes a demonstration project in Franklin County, Pennsylvania that (1) provides access to Chambersburg, Pennsylvania and (2) relieves congestion on an exiting interchange of a North/South interstate route. Public Law 100-17 was included in the needs identified for the project. (AR-46 at I-1.) D Modified does satisfy these needs.

The administrative record demonstrates that the traffic analysis identified concerns regarding congestion at the I-81/Route 30 interchange. (SMF 28.) Presently, the Route 30 interchange carries the largest volume of traffic in the Chambersburg area. (SMF 46.)  The traffic analysis of present (1995) conditions revealed the following:

> Detailed observations indicate long platoons of vehicles waiting at the three traffic signals within the interchange complex.  These signals are as follows:
>
> - U.S. Route 30 and Walker Road;
> - U.S. Route 30 and the Northbound On-Off Ramps to I-81; and
> - U.S. Route 30 and the Southbound On-Off Ramps to I-81.
>
> On roadways where traffic signals are spaced closely together, traffic flow is controlled by the roadway link or intersection that has the least capacity or ability to accommodate its traffic demands, much like the neck of a bottle controls the rate a liquid flows from the bottle. As a result, some intersections and intersection approaches in the area influenced by the bottleneck will either be blocked by the traffic backing up from the bottleneck or be relatively delay-free because traffic is metered by the bottleneck.
>
> The detailed observations revealed that there are two

be satisfied.

components of the roadway network that form the bottleneck – the intersection of U.S. Route 30/Walker Road/Stouffer Avenue and the 232 meter (760 foot) section of U.S. Route 30 between the Walker Road/Stouffer Avenue intersection and the I-81 southbound ramp intersection. Vehicles leaving the southbound off-ramp of I-81, entering U.S. Route 30, and attempting to turn left onto Stouffer Avenue must cross through traffic on U.S. Route 30. In the other direction, vehicles turning right from Stouffer Road onto U.S. Route 30 and attempting to turn left to enter northbound I-81 must also cross through traffic on U.S. Route 30. In fact, during a typical weekday, these two movements cause congestion such that U.S. Route 30 between Walker Road and southbound I-81 ramp intersection operates at Level of Service [LOS] E or F between 6:00 A.M. and 8:00 P.M., a total of 14 hours.

(AR-46 at III-83.) By 2016, at the I-81/Route 30 interchange traffic congestion under the No-Build alternative at the I-81/Route 30 interchange will increase by as much as 141%. (AR-46 at IV-89.)

Analysis of current (1995) traffic volumes indicates that the of Route 30/Walker Road/Stouffer Avenue intersection operates at unacceptable levels of service[3] (LOS D, E, or F) for 10 hours per day (with LOS E or F during peak hours). (SMF 32.) The section of Route 30 between the Walker Road/Stouffer Avenue intersection and the I-81 ramps will by 2016 operate at unacceptable LOS for 16 hours of the day and at LOS E or F for

---

[3] Level of service (LOS) is a qualitative measure describing operational conditions. Six LOS are defined in letter designation, A to F, with LOS A representing the best operating conditions and LOS F the worst. LOS D through F are considered unacceptable in rural areas and LOS E through F are considered unacceptable in all areas. (SMF 29-31.)

14 hours of the day in the 2016 design year. (SMF 33.) This combination of unacceptable traffic operations causes congestion through the entire I-81/Route 30 interchange area, restricting the ability of traffic to smoothly progress through the interchange area, at times blocking the interchange ramps at Route 30. (SMF 34.)

The primary cause of congestion at this interchange is the volume of traffic traveling through the interchange on Route 30 and the weaving of traffic between the ramps and the Walker Road/Stouffer Avenue intersection. (SMF 36.) Furthermore, traffic analysis and field observations show that the poor operation of the Route 30/ Walker Road/Stouffer Avenue intersection severely impacts the operation of the I-81 interchange ramps at Route 30. (SMF 39.) Based on the analysis conducted for the traffic studies, congestion at the I-81/Route 30 interchange ramps could be reduced by improving the LOS of the Walker Road/Stouffer Avenue intersection with Route 30. (SMF 40.)

Plaintiffs claim that the I-81/Route 30 interchange is not congested because the LOS on the ramps appear to be at an acceptable LOS.

> The discrepancy at the interchange ramps between the traffic model results (which indicates acceptable LOS) and actual conditions (congestion) is due to the fact that conventional LOS methodology analyzes intersections in isolation and does not account for the influence of

adjacent intersection congestion.  Put differently, traffic
volumes move so slowly through the interchange ramp
intersections as a result of the poor operation at the
adjacent U.S. Route 30 and Walker Road/Stouffer Avenue
intersection, that the traffic counted as being processed
by the interchange ramp intersections is artificially
lowered.  Under these conditions, traffic processed by the
upstream intersection is not only a function of its own
traffic signal, but also the ability of the next downstream
intersection to dissipate a queue, and these conditions are
not accurately portrayed by the Highway Capacity Software
techniques.

(AR-83 at 9; Defendants' reply brief, Exhibit "B", Declaration

of Jeff Greene at ¶7.)  When considered as isolated

intersections or as intersections which are not influenced by

the operation or congestion of other surrounding intersections,

the LOS which are obtained for the two I-81/Route 30 interchange

ramps appear to be acceptable. (SMF 37.) However, these

intersections (the I-81 ramps with Route 30) cannot be

considered in isolation because of the close spacing with the

congested Walker and Falling Spring Road intersections.  (SMF

38.)

     Plaintiffs also erroneously infer that the I-81 interchange

with Wayne Avenue is more congested than the interchange with

Route 30, and therefore, an alternative to relieve congestion at

the I-81/Wayne Avenue interchange should have been selected in

the ROD to comply with Public Law 100-17.  The administrative

record demonstrates that compared to the I-81/Route 30

interchange, the Wayne Avenue interchange does not experience

congestion.   Improvements to Wayne Avenue have been constructed.
These improvements include signalization of the I-81 ramps
intersections and widening to a five-lane cross section between
Orchard Road and Gerber Road.   (SMF 49.)  With these
improvements, in the design year 2016, the intersections of both
northbound and southbound I-81 ramps with Wayne Avenue will
operate at LOS B or C (uncongested) without the Kriner Road
interchange.   (SMF 50.)  Since LOS C is acceptable, no further
improvements are necessary.   (SMF 51.)

