ORIGINAL

104
9-10-02
SC

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREENE/GUILFORD ENVIRONMENTAL
ASSOCIATION, a non-profit
Corporation incorporated under the
laws of the Commonwealth of
Pennsylvania, CITIZENS FOR PLANNED
COMMUNITY GROWTH, an unincorporated
association organized under the
laws of the Commonwealth of
Pennsylvania, PAUL B. AMBROSE,
JOHN G. ENDERS, CHARLES F.
RAHAUSER, BETSY RAHAUSER, DOUGLAS
A. WARNOCK, U.X. VAGNERINI, THOMAS
W. BUNDY, STEPHEN P. BUCHER,
ROGER J. ROBERTSON, JAMES A.
STRITE, JR., DAVID A. GUTHRIE,
    Plaintiffs,

    v.

KEN WYKLE, Administrator, Federal
Highway Administration, ROBERT
GATZ, Federal Highway
Administration,
    Defendants,

    and

BRADLEY L. MALLORY, Secretary for
the Department of Transportation,
Commonwealth of Pennsylvania,
    Intervenor

: CIVIL ACTION NO.
: 1:CV-01-0910
:
: (Judge Conner)

FILED
HARRISBURG, PA

SEP 0 9 2002

MARY E. D'ANDREA, CLERK
Per _____
    Deputy Clerk

## FEDERAL DEFENDANTS' AND INTERVENOR'S JOINT
## RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

1.    Undisputed.

2.    Undisputed.

3.    Undisputed.

4.    It is undisputed that the Draft Environmental Impact Statement (DEIS) was circulated to the public in May of 1994 and that the DEIS identified Alternative D-C (one of the alternatives at Walker Road) as the "preferred alternative".

5.    It is undisputed that the Final Environmental Impact Statement (FEIS) was circulated to the public in May of 1995 and that the FEIS recommended the selection of Alternative D-C.

6-7. Disputed.  The Surface Transportation and Uniform Relocation Assistance Act (STURAA) authorized funding for a demonstration project in Chambersburg Area.  Specifically, the law provided:

> . . . The Secretary shall carry out a highway project, which demonstrates how construction of an interchange on a north-south interstate route will provide access to Chambersburg, PA, and relieve traffic congestion on an existing interchange on such interstate route.

101 stat. 192 (sec. 149 (a)(74)) (1987).

In 1995, the National Highway System Designation Act added the following at the end of the above quoted authorization language for the project:  "and other projects in the counties of Bedford, Blair, Centre, Franklin, and Huntingdon, Pennsylvania". The original language and purpose of Section 149 (a)(74) of STURAA remains the same – construct an interchange to provide

access to Chambersburg, Pennsylvania and relieve traffic congestion on existing interchange of a north-south interstate route.  The purpose of the catch-all phrase was simply to ensure that the money for the I-81 Interchange project would be used in this geographic area if the project was not constructed.  As discussed in detail in paragraph 160 of this Response, the needs for the project were well established as set forth in the DEIS and FEIS, and this additional language in the funding authorization does not change these project needs.  (SMF 27.) Alternatives in Bedford, Blair, Centre, and Huntingdon Counties would not be reasonable alternatives under NEPA because these alternatives would not satisfy the project needs of providing access to Chambersburg, relieving congestion on an existing interchange of a north-south interstate, and providing for existing and proposed development in Chambersburg.

8.    Disputed.  This section of the National Highway System Designation Act still referenced Chambersburg, Pennsylvania by providing for "a highway project, which demonstrates how construction of an interchange on a north-south interstate route will provide access to Chambersburg, PA, and relieve traffic congestion on an existing interchange on such interstate route. . . ." 101 stat. 192 (sec. 149 (a)(74)) (1987).

9.    Disputed.  After the FEIS, the Christian Fry Jr. House and associated farmland were determined to be eligible for

listing on the *National Register*.  (SMF 15.)  Alternative D-C,
the preferred alternative, required land from this property.
(SMF 16.)  Alternative D was modified to avoid taking land from
this historic property.  (SMF 17.)  Alternative D Modified is in
the same general location of Alternative C.  (AR-46 at ES-14;
III-39; III-26.)  Furthermore, D Modified is in the same impact
area as Alternatives C and D, therefore, D Modified did not
result in any significant social, cultural, or environmental
impacts that were not discussed in the FEIS.  (SMF 98.)
Moreover, the 1998 traffic analysis indicated that, from a
traffic standpoint, the operations of D Modified are comparable
to those under Alternative D-C.  (AR-80 at 19.)

    10.  Disputed.  A portion of Walker Road will be relocated
and the existing Walker Road/I-81 overpass will be removed and
replaced with a structure that meets current design criteria.
(SMF 80.)  Relocated Walker Road will be the main connector road
for the new interchange.  (AR-80 at 5.)  Moreover, a section of
Walker Road will be resurfaced from the Route 30 intersection to
Relocated Walker Road.  (AR-83 at 1.)  Although south of the
preferred alternative identified in the DEIS and FEIS, D
Modified does not involve building a connector road to
Chambersburg Borough, i.e., the extension of Norland Avenue.  D
Modified connects to the same road network as the other Walker

Road alternatives.  (AR-46 at II-6-17; AR-80 at 6-8.)  The response to paragraph 9 is incorporated herein by reference.

11.  Disputed.  Comparing the cost contained in the FEIS to final design costs (6 years later) is like comparing apples to oranges.  The overpass would most likely be replaced for all alternatives, which is a substantial portion of this increase.

12.  It is undisputed that D Modified was not identified in the DEIS or FEIS for the project.  The responses to paragraphs 9 and 10 are incorporated herein by reference.

13.  It is undisputed that in January, 1999, a written re-evaluation of the FEIS was prepared in accordance with 23 C.F.R. §771.129.  (AR-80.)  The 1999 Re-evaluation concluded:

> Based on the above analysis and the application of 40 C.F.R. §1508.27 which defines "significant", the modification of Alternative D does not result in significant new impacts from those which were discussed in the Final EIS . . . .  The affected environment of the study area is substantially the same as presented in the FEIS, and the environmental consequences of the proposed action are not significantly different from those presented in the FEIS.  Alternative D Modified lessens environmental impacts by avoiding historic resources and reducing visual effects to historic resources in the Walker Road vicinity, without causing other significant environmental impacts.

(AR-80 at 21.)

14.  Disputed.  The 1999 Re-evaluation of the FEIS was distributed to Federal Highway Administration (FHWA) for review. FHWA reviewed the 1999 Re-evaluation and approved the 1999 Re-

evaluation (by way of letter signed by FHWA's Division

Administrator) concluding:

> It is clear from the reevaluation that there are no new
> significant impacts related to the project (i.e., changes
> that have occurred since the final EIS was approved).
> Therefore a supplemental EIS is not required.

(AR-82 at Attachment D; AR-110 at 41-42.)  Moreover, the 1999

Re-evaluation was part of the Record of Decision (ROD) for the

project which was approved (signed) by FHWA's Eastern Resource

Center and FHWA's Pennsylvania Division Administrator.  (AR-82

at 14 and Attachment D.)

15.  It is undisputed that the ROD for the project was

approved and signed by FHWA's Eastern Resource Center on March

25, 1999 and by FHWA's Pennsylvania Division Administrator on

March 24, 1999.  (AR-82 at 14.)  Plaintiffs referenced an

incorrect date for the approval of the ROD.

16.  It is undisputed that defendants prepared a re-

evaluation of the ROD for the project which was dated June 28,

2001.  (AR-83.)  The remainder of this paragraph is disputed as

a conclusion of law.  Plaintiffs erroneously state that there is

no regulatory authority for a National Environmental Policy Act

(NEPA) document of this type.  Regulatory authority for a re-

evaluation of a ROD is located at 23 C.F.R. §771.129(c).

17.  It is undisputed that the Preliminary Alternatives

Report (PAR) was prepared in May of 1990.  The remainder of that

paragraph is disputed.  The PAR actually states:  "The project is one of several demonstration projects which came about through Public Law 100-17 dated April 2, 1987."  (AR-3 at 7.) There is no mention of project needs on the page cited by plaintiffs.

18.  Disputed.  The PAR did not discuss the project need. Two of the comments were from Franklin County Farmers' Association, Inc. and the Franklin County Heritage, Inc. which are not consulting agencies.  (AR-88 at 26, 33-37.)  The letter from Franklin County Heritage, Inc. does not mention project needs, rather it expresses opposition to Alternative C.  (AR-88 at 33-35.)  The letter from the Honorable John W. Keller (not a consulting agency) does not mention project needs, but does recognize a "desperate need of relief from the traffic congestion which is increasingly paralyzing transportation" and expresses opposition to Alternatives C and D.  (AR-88 at 37-38.) With regard to project needs, Pennsylvania Historic and Museum Commission (PHMC) and Environmental Protection Agency (EPA) only commented that the project need was not discussed in the PAR. (AR-88 at 44-47.)  The letter from the U.S. Fish and Wildlife Service provides that the PAR thoroughly covered the impacts to wetlands and other wildlife habitat and agreed that Alternative E could be dropped and that Alternatives B, C, and D should be studied in detail and makes no mention of project needs.  (AR-88

at 49.)   The Pennsylvania Game Commission and the Army Corps of Engineers simply stated that a needs study should be performed for the project.   (AR-88 at 92-93, 48.)

19.  It is undisputed that the Pennsylvania Fish Commission provided a comment letter dated July 3, 1990.  FHWA considered the comment during its review of the project.

20.  Disputed.  Pennsylvania Department of Transportation (PennDOT) retained the service of McCormick, Taylor and Associates to review the work to date and to assist Johnson, Mirmiran, and Thompson in determining a project need and in preparation and review of other documents.  (AR-90 at 11.)

21.  It is undisputed that the statement was included in 1992 in meeting minutes drafted by a consultant.  The statement was made early in the process.  The DEIS and FEIS showed that sufficient traffic was being diverted.  Project needs establish the standard by which alternatives are judged.  Since the Plaintiffs make a traffic based argument, the FEIS (AR 46 at IV-89) details the improvements to the intersection of Walker Road and Route 30.  (AR-46 at IV-88-89.)  This intersection is improved over no build in all cases studied that include the interchange at Walker Road.  The response to paragraph 160 is incorporated herein by reference.

22.  Disputed.  At the April 27, 1992 meeting the consultant (not PennDOT) presented several options regarding

developing the need for the project.  One option was to increase the study area and perform more traffic studies.  The second and third options involved putting the project on hold until either the results or the Route 30 Planning Study were completed or pending future land use changes.  (AR-90 at 12.)  The response to paragraph 160 is incorporated herein by reference.

23.  Undisputed.

24-25.    It is undisputed that Former Congressman Shuster was the ranking Republican on the Surface Transportation Subcommittee and served as the Chair of the Transportation and Infrastructure Committee from 1995 to 2000.

26.  Disputed.  Former Secretary Yerusalim stated in the July 6, 1992 letter:  "PennDOT is committed to pursuing construction of Exit 7 at or near Walker Road to service and promote economic development in the area.  It is our intention to satisfy the environmental requirements. . . ."  In 1992, at the time the letters were exchanged between former Pennsylvania Secretary Yerusalim and former Congressman Shuster, the preliminary alternatives report was prepared and distributed, which identified Walker and Kriner Roads as two potential locations for the new interchange.  (SMF 138; AR-90 at 25.)  The selection of these two locations was based on environmental and engineering studies.  The DEIS and FEIS evaluated in detail several alternatives at the Walker Road and Kriner Road

locations and identified Alternative D-C as the preferred alternative. (SMF 141.) The DEIS and FEIS evaluated in detail the social, environmental, and cultural impacts of these alternatives (SMF 143.)

27. It is undisputed that former Secretary Yerusalim sent a letter to former Congressman Shuster dated July 14, 1992. The letter explains that traffic and preliminary environmental studies were performed for the project and that the results of the of these studies were included in the PAR for the project. (AR-90 at 25.) The response to paragraph 26 is incorporated herein by reference.

28. Unable to respond because statement fails to cite to the Administrative Record.

29. Disputed. The project needs are not limited to the language contained in Public Law 100-17. Other needs may be added to the statutory language, as long as the statutory need is not compromised. The project needs did not include economic development. The project needs did include: "accommodating existing and future traffic volumes" and "providing for existing and proposed development in the study area." (AR-46 at I-1.)

30. Disputed. Defendants' focus of relieving traffic on the I-81/Route 30 interchange (Exit 6) was based on the language of Public Law 100-17. Therefore, to comply with Public Law 100-17, the interchange must be experiencing some congestion. The

I-81/Route 30 interchange is presently and will be in the future experiencing congestion. Later traffic studies confirmed this focus. The I-81/Wayne Avenue interchange is operating without congestion thanks to the recent improvements to Wayne Avenue. (AR-83 at 7.) The response to paragraph 160 is incorporated herein by reference.

31. Disputed. The document referenced by plaintiffs is simply a meeting discussing the project, not a scoping meeting as suggested by plaintiffs. Moreover, the meeting minutes do not state that the project will serve a future developer.

32. Disputed. PennDOT's Twelve Year Program is a planning tool (with public input) designed to show which projects are intended to be completed for each four (4) year period and the estimated costs associated with the completion of said projects. In Pennsylvania, the need for transportation improvements exceeds available resources. The Twelve Year Program prioritizes Pennsylvania's transportation projects while utilizing limited funding. The specific alternatives development is irrelevant to the Twelve Year Program.

Federal funding was first provided for the I-81 Interchange project with the passing of the STURAA of 1987. The first year that the project appeared on PennDOT's Twelve Year Program was 1987. In subsequent Programs (the first being the 1988-2000 Program), the geographic limit location was described as the

Chambersburg and/or Franklin County area because PennDOT was evaluating alternatives at both Walker and Kriner Roads. (AR-169 at 53-62.)  The term Exit 7 was used to identify this project because during its development, I-81 did not have an Exit #7. Early in the process, PennDOT stated:  "The proposed interchange has been called Interchange #7 . . . the interchange does not have to be located north of Chambersburg Borough between Interchange #6 and #8."  The Preliminary Alternatives Report dated 1990 (AR-2, 3), the DEIS dated May 1994 (AR-12), and the FEIS dated May 1995 (AR-46, 47, 48) evaluated several alternatives at both Walker and Kriner Roads.

33.  Undisputed except the date is incorrect.  The notice was published in the *Pennsylvania Bulletin* on February 6, 1988. 18 Pa. Bull. 627 (Feb. 6, 1988).

34.  Undisputed.  The responses to paragraphs 30 and 160 are incorporated herein by reference.  As defined by the original contract for this project, the study area for the project was defined as follows:  "The limits for this study are from approximately 2 miles north of existing Interchange 4 to existing Interchange 8 on Interstate 81."  (AR-163 at 1022.) Moreover, the notice of intent to prepare an EIS published in the *Federal Register* identified the study area as follows:  "The northern terminus and study area limit will be the existing interchange #8 of I-81 (Scotland).  The southern terminus and

study area will be approximately 2 miles north of the interchange #4 (Marion)." Alternatives at Walker and Kriner Roads were developed and studied in detail in the DEIS, FEIS, and re-evaluations. (AR-46 at II-3-17, IV-1-95.)

