2 to Gt

ORIGINAL (117)
10/8/02
Atc

FILED
HARRISBURG, PA

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

OCT 07 2002
MARY E. D'ANDREA, CLERK
Per ____
Deputy Clerk

|  |  |  |
|---|---|---|
| GREENE/GUILFORD ENVIRONMENTAL ASSOCIATION, a non-profit corporation incorporated under the laws of the Commonwealth of Pennsylvania, CITIZENS FOR PLANNED COMMUNITY GROWTH, an unincorporated association organized under the laws of the Commonwealth of Pennsylvania, PAUL B. AMBROSE, JOHN G. ENDERS, CHARLES F. RAHAUSER, BETSY RAHAUSER, DOUGLAS A. WARNOCK, U.X. VAGNERINI, THOMAS W. BUNDY, STEPHEN P. BUCHER, ROGER J. ROBERTSON, JAMES A. STRITE, JR., and DAVID A. GUTHRIE, | : : : : : : : : : : : : : : : : : : : : | CIVIL NO. 1:CV-01-0910 (Judge Conner) |
| Plaintiffs, | | |
| v. | | |
| KEN WYKLE, Administrator, Federal Highway Administration, ROBERT GATZ, Federal Highway Administration, | : : : : | |
| Defendants, | | |
| and | : : | |
| BRADLEY L. MALLORY, Secretary for The Department of Transportation, Commonwealth of Pennsylvania, | : : : : | |
| Intervenor. | : | |

## PLAINTIFFS' REPLY TO AGENCIES' JOINT RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT[1]

---

[1] The Plaintiffs reserve the right to supplement this *Reply* following this Court's ruling on Plaintiffs' two *Motions to Strike* extra-Record materials appended by the agencies to their *Joint Reply to Plaintiffs' Answer*

# **Table of Contents**

Table of Citations.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  iii

I. The Agencies Have Admitted That They Commenced Final Design on "Alternative D-Modified" Prior to the Release of the Record of Decision, in Violation of Federal Law.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  1

II. The Agencies Have Admitted That Their Own Studies Show That the I-81/Route 30 Interchange is Not Currently Congested and That it Will Not Be Congested in 2016. The Agencies Have Thus Misused Congressionally-Directed Demonstration Project Monies Plainly Intended to Relieve Traffic on an Already Congested Interchange.  .  .  .  .  .  3

III. The Agencies Have Admitted That They Failed to Examine the Impact of New Development and Truck-Intensive Warehouse Distribution Centers on the Wayne Avenue/I-81 Interchange.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  7

IV. The Agencies Have Admitted That the Norland Avenue Connector Road is Necessary for the Proper Functioning of the New Interchange and That Without the Connector Road, the Interchange Itself Will be Congested.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  11

V. The Agencies Fail to Rebut Plaintiffs' Contention That the Overhaul of Public Law 100-17 Required the Agencies to Examine an Appropriate Range of Alternatives.  .  .  13

VI. In Addition to Their Admissions, the Agencies Have Chosen Not to Respond to Several Allegations Made by the Plaintiffs.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  16

VII. The Agencies Have Failed to Explain How the Predetermination of the Location of the Interchange Did Not Violate Federal Law.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  17

VIII. The Agencies Have Failed to Explain How Their Identification of Historic Resources Was Not Arbitrary.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  26

IX. Conclusion.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  27

---

*in Opposition to Joint Motion for Summary Judgment* and their *Joint Response in Opposition to Plaintiffs' Motion for Summary Judgment.*

## **Table of Citations**

### _Cases_

*Alaska Wilderness Recreation v. Morrison*, 67 F.3d 723 (9th Cir. 1995). . . . . . . 14

*Ashwood Manor Civic Association v. Dole*, 619 F. Supp. 52 (E.D. PA 1985). . . . 25

*AWARE v. Colorado Dep't of Transp.*, 153 F.3d 1122 (10th Cir. 1998). . . . . . . 24

*Brooks v. Volpe*, 350 F. Supp. 269 (W.D. Wash. 1972). . . . . . . . . . . 25

*Cedar-Riverside Environmental Defense Fund v. Hills*,
    422 F. Supp. 294 (D. Minn. 1976). . . . . . . . . . . 23-24

*City of Carmel-By-The-Sea, et al. v. U.S. Dep't of Transportation*,
    95 F.3d 892 (9th Cir. 1996) . . . . . . . . . . . . . 14-15

*Coalition Against Raised Expressway, Inc. v. Dole*, 835 F.2d 803 (11th Cir. 1988). . . 25

*Curry v. U.S. Forest Serv.*, 988 F. Supp. 54 (W.D. Pa 1997). . . . . . . . . 14

*Davis v. Mineta*, 2002 U.S. App. Lexis 12285 (10th Cir. 2002). . . . . . . . 22

*Environmental Defense Fund v. Army Corps of Engineers*,
    470 F.2d 289 (8th Cir. 1972), *cert. denied* 412 U.S. 931 (1973). . . . . . . 25

*Isle of Hope Historical Ass'n, Inc. v. U.S. Army Corps of Engineers*,
    646 F.2d 215 (5th Cir. 1981) . . . . . . . . . . . . . .25

*Metcalf v. Daley*, 214 F.2d 1135 (9th Cir. 2000). . . . . . . . . . . . 22

*Presidio Golf Course v. Nat'l Park Serv.*, 155 F.3d 1153 (9th Cir. 1998). . . . . . .25

*Resources Ltd. v. Robertson*, 35 F. 3d 1300 (9th Cir. 1994). . . . . . . . . . 16

*Ross v. FHWA*, 162 F.3d 1046 (10th Cir. 1998). . . . . . . . . . . . 3-4

*Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997). . . . . . . 14

*Township of Lower Alloways Creek v. Public Service Electric & Gas Co.*,
    687 F.2d 732 (3rd Cir. 1982). . . . . . . . . . . . . . .18

*Wade v. Dole*, 561 F. Supp. 913 (D.Ct. Ill. 1983). . . . . . . . . . . .24

### _Statutes and Regulations_

23 U.S.C. §112(b)(3). . . . . . . . . . . . . . . . . . . 1-2

40 CFR §1506.1. . . . . . . . . . . . . . . . . . . . . . 1

Pub. L. No. 100-17, 101 Stat. 132 (April 2, 1987). . . . . . . . . . . . . . _passim_

**ARGUMENT**

**I. The Agencies Have Admitted That They Commenced Final Design on Alternative D-Modified Prior to the Release of the Record of Decision, in Violation of Federal Law.**

In the Plaintiffs' *Brief in Support of their Motion for Summary Judgment*, the Plaintiffs used Contracts and Work Orders between the agencies and their consultants in the Administrative Record to illustrate how the agencies commenced final design of the proposed Walker Road interchange years prior to the issuance of the Record of Decision (ROD) for this project. *See Brief* at 17-19.

