### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREENE/GUILFORD ENVIRONMENTAL ASSOCIATION, et al. | : | CIVIL CASE NO. 1:CV-01-0910 |
| | : | |
| Plaintiffs | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| KEN WYKLE, Administrator, Federal Highway Administration, ROBERT GATZ, Federal Highway Administration, | : | |
| Defendants | : | |
| | : | |
| v. | : | |
| | : | |
| BRADLEY L. MALLORY, Secretary for The Department of Transportation, Commonwealth of Pennsylvania, | : | |
| | : | |
| Intervenor | : | |

### <u>MEMORANDUM</u>

Presently before the court are the parties' cross motions for summary judgment. (Docs. 71 & 81). Plaintiffs seek judicial review of the Federal Highway Administration's ("FHWA") and the Pennsylvania Department of Transportation's ("PennDOT") (together "the Agencies") approval of a proposed highway interchange on Interstate 81 ("I-81") near Chambersburg, Pennsylvania. Plaintiffs, Greene/Guilford Environmental Association, Citizens for Planned Community Growth, Paul B. Ambrose, John G. Enders, Charles F. Rahauser, Betsy Rahauser, Douglas A. Warnock, U.X. Vagnerini, Thomas W. Bundy, Stephen P. Bucher, Roger J. Robertson, James A. Strite, Jr., and David A. Guthrie, challenge the

Agencies' action under the National Environmental Policy Act ("NEPA"), 42 U.S.C.

§ 4321 <u>et</u> <u>seq</u>., the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 <u>et</u>

<u>seq</u>., and the Surface Transportation & Uniform Relocation Assistance Act ("the

Demonstration Act"), Pub. L. No. 100-17 (Section 149(a)(74)), 101 Stat. 132, *as*

*amended by*, Pub. L. No. 104-59 (Sections 340(c)(1) & (2)), 109 Stat. 568 (Nov. 28, 1995).

 The parties have fully briefed the issues and the cross motions are now ripe for

disposition.  For the reasons that follow, the court will grant the agencies' motion

for summary judgment.

## I.     <u>Factual Background</u>

The factual background of this case is long and controversial.  The court will

not attempt to reproduce a comprehensive account of the path this case took to

arrive at its present posture.  However, the following is necessary to put the instant

motions in context.

In 1987, Congress passed the Demonstration Act, which authorized funds for

construction of an interchange in Franklin County, Pennsylvania.  The proposed

interchange will provide additional access to Chambersburg, Pennsylvania and

relieve congestion on an existing interchange.  In 1987, the Agencies began to

evaluate potential locations for the proposed interchange and identified several

alternatives that would potentially meet the requirements of the Demonstration

Act.  Pursuant to NEPA and NHPA, the parties conducted various studies of the

environmental and cultural ramifications of a new interchange.  See, e.g., AR-2,
AR-3, AR-5, AR-6, AR-7, AR-9.

　　　In May 1994, the Agencies issued the Draft Environmental Impact Statement
("DEIS"), in which they reviewed several alternatives under consideration and,
ultimately, recommended approval of Alternative D-C — an interchange at Walker
Road.  AR-12 at ES-26.  Over the course of the next twelve months, the Agencies
conducted additional studies, including a traffic study of the areas under
consideration (see AR-137), and presented the DEIS to and received comments
from the general public and interested organizations.  See, e.g., AR-14, AR-15,
AR-17, AR-18, AR-19, AR-20, AR-21, AR-29.

　　　In May 1995, the Agencies approved and issued the Final Environmental
Impact Statement ("FEIS"), in which they designated Alternative D-C as the
selected alternative for the interchange project.  AR-64.  In the FEIS, the Agencies
identified extensive environmental and cultural data supporting their selection of
Alternative D-C, including comments received on the DEIS.  See AR-64 at VII-1 et
seq.  Thereafter, the Agencies presented the FEIS for comment, see, e.g., AR-78, in
contemplation of a Record of Decision ("ROD").  40 C.F.R. § 1505.2.

　　　Prior to issuance of the ROD, the Agencies learned that Alternative D-C
would impact historic property at the Christian Fry, Jr. House ("the Fry
Property").  AR-80 at 4.  As a result, the Agencies elected to modify Alternative D
slightly and to construct an interchange that they designated "Alternative D

Modified" ("Alternative D. M."). The Agencies did not study Alternative D. M. in the prior EIS documents; as a result, they re-evaluated the FEIS to determine whether Alternative D. M. had a significantly different environmental impact than the three alternatives already studied at great length at Walker Road – *i.e.* Alternatives C, D, and D-C. In January 1999, the Agencies published a document titled "Re-evaluation of the FEIS" ("FEIS II") in which they determined that Alternative D. M., which lies in close proximity to the other Walker Road alternatives, did not create any new or unforeseen problems. See AR-80. Consequently, the Agencies did not complete a Supplemental Environmental Impact Statement ("SEIS") to address anew the environmental impact of Alternative D. M. Like the DEIS and FEIS, FEIS II was presented for public comment.

On March 25, 1999, the Agencies issued the Record of Decision ("ROD"). AR-82. In the ROD, David C. Lawton, of the FHWA Eastern Resource Center, and Ronald W. Carmichael, FHWA, Pennsylvania Division Administrator, approved Alternative D. M. for the interchange demonstration project. After commencing final design work on Alternative D. M., the Agencies issued a Re-evaluation of the ROD ("ROD II"), in which they discussed updated data and the progress of Alternative D. M.'s construction, including recently conducted traffic studies. AR-83 (ROD II, issued June 28, 2001). At present, construction of Alternative D. M. is on hold pending disposition of the instant litigation.

4

## II.    **Procedural Background**

Plaintiffs filed a complaint against Ken Wykle and Robert

Gatz[1] of the Federal Highway Administration ("FHWA") on April 24, 2001 (Doc. 1),

and an amended complaint on June 6, 2001.  (Doc. 6).  The federal defendants

answered the amended complaint on August 15, 2001.  (Doc. 12).  On that same date,

Bradley L. Mallory, on behalf of the Pennsylvania Department of Transportation

("PennDOT"), filed a motion to intervene as a defendant (Doc. 13), which motion

the Honorable Sylvia H. Rambo[2] granted by Order dated November 20, 2001.  (Doc.

37).