Plaintiffs claim that additional development occurred in
Chambers 5 industrial park since the FEIS was circulated and the
ROD was issued that would use Wayne Avenue to access I-81.
Additional traffic counts were taken in 2000 along Wayne Avenue.
(SMF 52.)  In 2000, PennDOT reanalyzed the traffic in the Wayne
Avenue area to validate traffic projections generated in the
1995 traffic studies (FEIS).  The 2000 traffic analysis
considered the additional development in Chambers 5 in addition
to other proposed development in Guilford Township.
(Defendants' reply brief, Exhibit "B", Declaration of Jeff
Greene at ¶6.)  PennDOT took the additional traffic counts along
Wayne Avenue just west of I-81, between Stouffer Avenue and I-
81.  (AR-83 at 8.)  A comparison of the actual 2000 counts with
the 1995 traffic analysis reveals a lower actual traffic growth
rate of .4% per year (compared to 2.8% per year) for the Wayne

Avenue area.[4]  (AR-83 at 8.)  The lower growth in traffic in the
Wayne Avenue area relates to the type of development that has
been occurring in the Chambers 5 Industrial Park (distribution
warehouses verses manufacturing complexes) and the smaller
development areas surrounding it.  (AR-83 at 8.)  Therefore, the
conclusion contained in the 1995 traffic studies remains valid
with regard to Wayne Avenue – existing congestion along Wayne
Avenue in the vicinity of the I-81 interchange will be improved
to acceptable levels of service through programmed improvements
which have since been completed.  (AR-37 at vi, 47.)

     As indicated in the Final Environmental Impact Statement
(FEIS), an interchange at Walker Road, will improve the level of
service of the critical intersection (Route 30/Walker
Road/Stouffer Avenue), which controls the level of congestion
through the interchange area.  (AR-46 at III-83; IV-85-89.)
Constructing an interchange at Walker Road will improve the
volume-to-capacity ration of this critical intersection by an
additional 22% resulting in a change from LOS E to LOS C during

---

[4]  Plaintiffs attempt to discredit the 2000 traffic analysis by
claiming that only traffic counts were taken and that the entire
traffic model should have been re-run.  The first step to
reanalyzing traffic data is collection, i.e., traffic counts.
If the growth rate resulting from the counts is equal to or
lower, the results of the model run in 1995 are confirmed.  In
other words, if the traffic counts are less or comparable, re-
running the model would result in the same conclusions with
regard to the Wayne Avenue interchange.  (Defendants' reply
brief, Exhibit "B", Declaration of Jeff Greene at ¶5.)

the A.M. peak hour (assuming Route 30 improvements are completed) and from LOS F to LOS E during the P.M. peak hour. [5] (AR-46 at IV-85, 87-88.)   See City of Carmel-By-The-Sea v. Dep't of Transp., 95 F.3d 892, 903 (9th Cir. 1996)(the court found that a change in the LOS by one (i.e., LOS E to LOS D) was would represent a traffic improvement).

As described in the 1995 and 1998 traffic studies, an interchange at Walker Road (such as D Modified) would serve approximately 9,000 to 10,900 vehicles per day in the 2016 design year, depending on the combination of other roadway improvements (Route 30 improvements and proposed Norland Avenue Extension).  (SMF 42.)   D Modified will remove a minimum of 6,000 vehicles from the I-81/Route 30 interchange.  (SMF 43.) Therefore, D Modified satisfies the need to relieve traffic on a

---

[5]  Plaintiffs erroneously claim that the project would not be needed but for the extension of Norland Avenue.  D Modified satisfies the project need to relieve congestion on an existing interchange, whereas Norland Avenue does not satisfy this need. With just the improvements at Route 30, the critical Walker Road/Stouffer Avenue/Route 30 intersection operates at LOS E during the A.M. peak hour and LOS F during the P.M. peak hour, so there is a need for improvement at this intersection whether or not Norland Avenue is extended.  (AR-46 at IV-87-88.)   With just the extension of Norland Avenue, this critical intersection will experience the same LOS - LOS E during the A.M. peak hour and LOS F during the P.M. peak hour (with improvements to Route 30).  (AR-46 at IV-87-88.)   The Norland Avenue project offers no improvement to this critical intersection.  (AR-46 at IV-87-88.) However, an interchange at Walker Road will significantly improve this critical intersection which will in turn improve the congestion on the I-81/Route 30 interchange ramps.  Another example of the interchange project's independent utility.

congested I-81 interchange in Franklin County.

Finally, plaintiffs claim that D Modified itself will operate at an unacceptable LOS in the 2016 design year citing defendants 1998 traffic report (AR-72 at 4, 18-25.)  The 1998 traffic analysis contains levels of service with and without signals at the interchange area.  (AR-72 at 3-4, 23-25.)  The signalized intersections have a LOS A or B at the interchange ramp areas and where Franklin Farm Lane intersects Relocated Walker Road.  (AR-72 at 23-25.) [6]  With a  signalized intersection, some of the traffic movements at the intersection of Kohler Road and Relocated Walker Road will experience unacceptable levels of service (D or E) if Norland Avenue is not extended; however, under the no build scenario some of the traffic movements at the intersection of Walker/Kohler Roads will experience level of service F, so the proposed project offers an improvement.  (AR-72 at 23; AR-46, App. B at 73.)

Based upon the above discussion, D Modified satisfies the needs identified in Public Law 100-17. [7]

---

[6]  Please note that the information contained in the circles of AR-72 at 18-25 is the LOS when the intersection is signalized and the information contained on the stick drawings are unsignalized LOS.

[7]  Plaintiffs claim that it was improper to add to the project the need to provide for existing and proposed development in the study area erroneously claiming that this need was added solely to accommodate the proposed Gabler tract development.  (AR-46 at I-1.)  A basic requirement of all planned highway projects is to

**B.  Defendants were not required to examine new alternatives under the National Environmental Policy Act (NEPA) as a result of the amendment to the statute authorizing funding for the project.**

Plaintiffs claim that an amendment to the funding language in 1995 required defendants to consider a wider range of alternatives.  (Plaintiffs' summary judgment brief at 30-35.) The Surface Transportation and Uniform Relocation Assistance Act (STURAA) authorized funding of a demonstration project in the Chambersburg area.  Specifically, the law provides:

> . . . The Secretary shall carry out a highway project, which demonstrates how construction of an interchange on a north-south interstate route will provide access to Chambersburg, PA, and relieve traffic congestion on an existing interchange on such interstate route.

101 stat. 192 (sec. 149 (a)(74))(1987).

In 1995, the National Highway System Designation Act added the following at the end of the above quoted authorization language for the project:  "and other projects in the counties of Bedford, Blair, Centre, Franklin, and Huntingdon, Pennsylvania".