35. Disputed. This document is not indicative of a pledge by the agencies to any specific alternative location. The Federal-Aid Project Agreement states the project termini as "I-81, near Chambersburg Borough, between Exit 5 and Exit 8, in Guilford and Greene Townships." (AR-167 at 2299.) The response to paragraph 34 is incorporated herein by reference.

36. Undisputed.

37. Undisputed. Defendants' focus of relieving traffic on the I-81/Route 30 interchange (Exit 6) was based on the language of Public Law 100-17. The responses to paragraphs 30 and 34 are incorporated herein by reference.

38. It is undisputed that Public Law 100-17 does not specifically mention Exit 6 or Route 30; however, Public Law 100-17 requires the relief of congestion on an existing interchange on I-81 and providing access to Chambersburg, Pennsylvania. Therefore, to comply with Public Law 100-17, the interchange must be experiencing some congestion. The I-81/Route 30 interchange is presently and will be in the future experiencing congestion. The I-81/Wayne Avenue interchange is operating without congestion thanks to the recent improvements

13

to Wayne Avenue.  The response to paragraph 160 is incorporated herein by reference.

39.  Undisputed.  The responses to paragraphs 30 and 34 are incorporated herein by reference.

40-41.    Disputed.  It appears from AR-88 at 24 that the meeting was in late July of 1990 and at the request of the Chamber of Commerce.  Moreover the letter indicates that there was already overwhelming support for the project.

42.  Disputed.  The coloring book was never distributed to the public.  "The exit 7 coloring book" was a conceptual public involvement tool.  It was never presented at any public meeting or presentation.  (Exhibit A, Declaration of Robert McClure.) All public involvement material is included in AR-43 and AR-44. The term Exit 7 was used in conjunction with this project because during the development of the project, I-81 did not have an Exit #7.  Early in the process, PennDOT stated:  "The proposed interchange has been called Interchange #7 . . . the interchange does not have to be located north of Chambersburg Borough between Interchange #6 and #8."  The Preliminary Alternatives Analysis Report dated 1990 (AR-2, 3), the DEIS dated May 1994 (AR-12), and the FEIS dated May 1995 (AR-46, 47, 48) evaluated several alternatives at both Walker and Kriner Roads.

43.  It is undisputed that Winsor Associates was retained to help with conflict resolution activities for the project. (AR-166 at 2057.)  Winsor's scope of work included meeting with community leaders, local government officials, and PennDOT personnel to identify their concerns.  (AR-166 at 2060.)

44.  It is undisputed that the statements were made by a consultant.  These statements represented the consultant's interpretation of comments made at a meeting of a citizen's organization which was concerned with development planned in the north end of the Borough.  (AR-90 at 83.)  The response to paragraph 43 is incorporated herein by reference.

45-46.   It is undisputed that PennDOT prepared transportation briefing papers for former Congressman Shuster. The briefing papers do mention relieving congestion at the I-81/Route 30 interchange, based on the language of Public Law 100-17, the traffic studies for the project, and the improvements planned on Wayne Avenue in the vicinity of the I-81/Wayne Avenue interchange (Exit 7).  See response to paragraph 30.  Moreover, these briefing papers also explained that alternatives at Walker and Kriner Roads were studied in detail. (AR-169 at 120, 123-124, 125, 128, 131, 136, 143, 146, 149, 152, 155, 161, 164, 168, 172, 176.)

47-48.   It is disputed that the agencies accelerated the schedule for the project.  The ROD was issued approximately four

(4) years after the FEIS was circulated to the public.  After FHWA approved PennDOT's request to complete concurrent preliminary design (design required under NEPA) and pre-final design, PennDOT retained Sheladia Associates, Inc. to perform pre-final design activities.  The beginning date of the Sheladia contract was March 22, 1995.  (AR-165 at 1734.)

At this point in time, the DEIS had already been circulated with a preferred alternative identified, comment period for the DEIS was closed, the public hearing was held, the public comments were reviewed and responded to, and sections of the FEIS were drafted with insignificant updates to the environmental impacts compared to the DEIS. (AR-96 at 775-76.) Barring an unforeseen circumstance, the NEPA process was near completion.  All that was required was approval and circulation of the FEIS, public comments on the FEIS, and consideration of any new comments not already received on the DEIS prior to issuance of the ROD.  At this point in the NEPA process, it is expected that an agency has a preferred alternative.  The CEQ regulations provide that the preferred alternative may be identified in the DEIS and should be identified in the FEIS.  40 C.F.R. §1502.14(e).

No final design was completed for any alternative before the ROD was issued.  (Exhibit B, Declaration of Charles Babcock, P.E.)  The majority of the work (pre-final design) completed was

16

on Alternative D-C, an alternative that was not selected in the ROD. (AR-98 at 1152, 1194; AR-99 at 1413, 1429, 1535, 1627, 1645.) For Alternative D-C, Sheladia completed: (1) preliminary cost estimates (AR-98 at 1194; AR-99 at 1413); (2) initial contact with utilities (AR-99 at 1429); (3) Safety Review submission and meeting (AR-99 at 1535-41); and the preliminary Traffic Control Plan (AR-99 at 1645-46). None of these activities are final design activities. (Exhibit B, Declaration of Charles Babcock P.E.)

In August of 1995, the Greene Township-Conococheague Rural ("GT-CR") Historic District was determined to be "eligible" by the Keeper. Two ramps of Alternative D-C were located in the newly designated historic district. (AR-99 at 1674.) For this reason, Sheladia began evaluating alternatives to avoid this historic district. On August 14, 1995, Sheladia presented a map of a potential alternative that avoids the GT-CR historic district to the Management Team. (AR-100 at 1693, ¶3.) The Management Team included representatives from FHWA, PennDOT and various consultants working on this project. (AR-100 at 1692.)

From August of 1995 until June of 1997, the boundaries of the historic resources located in the area of the GT-CR historic district were being evaluated. Because a number of modern intrusions were included in the purported historic district, defendants concluded that the Keeper made her decision based on

insufficient information.  (AR-80 at 3.)  FHWA submitted a
request for reconsideration to the Keeper.  (AR-56; AR-80 at 3.)
On January 15, 1997, the Keeper rescinded the eligibility
determination for the GT-CR historic district and determined
eligible two smaller rural historic districts and individual
properties.  On June 27, 1997, the Keeper issued a letter
announcing the Christian Fry, Sr. Farmstead boundaries.  (AR-104
at 286-287.)  That determination extended the Christian Fry, Sr.
Farmstead boundary which resulted in the need to evaluate the
possibility of an avoidance alternative.  (AR-104 at 308.)  On
February 25, 1998, Sheladia presented two alternatives that
avoided the Fry historic property to the Management Team.  (AR-
105 at 10, ¶2.)  One of these alternatives was Alternative D
Modified.  (AR-105 at 10, ¶2.)

The engineering of Alternative D Modified was developed to
the same level of detail as the other alternatives presented in
the EIS, so that traffic, environmental, and historic impacts of
Alternative D Modified could be compared to the alternatives
presented in the DEIS and FEIS in the 1999 Re-Evaluation to
determine whether a Supplemental EIS was necessary.  (AR-80.)

49-50.   Disputed as a conclusion of law.  As stated in
the Scope of Work, the work order for pre-final design was
consistent with PennDOT's Strike-Off Letter 430-85-93 (which was
approved by FHWA) and Concurrent National Environmental Policy

Act and Design Activities, dated September 3, 1985. (AR-165 at 1664.)

51. Disputed. The DEIS was circulated to the agencies comprising the Agency Coordination Meetings and comments on the DEIS were provided by a number of these agencies. (AR-47 at 1-14.)

52. Disputed. At the Agency Coordination Meeting EPA's representative asked if the DEIS would include a preferred alternative. PennDOT answered: "a preferred alternative would not be included in the DEIS unless otherwise instructed by the agencies." (AR-91 at 185.)

53. It is undisputed that the DEIS identified Alternative C-D as the "preferred alternative."

54. It is undisputed that the Gablers requested that the land located in the Borough be rezoned from residential to commercial. (AR-132 at 472-73.) The Gabler property was not zoned agricultural.

55. It is undisputed that AR-45 at VII-1 is a comment submitted by a local resident of the project. FHWA considered this comment during its review of the project. The substance of the comment is disputed.

56. It is undisputed that an e-mail reflects that someone from FHWA was appointed the coordinator to expedite the project. It is undisputed that Congressman Shuster was interested in the

project.  However, the e-mail does not indicate that the
appointment was in response to Congressman Shuster's desires.

57.  It is undisputed that the statement was made.
However, the schedule was not further accelerated.  The opposite
occurred.  In August of 1995, the Greene Township-Conococheague
Rural ("GT-CR") Historic District was determined to be
"eligible" by the Keeper.  Two ramps of Alternative C-D were
located in the historic district.  (AR-99 at 1674.)  After this
new historic district was identified, Sheladia began evaluating
alternatives to avoid this historic district.  On August 14,
1995, Sheladia presented a map of a potential alternative that
avoids the GT-CR historic district to the Management Team.  (AR-
100 at 1693, ¶3.)

From August of 1995 until June of 1997, the boundaries of
the historic resources located in the area of the GT-CR historic
district were being evaluated.  Because a number of modern
intrusions were included in the purported historic district,
defendants concluded that the Keeper made her decision based on
insufficient information.  (AR-80 at 3.)  FHWA submitted a
request for reconsideration to the Keeper.  (AR-56; AR-80 at 3.)
On January 15, 1997, the Keeper rescinded the eligibility
determination for the GT-CR historic district and determined
eligible two smaller rural historic districts and individual
properties.  On June 27, 1997, the Keeper issued a letter

announcing the Christian Fry, Sr. Farmstead boundaries.  (AR-104

at 286-287.)  That determination extended the Christian Fry, Sr.

Farmstead boundary which resulted in the need to evaluate the

possibility of an avoidance alternative.  (AR-104 at 308.)  On

February 25, 1998, Sheladia presented two alternatives that

avoided the Fry historic property to the Management Team.  (AR-

105 at 10, ¶2.)  One of these alternatives was Alternative D

Modified.  (AR-105 at 10, ¶2.)

The engineering of Alternative D Modified was developed to

the same level of detail as the other alternatives presented in

the EIS, so that traffic, environmental, and historic impacts of

Alternative D Modified could be compared to the alternatives

presented in the DEIS and FEIS in the 1999 Re-Evaluation to

determine whether a Supplemental EIS was necessary.  (AR-80.)

The ROD was not approved until March of 1999.  This schedule was

not expedited or accelerated because defendants ensured that

requirements contained in NEPA and the National Historic

Preservation Act (NHPA) were satisfied.

58.  Disputed.  First, FHWA authorized "pre-final design"

not "final design".  Second, the FEIS was circulated in May of

1995, only five months before this e-mail.  At this point in

time, the DEIS had already been circulated with a preferred

alternative identified, comment period for the DEIS was closed,

the public hearing was held, the public comments were reviewed

and responded to, and sections of the FEIS were being drafted with insignificant updates to the environmental impacts compared to the DEIS.  (AR-96 at 775-76.)

59.  Undisputed.  The response to paragraph 58 is incorporated herein by reference.

60.  It is undisputed that AR-22 provides that the proposed interchange will be located between Exit 6 and Exit 8.  The response to paragraph 58 is incorporated herein by reference. AR-22 was submitted for Alternative D-C which was not approved in the ROD.  Another Point of Access Justification Re-Assessment for Alternative D Modified was submitted June 4, 1998. According to FHWA policy, "any proposed access points can be submitted . . . for a determination of engineering and operational acceptability prior to completion of the NEPA process."  63 Fed. Reg. 7047 (Feb. 11, 1998).  This is permitted to determine whether the proposal is acceptable.  Id.  As was done in this case, final approval is not given until the ROD is issued.  Id.

61.  Disputed.  Plaintiffs cite to comments provided by Greene Township.  Defendants considered and responded to these comments.  (AR-110 at 123-131, 158-160.)  The AASHTO specification is a "generalized rule of thumb for minimum spacing," not a requirement.  AASHTO provides for spacing less than one mile in the same paragraph.  (AR-79 at 6.)

62.  Undisputed.

63.  Disputed.  Plaintiffs cite to comments provided by Greene Township.  Defendants considered and responded to these comments.  (AR-110 at 123-31.)  The response to paragraph 61 is incorporated herein by reference.

64.  Disputed.  Plaintiffs failed to cite to the administrative record as support for their statements.  The response to paragraph 61 is incorporated herein by reference.

65-66.   The response to paragraph 57 is incorporated herein by reference.  Certain approvals are out of FHWA's control, for example, receiving a signed Memorandum of Agreement (MOA) from PHMC and the Advisory Council under the NHPA.

67.  It is undisputed that Secretary Mallory stated that the interchange will be located in the vicinity of Walker Road.  At this point in time, the DEIS had already been circulated with a preferred alternative identified, comment period for the DEIS was closed, the public hearing was held, the public comments were reviewed and responded to, the FEIS was completed with insignificant updates to the environmental impacts compared to the DEIS, and the FEIS was submitted to FHWA for approval to circulate to the public.  (AR-96 at 775-76.)  Under NEPA, it is expected that an agency has a preferred alternative.  The CEQ regulations provide that the preferred alternative should be identified in the FEIS.  40 C.F.R. §1502.14(e).

68-69.    It is disputed that final design was authorized.
Pre-final design was authorized.  The responses to paragraphs
47-48 and 57 are incorporated herein by reference.

70-71.    It is undisputed that the statement was made in
paragraph 70.  It is disputed that there is no documentation to
support the determination not to prepare a FEIS.  The
regulations did not require the preparation of a SEIS.  The same
alternative identified in the DEIS was the preferred alternative
in the FEIS.  Moreover, there were no new impacts identified at
the time of the circulation of the FEIS.  (AR-96 at 755.)  The
FEIS, itself, is the documentation in support of this decision.

72.  Undisputed.  The response to paragraph 57 is
incorporated herein by reference.

73.  Disputed as a conclusion of law.  It is undisputed
that if the preferred alternative impacts an historic resource
that it must comply with Section 4(f) of the United States
Department of Transportation Act.  49 U.S.C. §302 (c).

74.  Disputed.  FHWA and PennDOT did not appeal the
Keeper's decision.  As specified in the Section 106 regulations,
a reevaluation may be required due to "the passage of time,
changing perceptions of significance, or incomplete prior
evaluations" 36 C.F.R. §800.4 (c)(1).  The FHWA and PennDOT
asked for a reevaluation because the *National Register*
nomination form submitted by the Green Township Supervisors,

which the Keeper used for her determination, was incomplete, and lacked an inventory of all historic and non-historic properties.