23 U.S.C. §112(b)(3) specifically prohibits the highway agencies from "commenc[ing]" final design prior to the approval of an ROD for a project. In addition, NEPA regulations forbid agencies from taking action or expending funds that would prejudice the "ultimate decision on the program." 40 CFR §1506.1. The underlying rationale for these regulations is to ensure that the agencies examine alternatives to the proposed action - and impacts resulting from the proposed action - before expending resources on one project alternative.

In their *Joint Response in Opposition to Plaintiffs' Motion for Summary Judgment* [hereinafter "Joint Response"], the agencies admit that they commenced final design on the project prior to the issuance of the ROD. *Joint Response* at 18-20. In delicate language, the agencies attempt to convince this Court that engaging in "pre-final" design is not the same as "commencing" final design on a project under 23 U.S.C. §112(b)(3), although the plain language of the law supports the opposite conclusion.

In fact, "pre-final" design is not recognized by the Planning Manuals used by the agencies for highway projects or in statutory or regulatory law. As explained by the

Plaintiffs in their *Statement of Material Facts*, "pre-final" design isn't even recognized by PennDOT's own *Environmental Impact Statement Handbook*, which fails to use the term in the agencies' master flow chart used to delineate the overall project development process. (AR-172 at 149); *See Plaintiffs' SMF* at 49-50.

In addition to their attempt to re-define the phrase "pre-final", the agencies then attempt to re-define the word "commence" within 23 U.S.C. §112(b)(3) by gingerly declaring that "no final design was *completed*" for the interchange before the ROD was issued. *See Joint Response* at 20, 22 (emphasis added). That precise language is mirrored in the Briefs filed by the agencies in support of their recent attempt to force extra-record Affidavits into the Record. In those Briefs, the agencies proclaim again that "[n]o final design activities were *completed* for the project." *Joint Response to Plaintiffs' Motion to Strike and for Sanctions* at 6 (emphasis added).

In addition, through their recent attempt to file Affidavits from agency consultants, the agencies have explicitly admitted that the plaintiffs' argument - that the agencies had commenced final design in violation of the law – can "not be adequately addressed by defendants solely by reference to the record." *Joint Response* at 3.

Finally, the agencies attempt to argue to this Court that their statutory violation is somehow irrelevant, because the Draft Environmental Impact Statement (DEIS) had already been circulated when final design was commenced. *See Joint Response* at 19. Leaving aside the fact that the agencies have openly admitted their violation of the law, the authorization of design activities on a Walker Road interchange occurred in June of 1994, and the agencies' authorization of final design on a Walker Road interchange occurred in December of 1994. *See Plaintiffs' SMF* at 47-48. Those authorizations were

issued almost a year prior to the release of the FEIS, and almost five years before the

Record of Decision (ROD) was issued. (AR-162 at 651; AR-103 at 369; AR-165 at 1664,

1681, 1707). Those agency authorizations served to "lock-in" a Walker Road location for

the interchange by authorizing the expenditure of planning funds to conduct final design

activities on a Walker Road interchange.

The complete failure of the agencies to rebut the Plaintiffs' allegations concerning

the agencies' violation of statutes and regulations governing final design - and the

agencies' admission that final design was commenced years prior to the issuance of the

ROD for the project - require this Court to find, as a matter of law and record, that the

planning for this interchange project violated federal law. As a remedy for that violation,

this Court must order the agencies to re-start their environmental planning process and

conduct objective, non-predetermined studies to evaluate the best location for the

highway project.

**II. The Agencies Have Admitted That Their Own Studies Show That the I-81/Route
30 Interchange is Not Currently Congested and That it Will Not Be Congested in
2016. The Agencies Have Thus Misused Congressionally-Directed Demonstration
Project Monies Plainly Intended to Relieve Traffic on an Already Congested
Interchange.**

As illustrated by the Plaintiffs in their Summary Judgment materials, the clear

language of Public Law 100-17 required the agencies to follow the Congressionally

stated purpose for the project – of building an interchange to "relieve congestion *on* an

existing interchange." *Plaintiffs' Brief in Support of Summary Judgment* at 39-49

(emphasis added). To carry out the Demonstration Project, the agencies were required to

first, locate an already congested interchange near Chambersburg, and second, build a

new interchange that would relieve congestion *on* that interchange. *See Ross v. FHWA*,

162 F.3d 1046, 1052 (10th Cir. 1998) (stating that the high degree of federal involvement in Demonstration Projects requires that demonstration funding "only be spent on the specified project."); *See Plaintiffs' Brief in Support of Summary Judgment* at 40.

As recounted in the Plaintiffs' *Brief in Support of Summary Judgment*, the I-81/Route 30 interchange – according to *every* traffic study ever completed by the agencies on this project – is not congested, nor will it be congested in the 2016 design year.[1] In fact, in the FEIS prepared for the project, the agencies explicitly admitted that the "interchange ramps have adequate capacity to handle *current and future traffic*." (AR-46 at ES-6) (emphasis added). In response to comments raising this precise question during the planning process, the agencies admitted outright that "[t]he existing Exit 6 Interchange [I-81/Route 30] itself is not a traffic problem." (AR-29 at 27).[2]

Throughout their *Joint Response*, the agencies continue to admit that the I-81/Route 30 interchange is not congested, stating that the Level of Service "which are obtained for the two I-81/Route 30 interchange ramps appear to be acceptable." *Joint Response* at 5.