On September 28, 2001, the federal defendants filed twelve boxes of

documents comprising the administrative record.[3]  (See Docs. 21-33).  On

December 14, 2001, plaintiffs filed a motion to supplement the record (Docs. 38),

which the court granted by Order dated March 1, 2002.  (See Doc. 54).  In

accordance with the court's March 1, 2002 Order, the Agencies filed two additional

---

[1] Hereinafter, the court will sometimes refer to Wykle and Gatz as the "federal defendants."

[2] By Order dated August 15, 2002, Judge Rambo transferred this case to the undersigned.  (Doc. 94).

[3] The administrative record ("AR") consists of "all documents and materials directly or indirectly considered by agency decisionmakers."  Don't Ruin Our Park, v. Stone, 802 F.Supp. 1239, 1246 (M.D.Pa. 1992) (quoting City of Waltham v. U.S.P.S., 786 F.Supp. 105, 116 (D.Mass. 1992)).

5

boxes of documents which the court deemed to be part of the administrative record.  (See Docs. 63-65).

The Agencies filed a motion for summary judgment on June 7, 2002 (Doc. 71) and plaintiffs filed a motion for summary judgment on July 25, 2002.  (Doc. 81).  During the course of briefing the cross-motions, the Agencies filed four affidavits to explain gaps in the administrative record.  (See Docs. 96 & 103).  Plaintiffs subsequently filed two motions to strike these extra-record affidavits.  (See Docs. 98 & 106).  The court denied both motions to strike by Order dated February 6, 2003.  (Doc. 118).  Thus, the record before the court consists of the originally submitted administrative record, the supplement thereto, and the four affidavits referenced above.  (Docs. 21-33, 63-65, 96 & 103).

## III.    <u>Summary Judgment Legal Standard</u>

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  See also Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001).  A fact that will affect the outcome of the case under the governing law is "material."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party."  Reeder v. Sybron Transition Corp., 142 F.R.D. 607, 609 (M.D.Pa. 1992)

(citing White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988)).
See also Saldana, 260 F.3d at 232.

At the summary judgment stage, a judge does not weigh the evidence for the
truth of the matter, but simply determines "whether there is a genuine issue for
trial." Schnall v. Amboy Nat. Bank, 279 F.3d 205, 209 (3d Cir. 2002) (citing
Anderson, 477 U.S. at 249). An issue of material fact is "genuine" if "the evidence is
such that a reasonable jury could return a verdict for the nonmoving party." Id.

"Once the moving party has shown that there is an absence of evidence to
support the claims of the non-moving party, the non-moving party may not simply
sit back and rest on the allegations in the complaint; instead, it must 'go beyond
the pleadings and by [its] own affidavits, or by the depositions, answers to
interrogatories, and admissions on file, and designate specific facts showing that
there is a genuine issue for trial.'" Schiazza v. Zoning Hearing Bd., Fairview Tp.,
York County, Pennsylvania, 168 F.Supp.2d 361, 365 (M.D.Pa. 2001) (citing Celotex
Corp. v. Catrett, 477 U.S. 317, 324 (1986)). See also Saldana, 260 F.3d at 232.
Summary judgment should be granted when a party "fails to make a showing
sufficient to establish the existence of an element essential to that party's case, and
on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S.
at 322-323.

The same standard applies when the court is considering cross-motions for
summary judgment. However, "the court must construe the

motionsindependently, viewing the evidence presented by each moving party in the light most favorable to the non-movant." Schiazza, 168 F.Supp.2d at 365.

## IV.    Alleged NEPA Violations

### A.    *NEPA Requirements*

NEPA "imposes upon agencies duties that are 'essentially procedural.'" Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227 (1980) (quoting Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978)). Under NEPA, all agencies of the Federal government must:

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on–
>
> (i)    the environmental impact of the proposed action,
>
> (ii)   any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii)  alternatives to the proposed action,
>
> (iv)   the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v)    any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C).

8

Agencies must also "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources . . . ." <u>Concerned Citizens Alliance, Inc. v. Slater</u>, 176 F.3d 686, 704 (3d Cir. 1999) (quoting 42 U.S.C. § 4332(2)(E)).

In the instant case, plaintiffs' NEPA challenge requires the court to determine only whether the Agencies complied with NEPA's procedural requirements; NEPA does not require the court to review the Agencies' substantive decision-making.  The Supreme Court has explained that:

> Although [NEPA's] procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process . . . .  Other statutes may impose substantive environmental obligations on federal agencies,  but NEPA merely prohibits uninformed--rather than unwise-- agency action.

<u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350-351 (1989) (citations omitted).

NEPA's procedural requirements are clarified in regulations promulgated by the Council on Environmental Quality ("CEQ"), <u>see</u> 40 C.F.R. § 1500 <u>et</u> <u>seq</u>., and by the FHWA, <u>see</u> 23 C.F.R. § 771.101 <u>et</u> <u>seq</u>.  The court will discuss specific regulations when applicable to plaintiffs' claims.

**B.**    ***Scope of Review Under NEPA***

The court's scope of review in this matter is governed by the Administrative

Procedures Act ("APA"), 5 U.S.C. § 701 et seq.  Section 706 of the APA provides:

> To the extent necessary to decision and when presented, the
> reviewing court shall decide all relevant questions of law,
> interpret constitutional and statutory provisions, and
> determine the meaning or applicability of the terms of an
> agency action. The reviewing court shall–
>
> (1)    compel agency action unlawfully withheld or unreasonably
>          delayed; and
>
> (2)    hold unlawful and set aside agency action, findings, and
>          conclusions found to be–
>
>         (A)    arbitrary, capricious, an abuse of discretion, or otherwise
>                  not in accordance with law;
>
>         (B)    contrary to constitutional right, power, privilege, or
>                  immunity;
>
>         (C)    in excess of statutory jurisdiction, authority, or
>                  limitations, or short of statutory right;
>
>         (D)    without observance of procedure required by law;
>
>         (E)    unsupported by substantial evidence in a case subject to
>                  sections 556 and 557 of this title or otherwise reviewed on
>                  the record of an agency hearing provided by statute; or
>
>         (F)    unwarranted by the facts to the extent that the facts are
>                  subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review
> the whole record or those parts of it cited by a party, and due
> account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Review under Section 706 is highly deferential.  "[T]he court's role does not extend beyond ensuring that the agency has adequately considered and disclosed the environmental impact of its actions and 'arrived at a reasoned judgment based on a consideration and application of the relevant factors.' "  Don't Ruin Our Park v. Stone, 802 F.Supp. 1239, 1249 (M.D.Pa. 1992) (quoting Sabine River Authority v. U.S. Dept. of Interior, 951 F.2d 669, 678 (5th Cir. 1992)).