---

accommodate the existing traffic and the planned future traffic. (23 U.S.C. §109(a)(1).  This need was a consideration of both locations, Walker Road and Kriner Road.  The FEIS recognized that significant development was planned to occur in the area of the Kriner Road alternatives.  The Chambers 5 business park was one of the major developments that the Kriner Road alternatives would service.  (AR-46 at I-14.)  Specifically, defendants found that traffic would increase on local roads in the vicinity of Kriner Road due to the existing and planned development through 2016.  (AR-46 at II-6.)  The Kriner Road alternatives did not satisfy the need to relieve congestion on an existing interchange.  The Kriner Road alternatives accommodates existing and proposed development in the study area at an acceptable level of service.  (AR-46 at II-6.)

Plaintiffs claim that the use of this catch-all phrase requires the consideration of additional alternatives for the I-81 Interchange project in Franklin County.

The original purpose of Section 149 (a)(74) of STURAA remains the same – construct an interchange to provide access to Chambersburg, PA and relieve traffic congestion on existing interchange.  Plaintiffs even argue on pages 40 through 49 of their summary judgment brief that as a demonstration project the federal funds must be used to relieve traffic congestion on an existing interchange that provides access to Chambersburg citing Ross, 162 F.3d at 1052 and Wade v. Lewis, 561 F. Supp. 913, 939 (N.D. Ill. 1983).  The purpose of the catch-all phrase was simply to ensure that the money for the I-81 Interchange project would be used in this geographic area if the project was not constructed.

As discussed in detail in the previous section, the needs for the project were well established as set forth in the DEIS and FEIS, and this additional language in the funding authorization does not change these project needs.  (SMF 27.) Courts have repeatedly held that NEPA requires only the consideration of reasonable alternatives.  Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517, 524 (9th Cir. 1994); Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195 (D.C. Cir. 1991); Druid Hills Civic Ass'n v. Fed. Highway

Admin., 772 F.2d 700, 713 (11th Cir. 1985); Piedmont Heights

Civic Club, Inc. v. Moreland, 637 F.2d 430, 436 (5th Cir. 1981).

The range of alternatives that must be considered in an EIS need

not extend beyond those reasonably related to the purposes of

the project.  Laguna Greenbelt, 42 F.3d at 524.  Alternatives in

Bedford, Blair, Centre, and Huntingdon Counties would not be

reasonable alternatives under NEPA because these alternatives

would not satisfy the project needs of providing access to

Chambersburg, relieving congestion on an existing interchange,

and providing for existing and proposed development in

Chambersburg.

    The precedent cited by plaintiffs fails to support their

argument that additional alternatives should have been evaluated

as a result of the amendment to the projects funding statute.

City of Carmel-By-The-Sea v. Dep't of Transp., 95 F.3d 892,

903,907-08 (9th Cir. 1996) and Alaska Wilderness Recreation &

Tourism v. Morrison, 67 F.3d 723, 730 (9th Cir. 1995) are easily

distinguished from the present case.[8]

    In City of Carmel, 95 F.3d at 903, 906, the DOT changed the

goals as represented in the DEIS which merely mentioned LOS C to

focusing on LOS C in the FEIS which resulted in the elimination

_____

[8]  Plaintiffs also cite to Resources Ltd., Inc. v. Robertson, 35
F.3d at 1300, 1307 (9th Cir. 1993).  That case did not address a
change in the project needs under NEPA.  Furthermore, that case
found that the Forest Service considered an adequate range of
alternatives.  Id.

of all but one alternative.  In other words, the needs
represented in the DEIS was broadly stated and the needs
represented in the FEIS was narrowed to LOS C.  Id.  First, in
the present case, the goals provided in the DEIS, FEIS, re-
evaluations, and ROD are the same, i.e., defendants have not
changed the project needs; therefore, the findings in City of
Carmel are not applicable.  Second, the amendment to the
project's funding statute to add a catch-all phrase did not
change the intent of the statute or the needs identified for
this project.  Third, as discussed above, consideration of
projects in other counties would not satisfy the needs
identified for this project; therefore, plaintiffs have failed
to demonstrate that there were other conceivable alternatives
that could satisfy the needs identified for this project –
provide access to Chambersburg, Pennsylvania and relieve
congestion on an existing interchange on a north-south
interstate.  Id. at 907.

In Alaska Wilderness, 67 F.3d at 730, the needs of the EIS
focused primarily on contract requirements for the harvest of
timber.  The contract was eliminated.  Id.  The court held that
the elimination of the contract effected the range of
alternatives considered because the elimination opened for
consideration alternatives that could not be reviewed when the
contract was in place.  Id.  In the present case, the amendment

13

to the funding statute did not change the needs identified for the project; therefore, the findings in <u>Alaska Wilderness</u> are not applicable to this case.

Based upon the above discussion, defendants were not required to examine new alternatives under NEPA as a result of the amendment to the statute authorizing funding for the project.

**C.   The studies for the I-81 Interchange project were completed with good faith objectivity – the project was not pre-determined.**

Plaintiffs continue to maintain that defendants pre-determined the alternative that was ultimately chosen in the ROD for the project.  In making their argument, they cite to statements contained in the record claiming that there was political pressure to complete the project in an expedited manner.  However, if the Court looks at the complete record and not at a few isolated statements, the Court will determine that FHWA took the required hard look at historic and environmental resources as required by the NEPA and the National Historic Preservation Act (NHPA) in developing this project.  Defendants considered in its decision-making process the social, environmental, and historic impacts associated with several alternatives at Walker Road and Kriner Road.[9]  FHWA participated

---

[9]  Plaintiffs would have this Court believe that only the social, historic, and environmental impacts of the alternatives at

in the development of the DEIS and FEIS for the project which evaluated in detail the alternatives at Walker Road and Kriner Road.  (SMF 137.)  The administrative record demonstrates that the following is the development history of this project:

In 1992, at the time the letters were exchanged between former Pennsylvania Secretary Yerusalum and former Congressman Shuster, the preliminary alternatives report was prepared and distributed, which identified Walker and Kriner Roads as two potential locations for the new interchange.  (SMF 138.)  The selection of these two locations was based on environmental and engineering studies.  The DEIS (May, 1994) and FEIS (May, 1995) evaluated in detail several alternatives at the Walker Road and Kriner Road locations and identified Alternative D-C as the preferred alternative.  (SMF 141.)  The DEIS and FEIS evaluated in detail the socioeconomic, environmental and historic impacts of the project.  (SMF 142.)  The impacts evaluated included secondary and cumulative impacts.  (SMF 143.)