75.  Disputed.  The Gablers were concerned with the boundary determination of the Eastern Greene Rural Historic District.  Defendants request for a re-evaluation was separate from the Gabler's actions.

76-77.    Disputed.  The response to paragraph 74 is incorporated herein by reference.

78-80.    Undisputed.  FHWA responded to the Inspector General's Office regarding the complaint.  (AR-103 at 373-75.) In fact, the Inspector General's Office, an independent arm of the U.S. Department of Transportation, investigated the complaints of pre-determination and found nothing improper. (SMF 158.)

81.  Disputed as a conclusion of law.

82.  Disputed.  Plaintiffs fail to cite to any documentation in the administrative record as support for this statement.  The response to paragraph 6 is incorporated herein by reference.

83.  Disputed.  The response to paragraph 6 is incorporated herein by reference.

84-89.    The responses to paragraphs 6 and 8 are incorporated herein by reference.

90.  It is undisputed that the reevaluations and the ROD were completed after the amendment.  It is disputed that the amendment changed the project need.  The responses to paragraphs 6 and 8 are incorporated herein by reference.

91.  Disputed as a conclusion of law.  The responses to paragraphs 6 and 8 are incorporated herein by reference.

92-94.    Disputed.  The cited documents were comments provided by Greene Township.  Defendants considered and responded to these comments during their decision-making process.  (AR-110 at 123-131.)  By way of further answer, the results of the traffic analysis revealed that traffic will increase on local roadways with or without an interchange at Walker Road, due to existing and planned development.  (SMF 75.) Moreover, plaintiffs admit that traffic will increase on local roadways with or without an interchange at Walker Road. (Plaintiffs' Answer to SMF 75.)  Plaintiffs admit that traffic will increase in northern Chambersburg and western Greene Township with or without construction of the Walker Road interchange.  (Plaintiffs' Answer to SMF 76.)  Plaintiffs admit that traffic along Walker Road is expected to increase by as much as four-fold, and traffic along Norland Avenue is expected to double between 1995 and 2016 for No-Build conditions. (Plaintiffs' Answer to SMF 77.)  With the Walker Road interchange, increases in traffic can be expected on some local

roadways; however, when compared to the increases expected on some local roads due to the identified developments, the increases due to the interchange are not as significant.  For example, on Walker Road between Franklin Farm Lane and Mower Road traffic increases 386% & comparing the 1995 traffic to 2015 no build traffic, whereas with the interchange there is only a 6.9% increase on traffic on Walker Road east of Franklin Farm Lane compared to the 2015 no build alternative.  (AR-46, App. B at 5, 66, 96.)  The average daily traffic on other local roads remains substantially the same with or without the intersection, namely Franklin Farm Lane, Mower Road, Ragged Edge Road, Norland Avenue west of Scotland Road and Scotland Road South of Norland Avenue.  (SMF 79.)  Because there is a significant increase in traffic on the local roads without the construction of a new interchange, improvements to local roads are necessary even if the interchange is not built.  The need for improvements to local roads is independent of the interchange project.

Finally, the ROD specifically address the issue of traffic on local roads:

> The traffic studies show that traffic will increase on area roadways with or without an interchange at Walker Road.  In fact, under the No-Build condition and with improvements to U.S. Route 30 and the completion of the Norland Avenue Extension (a local project), traffic on segments of Walker Road will likely increase by as much as 205% to 238%.  One of the largest components of future traffic on area roadways is the planned and on-going development which has been identified in the area.  Without this development,

> there would be increased traffic on the area roadways surrounding the interchange area due to the background population growth, which is likely to occur with or without the construction of the interchange. While it is likely that roadway improvements will eventually be necessary, the improvements will not be as a result of this project.

(AR-82 at 12-13.) Improvements to local roads are included in this project.

95. Disputed as characterized. The condition of Walker Road and Franklin Farm Lane were discussed in the FEIS. (AR-46 at III-65-66. The cited documents were comments provided by Greene Township. Defendants considered and responded to these comments during their decision-making process. (AR-110 at 123-131.) The responses to paragraphs 92-94 and 101 are incorporated herein by reference.

96. Disputed. The cited documents were comments provided by Greene Township. Defendants considered and responded to these comments during their decision-making process. (AR-110 at 123-131.) The curves referred to in this paragraph are located on the eastern boundary of the traffic study area, east of Mower Road. (AR-46, App. B at 5, 66, 96.) Defendants' response to Greene Township's comment specifically addresses the need for improvements to Walker Road to accommodate D Modified and provides: "While it is agreed that these roads do not meet collector road design standards, this situation would occur regardless if there was a Walker Road interchange or not. It is

recommended that Greene Township consider the no-build condition and particularly the data collected by their own consultant and begin efforts to improve conditions on these Township roads." (AR-110 at 127.)

97.  It is undisputed that the curves referenced in paragraph 96 are bordered by properties eligible for the *National Register*.  Improvements to these curves are not necessary as a result of this project.  The percentage increases on local roads are due to identified developments and occur even if the intersection is not construction at Walker Road, i.e. no build conditions.  The increases due to the interchange are nonexistent or not significant.  For example, on Walker Road between Franklin Farm Lane and Mower Road traffic increases 386 % comparing the 1995 traffic to 2015 no build traffic, whereas with the interchange there is only a 6.9% increase on traffic on Walker Road east of Franklin Farm Lane compared to the 2015 no build alternative.  (AR-46, App. B at 5, 66, 96.)  The cited documents were comments provided by Greene Township.  Defendants considered and responded to these comments during their decision-making process.  (AR-110 at 123-131.)  The response to paragraph 94 is incorporated herein by reference.

98.  Disputed.  The area described in this paragraph is not a "T" intersection, rather, this area will become a curve because stop signs for all westbound movements and for

northbound right turns will be eliminated.  (AR-82 at 7.)  The
cited documents were comments provided by Greene Township.
Defendants considered and responded to these comments during
their decision-making process.  (AR-110 at 123-131.)  The
response to paragraph 96 is incorporated herein by reference.

99.  It is undisputed that curve referenced in paragraph 98
is bordered by properties eligible for the *National Register*.
Improvements to this curve is not necessary as a result of this
project.  The percentage increases on local roads are due to
identified developments and occur even if the intersection is
not constructed at Walker Road, i.e. no build conditions.  The
increases due to the interchange are not significant.  For
example, on Walker Road east of existing Franklin Farm Lane to
Mower Road traffic increases 386% comparing the 1995 traffic to
no build 2015 traffic, whereas with the interchange there is
only a 6.9% increase on traffic on Walker Road east of Franklin
Farm Lane compared to the 2015 no build alternative.  (AR-46,
App. B at 5, 66, 96.)  The cited documents were comments
provided by Greene Township.  Defendants considered and
responded to these comments during their decision-making
process.  (AR-110 at 123-131.)

100. The cited documents were comments provided by Greene
Township.  Defendants considered and responded to these comments

during their decision-making process.  (AR-110 at 123-131.)  The response to paragraph 99 is incorporated herein by reference.

101. Undisputed.  By way of further response, a portion of Walker Road will be relocated and the existing Walker Road/I-81 overpass will be removed and replaced with a structure that meets current design criteria.  (SMF 80.)  Relocated Walker Road will be the main connector road for the new interchange.  (AR-80 at 5.)  Moreover, a section of Walker Road will be resurfaced from the Route 30 intersection to Relocated Walker Road.  (AR-83 at 1.)

102. Undisputed.  By way of further response, Relocated Walker Road will intersect with Franklin Farm Lane.  The proposed interchange ramps will not intersect Franklin Farm Lane.  (AR-80 at 7)  The traffic studies for the project show that on Franklin Farm Lane from Route 30 to the Relocated Walker Road, traffic volumes on Franklin Farm Lane will continue to increase without the proposed interchange.  (SMF 206.)  The volume of traffic using Franklin Farm Lane is anticipated to increase from 450 to 2,300 vehicles per day by year 2016 either with or without construction of the Walker Road intersection.  (SMF 207, 209.)

103. Undisputed.  The responses to paragraphs 101 and 102 are incorporated herein by reference.

104. Disputed.  The documents cited by plaintiffs are dated

August 6, 1987, prior to the completion of any traffic studies.

The traffic study showed that traffic increased on the local

roads with or without the project.  Traffic studies were not

begun until 1989 (traffic counts were taken in February of 1989

and origin and destination data was not collected until 1989.)

(AR-115 at 149; AR-3 at 29-30.)  The responses to paragraphs 92-

94 and 101 are incorporated herein by reference.  Moreover, AR-

86 at 8 did not conclude that upgrades were necessary "for the

interchange to operate safely".

105. It is undisputed that the comment was received and

considered during the decision-making process.  Again, the

document cited by plaintiffs is from January of 1989 and prior

to the completion of any detailed traffic analysis of local

roads.  The traffic studies showed that traffic increased on the

local roads with or without the project.  Traffic studies were

not begun until 1989 (traffic counts were taken in February of

1989 and origin and destination data was not collected until

1989.)  (AR-115 at 149; AR-3 at 29-30.)  The responses to

paragraphs 92-94 and 101 are incorporated herein by reference.

106. It is undisputed that the PAR includes the quoted

statement.  However, the PAR does not conclude that Alternative

D was the cause of the increase of traffic on local roads.  The

PAR indicated a similar statement for the no build alternative,

the PAR also concluded:  "With increased traffic within this
network expected to continue, increased congestion and delays
can be expected in the future."  (AR-3 at 4.)  The document
cited by plaintiffs is from May of 1990 and prior to the
completion of detailed traffic analysis of local roads that
showed that traffic increased on the local roads with or without
the project.  The PAR did not contain a detailed comparison of
the build and no build alternatives on local roads.  In fact,
the PAR states that "additional areas where traffic impacts will
be studied are located outside the limits of the . . . study
area as shown on Figure 1b."  (AR-3 at 7, 9.)  The responses to
paragraphs 92-94 and 101 are incorporated herein by reference.

107. Disputed.  The PAR recognizes that traffic will
increase on local roads without the project.  (AR-3 at 41.)  The
response to paragraphs 106 is incorporated herein by reference.

108-110.  It is undisputed that these comments from the
Army Corps of Engineers, Pennsylvania Department of Agriculture,
and Judge John W. Keller were received in July of 1990
commenting on the PAR.  These comments on the PAR were made
prior to the completion of the DEIS (dated 1994) which showed
that traffic increased on the local roads with or without the
project.  The PAR did not contain a detailed comparison of the
build and no build alternatives on local roads.  In fact, the
PAR states that "additional areas where traffic impacts will be

studied are located outside the limits of the . . . study area

as shown on Figure 1b." (AR-3 at 7, 9.)  The responses to

paragraphs 92-94 and 102 are incorporated herein by reference.

Finally, with regard to paragraph 110, D Modified does not cause

an increase of traffic on Franklin Farm Lane.  AR-88 at 36 used

the terms of "increased traffic" not "interstate traffic" as

plaintiffs suggest.

111. It is undisputed that Franklin County Commissioner

made this comment.  The remainder of this paragraph is disputed.

Franklin County Commissioners supports an interchange at Walker

Road.  (AR-88 at 18-19.)  The Commissioners noted, that the

development of an interchange will provide additional access for

the proposed development in the Franklin Farm Area, without

using Route 30.  (AR-43, Section III at 27.)  Moreover, D

Modified does not impact the traffic volumes at Franklin Farm

Lane.

112-113.  For paragraph 112, traffic studies demonstrate

that Franklin Farm Lane from Relocated Walker Road to Route 30

is not a primary route of travel for any of the interchanges at

Walker Road.  On the Franklin Farm Lane from Route 30 to the

Relocated Walker Road, traffic volumes on Franklin Farm Lane

will continue to increase without the proposed interchange.

(SMF 206.)  The volume of traffic using Franklin Farm Lane is

anticipated to increase from 450 to 2,300 vehicles per day by

year 2016 either with or without construction of the Walker Road
intersection.  (SMF 207, 209.)  For paragraph 113, the cited
documents were comments provided by Greene Township.  Defendants
considered and responded to these comments during their
decision-making process.  (AR-110 at 123-131.)

114. It is undisputed that Chambersburg Area School
District passed a resolution regarding the removal of the
existing Walker Road overpass because "removal would require . .
. buses to travel more miles . . . it would create more
congestion and impact on safety of our buses now be it resolved
that we petition the Pennsylvania Department of Transportation
to keep the current Walker Road Bridge irregardless of any plans
to add additional bridges."  (AR-169 at 182.)  FHWA considered
this comment during its review of the project.  The proposed
overpass is only a few hundred yards from the existing overpass.

115-117.   It is undisputed that the condition of local
roads was raised at project meetings.  However, these meetings
occurred in April of 1992 prior to the completion of the DEIS
(dated 1994) and FEIS (dated 1995) which showed that traffic
increased on the local roads with or without the project.  The
responses to paragraphs 92-94 and 101 are incorporated herein by
reference.

118. It is undisputed that the comment was made in August
of 1993.  The record indicates that traffic does not increase

significantly on local roads due to the project.  The responses

to paragraphs 92-94, 96 through 101, and 127 are incorporated

herein by reference.  Moreover, the ROD specifically address the

issue of traffic on local roads:

> The traffic studies show that traffic will increase on area
> roadways with or without an interchange at Walker Road.  In
> fact, under the No-Build condition and with improvements to
> U.S. Route 30 and the completion of the Norland Avenue
> Extension (a local project), traffic on segments of Walker
> Road will likely increase by as much as 205% to 238%.  One
> of the largest components of future traffic on area
> roadways is the planned and on-going development which has
> been identified in the area.  Without this development,
> there would be increased traffic on the area roadways
> surrounding the interchange area due to the background
> population growth, which is likely to occur with or without
> the construction of the interchange.  While it is likely
> that roadway improvements will eventually be necessary, the
> improvements will not be as a result of this project.

(AR-82 at 12-13.)  Improvements to local roads are included in

this project.

119. It is undisputed that a consultant made the comment.

The response to paragraph 118 is incorporated herein by

reference.

120. It is undisputed that a comment was made regarding

Alternative C that it may impede access on Franklin Farm Lane in

a draft of the DEIS.  The approved DEIS does not state this

statement.  The responses to paragraphs 92-94 and 118 are

incorporated herein by reference.

121-122.  Undisputed.  By way of further response, the responses to paragraphs 92-94 and 96 through 100 are incorporated herein by reference.

123. Disputed.  The DEIS actually stated:  "Since Walker Road is a Township road, increased maintenance and/or upgrading of the roads would be required by Greene Township to handle the expected increased traffic volumes.  Walker Road from the vicinity of the proposed interchange to U.S. Route 30 would be reconstructed with an adequate pavement structure as part of the I-81 project. . . ."  (AR-12 at II-15.)  The administrative record demonstrates an increase in traffic on local roads with or without an interchange.  By way of further response, the responses to paragraphs 92-94 and 96 through 100 are incorporated herein by reference.