In an attempt to avoid the inescapable conclusion that the agencies misused Congressionally-directed funding in their attempt to build an interchange that does not relieve an already congested interchange, the agencies have struggled to argue that while the I-81/Route 30 interchange isn't congested, it was appropriate for the agencies to use those Demonstration Project funds to reduce traffic on Route 30. *Id.* at 2-3. The agencies

---

[1] The agencies' Preliminary Alternatives Report, completed in 1990, revealed that the interchange ramps were operating at a Level of Service "A". (AR-2 at 32). Other early agency studies revealed that the interchange would continue to operate at acceptable LOS's into 2016. (AR-97 at 957). The agencies' 1995 Traffic Studies confirmed that the interchange ramps would operate at acceptable LOS's in design year 2016, even assuming that no other highway improvements were made to Route 30 during that time period. (AR-31 at 4; AR-37 at 43, 44).

then attempt to explain that traffic on Route 30 – and specifically at the Route 30/Stouffer Avenue/Walker Road intersection – would be relieved by the construction of a new interchange. *Joint Response* at 4. Using that questionable analysis, the agencies then draw the conclusion that congestion **_at_** the I-81/Route 30 interchange "could be reduced by improving the LOS of the Walker Road/Stouffer Avenue intersection with Route 30." *Id.*

The agencies' arguments border on the nonsensical. First, they admit that the interchange ramps at the I-81/Route 30 interchange are operating without congestion – and that they will be operating at acceptable levels of service by 2016 without any highway improvements in the surrounding area. That admission, standing by itself and advanced consistently by the agencies in every traffic study and every document filed by the agencies with this Court, is sufficient for a finding that the agencies have misused Demonstration Project funding and must be ordered to apply these highway monies to another project that satisfies the plain language of Public Law 100-17.

In an attempt to salvage their case after that admission, the agencies then seek to argue that they have complied with Public Law 100-17 because they've sought to relieve congestion *around* the I-81/Route 30 Interchange by building a new interchange that will relieve congestion at the Stouffer Avenue/Walker Road/Route 30 intersection. *Joint Response* at 4-5.

Leaving aside, for a moment, the fact that all of the agencies' prior studies assert quite plainly that the "interchange ramps have adequate capacity to handle *current and future traffic*", and that relieving congestion "around" an interchange is quite different from relieving congestion "on" an interchange, the agencies' arguments that a Walker

---

[2] The agencies' 2000 traffic data again confirms that the interchange will not be congested in 2016, and will, in fact, operate almost entirely at Level of Service "B" by the design year. (AR-156 at 159).

Road interchange will relieve traffic on Route 30 – and at the Stouffer Avenue/Walker Road/Route 30 intersection - is simply absurd.

PennDOT itself perhaps stated it best in 1992 when the agency declared that the problem with a Walker Road interchange was the "inability to divert sufficient traffic from a major east-west route (such as U.S. Route 30)." (AR-90 at 5). That concern was restated by the Pennsylvania Department of Agriculture, which asserted that a Walker Road interchange would simply divert traffic onto local roads and back onto Route 30. (AR-12 at "Appendix D").

Even a cursory review of the plans for a Walker Road interchange reveal that those statements are accurate. For traffic using the new interchange and headed to Chambersburg - according to the agencies themselves - vehicles will travel on either rebuilt Walker Road (on the west side of I-81), or on Franklin Farm Lane (on the east side of I-81). To avoid dealing with historic properties and necessary road upgrades on Franklin Farm Lane, the agencies have claimed that rebuilt Walker Road will be the primary connector road for the new interchange. *See Agencies' Response to Plaintiffs' SMF* at paragraph 101.

As the primary connector road, vehicles traveling to Chambersburg using rebuilt Walker Road are cycled right back into the Stouffer Avenue/Walker Road/Route 30 intersection. That situation occurs unless the Norland Avenue Connector road is used to buffer the number of vehicles headed back to the Stouffer Avenue/Walker Road/Route 30 intersection. The agencies, however, contend that the Norland Avenue Connector is a separate and "unrelated" project, and is not necessary for the proper functioning of the interchange. Again, the agencies have placed themselves in a corner – either the Norland

Avenue Connector is an integral part of the project and the agencies have never studied

the cumulative and connected impacts of the road in violation of federal law; or the

Norland Avenue Connector is an unrelated project and the proposed interchange will not

function to relieve traffic at the Stouffer/Walker/Route 30 intersection. If the former, the

agencies have violated NEPA's mandates that all impacts from related actions be

examined, including cost; if the latter, the agencies have misused Congressionally-

directed funding for purposes not found within Public Law 100-17.

The agencies' arguments have thus come full-circle. The agencies have

gerrymandered their arguments throughout the planning process for this project, and, as a

result, have found themselves in violation of the law any way that they attempt to turn.

As such, this Court must declare that that the agencies have misused

Congressionally-directed Demonstration Project funding, and order the agencies to

develop a highway project consistent with the mandates of Public Law 100-17 and its

amendments.

### III. The Agencies Have Admitted That They Failed to Examine the Impact of New Development and Truck-Intensive Warehouse Distribution Centers on the Wayne Avenue/I-81 Interchange.

In the Plaintiffs' *Summary Judgment* materials, the Plaintiffs illustrated how the

highway agencies failed to examine how traffic - created by new industrial and

commercial development in the Kriner Road area - has caused, and will cause, congestion

on the existing Wayne Avenue/I-81 interchange south of Chambersburg. *Plaintiffs'*

*Answer in Opposition to Agencies' Joint Motion for Summary Judgment* at 19-27. The

agencies' failure to examine that development is crucial because the agencies eliminated

consideration of Kriner Road interchange locations south of Chambersburg purely on the basis that the Interchange was not congested.[3] *See Agencies' Joint SMF* at paras 49-51.

Ironically, the agencies eliminated consideration of an Interchange in the Kriner Road area for its purported failure to comply with Public Law 100-17, while selecting an interchange in the Walker Road area which fails to meet the mandates of that Law.

The Plaintiffs have shown that the agencies have explicitly admitted that greater-than-projected development in the Chambers-5 Industrial Park (which generates truck traffic that uses the Wayne Avenue interchange to access I-81) alone would create an unacceptable level of congestion on that interchange. *See Plaintiffs' SMF* at paragraphs 197-200. In 1995, the agencies admitted that a total of 1.8 million square feet of build-out in Chambers-5 alone would result in a worsening in congestion on the Wayne Avenue/I-81 interchange from a Level of Service "C" to an unacceptable Level of Service "D". (AR-105 at 155). Currently, the Chambers-5 Industrial Park has over 3 million square feet of build-out.

In addition to the grossly under-projected build-out of the Chambers-5 Park, the agencies also failed to examine the traffic impact created by the 1997 decision by the Guilford Township Board of Supervisors to adopt a zoning Ordinance that specifically encourages industrial and commercial development around the Wayne Avenue/I-81 interchange. (AR-134 at 1001). Finally, the Plaintiffs have shown that the Warehouse Distribution Centers already constructed south of Chambersburg contain an additional 2.5 million square feet of truck-intensive development, and that they generate traffic that

---

[3] The agencies eliminated the Kriner Road alternatives precisely because the alternatives purportedly did "not meet the need provided in Public Law 100-17 to relieve congestion __*on*__ an existing interchange." *See Joint Response to Plaintiffs' Statement of Material Facts* at para. 201 (emphasis added).

uses the Wayne Avenue interchange to access I-81. *See Plaintiffs' Answer in Opposition to Joint Motion for Summary Judgment* at 25.