The Third Circuit described the court's scope of review as such:

> the court [must] determine whether all necessary procedures were followed,  . . . consider de novo all relevant questions of law, and . . . examine the facts to determine whether the decision was arbitrary, capricious, and an abuse of discretion.

Concerned Citizens Alliance, Inc. v. Slater, 176 F.3d 686, 705 (3d Cir. 1999).

"[A] decision is arbitrary and capricious if it is "not rational and based on consideration of the relevant factors."  Moats v. United Mine Workers of America Health and Retirement Funds, 981 F.2d 685, 687 (3d Cir. 1992) (quoting FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 803 (1978)).  See also Jones v. U.S. Life Ins. Co., 12 F.Supp.2d 383, 387 (D.N.J. 1998) (" '[A]rbitrary and capricious' . . . is . . . without reason, unsupported by substantial evidence, or erroneous as a matter of law."); Elf Atochem North America, Inc. v. U.S., 882 F.Supp. 1499, 1501 n.3 (E.D.Pa. 1995) ("The 'abuse of discretion' standard and the 'arbitrary and capricious' standard are the same.") (citing Donovan v. Adams Steel Erection, Inc., 766 F.2d 804, 807 (3d Cir. 1985)).

11

**C.     *Predetermination***

Plaintiffs' predetermination claim alleges that the Agencies decided the location of the proposed interchange before they completed the NEPA evaluation process.  Plaintiffs allege that, from the very beginning, the Agencies sought to relieve congestion at the Route 30 / I-81 interchange, ignoring other, allegedly congested interchanges.  (See Doc. 83, pg. 13).  See also AR-89 at 6; AR-90 at 11; AR-167 at 2233.  Plaintiffs also accuse former Pennsylvania Secretary of Transportation, Howard Yerusalim, and former United States Congressman, Bud Shuster, of using political pressure to predetermine the location of the proposed interchange.  (Doc. 83, pg. 15) (quoting AR-90 at 3).

As stated above, NEPA does not mandate particular substantive results, it merely requires that federal agencies follow certain procedures to ensure that all major decisions are environmentally well-informed.  See Robertson, 490 U.S. at 350-351; Strycker's Bay, 444 U.S. at 227.  If the Agencies adequately comply with NEPA's procedural requirements, the court cannot set aside their decision merely because the court may have a difference of opinion regarding the weight to be given different factors.  See Robertson, 490 U.S. at 350 (finding that "the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs").

The test for unlawful predetermination is not whether the agency is subjectively impartial prior to issuing the ROD, but, rather, whether the NEPA process is completed with "good faith objectivity."  See Environmental Defense Fund, Inc. v. Corps of Engineers of U. S. Army, 470 F.2d 289, 296 (8th Cir. 1972) (hereinafter "EDF"); Coalition Against a Raised Expressway, Inc. v. Dole, 835 F.2d 803, 807 (11th Cir. 1988) (hereinafter "Raised Expressway").  In fact, *NEPA assumes that agencies will have a subjective bias toward their proposal.*  EDF, 470 F.2d at 295.

Statements by agency officials favoring one alternative over others prior to completion of the NEPA process do not necessarily violate NEPA.  To the contrary, such statements may simply be subjective expressions of confidence that the proposed alternative will survive the NEPA process.  See Presidio Golf Club v. National Park Service, 155 F.3d 1153, 1161 (9th Cir. 1998) (finding that certain statements "by the Club simply reflect[ed] a confidence on the part of the Park Service that the proposed plan would be adopted, which is permissible"); Raised Expressway, 835 F.2d at 807.  See also Doc. 94, pp. 13.

Plaintiffs primarily rely on two cases – Metcalf v. Daley, 214 F.3d 1135, 1142 (9th Cir. 2000); Davis v. Mineta, 302 F.2d 1104, 1112-13 (10th Cir. 2002) – for the proposition that the Agencies' conduct constitutes unlawful predetermination.  Both are factually distinguishable.  In Metcalf, the defendants contracted with the Makah Indians to carry out a whaling project before studying the environmental impact of the project.  Metcalf, 214 F.3d at 1142.  The Ninth Circuit held that such

13

action violated NEPA.  In this case, unlike <u>Metcalf</u>, the Agencies did not engage in final design (<u>see</u> Doc. 103, pp. 5-8) and did not make an irreversible commitment of resources prior to completing the NEPA process.

In <u>Davis</u>, Sandy City, Utah entered into a contract which obligated an organization, Horrocks, to study the environmental impact of a project and *specifically required Horrocks to make a finding of no significant impact.*  <u>Davis</u>, 302 F.3d at 1112-13.  The Tenth Circuit held that "Horrocks thus had an inherent, contractually-created bias . . . ."  <u>Id. at 1112</u> (citing <u>Metcalf</u>, 214 F.3d at 1143-44).  In contrast, the Agencies here had no contractual obligations compelling a certain result.  To the contrary, the Agencies completed the EIS process in good faith. Thus, <u>Davis</u> is inapposite.

Regardless of statements purportedly made by PennDOT and FHWA employees, or Congressman Shuster or Secretary Yerusalim, the Agencies appropriately and thoroughly analyzed the reasonable alternatives for this project. As set forth in Section I, <u>infra</u>, the Agencies issued the DEIS in May 1994 (AR-12) and the FEIS in May 1995 (AR-46).  In the DEIS and FEIS, the Agencies discussed a "no-build alternative," two Kriner Road alternatives (Alts. B & B-1), three Walker Road alternatives (Alts. C, D, & D-C), an alternative at Guilford Road (Alt. A - dismissed), and an alternative at Woodstock Road (Alt. E - dismissed).  AR-12 at II-1-16; AR-46 at ES-11-19.  The Agencies studied the impacts of the alternatives on socioeconomics and land use, visual resources, utilities, energy, cultural resources,

14

air quality, noise, vibration, surface water and aquatic biota, flood hazard and floodplains, wetlands, vegetation and wildlife, threatened / endangered species, groundwater / private supplies, soils and geology, hazardous waste, farmlands, and traffic and transportation. AR-12 at IV-1-62; AR-46 at IV-1-89. The Agencies timely circulated both the DEIS and the FEIS to interested parties and to the public for comment.