None of the alternatives would result in any impacts to wetlands, surface water, floodplains, hazardous waste sites, and threatened or endangered species and air quality receptors were well below National Ambient Air Quality Standards.  (SMF 144.) The Walker Road alternatives evaluated in the FEIS would result

---

Walker Road were evaluated in detail.  These impacts of the two (2) Kriner Road alternatives were also evaluated in detail in the FEIS.  (AR-46 at II-3-17; IV –1-95.)

in one residential displacement (none for D Modified), one well
displaced (none for D Modified), limited potential for secondary
development but development restrictions were put in place as
mitigation, direct take of productive agricultural lands ranging
from 8.0 acres to 18.6 acres, indirect take of productive
agricultural lands ranging from 0 acres to 10.6 acres, no
anticipated permanent impacts to utilities, three to four noise
receptors would result in an imperceptible increase, and all the
Walker Road alternatives except D Modified would impact one
historic resource (also a Section 4(f) resource).  (SMF 145.)
The Kriner Road alternatives would result in potential for
secondary development, direct take of productive agricultural
lands ranging from 12.7 acres to 14.2 acres, indirect take of
productive agricultural lands ranging from 2.9 acres to 8.5
acres, utility relocation of a high pressure gas line and water
main, four noise receptors would continue to exceed criteria for
noise abatement, no residential or well displacements, and one
alternative impacting four historic resources (Section 4(f)
resources) and one alternative avoiding historic resources.
(SMF 146.)

     After the FEIS was circulated, an additional historic
property was identified in the Walker Road area on August 3,
1995.  (AR-99 at 1667.)  The alternative identified in the FEIS
as the preferred alternative would require acquisition from the

newly identified historic property.   Therefore, Alternative D was modified to avoid taking property for this historic property.  A re-evaluation of the FEIS was conducted (dated January 1999) which concluded that D Modified did not result in any significant new impacts from those which were discussed in the FEIS.  (SMF 15, 16, 17, 94-98.)

In balancing the potential impacts, D Modified compared to the Kriner Road alternatives causes the least impacts.  (SMF 149.)  The Kriner Road alternatives and D Modified each have no displacements and 4 noise receptors are imperceptibly increased. (SMF 150.)  However, D Modified impacts a total of 16.2 acres of productive agricultural land and no historic resources compared to the Alternative B which impacts 17.1 acres of productive agricultural land and 2 historic resources and Alternative B-1 which impacts 21.2 acres of productive agricultural land and no historic resources.  (SMF 151.)  Moreover, the Walker Road alternatives better satisfy the project need of relieving congestion on an existing interchange.[10]

The ROD was issued on March 25, 1999 – approximately seven (7) years after the Yerusalum letters.  (SMF 155.)  Contrary to plaintiffs' claims, there was no pre-determination or rush to

---

[10] The Kriner Road alternatives would relieve congestion on the Wayne Avenue (Route 316)/I-81 interchange which is not congested.  (SMF 153.)  The Walker Road alternatives would relieve congestion on the Route 30/I-81 interchange which does experience congestion.  (SMF 153.)

judgment on this project.  Plaintiffs' alleged statements

regarding political pressure and expedited schedules to complete

the project occurred in 1994 and 1995.  Plaintiffs' alleged

expedited schedule called for a ROD in 1996.  A ROD was not

issued on the project until three (3) years later because

defendants were diligently complying with the requirements

contained in NEPA and NHPA.  Defendants took a "hard look" at

the social, environmental, and historic resources required by

NEPA and NHPA.

Finally, the pre-determination issue was raised throughout

the NEPA process for the project and said correspondence are

included in the administrative record for the project.  Indeed,

the administrative record reflects that FHWA considered and

addressed the allegations of pre-determination on numerous

occasions.  (SMF 156-157.)  In fact, as plaintiffs note in their

brief, the Inspector General's Office, an independent arm of the

U.S. Department of Transportation, investigated the complaints

of pre-determination and found nothing improper.  (SMF 158.)

Plaintiffs claim defendants proceeded to the final design

stage prior to the issuance of the ROD in violation of 23 U.S.C.

§112(b)(3) and 40 C.F.R. §1506.1.  Plaintiffs further claim that

this violation supports their pre-determination argument.  Both

claims are incorrect.

After FHWA approved PennDOT's request to complete

18

concurrent preliminary design (design required under NEPA) and
pre-final design, PennDOT retained Sheladia Associates, Inc. to
perform pre-final design activities.  The beginning date of the
Sheladia Contract was March 22, 1995.  (AR-165 at 1734.)

    At this point in time, the DEIS had already been circulated
with a preferred alternative identified, comment period for the
DEIS was closed, the public hearing was held, the public
comments were reviewed and responded to, and sections of the
FEIS were being drafted with insignificant updates to the
environmental impacts compared to the DEIS.  (AR-96 at 775-76.)
Barring an unforeseen circumstance, the NEPA process was near
completion.[11]  All that was required was approval and circulation
of the FEIS, public comments on the FEIS, and consideration of
any new comments not already received on the DEIS prior to
issuance of the ROD.[12]  At this point in the NEPA process, it is
expected that an agency has a preferred alternative.  The CEQ
regulations provide that the preferred alternative may be

_____

[11] As discussed in detail below, without the knowledge of FHWA or
PennDOT, Greene Township submitted an eligibility determination
on an historic district in the area of Alternative D-C to PHMC
even thought Greene Township was a consulting party under
Section 106 of NHPA for the project.  (AR-99 at 1449.)  This was
an unforeseen circumstance which lengthened the NEPA process an
additional three years.

[12]  The CEQ regulations do not require inviting the public to
comment on the FEIS or response to public comments prior to the
issuance of the ROD.  40 C.F.R. §§1503.1 -1503.4.  However,
FHWA's regulations do impose this requirement.

identified in the DEIS and should be identified in the FEIS.  40 C.F.R. §1502.14(e).

No final design was completed for any alternative before the ROD was issued.  (Exhibit B, Declaration of Charles Babcock at ¶ 4.)  The majority of the work (pre-final design) completed was on Alternative D-C, an alternative that was not selected in the ROD.  (AR-98 at 1152, 1194; AR-99 at 1413, 1429, 1535, 1627, 1645.)  For Alternative D-C, Sheladia completed: (1) preliminary cost estimates (AR-98 at 1194; AR-99 at 1413)[13]; (2) initial contact with utilities (AR-99 at 1429)[14]; (3) Safety Review submission and meeting (AR-99 at 1535-41)[15]; and the preliminary Traffic Control Plan (AR-99 at 1645-46).  (Exhibit B at ¶4.)

---

[13] Cost estimates are done during preliminary design and are included in the environmental documents.  The 15% contingency which is included on the estimate is an indicator that the estimate is a rough estimate.  (AR-98 at 1194-95; AR-99 at 1413-16; Exhibit B, Declaration of Charles Babcock at ¶ 6.)