124-127.  It is undisputed that the comments were made regarding upgrades to local roads.  Upgrades to some local roads are to be done with this project.  FHWA considered and responded to the comments received regarding this issue from other state agencies and the public.  (AR-47 at 8, 11.)  In fact, defendants retained Orth Rodgers, a traffic consultant, to conduct additional traffic analysis so that the questions raised by the public and the reviewers of the DEIS could be answered.  (AR-164 at 1494.)  The responses to paragraphs 92-94, 96-100, 101, 118, and 131 are incorporated herein by reference.  The comment made

37

by the consultant referred to in paragraph 126 was a summary of the concerns of the public.  (AR-92 at 112.)  For paragraph 127, plaintiffs cite to one comment provided at the public hearing, the other two cites to the transcript do not exist i.e., AR-14 at 40, 44.

128. Disputed.  Defendants' responded to Greene Township's comment and specifically addressed the need for improvements to Walker Road to accommodate D Modified and provides:  "While it is agreed that these roads do not meet collector road design standards, this situation would occur regardless if there was a Walker Road interchange or not.  It is recommended that Greene Township consider the no-build condition and particularly the data collected by their own consultant and begin efforts to improve conditions on these Township roads."  (AR-110 at 127.)

129. Disputed.  This statement came from a public meeting staff briefing sheet that was prepared by a consultant.

130. Undisputed.

131. Disputed.  Orth Rodgers was retained by PennDOT "to update and reevaluate the traffic projections" for the project.  (AR-164 at 1494.)  Orth Rodgers was retained so that "questions raised by the public and reviewers of the DEIS are answered."  (AR-164 at 1494.)  The Supplemental Traffic Studies dated May of 1995 was a summary of the studies conducted by Orth Rodgers.

(AR-37.)  These studies were also summarized in the FEIS for the project.  (AR-46 at App. B.)

132. Undisputed.  Upgrades to Walker Road were included as part of the project.  The response to paragraph 101 is incorporated herein by reference.

133. Disputed.  Plaintiffs citation to the record  applies to both interchanges locations, not just the Walker Road area. Moreover, this reference also provides:  "The Division has advised the State that significant additional analysis and decisions are required to define traffic impacts and local street improvements necessary to accommodate the proposed interchange.  (AR-93 at 785.)  Additional traffic analysis was completed.  The responses to paragraphs 101 and 131 are incorporated herein by reference.

134. Disputed.  FHWA does not state that the secondary impacts as it relates to historic resources and local roads were not studied.  The preceding sentence in AR-113 at 187 speaks to potential litigation.  FHWA is simply identifying the issues that would have been raised if litigation was brought.

135. Disputed.  A question was asked of PennDOT's legal counsel whether township roads could be taken over by the state. There is no support for plaintiffs statement that this was done "to avoid the question of financial responsibility for upgrading and maintenance of those roads."

136. It is undisputed that AR-13 at 41 states that increased traffic would require Walker Road, Mower Road, and Franklin Farm Road be upgraded to current criteria, but that the upgrades will not be a part of this project. (AR-13 at 41.) The responses to paragraphs 92-94, 96 through 100, and 102 are incorporated herein by reference.

137-138. Disputed. The administrative record demonstrates that traffic on local roads increases significantly with or without an interchange at Walker Road. The traffic studies show that the same amount of traffic will be on Franklin Farm Lane from Relocated Walker Road to Route 30 with or with out the interchange. (AR-34 at 37; AR-46, App. B at 66.) The section of Franklin Farm Lane referred to by plaintiff is approximately 1400 feet and will become a part of Relocated Walker Road. (AR-80 at 7.) The responses to paragraphs 92-94 and 102 are incorporated herein by reference.

139. It is undisputed that Franklin Farm Lane from Relocated Walker Road to Route 30 will carry 2,300 vehicles in 2016 if D Modified is not constructed or if D Modified is constructed. (AR-34 at 37; AR-46, App. B at 66.) The responses to paragraphs 102 and 138 are incorporated herein by reference. The document cited by Plaintiffs is a report completed by Greene Township.

140. The response to paragraph 284 is incorporated herein by reference.

141. It is undisputed that the document cited by plaintiffs stated the following:

> Since Walker Road is a Township road, significant increased maintenance and/or upgrading of the roads would be required by Greene Township to handle the expected increased traffic volumes. Walker Road in the vicinity of the proposed interchange would be reconstructed with an adequate pavement structure as part of the I-81 project; however, Walker Road east of I-81 would not be improved by the I-81 project.

(AR-22 at 22.) This document was completed for Alternative D-C, not D Modified. D Modified includes additional upgrades to Walker Road, i.e., the removal of the overpass and relocation of a section of Walker Road. The response to paragraph 101 is incorporated herein by reference.

142. Disputed. The February 7, 1995, meeting minutes cited by plaintiffs provides: "PennDOT and FHWA will meet to discuss which roadway improvements will be included as part of this project. The secondary impact analysis in the final EIS will document the extent of the project's impacts on the local roadway system." (AR-95 at 321.) These minutes do not state that the project will have secondary impacts on local roads.

143-144. Disputed. Plaintiffs refer to a draft of the FEIS. Moreover, this statement refers to Alternative C. The traffic analysis for the project does not support this

statement.  The traffic will not increase as a result of the
interchange project on Franklin Farm Lane when comparing the no
build traffic numbers.  (AR-34 at 37; AR-46, App. B at 66, 92,
94, 96.)  The response to paragraph 102 is incorporated herein
by reference.

145. It is admitted that the FEIS states that "[t]raffic
increases on local roads due to existing and planned development
through 2016 will necessitate increases in maintenance and/or
upgrading of these roads."  (AR-46 at II-17.)  This is not a
result of the intersection.  The responses to paragraphs 92-94
and 96 through 100 are incorporated herein by reference.

146. It is undisputed that the FEIS stated that Walker Road
west of I-81 will be part of the State Highway System.  It is
disputed that agencies failed to consider the impact of the
interchange on Franklin Farm Lane or Walker Road east of I-81.
Defendants studied these local roads and found for Franklin Farm
Lane there is no traffic increase as a result of the project and
for the area of Walker Road ease of I-81, the increase is
insignificant compared to the increase of traffic that will
occur under the no build conditions.  The responses to
paragraphs 92-94 and 96 through 100 are incorporated herein by
reference.

147. Disputed.  The cited documents were comments provided
by Greene Township.  Defendants considered and responded to

these comments during their decision-making process.  (AR-110 at

123-131.)  The statements are unsubstantiated, i.e., Greene

Township took no traffic data of its own.  The responses to

paragraphs 92-94 and 96 through 100 are incorporated herein by

reference.

148. Disputed.  The responses to paragraphs 98-99 are

incorporated herein by reference.

149. Disputed.  Franklin Farm Lane would need to be updated

to handle future traffic volumes under the no build alternative.

The response to paragraph 102 is incorporated herein by

reference.

150. Disputed as a conclusion of law.  Defendants did

consider the impact of the project on local roadways.  By way of

further response, the responses to paragraphs 92-94 and 96

through 100 are incorporated herein by reference.

151. Disputed.  D Modified will provide access to the

Borough of Chambersburg without the construction of the

extension of Norland Avenue.  (AR-46 at ES-4.)

152. Disputed.  For their traffic analysis, defendants

evaluated an alternative with just Norland Avenue Extended (AR-

46, App. B at 90), an alternative with just the Route 30

improvements (AR-46, App. B at 91), and an alternative with

Norland Avenue Extended and Route 30 improvements.  (AR-46, App.

B. at 93.)  These studies in no way constituted an admission
that the projects would be constructed.

153. Disputed.  Plaintiffs' citation to the administrative
record does not support their statement.  The proposed
development with and without an interchange at Walker Road was
also considered in the EIS studies.  (SMF 84.)  Norland Avenue
extended will take place entirely on the Gabler Tract (privately
owned).  Prior to development, the Gabler Tract was primarily
farmlands.  (SMF 86.)  The Gabler Tract will be developed with
or without the interchange.  (SMF 87.)  If a Walker Road
interchange is constructed, the Gabler Tract development will be
more intensive.  (SMF 88.)  If a Walker Road interchange is
constructed and the Norland Avenue is extended, 140 residential
units (154 acres) and 173 acres of commercial space would be
developed on the property by 2016.  (SMF 89.)  If the
interchange is not built at Walker Road and Norland Avenue is
not extended, 287 residential dwelling units (224 acres) and 103
acres of commercial space would be developed by 2016.  (SMF 90.)
Therefore, a reduction of 70 acres of residential development
and an increase of commercial development by 70 acres were
identified as a cumulative impact of a Walker Road interchange
and the extension of Norland Avenue.  (SMF 91.)  Either with or
without the interchange 327 acres of the Gabler Tract will be
developed.  (SMF 92.)

154. Disputed.  First, with the Route 30 improvements the level of service will improve to LOS D.  Second, the response to paragraph 340 is incorporated herein by reference.

155. Undisputed.  However, during the course of the project's development, the boundaries of the Eastern Greene Township Rural Historic District were changed by the Keeper of the *National Register*.  (AR-107 at 828.)  This boundary change removed the Eastern Greene Township Rural Historic District within the Borough of Chambersburg from eligibility in the *National Register*.  (AR-107 at 828.)  Therefore, no historic resources would be impacted by the extension of Norland Avenue.

156. Undisputed that a draft of the DEIS contains this statement regarding Alternative D.  The remainder of this paragraph is disputed.  The alternative identified as the preferred alternative in the approved DEIS was Alternative D-C.

157. Undisputed.  Moreover, the preferred alternative was Alternative D-C not Alternative D.

158. Disputed.  The document cited by plaintiffs was submitted by the Chambersburg Area Development Corporation, which is not an agency.  (AR-4.)  Moreover, plaintiffs are attempting to mislead the Court by stating that defendants made this statement.

159. It is undisputed that the EPA made a comment regarding the extension of Norland Avenue.  (AR-78 at 2.)  Defendants

considered and responded to the comment made by EPA.  (AR-78 at 2.)  The I-81 project has independent utility.  The response to paragraph 160 is incorporated herein by reference.

160. It is undisputed that a consultant made the following comment:  "It is unclear whether Alternative C and D are viable alternatives without the construction of Norland Avenue Extended, an unrelated project.  The success of these alternatives to meet the project need should not rest on the potential construction of a private endeavor."  The project has independent utility.  Public Law 100-17 authorizes a demonstration project in Franklin County, Pennsylvania that provides access to Chambersburg, Pennsylvania and relieves congestion on an exiting interchange.  Public Law 100-17 was included in the needs identified for the project.  (AR-46 at I-1.)  D Modified does satisfy these needs.

The administrative record demonstrates that the traffic analysis identified concerns regarding existing congestion at the I-81/Route 30 interchange.  (SMF 28.)  Presently, the Route 30 interchange carries the largest volume of traffic in the Chambersburg area.  (SMF 46.)  If construction of an interchange on I-81 is to relieve traffic congestion on an existing interchange, it is reasonable to relieve congestion on the interchange, which is currently, and in the future will be,

experiencing the worst congestion.  (SMF 47.)  The traffic

analysis of present (1995) conditions revealed the following:

> Detailed observations indicate long platoons of vehicles
> waiting at the three traffic signals within the interchange
> complex.  These signals are as follows:
>
> - U.S. Route 30 and Walker Road;
> - U.S. Route 30 and the Northbound On-Off Ramps to I-81;
>   and
> - U.S. Route 30 and the Southbound On-Off Ramps to I-81.
>
> On roadways where traffic signals are spaced closely
> together, traffic flow is controlled by the roadway link or
> intersection that has the least capacity or ability to
> accommodate its traffic demands, much like the neck of a
> bottle controls the rate a liquid flows from the bottle.
> As a result, some intersections and intersection approaches
> in the area influenced by the bottleneck will either be
> blocked by traffic backing up from the bottleneck or be
> relatively delay-free because traffic is metered by the
> bottleneck.
>
> The detailed observations revealed that there are two
> components of the roadway network that form the bottleneck
> – the intersection of U.S. Route 30/Walker Road/Stouffer
> Avenue and the 232-meter (760 foot) section of U.S. Route
> 30 between the Walker Road/Stouffer Avenue intersection and
> the I-81 southbound ramp intersection.  Vehicles leaving
> the southbound off-ramp of I-81, entering U.S. Route 30,
> and attempting to turn left onto Stouffer Avenue must cross
> through traffic on U.S. Route 30.  In the other direction,
> vehicles turning right from Stouffer Road onto U.S. Route
> 30 and attempting to turn left to enter northbound I-81
> must also cross through traffic on U.S. Route 30.  In fact,
> during a typical weekday, these two movements cause
> congestion such that U.S. Route 30 between Walker Road and
> southbound I-81 ramp intersection operates at Level of
> Service [LOS] E or F between 6:00 A.M. and 8:00 P.M., a
> total of 14 hours.

(AR-46 at III-83.)  By 2016, traffic congestion under the No-

Build alternative will increase by as much as 141%.  (AR-46 at

IV-89.)

Analysis of current traffic volumes indicates that the intersection of Route 30 and Walker Road/Stouffer Avenue operates at unacceptable levels of service (LOS D, E, or F) for 10 hours per day (with LOS E or F during peak hours). (SMF 32.) The section of Route 30 between the Walker Road/Stouffer Avenue intersection and the I-81 ramps will by 2016 operate at unacceptable LOS for 16 hours of the day and at LOS E or F for 14 hours of the day in the 2016 design year. (SMF 33.) This combination of unacceptable traffic operations causes congestion through the entire I-81/Route 30 interchange area, restricting the ability of traffic to smoothly progress through the interchange area, at times blocking the interchange ramps at Route 30. (SMF 34.)

The primary cause of congestion at this interchange is the volume of traffic traveling through the interchange on Route 30 and the weaving of traffic between the ramps and the Walker Road/Stouffer Avenue intersection. (SMF 36.) Furthermore, traffic analysis and field observations show that the poor operation of the Route 30/ Walker Road/Stouffer Avenue intersection severely impacts the operation of the I-81 interchange ramps at Route 30. (SMF 39.) Based on the analysis conducted for the traffic studies, congestion at the I-81/Route 30 interchange ramps could be reduced by improving the LOS of

the Walker Road/Stouffer Avenue intersection with Route 30.
(SMF 40.)

As indicated in the FEIS, an interchange at Walker Road,
will improve the level of service of the critical intersection
(Route 30/Walker Road/Stouffer Avenue), which controls the level
of congestion through the interchange area.  (AR-46 at III-83;
IV-85-89.)  Constructing an interchange at Walker Road will
improve the volume-to-capacity ration of this critical
intersection by an additional 22% resulting in a change from LOS
E to LOS C during the A.M. peak hour(assuming Route 30
improvements are completed) and from LOS F to LOS E during the
P.M. peak hour.  (AR-46 at IV-85, 87-88.)