In their *Joint Response*, the agencies admit that they failed to examine the impact of any of these developments on traffic congestion on the Wayne Avenue/I-81 interchange. In fact, they fail to even address the Plaintiffs' arguments with respect to the Distribution Warehouses and Guilford Township's adoption of a Zoning Ordinance, even though that Ordinance was adopted in 1997, two years prior to the issuance of the agencies' Re-evaluation of the FEIS and the Record of Decision. While explicitly recognizing in the "Re-evaluation" that the new Zoning Ordinance will "allow for development in the Kriner Road area", the agencies summarily concluded – without traffic studies or assessments – that the Zoning Ordinance "will not significantly affect the planned land uses within the study area." (AR-80 at 8,9).

The Re-evaluation then continues with a "Traffic and Transportation" Section that reviews and updates traffic impacts in the Walker Road area, but which completely fails to examine any new traffic impacts in the Kriner Road area. (AR-80 at 19, 20). The only citations offered by the agencies to support their contention that the traffic impacts of these new developments were examined are to the Re-evaluation itself, the FEIS – prepared two years prior to these developments – and a one page status of current developments in the study area. *See Joint Response to Plaintiffs' SMF* at para. 188.

The substantial traffic impacts resulting from the Distribution Warehouses was similarly never examined in any agency documents - including the agencies' "Re-Evaluation of the Record of Decision" - even though the Warehouses were planned and constructed prior to the release of that document in June of 2001. That failure, in itself,

requires this Court to order the agencies to prepare a Supplemental Environmental Impact Statement to address the impact of those developments on traffic at the Wayne Avenue/I-81 interchange, especially because agency projections around the Chambers-5 Park revealed that a mere 500,000 square feet of additional development in the Kriner Road area would result in a downgrading of the Level of Service to congested levels on the Wayne Avenue/I-81 interchange.

The agencies offer no defense to their failure to examine the traffic impacts of these new developments. The agencies do attempt to offer one defense to their failure to examine the build-out of the Chambers-5 Park: they argue that they actually over-projected traffic growth, and that traffic counts taken in 2000 reveal that the increased growth of Chambers-5 has had no impact on traffic congestion. *Joint Response* at 6-7.

That argument has become the linchpin supporting the agencies' contention that increased development in the Chambers-5 Park would not result in congestion at the Wayne Avenue/I-81 interchange. In making this argument, the agencies contend that their 2000 Traffic Counts revealed lower than projected traffic growth from development within the Park. *See Joint Response to Plaintiffs' SMF* at paras.189-195.

The agencies attempt to mislead this Court.

As admitted by the agencies in the FEIS, traffic traveling to and from the Chambers-5 Park uses two different access roads – Wayne Avenue and Kriner Road. (AR-46 at III-7). Yet, in 2000, the agencies collected traffic counts only from "along Wayne Avenue. . . between Stouffer Avenue and I-81" west of the interchange, and not on Kriner Road east of I-81.[4] *Joint Response* at 6. The agencies then attempt to use this

---

[4] The agencies' selection of only Wayne Avenue (west of I-81) for traffic impacts in 2000 is curious, given that the agencies took traffic counts at both Kriner Road and Wayne Avenue – the two roads serving as

selective data to argue that slower traffic growth has occurred. It is clear from these facts that the agencies failed to examine the impact of the accelerated development on the Wayne Avenue/I-81 interchange *even after admitting* that the current development in the Park would lead to congestion on the interchange.

Thus, in response to the Plaintiffs' arguments that the agencies failed to prepare an SEIS to examine the traffic impacts of significant new developments in the Kriner Road area, the agencies have admitted that they (1) failed to examine traffic impacts resulting from the accelerated development within the Chambers-5 Industrial Park, even after admitting that the accelerated development would create congestion at the Wayne Avenue/I-81 interchange; and (2) failed to examine any traffic impacts whatsoever resulting from the new truck-intensive, industrial development occurring near the Wayne Avenue/I-81 interchange south of Chambersburg.

As such, this Court must order the agencies to prepare a Supplemental Environmental Impact Statement to examine the impact of these developments on the Wayne Avenue/I-81 interchange.

## IV. The Agencies Have Admitted That the Norland Avenue Connector Road is Necessary for the Proper Functioning of the New Interchange and That Without the Connector Road, the Interchange Itself Will be Congested.

The Plaintiffs have illustrated how the agencies' proposed interchange at Walker Road will become congested itself before the design year. *See Plaintiffs' Brief in Support of Summary Judgment* at 48. Amazingly, in their *Joint Response*, the agencies admit outright that traffic movements around the newly constructed interchange "will

---

access roads to the Chambers-5 Park - in 1995. (AR-46 at I-9); *See Plaintiffs' Answer to Joint SMF* at para. 127.

experience unacceptable levels of service" without the construction of the Norland Avenue Connector Road. *See Joint Response* at 9; *See* AR-72 at 3-4.

That admission by the agencies is consistent with traffic studies prepared earlier, which examined the functioning of the proposed interchange. Specifically, in their 1998 Traffic Studies, the agencies declared that

> [a]t Relocated Walker Road at Kohler Road (extended), preliminary engineering calls for one lane on each approach. However, even when analyzed with separate left-turning lanes. . . southbound left-turns experience level of service "f" in all alternatives when unsignalized. If signalized, overall levels of service are "C" or better, except in the case that Norland Avenue is not extended to Walker Road. Figures 3 and 7 **show levels of service "D" or "E" result without the Norland Extension**. (AR-72 at 3-4) (emphasis added).

While claiming that the Norland Avenue Connector Road is an independent, federally funded road project "not a part of this project" (*See Agencies' Response to Plaintiffs' SMF* at paragraph 162 and *Agencies' Joint Reply to Plaintiffs' Answer in Opposition to Summary Judgment* at 7 (declaring that the Connector Road is a "separate independent project"), the agencies have admitted that the Connector Road is necessary for the proper functioning of the newly built interchange.

The agencies continue to argue that impacts and costs of the Norland Avenue Connector Road were not considered in any environmental documents because federal funding for the construction of the Road was not granted until "after the issuance of the Record of Decision." *See Agencies' Joint Reply to Plaintiffs' Answer in Opposition to Summary Judgment* at 7. Leaving aside the fact that the Connector – federally funded or not federally funded – serves as an integral part of the project and should have been examined, the agencies' "Re-evaluation of the ROD" was issued on June 28, 2001, *after* federal funding was granted for the Norland Avenue Connector project. (AR-83). Yet, the

"Re-evaluation", while purporting to examine all new developments since the issuance of the Record of Decision, contains no analysis or examination of impacts resulting from the Connector, while recognizing that the road "has been added. . . as a federally funded project." (AR-83 at 7).