Ultimately, the Agencies selected Alternative D. M. and on June 4, 1998, Alternative D. M. was presented at a public meeting. AR-80 at 6; AR-105 at 153-156, 186-89; AR-71. The Agencies solicited comments on Alternative D. M. from the Municipal Coordination Committee[4] ("MCC") and the public. See id.

After reviewing the voluminous impact studies and reports, comments and agency responses in the administrative record, the court is convinced that the Agencies completed the EIS process with good faith objectivity. The Agencies took a "hard look" at the environmental impact of the alternatives and NEPA requires no more. Robertson, 490 U.S. 332, 350-351. Hence, the court will grant the Agencies' motion for summary judgment on the predetermination claim.

---

[4] The MCC is comprised of the Advisory Council on Historic Preservation, the Chambersburg Area Development Corporation, Greene Township, the Greene / Guilford Environmental Association, G.S. and G. Properties, Guilford Township, PennDOT, and Pennsylvania Historic and Museum Commission. AR-46 at VII-2.

**D.**    ***Supplemental Environmental Impact Statement (SEIS)***

Plaintiffs also challenge the Agencies' failure to prepare a Supplemental

Environmental Impact Statement (SEIS).  NEPA itself does not contemplate the

preparation of a SEIS.  <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360,

370 (1989).  However, "[p]reparation of such statements . . . is at times necessary to

satisfy the Act's 'action-forcing' purpose."  <u>Id.</u> at 371.  Both the Council on

Environmental Quality ("CEQ") and FHWA have promulgated regulations

mandating preparation of a SEIS in certain circumstances.  The CEQ's regulation

provides that agencies:

> (1)    Shall prepare supplements to either draft or final environmental
>        impact statements if:
>
>    (i)    The agency makes substantial changes in the proposed action
>           that are relevant to environmental concerns; or
>
>    (ii)   There are significant new circumstances or information
>           relevant to environmental concerns and bearing on the
>           proposed action or its impacts.

40 C.F.R. § 1502.9(c).

Similarly, FHWA's regulation provides that:

An EIS shall be supplemented whenever the Administration determines

that:

> (1)    changes to the proposed action would result in significant
>        environmental impacts that were not evaluated in the EIS; or

16

(2)    New information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS.

23 C.F.R. § 771.130(a).

As these regulations imply, "an agency need not prepare a supplemental EIS in response to every piece of new information, or every change in circumstances, which comes to light following the approval of the FEIS." Sierra Club v. Froehlke, 816 F.2d 205, 210 (5th Cir. 1987). See also South Trenton Residents Against 29 v. Federal Highway Admin., 176 F.3d 658, 663 (3d Cir. 1999). The Agencies must prepare a SEIS only if "new circumstances . . . present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." Froehlke, 816 F.2d at 210 (emphasis in original). See also South Trenton Residents, 176 F.3d at 663 (quoting Froehlke).

It is the agency's responsibility to decide whether an SEIS is necessary. Louisiana Wildlife Federation, Inc. v. York, 761 F.2d 1044, 1051 (5th Cir. 1985). "In determining whether a supplemental EIS is required, the legal standard is essentially the same as the standard for determining the need for an original EIS." Id. at 1051. The court must uphold the agencies' decision not to prepare an SEIS unless the decision was arbitrary and capricious. See Marsh, 490 U.S. at 377. See also Society Hill Towers Owners' Association v. Rendell, 210 F.2d 168, 178-79 (3d Cir. 2000).

17

Plaintiffs assert an SEIS was required for the following reasons: (1) Alternative D. M. was not discussed in the EIS documents; (2) Chambers 5 Business Park has developed more quickly than anticipated; (3) Guilford Township revised its zoning ordinance for the Kriner Road area; and (4) the Pennsylvania commonwealth court has held that the Agricultural Security Areas ("ASA") laws apply to the Lamar White farm.  (Doc. 85, pg. 21).  The court will discuss each argument *seriatim.*

### 1.     <u>Selecting an alternative not evaluated in the FEIS</u>

The court must determine whether the Agencies' decision to forego the preparation of an SEIS (after switching selected alternatives) was arbitrary and capricious.  <u>Marsh</u>, 490 U.S. at 377.  As of May 1995, the Agencies had considered eight (8) alternatives:[5]

(1)     no build;
(2)     Alternative A[6] (Guildford Rd.);
(3)     Alternative B (Kriner Rd.);
(4)     Alternative B-1 (Kriner Rd.);
(5)     Alternative C (Franklin Farm Ln. & Walker Rd.);
(6)     Alternative D (Walker Rd.);
(7)     Alternative D-C (Walker Rd.);
(8)     Alternative E[7] (Woodstrock Rd.)

<u>See</u> <u>generally</u> AR-12 & AR-46.

---

[5] For a map depicting all alternatives, <u>see</u> AR-12 at II-3, 4.

[6] Dismissed without in-depth study.  <u>See</u> AR-12 at II-1.

[7] Also dismissed without intensive study.  <u>See</u> AR-12 at II-2.

18

Subsequent to May 1995, but prior to issuance of the ROD, the Agencies learned that the originally selected alternative, Alternative D-C, infringed on the historical Fry Property.  AR-80 at 4.  As a result, the Agencies modified Alternative D to avoid the Fry Property.  Id. at 4-5.  Alternative D. M. is located approximately 1300 to 1400 feet south of Alternative D-C along I-81 and it will exit onto a relocated Walker Road bridge.  See AR- 80 at 7.  The Agencies solicited comments on Alternative D. M. from the Municipal Coordination Committee and the public.  See AR-71, AR-80 at 6; AR-105 at 153-156, 186-89.

In the FEIS II, the Agencies compared the projected impacts of Alternative D. M. with Alternatives B, B-1, C, D, D-C and the no build alternative on cultural resources; Section 4(f) resources; surface water and aquatic biota; vegetation and wildlife; groundwater and water supplies; farmlands (including FPPA Soils, farmed parcels, productive land, Agricultural Security Areas, and secondary development); secondary impacts; public utilities; displacements; traffic relief at another interchange; and construction costs.  See AR-80 at 22 (Table 3: Environmental Impact Summary Matrix).  The Agencies concluded that:

> the impacts associated with Alternative D Modified are substantially the same as the originally Preferred Alternative, Alternative D-C. . . . Alternative D Modified does not result in significant new impacts from that which was discussed in the final EIS. . . .  Accordingly, a supplemental EIS is not required, and further distribution and comment on the Selected Alternative [is] not required.