[14] Initial contact with utilities is done during preliminary design.  Early coordination with utilities was necessary because there is an electric substation adjacent to I-81 in the study area.  (AR-46 at III-17; Exhibit B, Declaration of Charles Babcock at ¶ 7.)

[15] The Safety Review Committee reviews profiles, typical sections, cost estimates, preliminary traffic control plans to ensure that the alternative is safe.  This project had a few design exceptions.  Because of the presence of historic resources in the study area, it is reasonable to obtain the Committee's approval of the design exceptions prior to issuance of the ROD because if the Committee requires changes to the alternative based on safety reasons the historic or environmental impacts of the project may change.  (Exhibit B, Declaration of Charles Babcock at ¶ 8.)

None of these activities are final design activities.   (Exhibit B at ¶4.)

In August of 1995, the Greene Township-Conococheague Rural ("GT-CR") Historic District was determined to be eligible by the Keeper.   Two ramps of Alternative D-C were located in the historic district.   (AR-99 at 1674.)   After this new historic district was identified, Sheladia began evaluating alternatives to avoid this historic district.   On August 14, 1995, Sheladia presented a map of a potential alternative that avoids the GT-CR historic district to the Management Team.[16]   (AR-100 at 1693, ¶3.)   This work was required for the NEPA/NHPA environmental studies.

From August of 1995 until June of 1997, the boundaries of the historic resources located in the area of the GT-CR historic district were being evaluated.   Because a substantial number of modern intrusions were included in the purported historic district, defendants concluded that the Keeper made her decision based on insufficient information.   (AR-80 at 3.)   FHWA submitted a request for reconsideration to the Keeper regarding the eligibility of the GT-CR historic district   (AR-56; AR-80 at 3.)   On January 15, 1997, the Keeper rescinded the eligibility

---

[16]  The Management Team included representatives from FHWA, PennDOT, and the various consultants working on this project. (AR-100 at 1692.)

determination for the GT-CR historic district and determined eligible two smaller rural historic districts and individual properties.  On June 27, 1997, the Keeper issued a letter announcing the Christian Fry, Sr. Farmstead boundaries.[17]  (AR-104 at 286-287.)  The Keeper's determination extended the Christian Fry, Sr. Farmstead boundary which resulted in the need to evaluate the possibility of an avoidance alternative.  (AR-104 at 308.)  On February 25, 1998, Sheladia presented two alternatives that avoided the Fry historic property to the Management Team.  (AR-105 at 10, ¶2.)  One of these alternatives was Alternative D Modified.  (AR-105 at 10, ¶2.)

The engineering of D Modified was developed to the same level of detail as the other alternatives presented in the EIS, so that traffic, environmental, and historic impacts of D Modified could be compared to the alternatives presented in the DEIS and FEIS in the 1999 Re-Evaluation to determine whether a Supplemental EIS was necessary.  (AR-80.)  No pre-final design was completed for D Modified prior to the issuance of the ROD. (Exhibit B at ¶ 9.)

Therefore, based on the need of the project to remove traffic on an exiting congested interchange and the traffic

---

[17] The Christian Fry, Sr. Farmstead was evaluated earlier in the process (1993) and PHMC, the state SHPO, determined that the property was not eligible for inclusion on the National Register.  (AR-91 at 195.)

studies, defendants reasonably investigated alternatives in the
Walker Road area that would avoid the historic properties.
Defendants' actions are not indicative of pre-determination
under NEPA.  Rather, this project complied with NEPA and NHPA by
choosing an alternative that best satisfies the project needs
while evaluating (and minimizing) environmental and historic
impacts.

Plaintiffs also erroneously claim that PennDOT's Twelve
Year Program indicates that the exit was pre-determined.
PennDOT's Twelve Year Program is a planning tool (with public
input) designed to show which projects are intended to be
completed for each four (4) year period and the estimated costs
associated with the completion of said projects.  In
Pennsylvania, the need for transportation improvements exceeds
available resources.  The Twelve Year Program prioritizes
Pennsylvania's transportation projects while utilizing limited
funding.  The development of specific alternatives are
irrelevant to the Twelve Year Program.

Specifically, plaintiffs' claim that, because PennDOT's
Twelve Year Program for 1986-1998 dated September 2, 1987 and
October 23, 1987 indicate under project name/geographic limit
location that the project will be north of Chambersburg, this is
an indication of pre-determination.  (AR-169 at 66-67.)
Plaintiffs also point to a project status report dated April 12,

1988 provided by the District 8-0 office that is used to develop the Twelve Year Program which describes the project as north of Chambersburg, Greene Township.  (AR-169 at 69.)

Federal funding was first provided for the I-81 Interchange project with the passing of the Surface Transportation and Uniform Relocation Assistance Act of 1987.  Therefore, 1987 is the first year that the project appeared on PennDOT's Twelve Year Program.  In the Programs that followed (the first being the 1988-2000 Program), the geographic limit location was described as the Chambersburg and/or Franklin County area because PennDOT was evaluating alternatives at both Walker and Kriner Roads.[18]  (AR-169 at 53-62.)  The Preliminary Alternatives Report dated 1990 (AR-2, 3), the DEIS dated May 1994 (AR-12), and the FEIS dated May 1995 (AR-46, 47, 48) evaluated several alternatives at both Walker and Kriner Roads.

The precedent cited by plaintiffs fails to support their

---

[18]  Plaintiffs erroneously states that the Plans from 1989 to 1994 refer to an interchange to be constructed north of Exit 6, and thus, north of Chambersburg.  The geographic location was described in these plans as Chambersburg and/or Franklin County area.  (AR-169 at 53-62.)  The term Exit 7 was used in conjunction with this project simply because I-81 did not have an Exit #7.  Early in the process, PennDOT stated:  "The proposed interchange has been called Interchange #7 . . . the interchange does not have to be located north of Chambersburg Borough between Interchange #6 and #8."  In fact, several alternatives were developed at Walker Road and at Kriner Road (south of Exit 5) and studied in detail in the DEIS and FEIS for the project.  (AR-12 at II-2-15; AR-46 at II-3-17.)

pre-determination argument.  Brooks v. Volpe, 350 F. Supp. 269 (W.D. Wash. 1972), and Natural Resources Defense Council v. Callaway, 524 F.2d 79 (2$^d$ Cir. 1975),[19] do not address the pre-determination issue.