Norland Avenue will not satisfy the identified project
needs.  With just the improvements at Route 30, the critical
Walker Road/Stouffer Avenue/Route 30 intersection operates at
LOS E during the A.M. peak hour and LOS F during the P.M. peak
hour, so there is a need for improvement at this intersection
whether or not Norland Avenue is extended.  (AR-46 at IV-87-88.)
With just the extension of Norland Avenue, the critical Walker
Road/Stouffer Avenue/Route 30 intersection will operate at the
same LOS E during the A.M. peak hour and LOS F during the P.M.
peak hour (with improvements to Route 30).  (AR-46 at 87-88.)
The Norland Avenue project offers no improvement to the critical
Walker Road/Stouffer Avenue/Route 30 intersection.  (AR-46 at

87-88.)  However, as discussed above, an interchange at Walker Road will significantly improve this critical intersection which will in turn improve the congestion on the I-81/Route 30 interchange ramps.

161. Disputed.  The e-mail stated that the development on the Gabler Tract was related as the I-66 interchange is related to the Disney facilities.  The project has independent utility. The response to paragraph 160 is incorporated herein by reference.

162. It is undisputed that the extension of Norland Avenue is not a part of this project.  The response to paragraph 160 is incorporated herein by reference.  At the time of the DEIS, FEIS, 1999 Re-evaluation, and ROD there was no federal funding for the extension of Norland Avenue.

163. Disputed.  For the 1995 traffic studies, the traffic model was run with and without the Extension of Norland Avenue. (AR-46, App. B at 75-96.)  Moreover, two different development scenarios for the Gabler Tract were used when analyzing the traffic with and without an interchange at Walker Road.  (AR-46, App. B, Development Activity table at 1.)

164. Disputed.  This statement was made with regard to condemnation approval under Agricultural Land Condemnation and Assessment Board (ALCAB).  Norland Avenue Extended is a local

project with federal funding.  The response to paragraph 160 is incorporated by reference.

165. Disputed.  The consultant stated that segmentation was not an issue because the extension of Norland Avenue was not funded with state or federal funds and Norland Avenue would be constructed regardless of whether there was an interchange at Walker Road, i.e., independent utility.  (AR-138 at 159.)  The response to paragraph 160 is incorporated herein by reference.

166. Undisputed.  By way of further response, funding of the extension of Norland Avenue occurred after the DEIS, FEIS, 1999 Re-evaluation, and the ROD.

167. Disputed.  The I-81 project has independent utility; therefore, the environmental impacts of the Norland Avenue project need not be considered for the I-81 project. Regardless, the extension of Norland Avenue will not have any impacts to historic resources.  The responses to paragraphs 155 and 160 are incorporated herein by reference.

168. It is undisputed that the EPA made a comment at a review meeting.  FHWA considered and responded to this comment. (AR-78 at 2.)  The I-81 project has independent utility.  The response to paragraph 160 is incorporated herein by reference.

169. Undisputed.  The I-81 project has independent utility. The response to paragraph 160 is incorporated herein by reference.

170. Disputed.  The I-81 project has independent utility; therefore, the environmental impacts of the Norland Avenue project need not be considered for the I-81 project. Regardless, the extension of Norland Avenue will not have any impacts to historic resources.  The responses to paragraphs 155 and 160 are incorporated herein by reference.

171. Disputed.  The I-81 project has independent utility. The response to paragraph 160 is incorporated herein by reference.

172. Disputed.  The responses to paragraphs 92-94 and 96 through 100 are incorporated herein by reference.

173. Disputed.  The cost as represented the FEIS is now outdated.  Moreover, comparing a preliminary design cost to a final design cost is like comparing apples to oranges.

174. Disputed as a conclusion of law.  Evaluation of the cost of the project does not fall within the purview of NEPA.

175. Disputed as a conclusion of law.

176. It is undisputed that Alternative D-Modified was developed in 1998 after the circulation of the FEIS.  The response to paragraphs 47-48 is incorporated herein by reference.  The Christian Fry, Jr. House had originally been recommended as eligible for listing in the National Register of Historic Places in the Historic Structures Inventory Report (AR 7 at 19), which was transmitted to PHMC.  (AR-91 at 195.)  The

SHPO responded that the Christian Fry, Jr. House was not, in their opinion, eligible. (AR-91 at 201.) Later, the Keeper determined that the House was eligible, based on new information provided by FHWA and PennDOT. (AR-104 at 286.)

177. The following is undisputed: A portion of Walker Road will be relocated and the existing Walker Road/I-81 overpass and its approaches will be removed and replaced with a structure that meets current design criteria. (AR-80 at 6.) Relocated Walker Road will be the main connector road for the new interchange. (AR-80 at 5, 7.) Moreover, a section of Walker Road will be resurfaced from the Route 30 intersection to Relocated Walker Road. (AR-83 at 1.) Relocated Walker Road will intersect with Franklin Farm Lane. The interchange ramps will not intersect Franklin Farm Lane. (AR-80 at 7.)

178. Disputed. The response to paragraph 11 is incorporated herein by reference.

179. Disputed as a conclusion of law. The responses to paragraphs 13 and 14 are incorporated herein by reference.

180. Disputed. The 1999 Re-evaluation was prepared under 23 C.F.R. §771.129(b) to assess whether a Supplemental EIS was necessary under NEPA.

181. Undisputed. A re-evaluation of a FEIS is not required under 23 C.F.R. §771.129 to be distributed to the public for review and comment. However, D Modified was presented to the

public.   Comments of the Municipal Coordination Committee (MCC) and the public were solicited and responses are contained in the administrative record.   (SMF 21.)

182. Disputed.  The response to paragraph 14 is incorporated herein by reference.

183. Disputed.  Plaintiffs' supporting citation is a newspaper article which addresses an alternative different from D-Modified.  Relocated Walker Road will intersect with Franklin Farm Lane.  The interchange ramps will not intersect Franklin Farm Lane.  (AR-80 at 7)  The traffic studies for the project show that on the Franklin Farm Lane from Route 30 to the Relocated Walker Road, traffic volumes on Franklin Farm Lane will continue to increase without the proposed interchange. (SMF 206.)  The volume of traffic using Franklin Farm Lane is anticipated to increase from 450 to 2,300 vehicles per day by year 2016 either with or without construction of the Walker road intersection.  (SMF 207, 209.)

184. Disputed.  Plaintiffs' citations to the administrative record fail to support this paragraph.  The responses to paragraphs 274 and 275 are incorporated herein by reference.

185. It is undisputed that demolition of the existing overpass bridge and construction of a new overpass bridge increases the cost of the project.

186. Disputed.  None of plaintiffs citations to the administrative record support this paragraph.  In fact, one citation is to comments provided by Greene Township, rather than the studies completed for this project.  The upgrades to local roads included in this project (see response to paragraph 101) will not require the taking of property for an historic resource.  (AR-80 at 11-12, 22.)  The responses to paragraphs 92-94 and 96 through 100 are incorporated herein by reference.

187. It is disputed that a zoning ordinance encourages development.  The Guilford Township ordinance permits commercial and industrial development in the area of Kriner Road.

188. Disputed.  Defendants considered the proposed development of the Gabler Tract.  (AR-133 at 698; AR-46 at App. B, Development Activity Table.)  Defendants also considered the proposed development in the Kriner Road areas.  (AR-46 at App. B, Development Activity Table.)  The 1999 Re-evaluation of the FEIS considered the Guilford Township Zoning Ordinance and found that zoning ordinance will not affect the planned land uses within the study area which were described in the FEIS.  (AR-80 at 8-9; AR-46, App. B Development Activity Table.)  Moreover, the potential development analysis was updated in 2000.  (AR-156 at 37.)  Again, the 2000 update revealed that potential development in Guilford Township was consistent with what was reported in the FEIS.  The Guilford Township zoning ordinance

did not result in a significant new impact compared to what was reported in the FEIS.

189-195. Disputed.  First, paragraphs 189 through 193 fail to cite the administrative record for support for their statements.  The documents cited for paragraphs 194 and 195 were comments provided by the public.  These comments were considered and responded to by defendants during their decision-making process.  (AR-110 at 123-131.)

By way of further response, in 2000, PennDOT reanalyzed the traffic in the Wayne Avenue area to validate traffic projections generated in the 1995 (FEIS) traffic studies.  The 2000 traffic analysis considered the additional development in Chambers 5 in addition to other proposed development in Guilford Township. (Defendants' Reply Brief, Exhibit "B", Declaration of Jeff Greene at ¶6.)  PennDOT took additional traffic counts along Wayne Avenue just west of I-81, between Stouffer Avenue and I-81.  (AR-83 at 8.)  A comparison of the actual 2000 counts with the 1995 traffic analysis reveals a lower actual traffic growth rate of .4% per year (compared to 2.8% per year) for the Wayne Avenue area. (AR-83 at 8.)  The lower growth in traffic in the Wayne Avenue area relates to the type of development that has been occurring in the Chambers 5 Industrial Park (distribution warehouses verses manufacturing complexes) and the smaller development areas surrounding it.  (AR-83 at 8.)  Therefore, the

conclusion contained in the 1995 traffic studies remains valid with regard to Wayne Avenue – existing congestion along Wayne Avenue in the vicinity of the I-81 interchange will be improved to acceptable levels of service through programmed improvements which have since been completed.  (AR-37 at vi, 47.)  The 2000 traffic analysis confirms that a SEIS is not necessary.

196. Disputed.  The responses to paragraphs 188 and 189-93 are incorporated herein by reference.

197-198.  Disputed.  The documents cited for paragraphs 197 and 198 were comments provided by Greene Township.  Defendants considered and responded these comments during their decision-making process.  (AR-110 at 123-131.)  The response to paragraphs 189-195 is incorporated herein by reference.

199. Plaintiffs fail to cite to the administrative record. The response to paragraphs 189-195 is incorporated herein by reference.

200. Disputed.  Additional traffic counts were taken in 2000 that verify the conclusions contained in the FEIS regarding Wayne Avenue.  The response to paragraphs 189-195 is incorporated herein by reference.

201. It is undisputed that Kriner Road does not meet the need provided in Public Law 100-17 to relieve congestion on an existing interchange. The administrative record demonstrates that compared to the I-81/Route 30 interchange, the Wayne Avenue

interchange does not experience congestion.  Improvements to Wayne Avenue are constructed.  These improvements include signalization of the I-81 ramps intersections and widening to a five-lane cross section between Orchard Road and Gerber Road. (SMF 49.)  With these improvements, in the design year 2016, the intersections of both northbound and southbound I-81 ramps with Wayne Avenue will operate at LOS B or C (uncongested) without the Kriner Road interchange.  (SMF 50.)  Since LOS C is acceptable, no further improvements are necessary.  (SMF 51.) The response to paragraphs 189-195 is incorporated herein by reference.

202.  It is undisputed that Alternative B and B-1 reduce traffic at the Wayne Avenue interchange by 6,450 vehicles per day and that Alternative D-C and D-Modified would reduce traffic by 5,800 vehicles per day.  (AR-82 at 6.)  However, the fact still remains that the Wayne Avenue interchange is not congested and the Walker Road interchange/Route 30 is congested.  The responses to paragraphs 160 and 201 are incorporated herein by reference.

203.  Disputed.  Plaintiffs failed to cite to the administrative record as support for this paragraph.  By way of further response, the responses to paragraphs 189-195 and 201 are incorporated herein by reference.

204. Disputed.  D Modified impacts a total of 16.2 acres of productive agricultural land compared to Alternative B-1 which impacts 21.2 acres of productive agricultural land.  (SMF 151.) Therefore, in addition to satisfying the project need of relieving congestion on an existing interchange, the Walker Road alternative also has fewer impacts to productive agricultural land.

205. Disputed.  Plaintiffs' citation to the administrative record does not support this paragraph.  Moreover, the cited documents were comments provided by Greene Township.  Defendants considered and responded to these comments during their decision-making process.  (AR-110 at 123-131.)

206. Disputed.  The DEIS and FEIS actually states that the zoning within the project area is low density residential (59.3%) and agricultural districts (26.5%)  and that the intent of this zoning is "to promote future utilization of these areas for low density residential and preservation of agricultural lands".  (AR-46 at III-1.)  By way of further explanation the response to paragraphs 349-350 is incorporated herein by reference.

207-209.  Undisputed that 1995 projection was 13,777.  The remainder of these paragraphs is disputed.  The traffic trip generation was based on potential development.  (AR-37 at iv.) The 2000 census is not a part of the administrative record for

the project.  The 2000 and 2010 population projections for Green Township (taken for the project) were taken from the Green Township Comprehensive Plan Update dated 1994.  The footnote referenced merely cited Greene Township's methodology.  It is reasonable to build upon the work of other agencies, such as the local municipalities, when considering population projections.

210.  Disputed.  The document cited by plaintiffs only provides: "The township is widening the Kriner Road bridge (to Exit 5)."  (AR-132 at 388.)  The Wayne Avenue interchange is not congested and the Walker Road interchange is congested.  The responses to paragraphs 160 and 201 are incorporated herein by reference.

211.  Disputed as a conclusion of law.

212.  Disputed.  Alternative D Modified is in the same general location as Alternative C which was considered in detail in the DEIS and FEIS.  (AR-46 at ES-14; III-39; III-26.)  The response to paragraph 9 is incorporated herein by reference.

213.  Undisputed.

214.  Disputed.  FHWA considered and responded to a comment which proposed moving secondary and cumulative impact area (SCIA) 1400'feet south.  (AR-110 at 25.)  The plaintiffs admitted in paragraph 213 of their Statement of Material Facts that the SCIA included all of the Walker Road alternatives.  (AR-46 at V-1; AR-110 at 25.)  Alternative D Modified is in the

same general location as Alternative C.  (AR-46 at ES-14; III-39; III-26.)  Therefore, the secondary and cumulative impact study area set forth in the FEIS is applicable to D Modified. (AR-110 at 25.)  Moreover, defendants did analyze secondary and cumulative impacts for D Modified in the 1999 Re-evaluation of the FEIS.  (AR-80 at 20-21; AR-110 at 25-26.)

215. Disputed.  The identification of the SCIA was proper under NEPA.  The response to paragraph 214 is incorporated herein by reference.

216. Disputed.  Plaintiffs also erroneously state that "Franklin Farms" is a potentially eligible historic resource that may be impacted by the project.  The only portions of Franklin Farms that are eligible for the *National Register* are the Gass House and the Franklin Poor House.  The northern portion of the area known as "Franklin Farms" was included within the boundaries of the Greene Township-Conococheague Rural Historic District, which was submitted to the Keeper of the *National Register* for determination of eligibility during the course of this project.  (AR-63 at Drawings 1-3.)  Eventually, the Keeper determined that the Greene Township-Conococheague Rural Historic District was not eligible for the *National Register*, but that portions of this district were eligible.  The Keeper did not include Franklin Farms in the areas determined to be eligible for the *National Register*.  (AR-104 at 4.)

217. Disputed as a conclusion of law. Plaintiffs fail to cite to the administrative record as support for this statement. Defendants properly identified the "area of potential effect" (APE) for the project. The responses to paragraph 254, 274, and 275 are incorporated herein by reference.