Even a cursory review of the design and location of this interchange project reveals that the Connector Road is an integral component necessary for the proper functioning of the interchange. Without it, the new interchange simply diverts traffic onto local roadways that feed directly back onto Route 30, thus undermining the agencies' argument that the project relieves congestion on Route 30.

## V. The Agencies Fail to Rebut Plaintiffs' Contention That the Overhaul of Public Law 100-17 Required the Agencies to Examine an Appropriate Range of Alternatives.

In the Plaintiffs' *Brief in Support of their Motion for Summary Judgment*, the Plaintiffs illustrated how Public Law 100-17 was amended to allow Congressional funding to be spent on other highway projects within a five County area. *See Plaintiffs' Brief in Support of Summary Judgment* at 30-35. The Plaintiffs then explained that the amendment required the agencies to examine a span of alternatives that met those new purposes. *Id.* at 31-32. The Plantiffs noted that the Congressional amendment became law in November of 1995, only months after the FEIS had been issued, and three years before a Record of Decision (ROD) was issued for the project. *Id.* at 34; AR-82.

The agencies do not dispute that the underlying Demonstration law was changed to remove any reference to Chambersburg in the title block and authorize the funding to be expended on any highway projects in the counties of Bedford, Blair, Centre, Franklin, and Huntingdon. *Joint Response in Opposition to Plaintiffs' Motion for Summary*

*Judgment* at 11. Indeed, the agencies have explicitly admitted that they had "the option of developing the project for which the funds [are now] authorized." (AR-103 at 274). Instead, the agencies argue that their decision not to change the project needs meant that they were under no legal requirement to assess alternatives consistent with the new scope of the funding law. *Id.* at 12. In addition, the agencies attempt to downplay the change in purpose codified by the Congressional amendment, characterizing it as a "catch-all phrase" that did not change the "intent of the statute." *Id.* at 13.

The agencies are wrong in several respects. First, the need for this interchange project was established by Congress, not by the agencies. As a Demonstration Project, the agencies were legally required to expend the funds on the specific project that had been authorized by Congress. When Congress alters the purposes or needs within the law authorizing a Demonstration Project, the agencies must examine alternatives that reflect that changed purpose and needs. *See Plaintiffs' Brief in Support of Summary Judgment* at 31-33. Failure to examine a broad range of alternatives dictated by the "nature and scope" of the project creates a fatal flaw in the environmental planning process. *See, e.g. Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997); *Curry v. U.S. Forest Serv.*, 988 F. Supp. 54 (W.D. Pa 1997); *Alaska Wilderness Recreation v. Morrison*, 67 F.3d 723 (9th Cir. 1995); *City of Carmel-By-The-Sea, et al. v. U.S. Department of Transportation*, 95 F.3d 892 (9th Cir. 1996).

In an attempt to circumvent these legal mandates, the agencies struggle to distinguish *City of Carmel-By-The-Sea*, a case used by the Plaintiffs to show that the agencies were required to examine alternatives consistent with the new funding law. *See Plaintiffs' Brief in Support of Summary Judgment* at 31-32. In an attempt to distinguish

that case, the agencies make a distinction without a difference, stating that the case is

inapplicable because in *City of Carmel-By-The-Sea*, it was the agency itself which

changed the need and purpose of the project, and in this case, the agencies themselves

have not changed the need and purpose of the project. *Joint Response to Plaintiffs'*

*Motion for Summary Judgment* at 12-13.

The unique nature of a Demonstration Project makes the agencies' argument

untenable. Public Law 100-17 constituted a Congressional directive that established the

purpose and need of the project. It was not an authorization of general monies to fund

whatever project the agencies desired. Thus, when Congress overhauled Public Law 100-

17, the agencies were controlled by that change in purpose and were legally required to

carry out the delineated project, while studying a list of alternative locations for the

interchange dictated by the new purpose and need established by Congress.

The agencies are also wrong when they assert that the plaintiffs have not

advanced alternatives that would satisfy the new project purpose and need asserted by

Congress. The Plaintiffs have explicitly identified over seventy transportation projects in

Bedford, Blair, Centre, Franklin, and Huntingdon Counties upon which these

Demonstration project monies could be expended. *See Plaintiffs' Brief in Support of*

*Summary Judgment* at 34-35; (AR-169 at 52-72). However, the agencies – even when the

issue was raised numerous times during the planning process for the interchange –

refused to examine any of those alternatives, while giving no explanation for their

refusal. (AR-103 at 274; AR-104 at 23; AR-169 at 145, 148, 151, 154, 155, 158, 161,

164, 168, 172, 176; AR-106 at 408; AR-82 at 5).

The agencies' original alternatives – developed under the original Public Law 100-17 - "do not satisfy the revised statement of purpose and need", and the agencies' actions violate the basic tenets of the NEPA – which require a specific examination and analysis of alternatives that attain the project purpose. *See Resources Ltd. v. Robertson*, 35 F. 3d 1300, 1307 (9th Cir. 1994). As such, this Court must order the agencies to re-start the environmental planning process and integrate a consideration of revised alternatives within that process.

## VI. In Addition to Their Admissions, the Agencies Have Chosen Not to Respond to Several Allegations Made by the Plaintiffs.

In addition to making the various admissions outlined in this Brief, the agencies have simply chosen not to respond to allegations made by the Plaintiffs on key issues in this case.