AR-82 at 14.

The record as a whole supports the Agencies' conclusion that Alternative D. M. does not "present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." Froehlke, 816 F.2d at 210 (emphasis in original). Therefore, the court finds that the Agencies' decision to forego the preparation of an SEIS after changing the preferred alternative to Alternative D. M. was reasonable.

### 2.    Increased Development at Chambers 5 Business Park

In 1995, the Agencies estimated that Chambers 5 Business Park would have 1,320,000 square feet of building space by 2016. AR-46 at App. B, pg. 2 of Development Table. At present, Chambers 5 Business Park and the Kriner Road area already have over 3,000,000 square feet of building space. Plaintiffs argue that traffic caused by this unanticipated growth undermines the adequacy of the EIS documents. (Doc. 85, pg. 24). The Agencies respond that, despite this unexpected level of development, there are no significant changes in traffic conditions in the Kriner Road area and, thus, the increase in developed land does not mandate preparation of an SEIS.

In 1995, the Agencies conducted traffic studies in the area of each of the alternative locations for the proposed interchange. As a result, the Agencies predicted that development at Chambers 5 Business Park would cause 15,700 trips per day to that area in 2016. AR-83 at 8. The Agencies projected an 80% (or 2.8% per year) traffic volume growth rate for the period of 1995-2016. Id. In 2000, the

Agencies studied traffic conditions in both the Kriner Road and Walker Road areas. Despite the unexpected level of development, the Agencies discovered that traffic in the Kriner Road area has increased only 2% from 1995 to 2000 (or 0.4% per year). Id. The Agencies reasonably concluded that the increased development at the Business Park generated substantially less traffic than originally projected.[8] Therefore, the Agencies properly determined that the increased level of development did not require the preparation of an SEIS. The court finds that the Agencies' conclusions are reasonable and adequately supported by record evidence.

### 3.    Changes in Guilford Township's Zoning

After the Agencies issued the FEIS, Guilford Township adopted a zoning ordinance that re-classifies the Kriner Road area as "primarily industrial and agricultural-residential, with a commercial zone located along U.S. Route 11 from Kriner Road south to Marion." AR-80 at 9. Plaintiffs claim that the zoning change will generate greater traffic in the Kriner Road area when compared with the Walker Road area which is zoned agricultural and residential. (Doc. 85, pg. 23; Doc. 102, pp. 35-36).

---

[8] These lower traffic levels were attributed to the type of development undertaken. AR-83 at 8. The new development is primarily comprised of commercial distribution centers. (Doc. 85, pg. 24).

Ostensibly, the gravamen of plaintiffs's argument is that anticipated congestion on Kriner Road makes it a better choice than the Walker Road location. However, plaintiffs have not produced sufficient record evidence tending to show that the re-zoning "present[s] a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." Froehlke, 816 F.2d at 210. The court may not evaluate the subjective merits of competing proposals; that is not the court's role. The court must only determine whether the Agencies followed the correct procedures and whether the Agencies acted arbitrarily and capriciously when they determined that the re-zoning of the Kriner Road area did not substantially change the environmental picture presented in the EIS documents. See Strycker's Bay, 444 U.S. at 227; 40 C.F.R. § 1502.9(c); 23 C.F.R. § 771.130(a).

The Agencies conducted traffic studies in 1995, 1998 and 2000. In 1995, the Agencies thoroughly studied the projected traffic impact of the two acceptable alternatives: B-1 (Kriner Road) and D-C (Walker Road). See AR-37 at vi (traffic study conclusions). In 1998, plaintiffs re-evaluated the projected traffic patterns surrounding Alternative D. M. AR-72. In 2000, the Agencies took traffic counts at "critical intersections" studied in 1995 in order to evaluate the accuracy of the traffic predictions in the FEIS. (Doc. 96, Declaration of Jeffery L. Greene, pg. 4, ¶ 5). See also AR-156 at 103-158 (traffic count results). "The results of the 2000 traffic counts revealed that the traffic volumes were on a pace to be within the FEIS

projections." (Doc. 96, Declaration of Jeffery L. Greene, pg. 4, ¶ 5). Therefore, the Agencies concluded that the FEIS traffic studies were accurate and preparation of an SEIS was unnecessary. The court finds that this conclusion is reasonable and adequately supported by record evidence.

### 4. The Effect of the Pennsylvania Commonwealth Court's Ruling in *White v. PennDOT*, 738 A.2d 27 (Pa.Commw. 1999)

In 1999, the Agencies sought to conduct studies on a parcel of land then-owned by Lamar and Lois White ("the White parcel"). The Agencies intended to condemn 6.5 acres of the White parcel through which Alternative D. M.'s Northbound exit ramp will pass. The Whites initiated suit in the Pennsylvania commonwealth court seeking a declaration that Pennsylvania's Agricultural Security Areas[9] law precludes condemnation without the consent of the Agricultural Lands Condemnation Approval Board. The state court determined that the White parcel is an ASA protected property. White v. PennDOT, 738 A.2d 27 (Pa.Commw. 1999), aff'd, 759 A.2d 1273 (Pa. 2000). Plaintiffs argue that this state court ruling creates "serious impacts that further distinguished 'Alternative D-Modified' from the Kriner Road alternatives." (Doc. 85, pg. 28). The court disagrees. The ASA laws are merely a procedural hurdle to condemnation proceedings. Moreover, PennDOT has purchased the entire White parcel. Hence, this argument is moot.

---

[9] See 3 P.S. 901 et seq.

Plaintiffs also argue that an SEIS is required because Alternative D. M. will now impact the entire White parcel.  This argument is refuted by the express language of PennDOT's deed to the White parcel.  It contains restrictive covenants which limit the Agencies' use of the land, except for the uses associated with Alternative D. M. and described in the deed, to "agricultural purposes to the maximum extent possible and open space."  (Doc. 96, pg. 5, ¶ 2).  Based on the restrictive covenant, the Agencies reasonably concluded that acquisition of the entire White parcel would not materially alter the environmental impacts set forth in the FEIS and FEIS II.  (Doc. 96, pg. 21).  See also AR-80 at 7.  The court finds that this decision was not arbitrary and capricious.