In Metcalf v. Daley, 214 F.2d 1135, 1143, 1145 (9th Cir. 2000), the Ninth Circuit found that defendants made an "irreversible and irretrievable commitment of resources" by entering into a contract with the Makah (an Indian tribe) regarding quotas for hunting whales before considering the environmental consequences and preparing an environmental assessment (EA) under NEPA.  In March of 1996, more than a year before the EA was prepared, defendants entered into a contract containing the following commitments:  "(1) making a formal proposal to the IWC for a quota of gray whales for subsistence and ceremonial use by the Makah and (2) participating in the management of the harvest."  Id. at 1143.  The court found that defendants would have complied with NEPA if it made its promise to seek the quota conditional upon a NEPA determination.  Id. at 1144.  Moreover, the court clarified that the Metcalf case did

---

[19]  In Natural Resources Defense Council, 524 F.2d at 85-87, the issue involved authorship of the EIS, i.e., whether the Navy could have a consultant draft a portion of the EIS.  In ruling on this issue, the court refers to cases that do not permit a State to draft EIS based on bias.  Id. at 87.  The holding of these cases have been overruled through an amendment to NEPA.  Section 4332 (D) of NEPA specifically permits a State agency or official to prepare the NEPA documentation.  42 U.S.C. §4332(D).

not stand for the following proposition:

> [A]n agency cannot begin preliminary consideration of an action without first preparing an EA, or that an agency must always prepare an EA before it can lend support to any proposal. We have discussed this distinction in *Association of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158 (9th Cir. 1997), where we pointed out that 'an agency can formulate a proposal or even identify a preferred course of action before completing an EIS.' *Id.* at 1184. We also noted that "Council on Environmental Quality ("CEQ") regulations actually encourage identification of a preferred course of action during the NEPA process. . . .' *Id.* at 1185 (citing 40 C.F.R. §1502.14(e)).

The court limited the <u>Metcalf</u> holding to facts of that case:

> [O]ur holding here is limited to the unusual facts and circumstances of this case where the defendants already had made an 'irreversible and irretrievable commitment of resources' – i.e., by entering into a contract with the Makah before they considered its environmental consequences and prepared the EA.

<u>Id.</u> at 1145.

In the present case, at the time the letters were exchanged between former Pennsylvania Secretary Yerusalum and former Congressman Shuster, the preliminary alternatives report was prepared and distributed, which identified Walker and Kriner Roads as two potential locations for the new interchange based on environmental and engineering studies. (SMF 138; AR-90 at 25-26.) Former Secretary Yerusalum stated in these letters that "It is our intention to satisfy the environmental requirements. . . ." (AR-90 at 20.) Therefore, according to <u>Metcalf</u>, Secretary Yerusalum acted properly because his statements in the

letter were dependant on environmental clearance.  Furthermore,
prior to entering into the contract with Sheladia for pre-final
design activities (said contract was dated March 22, 1995), the
DEIS had already been circulated with a preferred alternative
identified, comment period for the DEIS was closed, the public
hearing was held, the public comments were reviewed and
responded to, and sections of the FEIS were being drafted with
insignificant updates to the environmental impacts compared to
the DEIS.  Unlike the facts in Metcalf, defendants did consider
the environmental circumstances prior to entering into the pre-
final design contract; therefore, as clearly stated by the Ninth
Circuit, the Metcalf finding of pre-determination would not
apply to the present case.

Davis v. Mineta, 2002 U.S. App. Lexis 12285 (10th Cir. 2002)
is also easily distinguished from the present situation.  In
Davis, the Tenth Circuit found that contractual obligations
indicated prejudgment of the NEPA issues.  Id. at 9  The
consultant that was employed to prepare the draft EA for FHWA's
review was contractually obligated to prepare a Finding of No
Significant Impact (FONSI) and to have the FONSI approved,
signed, and distributed by FHWA by a date certain.  Under NEPA,
if the agency is not certain whether an EIS is necessary, the
agency should prepare an EA.  40 C.F.R. §1501.4(b).  If the
agency determines that no EIS is needed because the project

would not cause significant impacts to the environment, the agency may prepare a FONSI; however, if significant impacts are likely from the project, the agency must prepare an EIS. Davis, 2002 U.S. App. LEXIS at 7-8. The Tenth Circuit found that the contract with the consultant preparing the EA determined the outcome of the NEPA analysis (FONSI) before the EA was prepared, i.e., the environmental analysis was performed. Id. at 10. Moreover, in Davis, defendants also only studied the no build alternative and the preferred alternative in detail. Id. at 12-13.

The holding of Davis does not apply to the present case for the same reasons that the Metcalf holding did not apply. First, the environmental impacts were considered prior to the expression of a preference by PennDOT. Second, in stating its preference, PennDOT also stated that it intended to comply with the environmental law (i.e., NEPA). The contracts for the consultant who was contracted to prepare the DEIS and FEIS for the project do not reveal any pre-determination of the alternative for the project.[20] Finally, Sheladia was contracted

---

[20]  Plaintiffs have referenced several documents that contain statements that the project was to relieve congestion on the I-81/Route 30 interchange. Defendants focus of relieving traffic on the I-81/Route 30 interchange (Exit 6) was based on the language of Public Law 100-17. Therefore, to comply with Public Law 100-17, the interchange must be experiencing some congestion. The I-81/Route 30 interchange is presently and will be in the future experiencing congestion. Later traffic studies

to perform pre-final design activities after the environmental impacts for the Walker Road and Kriner Road alternatives were studied in detail, the public hearing was held, and the comment period for the DEIS was closed.  Defendants actions were proper.

Cedar-Riverside Envtl. Defense Fund v. Hills, 422 F. Supp. 294 (D. Minn. 1976), is also easily distinguished from the present case.  In Cedar-Riverside, 422 F. Supp. at 328-29, the court evaluated the adequacy and accuracy of the environmental information presented in the EIS and the alternative analysis and found the EIS to be deficient ordering the progress of the project to stop until an adequate EIS was completed.  In the present case, plaintiffs claim that the DEIS, FEIS, and reevaluations are inadequate because an alleged conflict with local municipalities land use plans, alleged significant changes to the project area (agricultural impacts and development at Chambers 5 industrial park), alleged inadequate area of potential effect for historic resources, alleged failure to study impact to local roadways, alleged failure to comply with

---

confirmed this focus.  The I-81/Wayne Avenue interchange is operating without congestion thanks to the recent improvements to Wayne Avenue.  In an previous section, this Brief addresses in detail the congestion on the I-81/Route 30 interchange. Moreover, as defined by the original contract for this project, the study area for the project was defined as follows:  "The limits for this study area from approximately 2 miles north of existing Interchange 4 to existing Interchange 8 on Interstate 81."  (AR-163 at 1022.)  Contrary to what plaintiffs would have this Court believe, the study area was not limited to the area north of Chambersburg.