218-219. Undisputed. The DEIS contained a statement that approval from ALCAB would be necessary for condemnation of farmland for the proposed interchange. Moreover, the state-law, property acquisition requirements and proceedings before the ALCAB are irrelevant and immaterial in a NEPA action. FHWA did not participate in the ALCAB proceeding, nor was the ALCAB proceeding a part of FHWA's decision-making process. An ALCAB hearing was held. PennDOT complied with the ALCAB requirements, no state court appeals were filed from the ALCAB decision that approved the condemnation of the property, and the property in question was amicably purchased.

220. It is disputed that PennDOT reversed its decision to obtain ALCAB approval based on growing public opposition. By way of further answer, the decision that ALCAB approval was not necessary to condemn farmlands was supported by a reasonable interpretation of state law on the issue (specifically, the existing highway exemption) and was consistent with the existing agency policy (the Farmland Assessment Handbook). Moreover, PennDOT based its decision on a past decision by the Department

of Agriculture regarding another interchange project which was determined to be exempt from seeking ALCAB approval. (AR-95 at 334-338.) Finally, the Department of Agriculture's comment letter on the FEIS does not question the decision not to seek ALCAB approval. (AR-65 at 4.) The response to paragraphs 218-219 is incorporated herein by reference.

221. It is undisputed that the comment letter from the Pennsylvania Farm Bureau was received for the project. PennDOT. PennDOT considered and responded to this letter. (AR-99 at 1491.) The response to paragraphs 218-219 is incorporated herein by reference.

222. It is undisputed that Greene Township sent a comment letter dated April 25, 1995. It is disputed that Greene Township had an elevated interest to protect farmlands. The responses to paragraphs 349-350 and 218-219 are incorporated herein by reference.

223. Undisputed. The response to paragraphs 218-219 is incorporated herein by reference.

224. It is undisputed that the Whites filed a lawsuit in Commonwealth Court under the Agricultural Securities Laws. The response to paragraphs 218-219 is incorporated herein by reference.

225. Undisputed. The response to paragraphs 218-219 is incorporated herein by reference.

226. Undisputed.  The response to paragraphs 218-219 is incorporated herein by reference.

227. Disputed.  The Pennsylvania Supreme Court simply affirmed the order of the Commonwealth Court.  The Pennsylvania Supreme Court did not issue an opinion.  The response to paragraphs 218-219 is incorporated herein by reference.

228. Paragraph 228 is a conclusion of law.  By way of further response, the order issued by the Pennsylvania Commonwealth Court stated "PennDOT must obtain ALCAB approval for all or part of the proposed interchange project before it can file a declaration of taking involving lands used for productive agricultural purposes."  White v. Penna. Dep't of Transp. 738 A.2d 26 (Pa. Commw. 1999).  The response to paragraphs 218-219 is incorporated herein by reference.

229. Disputed.  By way of further answer, ALCAB has jurisdiction over the exercise of the state's power of eminent domain, only, and has no jurisdiction over the rights of private property owners to enter into amicable land transfers.  In fact, Whites have amicably transferred all of their interests in a parcel of land they owned at the location of the project to PennDOT by settlement and in lieu of condemnation.  Moreover, FHWA could have exercised their condemnation jurisdiction over the property under 23 C.F.R. §712.504 without being subject to the state law limitations on the condemnation of productive

agricultural land.  Regardless, ALCAB unanimously approved the condemnation of farmland for the project by a vote of 6-0.  (AR-AR-138 at 268-269.)  The response to paragraphs 218-219 is incorporated herein by reference.

230. Disputed as a conclusion of law.  NEPA only requires the identification and consideration of impacts to productive agricultural lands and Agricultural Security Areas.  Whether or not PennDOT had to go to ALCAB prior to condemning productive agricultural land is not relevant to whether or not a SEIS is required under NEPA.  The only question that is relevant under NEPA and its regulations with regard to productive agricultural impacts is whether there has been a **significant change** in the impacts compared to what was presented in the FEIS.  The rulings by the Pennsylvania Courts, that approval must be obtained from ALCAB prior to condemning productive agricultural lands for the project, was not a new impact to productive agricultural lands, but simply a procedural hurdle that PennDOT must overcome prior to condemnation.  The agricultural impacts were identified in both the DEIS and FEIS.  (AR-46 at IV-60-67.)  By way of further answer, FHWA and PennDOT prepared a re-evaluation of the FEIS in 1999 and a re-evaluation of the ROD in 2001 which considered updated agricultural studies.  The re-evaluations showed that the updated agricultural and other studies did not present a seriously different picture of the environmental impact of the

proposed project from what was originally envisioned in the DEIS and FEIS. (AR-80 at 22; AR-83 at 3-4.) Therefore, the preparation of a Supplemental Environmental Impact Statement ("SEIS") was not necessary.

231. It is undisputed that one of the Kriner Road alternatives did not take any property from Agricultural Security Areas. ALCAB approval is also necessary when the condemnation of productive agricultural land is necessary. 71 P.S. §106. ALCAB approval is required from the Commonwealth to condemn productive agricultural lands regardless of whether or not they are located in an Agricultural Security Area. All build alternatives involved the taking of some productive agricultural lands. Alternative B-1 had greater impacts to productive agricultural lands (12.7 acres of direct impact and 8.5 acres of indirect impact) compared to D Modified (12.1 acres of direct impact and 4.1 acres of indirect impact). (AR-83 at 3; AR-80 at 22.)

232. It is undisputed that a hearing was held before ALCAB on May 9, 10, and 11, 2001. The response to paragraphs 218-219 is incorporated herein by reference.

233. Undisputed. The Board consists of six members. Other members of the ALCAB include two farmers, the Secretary of Agriculture, Secretary of the Department of Environmental Protection, and Director of the Governor's Office of Policy. A

majority vote (four or more) is needed for approval.  The ALCAB
unanimously approved the taking of farmland for the project.

234-235.  Disputed as conclusions of law.  By way of
further response, the statutory standard of review employed by
ALCAB was whether the condemnation of the productive
agricultural was a "reasonable and prudent" alternative.  (AR-
138 at 265, 268; 3 P.S. §913(a).)  The response to paragraphs
218-219 is incorporated herein by reference.

236. It is undisputed that ALCAB approved the condemnation
of the Whites' property for the project.  (AR-138 at 268-269.)

237. The response to paragraph 11 is incorporated herein by
reference.

238. It is undisputed that these handwritten comments were
made.  It is unclear who made the handwritten comments.  The
response to paragraphs 218-219 is incorporated herein by
reference.  Also, PennDOT sent a memorandum to the Pennsylvania
Department of Agriculture (the agency that chairs the ALCAB)
containing the conclusion that all agricultural land (regardless
of Agricultural Security Area (ASA) status) is considered
"equally protected" under Pa Act 1979-100; and that there is no
different standard established under the Agricultural Area
Security Law (Pa Act 1981-43 as amended) or Governor's Executive
Order (Agricultural Land Preservation Policy found at 4 Pa Code
§7.301) (AR-138 at 169-170).

239. Disputed.   Plaintiffs citation to the administrative record does not show this and in fact supports the opposite conclusion.   The page cited states:   "Direct impacts to productive agricultural land would be less with Alternative D Modified than with Alternative B, B-1, and C. . .   Indirect impacts to productive agricultural land would be less with Alternative D Modified than all Build Alternatives. . . ."   (AR-80 at 18.)   The response to paragraphs 231 is incorporated herein by reference.

240. Undisputed.   The response to paragraph 230 is incorporated herein by reference.

241. It is undisputed that the consultant made that statement in a letter.   However, the updated environmental studies revealed that there were no significant changes to farmland impacts.   (AR-83 at 3-4.)   The response to paragraphs 218-219 is incorporated herein by reference.

242-244.   Disputed.   The cited documents were comments provided by Greene Township.   Defendants considered and responded to these comments during their decision-making process.   (AR-110 at 123-131.)   Furthermore, Alternative B-1 at Kriner Road and Alternative D Modified at Walker Road, had identical total ratings, 181 points.   (AR-80 at 18, AR-139 at 465 and 471.)

245-247.  The 2001 Re-evaluation of the ROD (AR-83 at 3) agrees with the 1999 Re-evaluation of the FEIS (AR-80 at 22) and ROD (AR-82 at 22) in that 17.8 acres (including 9.8 acres directly impacted) of productive agricultural land could potentially be impacted.  There was no change in the design or impacts of D Modified between March 25, 1999, and June 28, 2001.

248. Undisputed.  A SEIS is not required because the ROD identified an impact to one ASA when D Modified actually impacted two ASAs.  (SMF 121.)  This is not a change in impacts because the ROD did consider the additional 1.8 acre ASA as an impact to productive agricultural land that was enrolled in an ASA in 1997.  (AR-80 at 22.)  The 1.8 acres is part of the 12.1 acres of direct take (productive land) for D Modified.  (SMF 122.)  Thus both areas were identified and considered as impacts to productive agriculture land.

249-251.  Disputed.  The project still only requires the use of 6.5 acres from the White parcel.  See Exhibit "A" of Defendants' Reply Brief, deed transferring White property to PennDOT and compare to figure in 1999 Reevaluation at AR-80 at 7.  The deed recorded following the purchase of the White parcel contains a covenant that provides the following use restrictions:

> THE LANDS REMAINING AFTER THE HIGHWAY PROJECT IS
> CONSTRUCTED SHALL NOT BE USED FOR ANY PURPOSE OTHER THAN
> SAID TRANSPORTATION AND HIGHWAY PURPOSES AS EXCEPTED FROM

> THE BUILDING RESTRICTIONS IN PARAGRAPH 1 AS SET FORTH
> ABOVE, AGRICULTURAL PURPOSES TO THE MAXIMUM EXTENT POSSIBLE
> AND OPEN SPACE.

Exhibit "A" of Defendants Reply Brief, deed transferring White

property to PennDOT.

252. It is undisputed that the Kriner Road alternative

(Alternatives B and B-1) will take 17.1 acres and 21.2 acres of

productive agricultural land, respectively.

253. Disputed as a conclusion of law.  By way of further

response, the hearing of the project before the ALCAB as a

matter of state law did not require re-examination of the

project under NEPA.  The response to paragraph 230 is

incorporated herein by reference.  Furthermore, there are no

"additional impacts" as the plaintiffs assert.  The quantified

impacts from the 1999 Re-evaluation of the FEIS and ROD remain

unchanged.

254. Disputed.  Under Section 106 of NHPA Incorp from

attached, the "area of potential effect" (APE) is the study area

for the project for purposes of evaluation of cultural

resources.  36 C.F.R. §800.2 (c) (1998); 36 C.F.R. 800.16 (d)

(1999) (regulations were amended in 1999).

> Although not titled as such, the area of potential effect
> was defined for the two potential interchange locations
> (Kriner Road and Walker Road) on page 4 of the *Historic
> Structures Inventory and Determination of Eligibility
> Report* (1993).  Then called the project area, the APE was
> defined as follows:

"From the centerline of the proposed highway improvements, above-ground historic structures within 300' of the centerline of the proposed highway improvements were examined; other structures whose property lines ran within the area of proposed highway improvements were also inspected.  As a result, the historic resources, which could be subject to the potential introduction of visible, audible or atmospheric elements that are out of character with the property, or may alter its setting, were inventoried."

The Advisory Council on Historic Preservation's (ACHP's) regulations define the APE as "the geographic area or areas within which an undertaking may cause changes in the character or use of historic properties, if any such properties exist."  The ACHP has stated in its guidance that the APE should include all alternative locations for elements of the undertaking; all locations where the undertaking may result in disturbance of the ground; all locations from which elements of the undertaking (e.g. structures or land disturbance) may be visible; and all locations where the activity may result in changes in traffic patterns, land use, public access, etc.1  This ACHP guidance further notes that "the APE may or may not be the same as the area of effect defined under NEPA."  The ACHP has also noted that the APE should be "linked logically to the potential effects of the undertaking".2

The APE for the I-81 Interchange project was defined in accordance with 36 CFR 800.2(c) and taking into account ACHP guidance.

For transportation projects in Pennsylvania, the *area of potential effects* was generally called the *project area* in cultural resource documents prior to June 1998.  The cultural resource project area for the I-81 Interchange project was specifically defined, as noted above, and includes a specific distance from the centerline of the proposed undertaking.  In addition, the notation concerning property lines ensured that potential historic structures or districts would also be recognized.  For example, the buildings of a farmstead might lie more than 300' from the centerline of the proposed highway improvement, but the boundary of the property might include the existing tax parcel, which would be within the 300' area.  Thus, such a farmstead would be investigated for potential eligibility in this case.

(AR-110 at 22-23.)  The APE has not changed for the project. However, numerous properties were identified with boundaries outside the APE during the protracted identification process by FHWA and PennDOT.  PHMC requested that additional properties be surveyed to evaluate whether a rural historic district existed to the west of I-81.  (AR-91 at 201.)  Later, the Keeper requested individual eligibility for properties lying to the east of I-81.  (AR-102 at 204, 205.)

255. Undisputed.  By way of further answer, the project study area is not a static physical boundary, but is intended to be modified as a project progresses.  The parameters of a project are established during the planning and programming states.  Depending on the nature of the project, a project study area may be modified when the project need is defined, and when preliminary and detailed alternatives are developed.  Initially, the study area depicted a broad area which encompassed the geographic area and what was considered as background data were collected to comply with Public Law 100-17.  This geographic area was narrowed to four potential interchange locations as described in the PAR.  Two locations, the Walker Road and Kriner Road areas, were carried forward for further study, as documented in the DEIS and FEIS.  (AR-110 at 24.)

256. Disputed.  The scope of work for the consultant hired to complete the cultural recourse studies provided:  "all significant historic resources to possible project effect will be identified."  (AR-159 at 32.)  This was done for the project. (AR-7; AR-50; AR-62; AR-84; AR-9; AR-16; AR-57; AR-110 at 52, 186-92, 223.)

257.  It is undisputed that the historic survey would and does include an investigation of structures of potential historic significance within the area of the project's impact, i.e., the APE.  (AR-257 at 177; AR-7; AR-50; AR-62; AR-84; AR-9; AR-16; AR-57; AR-110 at 52, 186-92, 223.)

258.  Undisputed.  The response to paragraph 255 is incorporated herein by reference.

259-260.  Undisputed.  The response to paragraph 255 is incorporated herein by reference.

261. Disputed.  The notice of intent to prepare an EIS published in the *Federal Register* identified the study area as follows:  "The northern terminus and study area limit will be the existing interchange #8 of I-81 (Scotland).  The southern terminus and study area will be approximately 2 miles north of the interchange #4 (Marion)."  Nowhere in this document does it state that this is also the APE for historic and archaeological sites.  55 FR 6333 (Feb. 22, 1990).