The agencies have failed to respond to the Plaintiffs' assertions that (1) the agencies' reliance upon origin/destination[5] studies from 1989 is arbitrary because those studies were prepared twelve years prior to the issuance of the "Re-evaluation of the ROD" and are still being used by the agencies as the sole basis for the agencies' traffic assumptions (*Plaintiffs' Answer to Agencies' SMF* at paras. 43, 52, 54, and 82); (2) the agencies failed to adhere to highway engineering principles – codified within FHWA regulations - in their attempt to build an interchange slightly more than a half-mile north of the existing Route 30/I-81 interchange (*Plaintiffs' Brief in Support of Summary Judgment* at 21); (3) Jane Garvey, then-acting Administrator of the FHWA, arbitrarily

---

[5] Whereas traffic counts simply record raw vehicle numbers, origin/destination studies provide information about where individual vehicles are traveling – crucial information that allows the highway agencies to model traffic origination and destination and use that model to create traffic projections.

committed the agency to not prepare supplemental environmental studies – prior to an

examination or analysis of any data dealing with the issue (*Id.* at 25); (4) PennDOT

ignored specific FHWA instructions to not proceed to final design on a Walker Road

interchange (*Id.* at 28); (5) the agencies failed to consider any new developments in the

Kriner Road area, while using potential development in the Walker Road area to bolster

their support for a Walker Road interchange (*Id.* at 37); (6) the agencies arbitrarily

ignored the plain language of Public Law 100-17, and ignored the use of specific

Congressional language that delineated other Demonstration Projects (*Id.* at 39); (7) the

agencies violated their own rules governing the consistency of highway projects with

land use plans (*Id.* at 49); (8) the agencies used a "No Build" Alternative which

improperly assumed that no traffic improvements whatsoever would be built in the study

area (*Plaintiffs SMF* at para. 152); and (9) the agencies failed to re-examine costs for the

various alternatives when the cost for the proposed interchange increased by over 400%

(*Plaintiffs' SMF* at para. 171).

**VII. The Agencies Have Failed to Explain How the Predetermination of the
Location of the Interchange Did Not Violate Federal Law.**

In the *Plaintiffs' Brief in Support of Summary Judgment*, the Plaintiffs proved that

the agencies' planning process for this interchange was focused solely on delivering an

interchange in the Walker Road area. *Id.* at 11-28. To make that showing, the Plaintiffs

used close to a hundred different instances of predetermination – including agency

Contracts, agency Work Orders, advertisements for the preparation of environmental

studies, the agencies' own Twelve Year Plans, agreements between PennDOT and

FHWA, communications between Bud Shuster and then-Secretary of Transportation

Howard Yerusalim, agency electronic mails, agency studies, actions of agency Administrators, and Memoranda sent between agency staff – all drawn from the Administrative Record from the period of 1987 to 2001. *Id.* Even a cursory review of those materials reveal - without a doubt - that the agencies predetermined the location of the interchange in the Walker Road area in violation of federal law.

Plaintiffs believe that this showing of systemic predetermination – infused by the agencies throughout the planning process for the interchange – is sufficient for this Court to declare that the agencies have violated federal law because the predetermination suffocated the integration of objective environmental studies "into the very process of agency decisionmaking." *Township of Lower Alloways Creek v. Public Service Electric & Gas Co.*, 687 F.2d 732 (3rd Cir. 1982).

In their *Response*, the agencies – amazingly - make no effort to rebut the content or meaning of the almost one hundred instances of predetermination in the Administrative Record used by the Plaintiffs.

Instead, the agencies merely contend that all of the documents and materials used by the Plaintiffs are simply "isolated", had no impact on the planning process for the road, and that the agency studies were objective. *Joint Response in Opposition to Plaintiffs' Motion for Summary Judgment* at 14-15. The agencies have chosen to rely entirely upon the agencies' compliance with the *process* required by the NEPA and other federal laws to show that no predetermination occurred. Hence, the agencies begin their defense by simply *recounting the documents that were prepared* by the agencies, as evidence that the agencies implemented an objective NEPA process. *Id.* at 16.

The agencies fail even in that attempt. First, they attempt to compare the agricultural land, noise, and historic resource impacts from the alternatives for the project, and argue that the chosen interchange ("Alternative D-Modified") has the least impacts. *Id.* The agencies, however, fail to acknowledge that their comparison continues to be based on incorrect and stale data.

For example, the agencies continue to claim that only a small amount of farmland would be used for "Alternative D-Modified" in the face of their own admission that PennDOT has already purchased twenty-two additional acres of farmland that has now been removed from crop production. *See Joint Reply to Plaintiffs' Answer in Opposition to Summary Judgment* at 20.

The agencies' contention on historic properties is equally flawed, because the Plaintiffs have shown that the agencies arbitrarily selected a historic study area, that upgrades to local roads will require the taking of historic land and impacts to historic properties, that the agencies refused to move the Secondary and Cumulative Impacts Area (SCIA) southward to reflect the 1400' southward shift of the interchange location, and that the agencies have clung to the absurd contention that the interstate interchange will not result in an increase in vehicles on Franklin Farm Lane – one of only two local roads that would feed traffic directly to and from the interchange to Route 30.[6] *See*

---

[6] The agencies' own 2000 Traffic Counts - in addition to the design of the interchange which will clearly service vehicles traveling Franklin Farm Lane to reach Route 30 and points east of the existing Route 30/I-81 interchange – undermines the agencies' own arguments. The agencies' 2000 Traffic Counts at the existing Route 30/81 interchange indicate that between 51% and 65% of all vehicles exiting from the Northbound ramps are headed east on Route 30. (AR-156 at 179-184). The Counts reveal that between 27% and 41% of all vehicles exiting from the Southbound ramps are headed east on Route 30. (AR-156 at 185-190). Vehicles using the new interchange instead of the existing interchange and headed to Route 30 east will use the road connecting the new interchange to Route 30 on the east side of I-81 – Franklin Farm Lane. Using the most conservative assumptions with agency data, the amount of traffic on Franklin Farm Lane will be at least four times greater than the traffic levels projected by the agencies.

*Plaintiffs' Answer in Opposition to Summary Judgment* at 31-41, *Plaintiffs' SMF* at paragraphs 212-217; *Joint Reply to Plaintiffs' Answer in Opposition to Summary Judgment* at 12 (stating that the average daily traffic on local roads will "remain substantially the same with or without the interchange.").

Of course, by focusing on individual, discrete impacts listed in agency documents, the agencies hope to divert the Court's focus away from the "real and measurable impacts to the NEPA process" caused by the predetermination of the location of the interchange. Those impacts included the agencies' (1) arbitrary refusal to prepare a Supplemental Environmental Impact Statement to examine new developments in the project area, (2) arbitrary selection of a stunted historic resources study area to avoid addressing the impact of the interchange on certain historic properties, (3) refusal to examine the impact of the interchange traffic on local, rural, Township roadways, (4) refusal to comply with Congressional funding mandates that required the agencies to build the interchange to relieve congestion on an existing interchange, (5) refusal to examine alternatives created by Congressional amendment of the original funding law, and other manipulations of the planning process. *See Plaintiffs' Answer in Opposition to Summary Judgment* at 19-26, 31-36, 2-15, and 30-35.