In conclusion, plaintiffs have failed to establish a genuine issue of material fact that NEPA required the Agencies to produce an SEIS.  The Agencies' decision to forego the preparation of an SEIS was not arbitrary and capricious.  To the contrary, this decision is adequately supported by the record before this court.  Therefore, the Agencies are entitled to judgment as a matter of law on all of plaintiffs' claims regarding preparation of an SEIS.

### E.    *Segmentation*

Plaintiffs claim that the Agencies unlawfully segmented the interchange project and failed to address the cumulative impact of certain tangentially related projects - *i.e.* the extension of Norland Avenue and improvements to local roads.  The Third Circuit defines unlawful "segmentation" as follows:  isolating projects

24

so "interdependent that it would be unwise or irrational to complete one without the others." <u>Society Hill Towers</u>, 210 F.3d at 181 (quoting <u>Webb v. Gorsuch</u>, 699 F.2d 157, 161 (4th Cir. 1983)).[10] <u>See also</u>  <u>Utahns for Better Transp. v. U.S. Dept. of Transp.</u>, 305 F.3d 1152, 1182 (10th Cir. 2002) (citing 40 C.F.R. § 1508.27(b)(7)); <u>State of N.J., Dept. of Environmental Protection and Energy v. Long Island Power Authority</u>, 30 F.3d 403, 411 (3d Cir. 1994).

To avoid unlawful segmentation, an EIS must include discussion of three types of actions:

(1)     Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i)     Automatically trigger other actions which may require environmental impact statements.

(ii)     Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii)     Are interdependent parts of a larger action and depend on the larger action for their justification.

(2)     Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

---

[10] Some courts refer to this as a determination of independent utility. Projects have "independent utility" when "each of two projects would have taken place with or without the other . . . ." <u>Native Ecosystems Council v. Dombeck</u>, 304 F.3d 886, 894 (9th Cir. 2002).

(3)     Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

40 C.F.R. § 1508.25(a).

Additionally, the action evaluated in EIS documents must:

(1)     Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

(2)     Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and

(3)     Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 CFR § 771.111(f).

The segmentation analysis requires the court to:

consider the likelihood that a given project will be constructed along with the interdependence of other projects.  The more certain it is that a given project will be completed, the more reasonable it is to require [the agency] to consider the cumulative impact of that project and the [agency's] project in determining the [agency's] obligations under the applicable regulations.

Society Hill Towers, 210 F.3d at 182.

As aptly noted by the D.C. Circuit, "it is inherent in the very concept of a highway network that each segment will facilitate movement in many others; if such mutual benefits compelled aggregation, no project could be said to enjoy independent utility." <u>Coalition on Sensible Transp., Inc. v. Dole</u>, 826 F.2d 60, 69 (D.C. Cir. 1987).  The court held that "[t]he proper question is whether one project will serve a significant purpose even if a second related project is not built." <u>Id.</u> (citations omitted).  <u>See also Save Barton Creek Ass'n v. Federal Highway Admin.</u>, 950 F.2d 1129, 1141 (5th Cir. 1992).

The Demonstration Act provides that the primary objectives of the project are to "provide access to Chambersburg, Pennsylvania, and relieve traffic congestion on an existing interchange . . . ."  Pub. L. No. 100-17 (Section 149(a)(74)), 101 Stat. 132, *as amended by*, Pub. L. No. 104-59 (Sections 340(c)(1) & (2)), 109 Stat. 568 (Nov. 28, 1995).  The Agencies determined that Alternative D. M. <u>in isolation</u> will (1) provide much needed access to Chambersburg, Pennsylvania; and (2) relieve congestion on an existing interchange.  This determination is reasonable and supported by record evidence.  <u>See</u>, <u>e.g.</u>, AR-46 at ES-6-7.  The record also indicates that improvements to the local roads have utility independent of Alternative D. M.  <u>See</u> AR-37; AR-46 at III-64-66, IV-85-88.

The court is convinced that the interchange project, Norland Avenue extension and the local roads projects each serve a legitimate purpose on their own.  The Demonstration Act authorized construction of an interchange, and the

court finds that the selected alternative has logical termini and independent

utility.  The projects are not interdependent to the extent that it is unwise or

unreasonable to build Alternative D. M. without improving the local roads or

extending Norland Avenue.  Therefore, the court will grant the Agencies' motion

for summary judgment on the segmentation claim.

      **F.**     ***Amendment of the Demonstration Act***

Plaintiffs contend that the Agencies failed to study additional alternatives,

after Congress amended the Demonstration Act, in violation of NEPA.  Amended

Complaint, Count VIII (Doc. 6, pg. 25).  In pertinent part, the Demonstration Act

originally provided:

> (74) CHAMBERSBURG, PENNSYLVANIA. -- The Secretary shall carry out
> a highway project which demonstrates how construction of an interchange
> on a north-south interstate route will provide access to Chambersburg,
> Pennsylvania, and relieve traffic congestion on an existing interchange on
> such interstate route.

Pub. L. No. 100-17 (Section 149(a)(74)), 101 Stat. 132 (April 2, 1987).

Under the authority of this section, the Agencies began the planning process

for construction of an interchange on I-81.  The Agencies listed the following

project needs:

> (1)      complying with a Federal mandate for a demonstration project in the
>           Chambersburg area (Public Law 100-17);
> (2)      accommodating existing and future traffic volumes;
> (3)      adhering to comprehensive plans of area municipalities; and
> (4)      providing for existing and proposed development in the study area.

AR-12 at I-1 (DEIS).  See also AR-46 (FEIS).

After the Agencies selected Alternative D-C in the FEIS, Congress enacted the National Highway System Designation Act of 1995, which amended the Demonstration Act. The amendment provides:

> (74) PENNSYLVANIA. -- The Secretary shall carry out a highway project which demonstrates how construction of an interchange on a north-south interstate route will provide access to Chambersburg, Pennsylvania, and relieve traffic congestion on an existing interchange on such interstate route <u>and other projects in the counties of Bedford, Blair, Centre, Franklin, and Huntingdon, Pennsylvania</u>.

Pub. L. No. 100-17 (Section 149(a)(74)), 101 Stat. 132, *as amended by*, Pub. L. No. 104-59 (Sections 340(c)(1) & (2)), 109 Stat. 568 (Nov. 28, 1995) (the "amended Demonstration Act") (amended language underlined).