Public Law 100-17, and alleged failure to examine additional alternatives when the funding law was amended.  As addressed in detail in this brief, the defendants' summary judgment brief, and defendants' reply brief, defendants have complied with NEPA and NHPA for each of the issued raised above by plaintiffs.

Finally, two of the cases cited by plaintiffs in support of their pre-determination arguments actually supports defendants' position:  Wade, 561 F. Supp. 913; and AWARE v. Colorado Dep't of Transp., 153 F.3d 1122 (10th Cir. 1998).

In Wade, 561 F. Supp. at 947-48, the issue before the court was the adequacy of the environmental impact analysis performed by the United States Department of Transportation (DOT).  The court found the EIS itself to be deficient in detailing the environmental impacts.  In making this finding the court states that the DOT "in their anxiety to approve the predetermined route, failed to exercise the diligence which NEPA requires." Plaintiffs latched onto this finding as support for their pre-determination argument apparently without reading the actual holding of Wade with respect to the NEPA issue.  Id. 947.  Even with a finding of a pre-determined location for the alignment, under NEPA, the Wade court was only concerned with whether the DOT took a "hard look" at the environmental impacts resulting from the project.  Id. at 947-48.  The court found that the information contained in the supplemental administrative record

provides the basis which supports the conclusion that the DOT took the required "hard look" at the environmental consequences. Id. at 948.  The court held that the decision to construct the preferred alignment would be upheld under NEPA based on the administrative record as supplemented.  Id. at 948.  In the present case, the DEIS, FEIS, and the 1999 reevaluation discussed in detail the environmental impacts of the Walker and Kriner Road alternatives.  The administrative record demonstrates that defendants took the "hard look" required under NEPA in choosing D Modified.

In AWARE, 153 F.3d at 1127, plaintiffs alleged a conflict of interest because the consultant that prepared the EIS for the project was also under contract to perform the final design work for the project, and therefore, in a position to promote a build alternative over a no build alternative.  The court held that when an EIS is challenged over an alleged conflict of interest that is known to the agency, the court may evaluate the oversight that the agency provided to the EIS to determine whether the integrity and objectivity of the EIS is maintained. Id. at 1129.  In AWARE, the court held that the integrity and objectivity of the EIS was preserved by the degree of supervision exercised by the state DOT based on the following: DOT managers made all major decisions and the consultant reported to the DOT to receive direction; and the DOT

complaints of pre-determination and found nothing improper.
(AR-103 at 355.)

Finally, plaintiffs failed to distinguish the cases cited
by defendants that are on point: Environmental Defense Fund,
470 F.2d at 295-96 (found that the EIS satisfied the full
disclosure requirements of NEPA despite a statement by Colonel
Vernon W. Pinkey, District Engineer in charge of preparing the
EIS that "the Gillham Dam would definitely be built"); Coalition
Against Raised Expressway, Inc. v. Dole, 835 F.2d 803, 808 (11th
Cir. 1988) (found statement by FHWA to develop the "spur"
alternative and Blakely Island Route sufficiently so that these
alternatives could be dismissed in the EIS was just an
expression of confidence - the record showed that FHWA took the
required "hard look" at the alternatives); Presidio Golf Course
v. Nat'l Park Serv., 155 F.3d 1153, 1161 (9th Cir. 1998) (found
that the National Park Services' decision to build a new
clubhouse prior to completing the EA was again an expression of
confidence.)  See also, State of S. Carolina v. O'Leary, 953 F.
Supp. 699, 707 (D.S.C. 1996); Fayetteville Area Chamber of
Commerce v. Volpe, 515 F.2d 1021, 1026 (4th Cir. 1975).  As
stated by this Court, Presidio Golf Course, 155 F.3d at 1161, is
applicable to the present appeal.  Memorandum Decision dated
October 17, 2001 at 13-14.

Another case that supports defendants actions is Citizens

Committee Against Interstate Route 675 v. Lewis, 542 F.Supp. 496
(S.D. Ohio 1982). In Citizens Committee, plaintiffs contended
that the DOT had a preexisting bias in favor of constructing the
highway because it had acquired most of the right of way in the
corridor.  The court held:

> While the acquisition of certain portions of the right of
> way and the FHWA approvals received prior to the
> preparation of the DEIS may have rendered certain
> alternatives and courses of action infeasible, there is no
> indication that the ODOT's pre-existing bias, if any,
> prevented it from complying with NEPA.  It must be
> emphasized that only good faith objectivity, rather than
> subjective impartiality is required under NEPA . . .
> Specifically, the Court in the cited case stated that the
> procedural requirements of NEPA were enacted because 'NEPA
> assumes as inevitable an institutional bias within an
> agency proposing a project.'. . .Thus, there is no
> violation inherent in the fact that as here, an agency may
> have partially completed a project, or may, indeed, wish
> that the project would be approved.

Id. at 551, fn. 13.

Based on the above discussion and case law, the project was
not pre-determined, rather the studies for the I-81 Interchange
project were completed with good faith objectivity.

**D.    The local municipalities for the project have conflicting
transportation components of their comprehensive plans.**

Plaintiffs claim that D Modified is inconsistent with the
project need to "adhere to comprehensive plans of area
municipalities" and violates 40 C.F.R. §1506.2(d).  (Plaintiffs'
summary judgment brief at 49-50.)  Neither the Kriner Road nor
the Walker Road alternatives completely satisfies this project

need because the area municipalities have conflicting

transportation components of their comprehensive plans.  The

Franklin County Comprehensive Plan is consistent with D

Modified.

> Some of the most severe congestion and many of the most
> accident prone locations are around the Route 30
> interchange of I-81.  The proposed new interchange along I-
> 81 north of Route 30 is intended to provide an alternative
> route for traffic that will reduce these problems along
> Route 30.

(AR-136 at 1446.)  An interchange at Walker Road will relieve

congestion at the I-81/Route 30 interchange and is located north

of Route 30.  Kriner Road will not relieve congestion at this

interchange and is located south of Route 30.  Moreover, the

Franklin County Commissioners and Guilford Township support the

construction of an interchange at Walker Road.  (AR-88 at 18-19;

AR-93 at 504.)