262. It is undisputed that Franklin County Heritage and the Kittochtinny Historical Society expressed concerns regarding the potential impact of the project on the Gass House and the Franklin County Poor house. (SMF 189.)  FHWA considered and responded to these comments in its decision-making process. (AR-47 at 18-19; AR-78 at 255-66.)  The letter cited by plaintiffs Franklin County Heritage did not mention Franklin County Poor House.  The responses to paragraphs 102 and 274 are incorporated herein by reference.

263. Undisputed.

264. Undisputed.

265. It is undisputed that both properties are part of the Franklin Farms property and are located along Franklin Farm Lane.  It is disputed that these structures are houses.  These structures are Franklin County offices.  (AR-46 at III-4-5; AR-81 at 9.)

266. Disputed.  The Franklin County Commissioners were concerned with access to various buildings that provide services that are located on Franklin Farm Lane.  The Commissioners mentioned that some of the County owned buildings were also historic.  (AR-141 at 342.)  The response to paragraph 102 is incorporated herein by reference.

267. It is undisputed that the Secretary of PennDOT stated that *preliminary* environmental studies were conducted; that the

studies included potential impacts to "national register

buildings and properties"; and that the results were included in

the PAR.  Plaintiffs misquoted the letter.

268. The response to paragraph 259-261 is incorporated

herein by reference with regard to the study area delineated in

the PAR.

269. It is undisputed that the March 14, 1994 letter from

the Advisory Council made that statement.  FHWA considered and

responded to this letter on June 28, 1994.  (AR-92 at 344-45.)

A public hearing was held on June 29, 1994.  (AR-92 at 345.)

270. It is undisputed that the March 14, 1994 letter from

the Advisory Council made that statement.  FHWA considered and

responded to this letter on June 28, 1994.  (AR-92 at 344-45.)

This letter detailed the public involvement for the project

which included three public meetings and, due to the

controversy, a special committee of local citizens was formed

which met several times to discuss issues surrounding the

project.  (AR-92 at 344-45.)  Twelve Municipal Coordination

Meetings were also held between the consulting parties as

defined by Section 106 of the NHPA.  (SMF at 20.)

271-272.  Disputed.  The responses to paragraphs 254, 255,

and 261 are incorporated herein by reference.  Plaintiffs cite

to a draft of the DEIS and misquote the document in paragraph

272.  AR-10 at 77 actually provides:  "The cultural resources

study area for this project was defined as the potential right-of-way around each proposed alternative." The APE evaluated included more than just the right-of way required for the project. The proper document to review with regard to the definition of the APE is the Determination of Eligibility Report.

273. The responses to paragraphs 254 through 261 are incorporated herein by reference.

274. The responses to paragraphs 102, 254, 255, and 284 are incorporated herein by reference. The administrative record demonstrates that this project clearly has no adverse effect on the Gass House, Franklin County Poor House or any other potentially eligible resource along Franklin Farm Lane.

Both the Gass House and the Franklin County Poor House (also referred to jointly as the Union Plantation) are located along Franklin Farm Lane near its intersection with Route 30. (SMF 200.) The Gass House and Franklin County Poor House are eligible for listing on the *National Register* based on their architecture – as examples of Scotch-Irish farm house architecture. (SMF 201.) As indicated by the *National Register of Historic Places* Nomination Form, these historic properties have already been altered. (SMF 202.) The Gass House and Franklin County Poor House are presently being used as offices

for Franklin County.  Other modern office buildings and a
nursing home surround these historic properties.  (SMF 204.)

As documented in the FEIS and confirmed in the additional
traffic analysis for the project, impacts along Franklin Farm
Lane due to increased traffic, noise, and development as a
result of this project are non-existent or insignificant.  (SMF
205.)  The traffic analysis found that traffic volumes on
Franklin Farm Lane will continue to increase without the
proposed interchange.  (SMF 206.)  Traffic on Franklin Farm Lane
is projected to be the same under the No-Build scenario (2,300
vehicles per day) as with any of the combinations of
improvements described in the FEIS (Walker Road Interchange,
Norland Avenue Extension, and Route 30 improvements).  (SMF
207.)  This increase is due to traffic diverting from Route 30
and present and planned development in Guilford and Greene
Township.  (SMF 208.)  The volume of traffic using Franklin Farm
Lane is anticipated to increase by 450 to 2,300 vehicles per day
by year 2016 with or without the Walker Road interchange.  (SMF
209.)  Accordingly, the I-81 Interchange project would not cause
changes in traffic volumes near the Gass House and Franklin
County Poor House.

For the year 2016, there will be an increase in noise along
Franklin Farm Lane; however, as with the increase in traffic
volumes, the increase in noise will occur with or without the

proposed interchange.  (SMF 211.)  The FEIS and 1999 Re-evaluation included results of noise monitoring for the Walker Road alternatives at receptor R-4 that is located on Franklin Farm Lane near the nursing home.  (SMF 212.)  The nursing home is adjacent to the Gass House and Franklin County Poor House.  (SMF 212.)  Comparing the No Build alternative to D Modified, noise levels increase from 55.4 dBA to 55.8 dBA at this receptor.  (SMF 213.)  Noise levels of 66 dBA approach noise abatement criteria.  (SMF 214.)  These 2016 noise levels at R-4 are well below the noise abatement criteria.  (SMF 215.)  Moreover, the increase of noise is only 0.4 dBA as a result of the project.  (SMF 216.)  Since the human ear cannot detect a change in noise levels of less than 3 dBA, this slight increase will be imperceptible.  (SMF 217.)

The area surrounding these historic resources is already developed.  (SMF 218.)  Therefore, the only impact that secondary development would have on these resources would be with regard to traffic.  Future development was considered in calculating the 2016 projected traffic.  (SMF 220.)  These traffic, noise, and secondary development studies confirm defendants' delineation of the Section 106 APE for the project.  (SMF 221.)

275.  It is undisputed that comments were received regarding the impacts to historic properties along Franklin Farm

Lane.  FHWA considered and responded to these comments.  (AR-47 at 18; AR-78 at 259-260, 263; AR-95 at 262; AR-82 at 13.)  It is disputed that defendants were required to study the impacts to the historic properties along Franklin Farm Lane.  The response to paragraph 274 is incorporated herein by reference.  Moreover, defendants provided a detailed response to PHMC and Advisory Council on these comments prior to PHMC's and Advisory Council's signing of the MOA.  (SMF 190.)  PHMC asked defendants to address concerns expressed by the public regarding the Gass House and Franklin County Poor House.  (SMF 191.)  FHWA addressed these concerns by sending a letter to the Greene/Guilford Environmental Association and copying PHMC and Advisory Council with the response.  (SMF 192.)  In addition, defendants sent a letter to PHMC and copied Advisory Council addressing the allegations of potential effects to the Gass House and Franklin County Poor House on January 8, 1999.  (SMF 193.)

PHMC and Advisory Council, the agencies with expertise in matters involving historic resources, agreed that the areas of potential effects were properly identified and the identification of historic resources and the adverse effects of the project were complete by signing the MOA.  PHMC signed the MOA on December 17, 1998.  (SMF 194.)  The PHMC's letter transmitting the signed MOA stated:

>The Bureau of Historic Preservation (the State Historic
>Preservation Office) has reviewed the above named project
>in accordance with Section 106 of the National Historic
>Preservation Act . . . .   These requirements include the
>consideration of the project's potential effect upon both
>historic and archaeological resources.

(SMF 196.)  Advisory Council signed the MOA on March 23, 1999

and stated that the "Alternative D Modified . . . will best

serve to minimize effects to historic properties in keeping with

applicable laws and regulations."  (SMF 197.)  By signing the

MOA, PHMC and Advisory Council accepted the APE and minimization

measures provided for the purported adverse effects caused by

the project.  (SMF 198.)

276. The response to paragraphs 254-261 is incorporated

herein by reference with regard to the study area.

277. Disputed.  The response to paragraph 134 is

incorporated herein by reference.

278. Disputed.  Defendants have consistently maintained

that the Gass House is outside the APE for the project.  (AR-78

at 255, 262; AR-95 at 262; AR-82 at 13.)  AR-122 at 2848 makes

no mention of the Gass House.  The response to paragraph 274 is

incorporated herein by reference.

279. Disputed.  The citation to the administrative record

for this paragraph is not related to cultural resources, and is

not to the approved FEIS that was circulated to the public.  The

responses to paragraphs 254, 259-261, and 275 are incorporated herein by reference.

280.  Disputed.  The administrative record demonstrates that the APE was not limited to 300″ at the centerline of the proposed highway improvement.  The response to paragraphs 254 is incorporated herein by reference.

281-282.  Disputed as a conclusion of law.  By way of further response, the responses to paragraphs 254, 259-261, and 275 are incorporated herein by reference.

283. Disputed.  The document referenced is not directed to ALCAB.  It was a farmland technical memorandum.  For detailed study of the farmland impacts, this memorandum provides that only the area in the vicinity of the alternatives was analyzed for direct and indirect impacts.  (AR-35 at Figures III-6 –12.) The responses to paragraphs 255 and 259-261 are incorporated herein by reference.

284. Disputed.  The Secondary and Cumulative Impact Areas deals primarily with the assessment of potential development activity occurring due to the project.  (AR-46 at V-1.)  The County owns approximately 193 acres in the area known as Franklin Farms (which includes the Gass House and Franklin County Poor House.  The Gass House and Franklin County Poor House are presently used as a County-operated retirement and extended care facility.  (AR-110 at 21.)  The County constructed

four modern facilities along Franklin Farm Lane, including a group of low-income retirement units, a County administration building, a prison, and a state police barracks. (AR-110 at 21.) The Franklin County Commissioners identified plans for future development which includes: service area; Agricultural Center; Conference Center; Human Services expansion; Eco park; and an environmental area. The construction of an interchange will provide additional access for the proposed development without using Route 30 which will minimize any additional traffic in the vicinity of both the Gass and Poor House which are located at the Route 30 Franklin Farm Lane intersection. Therefore, additional development as a result of the interchange is unlikely given the surrounding property is owned by Franklin County and the area surrounding the Gass House and Franklin County Poor House is already developed or planned for development.

285. Disputed. None of the plaintiffs' citations to the record support their quoted language or conclusions contained in this paragraph. The results of the traffic analysis revealed that traffic will increase on local roadways with or without an interchange at Walker Road, due to existing and planned development. (SMF 75.) Moreover, plaintiffs admit that traffic will increase on local roadways with or without an interchange at Walker Road. (Plaintiffs' Answer to SMF 75.) The response

to paragraphs 92-94 and 96 through 100 are incorporated herein by reference.

286. It is undisputed that PennDOT made an error in this letter as to the access of the Gass House. However, the project will not have an adverse effect on the Gass House. The responses to paragraphs 274, 275, and 284 are incorporated herein by reference.

287. It is undisputed that access to the Gass House is from Franklin Farm Lane. The plaintiffs citation to the administrative record does not support this statement. The responses to paragraphs 254, 274, and 275 are incorporated herein by reference.

288. It is undisputed that comments were received regarding the impacts to historic properties along Franklin Farm Lane. FHWA considered and responded to this comment. (AR-78 at 255, 262.) It is disputed that the APE or historic boundaries were improperly manipulated. The responses to paragraph 254, 259-261, 274, 275, and 284 are incorporated herein by reference.

289. It is undisputed that this comment was received regarding the impacts to historic properties along Franklin Farm Lane. FHWA considered and responded to this comment. (AR-78 at 255, 262.) The responses to paragraph 254, 274, 275, and 284 are incorporated herein by reference.

290. Disputed.  PHMC asked defendants to respond to comments received by PHMC regarding the impacts to historic properties along Franklin Farm Lane.  FHWA considered and responded to these comments and copied PHMC with the response.  (AR-109 at 1584-89.)  The responses to paragraph 254, 274, 275, and 284 are incorporated herein by reference.

291. The response to paragraph 275 is incorporated herein by reference.

292. Disputed.  This was a memorandum from a consultant regarding what should be contained in a response to a comment letter.  The actual response to January 13, 1999 Greene Guilford Environmental Association letter is located at AR-110 at 21-26.  The responses to paragraph 254, 274, 275, and 284 are incorporated herein by reference.

293. It is undisputed that someone at FHWA sent the e-mail at AR-113 at 59.  Defendants complied with Section 106 of NHPA.  The responses to paragraph 254, 274, 275, and 284 are incorporated herein by reference.

294. Disputed.  Plaintiffs' citation to the record does support this paragraph.  The responses to paragraph 254, 274, 275, and 284 are incorporated herein by reference.

295. It is undisputed that Greene Township provided a comment letter to the Advisory Council objecting to PennDOT's identification of historic resources in the area of the Walker

Road interchange.  This letter was before the Advisory Council when it signed the MOA for the project.  Advisory Council signed the MOA on March 23, 1999 and stated that the "Alternative D Modified . . . will best serve to minimize effects to historic properties in keeping with applicable laws and regulations." (SMF 197.)  By signing the MOA, PHMC and Advisory Council accepted the APE and minimization measures provided for the purported adverse effects caused by the project.  (SMF 198.) The responses to paragraphs 254, 274, 275, and 284 are incorporated herein by reference.

296-297.  The responses to paragraphs 98 and 99 are incorporated herein by reference.

298. Disputed.  Plaintiffs cite to potential issues with D-modified.  The response to paragraphs 98 and 99 are incorporated herein by reference.

299. It is undisputed that D Modified does not take property from a historic resource.  The results of the traffic analysis revealed that traffic will increase on local roadways with or without an interchange at Walker Road, due to existing and planned development.  (SMF 75.)  Moreover, plaintiffs admit that traffic will increase on local roadways with or without an interchange at Walker Road.  (Plaintiffs' Answer to SMF 75.) The responses to paragraphs 98 and 99 are incorporated herein by reference.

300. Disputed.  The memorandum cited by plaintiffs was included in the record to show that defendants considered and responded to Greene-Guilford Environmental Association's January 13, 1999 letter.  (AR-110 at 21-26.)  The responses to paragraphs 98 and 99 are incorporated herein by reference.

301. It is undisputed that defendants properly identified the APE for the project.  The responses to paragraphs 96 through 100, 254, 274, and 275 are incorporated herein by reference.

302. Undisputed.

303. Disputed.  The response to paragraph 214 is incorporated herein by reference.

304. Disputed as a conclusion of law.  The responses to paragraphs 96-100, 254, 274, and 275 are incorporated herein by reference.

305. Undisputed.  By way of further explanation, the D-Modified satisfies Section 149(a)(74) of the STURAA of 1987 (Public Law 100-17).  The response to paragraph 160 is incorporated herein by reference.

306-316.  Disputed as a conclusion of law.  The response to paragraph 305 is incorporated herein by reference.