The agencies further claim that they "considered and addressed the allegations of pre-determination on numerous occasions" and that the Inspector General's Office "found nothing improper." *Id.* at 18. Simply put, the agencies "addressed" their predetermination of the interchange location by merely declaring that the location had not been predetermined – using exactly the same rote listing of historical events that take up the bulk of the agencies' *Answer Brief. See Joint Response* at 14-17. In addition, as

explained previously by the Plaintiffs – and indicated clearly by the Record – in response to a request to investigate the predetermination, the Inspector General simply asked the agencies to respond to the letter. The agencies then proceeded to call the Shuster/Yerusalim letters "regrettable". *See Plaintiffs' SMF* at paragraph 80; AR-103 at 373.

The agencies claim that the predetermination of the location of the interchange played no role in their decision to commence final design on a Walker Road interchange prior to the issuance of the Record of Decision. *Joint Response* at 18-19. As explained in this Brief and in other Briefs filed by the Plaintiffs, it is clear at this point that the agencies began final design on the Walker Road interchange before the issuance of the Record of Decision, in violation of 23 U.S.C. §112(b)(3) and NEPA regulations. *See* Part I, *infra*, of this Brief.

In response to the Plaintiffs' claims that the agencies' Twelve Year Plans evidence predetermination by the agencies of a Walker Road location for the interchange north of Chambersburg, the agencies struggle to argue that the Plans merely identified "Chambersburg and/or Franklin County area" as the location for the interchange. *Joint Response* at 24. The agencies attempt to mislead this Court. The Record reveals that all of the Twelve Year Plan listings refer to the interchange as "Exit 7", "Exit 7, North of Chambersburg", or "North of Chambersburg, Greene Twp."(AR-169 at 52, 54, 56, 58, 60, 62, 64, 66-67, 69-72).

In their sole effort to argue that the use of the term "Exit 7" did not mean the construction of an interchange between Exit #6 and Exit #8 (and thus north of Chambersburg), the agencies are not beyond simply fabricating records. On page 24 of

their *Joint Response*, the agencies declare that "[e]arly in the process, PennDOT stated that '[t]he proposed interchange has been called Interchange #7. . . the interchange does not have to be located north of Chambersburg.'" *Joint Response* at 24, fn. 18.  No such statement was ever made by the agencies, and no such statement appears in the Record.[7] It is purely an agency fabrication.

The agencies also struggle unsuccessfully to distinguish the cases in which Courts have ruled that the predetermination of a project location renders the environmental study process fatally defective. First, the agencies attempt to distinguish *Metcalf v. Daley*, 214 F.2d 1135 (9th Cir. 2000) and *Davis v. Mineta*, 2002 U.S. App. Lexis 12285 (10th Cir. 2002) on the grounds that those Courts struck down predetermined agency decisions only because no environmental studies had been completed prior to agency predetermination. The agencies argue that the cases are inapplicable to this case because here, the agencies conducted environmental studies prior to the Shuster/Yerusalim letters. *Joint Response* at 26-29.

The agencies' urged interpretation of these cases is flawed in several respects. The agencies conveniently – and necessarily – ignore the myriad of materials evidencing predetermination that were produced prior to the Shuster/Yerusalim letters. Those materials include Twelve Year Plans (AR-169 at 64, 66-72), the NEPA "Scope of Study" prepared by the agencies (AR-86 at 7), early agency Coordination Forms (AR-112 at 1), the now-infamous Coloring Book (AR-112 at 58-69), the advertisements soliciting an engineering firm to conduct a Design Location and Environmental Study for the

---

[7] This statement, although not appearing anywhere in the Record, was cited repeatedly by the agencies in an attempt to salvage this argument. *See, e.g. Joint Response to Plaintiffs' SMF* at paras. 32 and 42. If it exists at all, the attempt to use this extra-record material is consistent with the agencies' earlier sanctionable attempts to force materials into these proceedings.

interchange (AR-161 at 63), the Federal Aid Project Agreement between PennDOT and

the FHWA (AR-167 at 2299), the Contract for a Design Location Study and preparation

of an EIS (AR-163 at 1022, 1027, 1038), and the meetings between the agencies and the

Chambersburg Chamber of Commerce (AR-88 at 24).

Building upon that erroneous assumption, the agencies then attempt to argue that

agency environmental studies were completed prior to the exchange of the

Shuster/Yerusalim letters. *Joint Response* at 27. The only study issued prior to the

exchange of those letters was the Preliminary Alternatives Report[8] (AR-3), which is not

recognized by the NEPA. NEPA requires that the Draft and Final Environmental Impact

Statements themselves examine a range of alternatives to the project, and impacts

resulting from the project. *See* 40 CFR §1506.1. The Shuster/Yerusalim letters were

exchanged prior to even the first Draft of the DEIS, which was authored in July of 1993,

according to the agencies' own Administrative Record. (AR-6).

The agencies also struggle to distinguish *Cedar-Riverside Environmental Defense*

*Fund v. Hills*, 422 F. Supp. 294 (D. Minn. 1976), and attempt to argue that the Court in

that case focused not on predetermination, but on erroneous information provided by the

agencies in their environmental documents. *Joint Response* at 29. The agencies are

correct that the Court reviewed the "biased selection of evidence" and misinterpretation

of impacts. The Court, however, anchored their ruling in the failure of the agencies to

meet the "standard of objective good faith" required by the NEPA, and that the agencies

had demonstrated a "pattern showing bias" which rendered the EIS fatally defective.

*Cedar-Riverside* at 322-23, 28. That holding – that the agency's predetermination of

---

[8] The Preliminary Alternatives Report (PAR) specifically explains that the report "precedes the preparation of environmental documents which are required by law for all federally-aided projects." (AR-3 at 7).

project scope and location made the EIS facially defective – and that the

predetermination resulted in real impacts to the environmental study process – is identical

to the situation presented in this case.

Finally, the agencies attempt to argue that two other cases, *Wade v. Dole*, 561 F.

Supp. 913 (D.Ct. Ill. 1983) and *AWARE v. Colorado Dep't of Transp.*, 153 F.3d 1122

(10th Cir. 1998) actually support the agencies' arguments, not the Plaintiffs. *Joint*

*Response* at 30-33. The agencies struggle to assert that the *Wade* Court, while finding the

existence of a "predetermined route", solely examined whether the agency had taken a

"hard look" at the environmental impacts of the project to determine whether the EIS was

deficient. *Joint Response* at 30. In advancing their argument, however, the agencies

conveniently overlook that the Court's holding was based upon its conclusion that the

failure of the agency to adequately analyze environmental impacts *itself was evidence of*

*the agency's predetermination* of the scope of its action, and that the predetermination

had caused measurable impacts to the NEPA process. *Wade* at 920. Similarly, the

agencies attempt to use *AWARE* as support for their arguments, when in reality, the

situation in this case is almost identical to the factual situation in *AWARE*. Although the

agencies claim that the FHWA had "final say" over all decisions made by PennDOT, the

Administrative Record clearly undermines that argument. For example, the FHWA

repeatedly instructed PennDOT to examine the impact of the interchange on rural, local

roads, and PennDOT proceeded to ignore the federal agency's instructions. *See* AR-93 at

687; *Plaintiffs' Answer in Opposition to Joint Motion for Summary Judgment* at 11.