Plaintiffs argue that the amendment changes the project needs and requires the Agencies to evaluate alternatives in Bedford, Blair, Centre, Franklin, and Huntingdon counties. Plaintiffs cite <u>City of Carmel-By-The-Sea v. U.S. Dept. of Transportation</u>, 95 F.3d 892 (9th Cir. 1996) for the proposition that NEPA requires agencies to consider new alternatives when project needs change.

<u>Carmel-By-The-Sea</u> is factually distinguishable. In <u>Carmel-By-The-Sea</u>, the original project needs were simply to improve highway capacity and level of service. <u>Id.</u> at 903. However, the FEIS set forth the more precise goal of attaining a specified level of service (in this case, level of service "C" on a graded scale of "A - F"). The Ninth Circuit held that NEPA required the defendants to study

29

additional alternatives in light of the revised project needs.  In contrast, the project

needs of the case at bar have never changed.

Plaintiffs misapprehend the effect of the amended Demonstration Act,

suggesting that Chambersburg is no longer the focal point of the legislation:

> The title block for the original provision was altered to remove
> any reference to Chambersburg and the law was amended to
> read that '[t]he Secretary shall carry out . . . projects in the
> counties of Bedford, Blair, Centre, Franklin, and Huntingdon,
> Pennsylvania' using the funds previously earmarked for the
> interchange.

(Doc. 83, pg. 33) (quoting Pub. L. No. 104-59 (Section 304)).  This statement is

patently incorrect.  The amendment did not delete the provision requiring the

Agencies to complete a project providing access to Chambersburg and it did not

insert a disjunctive making the interchange project only one option.  The 1995

amendment provided authorization for other projects in addition to the

interchange project.  See Pub. L. No. 104-59 (Section 304) ("and other projects in the

counties of . . .").  The amendment did not alter the needs of the interchange

project.

The court does not believe Congress intended the 1995 amendment as a

direction to abandon eight years of planning to pursue other unrelated projects.

"The plain meaning of the statute controls unless the language is ambiguous or

leads to absurd results."  U.S. v. One "Piper" Aztec "F" De Luxe Model 250 PA 23

Aircraft Bearing Serial No. 27-7654057, – F.3d –, 2003 WL 751584 (3d Cir. 2003) (citing

Abdul-Akbar v. McKelvie, 239 F.3d 307, 313 (3d Cir.2001)).  The amended

Demonstration Act is unambiguous.  Congress's use of the conjunctive clearly

supports this court's construction of this statutory language.  See id. ("and other

projects in . . .").  Thus, plaintiffs' NEPA claim based upon the amended

Demonstration Act is unavailing.

G.    ***Greene Township's Comprehensive Plan***

Plaintiffs claim that the Agencies failed to reconcile Alternative D. M. with

Greene Township's comprehensive plan in violation of NEPA.  FHWA has

promulgated the following regulation pertinent to this issue:

> To better integrate environmental impact statements into State
> or local planning processes, statements shall discuss any
> inconsistency of a proposed action with any approved State or
> local plan and laws (whether or not federally sanctioned).
> Where an inconsistency exists, the statement should describe
> the extent to which the agency would reconcile its proposed
> action with the plan or law.

40 C.F.R. § 1506.2(d).

The Agencies expressly considered the inconsistencies between the Walker

Road alternatives and the transportation component of Greene Township's

comprehensive plan.  In accordance with 40 C.F.R. § 1506.2(d), the Agencies

addressed these inconsistencies in the EIS documents.  See, e.g., AR-12 at ES-22-23;

AR-46 at ES-23, ES-29, I-12.  Plaintiffs argue that the Agencies failed to "describe

the extent to which the agency would reconcile its proposed action with the

plan . . . ."  40 C.F.R. § 1506.2(d).  The Agencies respond that reconciliation is

impossible because the comprehensive plans of Greene Township and Franklin County are contradictory.  See AR-136 at 1446 (Franklin Township's plan favors construction of a new interchange that would "provide an alternative route for traffic that will reduce these problems along Route 30."); AR-86 at 16; AR-142 at 860 (stating that Greene Township disfavors construction of an interchange in the Walker Road vicinity because the township feels that it would interfere with the agricultural character of the area).

The court finds that the Agencies' failure to state explicitly the impossibility of complete reconciliation does not violate 40 C.F.R. § 1506.2(d) and NEPA.  "The federal regulation does not require that the Service bow to local law--only that it consider it."  Glisson v. U.S. Forest Service, 138 F.3d 1181, 1183 (7th Cir. 1998).  The Agencies discussed the conflict between Alternatives C, D, D-C and Alternative D. M. and Greene Township's comprehensive plan on numerous occasions.  See, e.g., AR-12 at ES-22-23; AR-46 at ES-23, ES-29, I-12.  Moreover, the conflict is based on Greene Township's desire to protect its farmlands and agricultural areas.  The Agencies discussed the potential impacts in Greene Township and the measures taken to minimize those impacts at great length throughout the NEPA process.

Remand for further explanation under Section 1506.2(d) is unnecessary.  The court finds that the Agencies' conduct was sufficient to comply with NEPA and Section 1506.2(d).  Glisson, 138 F.3d at 1138.

**VI.**    **Alleged Violations of NHPA Section 106**

Plaintiffs allege that the Agencies failed to evaluate the project's impact on certain historical resources in violation of Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f.  Plaintiffs claim that the Agencies intentionally narrowed the boundaries of the historic resources study area and that

> [t]hese attempts to avoid compliance with historic preservation laws have been repeatedly recognized by the Pennsylvania Historic and Museum Commission ("PHMC"), which has ruled that the project will have an "adverse effect" on historic resources.

(Doc. 85, pg. 41).  Specifically, plaintiffs contend that the Agencies' improperly excluded the Gass House and the Franklin County Poor House ("Poor House")[11] from the historical impact analysis.  The Agencies assert that these properties are outside of the area of potential effect and will not be adversely affected.  The court agrees.

Like NEPA, NHPA imposes upon federal agencies only procedural requirements.  See Connecticut Trust for Historic Preservation v. I.C.C., 841 F.2d 479, 484 (2d Cir. 1988) (finding that "NEPA and NHPA require only that agencies acquire information before acting.").  See also Concerned Citizens Alliance, Inc. v.

---

[11] The Gass House and Poor House are located on Franklin Farm Lane approximately one mile from Alternative D. M.  AR-110 at 10.