The Greene Township Comprehensive Plan states opposition to

an interchange at Walker Road claiming an interest in protecting

agricultural property.  Greene Township's actions do not support

these reasons.  According to Greene Township's planning

documents, the intended use of the area surrounding Walker Road

is residential, not agricultural.  (AR-134 at 931; AR-136 at

1712; AR-19 at 7-12.)  As pointed out by the Agricultural Land

Condemnation Assessment Board (ALCAB) (whose primary purpose is

to ensure that excessive amounts of farmlands are not

condemned), the Township's planning practices provides for the

development of the Township's agricultural land.    (AR-138 at

253.)    ALCAB found:

> The intention of Greene Township, however, in desiring to
> remain predominantly an agricultural municipality are
> contradicted by certain policies that the Township has been
> undertaking.  For instance, the Township re-zoned
> agricultural land at the interchange of Exit 8 to permit
> the construction of a Sheetz mini market and a storage
> building project adjacent thereto.  The Township has also
> zoned most of its agricultural land as R-1 rather than as
> agricultural in order to permit farmers to build additional
> residences on their farms.  However, by doing this the
> Township has given up control over how much land the
> farmers can convert to non-agricultural housing purposes.
> Furthermore, the Township has also permitted other parcels
> to be carved out of farmland without Township approval such
> as the two new houses along Walker Road . . . .  Permitting
> these types of structures to be erected without Township
> approval of any kind does not show a good faith effort to
> limit conversion of productive agricultural land in Greene
> Township.

AR-138 at 252-253)

Plaintiffs also erroneously claim that although defendants

acknowledged that D Modified was inconsistent with the Greene

Township Comprehensive Plan, defendants violated 40 C.F.R.

§1506.2(d) by failing to describe the extent to which defendants

attempted to reconcile this inconsistency.  Defendants conducted

nine Municipal Coordination Meetings (of which Greene Township

was a member).  (SMF 20.)  Limited access right-of-way was

created around the proposed interchange in order to reduce

potential development pressure.  (AR-110 at 189, 192; AR-156 at

2.)  Limited access easements will be along the interstate

ramps, relocated Walker Road, and a portion of Kohler Road. (AR-156 at 2.)  Defendants have complied with 40 C.F.R. §1506.2(d).

Based upon the above discussion, D Modified satisfies the need to adhere to comprehensive plans of area municipalities.

**E.    The "area of potential effect" was properly identified for purposes of complying with the National Historic Preservation Act.**

Plaintiffs continue to ignore the results of the traffic and noise studies and continue to assert that the "area of potential effect" (APE) under the NHPA was improper. Specifically, plaintiffs claim that the Gass House and Franklin County Poor House should have been included in the APE for the Project.  Both the Gass House and the Franklin County Poor House are located along Franklin Farm Lane near its intersection with Route 30.  (SMF 200.)  As documented in the FEIS and confirmed in the additional traffic analysis for the project, impacts along Franklin Farm Lane due to increased traffic, noise, and development as a result of this project are non-existent or insignificant.  (SMF 205.)

This issue is discussed in detail in defendants' summary judgment brief on pages 41-50 and in defendants' reply brief on pages 21 through 25.  However, there are two factual allegations made in plaintiffs' statement of material facts which defendants will address in this brief.

First, plaintiffs claim that upgrades on Walker Road east
of Franklin Farm Lanes are necessary as a result of this project
and that said impacts will impact properties eligible for the
*National Register of Historic Places*.  (Plaintiffs' SMF at 96-
100.)  Plaintiffs refer to two curves that are allegedly 90
degrees on the eastern boundary of the traffic study area, east
of Mower Road.  (AR-46, App. B at 5, 66, 96.)  Plaintiffs also
refer to the intersection of Relocated Walker Road and Franklin
Farm Lane[21] which will become a curve because stop signs for all
westbound movements and for northbound right turns will be
eliminated.  (AR-82 at 7.)  Improvements to these curves are not
necessary as a result of this project when compared to the
percentage increases expected on some of the local roads due to
identified developments, the increases due to the interchange
are not significant.  For example, on Walker Road between
Franklin Farm Lane and Mower Road traffic increases 386%
comparing the 1995 traffic to 2015 no build traffic, whereas
with the interchange there is only a 6.9% increase on traffic on
Walker Road east of Franklin Farm Lane compared to the 2015 no
build alternative.  (AR-46, App. B at 5, 66, 96.)  Defendants
specifically responded to comments regarding the need for
improvements to Walker Road to accommodate D Modified and

---

[21]  Plaintiffs erroneously claim that this area is a "T"
intersection.

38

provides:

> While it is agreed that these roads do not meet collector road design standards, this situation would occur regardless if there was a Walker Road interchange or not. It is recommended that Greene Township consider the no-build condition and particularly the data efforts to improve conditions on these Township roads.

(AR-110 at 127.)  Moreover, plaintiffs admitted that traffic increases substantially on local roads with or without an interchange at Walker Road.  (Plaintiffs' response to SMF at 75-77.)

Second, plaintiffs inferred that the interchange increases the development potential in the area of the Gass House and the Franklin County Poor House.  The County owns approximately 193 acres in the area known as Franklin Farms (which includes the Gass House and Franklin County Poor House).  The Gass House and Franklin County Poor House are presently used as a County-operated retirement and extended care facility.  (AR-110 at 21.) The County constructed four modern facilities along Franklin Farm Lane, including a group of low-income retirement units, a County administration building, a prison, and a state police barracks.  (AR-110 at 21.)  The Franklin County Commissioners identified plans for future development which includes:  service area; Agricultural Center; Conference Center; Human Services expansion; Eco park; and an environmental area.  The construction of an interchange will provide additional access

for the proposed development without using Route 30 which will minimize any additional traffic in the vicinity of both the Gass and Poor House which are located at the Route 30 Franklin Farm Lane intersection. Therefore, additional development as a result of the interchange is unlikely given the surrounding property is owned by Franklin County and the area surrounding the Gass House and Franklin County Poor House is already developed or planned for development.

## IV.  CONCLUSION

For the foregoing reasons, this Court should issue an order granting the Federal and State Government's motion for summary judgment and denying plaintiffs' motion for summary judgment.

Respectfully submitted,

THOMAS A. MARINO
United States Attorney

*Anne K. Fiorenza*

ANNE K. FIORENZA
Assistant United States Attorney
Federal Building - 2nd Floor
228 Walnut Street
P.O. Box 11754
Harrisburg, PA  17108-1754

*Kenda Jo Gardner*

KENDA JO M. GARDNER
Assistant Counsel
JOHN M. HRUBOVCAK
Assistant Counsel-in
Charge
ROBERT J. SHEA
Assistant Chief Counsel
ANDREW S. GORDON
Chief Counsel
Pennsylvania Department of
Transportation
Office of Chief Counsel
P.O. Box 8212
Harrisburg, PA  17105

Date:  September 9, 2002