317-320.  Disputed.  The discrepancy at the interchange ramps between the traffic model results (which indicates acceptable LOS) and actual conditions (congestion) is due to the fact that conventional LOS methodology analyzes intersections in

isolation and does not account for the influence of adjacent intersection congestion. Put differently, traffic volumes move so slowly through the interchange ramp intersections as a result of the poor operation at the adjacent Route 30 and Walker Road/Stouffer Avenue intersection, that the traffic counted as being processed by the interchange ramp intersections is artificially lowered. Under these conditions, traffic processed by the upstream intersection is not only a function of its own traffic signal, but also the ability of the next downstream intersection to dissipate a queue, and these conditions are not accurately portrayed by the Highway Capacity Software techniques. The response to paragraph 160 is incorporated herein by reference.

321. Defendants' focus of relieving traffic on the I-81/Route 30 interchange (Exit 6) was based on the language of Public Law 100-17, the traffic studies for the project, and the improvements planned on Wayne Avenue in the vicinity of the I-81/Wayne Avenue interchange (Exit 7). The responses to paragraphs 30 and 160 are incorporated herein by reference.

322. Disputed. The responses to paragraphs 160 and 317-320 are incorporated herein by reference.

323. Disputed. AR-37 at 44 shows a 22.7% improvement in the critical volume to capacity ration at the intersection of Route 30 and Walker Road. A 22.7% volume to capacity ration

provides a substantial reduction in congestion on Route 30.  In
addition, it shows an improvement in level of service from LOS F
to LOS E in the P.M.  In the A.M. peak, the improvement in level
of service is from LOS F to LOS C.  See also, AR-46 at IV-85,
88.  The response to paragraph 160 is incorporated herein by
reference.

324. Disputed.  The citation to the administrative record
does not contain this quotation.

325. Undisputed that the Justification for an Additional
Interchange states that 86% of the traffic is heading to
downtown Chambersburg.  (AR-22 at 33.)

326. Disputed.  This statement contains no citation to the
administrative record.  There is no change in traffic volumes
among any of the alternatives studied on Franklin Farm Lane near
Route 30.  Therefore, no traffic is anticipated to use Franklin
Farm Lane to access the interchange.  (AR-46, App. B at 66, 92,
96.)  The response to paragraph 102 is incorporated herein by
reference.

327. Disputed.  AR-79 is a report submitted by Greene
Township's expert commenting on the traffic for D Modified.
These comments were considered and responded to by defendants
during their decision-making process.  (AR-110 at 123-131.)  The
statement made on pages 7 and 8 of AR-79 are unsubstantiated,
i.e., the report contains no traffic information to support the

statements made.  Moreover, the page cited does not state that all the traffic will be routed back to Route 30, rather the report states that traffic will be routed to "Route 30, Norland Avenue, U.S. Route 11, Woodstock Road, and Route 997."  Second, the page cited does not conclude that the exit will fail to alleviate any traffic congestion on Route 30.  The need for the project (as repeatedly pointed out by plaintiffs) is to relieve congestion on the I-81/Route 30 interchange, not to relieve congestion on Route 30.  The response to paragraphs 92-94 is incorporated herein by reference.

328. Disputed.  Plaintiffs claim that the entire roadway network should have been reanalyzed for D Modified.  Defendants traffic engineer concluded that this was unnecessary.  The 1998 supplemental traffic studies were performed for D Modified.  (AR-72 at 1.)  The 1998 studies analyzed the immediate interchange area and the next intersection beyond the interchange area (Relocated Walker Road/Franklin Farm Lane).  (AR-72 at 37.)  The 1998 traffic studies did not analyze the local roads beyond these intersections because D Modified has the same connectivity to the road network, and therefore, would not change the traffic numbers beyond the immediate interchange area.  (AR-72 at 36-37; AR-46 at 95.)  D Modified performs the same functions and involves the same travel times as the other Walker Road alternatives for purposes of traffic analysis.

(Defendants' Reply Brief, Exhibit B, Declaration of Jeff Greene at ¶4.)  Therefore, the traffic on Relocated Walker Road, Franklin Farm Lane, Kohler Road, and Norland Avenue is the same as the other Walker Road alternatives as represented in the FEIS (which is based on the 1995 traffic studies).  (AR-72 at 36-37; AR-46 at App. B at 95-96.)  Therefore, the roads farther removed from the interchange would have the same results.

329-330.  Disputed.  The reviewer does not need to make the comparison as there is no comparison to be made.  Outside the area described in AR-176 at 696, D Modified has the same affect as Alternative D-C.  Based upon the traffic engineer's professional judgment, there was no reason to re-run the model.

331. Disputed.  The traffic impact with just the Route 30 improvements would be the same as what was represented in the FEIS.  (AR-46 at 91.)  The traffic impact of just the Walker Road without any improvements was analyzed in the 1998 traffic analysis.  (AR-72 at 1.)

332-333.  Dispute characterization.  The draft of the DEIS contained an error.  FHWA noted the error and the error was corrected in the DEIS that was circulated to the public.

334. Disputed.  The memo stated that the other location (i.e., Kriner Road) would be feasible and prudent unless access to the Gabler tract was a need.  AR-113 at 164.)

335. It is undisputed that consultant expressed a concern. PennDOT responded that the project was not based on economic development.

336. Disputed.  The Addendum of the Criteria of Effect Report actually states:  "The No-Build alternative was also considered.  However, it would not address the project need of reducing congestion on the existing I-81 interchange near Chambersburg."  Nowhere does this report state that the No-Build was discarded.  (AR-57 at 8.)

337. Disputed.  The responses to paragraphs 160 and 317-320 are incorporated herein by reference.

As described in the 1995 and 1998 traffic studies, an interchange at Walker Road (such as D Modified) would serve approximately 9,000 to 10,900 vehicles per day in the 2016 design year, depending on the combination of other roadway improvements (Route 30 improvements and proposed Norland Avenue Extension).  (SMF 42.)  Therefore, D Modified satisfies the need to relieve traffic on a congested I-81 interchange in Franklin County.

338. Undisputed.  The level of service represented in the FEIS assumed no improvements to Wayne Avenue, i.e. the no-build alternative.  (AR-37 at 37.)  Since the publication of the FEIS and the 1995 traffic study, Wayne Avenue has been widened and signalized, improving the quoted levels of service to C.  (AR-

46, App. B at 156.)  Please note that the information contained

in the circles at AR-46, App. B at 156 is the LOS when the

intersection is signalized and the information contained on the

stick drawings are unsignalized LOS.

339. Disputed.  Plaintiffs fail to cite to the

administrative record as support for this statement.  The

administrative record actually demonstrates that the Wayne

Avenue improvements does reduce congestion at the I-81/Wayne

Avenue interchange.  The response to paragraphs 189-195 is

incorporated herein by reference.

340. Disputed.  The 1998 traffic analysis contains levels

of service with and without signals at the interchange area.

(AR-72 at 3-4, 23-25.)  The signalized intersections LOS (A or

B) are acceptable at the interchange ramp areas and where

Franklin Farm Lane intersects Relocated Walker Road.  (AR-72 at

23-25.)  With a signalized intersection, some of the traffic

movements at the intersection of Kohler Road and Relocated

Walker Road will experience unacceptable levels of service (D or

E) if Norland Avenue is not extended; however, under the no

build scenario some of the traffic movements at the intersection

of Walker/Kohler Roads will experience level of service F.  (AR-

72 at 23; AR-46, App. B at 73.)  Please note that the

information contained in the circles at AR-72 at 18-25 is the

LOS when the intersection is signalized and the information contained on the stick drawings are unsignalized LOS.

341. Disputed.  AR-72 at 24 shows LOS with traffic signals at the intersections of Walker Road and the I-81 ramps.  This will achieve levels of service A and B for the southbound and northbound intersections, respectively.  Please note that the information contained in the circles at AR-72 at 24 is the LOS when the intersection is signalized and the information contained on the stick drawings are unsignalized LOS.

342. Disputed.  The response to paragraph 340 is incorporated herein by reference.

343. Disputed.  AR-72 at 4 goes on to state that if signalized the overall levels of service are "C" or better.  The responses to paragraphs 340 and 341 are incorporated herein by reference.

344. Disputed as a conclusion of law.  The responses to paragraphs 160, 317-320, and 337 are incorporated herein by reference.

345. It is undisputed that one of the project needs was "adhering to comprehensive plans of area municipalities."  (AR-46 at I-1.)  The primary project need was "complying with a Congressionally-legislated demonstration project to provide access to Chambersburg and to relieve congestion on an existing

interchange (Public Law 100-17)". The response to paragraph 360 is incorporated herein by reference.

346. Disputed. The FEIS actually states: "To be successful, this endeavor must also address the broader challenge of accommodating planned growth while not forcing unwanted highway commercial sprawl or development pressures upon areas that the local communities wish to preserve historic recourses, farmlands, and open space." The project accomplishes this by including limited access easement in the area of the interchange and by including a covenant on the lands remaining from the twenty-two (22) acre White parcel (the project only requires the direct use of 4.7 acres and the indirect use of 1.8 acres) requiring the land to be used only for agricultural purposes or open space. (AR-80 at 22; Defendants' Joint Reply Brief, Exhibit A, Declaration of David Reynolds.)

347. Undisputed.

348. Undisputed. By way of further answer, D Modified accomplishes this. D Modified does not take property from any historic resources. Moreover, D Modified impacts less farmlands than the Kriner Road alternatives. D Modified would take directly take 12.1 acres of productive agricultural lands and indirectly take 4.1 acres. (SMF 103.) Alternative B-1, the Kriner Road alternative that avoids historic resources, would directly take 12.7 acres of productive agricultural land and

indirectly take 8.5 acres.  D Modified results in less impacts

to productive agricultural lands.  (AR-80 at 22 which is also

attachment D to AR-82, the ROD.)

349-50.  It is undisputed that Greene Township has opposed

the location of the interchange at Walker Road since February of

1988.  AR-86 at 16 does not state that the reasons is to

preserve agricultural lands and prevent sprawl within the

Township.  Furthermore, AR-142 at 860 is a newspaper article.

Greene Township's actions do not support these reasons.

According to Greene Township's planning documents, the intended

use of the area surrounding Walker Road is residential, not

agricultural.  (AR-134 at 931; AR-136 at 1712; AR-19 at 7-12.)

As pointed out by ALCAB (whose primary purpose is to ensure that

excessive amounts of farmlands are not condemned), the

Township's planning practices provides for the development of

the Township's agricultural land.  (AR-138 at 253.)  ALCAB

found:

> The intention of Greene Township, however, in desiring to
> remain predominantly an agricultural municipality are
> contradicted by certain policies that the Township has been
> undertaking.  For instance, the Township re-zoned
> agricultural land at the interchange of Exit 8 to permit
> the construction of a Sheetz mini market and a storage
> building project adjacent thereto.  The Township has also
> zoned most of its agricultural land as R-1 rather than as
> agricultural in order to permit farmers to build additional
> residences on their farms.  However, by doing this the
> Township has given up control over how much land the
> farmers can convert to non-agricultural housing purposes.
> Furthermore, the Township has also permitted other parcels

to be carved out of farmland without Township approval such as the two new houses along Walker Road . . . . Permitting these types of structures to be erected without Township approval of any kind does not show a good faith effort to limit conversion of productive agricultural land in Greene Township.

(AR-138 at 252-253)

351. Disputed.  Landowners, not municipal officials, established Agricultural Security Areas (ASA) in Greene Township and Guilford Township in the Walker Road/Franklin Farm Lane area.  It is not disputed that some parcels in the Walker Road and Franklin Farm Lane area were enrolled in 1983 according to Greene Township's ASA maps.  (AR-139 at 418, 420.)

352. Disputed.  Franklin County Commissioners support an interchange at Walker Road.  (AR-88 at 18-19; AR-43, Section III at 27.)

353. The responses to paragraphs 102, 110, and 113 are incorporated herein by reference.

354. Disputed.  The responses to paragraphs 102 and 112-113 are incorporated herein by reference.

355-356.  It is undisputed that the Franklin County Comprehensive Plan at the inception of the project made no mention of an interchange.  The Comprehensive Plan at this time did not identify any specific project in the County.  (AR-158 at 257.)  However, the current Comprehensive Plan does recommend that the development of a new interchange on I-81 north of the

Route 30 interchange to reduce traffic congestion at the Route 30 and Route 997 interchanges.  (AR-136 at 1439.)

357. It is undisputed that Guilford Township did not have a Comprehensive Plan during the circulation of the DEIS and FEIS. However, Guildford Township is in favor of building an interchange at Walker Road.  (AR-93 at 504.)

358. Undisputed.

359. Undisputed.  By way of further answer, if the extension of sewer and water lines to the interchange area is cost prohibitive than excessive development should not occur in the area of the interchange, because the public infrastructure to support intensive development does not exist.

360. Disputed.  The 2001 Re-evaluation of the ROD states: "While Greene Township's 1994 Comprehensive Plan states oppositions to an interchange alternative at Walker Road, the project is consistent with Greene Township's zoning, development approvals, and future land use patterns."  (AR-83 at 6.)  A similar conclusion was made by ALCAB, a board independent of PennDOT.  The response to paragraph 349-350 is incorporated herein by reference.

361. Disputed.  The DEIS and FEIS actually states that the zoning within the project area is low density residential (59.3%) and agricultural districts (26.5%)  and that the intent of this zoning is "to promote future utilization of these areas

for low density residential and preservation of agricultural lands". (AR-46 at III-1.)

362. Disputed. The response to paragraph 360 is incorporated herein by reference.

363. The responses to paragraphs 349-350 and 360 are incorporated herein by reference.

364. The response to paragraph 352 is incorporated herein by reference.

365. Disputed. A copy of the Franklin County Comprehensive Plan was included in the administrative record beginning at AR-136. The 1977 Franklin County Comprehensive Plan was included in the supplement to the administrative record beginning at AR-158.

366. Denied as a conclusion of law.  Defendants properly considered the comprehensive plans of area municipalities.

Respectfully submitted,


THOMAS A. MARINO
United States Attorney



ANNE K. FIORENZA
Assistant United States Attorney
Federal Building - 2nd Floor
228 Walnut Street
P.O. Box 11754
Harrisburg, PA  17108-1754

KENDA JO M. GARDNER
Assistant Counsel
JOHN M. HRUBOVCAK
Assistant Counsel-in
Charge
ROBERT J. SHEA
Assistant Chief Counsel
ANDREW S. GORDON
Chief Counsel
Pennsylvania Department of
Transportation
Office of Chief Counsel
P.O. Box 8212
Harrisburg, PA  17105


Date:  September 9, 2002

## CERTIFICATE OF SERVICE

I, Kenda Jo M. Gardner, hereby certify that on this 9th day of September, 2002, I served a copy of the foregoing documents by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and placed said envelope and contents in the United States Mail at Harrisburg, Pennsylvania:

Thomas Alan Linzey, Esquire
Community Environmental Legal Defense Fund
2859 Scotland Road
Chambersburg, PA  17201


KENDA JO M. GARDNER
Assistant Counsel
Office of Chief Counsel
Pennsylvania Department of
   Transportation
Commonwealth of Pennsylvania
P.O. Box 8212
Harrisburg, PA  17105-8212
(717) 787-5299
Fax: (717) 772-2741