The agencies have failed to rebut several other cases which hold that agency

predetermination constitutes a fatal defect to the environmental study process. *See*

*Ashwood Manor Civic Association v. Dole*, 619 F. Supp. 52 (E.D. PA 1985); *Isle of Hope*
*Historical Ass'n, Inc. v. U.S. Army Corps of Engineers*, 646 F.2d 215 (5th Cir. 1981); and
*Brooks v. Volpe*, 350 F. Supp. 269 (W.D. Wash. 1972).

Finally, the agencies accuse the Plaintiffs of failing to distinguish several cases
raised by the agencies that stand for the proposition that an agency preference for a
particular project does not fatally predetermine the project. *Joint Response* at 33-34. The
Plaintiffs chose to not address those cases in detail because, simply put, they are not on
point. The Administrative Record in this case is replete with agency documents,
decisions, and materials that predetermined the location of this interchange from the
inception of the project. That, in itself, distinguishes this case from *EDF*, *Coalition*
*Against Raised Expressway*, and *Presidio Golf Course*. All of those cases dealt with a
single statement or decision evidencing an expression of preference by the agencies. In
this case, however, the Plaintiffs have illustrated close to a hundred different instances of
predetermination that had a real and measurable impact on the NEPA process. *See*
*Plaintiffs' Brief in Support of Summary Judgment* at 7-30. The agencies' arguments that
those materials are "isolated" and represent an "expression of preference" are simply
absurd.

Even the one exchange of letters that the agencies choose to defend – the
statement by then-Secretary of Transportation Howard Yerusalim made as early as 1992 -
that PennDOT was *"restructuring the project scope by focusing on the objective to*
*provide access to developing land adjacent to Walker Road."* – is not akin to a "statement
of preference." (AR-90 at 25). Instead, it constitutes a directive from the Secretary of the

Department of Transportation to agency consultants mandating that the entire focus of the

environmental studies be on delivering an interchange in the Walker Road area.

Because the Record is replete with evidence that the agencies predetermined the

location of the interchange, this Court must order the agencies to re-start the

environmental study process.

## VIII. The Agencies Have Failed to Explain How Their Identification of Historic Resources Was Not Arbitrary.

The Plaintiffs have shown that the agencies manipulated the study area for

historic resources to arbitrarily eliminate examination of historic properties that would be

impacted by the interchange. *Plaintiffs' Brief in Support of Summary Judgment* at 31-41.

In response to that evidence, the agencies first continue to assert the absurd claim that the

proposed interchange will not increase traffic on local roadways. *Joint Response* at 37.

Second, the agencies argue that the Secondary and Cumulative Impacts Area (SCIA),

established by the agencies in the FEIS did not need to be shifted southward following

the shift of the interchange location 1400' south. *Agencies' Joint Reply to Plaintiffs'*

*Answer in Opposition to Summary Judgment* at 18.

The Plaintiffs have previously addressed these arguments at length. *See Plaintiffs'*

*Answer in Opposition to Summary Judgment* at 2-15; 31-36. Here, the Plaintiffs will

address one point raised by the agencies in their *Joint Response*.

The agencies contend that the Secondary and Cumulative Impacts Area (SCIA) –

intended to reflect an area in which a Walker Road interchange would cause secondary

and cumulative impacts - established in 1995 did not need to be shifted southward after

the interchange was shifted 1400' to the south in 1998. *Joint Reply* at 18. The agencies

contend that the SCIA area was drawn to include all Walker Road interchanges, and that

it thus has equal applicability to the current design. *Id.* The agencies' argument simply does not withstand scrutiny. All of the Walker Road Alternatives studied in the DEIS and the FEIS used the Walker Road bridge as their overpass for I-81. Hence, the SCIA was drawn outward from the bridge to reflect the use of the bridge by all of the Alternatives studied in the DEIS and the FEIS. Alternative D-Modified (not studied in the DEIS or the FEIS), however, requires the demolition of the Walker Road bridge, and the construction of a new bridge 1400' to the south. As such, the SCIA, while applicable to all Walker Road Alternatives using the Walker Road bridge, is not applicable to the proposed interchange. *See Plaintiffs' SMF* at paras. 212-219.

The refusal of the agencies to consistently apply the Secondary and Cumulative Impacts Area (SCIA) to "Alternative D-Modified" as to the other Walker Road alternatives, requires that this Court find that the agencies' actions are arbitrary, and order the agencies to study those impacts.

## IX. Conclusion

For the above reasons, the Plaintiffs respectfully request that this Court grant the Plaintiffs' *Motion for Summary Judgment*.

Respectfully Submitted this **5th** Day of **October**, 2002

_____
Thomas Alan Linzey, Esq.
Community Environmental Legal Defense Fund (CELDF)
2859 Scotland Road
Chambersburg, Pennsylvania 17201
(717) 709-0457
(717) 709-0263 (fax)

# Certificate of Service of Process

I, Thomas Alan Linzey, Esq., hereby swear and affirm that I have served the Plaintiffs' *Reply* on the Parties identified below by the following method:

FIRST CLASS MAIL PRE-PAID

The following individuals were served with the above mentioned document:

Anne Fiorenza, Esq.
Assistant U.S. Attorney
United States Attorneys Office
Federal Building, Suite 217
228 Walnut Street
P.O. Box 11754
Harrisburg, Pennsylvania 17108-1754

Kenda Jo Gardner, Esq.
Assistant Counsel
Pennsylvania Department of Transportation
P.O. Box 8212
Harrisburg, Pennsylvania 17105-8212

FILED
HARRISBURG, PA

OCT 0 7 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

I swear and affirm that service of the documents was completed this **5th** Day of **October**, 2002.

Signed,

_____
Thomas Alan Linzey, Esq.
Community Environmental Legal Defense Fund (CELDF)
2859 Scotland Road
Chambersburg, Pennsylvania 17201

*Counsel for the Plaintiffs*