Slater, 176 F.3d 686, 695 (3d Cir. 1999).  In pertinent part, Section 106 of NHPA

provides:

> [t]he head of any Federal agency having direct or indirect
> jurisdiction over a proposed Federal or federally assisted
> undertaking . . . shall, prior to the approval of the
> expenditure . . . take into account the effect of the undertaking
> on any district, site, building, structure, or object that is
> included in or eligible for inclusion in the National Register.
> The head of any such Federal agency shall afford the Advisory
> Council on Historic Preservation established under part B of
> this subchapter a reasonable opportunity to comment with
> regard to such undertaking.

16 U.S.C. § 470f.

NHPA does not require an agency to study every historic property in the

same region as a proposed project.  Instead, the agency is charged with studying

only those properties located in the area of potential effect ("APE").  36 C.F.R. §

800.16(d).  The APE is defined as follows:

> the geographic area or areas within which an undertaking may
> directly or indirectly cause alterations in the character or use of
> historic properties, if any such properties exist. The area of
> potential effects is influenced by the scale and nature of an
> undertaking and may be different for different kinds of effects
> caused by the undertaking.

36 C.F.R. § 800.16(d).

The Agencies prepared an Historical Structures Inventory & Determination

of Eligibility Report (AR-7), a Rural Historic Landscape Assessment (AR-50), a

Criteria for Effect Report (AR-9) , and an Addendum to the Criteria of Effect

Report.  (AR-70).  The Agencies, in cooperation with the Advisory Council on

Historic Preservation ("ACHP") and Pennsylvania Historic and Museum Commission ("PHMC"),[12] determined APEs for the Kriner Road and Walker Road alternatives.  See AR-110 at 9-11 (letter from PennDOT official explaining the project APEs).  Review of these documents reveals an extensive evaluation of properties within the APEs.  The Gass House and Poor House are outside of the APE for the Walker Road alternatives and, thus, were not studied.  Id.

   Plaintiffs assert that the agencies failed to study all historic properties within the "project study area" in violation of NHPA.  (Doc. 85, pg. 33-34) (citing Colorado River Indian Tribes v. Marsh, 605 F.Supp. 1425 (C.D.Cal. 1985)).  Unlike the APE, the project study area comprises the entire geographic area in which the Agencies considered locations for the proposed interchange.  Plaintiffs' reliance on Colorado River is misplaced.  In Colorado River, the defendants proposed a project which required them to work on a riverbed.  Relying on a *proposed* regulation, the defendants studied only the "permit area" instead of the entire APE.  The court found that the Agencies failure to study the entire APE violated NHPA.  Colorado River, 605 F.Supp. at 1435, 1438. In this case, the Agencies properly evaluated the historical resources within the APE.  See, e.g., AR-7; AR-50.  Hence, Colorado River lends no support to plaintiffs' argument.

---

[12] PHMC is Pennsylvania's State Historic Preservation Officer ("SHPO"). Friends of the Atglen-Susquehanna Trial, Inc. v. Surface Transp. Bd., 252 F.3d 246, 256 (3d Cir. 2001).

In May 1999, the Advisory Council on Historic Preservation informed the Agencies that they had met their obligations under NHPA.  AR-82, Attachment F. The court agrees.  The record demonstrates that the Agencies selected a reasonable APE, fully evaluated all historic properties within the APE, consulted with ACHP and PHMC, and integrated those organizations' comments into the decision-making process.  "Section 106 does not require more."  <u>Concerned Citizens Alliance</u>, 176 F.3d at 697.  Therefore, the court will grant the Agencies' motion for summary judgment on plaintiffs' NHPA claims.

**VII.    <u>Alleged Violation of the Demonstration Act</u>**

The Demonstration Act requires the project to meet two criteria: (1) provide access to Chambersburg, Pennsylvania, and (2) relieve traffic congestion on an existing interchange.  Pub. L. No. 100-17 (Section 149(a)(74)), 101 Stat. 132, *as amended by*, Pub. L. No. 104-59 (Sections 340(c)(1) & (2)), 109 Stat. 568 (Nov. 28, 1995).

Plaintiffs allege that Exit 6 is not congested.  Consequently, plaintiffs claim that the selection of Alternative D. M. violates the second criteria[13] of the Demonstration Act.[14]

The Agencies' conclusion that the project will relieve congestion on Exit 6 relies on a broad, yet practical, view of the area.  In response to public comment, the Agencies explained:

> [t]he existing Exit 6 interchange itself is not a traffic problem. The traffic congestion on U.S. Route 30 and at the interchange is a result of the limited number of lanes on U.S. Route 30 on either side of the Exit 6 interchange.

AR-29 at 27 (Response No. 17).

Other courts have noted, and it is readily apparent to this court, that conditions on one road affect the flow of traffic on connected roads.[15]  Coalition on Sensible Transp., 826 F.2d at 69.  The record supports the Agencies' conclusion that the intersection at Walker Road and Route 30 depresses the rate of travel through the Exit 6 interchange.  See AR-46 at I-18.  Despite the artificially low level of

---

[13] It is undisputed that Alternative D. M. will provide much needed access to Chambersburg, Pennsylvania, thereby satisfying the first criteria of the Demonstration Act.

[14] Our scope of review is the same as under NEPA. The court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706.

[15] This is a phenomenon that any rush hour traveler on or near the Capital Beltway in Harrisburg, the Schuylkill Expressway in Philadelphia, or the Parkway in Pittsburgh will experience.

service readings for the Exit 6 interchange, the Agencies found that "[i]f only an interchange to I-81 at Walker Road is constructed, the congestion (V[olume] / C[apcity] ratio) in the interchange area is reduced by 41% over the no-build condition in the P.M. peak and by 59% in the A.M. peak."  AR-46 at I-18.  In real numbers, Alternative D. M. will "remove a minimum of 6,000 vehicles from the I-81/U.S. Route 30 interchange" per day.  AR-78 at 73.  Thus, the record clearly supports the Agencies' conclusion that Alternative D. M. will relieve congestion on an existing interchange.  The court will grant the Agencies' motion for summary judgment on plaintiffs' Demonstration Act claim.

**VIII.** **Conclusion**

The court will issue an appropriate order incorporating the rulings set forth in this opinion.

                                              S/ Christopher C. Conner
                                              CHRISTOPHER C. CONNER
                                              United States District Judge


Dated:   March 24, 2003